## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-21724** |
| | **BLOOM/McAliley** |
| Plaintiff, | |
| v. | |
| CARNIVAL CORPORATION, | |
| Defendant. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23588** |
| | **BLOOM/Louis** |
| Plaintiff, | |
| v. | |
| MSC CRUISES SA, | |
| MSC CRUISES SA CO, and | |
| MSC CRUISES (USA) INC., | |
| Defendants. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23590** |
| | **BLOOM/Louis** |
| Plaintiff, | |
| v. | |
| ROYAL CARIBBEAN CRUISES, LTD., | |
| Defendant. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23591** |
| | **BLOOM/Louis** |
| Plaintiff, | |
| v. | |
| NORWEGIAN CRUISE LINE HOLDINGS LTD., | |
| Defendant. | |
| _____/ | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants Carnival Corporation d/b/a Carnival Cruise Line ("Carnival"); MSC Cruises S.A., MSC Cruises SA Co., and MSC Cruises (USA) Inc. (collectively, "MSC Cruises"); Royal Caribbean Cruises Ltd. ("Royal Caribbean"); and Norwegian Cruise Line Holdings Ltd. ("Norwegian" and, collectively with Carnival, MSC, and Royal Caribbean, "Defendants"), pursuant to Local Rule 56.1, submit its statement of undisputed material facts as to which there is no genuine issue to be tried.

## Ownership of Time and Scope-Limited Concession

1. Plaintiff possessed nothing more than a non-exclusive, time-limited right to operate a cargo-services business *at* the Havana Cruise Port Terminal (the "Terminal"). **Ex. 1**, Expert Report of Ambar Diaz, Esq. (the "Diaz Report), at 21, Conclusion 3 (March 19, 2021).

2. Plaintiff had no right to exclude third parties from the Terminal. **Ex. 1**, Diaz Report at 16, 21, Conclusions 4, 6 (citing **Ex. 2**, Law of Ports Arts. 12, 44, 48).

3. Plaintiff had no right to operate passenger services or prevent passenger ships (such as cruise lines) from docking at the Terminal. **Ex. 1**, Diaz Report at 7, 15-17 and **Ex. 3** (*in globo*), Art. 2, Decree 1944 of 1920.

4. The Cuban Government always retained ownership and control over the use of the shoreline and any piers built on the shoreline at the Terminal, including the San Francisco Pier ("Pier 1") that Defendants allegedly used at the Terminal. **Ex. 1**, Diaz Report at 21, Conclusion 1 and 2 (citing **Ex. 2**, Law of Ports Art. 1, 2, 4 and 13).

5. Plaintiff's limited rights to use the Terminal were granted pursuant to and circumscribed by the provisions of the General Law of Public Works for the Island of Cuba and the Law of Ports for the Island of Cuba. **Ex. 1**, Diaz Report at 4, 10, 12, Law of Ports, Arts. 1, 1.2, 2, 4, 18, 21 and **Ex. 4**, Law of Public Works, Arts, 1, 2, 4, 72, 119.

6. The purpose of this administrative concession, like all administrative concessions under Cuban law, was to delegate work on public property to the private sector for the public's use and benefit. **Ex. 1**, Diaz Report at 5-7 (citing **Ex. 4**, Law of Public Works Art. 1).

7. Plaintiff's Concession began in 1905 as a proposal by Sylvester Scovel (who owned Plaintiff's predecessor) to the Cuban Government "to build a dock for public use" in Havana Harbor in exchange for the right to operate a cargo loading and unloading business. **Ex. 1**, Diaz Report at 7 (citing Scovel Proposal at 5-6).

8. The rights granted to Plaintiff, and the construction and the operation of the piers at the Terminal, were highly regulated and controlled by the Cuban Government. **Ex. 1**, Diaz Report at 6-12 (citing **Ex. 2**, Law of Ports, Arts. 18 and 21) and **Ex. 4**, General Law of Public Works, Art. 64.

9. After finding that the proposal complied with the applicable Cuban laws for such projects, the State entered five presidential decrees spanning from 1905-1934 that defined Plaintiff's rights, all of which confirmed that these were for public use. **Ex. 1**, Diaz Report, **Ex. 3** (*in globo*), (identifying Decree 85 of 1905, Decree 467 of 1905, Decree 1022 of 1910, Decree 184 of 1911, and Decree 1944 of 1929).

10. Plaintiff did not have a monopoly over its use of the Terminal. **Ex. 1**, Diaz Report p. 15; and **Ex.** 2, Law of Ports, Arts. 44, 48, 49, and **Ex. 3** (*in globo*) (Decree 467, Condition No. 2).

11. The only right afforded to Plaintiff was the right to operate a cargo business, which was the purpose of the concession. Diaz Report at 16 and **Ex. 3** (*in globo*) Decree 1944 p. 2 ("The proposed works will undoubtedly facilitate the merchandise handling operations, and will additionally result in greater available capacity at the aforesaid docks, thereby meeting a significant need and affording significant advantage of being able to transport cargo intended for the interior of the Republic").

12. Mr. Scovel's proposal offered to rebuild a booth for providing passenger services that had previously existed at this part of the Port of Havana – and offered to deliver that passenger booth *to the Cuban Government*. **Ex. 1**, Diaz Report at 17.

13. This offer was memorialized in the Concession and subsequent Presidential Decrees, which required Plaintiff and its predecessors to deliver the reconstructed passenger booth to the Government upon their completion. *Id*. (citing Decree 467, Condition No. 17).

