UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:19-cv-23591-BLOOM/LOUIS

HAVANA DOCKS CORPORATION,

    Plaintiff,
v.

NORWEGIAN CRUISE LINE
HOLDINGS, LTD.,

    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON MOTION TO STRIKE PLAINTIFF'S JURY TRIAL DEMAND

**THIS CAUSE** is before the Court on Defendant Norwegian Cruise Line Holdings, LTD.'s Motion to Strike Plaintiff's Jury Trial Demand. ECF No. 197. Plaintiff Havana Docks Corporation filed a Response in Opposition, ECF No. 254, to which Defendant further filed a Reply, ECF No. 264. This matter was referred to the undersigned by the Honorable Beth Bloom, United States District Court Judge, for a report and recommendation. Upon review of the Motion, Response, Reply, and being otherwise duly apprised in the matter, I recommend that Defendant's Motion be **DENIED**.

    **I.**    **BACKGROUND**

Plaintiff, the owner of a certified claim to a dock in Havana, Cuba, initiated this claim against Defendant, arguing that it acted in contravention of the Helms-Burton Act, 22 U.S.C. § 6021, *et seq.* (the "Act"), when it used the dock in question for disembarking passengers from its cruise ships that made port in Havana, and is now liable to Plaintiff for $700 million in damages. This litigation is one of four companion cases in which Plaintiff seeks damages under the Act against cruise lines that utilized the subject dock. *See also Havana Docks Corporation vs. Carnival*

1

*Corporation*, Case No. 19-cv-21724 (S.D. Fla. 2019); *Havana Docks v. MSC Cruises SA Co., et al*, Case No. 19-cv-23588 (S.D. Fla. 2019); *Havana Docks v. Royal Caribbean Cruises, Ltd.*, Case No. 19-cv-23590 (S.D. Fla. 2019).

Title III of the Act imposes liability on a person who "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959," where a United States national owns the claim to the property in question. 22 U.S.C. § 6082(a)(1)(A). The concept of claim ownership predates the Act; previously, the International Claims Settlement Act permitted United States nationals whose property was confiscated by the Cuban government to submit claims to an administrative body known as the Foreign Claims Settlement Commission ("FCSC") that would grant certified claims based on the value of the property confiscated. 22 U.S.C. § 1621, *et seq*. The purpose of this process was to certify claims not against individuals, but rather against foreign sovereign entities like, as relevant here, the Cuban government, as the International Claims Settlement Act contemplated recovery for the confiscated property from foreign governments themselves and is entirely silent on any liability that might be incurred by unrelated third parties.

Title III, enacted in 1996, takes those claims certified against the Cuban government and holds private parties liable for a money judgment as much as three times the value of the property where the individual trafficked in the property.[1] Title III claims are not limited to those who hold a claim certified by the FCSC, but the certified claims are conclusive proof of an ownership interest, and the amount of the claim—relevant to Title III's damages calculations—carries a statutory presumption of correctness rebuttable only by clear and convincing evidence. 22 U.S.C. §§ 6082(a)(2); 6083(a)(1). The Act further empowers federal courts adjudicating Title III claims to refer claims to the FCSC for determinations regarding amount and ownership. *Id.* at § 6083(a)(2).

---

[1] The right to treble damages attaches where a United States national owns the certified claim. 22 U.S.C. § 6082(a)(3).

Though the Act requires the individual who "traffics" to have done so knowingly and intentionally, a plaintiff's damages are based solely on the property or claim value rather than any other demonstrable harm incurred by the plaintiff. Put differently, the question here is binary—liability hinges on whether or not a defendant has trafficked in the property, and how much or how often (or how little) they might have so trafficked is irrelevant. The Act's definition of trafficking includes, as is relevant to the instant litigation, commercial use of the property, but carves out property use incident to "lawful" travel to Cuba where that use is "necessary." *Id*. at § 6023(13).

The present dispute before the undersigned is whether these claims entitle Plaintiff to a trial by jury; Plaintiff contends that it does, while Defendant contends that it does not. This Report and Recommendation follows.

