UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

HAVANA DOCKS CORPORATION,                     Case No: 19-cv-21724-
                                              BLOOM/MCALILEY
        Plaintiff,

v.

CARNIVAL CORPORATION,

        Defendant.
_____/

HAVANA DOCKS CORPORATION,                     Case No: 19-cv-23588-
                                              BLOOM/LOUIS
        Plaintiff,

v.

MSC CRUISES SA, *et al.*,

        Defendants.
_____/

HAVANA DOCKS CORPORATION,                     Case No: 19-cv-23590-
                                              BLOOM/LOUIS
        Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

        Defendant.
_____/

HAVANA DOCKS CORPORATION,                     Case No: 19-cv-23591-
                                              BLOOM/LOUIS
        Plaintiff,

v.

NORWEGIAN CRUISE LINE HOLDINGS, LTD.,

        Defendant.
_____/

## OMNIBUS REPORT AND RECOMMENDATION
## REGARDING *DAUBERT* MOTIONS

Both Plaintiff and Defendants have filed motions to exclude from evidence at trial the testimony of the opposing party's damages expert(s). Specifically, Plaintiff filed a Motion to Exclude Opinion of Pablo Spiller (ECF No. 328),[1] who is a damages expert all Defendants have retained.[2] For their part, Defendants filed an Omnibus Motion to Exclude Testimony of Plaintiff's Experts. (ECF No. 320). That Motion is directed to five damages experts Plaintiff retained (hereafter, Plaintiff's "Damages Experts"), and one additional expert, who is a historian (hereafter, Plaintiff's "Historian Expert").[3] The Motions are fully briefed,[4] and the Honorable Beth Bloom referred them to me for a report and recommendation. (ECF No. 393).

---

[1] In that Motion, Plaintiff also moved to exclude the testimony of another expert, Julian Ackert. The Court addressed that earlier, by a separate Report and Recommendation and Omnibus Order. (ECF Nos. 425, 477).

[2] Plaintiff filed four identical actions, each against a different cruise line. Those cases, and the Defendants, are: (1) Carnival Corporation (No. 19-cv-21724); (2) MSC Cruises SA, MSC Cruises SA CO, and MSC Cruises (USA) Inc. (collectively, "MSC") (No. 19-cv-23588); (3) Royal Caribbean Cruises, Ltd. (No. 19-23590); and (4) Norwegian Cruise Line Holdings, Ltd. (No. 19-cv-23591). (Hereafter, "Defendants"). These lawsuits have common issues, and the Court permitted the parties to file global *Daubert* motions. (ECF No. 289). Unless otherwise indicated, the record citations here are to *Havana Docks v. Carnival Corp.*, No. 19-cv-21724.

[3] Plaintiff believes that the historian's testimony is relevant to the issue of damages.

[4] The additional briefing on Plaintiff's Motion is found at ECF Nos. 364 and 398, and on Defendants' Motion at ECF Nos. 369 and 400. At my direction, the parties also filed Supplemental Memoranda of Law. (ECF Nos. 468, 474, 475).

I heard oral argument on the Motions on January 25, 2021, the transcript of which is filed at ECF No. 455.[5] I issue this Report and Recommendation after careful review of the legal memoranda the parties have filed – including attachments – the governing law, the record in this action, and the argument of counsel. Before turning to the Motions, I provide information about these lawsuits that is relevant to damages, and summarize the legal standard set forth in Federal Rule of Evidence 702, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which governs the Motions.

## I.   Background

During the first half of the last century, Plaintiff Havana Docks Corporation, and its predecessor, all United States companies, built and operated commercial waterfront real property in the Port of Havana, Cuba. "The piers and buildings were used for warehousing purposes, cargo deposits, and for merchandise provisionally stored pending Customs clearance." (ECF No. 81-1 at 6).[6] Plaintiff did so pursuant to a concession, granted by Cuba in 1905, that Plaintiff operated under for fifty-five years. Cuba amended and modified the terms of the concession over that time. (Hereafter, the "Concession"). On October 24, 1960, Cuba confiscated and nationalized Plaintiff's property interests (hereafter, the "Confiscated Property"), without paying Plaintiff any compensation. At that time, the Concession was for 99 years, and a balance of 44 years of concessionary rights remained.

---

[5] That record is cited here as Tr. at __.

[6] All citations to this Court's docket are to the CM/ECF-assigned page numbers, not to the original page numbers of filed documents, with the sole exception of citations to deposition transcripts.

In 1964, Congress amended the International Claims Settlement Act (the "Settlement Act") to authorize the Foreign Claims Settlement Commission (the "Commission") to adjudicate claims against the government of Cuba for expropriation of property. *See* 22 U.S.C. § 1643. Plaintiff filed a claim for the value of its Confiscated Property, and in 1971, the Commission issued its Final Decision that certified Plaintiff's loss as the amount of $9,179,700.88 (rounded here to $9.2 million), plus 6% interest per annum "from the respective dates of loss to the date of settlement." (ECF No. 81-1 at 4).[7]

Plaintiff brings these lawsuits pursuant to Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. §§ 6021–6091 (the "LIBERTAD Act", "Helms-Burton Act" or the "Act"). That Act creates this private right of action: "any person that ... traffics in property which was confiscated by the Cuban Government on or after

---

[7] The Commission explained its role in the certification of claims against Cuba:

> Title V of the [Settlement Act] ... does not provide for the payment of these losses of American nationals…. The statute provides only for the determination by the Commission of the validity and amounts of such claims and the certification of the findings to the Secretary of State. The stated purpose of the Congress in directing that the amounts of these losses be certified to the Secretary of State is to provide him with appropriate information which would be useful in future negotiation of a claims settlement agreement with a friendly government in Cuba when diplomatic relations are resumed.
>
> ...
> Thus, in effect, this program may be classified as a presettlement adjudication of claims to determine the extent of American losses and provide a tool for our Government in dealing with the Government of Cuba in the future on this important international issue.

Foreign Claims Settlement Commission of the United States, *Section II: Completion of the Cuban Claims Program under Title V of the International Claims Settlement Act of 1949*, at 70 (1979), https://www.justice.gov/sites/default/files/fcsc/docs/final-report-cuba-1972.pdf.

January 1, 1959, shall be liable to any United States national who owns the claim to such property ....” 22 U.S.C. § 6082(a)(1)(A). In its recent Omnibus Order, this Court found that Defendants trafficked in the Confiscated Property when they operated cruises to Cuba and embarked and disembarked their passengers in the Port of Havana where Plaintiff once operated, and the Court entered summary judgment on liability for Plaintiff, against all Defendants. (Omnibus Order, ECF No. 477). Thus, these actions will proceed to trial on damages.

The Helms-Burton Act’s damages provision allows for alternate measures of damages. In pertinent part, it provides that Plaintiff may recover “money damages in an amount equal to the sum of—

> (i) the amount which is *the greater of*—
>
>> (I) the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949 [22 U.S.C. 1621 et seq.], plus interest;
>>
>> ...; *or*
>>
>> (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, *whichever is greater* ....

22 U.S.C § 6082(a)(1)(A)(i) (emphasis added).[8] The Act sets out a strong presumption that damages will be the amount certified by the Commission; that is, the presumption is “rebuttable by clear and convincing evidence” that proof of the greater of the current or

---

[8] These damages may be trebled. 22 U.S.C. § 6082(a)(3)(C).

past fair market value "is the appropriate amount of liability". 22 U.S.C § 6082(a)(2). "Appropriate" is not defined in the statute.

With their experts, both parties have developed evidence of the fair market value of the Confiscated Property.

Plaintiff's Damages Experts collectively offer the opinion that the current fair market value is $232.5 million. *See* (Hentschel Report at 74, ECF No. 320-7).[9] They do not offer an opinion of the fair market value in 1960. Since Plaintiff's $232.5 million measure of damages is greater than the amount certified by the Commission, Plaintiff hopes to overcome the presumption that the amount of its certified claim is the amount of Defendants' liability and establish that it is instead, $232.5 million.