14. Since passenger services had previously existed at this location, and under the Law of Ports the Concession could not alter "prior rights to the use of the port and its works," the delivery of the passenger booth to the Republic of Cuba only confirms that Plaintiff and its predecessors never had a right to control or even offer passenger services at the Terminal. **Ex. 1**, Diaz Report at 17 (quoting **Ex. 2**, Law of Ports, Art. 49).

15. In a November 3, 2018 email from a shareholder of Plaintiff, Robert MacArthur, whose father's company had built the Terminal's piers, to Plaintiff's President Mickael Behn, Mr.

2

MacArthur cautions Mr. Behn not to mislead the public about what assets Plaintiff owned in Cuba, specifically that HDC did not own the property. **Ex. 2** (HDC 015213) at 015215.

16. Similarly, in a submission to the Foreign Claims Settlement Commission (the "FCSC"), Plaintiff said that it "offers docking and warehousing facilities for import and export, bonded warehouses and provisional *cargo* deposits for merchandise pending customs appraisement, etc." **Ex. 3**, HDC-CCL 000596 at 000596.

17. In its April 27, 1967 claims application, submitted by then Plaintiff's Vice President Thomas Whittaker, Plaintiff states it owns real estate in Havana made up of "land and concessions." **Ex. 4**, HDC-CCL 000552; **Ex. 5**, HDC-CCL 000353 at 000356.

18. In addition, in answering specific questions posed by the FCSC regarding the extent of HDC's property in Cuba, it stated:

> Answers to:
>
> INFORMATION QUESTIONNAIRE FOR
> UNITED STATES PROPERTY OWNERS IN CUBA
>
> The HAVANA DOCKS CORPORATION owns and operates in Havana Harbor, three Ocean Steamship piers, named respectively, the San Francisco, Machina and Santa Clara piers linked by a marginal building. This terminal company offers docking and warehousing facilities for import and export, bonded warehouses and provisional cargo deposits for merchandise pending customs appraisement, etc.

**Ex. 3**, HDC-CCL 000596 at 000596.

### Lawful Travel Exclusion

19. When Norwegian and Royal Caribbean applied to OFAC for a specific license to cruise to Cuba, OFAC responded, in writing, that given the existence of the general license to travel to Cuba, nothing more or more specific was required. **Ex. 6**, RCL-Havana417-18; **Ex. 7** RCL-Havana419-634; **Ex. 8**, RCL-Havana635-768; **Ex. 9**, RCL-Havana769; **Ex. 10** (NCLH_23591-00556558) at NCLH_23591-00556558; **Ex. 11**, NCLH_23591-00027586 at NCLH_23591-00027586. This general license covered all Defendants here. *See* 31 C.F.R. § 515.572(a)(2).

20. Defendants did not *begin* cruising to Cuba until after the U.S. Government issued licenses authorizing them to do so. **Ex. 12**, Resp. to First Interr. at No. 3(c); **Ex. 13**, RCL-Havana 1021; **Ex. 14**, HavanaDocks_0359965; **Ex. 15**, HavanaDocks _0359958; **Ex. 16**, Dec. 22, 2020, Perez Dep., Tr. 21:13–22:03; Comp. **Ex. 17**, HavanaDocks_0345551; **Ex. 18**, HavanaDocks _0345553; **Ex. 19**, MSC's First Supp. Resp. to First Interr. at No. 3(c)-(d); **Ex. 20**, Norwegian's

3

Second Am. Resps. and Objs. to No. 3(c) of Havana Docks Corporation's First Set of Interrogs. at 4; **Ex. 21**, NCLH_23591-00019453 at 11.

21. Defendants *stopped* cruising to Cuba as soon as the regulations were again amended, effective as of June 5, 2019, to end commercial cruise travel to Cuba. **Ex. 12**, Resp. to First. Interr. at No. 3(c); **Ex. 22**, RCL-Havana 1021; **Ex. 19**, First Supp. Resp. to First Interr. at No. 3(c)-(d); **Ex. 20**, Norwegian's Second Am. Resps. and Objs. to No. 3(c) of Havana Docks Corporation's First Set of Interrogs. at 4; **Ex. 21**, NCLH_23591-00019453 at 6; **Ex. 23**, Jul. 29, 2021, Arnold Donald at 145:07-146:08.

22. During the time they were sailing to Havana, Defendants' ships docked at Pier 1, which is one of the three piers at the Terminal. **Ex. 24**, Delgado Depo., 77:2-78:11; **Ex. 25**, Allen Depo., 25:17-26-3; **Ex. 26**, Stein Depo., 112:13-113:5; Stein Depo Ex. 2, p.8); **Ex. 27**, Resp. to Third Interr. at No. 2; **Ex. 28**, Deposition of Mario Parodi as Corporate Representative of Norwegian Cruise Line Holdings Ltd. ("Parodi Dep.") at 164:24-165:18 (Nov. 5, 2020)); **Ex. 29**, Norwegian's Resps. and Objs. to No. 2 of Havana Docks Corporation's Second Set of Interrogs. at 2; **Ex. 30**, Deposition of Giora Israel as Corporate Representative of Carnival Corporation ("Israel Dep.") at 145:07-146:08; **Ex. 31**, HavanaDocks_0378115; **Ex. 32**, HavanaDocks_0378131; **Ex. 33**, HavanaDocks_0385087; **Ex. 34**, HavanaDocks_0386061; **Ex. 35**, HavanaDocks_0386325; **Ex. 36**, HavanaDocks_0412496; **Ex. 37**, HavanaDocks_0412509; **Ex. 38**, HavanaDocks_0413044; **Ex. 39**, HavanaDocks_0413052; **Ex. 40**, HavanaDocks_0413138; **Ex. 41**, HavanaDocks_0413834; **Ex. 42**, HavanaDocks_0413842; **Ex. 43**, HavanaDocks_0438942.