## II.     LEGAL STANDARD

The right to a jury trial may be conferred either by statutory grant or by the Seventh Amendment itself. In keeping with the doctrine of constitutional avoidance, a court considering this question must first analyze the statute at issue to "ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided." *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345 (1998); *Tull v. United States*, 481 U.S. 412, 417, n.3, (1987); *Curtis v. Loether*, 415 U.S. 189, 192, n.6 (1974)). Where the language and legislative history of the statute are silent regarding the right to trial by jury, however, the court "must answer the constitutional question presented." *Tull*, 481 U.S. at 417 n.3; *see also Feltner*, 523 U.S. at 345. And where the Seventh Amendment applies, "issues that are proper for the jury must be submitted to it to preserve the right to a jury's resolution of the ultimate dispute." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1373–74 (11th Cir. 2021) (quoting *City of Monterey*, 526 U.S. at 718) (internal quotations omitted).

Despite Federal Rule of Civil Procedure 2's proclamation that "[t]here shall be one form of action to be known as 'civil action,'" thereby merging law and equity, a viable distinction persists today in analyzing Seventh Amendment rights. The Amendment provides that for "suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...," a notion the Supreme Court interprets to mean the right to a jury trial extends only to "suits at common law." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989). Though the thrust of the Seventh Amendment when enacted was to "preserve the right to jury trial as it existed in 1791," it is settled law that the right encompasses more than simply those common-law forms of action recognized in 1791. *Curtis*, 415 U.S. at 193 (holding the right may attach to new causes of action created by statute). As stated by the Court in *Parsons v. Bedford*, 3 Pet. 433, 446-47 (1830), the phrase "common law" as used in the amendment was most meaningfully intended to stand in contrast to those suits in equity, admiralty, and maritime jurisdiction.

Accordingly, "common law" in this context translates into "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A.*, 492 U.S. at 41 (internal quotations and citation omitted); *see also Parsons*, 3 Pet. at 446-47 ("In a just sense, the amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever might be the peculiar form which they may assume to settle legal rights."). The right thus extends to statutory causes of action where the statute creates legal rights and legal remedies. *Curtis*, 415 U.S. at 194.

In determining whether the claim in question sounds in law, the court first compares the action to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and second, it examines "the remedy sought and determine[s] whether it is legal or equitable in nature." *Granfinanciera, S.A.*, 492 U.S. at 42 (quoting *Tull*, 481 U.S. at 417-18)

4

(internal quotations omitted).  The question is whether, on balance, these two considerations—though the consideration of the remedy weighs heavier than the nature of the action—suggest that the action concerns a legal right and thus suggests a right to trial by jury under the Seventh Amendment.  *Id.*

But the answer is not the end of the inquiry, for while Congress is constitutionally precluded from stripping the right to a jury trial for the adjudication of *private* legal rights, the same is not true insofar as *public* rights are concerned.  *Id.* at 52.  Where Congress "devises a novel cause of action involving public rights" and tasks adjudication to a tribunal lacking in statutory authority to employ a jury as the factfinder, no right to a jury trial attaches.  *Id.* at 51-52.  Public rights include those seemingly private rights created by Congress that are "so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Id.* at 54 (noting that for inherently legal statutory causes of action, "the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal").

In the context of such administrative proceedings, the Supreme Court has observed that "jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the [administrative agency]'s role in the statutory scheme."  *Curtis*, 415 U.S. at 194 (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)); *see also id.* ("The concept of expertise on which the administrative agency rests is not consistent with the use by it of a jury as fact finder." (quoting L. Jaffe, Judicial Control of Administrative Action 90 (1965) (internal quotations omitted))).  Congress is empowered in such cases to entrust enforcement of the statutory right to either an "administrative process or a specialized court of equity free from the strictures of the Seventh Amendment."  *Id.* at 195.  But if Congress allows for enforcement of

5

statutory rights to rest with an "ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right," trial by jury "must be available" for causes of action implicating legal rights and remedies. *Id.*; *see also Granfinanciera*, S.A., 492 U.S. at 49 ("Unless Congress … has permissibly withdrawn jurisdiction over [an] action by courts of law and assigned it exclusively to non-Article III tribunals sitting without juries, the Seventh Amendment guarantees [litigants] a jury trial upon request.").