Defendants' damages expert offers three opinions. First, he opines that the Commission overstated the value of the Confiscated Property and that had it applied the proper methodology, that would have led to the value of $826,721. (Spiller Report at 8 ¶ 8, ECF No. 325-5).[10] Defendants' expert offers two other opinions: that the fair market value of the Confiscated Property in 1960 was $1,457,821,[11] and that the current fair market value is $46,300,457 (rounded to $46 million). (*Id.* at 8 ¶¶ 9-10).

---

[9] Both Plaintiff's and Defendants' experts calculate the current fair market value as of dates in early 2021, when they completed their reports.

[10] Defendants' damages expert, Pablo Spiller, submitted individual reports in each lawsuit that are substantially similar. The main difference is a slight adjustment to the amount in his second opinion. The Court cites here Spiller's report in *Havana Docks v. Carnival Corp.*, No. 19-cv-21724.

[11] According to that expert, when interest is added, as of August 2019 that sum is $1,534,826. (*Id.* at 8 ¶ 9). In the cases against MSC, Royal Caribbean and Norwegian, that sum is $1,535,258. *See Havana Docks v. MSC*, No. 19-cv-23588, ECF No. 213-4 at 9; *Havana Docks v. Royal Caribbean*

In their respective Motions, each party challenges the admissibility of the testimony of the other's experts,[12] as falling short of the standard set by Rule 702 and the Supreme Court's decision in *Daubert*, and its progeny.

## II.    Legal standard

Rule 702 governs the admissibility of expert opinion testimony. The Rule requires this Court to act as a gatekeeper, admitting only scientific, technical, or other specialized expert testimony that is both reliable and relevant. *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The ultimate objective of this gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The Eleventh Circuit Court of Appeals set forth a "rigorous three-part inquiry" that courts must engage in to perform their gatekeeping function. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Specifically, courts must consider whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the

---

*Cruises, Ltd.*, No. 19-cv-23590, ECF No. 136-4 at 9; *Havana Docks v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. 225-4 at 9. The sum slightly differs based on the date Plaintiff filed suit.

[12] Plaintiff does not, however, challenge Defendants' expert's current fair market value opinion.

trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* (citation omitted). The Eleventh Circuit refers to these as the "qualifications," "reliability," and "helpfulness" inquiries. *Id.*

When conducting its *Daubert* analysis, the court must focus "solely on [the] principles and methodology [that experts employ], not on the conclusions that they generate." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted). "[I]t is not the role of the district court to make the ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party who wishes to use the expert testimony must demonstrate by a preponderance of the evidence that the testimony is admissible. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison*, 184 F.3d at 1306. The decision whether to admit or exclude expert testimony is within the court's discretion, and the court enjoys "considerable leeway" when determining the admissibility of such testimony. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (citation omitted).

In its gatekeeper role, the Court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.* 298 F.3d 1253, 1256 (11th Cir. 2002). Its role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc.*, 326 F. 3d at 1341 (11th Cir. 2003) (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

With these principles in mind, the Court turns to the Motions.

## III.   Defendants' *Daubert* Motion

Defendants ask this Court to exclude the testimony of Plaintiff's Damages Experts, who are:  two civil engineers, Michael Garlich and James Patton; a cost estimator, Michael Deiters; a port operations consultant, Franc Pigna; and a real estate appraiser, John Hentschel. In the same Motion, Defendants also ask the Court to exclude historian José Azel from testifying at trial. (ECF No. 320). I turn to the Damages Experts first.

### A.  Damages Experts; Background

As noted, the Act authorizes as a measure of damages the greater of the fair market value of the confiscated property now, or at the time of confiscation. 22 U.S.C. § 6082(a)(1)(A)(i)(III). Plaintiff hopes to call its Damages Experts to present evidence that the current fair market value of its Confiscated Property is $232.5 million.

#### 1.  Plaintiff's Confiscated Property

This Court has concluded that "Plaintiff [may] attempt to recover only the amount of compensation for its interests in the Subject Property that were confiscated." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Inc.*, 454 F. Supp. 3d 1259, 1278 (S.D. Fla. 2020).[13] Plaintiff's fair market valuation, therefore, is limited to the property interests that Cuba confiscated. As Plaintiff acknowledges,[14] it did not own the Confiscated Property

---

[13] This Order, which addressed and rejected arguments for dismissal of the suit, was entered in *Havana Docks v. Norwegian Cruise Line Holdings, Inc.*, No. 19-cv-23591, ECF No. 53. Its conclusions nonetheless apply to all four of the Havana Docks cases.

[14] At oral argument Plaintiff's counsel said Plaintiff owned "[s]omething less than fee simple but something more than just a leasehold ...." (Tr. at 102); *see also* (Tr. at 16, 17, 132).

in fee simple. This Court has held that "[a]ny recovery for the trafficking alleged in this action would not ... entitle Plaintiff to recover compensation for an interest in the Subject Property that it did not own, nor would it effectively treat Havana Docks' interest as a fee simple interest." *Id.*

The Concession, a civil law concept, granted Plaintiff the usufructuary right to "use and enjoy" the piers and structures, and to operate a business there for a term of years. *See* (Omnibus Order at 31 n.20, ECF No. 477). It obligated Plaintiff, at its conclusion, to "surrender the works to the Government in perfectly serviceable condition." (ECF No. 320-1 at 5).

The most analogous property interest in United States common law is a leasehold, and the Court has found that "Havana Docks' interest was a 99-year leasehold interest." (Omnibus Order at 111, ECF No. 477). That said, the parties debate the exact contours of Plaintiff's property rights under the Concession. Defendants' *Daubert* Motion does not require the Court to address that debate because, under either party's conception of Plaintiff's property interests, Plaintiff's Damages Experts' methodology is fatally flawed, as explained below.

### 2. The Sierra Maestra Terminal

Pursuant to the Concession, Plaintiff constructed improvements to the Sierra Maestra Terminal (the "Terminal") in the Port of Havana, Cuba, and operated a business there. The Terminal consists of a marginal wharf that supports a 3 to 6-story building[15] (the

---

[15] The main building is three stories, and its towers are six.

"Marginal Building") and three piers: (1) the San Francisco Pier, (2) the Machina Pier and (3) the Santa Clara Pier.[16] This photograph depicts the layout:



(Garlich Report at 8, ECF No. 320-20).

Before Cuba expropriated the property in 1960, the Terminal functioned as a "bulk and palletized cargo port facility offering docking and warehousing facilities for import and export, bonded warehouses, and provisional cargo deposits for merchandise pending customs appraisement". (Hentschel Report at 4, ECF No. 320-7) (quotation marks and citation omitted). At that time, the Terminal was "fully functional and reportedly in very good physical condition." (*Id.* at 17). Much later, in the 1990s, Cuba began to use the property as a cruise ship passenger terminal facility. (*Id.* at 5). Specifically, Cuba adapted the San Francisco Pier for that use, and left unused the Machina and Santa Clara Piers, and the Marginal Building. (*Id.* at 18). As of 2021, the physical condition of the Terminal was

---

[16] The Marginal Building and three Piers are the four principal structures at the Terminal.

"fair to poor" because, as one of Plaintiff's Damages Experts states, "there appears to have been a failure to maintain the property and make requisite repairs when due which seems to have resulted in a substantial deterioration in the property's physical condition." (*Id.* at 17). This photograph, taken in 2018, shows some of that deterioration; namely, to the Machina and Santa Clara Piers:



(Garlich Report at 10, ECF No. 320-20).

Plaintiff's Damages Experts evaluate the current fair market value of the Confiscated Property assuming it would be transformed into a world-class modern cruise ship terminal that includes, on the property, a five-star hotel. Its expert, John Hentschel, concludes that this would be the highest and best use of the Confiscated Property today. *See* (Hentschel Report at 45, ECF No. 320-7).