23. The Cuban Government required Defendants to dock at that pier, at that terminal, when calling in Havana. On multiple occasions Defendants asked the Cuban Government for permission to anchor their ships offshore and "tender" passengers ashore, as well as to dock at other facilities in Havana (such as the Port of Mariel) or at other cities located nearby Havana (such as Matanzas), *but the Cuban Government did not authorize any such request*. **Ex. 24**, Delgado Depo., 89:11-16 (no other option in Havana), 193:23-196:3 (unsuccessfully requested to dock somewhere other than the Terminal, including in Matanzas), 203:17-204:15 (unsuccessfully requested permission to tender), 205:8-13 (unsuccessfully requested to dock somewhere other than the Terminal or to anchor offshore), 205:23-206:3 (required to use Terminal), 206:4-18 (not permitted to tender), 206:19-207:12 (not permitted to dock in Matanzas), 207:13-209:6 (not

permitted to dock at a different facility in Havana that would have accommodated even the largest ships), 213:15-215:11 (the contracts' references to "Terminal de Cruceros de la Habana" are references to the Terminal); **Ex. 26**, Stein Depo., 54:9-57:9 (required to use the Terminal because were orally told to, and contract specified use of, the Terminal; port agent's form specified that tendering was not permitted), 106:23-107:9 (required to use the Terminal because Cuban vessel pilots physically took the vessels to the terminal, contracts specified use of the terminal, and were orally required to use terminal; port agent's form specified that tendering was not permitted), 109:18-110:4 (required to use the Terminal), 111:5-22 (required to use the Terminal in Havana); Stein Depo. Ex. 2, pp. 5-7, *see also* Stein Depo., 68:23-71:11 (verifying accuracy of information in Ex. 2 of the Stein Depo.); **Ex. 44**, Adam Goldstein Depo., 39:21-40:17 (explaining what a "tender' is); **Ex. 45**, RCL-Havana78270 ("Please note that tendering at the Bay of Havana remains a BIG no, so far."); **Ex. 1**, Diaz Report, pp. 28-32); **Ex. 46**; **Ex. 47** (MSCCUSA000000079403); **Ex. 48**; **Ex. 49**; **Ex. 50**, HavanaDocks_0358180–181; **Comp. Ex. 51**, HavanaDocks_0353427–438, HavanaDocks_0419093; HavanaDocks_0363233; **Ex. 52**, HavanaDocks_0438773–789; **Ex. 1**, Diaz Expert Rpt., 4, 23 ("the use of ship tenders is not permitted in the port of Havana"), 27 and Ex. 2 ( Law of Ports, Arts., 1, 2, and 4), Ex. 3 (Pres. Decree No. 467 of 1905, Arts., 28–29), and Ex. 4 (Decree 467, Art. 2); **Ex. 53**, Oct. 22, 2020, Israel Dep. Tr., 139:21–140:14, 141:05–19; 149:20–150:01; 151:23–152:03; 145:20–23; 138:06–12; 120:14–121:13; 101:12–102:14; 122:10–14; 132:02–16 and Ex. 8; **Ex. 30**, Dec. 3, 2020, Israel Dep. Tr., 174:09–16; 197:02–198:02; **Ex. 16**, Dec. 22, 2020, Perez Dep. Tr. 24:10–17 ("That was the only facility available to sail to Havana."); 25:20–21; **Ex. 54**, Mio Dep., 86:15–87:5 (authorities said it was "not possible [and] not allowed" to anchor and tender), 87:15-25, 98:14-22, 114:17-22; **Ex. 55**, Pastena Depo., 107:9-15 ("[The Cuban] authority denied the container terminal of Havana. The only option you have is to go at [Pier No. 1] north without any dolphin, any – any facility. This is . . . the authorization we receive."), 108:23–109:1, 111:8-13, 115:16-20, 134:9-20; **Ex. 56,** Onorato Dep., 136:15-22 ("[T]he Cuban authorities . . . said that this was not possible to use this pier [at the TCH] because they could not have customs and immigration operations there for all the passengers. That's why they gave us as the only option the [Pier No. 1]."); **Ex. 57,** Del Rio Dep., 234:12–236:4 (Cuban Government said had to use the Terminal in Havana, and rejected request to use the Port of Mariel); **Ex. 58**, Farkas Dep., 16:3-16:11, 18:6-18:15 (Cuban Government repeatedly said had to use the Terminal and could not tender and then use some secondary pier to disembark passengers); **Ex.**

5

**59**, Cruz Dep., 28:7–28:16, 62:2–62:9 (considered and researched other ports near Havana, including Mariel); **Ex. 60**, NCLH_23591-00017356 at NCLH_23591-00017356 (anchoring proposal); **Ex. 61**, NCLH_23591-00017179 (same); **Ex. 62**, NCLH_23591-00017357 at NCLH_23591-00017357-58 (same); **Ex. 63**, NCLH_23591-00017359 at NCLH_23591-00017359-60(same); **Ex. 64**, NCLH_23591-00014456 at NCLH_23591-00014456 (anchoring and tendering not allowed in Havana); **Ex. 65**, NCLH_23591-00015571 at NCLH_23591-00015571-89 (second anchoring proposal); **Ex. 57**, Del Rio Dep., 231:17–231:25) (no response to second anchoring proposal); **Ex. 66**, NCLH_23591-00006355 at NCLH_23591-00006355 (noting that as of late March 2019, "tendering is still not allowed and we have no hope that it will be anytime soon"); **Ex. 67**, Skogland Dep. at 12:17-20, 36:7-14, 77:2-6, 79:3-17, 80:15-81:5, 81:7-21, 83:4-6 (because Viking Cruises was "unable to secure the slots at the [cruise] terminal in Havana due to other traffic," Viking instead reserved berth space in Cienfuegos and Santiago de Cuba to sail to those cities from Miami could not sail into Havana, despite the fact that Viking "did not cease looking for long-term solutions for having our ships docked in Havana").