This analysis can be distilled into four questions: the prefatory question is (1) whether the statute demonstrates congressional intent to permit trial by jury. If it does, the court need go no further; if it does not, the court considers whether (2) the right and (3) the remedy are legal in nature or whether they are equitable. If the court determines that, on balance, the cause of action and remedy sound in equity, the court then considers (4) whether Congress has permissibly delegated adjudication to an alternative tribunal in which a jury trial is unavailable.

## III. ANALYSIS

### A. Whether the Act Explicitly Confers a Right to Jury Trial

The preliminary inquiry before the Court is whether the statute at issue confers a right to a jury trial. The purpose of this step in the analysis is to determine whether the court may fairly find that the statute grants such a right and thereby avoids the constitutional issue of whether such a right exists under the Seventh Amendment. Congress may statutorily create new causes of action and provide that a right to trial by jury exists, but where the statute contains no indicia of such intent, the court must consider whether the nature of the claim entitles a party to a right to a jury trial under the Seventh Amendment.

Congress may confer the statutory right to a jury trial through explicit grant in the plain language of the statute or its legislative history. *See Tull*, 481 U.S. at 417 (observing that "[n]othing in the language of the Clean Water Act or its legislative history implies any

congressional intent to grant defendants the right to a jury trial during the liability or penalty phase of the civil suit proceedings. Given this statutory silence, we must answer the constitutional question presented"). Though the Supreme Court has rejected the notion that Congress may confer a statutory right to a jury trial by simply referring to the action as one "at law" or by authorizing "legal relief," it has found instances when, though a statute lacks an explicit grant, the statutory scheme is such that Congress' desire for a right to a trial by jury may be inferred. *See, e.g.*, *City of Monterey*, 526 U.S. at 708. In finding that a statutory right to a jury trial was not a "necessary implication" of the phrase "action at law," the Court in *City of Monterey* cited a prior decision in which the Court found the statutory right existed in part because the statue explicitly authorized "legal . . . relief" but then also explicitly incorporated the Fair Labor Standards Act procedures, which themselves had been interpreted as conferring a trial by jury for private actions. *Id.* (citing *Lorillard v. Pons*, 434 U.S. 575, 583 (1978)).

The Act does not explicitly contemplate the right to a trial by jury; on this the Parties agree. Defendant goes a step further to argue that certain features of the statute suggest congressional intent to *avoid* jury trials in adjudicating disputes. Though the proper question is whether Congress intended to *grant* such a right as this would avoid the constitutional question, Defendant clearly maintains that no indicia of congressional intent to grant the right exist. Plaintiff avers that the statute contains the "hallmarks" of action at law but concedes that the lack of any explicit references in the Act suggests that the Court cannot resolve this question through statutory construction and thus must undertake the Seventh Amendment analysis.

### B. Whether the Act Places Legal Rights at Issue

Finding the statute does not itself confer the right to a trial by jury, the Court must consider whether Title III comprises the type of claim protected by the Seventh Amendment. The two-pronged test in *Granfinanciera* first requires the Court to consider whether the claim created under

Title III concerns legal rights as compared to 18th-century actions brought in English before the courts in law and equity were merged.  492 U.S. at 42 (quoting *Tull*, 481 U.S. at 417-18).