Plaintiff's Damages Experts note that the Piers and Marginal Building are still present in the Port of Havana, and that in recent years Cuba modified the San Francisco Pier for cruise travel. (ECF No. 369 at 6-7). In December 2020, representatives of Defendant Carnival met with principals of Aries Transportes, S.A. ("Aries"), part of the

Cuban Government's Ministry of Transportation that serves as its port authority,[17] to discuss ongoing modifications to the Terminal to accommodate larger classes of cruise ships. (*Id.* at 7) (citing ECF No. 310-27). Plaintiff relies upon a Carnival document about that meeting, and modifications discussed at that time, of the San Francisco and Santa Clara Piers, and the removal of a portion of the Machina Pier. (*Id.*). That document includes this diagram, which illustrates those changes:



**Updated Terminal Sierra Maestra Enhancement Plan.**

(ECF No. 310-27 at 5). Plaintiff also notes that in 2021, Cuba's official state news agency reported that a part of the Marginal Building is, or will be, converted into a five-star, 55-room hotel. (ECF No. 369 at 7 n.4).

---

[17] (Omnibus Order at 47, ECF No. 477).

In their reports, Plaintiff's Damages Experts assume similar modifications to the Piers, and they go further to include the construction of a full-service, 320-room[18] hotel within the existing Marginal Building. (Hentschel Report at 43-45, ECF No. 320-7). Plaintiff's five Damages Experts each analyze an aspect of that valuation. Hentschel serves as Plaintiff's ultimate expert. He reviews the reports of the other four experts, attaches them to his report and "adopt[s]" them as "an integral part of [his] report." (*Id.* at 17). Hentschel reaches the ultimate opinion as to the best approach to determining the current fair market value.

### 3. Summary of Plaintiff's Damages Experts' opinions

#### a. Michael Garlich; structural engineer

Michael Garlich, a structural engineer, provides opinions on "the possible construction and configuration of the existing structures; the estimated service life[19] of the structures; anticipated structural repairs that may be required to extend the service life of the structures to the end of the Concession period; and conceptual upgrades to the Terminal to accommodate modern-day cruise ships." (Garlich Report at 6, ECF No. 320-20). In reaching his conclusions, Garlich disregards significant deterioration and changes

---

[18] Plaintiff's experts describe the hotel as having "320 keys." That number represents 146 guest suites and 174 guest rooms. *See* (Patton Report at 10, ECF No. 320-18). For simplicity, I refer to the total amount as rooms.

[19] The term "service life" refers to "the length of time a structure or facility may be used economically before emergent damage or deterioration causes increasing interruptions in facility operations or a threat to public safety." (Garlich Report at 23 n.10, ECF No. 320-20).

to the property since 1960 and assumes that the structures are in the same good condition today, that they were then. (*Id.* at 6).[20]

None of the experts were able to travel to Cuba to inspect the property or gather information. As a result, Garlich estimates the original construction of the structures and prepares schematic drawings[21] of them. (*Id.*).[22] He concludes that the structures had a total estimated service life of 75-80 years, and that preventative repairs would be needed after the first 30 years. (*Id.* at 31-32). Garlich also prepares schematic structural drawings for upgrades necessary to accommodate modern-day cruise ships, to include an extension of the San Francisco and Santa Clara Piers, and partial demolition of the Machina Pier. (*Id.* at 7, 49-51).

### b. Michael Deiters; cost to reproduce and modernize the structures

Michael Deiters, an engineering cost estimator, uses Garlich's conceptual drawings to evaluate what it would cost to: (1) reproduce the three Piers and Marginal Building, and (2) modernize the three Piers by extending the San Francisco and Santa Clara Piers,[23] and

---

[20] In his Executive Summary, Garlich writes: "Note that for the purposes of this report and subsequent development of cost estimates, the condition of the structure is assumed to be the same in 2021 as it was in 1960. [Plaintiff's counsel] directed [Garlich] to disregard deterioration and changes in the condition of the structures that have occurred since 1960." (*Id.*).

[21] A schematic drawing is a "simplified graphic." (*Id.* at 11 n.5).

[22] Garlich relied on photographs and published reports and records. He was unable to view archive construction drawings, inspection reports and maintenance reports. (Garlich Report at 6, ECF No. 320-20).

[23] This involves "the addition of mooring cells, breasting and mooring dolphins, mooring bollards, aluminum catwalks, concrete piles, [and] pile caps." (Deiters Report at 7, ECF No. 320-14).

partially demolish the Machina Pier. (Deiters Report at 4, ECF No. 320-14). He concludes that the total estimated costs are: (i) $776,508,985.00 to reproduce the three Piers and the Marginal Building, and (ii) $255,393,688.00 for modernization. (*Id.* at 5-7). These amounts incorporate the assumption that the structures are in the same good condition today, that they were in 1960. *See* (ECF No. 369 at 18).

### c. James Patton; the hotel

James Patton, a civil engineer, and development consultant, opines that it is feasible to convert a part of the Marginal Building into a full-service hotel. (Patton Report at 4, ECF No. 320-18). He too does not address the current state of disrepair of the property; rather he "assume[s] [it] to be in good condition, including the foundation (the wharf upon which it is constructed)." (*Id.* at 6). Unable to inspect the property, Patton uses publicly available information[24] and creates schematic drawings of "the renovation and conversion that would be necessary to develop a full-service hotel utilizing the existing historic Terminal structure." (*Id.* at 5). Patton concludes that it is feasible to build a six-floor, 320-room hotel, complete with restaurants, kitchens, meeting rooms, a spa/fitness center, an infinity pool, and more, within the existing Marginal Building. *See* (*Id.* at 9-10).[25]

---

[24] Patton relies on "available historic narrative, aerial mapping, and photographs related to the existing physical building/structure provided by [Plaintiff]; internet (World Wide Web) aerial mapping and photographic sources; internet 'webpages' of 'Old Havana' hotels; [his firm's] extensive expertise in the development of hotels; and [his firm's] long-term familiarity with development activity in the Caribbean locale." (Patton Report at 5, ECF No. 320-18). "As-built" drawings of the structure were unavailable. (*Id.*).

[25] Patton also estimates the cost to complete the renovation and the hotel's projected revenue and expenses. (*Id.* at 12, 14-15).

### d. Franc Pigna; the Income Approach

Franc Pigna, a port operations consultant, considers Garlich, Deiters and Patton's work and performs an economic valuation analysis of the envisioned modernized Terminal, that the parties call the "Income Approach." (Pigna Report at 7-8, ECF No. 320-8). Specifically, Pigna performs a Discounted Cash Flow analysis, which "determines the net present value of all future cash flows that can be expected for a specific holding period by discounting them with a discount rate." (*Id.* at 30). A discount rate is "the amount of risk an investor today would be taking by investing their money into [the] project." (*Id.* at 39). Pigna opines that a 14% discount rate should be applied here. (*Id.*). Like his colleagues, Pigna assumes that the Terminal is in "a good state of repair." (*Id.* at 14); *see also* (*id.* at 38) ("We have assumed that the condition of the [Terminal] in 1960 was excellent for its age ...."). He concludes that the present value of the future revenue stream (44 years, from 2021 to 2065)[26] totals $206,556,253.00. (*Id.* at 38). That figure represents the revenues from the San Francisco and Santa Clara Piers, the 320-room hotel in the Marginal Building and retail shops from the Terminal, minus the costs and expenses to run and operate the Piers and hotel. (*Id.*).

### e. John Hentschel; the Cost Approach

John Hentschel, a real estate appraiser, considers Garlich, Deiters and Patton's reports and performs a valuation analysis to determine the current fair market value of Plaintiff's Concession. (Hentschel Report at 6, ECF No. 320-7). He uses a different

---

[26] Pigna assumes that Plaintiff's Concession would re-commence in 2021 and therefore expire in 2065.

valuation approach, however: "the cost of producing a substitute property of equal utility, less the amount of accrued depreciation from all sources"; what the parties call the "Cost Approach." (*Id.* at 47). Like the others, in his assessment Hentschel ignores the "substantial deterioration in the property's physical condition" and assumes it "is in the same physical condition that existed" in 1960. (*Id.* at 17). He does this by treating this as a "hypothetical condition (as the term is defined in the U.S. Uniform Standards of Professional Appraisal Practice)". (*Id.*).[27]

Hentschel relies on Patton's determination that the total cost of reproducing the structures is $776,508,985.00 and that the total cost for modernization is $255,393,688.00. (*Id.* at 48-50). He deducts the modernization cost from the reproduction cost, to get to the subtotal: $521,115,297.00. (*Id.* at 50-51). Next, Hentschel values the anticipated future depreciation of the structures over the course of the Concession's remaining 44 years (starting in 2021), as $288,553,536.00. (*Id.* at 48-51). He deducts that amount from the $521 million amount, to reach a total reproduction cost of $232,561,761.00, which rounds to $232.5 million (*Id.* at 51).