24. Indeed, when Defendants' ships arrived in Havana, the Cuban harbor pilots physically boarded the ships and they *themselves* docked the ships at Pier One. **Ex. 68**, RCL-Havana11532-11565, 11547 (row 8), 11548 (rows 17-18); **Ex. 69**, RCL-Havana80835-80868, 80835-36, 80839-40; **Ex. 70**, RCL-Havana80798-80830; **Ex. 71**, RCL-Havana 202129-202162; **Ex. 72,** HavanaDocks_0353423–425 ("pilots will be dispatched to meet you at seabouy (approx. 1-3 miles out), will "board on starboard side," and will advise port authority to position the gangway furthest west" on the Havana pier); **Ex. 73**, HavanaDocks_0353427–438; **Ex. 74**, HavanaDocks_0377819 ("The pilot normally boards the vessel between 1 ½ miles to 2 miles East of the sea buoy"); **Ex. 75**, HavanaDocks_0363301; **Ex. 76**, HavanaDocks_0444392 ("The Harbour Master is the person who gives authority for anyone to enter the Port, he even has to give the Pilot permission to board the ship."); **Ex. 1**, Diaz Expert Rpt., 28–29 and Ex. 7, MINTRANS, Res. 251, Art. 34.2.; **Ex. 28**, Parodi Dep., 138:15-138:24 (pilotage services are when a local pilot boards the ship outside the port to drive it to the berth); **Ex. 77**, NCLH_23591-00021644 at NCLH_23591-00021646 (pilotage was a "[c]ompulsory service" that Mambisa provided).

25. Further, even if tendering had been allowed, the passengers would *still* need to be transported to the Terminal for required tasks such as customs and immigration. **Ex. 20**, Norwegian's Second Am. Resps. and Objs. to No. 2 of Havana Docks Corporation's First Set of

Interrogs. at 2 (explaining that the Terminal exclusively houses medical screening, immigration, and customs for passengers traveling on a cruise carrier vessel); **Ex. 77**, NCLH_23591-00021644 at NCLH_23591-00021651 (detailing in the "CLEARANCE" section that "[a]ll crew and pax [p]assports to be checked at the terminal"); **Ex. 1**, Diaz Expert Rpt., 29 ("[T]he Cruise Terminal is the only permitted point of disembarkation."); **Ex. 78**, Apr. 27, 2021, Perez Dep. Tr. 189:04–16; **Ex. 79**, Pastena Decl., ¶ 19; **Ex. 80**, Cancio Dep., 39:16-40:5 (Nov. 12, 2020)) ("Q. Do you know – if there's several stops – if a cruise ship has several stops in Cuba on the itinerary, do passengers have to clear customs and immigration at every stop? A. Yes."), 42:22-43:3 ("Q. Okay. When a ship anchors offshore in Cuba, can the Cuban Government officials that perform customs and immigration come . . . onto the ship and perform their services on the ship? A. No."); **Ex. 28**, Parodi Dep., 58:7-59:25, 60:10-62:25 (testifying Norwegian unsuccessfully offered to the Cuban Government to have the officials clear the passengers onboard the ships in Havana, Cuba).

26. Furthermore, Defendants' contracts with the Cuban government required Defendants to use the terminal in Havana. **Ex. 46**; **Ex. 47** (MSCCUSA0000079403 at 79404) (2018 MSC S.A. contract with Aries requiring use of "Cruise Terminal of Havana"); **Ex. 48** (NCL contracts); **Ex. 49**; **Ex. 53**, Oct. 22, 2020, Israel Dep. Tr., 124:11–15 ("Finally, it is the [Terminal] contract that the Cuban Government had presented us with no choices. That's the place we're going to. It was never a choice, and our contract specifically specified where we are going.") and Ex. 8; **Ex. 47** (MSCCUSA0000079403) (2018 MSC S.A. contract with Aries requiring use of "Cruise Terminal of Havana"); **Ex. 48** (NCLH_23591-00524981) at NCLH_23591-00524989-90; **Ex. 24**, Delgado Depo., 213:15-215:11 (the contracts' references to "Terminal de Cruceros de la Habana" are references to the Terminal); **Ex. 26**, Stein Depo., 54:9-57:9 (required to use the Terminal because, among other reasons, contract specified use of the Terminal);

27. On multiple occasions, HDC demanded that the U.S. Department of State enforce the Helms-Burton Act against the Defendants on the basis that their use of the Terminal was supposedly illicit trafficking for the purposes of the Act. **Ex. 81**, HDC 001498 at HDC 001498, 001501 (referring to the "3 separate occasions when I presented these facts to State Department officials and requested a Title IV action against the foreign executives and directors of cruise lines"); **Ex. 82**, HDC Depo., 130:25-133:10, 145:5-146:15 (describing meeting between HDC, Garcia-Bengochea, and State Department); **Ex. 82**, HDC Depo., 139:1-25 (Plaintiff gave Bengochea ""permission to represent us in correspondence like the email we are looking at"); *id.*

7

133:2-7; **Ex. 83**, HDC 014348 at 14348 (Bengochea says he is "partnered" with Plaintiff), *id.* at 14350 (Bengochea says he "represent[s]" Plaintiff).