Defendant argues that the Act has no remotely comparable historical analog to any action at law and urges the Court for this reason to reject the notion that the case deals with the adjudication of legal rights.  In describing the nature of the rights adjudicated under the Act, Defendant refers to them as "public rights," in part basing its argument on *Granfinanciera*'s observation that an exception to the right to a jury for legal causes of action arises when certain public rights are implicated, and Congress elects to entrust adjudication to an alternative administrative process or a special court in equity; in this instance the alternative process would be frustrated rather than aided by the imposition of the jury as a factfinder.  492 U.S. at 54.  Inextricably intertwined to what the *Granfinanciera* Court referred to as public rights was the process enacted by Congress: a federal regulatory program providing for agency adjudication requiring limited involvement by the Article III judiciary.  *Id.*  Here, though Congress delegated to the FCSC the ability to render determinations as to claim value in the Act, it created no federal regulatory scheme for an alternative non-Article III adjudicative process insofar as liability is concerned—to the contrary, the statute explicitly confers the right to bring suit in an Article III court—and there is accordingly no alternative administrative process to be hampered by the imposition of a jury as a factfinder.  The Act thus does not implicate the type of "public rights" considered by the Court in *Grandfinanciera*.

In drawing another distinction from those rights traditionally at common law, Defendant additionally argues that claims under the Act are more akin to those suits against foreign sovereigns, which do not require jury trials under the Seventh Amendment.  ECF No. 197 (citing *Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1534 (11th Cir. 1985)).  Defendant's analogy depends on its characterization of the Act as having created a vicarious liability scheme, which

makes third parties who allegedly traffic in the subject property liable for the wrongdoing of the Cuban government in confiscating the property. Defendant supports its argument with the fact that the Act uses the property value of the confiscated property to measure the value of Plaintiff's damages in this suit. Title III additionally provides that plaintiffs in a Title III action who fail to recover maintain the potential to be compensated following "any agreement between the United States and Cuba settling claims covered." 22 U.S.C. § 6082 (f)(2)(A)(i), (iii). Defendant further notes that 18th-century common law recognized no private cause of action that could be suspended based on executive assessment of their foreign policy impact, as the President may under the Act, 22 U.S.C. § 6085(c), and should a democratically elected government come to power in Cuba, the right to bring actions under the Act even for past incidents of trafficking is forever extinguished, 22 U.S.C. § 6082(h)(1)(B).

Plaintiff avers that its claim sounds "basically in tort" and is most comparable to negligence, arguing that the Act created a new legal duty of care for which liability hinged on a defendant's breach. ECF No. 254 at 6 (citing *Curtis*, 415 U.S. at 195 ("[T]he statute merely defines a new legal duty and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach[.]")). In support, Plaintiff cites a range of torts recognized at common law, elements of which Plaintiff avers resemble its infringed rights protected under the Act: trover (damages for conversion measured by property value); ejectment (for wrongfully dispossessed leaseholders); and *trespass quare clausum fregit* (for transitory transgressions of real property rights such as crossing, invading, or damaging another's real property absent permission). ECF No. 254 at 7-9.

Though none of the common law torts cited by Plaintiff reflect an exact match to Title III, with its imposition of liability for transitory transgressions where the plaintiff was wrongfully dispossessed of property by one not party to the suit, but elements of each resemble pieces of the

9

rights being adjudicated under the Act. As the Court found in *City of Monterey*, the key to finding that § 1983 sounded in tort was that it "provide[s] redress for interference with protected personal or property interests." 526 U.S. at 709 (finding an analog between the type of redress found in those classic tort claims and § 1983's "relief for invasions of rights protected under federal law"). Justice Scalia observed in his historical analysis[2] that § 1983 fit this description because it was "designed to provide compensation for injuries arising from the violation of legal duties" and to deter "future violations." *Id.* at 727.

Title III too provides redress for interference with protected personal property interests, creating a civil remedy against a person who traffics in the subject property, 22 U.S.C. § 6082(a)(1)(A), and defining a "person" as "any person or entity, including any agency or instrumentality of a foreign state," *id.* at § 6023(11). The cause of action may stem from the "wrongful confiscation or taking of property" by the Cuban government, but liability under the Act is designed to, among other things "deter trafficking in wrongfully confiscated property." 22 U.S.C. § 6081(11). As stated by the Second Circuit:

> Finding that the Castro government was "offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures" involving confiscated property in order to obtain "badly needed financial benefit, including hard currency, oil, and productive investment and expertise," 22 U.S.C. § 6081(5), (6), Congress established a civil remedy for any United States national owning a claim to "property" confiscated by the Cuban government after January 1, 1959, against "any person" who "traffics" in such property, *id*. § 6082(a)(1)(A).

*Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 125 (2d Cir. 2000). By its plain language, the Act imposes liability on persons who traffic in the property in order to deter them from doing so, rather than imposing liability against those who wrongfully confiscated the subject property.

---

[2] Though concurring in the judgment, Justice Scalia's historical analysis was cited by the majority in agreement.

But this is not to diminish the facets of the Act Defendant cites that are both animated by foreign policy considerations and potentially impacted by them. Defendant is entirely accurate that the Act is unlike other actions at law in permitting the President to unilaterally suspend the Act based on foreign policy interests and in extinguishing claims contingent on the election of a democratic government in Cuba. These novel elements do not, however, change the fundamental character of the Act; the court's charge here is to examine "the *issue* to be tried rather than the character of the overall action." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569 (1990). The issue to be tried here is whether Defendant is liable to Plaintiff for "trafficking" in the subject waterfront property, which at its most basic level would, if Defendant is found liable, provide compensation for Plaintiff following interference with its protected personal or property interests. On balance, the scale tips in favor of a finding that the right to be adjudicated under the Act is a legal one.

### C. Whether the Act Offers a Remedy at Law

I must next consider whether the relief sought is inherently legal or equitable in nature; this question weighs heavier than the proceeding question, and even where an action is determined to be one at law "if the remedy sought is equitable, then the case is properly heard in a court of equity." *Hughes v. Priderock Capital Partners, LLC*., 812 Fed. Appx. 828, 833 (11th Cir. 2020).

Monetary damages, like those provided under the Act, are generally considered a legal remedy. *See AcryliCon USA, LLC*, 985 F.3d at 1374 (citing *Teamsters*, 494 U.S. at 570 ("[A]n action for money damages was the traditional form of relief offered in the courts of law." (quotation marks omitted))); *see also City of Monterey*, 526 U.S. at 710 ("We have recognized the 'general rule' that monetary relief is legal." (citations and internal quotations omitted)). As Defendant observes, however, certain monetary damages such as restitution and unjust enrichment may be remedies at equity depending on "the basis for [the plaintiff's] claim and the nature of the underlying remedies

sought." *Id.* at 1374 n.45 (quoting *Great-West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212 (2002)) (alteration in original) (citation and internal quotations omitted); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d.  Restitution is ordinarily a remedy at law when it takes the form of a "judgment imposing a merely personal liability upon the defendant to pay a sum of money." *AcryliCon USA, LLC*, 985 F.3d at 1374 (citing *Knudson*, 534 U.S. at 213; Restatement (Third) of Restitution and Unjust Enrichment § 4 cmt. d).

But where the restitution damages would be comprised of property "belonging in good conscience to the plaintiff" that may "clearly be traced to particular funds or property in the defendant's possession," then the restitution is equitable in nature. *Id.* (citing *Knudson*, 534 U.S. at 213).  In this sense, though the damages are money damages, the specific funds at issue are Plaintiff's property that it seeks to have returned.  By way of illustration, the Eleventh Circuit has observed that restitution in equity typically takes the form of a constructive trust or equitable lien which holds the money or property identified as a plaintiff's and could be traced to these particular funds in the defendant's possession. *Hughes*, 812 Fed. Appx. at 833.  A court in equity could then simply transfer title of the property or grant a security interest to the plaintiff, its rightful owner.  *Id.*

The determinative question is whether the action imposes liability on the defendant for a sum of money or whether it seeks to "restore to the plaintiff particular funds or property in the defendant's possession."  *Id.* (citing as an example the disgorgement of profits, which seeks the return of specific funds traceable to the defendant and is thus equitable).  Equitable restitution is best viewed as the return of a plaintiff's own property that the defendant wrongly has; the funds are traceable because a *specific* set of funds are at issue, and the remedy is equitable because the Court is simply ordering their return.