Finally, Hentschel compares his Cost Approach with Pigna's Income Approach, to determine which better represents the current fair market value of the conceived highest and best use of the Terminal. (*Id.* at 71-74). As part of that determination, he considers the quantity and quality of the data available for analysis. (*Id.* at 73). He notes that "[i]nformation in Cuba is controlled and disseminated by the government" and as such,

---

[27] Uniform appraisal standards, and the notion of an appraisal hypothetical, are addressed *infra* at Section III(B)(2).

"[t]he quantity of the data available for use in the Income Approach was often limited, while the quality of the data was often anecdotal, incomplete, unverifiable and sometimes contradictory. In certain instances, information was only available from third party sources which at times was also incomplete and/or unverifiable." (*Id.*). The Income Approach thus employs a "number of assumptions". (*Id.*). Although the Cost Approach also requires assumptions, Hentschel states: "the level of assumptions that we had to make [in the Cost Approach] were nowhere near the level of assumptions we had to make in the income approach." (Hentschel Dep. at 311:18-25, ECF No. 320-10). Hentschel therefore concludes that the Income Approach is less reliable than the Cost Approach and he selects the latter as the preferred way to determine the current fair market value. (*Id.* at 312:8-13).

Plaintiff relies on Hentschel's conclusion to argue that the current fair market value of the Confiscated Property is $232.5 million.

### B. Defendants' arguments

Defendants present multiple arguments why Plaintiff's Damages Experts are not reliable and helpful.[28] Their most sweeping argument is that Plaintiff's fair market valuation rests on the fee simple value of the piers and structures – not on Plaintiff's more limited concessionary or leasehold interest – and that as a result, Plaintiff, in violation of this Court's orders, "effectively treat[s] [its] interest as a fee simple interest" and attempts to "recover compensation for an interest ... that it did not own." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Inc.,* 454 F. Supp. 3d at 1278; (ECF No. 320 at 12-14).

---

[28] Neither party challenges the qualifications of any expert.

Defendants also argue that Plaintiff's Damages Experts misapply the highest and best use notion of fair market valuation, by failing to demonstrate that their envisioned modernized Terminal, with the 320-room hotel, is legally permissible, physically possible, financially feasible and reasonably probable. (ECF No. 320 at 17-23).

Another of Defendants' arguments is that Plaintiff's Cost Approach fails to value its time-limited concession interest, (*Id.* at 23-25); that is, it "yields the same [value] regardless of how many years were left on the concession." (*Id.* at 23) (emphasis omitted).

Defendants also argue that the Income Approach is less reliable than the Cost Approach, and they note Hentschel's agreement on this point. (ECF No. 320 at 25-27). Defendants assert that the Income Approach does not rely on sufficient data, such as the failure to account for Cuba's centrally planned economy, substantial political risks, and income taxes, and that it applies an inappropriate discount rate. (*Id.*).

In addition, Defendants challenge specific facts and data that each Damages Expert relies on. (*Id.* at 27-33). Based on assumptions those experts make, and their failure to account for other factors, Defendants argue that each Damages Experts' methodology is therefore unreliable. (*Id.*).

The Court does not address these arguments, because Defendants make one additional argument, that is plainly meritorious and mandates the exclusion of Plaintiff's Damages Experts. Specifically, Defendants challenge Plaintiff's Damages Experts' collective decision to not financially account for the current deteriorated condition of the structures at the Terminal. Defendants argue that this is an impermissible departure from accepted principles of fair market valuation, that causes their valuations to be unreliable.

Defendants are correct. Before turning to that error, I review the common law authority on fair market value.

### 1.  The applicable law

The law is well-established that fair market value is "the price that a reasonable and willing buyer would pay a reasonable and willing seller given market conditions." *United States v. 480.00 Acres of Land*, 557 F.3d 1297, 1306-07 (11th Cir. 2009) (citation omitted). This requires consideration of "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ...." *Olson v. United States*, 292 U.S. 246, 255 (1934). The *Olson* Court explained: "The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable." *Id.* The Eleventh Circuit Court of Appeals elaborated further:

> Because a reasonable buyer "will purchase land with an eye to not only its existing use but to other potential uses as well," fair market value "includes any additional market value it may command because of the prospects for developing it to the 'highest and best use' for which it is suitable."

*United States v. Easements and Rights-of-Way Over a Total of 15.66 Acres of Land*, 779 Fed. Appx. 578, 581 (11th Cir. 2019) (quoting *United States v. 320.0 Acres of Land, More or Less in Monroe Cnty.*, 605 F.2d 762, 781 (5th Cir. 1979)).[29] In the end, the property owner "is entitled to be put in as good a position pecuniarily as if his property had not been

---

[29] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

taken. *He must be made whole but is not entitled to more*." *Olson*, 292 U.S. at 255 (emphasis added).[30]

Courts have recognized, and the parties agree,[31] that the highest and best use must be: (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) reasonably probable. *See, e.g.*, *Lost Tree Village Corp. v. United States*, 787 F.3d 1111, 1118 (Fed. Cir. 2015); *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1066 (9th Cir. 2010); *United States v. 275.81 Acres of Land*, No. 09-233, 2013 WL 989956, at *4 (W.D. Pa. Mar. 13, 2013). These principles derive from uniform appraisal standards that the parties agree set out the methodology their experts must use. *See, e.g.*, (Tr. at 78); *see also* (Tr. at 108).

### 2. Plaintiff improperly ignores the actual current condition of the property in its current fair market valuation

In their fair market valuation of the Confiscated Property today, Plaintiff's Damages Experts intentionally ignore its poor state of repair. They justify this by relying on a faulty legal assumption. This error causes Plaintiff's experts to depart from accepted appraisal methodology and to not account for the reduction of value caused by the failure to maintain the structures at the Terminal. The error is consequential, as there can be no doubt that the current value of the Confiscated Property would be higher had it been well-maintained. For

---

[30] These principles of fair market valuation have been forged in litigation about the "just compensation" the government owes, under the Fifth Amendment of the Constitution, to property owners whose property the government has condemned. Both parties reasonably rely on this body of law, as setting out the standard for fair market valuation.

[31] *See* (ECF No. 320 at 18-22); (ECF No. 369 at 6-14); (Tr. at 78); (Hentschel Report at 43-44, ECF No. 320-7).

this reason, Plaintiff's Damages Experts' opinions are unreliable and must be excluded. *See DAGS II, LLC v. Huntington Nat'l Bank*, 865 F.3d 384, 389-90 (6th Cir. 2017) (affirming exclusion of expert testimony because the expert's departure from accepted appraisal methodology was not justified); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir. 2005) (reversing district court's decision to admit expert testimony at trial because neither expert "utilized a reliable methodology").

As noted, Plaintiff's lead expert, Hentschel, incorporates the reports of the other four Damages Experts, into his final report. (Hentschel Report at 17, ECF No. 320-7). There, he acknowledges the deteriorated condition of the property:

> As of the October 24, 1960, the date of expropriation, the Subject Property was fully functional and reportedly in very good physical condition…. During the ensuing 60+/- years, there appears to have been a failure to maintain the property and make requisite repairs when due which seems to have resulted in a substantial deterioration in the property's physical condition.

(*Id.*). At the direction of Plaintiff's counsel, Hentschel imports into his analysis one of the "General Provisions" set forth in Subchapter I of the Settlement Act. It states, in relevant part, that the Commission, when it adjudicates a claim, should apply a principle of international law:

> *In determining the value of a claim under international law*, the Commission shall award the fair market value of the property as of the time of the taking by the foreign government involved (*without regard to any action or event that occurs after the taking*) …. Fair market value shall be ascertained in accordance with the method most appropriate to the property taken and equitable to the claimant ….