28. The U.S. Government repeatedly told HDC that the cruise lines' use of the SMT was within the lawful travel exclusion contained in the Helms-Burton Act. **Ex. 84**, HDC 016084 at 016084) (email from the State Department to HDC) ("As previously discussed, given the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba, we [the U.S. Department of State] are not currently pursuing Title IV actions in relation to commercial cruise lines."); **Ex. 85**, Deposition of Deanna Kim ("Kim Dep.") at 21:25-22:5 (Apr. 14, 2021); **Ex. 86**, HDC 001013 at HDC 001013 (email from HDC to the State Department) (acknowledging a State Department representative's "assertion [during an in-person meeting] that the cruise lines were not trafficking by virtue of Sec. 401(c)(2)(B)(iii) of H-B," which is the lawful travel exclusion); **Ex. 82**, HDC Depo., 147:1-11, 149:23-25);  **Ex. 87**, HDC 013553 at HDC 013554  ("Heretofore The State Department has asserted that the use of the confiscated port properties in Cuba has been 'necessary' to the conduct as such travel as allowed for in the law."); **Ex. 82**, HDC Depo., 151:1-152:11; **Ex. 88**, HDC 001328 at HDC 001328 ("The State Dept. lawyer specifically told me they viewed docking on our property as 'necessary' and so they wouldn't consider it trafficking."); **Ex. 89**, HDC 001498 at HDC 001501 ("On 3 separate occasions when I presented these facts to State Department officials and requested a Title IV action against the foreign executives and directors of the cruise lines, State officials determined without any investigation that it was necessary for the cruise lines to use our properties to cruise to Cuba."); **Ex. 82**, HDC Depo., 166:22-167:23).

<u>**No United States Principal Place of Business**</u>

29. Plaintiff is a corporation organized under the laws of the State of Delaware. **Ex. 90**, Havana Docks Corporation's Second Am. Answer and Objs. to Interrog. No. 4 to Def.'s Second Set of Interrogs. at 2.

30. In 2019, Plaintiff had two directors and officers – Mickael Behn and Jerry Johnson. **Ex. 91**, Havana Docks Corporation's Second Am. and Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 3–4.

31. In 2019, and long before then, Mickael Behn was Plaintiff's President, a director, and a shareholder. **Ex. 91**, Havana Docks Corporation's Second Am. And Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 4; **Ex. 92**, Johnson as Corporate

Representative of Havana Docks Corporation Dep. at 34:4–34:8, 60:5–60:9, Case No. 19-23591 (Dec. 8, 2020); **Ex. 93**, Behn Dep. at 130:13–130:16, Case No. 19-23591 (Dec. 14, 2020).

32. Mickael Behn's great-grandfather created Plaintiff and later transferred responsibility for Plaintiff's management to Mickael Behn's grandfather prior to Mickael Behn assuming control of Plaintiff. **Ex. 94**, HDC 001493 at HDC 001493.

33. In 2019, Jerry Johnson was Plaintiff's Secretary and Treasurer, and he has never been a shareholder. **Ex. 91**, Havana Docks Corporation's Second Am. And Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 3; **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 34:11–34:13, Case No. 19-23591 (Dec. 8, 2020).

34. In 2019, Jerry Johnson was thus the only director and officer of Plaintiff with no equity ownership interest in Plaintiff. **Ex. 91**, Havana Docks Corporation's Second Am. And Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 3; **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 34:11–34:13, 60:5–60:9, Case No. 19-23591 (Dec. 8, 2020).

35. Mickael Behn acquired by gift in April of 2019 46 shares – making him among of the three largest shareholders of Plaintiff (Mickael Behn's relatives in 2019 each owned 46 shares of Plaintiff, meaning that together the Behn family members own 138 of the 171 outstanding shares of Plaintiff). **Ex. 90**, Havana Docks Corporation's Second Am. Answers and Objs. to Interrog. No. 4 to Def.'s Second Set of Interrogs. at 3, Ex. B; **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 60:5–60:9, Case No. 19-23591 (Dec. 8, 2020) ("Q. Which one of the shareholders is Mickael Behn? A. That would be shareholder number nine."); **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 61:8–61:24, Case No. 19-23591 (Dec. 8, 2020) ("Q. And turning back to shareholder seven . . . Who is that? . . . A. Okay. If I might explain what we were trying to say there for shareholder number seven. To the best of our knowledge, through the corporate shareholder records, the certificate was still in the name of William S. Behn, who was a son of William C. Behn. Mr. William S. Behn . . . the shareholder at the time the lawsuit was filed, was William S. Behn and he was deceased. The shares have now accrued to his daughter Melanie Behn Lucain."); **Ex. 93**, Behn Dep. at 40:1-41:7, Case No. 19-23591 (Dec. 14, 2020); **Ex. 95,** HDC 023141 at HDC 023145.

36. Since 1999, Mickael Sosthenes Behn's primary place of residence has been London, United Kingdom. **Ex. 93**, Behn Dep. at 8:4-8:11, 15:22–15:24, Case No. 19-23591 (Dec. 14, 2020) ("Q. Good. As I understand it, just before we went on the record, you gave an address in London on Wimbledon Park Road. And that's where you're currently located; is that correct? A. That is correct. Q. And is that your home address? A. That's currently where I'm – yeah, home address here currently."); **Ex. 96**, Havana Docks' Answers and Objs. to Norwegian Cruise Line Holdings Ltd.'s Am. First Set of Reqs. for Admiss. at 2.