Defendant argues that the Act's provision of damages amounts to equitable restitution because Plaintiff seeks to "restore to it the property, or its nearest equivalent, from the wrongdoer (here, the Cuban government)." ECF No. 197 at 14. Defendant continues to rely on a theory that the Act merely shifted liability from the Cuban government who confiscated the subject property and created vicarious liability for traffickers. This theory is contradicted by the plain language of the Act—it imposes liability to discourage individuals from *trafficking* in the property but not for property confiscation itself—and the remedial scheme. The Act calculates damage awards using the value of the property, but this is designed to be compensatory for a plaintiff and punitive for a defendant; the Act neither mentions restoring to Plaintiff the confiscated property or its equivalent, nor includes any requirement that the Defendant confiscated or possesses the subject property.

Though damages under the Act turn on property value rather than a defendant's allegedly ill-gotten gains, Defendant also argues that because both the congressional Findings of the Act and Plaintiff's operative Complaint mention such improper profits, the remedy must be equitable. ECF No. 197 at 16. The Findings indeed state that the judicial remedy to be applied should "deny traffickers any profits" from the economic exploit of the confiscated property, and Plaintiff alleges in the operative Complaint that Defendant "profited" from the Cuban government's possession of the confiscated property.

The Court in *Tull* observed, however, that even where damages *are* calculated using profits, the remedy is not necessarily equitable disgorgement. In rejecting the government's argument that suits enforcing civil penalties under the Clean Water Act were comparable to a disgorgement of improper profits remedy, the Court observed that while the district court in part calculated the damages based on the petitioner's profits from property sales, in certain instances where the petitioner received no profits at all, the court nevertheless imposed a fine. 481 U.S. at 423-24. The Supreme Court held that the district court sought to do more than merely restore the status

13

quo as an equitable remedy would; it was punitive in nature and thus inherently legal rather than equitable. *Id.* at 423.

Characterizing the damages as disgorgement here is inaccurate given that the damages are measured by property value with no apparent connection to a defendant's revenue or profits. Where funds are at issue in an equitable remedy, they must be traceable to funds in a defendant's possession, but here there is no meaningful link between the property value and any profit Defendant made from its alleged use of the subject property.

When coupling the fact that damages under the Act are unconnected to a defendant's profits with the stated finding that individuals should be deterred from trafficking (and thus profiting) from the confiscated property, the damages are plainly designed to be punitive and therefore legal in character. The Act's inherently punitive provision for treble damages, applied in instances where a United States national owns the claim in question, further bolsters the interpretation of the damages as legal in nature, consistent with the stated goals of the act, to incentivize *deterrence*. *See Tull*, 481 U.S. at 423; *see also Fleitmann v. Welsbach St. Lighting Co. of Am.*, 240 U.S. 27, 29 (1916) (finding that even a derivative suit brought by a shareholder in equity under the Sherman Act was entitled to the right to a trial by jury because "when a penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through the verdict of a jury in a court of common law. On the contrary, it plainly provides the latter remedy, and it provides no other.")

Accordingly, I recommend finding that the nature of the remedy sought by Plaintiff under the Act is legal. This latter factor of the *Granfinanciera* test, which weighs more heavily than the former, tips the scale further in favor of finding Plaintiff's claims under the Act to be legal in nature. On balance, I recommend finding that Plaintiff is entitled to a trial by jury under the Seventh Amendment.

**IV.     CONCLUSION**

For the forgoing reasons, the undersigned respectfully recommends that Defendant's Motion to Strike Plaintiff's Jury Trial Demand be **DENIED**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Beth Bloom, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**DONE AND ORDERED** in Chambers at Miami, Florida this 11th day of January, 2022.

_____
**LAUREN F. LOUIS**
**UNITED STATES MAGISTRATE JUDGE**