22 U.S.C. § 1623(a)(2)(B) (emphasis added). Hentschel quotes this language and relies upon it to assume that the property he values today is in good repair, when he knows that it is not. (Hentschel Report at 6, ECF No. 320-7). Hentschel reasons that

> to value the property in its actual present physical condition (which photographs suggest would be considered to be fair to poor) would attribute the waste that occurred after the taking and diminution in value attributable thereto to the owner (the claimant) from whom the property was expropriated ... rather than the expropriator, which would seem contrary to the intent of and the instruction contained in the International Claims Settlement Act that the appraiser value the property in a manner "most equitable to the Claimant" and "without regard to any action or event that occurs after the taking." To value the property in its actual present physical condition (portions of which are deteriorated and appear to be in fair to poor physical condition) would penalize the person from whom the property was expropriated (the Claimant) for the actions or inactions of others who were in control of the property during the intervening 60 +/- year period during which time the deterioration occurred.

(*Id.* at 17) (emphasis omitted).[32] Hentschel fails to appreciate that Congress, in the Settlement Act, set a standard for the Commission, whose task and purpose was altogether different than his own. He mistakenly concludes that the authority of the Settlement Act extends beyond the work of the Commission, to anyone who today attempts to determine the current fair market value of real property in Cuba that was expropriated, and thus justifies departure from established appraisal methodology. Hentschel expresses this belief as follows:

---

[32] Here, Hentschel cites *Case Concerning Certain German Interests in Polish Upper Silesia (Chorzów Factory) (Germany v. Poland),* Judgment (Permanent Court of International Justice), 25 May 1926, PCIJ SERIES A, NO. 7, at 47 (1927), which Plaintiff's counsel provided him. (Hentschel Report at 17 n.3, ECF No. 320-7).

> Hence, *to abide by the provisions of the International Foreign Claims Settlement Act and the precepts and precedents of international law*, it is appropriate that the appraiser should estimate the current value of the property as of March 1, 2021 under the hypothetical condition (as the term is defined in the U.S. Uniform Standards of Professional Appraisal Practice) that the property is in the same physical condition that existed as of the date of expropriation.

*Id.* (emphasis added). As noted, and as Plaintiff acknowledges, (ECF No. 369 at 18), Plaintiff's other Damages Experts make this same assumption. Hentschel's reasoning is flawed, for several reasons.

First, the plain language of that General Provision of the Settlement Act that Hentschel quotes, provides that the Commission shall "award the fair market value of the property *as of the time of the taking*". 22 U.S.C. § 1623(a)(2)(B) (emphasis added). As a simple temporal matter, what happened *after* the taking should not affect the fair market value at the time of the taking.

Second, when Congress amended the Settlement Act to include Subchapter V, Claims Against Cuba and China, it expressly and selectively incorporated into Subchapter V some of the General Provisions of Subchapter I, but it did not incorporate subsection (a) of Section 1623; the provision that Hentschel relies on. *See* 22 U.S.C. § 1643h.[33] Thus, Hentschel relies upon a provision of the Settlement Act that Congress did not extend to the Commission's valuation of claims against Cuba.

---

[33] A provision of Subchapter V does direct the Commission to "determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba". 22 U.S.C. § 1643b(a). It does not, however, include the phrase in Subchapter I, General Provisions, that Hentschel relies upon, *i.e.*, "without regard to any action or event that occurs after the taking". 22 U.S.C. § 1623(a)(2)(B).

Far more important is the plain language of the Helms-Burton Act. As relevant here, it clearly states that Plaintiff may recover the greater of (1) the amount certified by the Commission, or (2) the fair market value (past or present, whichever is greater), with a strong presumption in favor of the Commission's certified amount as the measure of damages.

"[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous ... judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (quotation marks and citation omitted); *see also Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC,* 777 F.3d 1187, 1191 (11th Cir. 2014). "Words are interpreted with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood". *United States v. Veal*, 153 F.3d 1233, 1246 (11th Cir. 1998), *abrogated on other grounds by Fowler v. United States*, 563 U.S. 668 (2011). There is no difficulty applying these principles of statutory construction here.

The damages provision of the Helms-Burton Act, 22 U.S.C. § 6082(a)(1)(A)(i), is unambiguous. It provides a clear "either/or" choice between the amount certified by the Commission (which is, by law, subject to "principles of international law")[34] *or* the greater of the fair market value of the confiscated property, at the time of confiscation, or now. Congress does not authorize the inclusion of "precepts and precedents of international law"

---

[34] The Settlement Act, 22 U.S.C. § 1643b(a).

26

in the fair market valuation of the property. (Hentschel Report at 17, ECF No. 320-7). It could have done so, but it did not.

As noted, in 1934 the Supreme Court, in *Olson v. United States*, recognized that fair market value is "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ...." 292 U.S. at 255. In 1996, when Congress enacted the Helms-Burton Act, fair market value was an established common law principle. It is "a term of art that has been commonly used by courts in the United States as a standard for determining the 'price' of property." *In re Mahoney*, 251 B.R. 748, 755 (S.D. Fla. 2000) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38 (1994) (quoting Black's Law Dictionary 971 (6th ed. 1990)); *F & M Schaeffer Brewing Co. v. Lehigh Cnty. Bd. of Appeals,* 610 A.2d 1, 3 (1992); *In re Nesser,* 206 B.R. 357, 366 (Bankr. W.D. Pa. 1997)).

The rules of statutory construction are clear: "In the absence of contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) (citing *Morissette v. United States,* 342 U.S. 246, 263 (1952); *Gilbert v. United States,* 370 U.S. 650, 658 (1962)). The language of the damages provision of the Helms-Burton Act allows no doubt: Congress authorized the common law concept of fair market value as an alternate measure of damages, to an amount certified by the Commission. It did nothing to blur the line between the work of the Commission, which is informed by international law, and the common law concept of fair market value.

Before I address the accepted appraisal methodology that Plaintiff's Damages Experts do not follow, I turn to an argument Plaintiff presents, in its Response Memorandum, to try to justify its Damages Experts' deviation from the norm. *See* (ECF No. 369 at 14-19).

Plaintiff begins by citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 429 (1964) for the proposition that, "[u]nder international law, a confiscation is *wrongful* if it is not for a public purpose, is discriminatory, or is without provision for prompt, adequate, and effective compensation." (ECF No. 369 at 15) (emphasis added) (quotation marks omitted).[35] Plaintiff then makes the case that Cuba wrongfully seized Plaintiff's property, to include relying on Congressional findings in the Helms-Burton Act that this is so. (ECF No. 369 at 15-6).[36]

---

[35] The *Sabbatino* Court addressed the application of the act of state doctrine in an action brought by an instrumentality of the Cuban government to enforce a decree of the Cuban government expropriating certain property. 376 U.S. at 399-401. The Court did not address the Helms-Burton Act or principals of fair market valuation.

[36] Congress made these findings:

> (8) The international judicial system, as currently structured, lacks fully effective remedies for the *wrongful confiscation* of property and for unjust enrichment from the use of *wrongfully confiscated property* by governments and private entities at the expense of the rightful owners of the property.

> (10) The United States Government has an obligation to its citizens to provide protection against *wrongful confiscations* by foreign nations and their citizens, including the provision of private remedies.

> (11) To deter trafficking in *wrongfully confiscated* property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting *Castro's wrongful seizures.*

Next, Plaintiff argues that because Cuba's seizure of Plaintiff's property interests was wrongful, this Court must apply a principle of international law, espoused by the Permanent Court of International Justice[37] that "reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act has [*sic*] not been committed." (*Id.* at 16) (alteration omitted) (quoting *Factory at Chorzów* (Germany v. Pol.), Judgment, 1928, P.C.I.J. (ser. A) No. 17, at 47 (September 13)). According to Plaintiff, this principle of international law should lead this Court to find that a determination of the current fair market value of the Confiscated Property must ignore the current poor and deteriorated condition of the property. (ECF No. 369 at 17). Plaintiff further maintains that it may accomplish this by employing a hypothetical permitted by uniform appraisal standards.[38]

What Plaintiff does not acknowledge is that *Chorzów*, and the other cases that Plaintiff relies upon to apply this principle, concerned claims brought against the confiscating state. *See* (ECF No. 369 at 17) (citing *Crystallex Int'l Corp. v. Boliviarian*

---

22 U.S.C. § 6081(8), (10), (11) (emphases added).

[37] The Permanent Court of International Justice was the predecessor of the International Court of Justice (IJC), established in the Covenant of the League of Nations. *Permanent Court of Int'l Justice*, INT'L COURT OF JUSTICE, https://www.icj-cij.org/en/pcij (last visited Mar. 31, 2022). The IJC is the principal judicial organ of the United Nations. Its role is to resolve, in accordance with international law, legal disputes submitted to it by States. *The Court*, INT'L COURT OF JUSTICE, https://www.icj-cij.org/en/court (last visited Mar. 31, 2022). The Court has no jurisdiction to deal with applications from individuals, non-governmental organizations, corporations, or any other private entity; it hears only disputes between States. *Who May Submit Cases to the Court?*, Second Question under *Frequently Asked Questions*, INT'L COURT OF JUSTICE, https://www.icj-cij.org/en/frequently-asked-questions (last visited Mar. 31, 2022).