37. At the time Plaintiff commenced this action on August 27, 2019, Jerry Johnson's primary place of residence was Lexington, Kentucky. **Ex. 91**, Havana Docks Corporation's Second Am. and Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 3.

38. Under Plaintiff's By-Laws, Plaintiff's directors are tasked with the authority to manage Plaintiff's business, who assigned that to responsibility to Mickael Behn and Jerry Johnson. **Ex. 97**, HDC 013255 at HDC 013257 ("The business of the corporation shall be managed by the directors."); **Ex. 92** (Johnson as Corporate Representative of Havana Docks Corporation Dep. at 39:22–39:24, Case No. 19-23591 (Dec. 8, 2020).

39. Half of Plaintiff's directors in 2019 resided outside of the United States. **Ex. 96**, Havana Docks' Answers and Objs. to No. 2 of Norwegian Cruise Line Holdings Ltd.'s Am. First Set of Reqs. for Admiss. at 2; **Ex. 91**, Havana Docks Corporation's Second Am. and Supplemental Answer and Objs. to Interrog. No. 1 to Def.'s Third Set of Interrogs. at 3–4.

40. Pursuant to Plaintiff's By-Laws, in 2019, Mickael Behn as Plaintiff's President was "the chief executive officer of the corporation" and given the power to have "general charge of the business and affairs of the corporation." **Ex. 97**, HDC 013255 at HDC 013259.

41. It was Mickael Behn who decided to offer Jerry Johnson a position on the board and as an officer of HDC in 2018. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 45:3–45:17, Case No. 19-23591 (Dec. 8, 2020).

42. Pursuant to Plaintiff's By-Laws, in 2019, Jerry Johnson as Plaintiff's Secretary and Treasurer had the power to "keep proper records . . . give . . . notice of all meetings," "have charge of the financial affairs of the corporation," and "perform such other duties as may be imposed upon him by the directors or the executive committee or the president." **Ex. 97**, HDC 013255 at HDC 013260.

43. Jerry Johnson reports to Mickael Behn still to this day. **Ex. 82**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 29:14–29:17, Case No. 19-23590 (Jan. 19, 2021) ("Q. On some of those more important non-routine decisions, if you and Mr. Behn disagreed, who would win out?  A.  Mr. Behn."); **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 42:5–42:12, Case No. 19-23591 (Dec. 8, 2020) ("Q. So you, as secretary, treasurer, I think you also said comptroller, you report to Mr. Behn as the president of Havana Docks Corporation, correct?  A.  Yes, sir, that is correct.  Q.  Mr. Behn, as president of the corporation, does not report to you as secretary, treasurer, and comptroller, correct?  A.  He does not.").

44. Plaintiff is not registered to do business in Kentucky. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 53:18–53:24, Case No. 19-23591 (Dec. 8, 2020) ("Q.  Is Havana Docks Corporation registered to do business in Kentucky?  A.  No, sir.").

45. As of December 2020, Mickael Behn had not been to Kentucky since he was a child. **Ex. 93**, Behn Dep. at 20:12–20:16, Case No. 19-23591 (Dec. 14, 2020).

46. Plaintiff uses the address of a bank in Lexington, Kentucky in which Plaintiff and the Behn family have bank accounts and where Jerry Johnson works, as its corporate address, but as of December 2020 Mickael Behn had never been to this address. **Ex. 98**, HDC 018866 at HDC 018873, **Ex. 93** (Behn Dep. at 21:9–21:13, Case No. 19-23591 (Dec. 14, 2020)) ("Q.  Have you ever been to the Bank of the Bluegrass . . . That Mr. Johnson mentioned to us during his deposition? I think it was on Southland Drive.  A.  Yeah, 215 Southland Drive.  No, I have not.").

47. Aside from paying Mr. Mickael Behn a monthly stipend for his work and prosecuting this lawsuit and investment work, Plaintiff has no other business. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 55:23–56:4, Case No. 19-23591 (Dec. 8, 2020).

48. Mickael Behn and Jerry Johnson primarily communicate by email and telephone. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 40:12–41:1, Case No. 19-23591 (Dec. 8, 2020).

49. Mickael Behn conducts business primarily from the United Kingdom or European Union. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 38:12–38:15, Case No. 19-23591 (Dec. 8, 2020) (testifying Mickael Behn was in London when he signed via DocuSign written consents in lieu of board director meetings); **Ex. 99**, Julian Ackert, Amended

Declaration of Julian Ackert 3 (2021) ("Based on an analysis of the available email metadata in the Production Set [HDC 000001 - HDC 018681], 41 of the 42 (98%) of the emails collected from custodian Mickael Behn that were sent from email addresses associated with Mickael Behn routed through computers physically located in the United Kingdom (UK) or European Union (EU). The email metadata for these 41 emails indicated that at the time the email was sent, the sender was geographically located in the UK or EU."); **Ex. 100**, Ackert Dep. 20:10–20:18, Case No. 19-23591 (June 22, 2021).