[38] I address the concept of an appraisal hypothetical below.

*Republic of Venezuela*, 244 F. Supp. 3d 100, 119 (D.D.C. 2017) (court confirmed award of international arbitration tribunal against Venezuela, for expropriator rescission of mine operating contract in violation of treaty), and *ADC v. Hungary*, ICSID Case No. ARB/03/16)). If Plaintiff were suing Cuba here, the principle espoused in *Chorzów* might apply. Cuba, which is responsible for the neglect of the Terminal, of course is not a party.

Rather, Plaintiff employs the private right of action that Congress created in the Helms-Burton Act, to recover damages from third parties who trafficked in property that Cuba confiscated. This Court presumes, as it must, that in the damages provision of that Act, Congress said what it meant and meant what it said. *Conn. Nat'l Bank v. Germain*, 503 U.S. at 254. It gives Plaintiff a choice: recover from Defendants the amount the Commission certified, or if it is greater, recover (in this instance) the current fair market value of the property; with a strong presumption for the Commission's valuation.

Defendants correctly point out that Plaintiff attempts to pick and choose the most favorable aspects of the alternative measures of damages, to create its own hybrid fair market valuation. That is, it wants to recover the *current* fair market value of the confiscated property, but only if it can turn back the clock to 1960 and use the good condition of the property then – not the actual condition of the property today. Put differently, Plaintiff departs from the "either/or" damages choice of the Act and creates its own blended concept of fair market value. Plaintiff tries to justify this by confusing the legal principles that underlie the Commission's certification of Plaintiff's claim, with Congress' plain and clear statement that, as an alternative, Plaintiff can recover the current

fair market value of its stolen property, if it is greater. Plaintiff has wholly departs from the plain language of the statute.

Plaintiff's mixing-and-matching of standards causes Plaintiff to depart from the accepted methodology for valuation of fair market value and thus to run afoul of *Daubert* and Rule 702. As noted, to establish the highest and best use of property, it must be shown that the use is (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) reasonably probable. As explained here, the Damages Experts' misguided methodology leaves Plaintiff unable to show that its envisioned highest and best use is, in fact, financially feasible.

The methodology for determining the four elements of highest and best use is set forth in standards issued by the Appraisal Institute and the Appraisal Foundation.[39] The Appraisal Institute, in its publication, The Appraisal of Real Estate, 15th Edition, Chapter 17 "Highest and Best Use Analysis", recognizes those four "essential components" of highest and best use. (ECF No. 470-2 at 319).[40] Within that chapter, the Appraisal Institute addresses a highest and best use analysis that assumes "[a]lternative [u]ses of the [r]eal [e]state as [i]mproved", (*Id.* at 327), which is the approach Plaintiff's Damages Experts take. Addressing financial feasibility, the Institute states the following:

---

[39] At my direction, (ECF No. 468), the parties filed with the Court a copy of the appraisal standards they rely upon. (ECF No. 470). They filed different appraisal standards, although all recognize the concept of highest and best use. To give Plaintiff the benefit of the doubt, I rely here on the appraisal standards it provided the Court.

[40] The Appraisal Foundation, in its Uniform Appraisal Standards for Federal Land Acquisitions, 2016, an authority that Defendant cites, also recognizes these four elements of highest and best use. The Appraisal Institute, *Uniform Appraisal Standards for Federal Land Acquisitions*, at 102-03 § 4.3.2 Criteria for Analysis (2016) (ECF No. 470-3 at 113-14).

> Repairs may need to be made to the existing improvements for the current use to achieve the best competitive position in the marketplace. *The costs of curing physical deterioration* or functional obsolescence, redesigning a building, or converting the existing improvements into an alternative use ... should be analyzed in light of the value created in the market.... *If the changes will not be economically feasible, the expenditures would not be made—a point that an appraiser should incorporate into the highest and best use analysis.*

(*Id.* at 329) (emphasis added).

Plaintiff does not dispute that the accepted methodology for determining current fair market value accounts for the cost of making repairs to deteriorated property. Two of Plaintiff's Damages Experts, Garlich (the structural engineer) and Deiters (who estimated the cost to reproduce and modernize the structures), nearly concede as much, when they testified that they had never before assumed that a structure that had not been maintained for decades, had not deteriorated. *See* (Garlich Dep. at 99:3-10, ECF No. 320-11); (Deiters Dep. at 39:9-17, ECF No. 320-13). At deposition Garlich also acknowledged the obvious: that the repair of the deteriorated property in the Havana Port would be an additional cost.[41]

Instead, Plaintiff does something different; it contends it is relieved of this obligation because of the legal principle set forth in *Chorzów* and the Settlement Act. (ECF No. 369 at 16-19). From there Plaintiff leaps to a notion, recognized in appraisal methodology, that appraisers can rely on hypothetical conditions, and contends that its Damages Experts can employ the hypothetical that the Confiscated Property today is in the same condition it was in 1960.

---

[41] *See* (Garlich Dep. at 130:18–131:12, ECF No. 320-11).

The Appraisal Foundation, in its uniform standards for appraisal of real property, permits an appraiser to "identify any hypothetical conditions necessary in the assignment *... only if: (i) use of the hypothetical condition is clearly required for legal purposes*, for purposes of reasonable analysis, or for purposes of comparison; and (ii) use of the hypothetical condition results in a credible analysis ...." The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice (USPAP)* ("Uniform Standards"), at 17 (2020-21 ed.) (ECF No. 470-1 at 30) (emphasis added).[42] A hypothetical condition can "bas[e] the analysis upon a condition known to be false ...." (ECF No. 470-1 at 298). As noted, Hentschel relies upon these Uniform Standards to employ the hypothetical that today the confiscated property is in the same condition it was in 1960. (Hentschel Report at 17, ECF No. 320-7). Hentschel acknowledges that this is false. (*Id.*)

The flaw in Plaintiff's Damages Experts' use of the hypothetical is, as explained above, that it is not "clearly required for legal purposes." (ECF No. 470-1 at 30). Without valid justification, Plaintiff's Damages Experts thus depart from accepted appraisal methodology when they ignore "60+/- years ... [of] ... failure to maintain the property and make requisite repairs when due which seems to have resulted in a substantial deterioration in the property's physical condition." (Hentschel Report at 17, ECF No. 320-7). Plaintiff's Damages Experts never put a dollar amount to the reduced value caused by neglect of the Terminal structures, but there is no doubt that it is substantial and that, if accounted for, would reduce the current fair market value. Not having accounted for this cost, Plaintiff's

---

[42] Plaintiff argues only that the hypothetical is required for legal purposes.

Damages Experts fail to demonstrate the financial feasibility of its suggested highest and best use of the property today, which makes their opinion as to the current fair market value unreliable.

"Reliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable." *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1148, 1156 (N.D. Ca. 2003) (excluding expert who relies on an incorrect legal principle). Plaintiff's Damages Experts' hypothetical – that the Confiscated Property is today in good repair – is based on an erroneous reading of the law. Reliance on the impermissible hypothetical causes the Damages Experts to omit a necessary step in their fair market valuation analysis. "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain*, 401 F.3d at 1245 (emphasis omitted) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2nd Cir. 2002)) One of the *Daubert* factors is whether the technique or theory has been "generally accepted" in the scientific community. *Daubert*, 509 U.S. at 584.[43] Plaintiff's Damages Experts' misapplication of the highest and best use methodology is a departure from accepted appraisal methodology.