50. Those 41 emails concern Plaintiff's operations and/or activities and evidence Mr. Behn's overall direction of the same. *See, e.g.*, **Ex. 101**, HDC 001357 at HDC 001357 (evidencing a letter to "GPH" regarding Plaintiff's claim to confiscated property in Havana, Cuba was subject to Mr. Behn's approval and was to be sent by him as President of Plaintiff); **Ex. 102**, HDC 017586 at HDC 017586 (same); **Ex. 103**, HDC 014943 at HDC 014943 (forwarding to Bank of the Bluegrass after-the-fact a letter that Mr. Behn and Dr. Garcia-Bengochea sent to the United States Government concerning Plaintiff's claim to confiscated property in Havana); **Ex. 104**, HDC 017556 at HDC 017556 (providing Mr. Behn with a draft e-mail to the United States Government for Mr. Behn's approval); **Ex. 105**, HDC 017564 at HDC 017564 (evidencing that Mr. Behn providing approval for Dr. Garcia-Bengochea's actions); **Ex. 106**, HDC 017612 at HDC 017612 (evidencing that Mr. Behn maintained records of Plaintiff that Mr. Johnson did not).

51. Over 50% of the emails exchanged between Mickael Behn and Jerry Johnson in a sample set of 165 emails were either sent or received from the United Kingdom or European Union. **Ex. 99**, Julian Ackert, Amended Declaration of Julian Ackert 3-4 (2021) ("Based on an analysis of the available email metadata in the Production Set [HDC 000001 - HDC 018681], 114 of 165 (69%) emails collected from custodians Mickael Behn and Jerry Johnson that were communications between email addresses associated with Mickael Behn and Jerry Johnson routed through computers physically located in the UK or EU, and up to 164 out of 165 emails (99%) were routed from or to an individual located in the UK or the EU. The email metadata for these 114 emails indicates that at the time the email was sent or received, either the sender or the recipient was geographically located in the UK or EU."), **Ex. 100** (Ackert Dep. 22:12–22:20, Case No. 19-23591 (June 22, 2021)) ("The second opinion is in paragraph 12 of my report that based on the analysis of the production set data that I analyzed, 114 of 165 emails collected from Behn and Jerry Johnson were communications between email addresses associated with Behn or Jerry

Johnson, and they routed through computers physically located in the UK or EU. And up to 164 of them of the 165 were routed to or from an individual located in the UK or EU.").

52. Of 114 emails analyzed by Defendants' expert, many involve Mickael Behn providing authorization and/or approval of acts to be undertaken by an officer or agent of Plaintiff or sharing with Mr. Johnson acts that he unilaterally took on behalf of Plaintiff. *See, e.g.*, **Ex. 107**, HDC 000940 at HDC 000940 (forwarding to Mr. Johnson after-the-fact a letter that Mr. Behn and Dr. Garcia-Bengochea sent to the United States Government concerning Plaintiff's claim to confiscated property in Havana); **Ex. 108**, HDC 001137 at HDC 001137 (evidencing Mr. Behn's approval of "a large expense and [billboard] campaign"); **Ex. 109**, HDC 016251 at HDC 016251 (speaking on behalf of Plaintiff, Mr. Behn approves a final draft letter concerning Plaintiff's demands under Title IV of the Helms-Burton Act); **Ex. 110**, HDC 016254 at HDC 016254 (requesting Mr. Behn's approval on draft letter referenced in HDC 016251); **Ex. 111**, HDC 016329 at HDC 016329 (evidencing Mr. Behn's authorization in 2018 regarding social media post concerning Plaintiff's claim to confiscated property); **Ex. 112**, HDC 016398 at HDC 016398 (evidencing Mr. Behn directing Plaintiff's lobbying efforts under the Act); **Ex. 113**, HDC 016486 at HDC 016486 (evidencing Mr. Behn maintained records of Plaintiff that Mr. Johnson did not); **Ex. 114**, HDC 017556 at HDC 017556 (providing approval to draft email Mr. Johnson sent to him for his review before sending it out to the United States Government); **Ex. 105** (HDC 017564) at HDC 017564 (evidencing that Mr. Behn providing approval for Dr. Garcia-Bengochea's actions).

53. The retention of Plaintiff's accountant, corporate lawyer, and one of counsel representing Plaintiff in this suit (Mr. Rodney Margol) was done by Jerry Johnson, but with Mickael Behn's approval from London. **Ex. 93**, Behn Dep. at 97:17–97:21, 151:4–151:8, Case No. 19-23591 (Dec. 14, 2020); **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 235:7–236:1, 237:6–237:25, Case No. 19-23591 (Dec. 8, 2020) ("Q. Was it Ms. Tyler who is the CPA that you hired for HDC? A. Yes, sir. That is correct. Kimberly Tyler. Q. Okay. And did Mr. Behn approve the hiring of Ms. Tyler by HDC? A. Yes, sir . . . And likewise, did Mr. Behn then approve the hiring by HDC of Mr. Mains as the corporate lawyer? A. Yes, sir, to the best of my remembrance . . . Q. And to the best of your recollection, when Mr. Behn approved the hiring of Ms. Tyler and Mr. Mains, was Mr. Behn in London? A. I believe that would be correct.").

54. Until recently, Mickael Behn also created and managed Plaintiff's Twitter account. **Ex. 93**, Behn Dep. at 131:12–131:15, 132:11–132:14, Case No. 19-23591 (Dec. 14, 2020)); **Ex. 92,** Johnson Dep. at 57:25–58:7, Case No. 19-23591 (Dec. 9, 2020).

55. Mickael Behn is the officer who reviews and provides approval for payments, such as occasional consulting fees paid to Aphra Behn, Mickael Behn's mother, Jerry Johnson, and Aaron Johnson (Jerry Johnson's son). **Ex. 115**, HDC 021750 at HDC 021755-56; **Ex. 116**, AJohnson 0525 at AJohnson 0525 ("If you would, please send to Mickael for his review and approval with copy to me. Once we have circle back from Mickael, I will have my associate, Sherri Case, issue a check for you today."); **Ex. 117**, A. Johnson Dep. at 37:10–37:20, Case No. 19-23591 (Apr. 9, 2021).