Because their opinion is unreliable, it is also unhelpful, and this too calls for its exclusion. The third *Daubert* factor requires Plaintiff to demonstrate that its Damages Experts' testimony will assist "the trier of fact, through the application of ... specialized expertise, to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158

---

[43] As noted, the Supreme Court later extended the *Daubert* principles beyond science to technical and other specialized knowledge. *Kumho Tire*, 526 U.S. at 147.

F.3d 548, 562 (11th Cir. 1998) (quoting Fed. R. Evid. 702 and *Daubert*, 509 U.S. at 589).
Plaintiff has failed to do this. Its Damages Experts' failure to account for the actual
condition of the structures at the Terminal today, leaves them unable to assist the trier of
fact to determine the current fair market value of the Confiscated Property.

For these reasons, I recommend that the Court grant Defendants' *Daubert* Motion
and exclude Plaintiff's Damages Experts.

### C. Plaintiff's Historian Expert

José Azel is Plaintiff's final expert. Azel earned an MBA, in international business,
from the University of Miami in 1986 and two years later the same University awarded
him a PhD., in international affairs. He is a Former Senior Scholar of the Institute for Cuban
and Cuban-American Studies, and a Former Adjunct Professor of International Business,
both at the University of Miami.[44] He has published many articles, mostly about Cuba and
political issues. (Azel Report at 31-42, ECF No. 320-21).

Azel offers conclusions about the Cuban government around the time of the
revolution, to offer "historical context for the confiscation of the properties of the nationals
of the United States" in 1960. (*Id.* at 4). His report "details numerous acts of aggression
and terror carried out by the Cuban Government from 1959 through 1960, many of which
targeted the United States and its nationals. The report also describes Cuba's current
political and government structure, the lack of freedom in Cuba, including criminal
penalties for gathering evidence or participating in legal proceedings relating to the

---

[44] In his report, Azel did not provide dates when he held these positions.

LIBERTAD Act, and the inability of the former owners of the confiscated properties to reclaim the property or receive compensation from the current Cuban Government." (*Id.*).

Defendants rightfully challenge Azel's qualifications to render opinions about Cuban law, as he is not an attorney. Defendants also challenge his opinions as both unreliable and not helpful. (ECF Nos. 320 at 33-36; 400 at 18-19).

In response, Plaintiff argues that Azel's opinions are relevant to two issues.

First, Plaintiff wants Azel to provide evidence that Cuba's confiscations of property "lacked a legitimate public purpose, were discriminatory, and failed to provide any compensation, and so were illegal under international law." (ECF No. 369 at 31). Plaintiff wishes to offer this evidence in support of its Damages Experts' use of the hypothetical, in their current fair market valuation, that the real property at the Terminal is in a good state of repair. The prior section of this Report set out why international law does not inform the determination of the current fair market value of the Confiscated Property. For the reasons expressed there, I conclude that Azel's testimony, that Cuba acted wrongfully when it took Plaintiff's property, is irrelevant and therefore not helpful.

Second, Plaintiff wants Azel to testify that Cuban Law 88 imposes criminal penalties on any person who provides support to those who seek to enforce the Helms-Burton Act, and that this is why Plaintiff's Damages Experts were unable to travel to Cuba to inspect the Terminal and to gather on-the-ground information about the property, (*id.*); something that those experts would normally do as part of their valuation of real property. This too is irrelevant, and therefore not helpful, given Defendants' stipulation, stated at

oral argument, that Plaintiff's Damages Experts were not permitted to travel to Cuba to inspect the property. (Tr. at 85).

Azel's opinions otherwise clearly do not bear on the damages issues pending for trial. For these reasons, I recommend that the Court grant Defendants' Motion to Exclude the Testimony of Azel as irrelevant and not helpful.

I add that expert testimony is also subject to other Rules of Evidence. *Allison*, 184 F.3d at 1309. Rule 401 provides that "[e]vidence is relevant if ... the fact is of consequence in determining the action." Fed. R. Evid. 401(b). Rule 403 permits the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay ...." Fed. R. Evid. 403. Many of Azel's opinions are not relevant, and if they are relevant, their probative value is substantially outweighed by the danger of undue prejudice, confusing the issues, misleading the jury, or delaying the damages trial. This is certainly so for his opinions about "numerous acts of aggression and terror carried out by the Cuban Government" and the "lack of freedom in Cuba". (Azel Report at 4, ECF No. 320-21). This information has no bearing on the issue of damages, and it should be excluded.

## IV.    Plaintiff's Motion to Exclude Opinion of Pablo Spiller

Defendants collectively engaged one expert on damages, Pablo Spiller. In his report, he offers three opinions summarized as follows:

> First, the Commission, in its certification of Plaintiff's claim, made serious methodological mistakes which caused it to grossly overstate the value of the Confiscated Property. The Commission should have used an income-based approach, and had it done so, it would have obtained a value of $826,721.

> Second, the fair market value of the Confiscated Property as of 1960, calculated by using a Discounted Cash Flow approach, was $1,457,821. With interest calculated at 0.09% per year, that sum, as of August 2019, was $1,535,258.
>
> Third, the fair market value of Plaintiff's remaining 44-year interest in the Confiscated Property as of February, 2021, was $46,300,457.

(Spiller Report at 8 ¶¶ 8-10, ECF No. 325-5).

In its Motion, Plaintiff challenges only the first two opinions as not relevant and therefore not helpful to the trier of fact.[45] Plaintiff is correct.

**A. The Act and the Settlement Act bars Spiller's first opinion**

When Spiller, in his first opinion, challenges the methodology the Commission used to value Plaintiff's claim, he calls into question the Commission's factual findings. First, he contends that the Commission incorrectly identified Plaintiff's property rights that were confiscated, when he writes that the Commission "[i]ncorrectly assessed the value of the concession *and* the real property (the Three Piers and the Marginal Building) as if those were two distinct assets, when it should have assessed the value of the concession relating to the right to operate a business on such real property". (Spiller Report at 36 ¶ 65(a), ECF No. 325-5). Spiller also argues that the Commission erred when it used the book value approach in its valuation, and that this substantially overvalued Plaintiff's property. (*Id.* at 39-44). And he contends that the Commission made erroneous ad-hoc adjustments to the book value that substantially overestimated Plaintiff's losses. (*Id.* at 44-47). By proposing

---

[45] Plaintiff does not challenge Spiller's qualifications or methodology.

to use Spiller's first opinion as evidence, Defendants invite this Court to review and disregard the Commission's Final Decision.

Congress, in the Settlement Act, flatly prohibited this frank challenge to the Commission's factual and legal findings, when it wrote: "The action of the Commission in allowing or denying any claim ... shall be final and conclusive on all questions of law and fact and not subject to review by ... any court by mandamus or otherwise." 22 U.S.C. § 1623(h). This limitation is one of the General Provisions in Subchapter I of the Settlement Act. Later, when Congress amended that Act to include Subchapter V, Claims Against Cuba and China, it expressly stated that this general provision was applicable to those claims. *See* 22 U.S.C. § 1643h ("... the following provisions of subchapter I of this chapter shall be applicable to this subchapter: Subsections ... (h) ... of section 1623 of this title ....").

With this language, Congress deprived this Court of jurisdiction to consider Spiller's critique of the Commission. *See* (*Zutich v. Gillilland*, 254 F.2d 464, 465 (6th Cir. 1958) (affirming trial court's dismissal of action because it "was correct in concluding that this unambiguous statutory language [in § 1623(h)] left it without jurisdiction to review the Commission's decision."); *De Vegvar v. Gillilland*, 228 F.2d 640, 642 (D.C. Cir. 1956) ("Errors in the result reached, or errors in the admission of evidence or in the making of a legal ruling – assuming such errors to have been made – are not grounds for judicial intervention in the face of the congressional fiat [in § 1623(h)] that the Commission's determinations shall be free of judicial review. Plaintiff is barred by the statutory prohibition."). This limitation on this Court's authority is reason enough, to exclude

Spiller's first opinion. I note, however, that the Helms-Burton Act also provides grounds for its exclusion.