56. Mickael Behn is the officer who reviews and provides approval of drafts of corporate governance records. **Ex. 118**, AJohnson 0088 at AJohnson 0088 ("If you would send these drafts on to Mickael for his final approval, perhaps we can get them transmitted to the shareholders for vote today, August 1, 2018."); **Ex. 119**, AJohnson 0087 at AJohnson 0087 (providing approval of draft documents sent to Mr. Behn for "final review").

57. Mickael Behn is the ultimate decision making officer for Plaintiff with respect to lobbying and legal strategy. **Ex. 120**, HDC 021512ddp at HDC 021512ddp (regarding a letter concerning Title III of the Act, Jerry Johnson writes, "Hi Mickael. See what you think about the attached edited draft"); **Ex. 121**, HDC 021720ddp at HDC 021720ddp (speaking on behalf of the "HDC camp").

58. The historical corporate records of HDC are kept in Mickael Behn's family home in Miami under his possession, custody, or control. **Ex. 122**, MAC001313 at MAC001315 ("I don't have the records of that lease at hand. They are in my house in Miami. As are the incorporation papers of the company in 1917. All that paperwork was submitted to be able to get recognition of our claims.").

59. Mickael Behn spoke to third-parties on behalf of Havana Docks Corporation, as evidenced by his Havana Docks signature block. **Ex. 123**, HDC 015350 at HDC 015350; **Ex. 124**, HDC 014705 at HDC 014705-706.

60. In return for Mickael Behn's management of Plaintiff, Mickael Behn gets paid $250.00 per month. **Ex. 115**, HDC 021750 at HDC 021751-54; HDC 021756-58.

61. Jerry Johnson receives no monthly stipend from Plaintiff. **Ex. 92**, Johnson as Corporate Representative of Havana Docks Corporation Dep. at 53:14–53:17, Case No. 19-23591 (Dec. 8, 2020).

62. On discrete occasions Jerry Johnson was compensated for specific services, which payments were specifically directed and approved by Plaintiff's President, Mickael Behn. **Ex. 115**, HDC 021750 at HDC 021755 ("JERRY M. JOHNSON DISTRIBUTION PER REQUEST OF MICKAEL BEHN FOR CONSULTING FEE").

Dated:  September 20, 2021     Respectfully submitted,

| | |
|---|---|
| **BOIES SCHILLER FLEXNER LLP**<br>401 East Las Olas Boulevard, Suite 1200<br>Fort Lauderdale, Florida<br>Telephone:  (954) 356-0011<br><br>By:/s/ *Stuart H. Singer*<br>Florida Bar No. 377325<br>ssinger@bsfllp.com<br>Meredith Schultz<br>Florida Bar No. 29536<br>mschultz@bsllp.com<br>Corey P. Gray<br>Florida Bar No. 0115473<br>cgray@bsfllp.com<br><br>Pedro A. Freyre<br>Florida Bar No. 192140<br>Pedro.freyre@akerman.com<br>**AKERMAN LLP**<br>98 S.E. 7th Street, Suite 1100<br>Miami, Florida 33131<br>Telephone:  (305) 374-5600<br><br>George J. Fowler, III (admitted *pro hac vice*)<br>gfowler@joneswalker.com<br>Luis Llamas<br>Florida Bar No. 89822<br>llamas@joneswalker.com<br>**JONES WALKER LLP**<br>201 St. Charles Avenue<br>New Orleans, LA 70170<br>Telephone:  (504) 582-8752<br><br>*Counsel for Carnival Corporation*<br><br>**VENABLE LLP**<br>600 Massachusetts Avenue | **HOGAN LOVELLS US LLP**<br>600 Brickell Avenue, Suite 2700<br>Miami, Florida 33131<br>Telephone (305) 459-6500<br>Facsimile: (305) 459-6550<br><br>By: /s/ *Allen P. Pegg*<br>Richard C. Lorenzo<br>Florida Bar No. 071412<br>richard.lorenzo@hoganlovells.com<br>Allen P. Pegg<br>Florida Bar No. 597821<br>allen.pegg@hoganlovells.com<br><br>*Counsel for Norwegian Cruise Line Holdings Ltd.*<br><br><br><br>**HOLLAND & KNIGHT LLP**<br>701 Brickell Avenue, Suite 3300<br>Miami, Florida 33131<br>Telephone:  (305) 374-8500<br>Facsimile:  (305) 789-7799<br><br>By: */s/ Scott D. Ponce*<br>Sanford L. Bohrer<br>Florida Bar No. 160643<br>sbohrer@hklaw.com<br>Scott D. Ponce<br>Florida Bar No. 0169528<br>sponce@hklaw.com<br><br>*Counsel for Royal Caribbean Cruises Ltd.* |

Washington, D.C. 20001
Telephone: (202) 344-4703
Facsimile:  (202) 344-8300

By:*/s/ J. Douglas Baldridge*
Florida Bar No. 708070
JBaldridge@venable.com
Andrew T. Hernacki (admitted *pro hac vice*)
ATHernacki@venable.com
Justin B. Nemeroff (admitted *pro hac vice*)
JBNemeroff@venable.com

*Counsel for MSC Cruises*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2021, the foregoing was filed with the Clerk of Court using CM/ECF, which will serve a Notice of Electronic Filing on all counsel of record.

By:     */s/ Allen P. Pegg*
        Allen P. Pegg