Congress, in a Conference Committee Report on the liability and damages provision of the Helms-Burton Act – 22 U.S.C. § 6082 – wrote this about the purpose behind its creation of this private right of action:

> The conference substitute retains the language of the House bill creating *a strong presumption in favor of findings of the FCSC when determining the amount of liability* under this section for claims certified by the FCSC.... It is the committee of conference's *intent not to supplant or undermine the Foreign Claims Settlement process*, but to provide an additional remedy for U.S. nationals through which they may take action to protect their claim to a confiscated property in Cuba.

H.R. Rep. No. 104-468, at H1659 (March 4, 1996) (emphasis added).

This "strong presumption in favor of findings of [the Commission]" is evident in several provisions of the Act. One, titled "Rule of Construction", states: "Nothing in *this chapter* or in section 514 of the ... Settlement Act[46] ... shall be construed ... as superseding, amending, or otherwise altering certifications that have been made under title V of the ... Settlement Act ... before March 12, 1996." 22 U.S.C. § 6083(c)(2) (emphasis added). "[T]his chapter" refers to the Helms-Burton Act itself. Here, Defendants propose to employ the damages provision of that Act to present Spiller's first opinion that the Commission 'got it wrong' when it certified Plaintiff's claim. Defendants would have this Court

---

[46] This section is codified at 22 U.S.C. 1643l, which authorizes district courts to refer to the Commission, for fact-finding purposes, "questions of the amount and ownership of a claim by a United States national ...." It is of no consequence to the significance of § 6083(c)(2) in this case.

disregard the Commission's findings and conclusions in whole or in part. Defendants' use of Spiller's first opinion would be contrary to this Rule of Construction.

Other provisions of the Helms-Burton Act codify Congressional deference to the findings of the Commission. One is titled "Conclusiveness of certified claims". 22 U.S.C. § 6083(a)(1). It states that a "court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [Commission] ...." *Id.* Relying on that provision, and the Settlement Act, this Court, in its Omnibus Order, found that it "must accept as true the [Commission]'s certification of an ownership of an interest in confiscated property made in favor of [Plaintiff] and stated: "While Defendants may seek to have the Court usurp the [Commission's] role and issue its own legal and factual conclusions, the Court is unable to do so based on the express terms of the statute. *See* §§ 1622g, 1623(h); § 6083(a)(1)." (Omnibus Order at 100, 112-13, ECF No. 477). A component of Spiller's first opinion is that the Commission did not value Plaintiff's actual property interest. That is, with this opinion Defendants directly dispute the ownership interest that the Commission certified, contrary to this mandate of the "[c]onclusiveness of [the] certified claim[]". 22 U.S.C. § 6083(a)(1).

Finally, and as already noted, the Act's damages provision sets out "a presumption that the amount for which a person is liable ... is the amount that is certified" by the Commission. 22 U.S.C. § 6082(a)(2). Congress set the high bar of clear and convincing evidence, to rebut that presumption. *Id.* That is, for the measure of damages to be something other than the amount the Commission certified, a party would have to show by clear and

convincing evidence that the greater of the former or current fair market value is "the appropriate amount of liability ...." *Id.* Defendants propose to use Spiller's first opinion as a reason to find that the amount the Commission certified is not the "appropriate amount of liability". *Id.* Defendants acknowledge this, in their Response Memorandum: "there are myriad reasons the amount of the certified claim might not be the appropriate amount of liability. One possibility, as demonstrated here by [] Spiller, is that the [Commission] erred in its valuation." (ECF No. 364 at 6). Defendants' use of Spiller's first opinion for this purpose would be contrary to the strong deference Congress expressed for the findings of the Commission, in both the Settlement Act and the Helms-Burton Act. Put differently, given that clearly expressed respect for the findings of the Commission, Defendants would be hard-pressed to use Spiller's first opinion to argue that the amount the Commission certified is not the "appropriate amount of liability". 22 U.S.C. § 6082(a)(2).

Because Spiller's first opinion, that the Commission 'got it wrong,' is contrary to clearly established law, that opinion is not relevant to a determination of damages, nor would it be helpful to the trier of fact. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible. (citations omitted). They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."). I recommend that the Court exclude Spiller's first opinion.

### B. Spiller's second opinion is not relevant or helpful

Spiller next offers an opinion that the fair market value of the Confiscated Property in 1960 was $1,457,821, using a Discounted Cash Flow analysis. As noted, Spiller identifies Plaintiff's property interest as a concession that does not include an interest in

real property. He takes the average of Plaintiff's revenue between 1954 and 1958 and uses that to estimate the revenue Plaintiff would have earned from 1961 to 2004. (Spiller Report at 49-50, ECF No. 325-5). He then discounts that figure to "properly reflect[] the time value of money and the associated risks of operating the concession in Cuba" and concludes that the fair market value of the property as of October 24, 1960, was $1,457,821. (*Id.* at 51). When Spiller adds interest, at the rate of 0.09%, from October 24, 1960, until August 27, 2019 (the date when Plaintiff first filed suit), the total figure becomes $1,535,258. (*Id.* at 52 ¶ 108). I use the rounded figure here, of $1.5 million, as Spiller's valuation of the property at the time of confiscation.

In his Report, Spiller explains why he believes the income approach, summarized above, is the "most suitable valuation technique" to value Plaintiff's property. (*Id.* at 32 ¶ 52). He writes this:

> *The cost-based approach or book value method* relies entirely on historical information. As a result, it does not capture a company's expected capacity to generate earnings or cash flows. The book value method measures the value of an asset by reference to the value recorded in the company's financial statements. Generally, the book value of an asset reflects the acquisition cost (purchase price, or amounts spent to build) of such assets, net of accumulated depreciation. As such it is backward looking in nature.

(*Id.* at 34-35 ¶ 61) (emphasis added). In its Motion, Plaintiff seizes on the italicized phrase ("[t]he cost-based approach or book value method") to argue that Spiller erroneously equates the cost-based approach with book value, and Plaintiff argues that the Court should exclude this opinion for this reason. (ECF No. 328 at 17-18).

In its Response, Defendants cite to Spiller's deposition testimony and Rebuttal Report as evidence that Spiller does not conflate the two approaches to valuation. (ECF No. 364 at 10-11) If Spiller were permitted to testify to his second opinion, this is something that Plaintiff could easily address using the accepted means of challenging the evidence of an opposing party. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Plaintiff has not carried its burden to show that this opinion – if it is indeed Spiller's opinion – must be excluded from evidence under Rule 702.

Plaintiff has shown, however, that Spiller's second opinion is not relevant. His $1.5 million value of the Confiscated Property in 1960 is less than the $9.2 million that the Commission certified; it is also less than his current fair market valuation of $46 million. The Act's damages provision plainly states that the greater figure is the amount of damages. It also provides that the Commission's $9.2 million finding is presumed to be the amount of Defendants' liability. 22 U.S.C. § 6082 (a)(1)(A), (a)(2). As the lesser and disfavored number, Spiller's 1960 fair market value is irrelevant.

Defendants may attempt to argue that Spiller's $1.5 million 1960 value is the more "appropriate amount of liability" and if that is the case, the Court may wish to consider his opinion in that context. I otherwise recommend that the Court grant Plaintiff's *Daubert* Motion and Exclude Spiller's second opinion.

## V.    Conclusion and Recommendations

For the reasons expressed above, I respectfully recommend that the Court **GRANT** Defendants' Omnibus Motion to Exclude Testimony of Plaintiff's Experts (ECF No. 320), and exclude from evidence the testimony of John Hentschel, Franc Pigna, Michael Deiters, James Patton, Michael Garlich and José Azel.

I further recommend that the Court **GRANT** Plaintiff's Motion to Exclude Opinion of Pablo Spiller (ECF No. 328).

## VI.    Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Beth Bloom, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v.* Johnson, 885 F.2d 790, 794 (11th Cir. 1989), 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016).

RESPECTFULLY RECOMMENDED in Miami, Florida, this 1st day of April 2022.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

cc:    The Honorable Beth Bloom
        Counsel of Record