# EXHIBIT 5

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 1-11884

## ROYAL CARIBBEAN CRUISES LTD.

| Republic of Liberia | 98-0081645 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

(Exact name of registrant as specified in its charter)

**1050 Caribbean Way, Miami, Florida 33132**

(Address of principal executive offices) (zip code)

**(305) 539-6000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $.01 per share | RCL | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
|---|---|---|---|
| Emerging growth company ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. Yes ☒   No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of the registrant's common stock at June 30, 2021 (based upon the closing sale price of the common stock on the New York Stock Exchange on June 30, 2021) held by those persons deemed by the registrant to be non-affiliates was approximately $21.7 billion. Shares of the registrant's common stock held by each executive officer and director and by each entity or person that, to the registrant's knowledge, owned 10% or more of the registrant's outstanding common stock as of June 30, 2021 have been excluded from this number in that these persons may be deemed affiliates of the registrant. This determination of possible affiliate status is not necessarily a conclusive determination for other purposes.

There were 255,002,771 shares of common stock outstanding as of February 24, 2022.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to its 2022 Annual Meeting of Shareholders are incorporated by reference in Part III, Items 10-14 of this Annual Report on Form 10-K as indicated herein.

**ROYAL CARIBBEAN CRUISES LTD.**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 25 |
| Item 2. | Properties | 25 |
| Item 3. | Legal Proceedings | 25 |
| Item 4. | Mine Safety Disclosures | 25 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 26 |
| Item 6. | Reserved | 28 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 29 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 52 |
| Item 8. | Financial Statements and Supplementary Data | 54 |
| Item 9. | Changes In and Disagreements With Accountants on Accounting and Financial Disclosure | 54 |
| Item 9A. | Controls and Procedures | 55 |
| Item 9B. | Other Information | 55 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevents Inspections | 55 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 56 |
| Item 11. | Executive Compensation | 56 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 56 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 56 |
| Item 14. | Principal Accounting Fees and Services | 56 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 57 |
| Item 16. | Form 10-K Summary | 72 |
| Signatures | | 73 |

Table of Contents

**PART I**

As used in this Annual Report on Form 10-K, the terms "Royal Caribbean," "Royal Caribbean Group," the "Company," "we," "our" and "us" refer to Royal Caribbean Cruises Ltd. and, depending on the context, Royal Caribbean Cruises Ltd.'s consolidated subsidiaries and/or affiliates. The terms "Royal Caribbean International," "Celebrity Cruises," and "Silversea Cruises" refer to our wholly owned global cruise brands. Throughout this Annual Report on Form 10-K, we also refer to our partner brands in which we hold an ownership interest, including "TUI Cruises," and "Hapag-Lloyd Cruises." However, because these partner brands are unconsolidated investments, our operating results and other disclosures herein do not include these brands unless otherwise specified. In accordance with cruise vacation industry practice, the term "berths" is determined based on double occupancy per cabin even though many cabins can accommodate three or more passengers.

This Annual Report on Form 10-K also includes trademarks, trade names and service marks of other companies. Use or display by us of other parties' trademarks, trade names or service marks is not intended to and does not imply a relationship with, or endorsement or sponsorship of us by, these other parties other than as described herein.

**Item 1. Business.**

**General**

We are one of the leading cruise companies in the world. We control and operate three global cruise brands: Royal Caribbean International, Celebrity Cruises and Silversea Cruises (collectively, our "Global Brands"). We also own a 50% joint venture interest in TUI Cruises GmbH ("TUIC"), that operates the German brands TUI Cruises and Hapag-Lloyd Cruises (collectively, our "Partner Brands"). Together, our Global Brands and our Partner Brands operate a combined total of 61 ships in the cruise vacation industry with an aggregate capacity of approximately 140,855 berths as of December 31, 2021.

Our ships operate on a selection of worldwide itineraries that call on approximately 1,000 destinations on all seven continents. In addition to our headquarters in Miami, Florida, we have offices and a network of international representatives around the world, which primarily focus on sales and market development.

We compete principally by operating valued brands that offer exceptional service provided by our crew and on the basis of innovation and quality of ships, variety of itineraries, choice of destinations and price. We believe that our commitment to build state-of-the-art ships and to invest in the maintenance and upgrade of our fleet to, among other things, incorporate many of our latest signature innovations, allows us to continue to attract new and loyal repeat guests.

Royal Caribbean was founded in 1968 as a partnership. Its corporate structure has evolved over the years and, the current parent corporation, Royal Caribbean Cruises Ltd., was incorporated on July 23, 1985 in the Republic of Liberia under the Business Corporation Act of Liberia.

**COVID-19**

*Return to Healthy Sailing*

We have restarted our global cruise operations in a phased manner, following our voluntary suspension of global cruise operations that commenced in March of 2020 in response to the COVID-19 pandemic. By the end of December 2021, we operated 50 of our Global and Partner Brand ships, representing over 85% of our capacity, and we have carried approximately 1.3 million guests since we resumed operations.

Our return to service efforts incorporate our enhanced health and safety protocols, and the requirements of regulatory agencies, which has resulted in reduced guest occupancy, modified itineraries and vaccination protocols. We experienced service disruptions and cancelled several sailings in the first quarter of 2022 due to the impact from the Omicron variant ("Omicron"). Service disruptions have abated as COVID-19 cases have declined. Despite the service disruptions and cancellations, we believe the overall trajectory of our return to service remains unchanged. We expect that by the end of the first quarter of 2022, 53 out of 62 ships, including *Wonder of the Seas*, which was delivered in January 2022, will have been brought back to service. Additionally, we expect that the rest of the fleet will return to operations before the summer season. See Part II. Item 7. *Management's Discussion and Analysis - Critical Accounting Policies and Estimates* and *Recent Developments: COVID-19*, and Note 1. *General* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data* for further details on the impact of COVID-19 on our financial condition and results of operations.

**Our Global Brands**

Our Global Brands include Royal Caribbean International, Celebrity Cruises, and Silversea Cruises. We believe our Global Brands possess the versatility to enter multiple cruise market segments within the cruise vacation industry. Although each of our Global Brands has its own marketing style, as well as ships and crews of various sizes, the nature of the products and services delivered by our Global Brands share a common base (i.e., the sale and provision of cruise vacations). Our Global Brands also offer similar itineraries as well as similar cost and revenue components. The itineraries of our Global Brands are subject to the phased resumption of our operations and local restrictions. In addition, our Global Brands have historically sourced passengers from similar markets around the world and operated in similar economic environments with a significant degree of commercial overlap. As a result, we strategically manage our Global Brands as a single business with the ultimate objective of maximizing long-term shareholder value.

*Royal Caribbean International*

Royal Caribbean International is the world's largest cruise brand. The brand competes in both the contemporary and premium segments of the cruise vacation industry and appeals to families with children of all ages, as well as both older and younger couples. Royal Caribbean International offers cruises and land destinations that generally feature a casual ambiance, as well as a variety of activities and entertainment venues. We believe that the quality of the Royal Caribbean

International brand allows it to achieve market coverage that is among the broadest of any of the major cruise brands in the cruise vacation industry. Royal Caribbean International's strategy is to attract an array of vacationing guests by offering a wide variety of itineraries to destinations worldwide, including Alaska, Asia, Australia, the Bahamas, Bermuda, Canada, the Caribbean, Europe, the Panama Canal and New Zealand, with cruise lengths generally ranging from one to 25 nights. Royal Caribbean International offers multiple innovative options for onboard dining, entertainment and other onboard activities. Because of the brand's ability to deliver extensive and innovative product offerings at an excellent value to consumers, we believe Royal Caribbean International is well positioned to attract new consumers to cruising and to continue to bring loyal repeat guests back for their next vacation.

Royal Caribbean International operates 25 ships with an aggregate capacity of approximately 88,400 berths. Additionally, as of December 31, 2021, Royal Caribbean International had five ships on order with an aggregate capacity of approximately 28,200 berths, which consisted of two Oasis-class ships and the first three ships of a new generation, known as the Icon-class ships. The two Oasis-class ships include *Wonder of the Seas*, which was delivered in January of 2022, and our sixth Oasis-class ship, which is expected to be delivered in the second quarter of 2024. The Icon-class ships include *Icon of the Seas*, which is expected to be delivered in the third quarter of 2023, and the second and third Icon-class ships, which are expected to be delivered in the second quarters of 2025 and 2026, respectively.

The expected delivery dates for all of our ships on order are subject to change in the event of shipyard construction delays. See Part I. Item 1A. Risk Factors for further discussion on the impact of COVID-19 on shipyard operations.

*Celebrity Cruises*

Celebrity Cruises is positioned within the luxury segment of the cruise vacation industry. Celebrity Cruises' strategy is to target affluent consumers by delivering a destination-rich experience on upscale ships that offer, among other things, luxurious accommodations, refined design-forward spaces, world-class service and culinary excellence. Celebrity Cruises offers a range of itineraries to destinations, including Alaska, Asia, Australia, Bermuda, Canada, the Caribbean, Europe, the Galapagos Islands, Hawaii, New Zealand, the Panama Canal and South America, with cruise lengths ranging from two to 18 nights.

Celebrity Cruises operates 14 ships with an aggregate capacity of approximately 29,215 berths. Additionally, as of December 31, 2021, Celebrity Cruises had two ships on order with an aggregate capacity of approximately 6,500 berths. These ships include two Edge-class ships, *Celebrity Beyond* and *Celebrity Ascent*, which are expected to be delivered in the second quarter of 2022 and in the fourth quarter of 2023, respectively. In addition, we have an agreement in place with Chantiers de l'Atlantique to build an additional Edge-class ship with capacity of approximately 3,250 berths, estimated for delivery in 2025, which is contingent upon completion of certain conditions precedent and financing.

*Silversea Cruises*

Silversea Cruise Holding Ltd. ("Silversea Cruises") is an ultra-luxury and expedition cruise line with smaller ships, high standards of accommodations, fine dining, personalized service and exotic itineraries. Silversea Cruises delivers distinctive destination experiences by visiting unique and remote destinations, including the Galapagos Islands, Antarctica and the Arctic with cruise itineraries generally ranging from five to 25 nights.

Silversea Cruises operates ten ships, with an aggregate capacity of approximately 3,950 berths, including the brand's newest ship, *Silver Dawn*, which was delivered in the fourth quarter of 2021 and is expected to commence revenue generating voyages in the second quarter of 2022. Additionally, as of December 31, 2021, Silversea Cruises had two ships on order with an aggregate capacity of approximately 1,460 berths. The Evolution-class ships are expected to be delivered in the second quarters of 2023 and 2024, respectively.

*Azamara*

Effective March 19, 2021, we sold our wholly-owned brand, Azamara Cruises ("Azamara"), including its three-ship fleet and associated intellectual property, to Sycamore Partners for $201 million, before closing adjustments. The sale of Azamara does not represent a strategic shift that will have a major effect on our operations and financial results, as we continue to provide similar itineraries and to source passengers from the markets served by the Azamara business.

**Our Partner Brands**

Our Global Brands are complemented by our interest in TUIC, our 50%-owned joint venture that operates the German brands TUI Cruises and Hapag-Lloyd Cruises (collectively, our "Partner Brands").

TUIC is a joint venture owned 50% by us and 50% by TUI AG, a German tourism company, which is designed to serve the contemporary and premium segments of the German cruise market by offering products tailored for German

guests. All onboard activities, services, shore excursions and menu offerings are designed to suit the preferences of this target market.

TUI Cruises operates seven ships, with an aggregate capacity of approximately 17,700 berths. Additionally, as of December 31, 2021, TUI Cruises had three ships on order with an aggregate capacity of approximately 11,100 berths, that are expected to be delivered in the second quarter of 2024, the fourth quarter of 2024 and the second quarter of 2026, respectively.

Hapag-Lloyd Cruises operates two luxury liners and three smaller expedition ships, with an aggregate capacity of approximately 1,590 berths. Hapag-Lloyd Cruises did not have any ships on order as of December 31, 2021. Refer to Note 7. *Other Assets* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data* for further details.

**Industry**

The cruising industry has been considered a well-established vacation sector in the North American, European and Australian markets and a developing sector in several other emerging markets. As the industry proceeds with its resumption of operations, we believe that cruising will continue to be a popular vacation choice in the long-term due to its inherent value, extensive itineraries and variety of shipboard and shoreside activities.

The Company and other industry participants voluntarily suspended operations in March of 2020 and gradually resumed operations in the second half of 2021, resulting in a limited number of operated cruises in 2020 and 2021. As a result, representative information of market penetration and other indicators are not meaningful for 2020 and 2021. For the five year period prior to 2020, industry data indicated that market penetration rates were still low and that a significant portion of cruise guests carried in those years were first-time cruisers. We believe this presents an opportunity for operational and financial recovery and long-term growth for the industry as it continues to resume operations.

The following table details industry market penetration rates for North America, Europe and Asia/Pacific for the five years prior to the impact of COVID-19 in 2020, computed based on the number of annual cruise guests as a percentage of the total population:

| Year [1] | North America[2][3] | Europe[2][4] | Asia/Pacific[2][5] |
|---|---|---|---|
| 2015 | 3.36% | 1.25% | 0.08% |
| 2016 | 3.43% | 1.23% | 0.11% |
| 2017 | 3.56% | 1.28% | 0.15% |
| 2018 | 3.87% | 1.38% | 0.16% |
| 2019 | 3.89% | 1.41% | 0.20% |

(1)    Historically, we have reported annual comparable information for relevant comparisons to other periods. The 2020 suspension of global cruise operations as a result of COVID-19 and the gradual resumption of operations in 2021 do not allow for a meaningful comparison to prior years' information and as such the 2020 and 2021 data has been excluded from this table.

(2)    Source: Our estimates are based on a combination of data obtained from publicly available sources including the International Monetary Fund, United Nations, Department of Economic and Social Affairs, Cruise Lines International Association ("CLIA") and G.P. Wild. In addition, our estimates incorporate our own analysis utilizing the same publicly available cruise industry data as a base.

(3)    Our estimates include the United States and Canada.

(4)    Our estimates include European countries relevant to the industry (most notably: the Nordics, Germany, France, Italy, Spain and the United Kingdom).

(5)    Our estimates include Southeast Asia (most notably: Singapore, Thailand and the Philippines), East Asia (most notably: China and Japan), South Asia (most notably: India) and Oceania (most notably: Australia and New Zealand) regions.

The global cruise fleet was served by a weighted average of approximately 579,000 berths during 2019 with approximately 354 ships at the end of 2019. As of December 31, 2021, there were approximately 78 ships on order with an estimated 183,000 berths that are expected to be placed in service in the global cruise market through 2027, not taking into account ships taken out of service at an accelerated rate and new ship orders were deferred due to global cruise operation restrictions in 2020 and limited sailings in 2021 resulting from the COVID-19 pandemic. The global cruise industry carried approximately 30.0 million cruise guests in 2019 and approximately 28.5 million in 2018.

The following table details the growth in global weighted average berths and the global, North American, European and Asia/Pacific cruise guests for the five years prior to the impact of COVID-19 in 2020 (in thousands, except berth data):

| Year [1] | Weighted-Average Supply of Berths Marketed Globally [2] | Royal Caribbean Group Total Berths [3] | Global Cruise Guests [2] | North American Cruise Guests [2][4] | European Cruise Guests [2][5] | Asia/Pacific Cruise Guests [2][6] |
|---|---|---|---|---|---|---|
| 2015 | 469,000 | 112,700 | 23,000 | 12,004 | 6,587 | 3,129 |
| 2016 | 493,000 | 123,270 | 24,000 | 12,274 | 6,512 | 4,466 |
| 2017 | 515,000 | 124,070 | 26,700 | 12,865 | 6,779 | 5,415 |
| 2018 | 546,000 | 135,520 | 28,500 | 14,062 | 7,343 | 5,685 |
| 2019 | 579,000 | 141,570 | 30,000 | 14,246 | 7,554 | 7,317 |

---

(1) Historically, we have reported annual comparable information for relevant comparisons to other periods. The 2020 suspension of global cruise operations as a result of COVID-19 and the gradual resumption of operations in 2021 do not allow for a meaningful comparison to prior years' information and as such the 2020 and 2021 data has been excluded from this table.

(2) Source: Our estimates of the number of global cruise guests and the weighted-average supply of berths marketed globally are based on a combination of data that we obtain from various publicly available cruise industry trade information sources. We use data obtained from Seatrade Insider, Cruise Industry News and company press releases to estimate weighted-average supply of berths and CLIA and G.P. Wild to estimate cruise guest information. In addition, our estimates incorporate our own analysis utilizing the same publicly available cruise industry data as a base.

(3) Total berths include our berths related to our Global Brands and Partner Brands.

(4) Our estimates include the United States and Canada.

(5) Our estimates include European countries relevant to the industry (most notably: the Nordics, Germany, France, Italy, Spain and the United Kingdom).

(6) Our estimates include Southeast Asia (most notably: Singapore, Thailand and the Philippines), East Asia (most notably: China and Japan), South Asia (most notably: India) and Oceania (most notably: Australia and New Zealand) regions.

***North America***

Industry cruise guests have been primarily sourced from North America, which represented approximately 47% of global cruise guests in 2019. The compound annual growth rate in cruise guests sourced from this market was approximately 4% from 2015 to 2019.

***Europe***

Industry cruise guests sourced from Europe represented approximately 25% of global cruise guests in 2019. The compound annual growth rate in cruise guests sourced from this market was approximately 3% from 2015 to 2019.

***Asia/Pacific***

Industry cruise guests sourced from the Asia/Pacific region represented approximately 24% of global cruise guests in 2019. The compound annual growth rate in cruise guests sourced from this market was approximately 24% from 2015 to 2019.

**Competition**

We compete with a number of cruise lines. Our principal competitors are Carnival Corporation & plc, which owns, among other brands, Aida Cruises, Carnival Cruise Line, Costa Cruises, Cunard Line, Holland America Line, P&O Cruises, Princess Cruises and Seabourn; Disney Cruise Line; MSC Cruises; Norwegian Cruise Line Holdings Ltd, which owns Norwegian Cruise Line, Oceania Cruises, and Regent Seven Seas Cruises; and Virgin Voyages. Cruise lines also compete with other vacation alternatives such as land-based resort hotels, internet-based alternative lodging sites and sightseeing destinations for consumers' leisure time. The COVID-19 pandemic-related restrictions and general economic conditions have significantly affected companies within the vacation market which may result in a changed competitive landscape as we continue to return to service.

**Operating Focus**

Our principal operating strategies remain consistent with our historical strategies, yet have been affected by the impact that the COVID-19 pandemic has had, and continues to have, on our Company's operations. We continue to prioritize operating strategies that support the return of our full fleet into operations, the delivery of memorable vacation experiences to our guests, the healthy and safe return of global cruising for guests, crew and the communities visited, and the enhancement of our financial results and liquidity. We strive to execute these strategies in a socially and environmentally responsible manner, working with our various business and community partners as we build toward a more sustainable cruise industry.

Our Company's operating focus is as follows:

- deliver outstanding vacation experiences to our guests;
- protect the health, safety and security of our guests and employees;
- support the healthy return of cruising globally along with our industry partners, including national and local governments and regulators, the communities in which we operate, other cruise companies, shipyards, our guests and trade partners;
- strengthen our consumer engagement in order to enhance our revenues;
- focus on cost efficiency, adequate cash and liquidity, and manage our balance sheet, with the overall goals of sustaining our operations and being well positioned during our recovery, and, in the long-term, maximizing our return on invested capital and shareholder value;
- protect the environment in which our vessels and organization operate;
- invest in our workforce in order to better serve our global guest base and grow our business, and promote gender equality, diversity and inclusion;
- increase the awareness and market penetration of our brands globally;
- strategically invest in our fleet through the upgrade and maintenance of existing ships and the transfer of key innovations, while prudently expanding our fleet with new state-of-the-art cruise ships;
- capitalize on the portability and flexibility of our ships by deploying them into those markets and itineraries that provide opportunities to optimize returns, while continuing our focus on existing key markets;
- provide extraordinary destination experiences and state-of-the-art port facilities to our guests;
- continue to deploy technology capabilities and advanced uses of data and analytics to deliver innovative customer experiences as well as to create operational efficiencies that enhance employee satisfaction; and
- maintain strong relationships with travel advisors, which continue to be the principal industry distribution channel, while enhancing our consumer outreach programs.

*Safety and health policies*

We are committed to protecting the health, safety and security of our guests, employees and others working on our behalf. Our efforts in these areas are managed by several departments within the Company that are responsible for maritime safety, global security, environmental stewardship and medical/public health activities; overseen by the Safety,

Table of Contents

Environment, Sustainability and Health Committee of our board of directors and informed by a Maritime Advisory Board of experts. Refer to the *Regulation - Safety and Security Regulations* section below for further information.

*Support the healthy return of cruising*

We continue to work and collaborate with epidemiological and policy experts, health authorities and various governments around the globe to drive a healthy and safe return to cruising for guests, crew and the communities visited. We work in close partnership and communication with our contracted shipyards to work towards a safe and effective shipyard working environment in the midst of COVID-19. Refer to the *Regulation - CDC COVID-19 Program for Cruise Ships Operating in U.S. Waters* section below for further information.

We have established flexible cruise pricing and booking programs (e.g. Cruise with Confidence, Best Price Guarantee, COVID Protection Policy, and all-inclusive pricing) that present our guests with options and value as we continue our return to service. The travel advisor community has been a vital partner in our success, and we are committed to assist travel advisors during this challenging time with essential financial relief (e.g., the RCL CARES program).

*Consumer engagement*

We place a strong focus on identifying the needs of our guests and creating product features and innovations that our customers value. We are focused on the acquisition and targeting of high-value guests by better understanding consumer data and insights to create communication strategies that resonate with our target audiences.

We target customers at important consumer decision points and identify underlying needs for which guests are willing to pay a premium. We rely on various programs and technologies during the cruise-planning, cruising and after-cruise periods aimed at increasing ticket prices, onboard revenues and occupancy. We have and expect to strategically invest in onboard projects on our ships that we believe drive marketability, profitability and improve the guest experience.

*Focus on cost efficiency, capital allocation, adequate cash and liquidity and managing of our balance sheet*

We are focused on improving our cost structure to best position us during our recovery. We are leveraging our scale and shifting our resources behind our Royal Caribbean International, Celebrity Cruises and Silversea brands. We continue to focus on liquidity through cash flow optimization and additional financing sources while managing our balance sheet, with the goal of being well positioned during our recovery. Additionally, we agreed with certain of our lenders that we will not pay dividends or engage in stock repurchases until the end of the third quarter of 2022. In the event we declare a dividend or engage in share repurchases, we will need to repay the amounts deferred under our export credit facilities.

We are focused on maintaining a strong liquidity position and a balanced debt maturity profile, while making progress on achieving an unsecured balance sheet, lowering interest expense, and reducing leverage. We believe these strategies enhance our ability to achieve our overall goal of maximizing our long-term shareholder value.

*Protect the environment*

We are focused on the environmental health of the marine environment and communities in which we operate. This includes reducing our carbon footprint through our Destination Net Zero strategy, our energy and carbon efficiencies included in the design of our new capacity, our ongoing energy management program on our existing fleet and the development of new technologies.

Destination Net Zero is our decarbonization strategy that focuses on how to achieve net zero emissions by 2050 and assessing the feasibility of establishing Science-Based Targets. Destination Net Zero's four-pronged approach includes the modernization of our global brands fleet through the introduction of new energy-efficient and alternatively fueled vessels, continued investment in energy efficiency programs, development of alternative fuel and alternative power solutions, and optimized deployment and integration of strategic shore-based supply chains. We are in the early stages of developing our roadmap to achieve these goals. It is already clear that such a strategy will require new fuels that are not available today. Refer to Item 1A. Risk Factors - "*Our sustainability activities, including environmental, social and governance (ESG) matters, could result in reputational risks, increased costs and other risks*" for a discussion of the risks associated with our environmental initiatives.

Our long-term partnership with the World Wildlife Fund focuses on greenhouse gas reduction strategies, sustainable sourcing of food supplies, waste management, sustainable destinations and guest education on ocean conservation issues, which supports onboard conservation efforts such as our reduced use of plastics. We are also committed to assessing and managing potential impacts related to our operations in the communities in which we operate.

We believe in transparent reporting on our environmental and sustainability stewardship, as well as our social and governance efforts, and have annually published a Sustainability Report since 2008. This report, the current version of which is accessible on our corporate website, highlights our progress with regards to those environmental and social aspects of our business that we believe are most significant to our organization and stakeholders. In addition to providing an overview, the report complies with the guidelines of the Global Reporting Initiative and the Sustainable Accounting Standards Board. Our corporate website also provides information about our environmental performance goals and sustainability initiatives. The foregoing information contained on our website is not part of any of these reports and is not incorporated by reference herein or in any other report or document we file with the Securities and Exchange Commission. Refer to the *Regulation - Environmental Regulations* section below for further information.

*Investing in our workforce and promoting equality, diversity and inclusion*

We believe that our employees, both shipboard and shoreside, are a critical success factor for our business. We strive to identify, hire, develop, motivate and retain the best employees, who provide our guests with extraordinary vacations. Our ability to attract, engage, and retain key employees has been and will remain critical to our success.

We focus on providing our employees with a competitive compensation structure, development opportunities, and other personal and professional growth opportunities in order to strengthen and support our human capital. We also select, develop and have strategies to retain high performing leaders to advance the enterprise now and in the future. To that end, we pay special attention to identifying high performing leaders and developing bench strength so these leaders can assume leadership roles throughout the organization.

We strive to maintain a work environment that reinforces collaboration, motivation and innovation, and believe that maintaining a strong employee-focused culture is beneficial to the growth and expansion of our business. We foster diversity and inclusion among our broad employee base. Refer to the *Human Capital* section below for further information.

*Global awareness and market penetration*

We increase brand awareness and market penetration of our cruise brands in various ways, including the use of communication strategies and marketing campaigns designed to emphasize the qualities of each brand and to broaden the awareness of the brand, especially among target groups. Our marketing strategies include the use of travel advisors, traditional media, mobile and digital media as well as social media, influencers and brand websites. Our brands engage past and potential guests by collaborating with travel partners and through call centers, international offices and international representatives. In addition, our Global Brands target repeat guests with exclusive benefits offered through their respective loyalty programs.

We sell and market our Global Brands to guests outside of the United States and Canada through the combined efforts of internationally focused internal resources and a network of independent international representatives located throughout the world. While the majority of our guests for our Global Brands come from North America, we also sell and market our cruise brands to guests in countries outside of North America by tailoring itineraries and onboard product offerings to the cultural characteristics and preferences of our international guests. In addition, we explore opportunities that may arise to acquire or develop brands tailored to specific markets.

Prior to the impact of COVID-19 in 2020, passenger ticket revenues generated by sales originating in countries outside of the United States were approximately 35% of total passenger ticket revenues in 2019, and 39% in 2018. International guests have grown from approximately 2.5 million in 2015 to approximately 2.6 million in 2019. Refer to Item 1A. *Risk Factors - "Conducting business globally may result in increased costs and other risks"* for a discussion of the risks associated with our international operations.

*Fleet upgrade and maintenance*

We place a strong focus on innovation, which we seek to achieve by introducing new concepts on our new ships and continuously making improvements to our fleet through modernization projects and key technological improvements. Several of these innovations have become signature elements of our brands. For the Royal Caribbean International brand, we introduced the "Royal Promenade" (a boulevard with shopping, dining and entertainment venues) and interior balconies on the Oasis class ships and a two-level family suite on *Symphony of the Seas*. For the Celebrity Cruises brand, we enhanced many of the brand's design features through the introduction of the Solstice class ships. More recently, with the introduction of *Celebrity Edge*, we introduced the "Magic Carpet" (a cantilevered, floating platform that reaches a height of 13 stories above sea level and can serve as a dining venue, full bar and platform for live music) and newly designed staterooms with an "Infinite Veranda" where, with the touch of a button, the veranda becomes part of the entire living space.

As part of the newbuild and modernization programs, we also seek to bring innovations in the areas of safety, reliability and energy efficiency to our fleet.

We are committed to building state-of-the-art ships at a moderate growth rate and we believe our success in this area provides us with a competitive advantage. Our newer vessels traditionally generate higher revenue yield premiums and are more efficient to operate than older vessels.

As of December 31, 2021, our Global Brands and Partner Brands have 12 ships on order. Refer to the *Operations* section below for further information on our ships on order. In addition, we regularly evaluate opportunities to order new ships, purchase existing ships or sell ships in our current fleet while ensuring that we remain focused on the returns we generate on invested capital and maintaining a high level of discipline on capital spending and operating leverage.

During 2021, we sold the Azamara brand, which included three vessels: *Azamara Journey, Azamara Quest* and *Azamara Pursuit.*

*Markets and itineraries*

In an effort to penetrate untapped markets, diversify our consumer base and respond to changing economic and geopolitical market conditions, we continue to seek opportunities to deploy ships to new and stronger markets and itineraries throughout the world. The portability of our ships allows us to deploy our ships to meet demand within our existing and new cruise markets. We make deployment decisions generally 18 to 28 months in advance, with the goal of optimizing the overall profitability of our portfolio. Additionally, the infrastructure investments we have made to create a flexible global sourcing model have made our brands relevant in a number of markets around the world, which allows us to be opportunistic and source the highest yielding guests for our itineraries.

Our ships offer a wide selection of itineraries that call on approximately 1,000 destinations in 120 countries, spanning all seven continents. We are focused on maximizing long-term shareholder returns by operating in established markets while growing our presence in developing markets. New capacity has allowed us to expand into new markets and itineraries. Our brands have expanded their mix of itineraries while strengthening our ability to further penetrate the Asian and Australian markets. The acquisition of Silversea Cruises added more than 500 new destinations allowing us to expand and enhance our selection of exotic itineraries.

We have developed new and attractive itineraries that have allowed us to resume our operations on a staggered basis and in consideration of local restrictions. We are also responding quickly to changes in market demand, as observed in our bookings.

*Destination experiences and port facilities*

In order to provide unique destination experiences to our guests, we have invested in our private land destinations. In 2018, we announced Perfect Day Island Collection, an initiative to develop a series of private island destinations around the world. The first island in the collection, Perfect Day at CocoCay, opened in Spring 2019 and includes a wide range of attractions, such as a full water park, zip line course, freshwater pools, helium balloon ride, splash pads and a beach club. As a result of the operational disruptions caused by the COVID-19 pandemic and in an effort to bolster our liquidity, we have delayed previously announced Perfect Day site openings and are reassessing their timing as well as the timing of our Royal Beach Club offering portfolio. We are also reassessing our investment in other destinations.

In an effort to secure desirable berthing facilities for our ships, and to provide new or enhanced cruise destinations for our guests, we have actively assisted or invested in the development or enhancement of certain port facilities and infrastructure, including mixed-use commercial properties, located in strategic ports of call. For instance, a new homeport cruise terminal of approximately 170,000 square feet was completed at Port Miami in Miami, Florida in 2018. We expect that our new homeport cruise terminal in Galveston, Texas will be completed in 2022.

Generally, we collaborate with local, private or governmental entities by providing management and/or financial assistance and often enter into long-term port usage arrangements. Our participation in these efforts is most often accomplished via investments with the relevant government authority and/or various other strategic partnerships established to develop and/or operate the port facilities, by providing direct development and management expertise or in certain limited circumstances, by providing direct or indirect financial support. In exchange for our involvement, we generally secure preferential berthing rights for our ships.

*Technological capabilities*

Technology is a pervasive part of virtually every business process we use to support our strategic focus and provide a quality experience to our customers before, during and after their cruise. Technology also plays a critical role in the

measures and protocols that we have developed and will continue to develop to mitigate COVID-19 on our cruise ships. For example, through the deployment of our innovative electronic safety drill ("Muster 2.0") program, we have added convenience, allowed for physical distancing, and improved our guests experience regarding the mandatory safety briefing. Additionally, through the in-app messaging technology we are enhancing guest check-in to support education, testing and screening information prior to embarkation, and to support onboard detection contingency scenarios and protocols, and most importantly promote the health and safety of guests and crew.

We have continued to integrate digital capabilities into our operations and have increased our focus in bringing in data analytics and artificial intelligence into our processes. For example, we continue to develop tools to enhance our guests' digital experience and grow onboard revenue, by making it easier for our guests to plan and maximize their next vacation through our apps. Also, we have continued the deployment of our innovative guest journey solutions across our fleet from online check-in to port embarkation to onboard cruise experience. At the same time, we are investing in shipboard operational technology to facilitate casino play, hotel maintenance, as well as the optimization of marine maintenance. In concert with our destination focus, our island technology solutions are now enabling our guests to remain connected with WiFi access, order food and beverage as well as take advantage of all the island based activities with the same ease as onboard our ships.

Investments in our core platforms, as well as the trade and direct distribution channels, are delivering the benefit of more modernized solutions with scalability and faster self-service response times while also deploying new features such as flight packages and additional promotional offer capabilities.

Cyber security and data privacy are an ongoing focus, and we have made and will continue to make investments to protect our customer data, intellectual property and global operations.

*Travel advisor support and consumer outreach*

Travel advisors continue to be a significant sourcing channel of ticket sales for our ships. We believe in the value of this distribution channel and invest in maintaining strong relationships with our travel partners. To accomplish this goal, we seek to maintain competitive commission rates and incentive structures with the marketplace. We continuously work with travel advisors to sell upgrades and add-ons such as air and pre-cruise purchases to improve the retention and profitability of the channel. We provide brand dedicated sales representatives who serve as consultants to our travel partners. We also provide trained customer service representatives, call centers and online training tools.

At the onset of the COVID-19 pandemic, we launched the RCL CARES program which provided dedicated financial guidance as travel advisors navigated government relief benefits, including small business loans and the Paycheck Protection Program. As part of the RCL Cares program, we also launched our Pay it Forward program in February 2021, which made available interest free commercial loans for qualifying travel advisors to begin their recovery efforts.

In addition, we continue to operate our Consumer Outreach department, which provides consumers 24-hour access to our vacation planners and customer service agents in our call centers. In addition, we maintain and invest in our websites, including mobile applications and mobile websites. We enable our guests to communicate and book with us through various channels such as phone, web, chat, text message, and/or email.

We also have an Onboard Cruise Sales department to help guests book their next cruise vacations while onboard our ships.

**Guest Services**

We offer to handle virtually all travel aspects related to guest reservations and transportation, including arranging guest pre- and post-hotel stay arrangements and air transportation.

Royal Caribbean International, Celebrity Cruises and Silversea Cruises offer recognition and status upgrades to their guests through their loyalty programs, Crown & Anchor Society, Captain's Club, and Venetian Society, respectively, to encourage repeat business. Crown & Anchor Society has approximately 16.5 million members worldwide. Captain's Club and Venetian Society have approximately 5.1 million members combined worldwide. Members are recognized through increasing membership status by accumulating cruise points or credits, depending on the brand, which may be redeemed on future sailings. Members are awarded points or credits in proportion to the number of cruise days and stateroom category. The loyalty programs provide tiers of membership benefits which entitle guests to upgraded experiences and recognition relative to the status achieved once the guests have accumulated the number of cruise points or credits specified for each tier. In addition, upon achieving a certain level of cruise points or credits, members benefit from reciprocal membership benefits across all of our loyalty programs. Examples of the benefits available under our loyalty programs include, but are not limited to, priority ship embarkation, priority waitlist for shore excursions, complimentary laundry service,

complimentary Internet, booklets with onboard discount offers, upgraded bathroom amenities, private seating on the pool deck, ship tours and, in the case of our most loyal guests who have achieved the highest levels of cruise points or credits, complimentary cruise days. We regularly work to enhance each of our loyalty programs by adding new features and amenities in order to reward our repeat guests.

**Operations**

*Cruise Ships and Itineraries*

As of December 31, 2021, our Global Brands and Partner Brands collectively operated 61 ships with a selection of worldwide itineraries that call on approximately 1,000 destinations.

The following table presents summary information concerning ships that we expect will be in our fleet in 2022 under our Global Brands and Partner Brands.

| Ship | Year Ship Built | Year Ship In Service or Delivered, if after 2021[1] | Approximate Berths |
|------|-----------------|-----------------------------------------------------|--------------------|
| **Royal Caribbean International** | | | |
| Wonder of the Seas | 2022 | 2022 | 5,700 |
| Odyssey of the Seas | 2021 | 2021 | 4,200 |
| Spectrum of the Seas | 2019 | 2019 | 4,150 |
| Symphony of the Seas | 2018 | 2018 | 5,500 |
| Harmony of the Seas | 2016 | 2016 | 5,500 |
| Ovation of the Seas | 2016 | 2016 | 4,150 |
| Anthem of the Seas | 2015 | 2015 | 4,150 |
| Quantum of the Seas | 2014 | 2014 | 4,150 |
| Allure of the Seas | 2010 | 2010 | 5,500 |
| Oasis of the Seas | 2009 | 2009 | 5,600 |
| Independence of the Seas | 2008 | 2008 | 3,850 |
| Liberty of the Seas | 2007 | 2007 | 3,800 |
| Freedom of the Seas | 2006 | 2006 | 3,950 |
| Jewel of the Seas | 2004 | 2004 | 2,200 |
| Mariner of the Seas | 2003 | 2003 | 3,350 |
| Serenade of the Seas | 2003 | 2003 | 2,150 |
| Navigator of the Seas | 2002 | 2002 | 3,400 |
| Brilliance of the Seas | 2002 | 2002 | 2,150 |
| Adventure of the Seas | 2001 | 2001 | 3,350 |
| Radiance of the Seas | 2001 | 2001 | 2,150 |
| Explorer of the Seas | 2000 | 2000 | 3,300 |
| Voyager of the Seas | 1999 | 1999 | 3,450 |
| Vision of the Seas | 1998 | 1998 | 2,050 |
| Enchantment of the Seas | 1997 | 1997 | 2,300 |
| Rhapsody of the Seas | 1997 | 1997 | 2,050 |
| Grandeur of the Seas | 1996 | 1996 | 2,000 |
| **Celebrity Cruises** | | | |
| Celebrity Beyond | 2022 | 2022 | 3,250 |
| Celebrity Apex | 2020 | 2020 | 2,900 |
| Celebrity Flora | 2019 | 2019 | 100 |
| Celebrity Edge | 2018 | 2018 | 2,900 |
| Celebrity Reflection | 2012 | 2012 | 3,050 |

Table of Contents

| Ship | Year Ship Built | Year Ship In Service or Delivered, if after 2021[1] | Approximate Berths |
|---|---|---|---|
| *Celebrity Silhouette* | 2011 | 2011 | 2,900 |
| *Celebrity Eclipse* | 2010 | 2010 | 2,850 |
| *Celebrity Equinox* | 2009 | 2009 | 2,850 |
| *Celebrity Solstice* | 2008 | 2008 | 2,850 |
| *Celebrity Xploration* | 2007 | 2016 | 15 |
| *Celebrity Constellation* | 2002 | 2002 | 2,200 |
| *Celebrity Summit* | 2001 | 2001 | 2,200 |
| *Celebrity Infinity* | 2001 | 2001 | 2,150 |
| *Celebrity Xpedition* | 2001 | 2004 | 50 |
| *Celebrity Millennium* | 2000 | 2000 | 2,200 |
| **Silversea Cruises** | | | |
| *Silver Dawn*[3] | 2021 | 2022 | 600 |
| *Silver Origin* | 2020 | 2020 | 100 |
| *Silver Moon* | 2020 | 2020 | 600 |
| *Silver Muse* | 2017 | 2017 | 600 |
| *Silver Spirit* | 2009 | 2009 | 600 |
| *Silver Whisper* | 2001 | 2001 | 400 |
| *Silver Shadow* | 2000 | 2000 | 400 |
| *Silver Wind* | 1995 | 1995 | 250 |
| *Silver Cloud* | 1994 | 1994 | 250 |
| *Silver Explorer* | 1989 | 2008 | 150 |
| **TUI Cruises** | | | |
| *Mein Schiff 2*[2] | 2019 | 2019 | 2,900 |
| *Mein Schiff 1* | 2018 | 2018 | 2,900 |
| *Mein Schiff 6* | 2017 | 2017 | 2,500 |
| *Mein Schiff 5* | 2016 | 2016 | 2,500 |
| *Mein Schiff 4* | 2015 | 2015 | 2,500 |
| *Mein Schiff 3* | 2014 | 2014 | 2,500 |
| *Mein Schiff Herz* | 1997 | 2011 | 1,900 |
| **Hapag-Lloyd** | | | |
| *Hanseatic Spirit* | 2021 | 2021 | 230 |
| *Hanseatic Inspiration* | 2019 | 2019 | 230 |
| *Hanseatic Nature* | 2019 | 2019 | 230 |
| *Europa 2* | 2013 | 2013 | 500 |
| *Europa* | 1999 | 1999 | 400 |
| | | | |
| **Total** | | | 149,805 |

---

(1)     The year a ship entered service refers to the year in which the ship commenced cruise revenue operations for the brand. If after 2021, the date reflects the year of expected delivery into the brand.

(2)     TUI Cruises' newbuild entered service as *Mein Schiff 2* in February 2019 and the existing *Mein Schiff 2* was renamed *Mein Schiff Herz*.

(3)     *Silver Dawn* was delivered in 2021 and is expected to commence cruise revenue operations in the second quarter of 2022

As of December 31, 2021, our Global Brands and our Partner Brands have 12 ships on order. Two ships on order are being built in Germany by Meyer Werft GmbH, four are being built in Finland by Meyer Turku shipyard, four are being built in France by Chantiers de l'Atlantique and two are being built in Italy by Fincantieri. As of December 31, 2021, the dates that the ships on order are expected to be delivered, subject to change in the event of construction delays, and their approximate berths are as follows:

| Ship | Shipyard | Expected Delivery | Approximate Berths |
|---|---|---|---|
| Royal Caribbean International — | | | |
| Oasis-class: | | | |
| *Wonder of the Seas* | Chantiers de l'Atlantique | 1st Quarter 2022 | 5,700 |
| *Unnamed* | Chantiers de l'Atlantique | 2nd Quarter 2024 | 5,700 |
| Icon-class: | | | |
| *Icon of the Seas* | Meyer Turku Oy | 3rd Quarter 2023 | 5,600 |
| *Unnamed* | Meyer Turku Oy | 2nd Quarter 2025 | 5,600 |
| *Unnamed* | Meyer Turku Oy | 2nd Quarter 2026 | 5,600 |
| Celebrity Cruises — | | | |
| Edge-class: | | | |
| *Celebrity Beyond* | Chantiers de l'Atlantique | 2nd Quarter 2022 | 3,250 |
| *Celebrity Ascent* | Chantiers de l'Atlantique | 4th Quarter 2023 | 3,250 |
| Silversea Cruises — | | | |
| Evolution-class: | | | |
| *Silver Nova* | Meyer Werft | 2nd Quarter 2023 | 730 |
| *Unnamed* | Meyer Werft | 2nd Quarter 2024 | 730 |
| TUI Cruises (50% joint venture) — | | | |
| *Mein Schiff 7* | Meyer Turku Oy | 2nd Quarter 2024 | 2,900 |
| *Unnamed* | Fincantieri | 4th Quarter 2024 | 4,100 |
| *Unnamed* | Fincantieri | 2nd Quarter 2026 | 4,100 |
| Total Berths | | | 47,260 |

In addition, we have an agreement in place with Chantiers de l'Atlantique to build an additional Edge-class ship for delivery in 2025, which is contingent upon completion of conditions precedent and financing.

*Seasonality*

Our revenues have historically been seasonal based on the demand for cruises. Demand is typically strongest for cruises during the Northern Hemisphere's summer months and holidays. In order to mitigate the impact of the winter weather in the Northern Hemisphere and to capitalize on the summer season in the Southern Hemisphere, our brands have focused on deployment in the Caribbean, Asia and Australia during that period.

*Passengers and Capacity*

Selected statistical information is shown in the following table (see *Financial Presentation- Description of Certain Line Items* and *Selected Operational and Financial Metrics* under Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations*, for definitions). *Passengers Carried, Passenger Cruise Days, Available Passenger Cruise Days* and *Occupancy* reflect the impact of our suspension of operations during parts of 2020 and 2021 due to the COVID-19 pandemic and the gradual resumption of operations during the second half of 2021:

| | Year Ended December 31, (3) | | | | |
|---|---|---|---|---|---|
| | 2021(1)(3) | 2020(2) | 2019 (2) | 2018 (2) | 2017 |
| Passengers Carried | 1,030,403 | 1,295,144 | 6,553,865 | 6,084,201 | 5,768,496 |
| Passenger Cruise Days | 5,802,582 | 8,697,893 | 44,803,953 | 41,853,052 | 40,033,527 |
| Available Passenger Cruise Days (APCD) | 11,767,441 | 8,539,903 | 41,432,451 | 38,425,304 | 36,930,939 |
| Occupancy | 49.3% | 101.9% | 108.1% | 108.9% | 108.4% |

(1)  Due to the elimination of the Silversea Cruises three-month reporting lag in October of 2021, we include Silversea Cruises' metrics from October 1, 2020 through June 30, 2021 and October 1 through December 31, 2021 in the year ended December 31, 2021. The year ended December 31, 2021 does not include July, August, and September 2021 statistics as Silversea Cruises' results of operations for those months are included within *Other (expense) income* in our consolidated statements of comprehensive loss for the year ended December 31, 2021. Refer to Note 1. General to our consolidated financial statements under Item 8. Financial Statements and Supplementary Data for more information on the three-month reporting lag.

(2) Due to the three-month reporting lag effective through September 30, 2021, we include Silversea Cruises' metrics from October 1, 2019 through September 30, 2020 in the year ended December 31, 2020, from October 1, 2018 through September 30, 2019 in the year ended December 31, 2019, and from August 1, 2018 through September 30, 2018 in the year ended December 31, 2018.

(3)  For the year ended December 31, 2021, we include Azamara Cruises' metrics through March 19, 2021, the effective sale date of the brand. Refer to Note 1. General to our consolidated financial statements under Item 8. Financial Statements and Supplementary Data for more information on the sale of the Azamara Cruises brand.

*Cruise Pricing*

Our cruise ticket prices include accommodations and a wide variety of activities and amenities, including meals and entertainment. Prices vary depending on many factors including the destination, cruise length, stateroom category selected and the time of year the cruise takes place. In response to COVID-19, we established flexible cruise pricing programs (i.e. Cruise with Confidence, Best Price Guarantee and all-inclusive pricing) that present our guests with options and value.

Although we grant credit terms in select markets mainly outside of the United States, our payment terms generally require an upfront deposit to confirm a reservation, with the balance due prior to the sailing. Our cruises are generally available for sale at least one year in advance and often more than two years in advance of sailing. During the selling period of a cruise, we continually monitor and adjust our cruise ticket prices for available guest staterooms based on demand, with the objective of maximizing net yields.

As our business has grown globally, our sale arrangements with travel advisors may vary. For instance, although our direct business has historically grown at a rapid pace, sale arrangements through travel advisor charter and group sales are proportionately higher in the China market than in our other markets which are primarily through retail agency and direct sales.

We have developed and implemented enhancements to our reservations system that provide us and our travel partners with additional capabilities, making it easier to do business with us. For example, we offer air transportation to our guests through our air transportation program available in major cities around the world.

Passenger ticket revenues accounted for approximately 61%, 68% and 72% of total revenues in 2021, 2020 and 2019, respectively.

*Onboard Activities and Other Revenues*

Our cruise brands offer modern fleets with a wide array of onboard services, amenities and activities which vary by brand and ship. While many onboard activities are included in the base price of a cruise, we realize additional revenues from, among other things, gaming, the sale of alcoholic and other beverages, Internet and other telecommunication services, gift shop items, shore excursions, photography, spa/salon and fitness services, art auctions, retail shops and a wide variety of specialty restaurants and dining options. Many of these services are available for pre-booking prior to embarkation. These activities are offered either directly by us or by independent concessionaires from which we receive a percentage of their revenues. The all-inclusive pricing programs that we offer currently, add some of these onboard activity and other services to the base price of the cruise.

In conjunction with our cruise vacations, we offer pre- and post-cruise hotel packages to our Royal Caribbean International, Celebrity Cruises and Silversea Cruises guests. We also offer cruise vacation protection coverage to guests in a number of markets, which provides guests with coverage for trip cancellation, medical protection and baggage protection. Onboard and other revenues accounted for approximately 39%, 32% and 28% of total revenues in 2021, 2020 and 2019, respectively.

**Segment Reporting**

We control and operate three cruise brands, Royal Caribbean International, Celebrity Cruises, and Silversea Cruises. In addition, we have a 50% joint venture interest in TUIC, our 50%-owned joint venture that operates the German brands TUI Cruises and Hapag-Lloyd Cruises. We believe our brands possess the versatility to enter multiple cruise market segments within the cruise vacation industry. Although each of our brands has its own marketing style as well as ships and crews of various sizes, the nature of the products sold and services delivered by our brands share a common base (i.e., the sale and provision of cruise vacations). Our brands also have similar itineraries as well as similar cost and revenue components. In addition, our brands source passengers from similar markets around the world and operate in similar economic environments with a significant degree of commercial overlap. As a result, our brands have been aggregated as a single reportable segment based on the similarity of their economic characteristics, types of consumers, regulatory environment, maintenance requirements, supporting systems and processes as well as products and services provided. Our President and Chief Executive Officer has been identified as the chief operating decision-maker and all significant operating decisions including the allocation of resources are based upon the analyses of the Company as one segment. (For financial information, see Item 8. *Financial Statements and Supplementary Data*.)

**Human Capital**

Our human capital strategy focuses on attracting, developing and retaining the best talent in the industry. Some key elements of these strategies include: assessing current and future talent needs; a diverse and inclusive workforce; robust opportunities for employee growth and development; support for health and well-being; and an active listening strategy to make sure voices are heard and continuous improvement occurs. We review our human capital metrics and our diversity equity and inclusion (DEI) program with the Talent and Compensation Committee of our Board of Directors on an annual basis.

As of December 31, 2021, our three global cruise brands, Royal Caribbean International, Celebrity Cruises, and Silversea Cruises, employed approximately 85,000 employees spanning across our shipboard fleet and shoreside locations. Our shoreside workforce, including private destinations, consisted of approximately 7,600 full time and 100 part-time employees. Our shipboard workforce consisted of 77,000 employees, and as of December 31, 2021, approximately 86% were covered by collective bargaining agreements.

The following table details the distribution of our workforce by employee type and region as of December 31, 2021:

| Employee Type[1] | U.S. Based Employees | International Employees |
|---|---|---|
| Shoreside Operations | 4,100 | 2,500 |
| Shipboard Employees | | 77,000 |
| Private Destinations[2] | | 1,100 |

(1)  Includes full time and part time employees.

(2)  Private Destinations includes Coco Cay, Labadee and Galapagos based employees.

As a global operation, we take great pride in the broad diversity of our workforce and the value it brings to our company. Our shoreside workforce is gender diverse with 53% female representation. Our shipboard workforce is comprised of employees from 130 plus countries. The majority of our shipboard workforce comes from the Philippines (28%), Indonesia (16%) and India (14%). Our shoreside workforce is primarily based out of the U.S. (62%), Philippines (17%), U.K. (5%), Mexico (5%), and China (3%).

Table of Contents

The following table details the gender distribution of our workforce by employee location as of December 31, 2021:

| Employee Location | Male | Female |
|---|---|---|
| Shoreside - U.S. | 42% | 58% |
| Shoreside - International | 52% | 48% |
| Shipboard | 78% | 22% |

Our U.S. shoreside workforce is ethnically diverse with 54% comprised of non-White ethnic groups.

| U.S. Shoreside Representation by Ethnicity | % of Total U.S. Shoreside Population |
|---|---|
| White | 46% |
| Hispanic | 38% |
| African American | 11% |
| Asian | 5% |
| Others[1] | —% |

(1)   Others category is greater than 0% but less than 1%.

We offer a variety of learning and development programs to our workforce which includes a combination of instructor led (classroom and virtual) and web based (self-learning) courses. In 2021, our workforce invested approximately 620,000 hours in learning programs across a variety of areas ranging from Ethics, Compliance, Data Analysis, Business Software and Tools, Finance/Accounting, Professional development, Project Management skills, Leadership and Safety/Security. In total, our workforce completed over 400,000 courses within our learning management systems. During 2021, we also coached over 500 leaders across our shipboard and shoreside populations (421 Shipboard; 110 Shoreside), as part of our plans for a healthy return to service.

During 2021, we focused on our global healthy return to sailing and on bringing our crew back on board our ships. As part of our healthy return to sailing, we determined to establish a highly vaccinated environment. We returned 37,000 crew from various countries and made vaccines available to all returning crew members through partnerships with various world governments. By the end of 2021, we operated 85% of our fleet's capacity, with 100% vaccinated crew back on board.

In the third quarter of 2021, we welcomed our shoreside employees back to our headquarters in Miami and other locations around the world. Employees returned to our offices with robust protocols that promote their health and safety. We continue to run our employee pulse surveys every quarter to understand and positively impact our employees' experience. In 2021, our shoreside employee engagement scores remained high and above most global industry benchmarks.

**Insurance**

We maintain insurance on the hull and machinery of our ships, with insured values generally equal to the net book value of each ship. This coverage is maintained with reputable insurance underwriters from the British, Scandinavian, French, United States and other reputable international insurance markets.

We are members of four Protection and Indemnity ("P&I") clubs, which are part of a worldwide group of 13 P&I clubs, known as the International Group of P&I Clubs (the "IG"). Liabilities, costs and expenses for illness and injury to crew, guest injury, pollution and other third-party claims in connection with our cruise activities are covered by our P&I clubs, subject to the clubs' rules and the limits of coverage determined by the IG. P&I coverage provided by the clubs is on a mutual basis and we are subject to additional premium calls in the event of a catastrophic loss incurred by any member of the 13 P&I clubs, whereby the reinsurance limits purchased by the IG are exhausted. We are also subject to additional premium calls based on investment and underwriting shortfalls experienced by our own individual insurers.

We maintain war risk insurance for legal liability to crew, guests and other third parties as well as for loss or damage to our vessels arising from acts of war, including invasion, insurrection, terrorism, rebellion, piracy and hijacking. Our primary war risk coverage is provided by a Norwegian war risk insurance association and our excess war risk insurance is provided by our four P&I clubs. Consistent with most marine war risk policies, our coverage is subject to cancellation in the event of a change in risk. In the event of a war between major powers, our primary policies terminate after thirty days'

15

Table of Contents

notice and our excess policies terminate immediately. Our excess policies are also subject to cancellation after a notice period of seven days in the event of other changes in risk. These notice periods allow for premiums to be renegotiated based on changes in risk.

Insurance coverage for other exposures, such as shoreside property and casualty, passenger off-vessel, directors and officers and network security and privacy, are maintained with various global insurance companies.

We do not carry business interruption insurance for our ships based on our evaluation of the risks involved and protective measures already in place, as compared to the cost of insurance.

All insurance coverage is subject to certain limitations, exclusions and deductible levels. In addition, in certain circumstances, we either self-insure or co-insure a portion of these risks. Premiums charged by insurance carriers, including carriers in the maritime insurance industry, increase or decrease from time to time and tend to be cyclical in nature. These cycles are impacted both by our own loss experience and by losses incurred in direct and reinsurance markets. We historically have been able to obtain insurance coverage in amounts and at premiums we have deemed to be commercially acceptable. No assurance can be given that affordable and secure insurance markets will be available to us in the future, particularly for war risk insurance.

**Trademarks**

We own a number of registered trademarks related to the Royal Caribbean International, Celebrity Cruises and Silversea Cruises cruise brands. The registered trademarks include the name "Royal Caribbean International" and its crown and anchor logo, the name "Celebrity Cruises" and its "X" logo, the name "Silversea Cruises" and its logo, and the names of various cruise ships, ship venues and other marketing programs. We believe our largest brands' trademarks are widely recognized throughout the world and have considerable value. The duration of trademark registrations varies from country to country. However, trademarks are generally valid and may be renewed indefinitely as long as they are in use and/or their registrations are properly maintained.

**Regulation**

Our ships are regulated by various international, national, state and local laws, regulations and treaties in force in the jurisdictions in which they operate. In addition, our ships are registered in the Bahamas, Malta or in the case of our ships operating in the Galapagos Islands, Ecuador. Each ship is subject to regulations issued by its country of registry, including regulations issued pursuant to international treaties governing the safety of our ships, guests and crew as well as environmental protection. Each country of registry conducts periodic inspections to verify compliance with these regulations as discussed more fully below. Ships operating out of ports of call around the world are also subject to inspection by the maritime authorities of that country for compliance with international treaties and local regulations. Additionally, ships operating out of the United States ports are subject to inspection by the United States Coast Guard for compliance with international treaties and by the United States Public Health Service for sanitary and health conditions. Our ships are also subject to similar inspections pursuant to the laws and regulations of various other countries our ships visit.

We believe that we are in material compliance with all the regulations applicable to our ships and that we have all licenses necessary to conduct our business. Health, safety, security, environmental and financial responsibility issues are, and we believe will continue to be, an area of focus by the relevant government authorities in the United States and internationally. From time to time, various regulatory and legislative changes may be implemented that could impact our operations and subject us to increasing compliance costs in the future.

*CDC COVID-19 Program for Cruise Ships Operating in U.S. Waters*

Beginning in October 2020, our ships home porting or calling in U.S. ports operated under a Framework for Conditional Sailing Order ("CSO") issued by the U.S. Centers for Disease Control and Prevention ("CDC") that permitted cruise ship passenger operations in U.S. waters subject to certain conditions and safety protocols. The CSO, which had been modified over time, expired on January 15, 2022. On February 9, 2022, the CDC published a COVID-19 program (the "Program") for cruise vessels sailing in U.S. waters. Under the Program, persons traveling on cruise ships designated as "Highly Vaccinated" do not have to wear a mask in any areas onboard and are not subject to physical distancing protocols. Cruise lines may opt into the Program on a voluntary basis Cruise lines may also opt out at any time. We have voluntarily opted-in to the CDC's Program beginning with sailings departing on or after February 25, 2022, and have designated all ships across our brands as "Highly Vaccinated" vessels. Going forward, the CDC may issue additional recommendations or requirements through technical instructions to the Program. We plan to continue to monitor and evaluate any further CDC guidance based on our assessment of then-current epidemiological conditions, and applicable health and safety protocols.

*Safety and Security Regulations*

Our ships are required to comply with international safety standards defined in the International Convention for Safety of Life at Sea ("SOLAS"), which, among other things, establish requirements for ship design, structural features, materials, construction, lifesaving equipment and safe management and operation of ships for guest and crew safety. The SOLAS standards are revised from time to time and incorporated in our ship design and operation, as applicable. The latest enhancements include the addition of the Polar Code which sets goal-based standards for ships operating in the polar region as well as damage stability requirements for new designs and operational measures for existing vessels. Compliance with these modified standards have not historically had a material effect on our operating costs. SOLAS incorporates the International Safety Management Code ("ISM Code"), which provides an international standard for the safe management and operation of ships and for pollution prevention. The ISM Code is mandatory for all vessels, including passenger vessel operators.

All of our operations and ships are regularly audited by various national authorities, and we are required to maintain the relevant certificates of compliance with the ISM Code.

Our ships are subject to various security requirements, including the International Ship and Port Facility Security Code ("ISPS Code"), which is part of SOLAS, and the U.S. Maritime Transportation Security Act of 2002 ("MTSA"), which applies to ships that operate in U.S. ports. In order to satisfy these security requirements, we implement security measures, conduct vessel security assessments, and develop security plans. The security plans for all of our ships have been submitted to and approved by the Recognized Security Organization on behalf of the ships' flag state and are in compliance with the ISPS Code and the MTSA.

The Cruise Vessel Security and Safety Act of 2010, which applies to passenger vessels which embark or include port stops within the United States, requires the implementation of certain safety design features as well as adoption of practices for the reporting of and dealing with allegations of crime. The cruise industry supported this legislation and we believe that our internal standards are generally as strict or stricter than the law requires. Some provisions of the act call for regulations which have not been finalized. We do not expect the pending regulations will have a material impact on our operations.

*Environmental Regulations*

We are subject to various international and national laws and regulations relating to environmental protection. Under such laws and regulations, we are generally prohibited from discharging materials other than food waste into the waterways. We have made, and will continue to make, capital and other expenditures to comply with environmental laws and regulations. From time to time, environmental and other regulators consider more stringent regulations, which may affect our operations and increase our compliance costs. We believe that the impact of ships on the global environment will continue to be an area of focus by the relevant authorities throughout the world and, accordingly, may subject us to increasing compliance costs in the future, including the items described below.

Our ships are subject to the International Maritime Organization's ("IMO") regulations under the International Convention for the Prevention of Pollution from Ships (the "MARPOL Regulations") and the International Convention for the Control and Management of Ships Ballast Water and Sediments (Ballast Water Management Convention), in addition to other regional and national regulations such as EU Directives and the US Vessel General Permit, which includes requirements designed to minimize pollution by oil, sewage, garbage, air emissions and the transfer of non-native/non-indigenous species. We have obtained the relevant international compliance certificates relating to oil, sewage, air pollution prevention and ballast water for all of our ships.

The MARPOL Regulations imposed reduced global limitations on the sulfur content of emissions emitted by ships operating worldwide to 0.5% as of January 1, 2020, which was reduced from 3.5%. As we continue our gradual resumption of operations, we do not expect for this increased limitation to have a material impact to our results of operations largely due to a number of mitigating steps we have taken over the last several years, including equipping all of our new ships delivered during or after 2014 with Advanced Emissions Purification ("AEP") systems covering all engines and actively developing and installing AEP systems on the majority of our remaining fleet resulting in 70% of our fleet being equipped with AEP systems.

The MARPOL Regulations also establish special Emission Control Areas ("ECAs") with additional stringent limitations on sulfur emissions in these areas. There are four established ECAs that restrict sulfur emissions: the Baltic Sea, the North Sea/English Channel, certain waters surrounding the North American coast, and the waters surrounding Puerto Rico and the U.S. Virgin Islands (the "Caribbean ECA"). Ships operating in these sulfur ECAs have been required to

17

reduce their emissions sulfur content to 0.1%. This reduction has not had a significant impact on our results of operations to date due to the mitigating steps described above.

We continue to implement our AEP system strategy for both our ships on order and our existing fleet. As our new ships are delivered with AEP systems, or other mitigating technologies (Liquified Natural Gas ("LNG") fuels, fuel cells, etc.), and additional existing ships are retrofitted with AEP systems, they will provide us with additional operational and deployment flexibility.

Additionally, all new ships operating within the North American and U.S. Caribbean Sea ECA that began construction on or after January 1, 2016, and North and Baltic Sea ships constructed on or after January 1, 2021 are required to meet more stringent nitrogen oxide emission limits. We comply with these rules for those relevant ships in service. As an added measure, all of our ships under construction are being built to comply with these rules. The rules have not had and are not expected to have a significant impact to our operations or costs.

In November of 2020, IMO approved amendments to the MARPOL convention that will require ships, beginning in 2023, to combine a technical and an operational approach (Energy Efficiency Existing Ship Index ("EEXI") and Carbon Intensity Indicator ("CII")) to reduce their carbon intensity in line with the ambition of the Initial IMO GHG Strategy which aims to reduce carbon intensity of international shipping by 40% by 2030, compared to 2008. While there is still work to be completed ahead of these amendments being implemented, the approved framework for the EEXI amendment is not expected to have a material impact on our operations. However, the framework for CII is expected to have a negative impact on our itinerary flexibility for certain of our ships depending on the final operational measures needed to comply.

Effective July 1, 2015, the European Commission adopted legislation that requires cruise ship operators with ships visiting ports in the European Union to monitor and report on the ship's annual carbon dioxide emissions starting in 2018. Additionally, in 2019, the IMO's monitoring and reporting system (IMO data and collection system), which is applicable to all ship itineraries, entered into force. While compliance with these regulations did not materially impact our costs or results of operations, the legislations contemplate further obligations and restrictions which could ultimately result in additional costs or charges associated with carbon dioxide emissions.

The IMO Ballast Water Management Convention, which came into effect in 2017, requires ships that carry and discharge ballast water to meet specific discharge standards by installing Ballast Water Treatment Systems by 2023. Compliance with this regulation has not had a material effect on our results of operations and we do not expect the continuing compliance with this regulation to have a material effect on our results of operations.

Refer to Item 1A. *Risk Factors - "Environmental, labor, health and safety, financial responsibility and other maritime regulations could affect operations and increase costs"* for further discussion of the risks associated with the regulations discussed above.

*Consumer Financial Responsibility Regulations*

We are required to obtain certificates from the United States Federal Maritime Commission relating to our ability to satisfy liability in cases of non-performance of obligations to guests, as well as casualty and personal injury. As a condition to obtaining the required certificates, we generally arrange through our insurers for the provision of surety for our ship-operating companies. The required amount is currently $32.0 million per operator and is subject to additional consumer price index based adjustments.

We are also required by the United Kingdom, Norway, Finland and the Baltics to establish our financial responsibility for any liability resulting from the non-performance of our obligations to guests from these jurisdictions. In the United Kingdom we are currently required by the Association of British Travel Agents to provide performance bonds totaling approximately £124 million. Additionally, we were required by the Civil Aviation Authority to provide performance bonds totaling £18.5 million. The Norwegian Travel Guarantee Fund requires us to maintain performance bonds in varying amounts during the course of the year to cover our financial responsibility in Norway, Finland and the Baltics.

Certain other jurisdictions also require that we establish financial responsibility to our guests resulting from the non-performance of our obligations; however, the related amounts do not have a material effect on our costs.

*Taxation of the Company*

The following is a summary of our principal taxes, exemptions and special regimes. In addition to or instead of income taxation, virtually all jurisdictions where our ships call impose some tax or fee, or both, based on guest headcount, tonnage or some other measure. We also collect and remit value added tax (VAT) or sales tax in many jurisdictions where

18

we operate.

Our consolidated operations are primarily foreign corporations engaged in the owning and operating of passenger cruise ships in international transportation.

*U.S. Income Taxation*

The following is a discussion of the application of the U.S. federal and state income tax laws to us and is based on the current provisions of the U.S. Internal Revenue Code, Treasury Department regulations, administrative rulings, court decisions and the relevant state tax laws, regulations, rulings and court decisions of the states where we have business operations. All of the foregoing is subject to change, and any such change could affect the accuracy of this discussion.

Application of Section 883 of the Internal Revenue Code

Royal Caribbean Cruises Ltd., Celebrity Cruises, Inc. and Silversea Cruises Ltd. are engaged in a trade or business in the United States, and many of our ship-owning subsidiaries, depending upon the itineraries of their ships, receive income from sources within the United States. Silversea Cruises Ltd. and our United Kingdom tonnage tax company are classified as disregarded entities, or divisions for U.S. federal income tax purposes that may earn U.S. source income. Under Section 883 of the Internal Revenue Code, certain foreign corporations may exclude from gross income (and effectively from branch profits tax as such earnings do not give rise to effectively connected earnings and profits) U.S. source income derived from or incidental to the international operation of a ship or ships, including income from the leasing of such ships.

A foreign corporation will qualify for the benefits of Section 883 if, in relevant part: (1) the foreign country in which the foreign corporation is organized grants an equivalent exemption to corporations organized in the United States; and (2) the stock of the corporation (or the direct or indirect corporate parent thereof) is "primarily and regularly traded on an established securities market" in the United States. In the opinion of our U.S. tax counsel, Faegre Drinker Biddle & Reath LLP, based on the representations and assumptions set forth in that opinion, Royal Caribbean Cruises Ltd., including Silversea Cruises Ltd., Celebrity Cruises Inc., and relevant ship-owning subsidiaries with U.S. source shipping income qualify for the benefits of Section 883 because Royal Caribbean Cruises Ltd. and each of those subsidiaries are incorporated in Liberia, which is a qualifying country, and our common stock is primarily and regularly traded on an established securities market in the United States (i.e., we are a "publicly traded" corporation). If, in the future, (1) Liberia no longer qualifies as an equivalent exemption jurisdiction, and we do not reincorporate in a jurisdiction that does qualify for the exemption, or (2) we fail to qualify as a publicly traded corporation, we and all of our ship-owning or operating subsidiaries that rely on Section 883 to exclude qualifying income from gross income would be subject to U.S. federal income tax on their U.S. source shipping income and income from activities incidental thereto.

We believe that most of our income and the income of our ship-owning subsidiaries, is derived from or incidental to the international operation of a ship or ships and, therefore, is exempt from taxation under Section 883.

Regulations under Section 883 list activities that are not considered by the Internal Revenue Service to be incidental to the international operation of ships including the sale of air and land transportation, shore excursions and pre-and post-cruise tours. Our income from these activities that is earned from sources within the United States will be subject to U.S. taxation.

Taxation in the Absence of an Exemption Under Section 883

If Royal Caribbean Cruises Ltd., the operator of our vessels, Celebrity Cruises Inc., or our ship-owning subsidiaries were to fail to meet the requirements of Section 883 of the Internal Revenue Code, or if the provision was repealed, then, as explained below, such companies would be subject to U.S. income taxation on a portion of their income derived from or incidental to the international operation of our ships.

Because Royal Caribbean Cruises Ltd. and Celebrity Cruises Inc. conduct a trade or business in the United States, Royal Caribbean Cruises Ltd., including Silversea Cruises Ltd., and Celebrity Cruises Inc. would be taxable at regular corporate rates on our separate company taxable income (i.e., without regard to the income of our ship-owning subsidiaries) on income which is effectively connected with our U.S. trade or business (generally only income from U.S. sources). In addition, if any of our earnings and profits effectively connected with our U.S. trade or business were withdrawn, or were deemed to have been withdrawn, from our U.S. trade or business, those withdrawn amounts would be subject to a "branch profits" tax at the rate of 30%. Royal Caribbean Cruises Ltd., which includes Silversea Cruises Ltd. for tax purposes, and Celebrity Cruises Inc. would also be potentially subject to tax on portions of certain interest paid by us at rates of up to 30%.

19

If Section 883 were not available to our ship-owning subsidiaries, each such subsidiary would be subject to a special 4% tax on its U.S. source gross transportation income, if any, each year because it does not have a fixed place of business in the United States and its income is derived from the leasing of a ship.

<u>Other United States Taxation</u>

Royal Caribbean Cruises Ltd., which includes Silversea Cruises Ltd., and Celebrity Cruises Inc. earn U.S. source income from activities not considered incidental to international shipping. The tax on such income is not material to our results of operation for all years presented.

<u>State Taxation</u>

Royal Caribbean Cruises Ltd., Celebrity Cruises Inc., and certain of our subsidiaries are subject to various U.S. state income taxes which are generally imposed on each state's portion of the U.S. source income subject to federal income taxes. Additionally, the state of Alaska subjects an allocated portion of the total income of companies doing business in Alaska and certain other affiliated companies to Alaska corporate state income taxes and also imposes a 33% tax on adjusted gross income from onboard gambling activities conducted in Alaska waters. This did not have a material impact to our results of operations for all years presented.

*United Kingdom Income Taxation*

During the year ended December 31, 2021, we operated 17 ships under the United Kingdom tonnage tax regime ("U.K. tonnage tax").

Companies subject to U.K. tonnage tax pay a corporate tax on a notional profit determined with reference to the net tonnage of qualifying vessels. The requirements for a company to qualify for the U.K. tonnage tax regime include being subject to U.K. corporate income tax, operating qualifying ships, which are strategically and commercially managed in the United Kingdom, and fulfilling a seafarer training requirement.

Relevant shipping profits include income from the operation of qualifying ships and from shipping related activities. Our U.K. income from non-shipping activities which do not qualify under the U.K. tonnage tax regime and which are not considered significant, remain subject to regular U.K. corporate income tax.

*Other Taxation*

We and certain of our subsidiaries are subject to value-added and other indirect taxes most of which are reclaimable, zero-rated or exempt.

**Website Access to Reports**

We make available, free of charge, access to our Annual Reports, all quarterly and current reports and all amendments to those reports, as soon as reasonably practicable after such reports are electronically filed with or furnished to the Securities and Exchange Commission through our website at *www.rclinvestor.com*. The information contained on our website is not a part of any of these reports and is not incorporated by reference herein.

**Information About our Executive Officers**

As of March 1, 2022, our executive officers are:

| Name | Age | Position |
|------|-----|----------|
| Jason T. Liberty | 46 | President and Chief Executive Officer |
| Naftali Holtz | 44 | Chief Financial Officer |
| Michael W. Bayley | 63 | President and Chief Executive Officer, Royal Caribbean International |
| Lisa Lutoff-Perlo | 64 | President and Chief Executive Officer, Celebrity Cruises |
| Roberto Martinoli | 69 | President and Chief Executive Officer, Silversea Cruises |
| Harri U. Kulovaara | 69 | Executive Vice President, Maritime |
| Laura Hodges Bethge | 47 | Executive Vice President, Shared Services Operations |
| R. Alexander Lake | 50 | Senior Vice President, Chief Legal Officer and Secretary |
| Henry L. Pujol | 54 | Senior Vice President, Chief Accounting Officer |

Jason T. Liberty has served as President and Chief Executive Officer since January 2022. Mr. Liberty has held several roles since joining the Company in 2005. Most recently, Mr. Liberty served as Executive Vice President and Chief Financial Officer since 2017 and, prior to that, as Senior Vice President and Chief Financial Officer since 2013. Before his role as Chief Financial Officer, Mr. Liberty served as Senior Vice President, Strategy and Finance from 2012 through 2013; as Vice President of Corporate and Revenue Planning from 2010 through 2012; and as Vice President of Corporate and Strategic Planning from 2008 to 2010. Before joining Royal Caribbean, Mr. Liberty was a Senior Manager at the international public accounting firm of KPMG LLP. Mr. Liberty currently serves on the Board of Directors of WNS Holdings.

Naftali Holtz has served as Chief Financial Officer since January 2022. In his role as Chief Financial Officer, Mr. Holtz is responsible for overseeing the company's financial planning and analysis, corporate strategy, treasury, corporate tax matters, investor relations, investments, internal audit, accounting and financial reporting. Prior to his role as Chief Financial Officer, Mr. Holtz served as senior vice president of finance, responsible for financial planning and analysis, risk management and treasury. Mr. Holtz worked for Goldman Sachs as a managing director and head of lodging and leisure investment banking before joining Royal Caribbean Group in 2019. Mr. Holtz is also a veteran of the Israeli Air Force.

Michael W. Bayley has served as President and Chief Executive Officer of Royal Caribbean International since December 2014. Prior to this, he served as President and Chief Executive Officer of Celebrity Cruises since August 2012. Mr. Bayley has been employed by Royal Caribbean for over 40 years, having started as an Assistant Purser onboard one of the Company's ships. He has served in a number of roles including as Executive Vice President, Operations from February 2012 until August 2012. Other positions Mr. Bayley has held include Executive Vice President, International from May 2010 until February 2012; Senior Vice President, International from December 2007 to May 2010; Senior Vice President, Hotel Operations for Royal Caribbean International; and Chairman and Managing Director of Island Cruises.

Lisa Lutoff-Perlo has served as President and Chief Executive Officer of Celebrity Cruises since December 2014 and has been with the company since 1985. She also leads the Company's Global Marine Organization. Ms. Lutoff-Perlo was the Executive Vice President, Operations of Royal Caribbean International from 2012 to 2014; Senior Vice President, Hotel Operations of Celebrity Cruises from 2007 to 2012; and Vice President, Onboard Revenue of Celebrity Cruises from 2005 to 2007. Ms. Lutoff-Perlo held various senior positions in sales and marketing with Royal Caribbean International from 1985 to 2005. Ms. Lutoff-Perlo currently serves on the Board of Directors of AutoNation and is Vice Chair for United Way of Broward County.

Roberto Martinoli has served as President and Chief Executive Officer of Silversea Cruises since 2016. Before joining Silversea, Mr. Martinoli was the Chairman and Chief Executive Officer of Grandi Navi Veloci from 2010 to 2016, Executive Vice President and Chief Operating Officer of Norwegian Cruise Line from 2007 to 2010, Executive Vice President of Operations at Carnival Cruise Lines from 2000 to 2007 and Senior Vice President at Costa Crociere from 1997 to 2000.

Harri U. Kulovaara has served as Executive Vice President, Maritime since January 2005. Mr. Kulovaara is responsible for fleet design and newbuild operations. Mr. Kulovaara also chairs our Maritime Safety Advisory Board. Mr. Kulovaara has been employed with Royal Caribbean since 1995 in a variety of positions, including Senior Vice President, Marine Operations, and Senior Vice President, Quality Assurance. Mr. Kulovaara is a naval architect and engineer.

21

Table of Contents

Laura Hodges Bethge has served as Executive Vice President of Shared Services Operations since February 2022, where she is responsible for overseeing the Company's safety, security and environment, risk management, supply chain, port operations, travel services, workplace solutions, and crew movement teams. She joined the Company in 2000 to lead the fleet accessibility program for Royal Caribbean and Celebrity Cruises, and she has since held several leadership roles within various areas of the business. Most recently, she served as Senior Vice President of Shared Services Operations from December 2020 to February 2022. Prior to that role, she served as Senior Vice President of Product Development for Royal Caribbean International from February 2020 to December 2020; Vice President of Customer Experience from April 2017 to February 2020; and Vice President of Market Development for China from October 2016 to April 2017.

R. Alexander Lake has served as Chief Legal Officer and Secretary of the Company since June 2021, in which role he has global responsibility for the Company's legal and compliance functions. Mr. Lake joined the Company from World Fuel Services Corporation, a global energy services company, where he spent over 17 years leading the legal, regulatory and compliance areas, serving most recently as Executive Vice President, Chief Legal Officer and Corporate Secretary from 2017 to 2021. Prior to World Fuel Services, Mr. Lake served as Assistant General Counsel at America Online Latin America, Inc. and practiced as a corporate lawyer in leading law firms in New York and Miami.

Henry L. Pujol has served as Senior Vice President, Chief Accounting Officer of the Company since May 2013. Mr. Pujol originally joined Royal Caribbean in 2004 as Assistant Controller and was promoted to Corporate Controller in May 2007. Before joining Royal Caribbean, Mr. Pujol was a Senior Manager at the international public accounting firm of KPMG LLP.

Table of Contents

**Item 1A. Risk Factors**

*The risk factors set forth below and elsewhere in this Annual Report on Form 10-K are important factors that could cause actual results to differ from expected or historical results. It is not possible to predict or identify all such risks. There may be additional risks that we consider not to be material, or which are not known, and any of these risks could affect our operations. The ordering of the risk factors set forth below is not intended to reflect a risk's potential likelihood or magnitude. See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations for a cautionary note regarding forward-looking statements.*

**COVID-19 and Financial Risks**

*The COVID-19 pandemic has had, and continues to have, a material adverse impact on our business, results of operations and liquidity. The global spread of COVID-19, the unprecedented responses by governments and other authorities to control and contain the disease, including related variants and challenges to global vaccination efforts, have caused significant disruptions, created new risks, and exacerbated existing risks to our business.*

We have been, and continue to be, negatively impacted by the COVID-19 pandemic, including impacts that resulted or may result from actions taken in response to the outbreak and the occurrence and spread of related variants. Examples of these include, but are not limited to, cruising advisories and required or voluntary travel restrictions, that resulted in the temporary suspension of our Global Brands' operations, from which we have resumed limited operations; restrictions on the movement and gathering of people; social distancing measures; shelter-in-place/stay-at-home orders; and disruptions to businesses in our supply chain. In addition to the restrictions affecting our business, the extent, duration, and magnitude of the COVID-19 pandemic's effect on the economy and consumer demand for cruising and travel is evolving and difficult to predict. As such, these impacts may persist for an extended period of time or even become more pronounced, even as we resume operations.

The COVID-19 pandemic also has elevated risks affecting significant parts of our business:

• **Operations:** While we have restarted our global cruise operations in a phased manner, following the March 2020 suspension of our global cruise operations, there is no assurance that our plan to resume operations will be successful. It is possible that future COVID-19 cases could occur onboard and, even if controlled and contained, it is uncertain whether we will need to suspend additional sailings and to what extent in such event. Onboard cases have resulted in illness among our guests and crew, incremental costs, guest refunds and negative publicity and media attention. In addition, we may face challenges in executing our return to service plans as a result of new and evolving operating protocols, including due to state laws regarding proof of vaccination requirements and related litigation, and possible changes in regulations in the countries in which we operate and plan to operate.

Uncertainties remain as to the specifics, timing and costs of administering and implementing our health and safety measures, some of which may be significant. These measures also may negatively impact guest satisfaction. Based on our assessment of these requirements and recommendations, the status of COVID-19 infection and/or vaccination rates in the U.S. or globally or for other reasons, we may determine it necessary to cancel or modify certain of our Global Brands' cruise sailings. In addition, there is no guarantee that the vaccines will be effective. We believe the impact to our global bookings resulting from COVID-19 will continue to have a material negative impact on our results of operations and liquidity, which may be prolonged beyond containment of the disease and its variants.

Our previous suspension of sailings and our gradual resumption of operations has led to a significant decline in our revenues and cash inflows, which required us to take cost and capital expenditure containment actions. Consequently, we reduced and furloughed some of our workforce, with approximately 23% of our U.S. shoreside employee base being impacted in 2020. Our ships and our shipboard crew are gradually being notified about new assignments as operations resume over time. We may be challenged in rebuilding the rest of our workforce which could delay our phased resumption of operations. In addition, we have reduced our planned capital spending through 2022, which may negatively impact or delay our execution of planned growth strategies, particularly as it relates to investments in our ships, technology, and our expansion of land-based developments. We also have taken actions to monitor and mitigate changes in our supply chain, and port destination availability, which may strain relationships with our vendors and port partners.

If we are unable to satisfy the safety standards applicable to our sailings, our operations may be negatively impacted and we could be exposed to reputational and legal risks. Due to the unprecedented and uncertain nature of the COVID-19 pandemic and related regulatory landscape, it is difficult to predict the impact of further disruptions and their magnitude. In addition, we have never previously experienced a complete cessation of our cruising operations or a subsequent phased resumption of operations, and as a consequence, we are unable to predict the precise impact of such a cessation or phased resumption of operations on our brands and future prospects.

• **Results of Operations:** Our suspensions of sailings have materially impacted the results of our operations. We have incurred and will continue to incur significant costs as we accommodate passengers due to cancelled sailings. In addition, we have

incurred and will likely continue to incur significant overhead costs associated with the return to service of our fleet and enhanced COVID-19 related cleaning, testing, vaccination and other mitigation procedures. We may experience volatility in demand for cruising for an indeterminable length of time due to the uncertain nature of the COVID-19 pandemic and ongoing concerns about health and safety, and we cannot predict when we will return to pre-pandemic demand or fare pricing or if we will return to such levels in the foreseeable future. In turn, these negative impacts to our financial performance have resulted and may continue to result in impairments of our long-lived and intangible assets, which has influenced our decision making relating to early disposal, sale or retirement of assets. Following the resumption of operations, our Global Brands and our Partner Brands may be subject to the continued impact of the COVID-19 pandemic. Additionally, any future profitability will be impacted by increased debt service costs as a result of our liquidity actions.

• **Liquidity:** The suspension of our sailings and the reduction in demand for future cruising adversely impacted our liquidity, and we have continued to experience higher than historical levels of refunds of customer deposits, while cash inflows from new or existing bookings on future sailings are below pre-pandemic levels. As a result, we have taken actions to increase our liquidity through a combination of operating and capital expense reductions and increased financing activities. Refer to Note 8. *Debt* to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further discussion of our 2021 financing activities.

We have agreed with certain of our lenders that we will not pay dividends or engage in stock repurchases until after the third quarter of 2022. Thereafter, in the event we declare a dividend or engage in stock repurchases we will need to repay the amounts deferred under our export credit facilities. On February 25, 2021, S&P Global further downgraded our senior unsecured rating from B+ to B, which had no financial impact, and downgraded our Senior Secured Notes which were partially repaid in August 2021, and Silversea Notes, which were fully repaid in June 2021 with the proceeds from the $650 million June Unsecured Notes, from BB to BB-. This downgrade had no impact on the terms of the notes. Our ability to raise additional financing, whether or not secured, could be limited if our credit rating is further downgraded, and/or if we fail to comply with applicable covenants governing our outstanding indebtedness, and/or if overall financial market conditions worsen. Additionally, due to the complexity of the pandemic's impact to the economy and uncertainty of its duration, we cannot guarantee that assumptions used to project our liquidity needs will be correct, which may result in the need for additional financing and/or may result in the inability to satisfy covenants required by our current credit facilities. If we continue to raise additional funds through equity or convertible debt issuances, our shareholders could experience dilution of their ownership interest, and these equity or convertible debt securities could have rights, preferences, and privileges that are superior to that of holders of our ordinary shares. If we raise additional funds by issuing debt, we may be subject to additional limitations on our operations due to restrictive covenants, which may be more restrictive than the covenants in our existing debt agreements, and we may be required to further encumber our assets. Also, as a result of our additional debt issuances, we will require a significant amount of cash to service our debt and sustain operations. Our ability to generate cash depends on factors beyond our control and we may be unable to repay or repurchase debt at maturity. If adequate funds are not available on acceptable terms, or at all, we may be unable to fund our operations, or respond to competitive pressures, any of which could negatively affect our business. There is no guarantee that financing will be available in the future or that such financing will be available with similar terms or terms that are commercially acceptable to us. Further, if any government agrees to provide us with disaster relief assistance, or other assistance due to the impacts of the COVID-19 pandemic, and we determine it is beneficial to seek such government assistance, it may impose restrictions on share buybacks, dividends, prepayment of debt, executive compensation or other areas of our business until the aid is repaid or redeemed in full, which could significantly limit our corporate activities and adversely impact our business and operations. We cannot assure you that any such disaster relief would be available to us.

*We may not be able to obtain sufficient financing or capital for our needs or may not be able to do so on terms that are acceptable or consistent with our expectations.*

To fund our capital expenditures (including new ship orders), operations and scheduled debt payments, we have historically relied on a combination of cash flows provided by operations, drawdowns under available credit facilities, the incurrence of additional indebtedness and the sale of equity or debt securities in private or public securities markets. Any circumstance or event which leads to a decrease in consumer cruise spending, such as worsening global economic conditions or significant incidents impacting the cruise industry, such as the COVID-19 pandemic, negatively affects our cash flows. We had net cash outflows from operations for the twelve months ended December 31, 2021. As result of the COVID-19 pandemic and the resulting suspension of our operations, we have experienced credit rating downgrades, which may reduce our ability to incur secured indebtedness by reducing the amount of indebtedness that we are permitted to secure, and may negatively impact our access to, and cost of, debt financing.

Our ability to access additional funding as and when needed, our ability to timely refinance and/or replace our outstanding debt securities and credit facilities on acceptable terms and our cost of funding will depend upon numerous factors including, but not limited to, the strength of the financial markets, our recovery and financial performance, the recovery and performance of our industry in general and the size, scope and timing of our financial needs. In addition, even where financing commitments have been secured,

significant disruptions in the capital and credit markets could cause our banking and other counterparties to breach their contractual obligations to us or could cause the conditions to the availability of such funding not to be satisfied. This could include failures of banks or other financial service companies to fund required borrowings under our loan agreements or to pay us amounts that may become due or return collateral that is refundable under our derivative contracts for hedging of fuel prices, interest rates and foreign currencies or other agreements. If any of the foregoing occurs for a prolonged period of time it will have a long-term negative impact on our cash flows and our ability to meet our financial obligations.

*Our substantial debt requires a significant amount of cash to service and could adversely affect our financial condition.*

We have a substantial amount of debt and significant debt service obligations. As of December 31, 2021, we had total debt of $21.1 billion. Our substantial debt has required us to dedicate a large portion of our cash flow from operations to service debt and fund repayments on our debt, thereby reducing the availability of our cash flow to fund working capital, capital expenditures and other general corporate expenses.

Our ability to make future scheduled payments on our debt service obligations or refinance our debt depends on our future operating and financial performance and ability to generate cash. This will be affected by our ability to successfully implement our business strategy, as well as general economic, financial, competitive, regulatory and other factors beyond our control, such as the disruption caused by the COVID-19 pandemic. If we cannot generate sufficient cash to meet our debt service obligations or fund our other business needs, we may, among other things, need to refinance all or a portion of our debt, obtain additional financing, delay planned capital expenditures or sell assets. We cannot assure that we will be able to generate sufficient cash through any of the foregoing. If we are not able to refinance any of our debt, obtain additional financing or sell assets on commercially reasonable terms or at all, we may not be able to satisfy our obligations with respect to our debt.

Our substantial debt could also result in other negative consequences for us. For example, it could increase our vulnerability to adverse general economic or industry conditions; limit our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate; place us at a competitive disadvantage compared to our competitors that have less debt; make us more vulnerable to downturns in our business, the economy or the industry in which we operate, including the current downturn related to COVID-19; limit our ability to raise additional debt or equity capital in the future to satisfy our requirements relating to working capital, capital expenditures, development projects, strategic initiatives or other purposes; restrict us from making strategic acquisitions, introducing new technologies or exploiting business opportunities; limit or restrict our ability to obtain and maintain performance bonds to cover our financial responsibility requirements in various jurisdictions for non-performance of guest travel, casualty and personal injury; make it difficult for us to satisfy our obligations with respect to our debt; and increase our exposure to the risk of increased interest rates as certain of our borrowings are (and may be in the future) at a variable rate of interest.

*Despite our leverage, we may incur more debt, which could adversely affect our business.*

We may incur substantial additional debt in the future. Except for the restrictions under the indentures governing our 10.875% and 11.5% senior secured notes due 2023 and 2025, respectively (the "Secured Notes"), and our 9.125% senior guaranteed notes due 2023 (the "Priority Guaranteed Notes") and certain of our other debt instruments, including our unsecured bank and export credit facilities, we are not restricted under the terms of our debt instruments from incurring additional debt. Although the indentures governing the Secured Notes, the Unsecured Notes, and certain of our other debt instruments, including our unsecured bank and export credit facilities, contain restrictions on the incurrence of additional debt, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances the amount of debt that could be incurred in compliance with these restrictions could be substantial. In the event that we execute and borrow under the $700.0 million commitment available to draw on at any time prior to August 12, 2022 for a 364-day term loan facility, the credit agreement that would govern such term loan facility would impose substantially similar restrictions (including the related qualifications and exceptions) as are set forth in the indenture governing the Unsecured Notes. If new debt is added to our existing debt levels, the related risks that we now face could increase. As of December 31, 2021, we have commitments for approximately $10.0 billion of debt to finance the purchase of 9 ships on order by our Royal Caribbean International, Celebrity Cruises and Silversea Cruises brands, all of which are guaranteed by the export credit agencies in the countries in which the ships are being built. The ultimate size of each facility will depend on the final contract price (including change orders and owner's supply) as well as fluctuations in the EUR/USD exchange rate.

*We are subject to restrictive debt covenants that may limit our ability to finance our future operations and capital needs and to pursue business opportunities and activities. In addition, if we fail to comply with any of these restrictions, it could have a material adverse effect on us.*

Certain of our debt instruments, including our indentures and our unsecured bank and export credit facilities, limit our flexibility in operating our business. For example, certain of our loan agreements and indentures restrict or limit our and our subsidiaries' ability to, among other things: (i) pay dividends or distributions, redeem or repurchase capital stock; (ii) incur or guarantee additional indebtedness; (iii) make certain investments; consummate certain asset sales; engage in certain transactions with affiliates; grant or assume certain liens; and consolidate, merge or transfer all or substantially all of our assets. In addition, both our

export credit facilities and our non-export credit facilities contain covenants that will, once our current waivers expire, require us, among other things, to maintain a specified minimum fixed charge coverage ratio and limit our net debt-to-capital ratio. In addition, our ECA facility amendments also require us to maintain minimum liquidity and a minimum stock holders' equity. Refer to Note 8. Debt to our consolidated financial statements under Item 8. Financial Statements and Supplemental Data for further discussion on our covenants and existing waivers.

All of these limitations are subject to significant exceptions and qualifications. Despite these exceptions and qualifications, we cannot assure you that the operating and financial restrictions and covenants in certain of our debt instruments will not adversely affect our ability to finance our future operations or capital needs or engage in other business activities that may be in our interest. Any future indebtedness may include similar or other restrictive terms. In addition, our ability to comply with these covenants and restrictions may be affected by events beyond our control. These include prevailing economic, financial and industry conditions. If we breach any of these covenants or restrictions, we could be in default under such indebtedness and certain of our other debt instruments, and the relevant debt holders or lenders could elect to declare the debt, together with accrued and unpaid interest and other fees, if any, immediately due and payable and proceed against any collateral securing that debt. If the debt under certain of our debt instruments that we enter into were to be accelerated, our liquid assets may be insufficient to repay in full such indebtedness. Borrowings under other debt instruments that contain cross-default provisions also may be accelerated or become payable on demand. In these circumstances, our assets may not be sufficient to repay in full that indebtedness and our other indebtedness then outstanding.

In addition, our ability to maintain our credit facilities may also be impacted by changes in our ownership base. More specifically, we may be required to prepay our non-ECA and ECA facilities if any person acquires ownership of more than 50% of our common stock or, subject to certain exceptions, during any 24-month period, a majority of our board of directors is no longer comprised of individuals who were members of our board of directors on the first day of such period. Our public debt securities also contain change of control provisions that would be triggered by a third-party acquisition of greater than 50% of our common stock coupled with a ratings downgrade, which would require us to offer to repurchase our public debt securities in the event of such change of control.

*If we elect to settle conversions of our convertible notes in shares of our common stock or a combination of cash and shares of our common stock, conversions of our convertible notes will result in dilution for our existing shareholders.*

We have an aggregate principal amount of $1.725 billion in convertible notes outstanding. If note holders elect to convert, the notes will be converted into our shares of common stock, cash, or a combination of cash and cash, at our discretion. Prior to March 15 and August 15, 2023, our convertible notes issued June 2020 and October 2020, respectively, will be convertible at the option of holders during certain periods only upon satisfaction of certain conditions. Beyond those dates, the convertible notes will be convertible at any time until the close of business on the second scheduled trading day immediately preceding their maturity date. Conversions of our convertible notes in shares of our common stock or a combination of common stock and cash, will result in dilution to our shareholders.

*We did not declare quarterly dividends on our common stock in 2021 and do not expect to pay dividends on our common stock for the foreseeable future.*

No cash dividends were declared on our common stock during the year ended December 31, 2021. We expect that any income received from operations will be devoted to our future operations and recovery. We do not expect to pay cash dividends on our common stock for the foreseeable future due to our agreement with certain of our lenders not to pay dividends until the end of the third quarter of 2022. In addition, in the event we thereafter declare a dividend, we will need to repay our debt deferral. Payment of dividends would, in any case, depend upon our profitability at the time, cash available for those dividends, and other factors as our board of directors may consider relevant.

*Increased regulatory oversight, and the phasing out of LIBOR may adversely affect the value of a portion of our indebtedness.*

The publication of certain LIBOR settings ceased after December 31, 2021, and uncertainty regarding alternative reference rates remains as many market participants await a wider adoption of replacement products prior to the cessation of the remaining USD LIBOR tenors (currently scheduled for June 30, 2023). When LIBOR ceases to exist, the level of interest payments on the portion of our indebtedness that bears interest at variable rates might be affected if we, the agent, and/or the lenders holding a majority of the outstanding loans or commitments under such indebtedness fail to amend such indebtedness to implement a replacement rate. Regardless, such replacement rate will give due consideration to any evolving or then-existing conventions for similar credit facilities, which may result in different than expected interest payments.

## Macroeconomic, Business, Market and Operational Risks

*Adverse worldwide economic or other conditions could reduce the demand for cruises and passenger spending, adversely impacting our operating results, cash flows and financial condition including impairing the value of our goodwill, ships,*

*trademarks and other assets and potentially affecting other critical accounting estimates where the change may be material to our operating results.*

In addition to health and safety concerns, demand for cruises is affected by international, national, and local economic conditions. Weak or uncertain economic conditions may impact consumer confidence and pose a risk as vacationers postpone or reduce discretionary spending. This, in turn, may result in cruise booking slowdowns, decreased cruise prices and lower onboard revenues. Given the global nature of our business, we are exposed to many different economies, and our business could be hurt by challenging conditions in any of our markets. Additionally, the continued impact of COVID-19 on the financial markets is uncertain and we cannot predict its effect on geopolitical events and/or international trade policies as countries attempt to mitigate the impact of the pandemic and as they re-open their economies or re-implement lockdown measures.

*Our operating costs could increase due to market forces and economic or geopolitical factors beyond our control.*

Our operating costs, including fuel, food, payroll and benefits, airfare, taxes, insurance, and security costs, can be and have been subject to increases due to market forces and economic or geopolitical conditions or other factors beyond our control, including the global inflationary pressures that we are currently experiencing and that have increased our operating costs. In connection with the COVID-19 pandemic, we've incurred increased operating costs, including as a result of rerouting itineraries due to ports closing or not accepting passengers. Increases in these operating costs could adversely affect our future profitability.

*Any further impairment of our goodwill, long-lived assets, equity investments and notes receivable could adversely affect our financial condition and operating results.*

We evaluate goodwill for impairment on an annual basis, or more frequently when circumstances indicate that the carrying value of a reporting unit may not be recoverable. A challenging operating environment (such as is currently being experienced due to the impact of COVID-19), conditions affecting consumer demand or spending, the deterioration of general macroeconomic conditions, or other factors could result in a change to the future cash flows we expect to derive from our operations. Reductions of cash flows used in the valuation analyses may result in the recording of impairments, which could adversely affect our financial condition and operating results. Refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations under Critical Accounting Estimates and Note 1. General for further comments on impairments.

*Price increases for commercial airline services for our guests or major changes or reduction in commercial airline services and/or availability could adversely impact the demand for cruises and undermine our ability to provide reasonably priced vacation packages to our guests.*

Many of our guests depend on scheduled commercial airline services to transport them to or from the ports where our cruises embark or disembark. Increases in the price of airfare would increase the overall price of the cruise vacation to our guests, which may adversely impact demand for our cruises. In addition, changes in the availability and/or regulations governing commercial airline services, including those resulting from the COVID-19 pandemic, have adversely affected and could continue to adversely affect our guests' ability to obtain air travel, as well as our ability to transfer our guests to or from our cruise ships, which could adversely affect our results of operations.

*Terrorist attacks, war, and other hostilities could have a negative impact on our results of operations.*

Events such as terrorist attacks, war (or war-like conditions), conflicts (domestic or cross-border), civil unrest and other hostilities, including an escalation in the frequency or severity of incidents, and the resulting political instability, travel restrictions and advisories, and concerns over safety and security aspects of traveling or the fear of any of the foregoing have had, and could have in the future, a significant adverse impact on demand and pricing in the travel and vacation industry. In view of our global operations, we are susceptible to a wide range of adverse events. These events could also result in additional security measures taken by local authorities which may potentially impact access to ports and/or destinations.

*Disease outbreaks and an increase in concern about the risk of illness could adversely impact our business and results of operations.*

Disease outbreaks and increased concern related to illness when travelling to, from, and on our ships could cause a drop in demand for cruises, guest cancellations, travel restrictions, an unavailability of ports and/or destinations, cruise cancellations, ship redeployments and an inability to source our crew, provisions or supplies from certain places. In addition, we may be subject to increased concerns that cruises are more susceptible than other vacation alternatives to the spread of infectious diseases such as COVID-19. In response to disease outbreaks our industry, including our passengers and crew, may be subject to enhanced health and safety requirements in the future which may be costly and take a significant amount of time to implement across our fleet. For example, local governments may establish their own set of rules for self-quarantines and/or require proof of individuals health status or vaccination prior to or upon visiting. The impact of any of these factors could have a material adverse effect on our business and results of operations. In addition, the new operating protocols we are developing and any other health protocol we may develop or that

may be required by law in the future in response to infectious diseases may be costly to develop and implement and may be less effective than we expected in reducing the risk of infection and spread of such disease on our cruise ships, all of which will negatively impact our operations and expose us to reputational and legal risks.

*Incidents on ships, at port facilities, land destinations and/or affecting the cruise vacation industry in general, and the associated negative media coverage and publicity, have affected and could continue to affect our reputation and impact our sales and results of operations.*

Cruise ships, private destinations, port facilities and shore excursions operated and/or offered by us and third parties may be susceptible to the risk of accidents, illnesses, mechanical failures, environmental incidents and other incidents which could bring into question safety, health, security and vacation satisfaction and negatively impact our sales, operations and reputation. Incidents involving cruise ships, and, in particular the safety, health and security of guests and crew and the media coverage thereof, including those related to the COVID-19 pandemic, have impacted and could continue to impact demand for our cruises and pricing in the industry. In particular, we cannot predict the impact on our financial performance and the public's concern regarding the health and safety of travel, especially by cruise ship, and related decreases in demand for travel and cruising. Moreover, our ability to attract and retain guests and crew depends, in part, upon the perception and reputation of our company and our brands and the public's concern regarding the health and safety of travel generally, as well as regarding the cruising industry and our ships specifically. Our reputation and our business could also be damaged by continued or additional negative publicity regarding the cruise industry in general, including publicity regarding the spread of contagious disease such as COVID-19, over-tourism in key ports and destinations and the potentially adverse environmental impacts of cruising. The considerable expansion in the use of social and digital media has compounded the potential scope and reach of any negative publicity. In addition, incidents involving cruise ships may result in additional costs to our business, increasing government or other regulatory oversight and, in certain cases, potential litigation.

*Significant weather, climate events and/or natural disasters could adversely impact our business and results of operations.*

Natural disasters (e.g. earthquakes, volcanos, wildfires), weather and/or climate events (including hurricanes and typhoons) could impact our source markets and operations resulting in travel restrictions, guest cancellations, an inability to source our crew or our provisions and supplies from certain places. We are often forced to alter itineraries and occasionally cancel a cruise or a series of cruises or to redeploy our ships due to these types of events, which could have an adverse effect on our sales, generating costs and profitability in the current and future periods. Increases in the frequency, severity or duration of these types of events could exacerbate their impact and disrupt our operations or make certain destinations less desirable or unavailable, impacting our revenues and profitability further. Any of the foregoing could have an adverse impact on our results of operations and on industry performance.

*Our sustainability activities, including environmental, social and governance (ESG) matters, could result in reputational risks, increased costs and other risks.*

Customers, investors, lenders, regulators and other industry stakeholders have placed increasing importance on corporate ESG practices and on the implications and social cost of their investments, which could cause us to incur additional costs and changes to our operations. If our ESG practices or disclosures do not meet investor or industry stakeholders' evolving expectations and standards, our customer, employee and supply chain vendor retention, and our brands and reputation, may be negatively impacted, which could affect our business operations and financial condition. We could also incur additional costs and require additional resources to monitor, report and comply with various ESG practices, which could increase our operating costs and affect our results of operations and financial condition.

In addition, from time to time, we communicate certain initiatives regarding climate change, and other ESG matters. We could fail or be perceived to fail in achieving such initiatives, which may negatively affect our reputation. The future adoption of new technology or processes to achieve the initiatives could also result in the impairment of existing assets.

*Our reliance on shipyards, their subcontractors and our suppliers to implement our newbuild and ship upgrade programs and to repair and maintain our ships exposes us to risks which could adversely impact our business.*

We rely on shipyards, their subcontractors and our suppliers to effectively construct our new ships and to repair, maintain, and upgrade our existing ships on a timely basis and in a cost-effective manner. There are a limited number of shipyards with the capability and capacity to build, repair, maintain and/or upgrade our ships. As such, any disruptions affecting the newbuild or fleet modernization supply chain will adversely impact our business as there are limited

substitutes.

The COVID-19 pandemic has led to suspensions and/or slowdowns of work at certain shipyards, which impacts our ability to construct new ships when and as planned, our ability to timely and cost-effectively procure new capacity, and our ability to execute scheduled drydocks and/or fleet modernizations. The effects of the COVID-19 pandemic on the shipyards, their subcontractors, and our suppliers have resulted in delays in our previously scheduled ship deliveries. Variations from our plan could have a significant negative impact on our business operations and financial condition.

Building, repairing, maintaining and/or upgrading a ship is sophisticated work that involves significant risks. Material increases in commodity and raw material prices, and other cost pressures impacting the construction of a new ship, such as the cost of labor and financing, could adversely impact the shipyard's ability to build the ship on a cost-effective basis. We may be impacted if shipyards, their subcontractors, and/or our suppliers encounter financial difficulties, supply chain, technical or design problems when building or repairing a ship. If materialized, these problems could impact the timely delivery or cost of new ships or the ability of shipyards to repair and upgrade our fleet in accordance with our needs or expectations. In addition, delays, mechanical faults and/or unforeseen incidents may result in cancellation of cruises or delays of new ship orders or necessitate unscheduled drydocks. Such events could result in lost revenue, increased operating expenses, or both, and thus adversely affect our results of operations.

*An increase in capacity worldwide or excess capacity in a particular market could adversely impact our cruise sales and/or operations*

Although our ships can be redeployed, cruise sales and/or pricing may be impacted by the introduction of new ships into the marketplace, reductions in cruise capacity, overall market growth and deployment decisions of ourselves and our competitors. As of December 31, 2021, a total of 78 new ships with approximately 183,000 berths were on order for delivery through 2027 in the cruise industry, including 12 ships currently scheduled to be delivered to us. The further net growth in capacity from these new ships and future orders, without an increase in the cruise industry's demand and/or share of the vacation market, could depress cruise prices and impede our ability to achieve yield improvement. Further, cruise prices and yield improvement could face additional pressure due to the pace at which we and other cruise line operators return to service.

In addition, to the extent that we or our competitors deploy ships to a particular itinerary/region and the resulting capacity in that region exceeds the demand, it may negatively affect our pricing and profitability. Any of the foregoing could have an adverse impact on our results of operations, cash flows and financial condition, including potentially impairing the value of our ships and other assets.

*Unavailability of ports of call may adversely affect our results of operations.*

We believe that port destinations are a major reason why guests choose to go on a particular cruise or on a cruise vacation. The availability of ports and destinations is affected by a number of factors, including industry demand and competition for key ports and destinations, existing capacity constraints, constraints related to the size of certain ships, security, financial limitations on port development, exclusivity arrangements that ports may have with our competitors, geopolitical developments and local governmental regulations. In light of the COVID-19 pandemic, port availability could also be subject to immediate change depending on local and/or onboard disease cases or other government restrictions as well as to limited availability during the resumption of operations. Higher fuel costs also may adversely impact the destinations on certain of our itineraries as they become too costly to include.

In addition, certain ports and destinations may face a surge of both cruise and non-cruise tourism which, in certain cases, has fueled anti-tourism sentiments and related countermeasures to limit the volume of tourists allowed in these destinations. In certain destinations, countermeasures to limit the volume of tourists have been contemplated and/or put into effect, including proposed limits on cruise ships and cruise passengers. Potential restrictions in ports and destinations, such as Venice, Barcelona or Key West, could limit the itinerary and destination options we can offer our passengers going forward.

Increased demand and competition for key ports of call or destinations, limitations on the availability or feasibility of use of specific ports of call and/or constraints on the availability of shore excursions and other service providers at such ports or destinations could adversely affect our operations and financial results.

*We may lose business to competitors throughout the vacation market.*

We operate in the vacation market and cruising is one of many alternatives for people choosing a vacation. We therefore risk losing business not only to other cruise lines, but also to other vacation operators, which provide other leisure options, including hotels, resorts, internet-based alternative lodging sites and package holidays and tours.

We face significant competition from other cruise lines on the basis of cruise pricing, travel advisor preference and also in terms of the nature of ships, services and destinations that we offer to guests. Our principal competitors within the cruise industry include Carnival Corporation & plc, which owns, among others, Aida Cruises, Carnival Cruise Line, Costa Cruises, Cunard Line, Holland America Line, P&O Cruises, Princess Cruises and Seabourn; Disney Cruise Line; MSC Cruises; and Norwegian Cruise Line Holdings Ltd, which owns Norwegian Cruise Line, Oceania Cruises and Regent Seven Seas Cruises. Our revenues are sensitive to the actions of other cruise lines in many areas including pricing, scheduling, capacity and promotions, which can have a substantial adverse impact not only on our revenues, but also on overall industry revenues.

In the event that we do not effectively market or differentiate our cruise brands from our competitors or otherwise compete effectively with other vacation alternatives and new or existing cruise companies, our results of operations and financial position could be adversely affected.

*If we are unable to appropriately balance our cost management and capital allocation strategies with our goal of satisfying guest expectations, it may adversely impact our business success.*

Our goals are to provide high quality products and deliver high quality services. There can be no assurance that we can successfully balance these goals with our cost management and capital allocation strategies. Our business also requires us to make capital allocation decisions across a broad scope of investment options with varying return profiles and time horizons for value realization. These include significant capital investment decisions such as ordering new ships, upgrading our existing fleet, enhancing our technology and/or data capabilities and expanding our portfolio of land-based assets, based on expected market preferences, competition and projected demand. There can be no assurance that our strategies will be successful, which could adversely impact our business, financial condition and results of operations. For example, our ownership and operation of older tonnage, in particular during the business disruption caused by COVID-19, has resulted in impaired asset values due to expected returns that we will not be able to recover.

*Our attempts to expand our business into new markets and new ventures may not be successful.*

We opportunistically seek to grow our business through, among other things, expansion into new destinations or source markets and establishment of new ventures complementary to our current offerings. These attempts to expand our business increase the complexity of our business, require significant levels of investment and can strain our management, personnel, operations and systems. In addition, we have been unable to execute our attempts to expand our business as a result of the impacts of the COVID-19 pandemic, as described elsewhere herein. There can be no assurance that these business expansion efforts will develop as anticipated or that we will succeed, and if we do not, we may be unable to recover our investment, which could adversely impact our business, financial condition and results of operations.

*Risks associated with our development and operation of key land-based destination projects may adversely impact our business or results of operations.*

We have invested, either directly or indirectly through joint ventures and partnerships, in a growing portfolio of key land-based projects including port and terminal facilities, private destinations and multi-brand destination projects. These investments can increase our exposure to certain key risks depending on the scope, location, and the ownership and management structure of these projects. These risks include susceptibility to weather events, exposure to local political/regulatory developments and policies, logistical challenges and human resource and labor risks and safety, environmental, and health risks, including challenges posed by the COVID-19 pandemic and its effects locally where we have these projects and relationships.

*Our reliance on travel advisors to sell and market our cruises exposes us to certain risks which could adversely impact our business.*

We rely on travel advisors to generate bookings for our ships. Accordingly, we must maintain competitive commission rates and incentive structures. If we fail to offer competitive compensation packages or fail to maintain our relationships, these agencies may be incentivized to sell cruises offered by our competitors, which could adversely impact our operating results. Our reliance on third-party sellers is particularly pronounced in certain markets. In addition, the travel advisor community is sensitive to economic conditions that impact discretionary income of consumers. Significant disruptions, such as those caused by the COVID-19 pandemic, or contractions in the industry could reduce the number of travel advisors available for us to market and sell our cruises, which could have an adverse impact on our financial condition and results of operations. Additionally, the strength of our recovery from suspended operations could be delayed if we are not aligned and partnered with key travel advisors.

*Business activities that involve our co-investments with third parties may subject us to additional risks.*

Partnerships, joint ventures and other business structures involving our co-investments with third parties generally include some form of shared control over the operations of the business and create additional risks, including the possibility that other investors in such ventures become bankrupt or otherwise lack the financial resources to meet their obligations or could have or develop business interests, policies or objectives that are inconsistent with ours. In addition to financial risks, our co-investment activities have also presented managerial and operational risks and expose us to reputational or legal concerns. These or other issues related to our co-investments with third parties could adversely impact our operations or liquidity. Due to the COVID-19 pandemic, Pullmantur S.A. filed for reorganization under the terms of the Spanish insolvency laws. The Company may be required to continue to provide funding for these affiliated entities and it is unclear when and to what extent these entities will fully resume operations and our ability to provide such funding will be limited by the level and terms of our outstanding indebtedness. Further, due to the arrangements we have in place with our partners in these ventures, we are limited in our ability to control the strategy of these ventures if and when they resume operations, or their use of capital and other key factors to their results of operation which could adversely affect our investments and impact our results of operations.

*Past or pending business acquisitions or potential acquisitions that we may decide to pursue in the future carry inherent risks which could adversely impact our financial performance and condition.*

The Company, from time to time, has engaged in acquisitions and may pursue acquisitions in the future, which are subject to, among other factors, the Company's ability to identify attractive business opportunities and to negotiate favorable terms for such opportunities. Accordingly, the Company cannot make any assurances that potential acquisitions will be completed timely or at all, or that if completed, we would realize the anticipated benefits of such acquisitions. Acquisitions also carry inherent risks such as, among others: (i) the potential delay or failure of our efforts to successfully integrate business processes and realizing expected synergies; (ii) difficulty in aligning procedures, controls and/or policies; and (iii) future unknown liabilities and costs that may be associated with an acquisition. In addition, acquisitions may adversely impact our liquidity and/or debt levels, and the recognized value of goodwill and other intangible assets can be negatively affected by unforeseen events and/or circumstances, which may result in an impairment charge. Any of the foregoing events could adversely impact our financial condition and results of operations.

*We rely on supply chain vendors and third-party service providers who are integral to the operations of our businesses. These vendors and service providers are also affected by COVID-19 and may be unable or unwilling to deliver on their commitments or may act in ways that could harm our business.*

We rely on supply chain vendors to deliver key products to the operations of our businesses around the world. Any event impacting a vendor's ability to deliver goods of the expected quality at the location and time needed could negatively impact our ability to deliver our cruise experience. Events impacting our supply chain could be caused by factors beyond the control of our suppliers or us, including inclement weather, natural disasters, new laws and regulations, labor actions, increased demand, problems in production or distribution and/or disruptions in third-party logistics or transportation systems, including those caused by the COVID-19 pandemic. Any such interruptions to our supply chain could increase our costs and could limit the availability of products critical to our operations.

In order to achieve cost and operational efficiencies, we outsource to third-party vendors certain services that are integral to the operations of our global businesses, such as our onboard concessionaires, certain of our call center operations, guest port services, logistics distribution and operation of a large part of our information technology systems, all of which are also affected by the COVID-19 pandemic. We are subject to the risk that certain decisions are subject to the control of our third-party service providers and that these decisions may adversely affect our activities. A failure to adequately monitor a third-party service provider's compliance with a service level agreement or regulatory or legal requirements could result in significant economic and reputational harm to us. There is also a risk the confidentiality, privacy and/or security of data held by third parties or communicated over third-party networks or platforms could become compromised.

*The potential unavailability of insurance coverage, an inability to obtain insurance coverage at commercially reasonable rates or our failure to have coverage in sufficient amounts to cover our incurred losses may adversely affect our financial condition or results of operations.*

We seek to maintain appropriate insurance coverage at commercially reasonable rates. We normally obtain insurance based on the cost of an asset rather than replacement value, and we also elect to self-insure, co-insure, or use deductibles in certain circumstances for certain risks such as loss of use of a ship or other business interruption. The limits of insurance coverage we purchase are based on the availability of the coverage, evaluation of our risk profile and cost of coverage. We do not carry business interruption insurance and accordingly we have no insurance coverage for loss of revenues or earnings from our ships or other operations. Accordingly, we are not protected against all risks and cannot be certain that our coverage will be adequate for liabilities actually incurred which could result in an unexpected decrease in our revenue and results of operations in the event of an incident.

We are members of four Protection and Indemnity ("P&I") clubs, which are part of a worldwide group of 13 P&I clubs, known as the International Group of P&I Clubs (the "IG"). P&I coverage provided by the clubs is on a mutual basis, and we are subject to additional premium calls in the event of a catastrophic loss incurred by any member of the 13 P&I clubs, whereby the reinsurance limits purchased by the IG are exhausted. We are also subject to additional premium calls based on investment and underwriting shortfalls experienced by our own individual insurers. Certain liabilities, costs, and expenses associated with COVID-19 cases identified on or traced to our vessels are eligible for insurance coverage under our participation in these P&I clubs.

We cannot be certain that insurance and reinsurance coverage will be available to us and at commercially reasonable rates in the future or at all or, if available, that it will be sufficient to cover potential claims. Additionally, we or other insurers could dispute or reject coverage. If our insurance is not adequate to cover our liabilities, or if we are unable to obtain insurance coverage at reasonable rates or at all, it could materially impact our financial condition and results of operations. If a loss is not covered by our insurance or if we experience a loss in excess of our coverage limits, or if our insurers are unable to pay the associated insurance claims volumes, may potentially impact the insurance markets we rely on for coverage and could adversely impact both the coverage available to us in the future as well as the premium costs we are required to pay for those coverages. Such events could adversely affect our financial condition or results of operations.

*Disruptions in our shoreside or shipboard operations or our information systems may adversely affect our results of operations.*

Our principal executive office and principal shoreside operations are located in Florida, and we have shoreside offices throughout the world. Actual or threatened natural disasters (e.g., hurricanes/typhoons, earthquakes, tornadoes, fires or floods), municipal lockdowns, curfews, quarantines, or similar events in these locations may have a material adverse impact on our business continuity, reputation and results of operations. In addition, substantial or repeated information system failures, computer viruses or cyber attacks impacting our shoreside or shipboard operations could adversely impact our business. We do not generally carry business interruption insurance for our shoreside or shipboard operations or our information systems. As such, any losses or damages incurred by us could have an adverse impact on our results of operations.

*Provisions of our Articles of Incorporation, By-Laws and Liberian law could inhibit a change of control and may prevent efforts by our shareholders to change our management.*

Certain provisions of our Articles of Incorporation and By-Laws and Liberian law may inhibit third parties from effectuating a change of control of the Company without approval from our board of directors which could result in the entrenchment of current management. These include provisions in our Articles of Incorporation that prevent third parties, other than A. Wilhelmsen AS and Cruise Associates and their permitted transferees, from acquiring beneficial ownership of more than 4.9% of our outstanding shares without the consent of our board of directors.

## Compliance and Regulatory Risks

*Changes in U.S. or other countries' foreign travel policy have affected, and may continue to affect our results of operations.*

Changes in U.S. foreign policy focus on the region and could in the future result in the imposition of travel restrictions or travel bans of U.S. persons to certain countries or result in the imposition of travel advisories, warnings, rules, regulations or legislation exposing us to penalties or claims of monetary damages. In addition, some countries have adopted restrictions against U.S. travelers, and we currently cannot predict when those restrictions will be eased. The timing and scope of these changes and regulations can be unpredictable, and they could cause us to cancel scheduled sailings, possibly on short notice, or result in litigation against us. This, in turn, could decrease our revenue, increase our operating costs and otherwise impair our profitability.

*Environmental, labor, health and safety, financial responsibility and other maritime regulations and measures could affect operations and increase operating costs.*

The U.S. and various state and foreign government or regulatory agencies have enacted or may enact environmental regulations or policies, such as requiring the use of low sulfur fuels (e.g. IMO 2020), that could increase our direct cost to operate in certain markets, increase our cost of fuel, limit the supply of compliant fuel, cause us to incur significant expenses to purchase and/or develop new equipment and adversely impact the cruise vacation industry. While we have taken and expect to continue to take a number of actions to mitigate the potential impact of certain of these regulations, there can be no assurances that these efforts will be successful over the long term.

There is increasing global regulatory focus on climate change, greenhouse gas and other emissions. These regulatory efforts, both internationally and in the U.S., are still developing, and we cannot yet determine what the final regulatory programs or their impact will be. However, such climate change-related regulatory activity in the future may adversely affect our business and financial results by requiring us to reduce our emissions, purchase allowances or otherwise pay for our emissions and may increase our exposure, if any, to climate change-related litigation. Such activity may also prevent us by increasing our operating costs, including fuel costs.

In addition, we are subject to various international, national, state and local laws, regulations and treaties that govern, among other things, discharge from our ships, safety standards applicable to our ships, treatment of disabled persons, health and sanitary standards applicable to our guests, security standards on board our ships and at the ship/port interface areas, and financial responsibilities to our guests. These issues are, and we believe will continue to be, an area of focus by the relevant authorities throughout the world. This could result in the enactment of more stringent regulation of cruise ships that could subject us to increasing compliance costs in the future and may increase our exposure, if any, to environmental-related litigation.

Some environmental groups also have generated negative publicity about the environmental impact of the cruise vacation industry and are advocating for more stringent regulation of ship emissions at berth and at sea. Growing environmental scrutiny of the cruise industry and any related measures could adversely impact our operations and financial results and subject us to reputational damages.

*A change in our tax status under the U.S. Internal Revenue Code, or other jurisdictions, may have adverse effects on our results of operations.*

Royal Caribbean Cruises Ltd. and a number of our subsidiaries are foreign corporations that derive income from a U.S. trade or business and/or from sources within the U.S. In connection with the year end audit, each year, Faegre Drinker Biddle & Reath LLP, our U.S. tax counsel, delivers to us an opinion, based on certain representations and assumptions set forth in it, to the effect that this income, to the extent derived from or incidental to the international operation of a ship or ships, is excluded from gross income for U.S. federal income tax purposes pursuant to Section 883 of the Internal Revenue Code. We believe that most of our income (including that of our subsidiaries) is derived from or incidental to the international operation of ships.

Our ability to rely on Section 883 could be challenged or could change in the future. Provisions of the Internal Revenue Code, including Section 883, are subject to legislative change at any time. Moreover, changes could occur in the future with respect to the identity, residence or holdings of our direct or indirect shareholders, trading volume or trading frequency of our shares, or relevant foreign tax laws of Liberia or the Bahamas, such that they no longer qualify as equivalent exemption jurisdictions, that could affect our eligibility for the Section 883 exemption. Accordingly, there can be no assurance that we will continue to be exempt from U.S. income tax on U.S. source shipping income in the future. If we were not entitled to the benefit of Section 883, we and our subsidiaries would be subject to U.S. taxation on a portion of the income derived from or incidental to the international operation of our ships, which would reduce our net income.

Additionally, portions of our business are operated by companies that are within the United Kingdom tonnage tax regime. Further, some of our operations are conducted in jurisdictions where we rely on tax treaties to provide exemption from taxation. To the extent the United Kingdom tonnage tax laws change or we do not continue to meet the applicable qualification requirements or if tax treaties are changed or revoked, we may be required to pay higher income tax in these jurisdictions, adversely impacting our results of operations.

As budgetary constraints continue to adversely impact the jurisdictions in which we operate, increases in income tax regulations, tax audits or tax reform affecting our operations may be imposed.

*We are not a U.S. corporation and, as a result, our shareholders may be subject to the uncertainties of a foreign legal system in protecting their interests.*

Our corporate affairs are governed by our Articles of Incorporation and By-Laws and by the Business Corporation Act of Liberia. The provisions of the Business Corporation Act of Liberia, and the corporation laws of a number of states in the U.S. However, there are very few judicial cases in Liberia interpreting the Business Corporation Act of Liberia. While the Business Corporation Act of Liberia provides that it is to be applied and construed to make the laws of Liberia, with respect of the subject matter of the Business Corporation Act of Liberia, uniform with the laws of the State of Delaware and other states with substantially similar legislative provisions (and adopts their case law to the extent it is non-conflicting), there have been few Liberian court cases interpreting the Business Corporation Act of Liberia, and we cannot predict whether Liberian courts would reach the same conclusions as United States courts. We understand that legislation has been proposed but not yet adopted to make the Liberian legislature which amends the provisions regarding the adoption of non-Liberian law to, among other things, provide for the adoption of the statutory and case law of Delaware and not also states with substantially similar legislative provisions, and potentially provide the courts of Liberia discretion in application of non-statutory corporation law of Delaware in cases when the laws of Delaware are silent. The rights of shareholders to bring a derivative action in Liberian courts may be more limited than in U.S. jurisdictions. There may also be practical difficulties for shareholders attempting to bring suit in Liberia, and Liberian courts may or may not recognize and enforce foreign judgments. Thus, our shareholders may have more difficulty challenging actions taken by management, directors or controlling shareholders than would shareholders of a corporation incorporated in a U.S. jurisdiction.

## General Risk Factors

*Conducting business globally may result in increased costs and other risks.*

We operate our business globally, which exposes us to a number of risks, including increased exposure to a wider range of regional and local economic conditions, volatile local political conditions, potential changes in duties and taxes, including changing and/or uncertain interpretations of existing tax laws and regulations, required compliance with additional laws and policies affecting cruising, vacation or maritime businesses or governing the operations of foreign-based companies, currency fluctuations, interest rate movements, difficulties in operating under local business environments, port quality and availability in certain regions, U.S. and global anti-bribery laws, imposition of trade barriers and restrictions on repatriation of earnings.

Our future growth strategies increasingly depend on the growth and sustained profitability of international markets. Factors that will be critical to our success in these markets include our ability to continue to raise awareness of our products and our ability to adapt our offerings to best suit rapidly evolving consumer demands. This risk is further heightened by the COVID-19 pandemic, as authorities in many of these markets have implemented numerous measures to contain the spread and impact of COVID-19, such as travel bans and restrictions, shelter-in-place/stay-at-home orders, and other limitations on business activity, including business closures. In addition these markets could change unpredictably and/or could be scaled up or down in response to evolving intensity or resurgence of COVID-19 and related variants in or around these markets. The execution of our planned growth strategies is dependent on meeting the governmental and regulatory measures and policies in each of these markets. Our ability to realize our future growth strategy is highly dependent on our ability to satisfy country-specific conditions and requirements in order to return to service, as well as meet the needs of region-specific consumer preferences as services come back online. These factors may cause us to reevaluate some of our international business strategies.

Operating globally also exposes us to numerous and sometimes conflicting legal, regulatory and tax requirements. In many parts of the world, including countries in which we operate, practices in the local business communities might not conform to international business standards. These legal and regulatory requirements and standards may change in response to the COVID-19 pandemic, and there may be greater uncertainty as to the interpretation and enforcement of applicable laws and regulations, including those introduced in response to the COVID-19 pandemic. We cannot guarantee consistent interpretation, application, and enforcement of rules and regulations put in place in response to the COVID-19 pandemic, which could place limits on our operations or increase our costs, as well as negatively impact our future growth strategies in our key growth markets. We must adhere to policies designed to promote legal and regulatory compliance as well as applicable laws and regulations. However, we might not be successful in ensuring that our employees, agents, representatives and other third parties with whom we associate properly adhere to applicable laws and regulations. In addition, we may be exposed to the risk of penalties and other liabilities if we fail to comply with all applicable legal and regulatory requirements introduced in response to the COVID-19 pandemic, which may be subject to frequent and rapid change. Failure by us, our employees or any of these third parties to adhere to our policies or applicable laws or regulations could result in penalties, sanctions, damage to our reputation and related costs, which in turn could negatively affect our results of operations and cash flows.

As a global operator, our business also may be impacted by changes in U.S. policy or priorities in areas such as trade, immigration (including any continuation of any of the immigration policies put in place by the U.S. government in response to the COVID-19 pandemic) and/or environmental or labor regulations, among others. Depending on the nature and scope of any such changes, they could impact our domestic and international business operations. Any such changes, and any international response to them, could potentially introduce new barriers to passenger or crew travel and/or cross border transactions, impact our guest experience and/or increase our operating costs.

If we are unable to address these risks adequately, our financial position and results of operations could be adversely affected, including impairing the value of our ships and other assets.

*The terms of our existing debt financing gives, and any future preferred equity or debt financing may give, holders of any preferred securities or debt securities rights that are senior to rights of our common shareholders.*

The holders of our existing debt have rights, preferences and privileges senior to those of holders of our common stock in the event of liquidation. If we incur additional debt or raise equity through the issuance of preferred stock or convertible securities, the terms of the debt or the preferred stock issued may give the holders rights, preferences and privileges senior to those of holders of our common stock, particularly in the event of liquidation. If we raise funds through the issuance of additional equity, the ownership percentage of our existing shareholders would be diluted.

*Fluctuations in foreign currency exchange rates, fuel prices and interest rates could affect our financial results.*

We are exposed to market risk attributable to changes in foreign currency exchange rates, fuel prices and interest rates. Significant changes in any of the foregoing could have a material impact on our financial results, net of the impact of our hedging activities and natural offsets. Our operating results have been and will continue to be impacted, often significantly, by changes in each of these factors.

A portion of our indebtedness bears interest at variable rates that are linked to changing market interest rates. As a result, an increase in market interest rates would increase our interest expense and our debt service obligations. As of December 31, 2021, we had approximately $7.4 billion of indebtedness that bears interest at variable rates. This amount represented approximately 34.3% of our total indebtedness. As of December 31, 2021, a hypothetical 1% increase in prevailing interest rates would increase our forecasted 2022 interest expense by approximately $74 million.

Additionally, the value of our earnings in foreign currencies is adversely impacted by a strong U.S. dollar. In addition, any significant increase in fuel prices could materially and adversely affect our business as fuel prices impact not only our fuel costs, but also some of our other expenses, such as crew travel, freight, and commodity prices. Mandatory fuel restrictions may also create uncertainty related to the price and availability of certain fuel types potentially

impacting operating costs and the value of our related hedging instruments.

*The loss of key personnel, our inability to recruit or retain qualified personnel or disruptions among our shipboard personnel could adversely affect our results of operations.*

Our success depends, in large part, on the skills and contributions of key executives and other employees and on our ability to recruit, develop and retain high quality personnel as well as having adequate succession plans and back-up operating plans for when critical executives are unable to serve. As demand for qualified personnel in the industry grows, we must continue to effectively recruit, train, motivate and retain our employees, both shoreside and on our ships, in order to effectively compete in our industry, maintain our current business and support our projected global growth.

We are experiencing difficulty in recruiting and retaining qualified personnel as a result of COVID-19, the reduction in our workforce during our suspension of cruise operations, general macroeconomic conditions and a competitive labor market. Our ability to rehire crew may be negatively impacted by increasing demands related to our health and safety protocols, including vaccine requirements, and by a reduced labor supply as previous crew may have obtained alternative employment during our suspension of cruise operations. A prolonged shortage of qualified personnel and/or increased turnover could decrease our ability to operate our business in an optimal manner. The shortage and competitive labor market may result in increased costs if we need to hire temporary personnel, and/or increased wages and/or benefits in order to attract and retain employees, all of which may negatively impact our results of operations.

As of December 31, 2021, approximately 86% of our shipboard employees were covered by collective bargaining agreements. A dispute under our collective bargaining agreements could result in a work stoppage of those employees covered by the agreements. We may not be able to satisfactorily renegotiate these collective bargaining agreements when they expire. In addition, existing collective bargaining agreements may not prevent a strike or work stoppage on our ships. We may also be subject to or affected by work stoppages unrelated to our business or collective bargaining agreements. Any such work stoppages or potential work stoppages could have a material adverse effect on our financial results, as could a loss of key employees, our inability to recruit or retain qualified personnel or disruptions among our personnel.

*If we are unable to keep pace with developments in technology, including technology in response to the COVID-19 pandemic, our operations or competitive position could become impaired.*

Our business continues to demand the use of sophisticated technology and systems. These technologies and systems require significant investment and must be proven, refined, updated, upgraded and/or replaced with more advanced systems in order to continue to meet our customers' demands and expectations. If we are unable to do so in a timely manner or within reasonable cost parameters or if we are unable to appropriately and timely train our employees to operate any of these new systems, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, which could result in higher than anticipated costs or impair our operating results.

In response to COVID-19, we have relied on technology to assist with mitigating the risk of COVID-19 for our passengers and crew. For example, we have deployed our patented eMuster technology across our fleet in an effort to minimize congregate settings onboard. Additionally, on certain vessels we have deployed our patented contact tracing technology in an effort to quickly identify close contacts of cases onboard. As this technology continues to develop we may be faced with technical constraints or development decisions. We may be unable to obtain appropriate technology in a timely manner or at all or we may incur significant costs in doing so. A failure to adopt the appropriate technology, or a failure or obsolescence in the technology that we do adopt, could adversely affect our results of operations.

*We are exposed to cyber security attacks and data breaches and the risks and costs associated with protecting our systems and maintaining data integrity and security.*

We are subject to cyber security attacks. These cyber attacks can vary in scope and intent from attacks with the objective of compromising our systems, networks, and communications for economic gain or with the objective of disrupting, disabling or otherwise compromising our maritime and/or shoreside operations. The attacks can encompass a wide range of methods and intent, including phishing attacks, illegitimate requests for payment, theft of intellectual property, theft of confidential or non-public information, installation of malware, installation of ransomware and theft of personal or business information. The frequency and sophistication of, and methods used to conduct, these attacks, have increased over time.

A successful cyber security attack may target us directly, or it may be the result of a third party's inadequate care, or resulting from vulnerabilities in licensed software. In either scenario, the Company may suffer damage to its systems and data that could interrupt our operations, adversely impact our brand reputation, and expose us to increased risks of governmental investigation, litigation, fines, and other liability, any of which could adversely affect our business. Furthermore, responding to such an attack and mitigating the risk of future attacks could result in additional operating and capital costs in technology, personnel, monitoring and other investments.

We are also subject to various risks associated with the collection, handling, storage, and transmission of sensitive information. In the regular course of business, we collect employee, customer, and other third-party data, including personally identifiable information and individual payment data, for various business purposes. Although we have policies and procedures in place to safeguard such sensitive information, this information has been and could be subject to cyber security attacks and the aforementioned

risks. In addition, various laws, including federal, state, and international laws relating to the collection, use, retention, security and transfer of personally identifiable information and individual payment data. Those laws include, among others, the European Union General Data Protection Regulation and regulations of the New York State Department of Financial Services and similar state agencies that impose additional cyber security requirements as a result of our provision of certain insurance products. Complying with these and other applicable laws has caused, and may cause, us to incur substantial costs or require us to change our business practices, and our failure to do so may expose us to substantial fines, penalties, restrictions, litigation, or other expenses and adversely affect our business. Further, any changes to laws or regulations, including new restrictions or requirements applicable to our business, or an increase in enforcement of existing laws and regulations, could expose us to additional costs and liability and could limit our use and disclosure of such information.

While we continue to evolve our cyber security practices in line with our business' reliance on technology and the changing external threat landscape, and we invest time, effort, and financial resources to secure our systems, networks and communications, our security measures cannot provide absolute assurance that we will be successful in preventing or defending from all cyber security attacks impacting our operation. There can be no assurance that any breach or incident will not have a material impact on our operations and financial results.

Any breach, theft, loss, or fraudulent use of guest, employee, third-party or company data, could adversely impact our reputation and brand and our ability to retain or attract new customers, and expose us to risks of data loss, business disruption, governmental investigation, litigation and other liability, any of which could adversely affect our business. Significant capital investments and other expenditures could be required to remedy the problem and prevent future breaches, including costs associated with additional security technologies, personnel, experts and credit monitoring services for those whose data has been breached. Further, if we or our vendors experience significant data security breaches or fail to detect and appropriately respond to significant data security breaches, we could be exposed to government enforcement actions and private litigation.

*Litigation, enforcement actions, fines or penalties could adversely impact our financial condition or results of operations and/or damage our reputation.*

Our business is subject to various U.S. and international laws and regulations that could lead to enforcement actions, fines, civil or criminal penalties or the assertion of litigation claims and damages. In addition, improper conduct by our employees, agents or joint venture partners could damage our reputation and/or lead to litigation or legal proceedings that could result in civil or criminal penalties, including substantial monetary fines. In certain circumstances it may not be economical to defend against such matters and/or our legal strategy may not ultimately result in us prevailing in a matter. Such events could lead to an adverse impact on our financial condition or results of operations. In addition, we have experienced, and may continue to experience, increases in litigation pertaining to the COVID-19 crisis, including potential claims for non-refundable cash deposits. We cannot predict the quantum or outcome of any such proceedings and the impact that they will have on our financial results, but any such impact may be material. While some of these claims are covered by insurance, we cannot be certain that all of them will be, which could have an adverse impact on our financial condition or results of operations.

Table of Contents

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

Information about our cruise ships, including their size, may be found within the *Operating Strategies - Fleet upgrade and maintenance* section and the *Operations - Cruise Ships and Itineraries* sections in Item 1. *Business*. Information regarding our cruise ships under construction, estimated expenditures and financing may be found within the *Future Capital Commitments* and *Funding Needs and Sources* sections of Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations.*

Our principal executive office and principal shoreside operations are located in leased office buildings at the Port of Miami, Florida. We also lease a number of other offices in the U.S. and throughout Europe, Asia, Mexico, South America and Australia to administer our brand operations globally.

We believe that our facilities are adequate for our current needs and that we are capable of obtaining additional facilities as necessary.

We also operate two private destinations which we utilize as ports-of-call on certain itineraries: (i) an island we own in the Bahamas that we call CocoCay; and (ii) Labadee, a secluded peninsula that we lease on the north coast of Haiti.

**Item 3.   Legal Proceedings**

As previously reported, two lawsuits were filed against us in August 2019 in the U.S. District Court for the Southern District of Florida (the "Court") under Title III of the Cuban Liberty and Democratic Solidarity Act, also known as the Helms-Burton Act. The complaint filed by Havana Docks Corporation ("Havana Docks Action") alleges it holds an interest in the Havana Cruise Port Terminal, and the complaint filed by Javier Garcia-Bengochea (the "Port of Santiago Action") alleges that he holds an interest in the Port of Santiago, Cuba, both of which were expropriated by the Cuban government. The complaints further allege that we trafficked in those properties by embarking and disembarking passengers at these facilities. The plaintiffs seek all available statutory remedies, including the value of the expropriated property, plus interest, treble damages, attorneys' fees and costs. In the Havana Docks Action, we and the plaintiff have filed motions for summary judgment, which were heard by the Court in January 2022. The Havana Docks Action is scheduled for trial on May 23, 2022. The Court dismissed the Port of Santiago Action with prejudice on the basis that the plaintiff lacked standing, and the plaintiff's appeal of the dismissal is awaiting a decision by the appellate court. We believe we have meritorious defenses to the claims alleged in both the Havana Docks Action and the Port of Santiago Action, and we intend to vigorously defend ourselves against them. The outcome of litigation is inherently unpredictable and subject to significant uncertainties, and there can be no assurances that the final outcome of either case will not be material.

We are also routinely involved in claims typical within the travel and tourism vacation industry. The majority of these claims are covered by insurance. We believe the outcome of such claims, net of expected insurance recoveries, will not have a material adverse impact on our financial condition or results of operations and cash flows.

**Item 4.   Mine Safety Disclosures**

None.

Table of Contents

**PART II**

**Item 5.   Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock is listed on the New York Stock Exchange ("NYSE") under the symbol "RCL."

**Holders**

As of February 24, 2022, there were approximately 1,267 record holders of our common stock. Since certain of our shares are held by brokers and other institutions on behalf of shareholders, the foregoing number is not representative of the number of beneficial owners.

**Dividends**

Holders of our common stock have an equal right, pro rata based on number of shares held, to share in our profits in the form of dividends when and if declared by our board of directors out of funds legally available, subject to any rights of holders of preferred stock if any. Holders of our common stock have no rights to any sinking fund.

There are no exchange control restrictions on remittances of dividends on our common stock by reason of our incorporation in Liberia because (1) we are and intend to maintain our status as a nonresident Liberian entity under the Liberia Revenue Code of 2000 as amended and the regulations thereunder, and (2) our ship-owning subsidiaries are not now engaged, and are not in the future expected to engage, in any business in Liberia, including voyages exclusively within the territorial waters of the Republic of Liberia. Under current Liberian law, no Liberian taxes or withholding will be imposed on payments to holders of our securities other than to a holder that is a resident Liberian entity or a resident individual or an individual or entity subject to taxation in Liberia as a result of having a permanent establishment within the meaning of the Liberia Revenue Code of 2000 as amended in Liberia.

The declaration of dividends shall at all times be subject to the final determination of our board of directors that a dividend is prudent at that time in consideration of the needs of the business. In connection with securing various financial covenant waivers, we agreed with certain of our lenders not to pay dividends until the end of the third quarter of 2022. In addition, in the event we thereafter declare a dividend, we will need to repay the amounts deferred under our export credit facilities as part of the principal amortization deferrals agreed with them during 2020 and 2021. Accordingly, we have not declared a dividend since the first quarter of 2020. Refer to Note 10. *Shareholders' Equity* to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information on dividends declared.

**Share Repurchases**

There were no repurchases of common stock during the year ended December 31, 2021.

In connection with our debt covenant waivers, we agreed with certain of our lenders not to engage in stock repurchases until the end of the third quarter of 2022. In addition, in the event we engage in share repurchases, we will need to repay the amounts deferred under our export credit facilities as part of the principal amortization deferrals agreed with them during 2020 and 2021.

Table of Contents

**Performance Graph**

The following graph compares the total return, assuming reinvestment of dividends, on an investment in the Company, based on performance of the Company's common stock, with the total return of the Standard & Poor's 500 Composite Stock Index ("S&P 500") and the Dow Jones United States Travel and Leisure Index for a five year period by measuring the changes in common stock prices from December 31, 2016 to December 31, 2021.



### COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN
Among Royal Caribbean Cruises Ltd., the S&P 500 Index and the Dow Jones U.S. Travel & Leisure Index

| | 12/16 | 12/17 | 12/18 | 12/19 | 12/20 | 12/21 |
|---|---|---|---|---|---|---|
| Royal Caribbean Cruises Ltd. | 100.00 | 148.23 | 124.30 | 173.97 | 98.48 | 101.39 |
| S&P 500 | 100.00 | 121.83 | 116.49 | 153.17 | 181.35 | 233.41 |
| Dow Jones U.S. Travel & Leisure | 100.00 | 123.81 | 116.89 | 144.87 | 147.40 | 164.33 |

The stock performance graph assumes for comparison that the value of the Company's common stock and of each index was $100 on December 31, 2016 and that all dividends were reinvested. Past performance is not necessarily an indicator of future results.

26

**Item 6.   Reserved.**

Not applicable.

**Item 7.**   **Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Cautionary Note Concerning Forward-Looking Statements**

The discussion under this caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere in this document, includes "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical fact, including statements regarding our expectations for future periods, business and industry prospects or future results of operations or financial position, made in this Annual Report on Form 10-K are forward-looking. Words such as "anticipate," "believe," "considering," "could," "driving," "estimate," "expect," "goal," "intend," "may," "plan," "project," "seek," "should," "will" and similar expressions are intended to further identify any of these forward-looking statements. Forward-looking statements reflect management's current expectations but they are based on judgments and are inherently uncertain. Furthermore, they are subject to risks, uncertainties and other factors that could cause our actual results, performance or achievements to differ materially from the future results, performance or achievements expressed or implied in those forward-looking statements. Examples of these risks, uncertainties and other factors include, but are not limited to, those discussed in this Annual Report on Form 10-K and, in particular, the risks discussed under the caption Risk Factors" in Part I, Item 1A herein.

All forward-looking statements made in this Annual Report on Form 10-K speak only as of the date of this document. Given these risks and uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. We undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**Overview**

The discussion and analysis of our financial condition and results of operations is organized to present the following:

- a review of our critical accounting policies and estimates and of our financial presentation, including discussion of certain operational and financial metrics we utilize to assist us in managing our business;

- a discussion of our results of operations for the year ended December 31, 2021 compared to the same period in 2020;

- a discussion of our business outlook, and

- a discussion of our liquidity and capital resources, including our future capital and contractual commitments and potential funding sources.

A discussion of our results of operations for the year ended December 31, 2020 compared to the year ended December 31, 2019 is included in Part II. Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations* of our Annual Report on Form 10-K for the year ended December 31, 2020, filed with the SEC on February 26, 2021 and is incorporated by reference into this Form 10-K.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). (Refer to Note 1. *General* and Note 2. *Summary of Significant Accounting Policies* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data*). Certain of our accounting policies are deemed "critical," as they require management's highest degree of judgment, estimates and assumptions. We have discussed these accounting policies and estimates with the audit committee of our board of directors. We believe our most critical accounting policies and estimates are as follows:

*Liquidity and COVID-19*

The effects of COVID-19 have had and continue to have a material negative impact on our operations, financial results and liquidity. The full extent of the impact will be determined by the length of time COVID-19 influences our industry and our gradual return to service. Given the ongoing effects of COVID-19 on our operations and global bookings, we have identified the estimation of our future liquidity requirements as a critical accounting policy.

- Expected continued gradual resumption of cruise operations;

- Expected sustained increase in revenue per available passenger cruise day during our continued resumption of cruise operations;

- Expected lower than comparable historical occupancy levels during our continued resumption of cruise operations, increasing over time until we reach historical occupancy levels; and

- Expected spend during our continued resumption of cruise operations, including returning our crew members to our vessels and maintaining enhanced health and safety protocols.

The assumptions used to estimate our liquidity requirements are frequently and continuously evaluated because of the unprecedented environment that we are experiencing due to COVID-19. In addition, the magnitude, duration and speed of the global pandemic continues to be uncertain. As a result, we have made reasonable estimates and judgments of the impact of COVID-19 on our liquidity within our financial statements and there may be changes to those estimates in future periods.

We have taken and will continue to take actions to improve our liquidity, including:

- Reduction of capital expenditures;

- Reduction of operating expenses in 2020 and 2021 during the suspension of our global cruise operations (including furloughing staff and laying up vessels);

- Amending credit agreements to defer payments and covenant requirements, as well as extend maturity dates;

- Raising capital through debt and stock issuances; and

- Suspending dividend payments.

*Ship Accounting*

Ships represent our most significant assets and are stated at cost less accumulated depreciation and amortization. Depreciation of ships is generally computed net of a 10%-15% projected residual value, using the straight-line method over the estimated useful life of the asset, which is generally 30-35 years. The 30-35 year useful life and 10%-15% residual value is the weighted-average of all major components of a ship. Our useful life and residual value estimates take into consideration the impact of anticipated technological changes, long-term cruise and vacation market conditions and historical useful lives of similarly-built ships. In addition, we take into consideration our estimates of the weighted-average useful lives of the ships' major component systems, such as hull, superstructure, main electric, engines and cabins. We employ a cost allocation methodology at the component level, in order to support the estimated weighted-average useful lives and residual values, as well as to determine the net cost basis of assets being replaced. Given the very large and complex nature of our ships, our accounting estimates related to ships and determinations of ship improvement costs to be capitalized require considerable judgment and are inherently uncertain. We do not have cost segregation studies performed to specifically componentize our ship systems. However, we estimate the costs, useful lives and residual values of component systems based principally on general and technical information known about major ship component systems and their lives, as well as our knowledge of the cruise vacation industry. We do not identify and track depreciation by ship component systems, but instead utilize these estimates to determine the net cost basis of assets replaced or refurbished. Improvement costs that we believe add value to our ships are capitalized as additions to the ship and depreciated over the shorter of the improvements' estimated useful lives or that

Table of Contents

of the associated ship. The estimated cost and accumulated depreciation of replaced or refurbished ship components are written off and any resulting losses are recognized within *Cruise operating expenses* in our Consolidated Statements of Comprehensive Loss.

We periodically review estimated useful lives and residual values for ongoing reasonableness, considering long term views on our intended use of each class of ships and the planned level of improvements to maintain and enhance vessels within those classes. In the event a factor is identified that may trigger a change in the estimated useful lives and residual values of our ships, a review of the estimate is completed.

We use the deferral method to account for drydocking costs. Under the deferral method, drydocking costs incurred are deferred and charged to expense on a straight-line basis over the period to the next scheduled drydock, which we estimate to be a period of thirty to sixty months based on the vessel's age as required by Class. Deferred drydock costs consist of the costs to drydock the vessel and other costs incurred in connection with the drydock which are necessary to maintain the vessel's Class certification. Class certification is necessary in order for our cruise ships to be flagged in a specific country, obtain liability insurance and legally operate as passenger cruise ships. The activities associated with those drydocking costs cannot be performed while the vessel is in service and, as such, are done during a drydock as a planned major maintenance activity. The significant deferred drydock costs consist of hauling and wharfage services provided by the drydock facility, hull inspection and related activities (e.g., scraping, pressure cleaning, bottom painting), maintenance to steering propulsion, thruster equipment and ballast tanks, port services such as tugs, pilotage and line handling, and freight associated with these items. We perform a detailed analysis of the various activities performed for each drydock and only defer those costs that are directly related to planned major maintenance activities necessary to maintain Class. The costs deferred are related to activities not otherwise routinely periodically performed to maintain a vessel's designed and intended operating capability. Repairs and maintenance activities are charged to expense as incurred.

We use judgment when estimating the period between drydocks, which can result in adjustments to the estimated amortization of drydock costs. If the vessel is disposed of before the next drydock, the remaining balance in deferred drydock is written-off to the gain or loss on disposal of vessel in the period in which the sale takes place. We also use judgment when identifying costs incurred during a drydock which are necessary to maintain the vessel's Class certification as compared to those costs attributable to repairs and maintenance which are expensed as incurred.

We believe we have made reasonable estimates for ship accounting purposes. However, should certain factors or circumstances cause us to revise our estimates of ship useful lives or projected residual values, depreciation expense could be materially higher or lower. If circumstances cause us to change our assumptions in making determinations as to whether ship improvements should be capitalized, the amounts we expense each year as repairs and maintenance costs could increase, partially offset by a decrease in depreciation expense. If we had reduced our estimated average ship useful life by one year, depreciation expense for 2021 would have increased by approximately $48.0 million. If our ships were estimated to have no residual value, depreciation expense for 2021 would have increased by approximately $261.7 million. We have evaluated our estimated ship useful lives and projected residual values in light of our current environment and determined that there are no changes to these estimates based on our gradual return to service.

*Business Combinations*

On July 31, 2018, we acquired a 66.7% equity stake ("the 2018 acquisition") in Silversea Cruises, previously known as Silversea Cruises Holding Ltd., an ultra-luxury and expedition cruise line, from Heritage Cruise Holding Ltd. ("Heritage"), previously known as Silversea Cruises Group Ltd. The purchase price for the 2018 acquisition consisted of $1.02 billion in cash, net of assumed liabilities, and contingent consideration due to Heritage. The fair value of the contingent consideration at the time of the 2018 acquisition was $44.0 million. Changes to the fair value of the contingent consideration were recorded in our results of operations, if any, in the period of the change prior to its termination.

On July 9, 2020, we acquired the remaining 33.3% interest in Silversea Cruises that we did not already own (the "noncontrolling interest") from Heritage. As a result of the acquisition of the noncontrolling interest, Silversea Cruises is now a wholly owned cruise brand. Refer to Note 1. *General* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data* for further information regarding acquisition of Silversea Cruises' noncontrolling interest.

We account for business combinations in accordance with ASC 805, *Business Combinations*, by applying the acquisition method of accounting. The acquisition method of accounting requires that we record the assets acquired and liabilities assumed, and the noncontrolling interest, if any, at their respective fair values at the acquisition date. Goodwill is recognized as the excess of the purchase price over the fair value of the net assets acquired. Significant estimates and assumptions are made by management to value such assets and liabilities based on third party valuations such as appraisals or internal valuations based on discounted cash flow analyses or other valuation techniques. Although we believe that those estimates and assumptions are

reasonable and appropriate, they are inherently uncertain and subject to change. If during the measurement period (not to exceed one year), additional information is obtained about facts and circumstances that existed as of the acquisition date related to the fair value of the assets acquired and liabilities assumed, we may adjust our estimates to account for subsequent adjustments to the provisional amounts recognized at the acquisition date, resulting in an offsetting adjustment to the goodwill associated with the business acquired. Our purchase price measurement period for the Silversea Cruises 2018 acquisition was closed during 2019.

Uncertain tax positions and tax-related valuation allowances are initially established in connection with a business combination as of the acquisition date. Additionally, any contingent consideration is estimated at fair value at the acquisition date. Liability-classified contingent consideration is remeasured each reporting period, with changes in fair value recognized in earnings until the contingent consideration is settled.

*Valuation of Goodwill, Indefinite-Lived Intangible Assets and Long-Lived Assets*

We review goodwill and indefinite-lived intangible assets for impairment at the reporting unit level annually or, when events or circumstances dictate, more frequently. The impairment review for goodwill consists of a qualitative assessment of whether it is more-likely than-not that a reporting unit's fair value is less than its carrying value and, if necessary, a goodwill impairment test. Factors to consider when performing the qualitative assessment include general economic conditions, limitations on accessing capital, changes in forecasted operating results, changes in fuel prices and fluctuations in foreign exchange rates.

The goodwill impairment analysis consists of a comparison of the fair value of the reporting unit with its carrying value. We typically estimate the fair value of our reporting units using a discounted cash flow model, which may also include a combination of a market-based valuation approach. The estimation of fair value utilizing discounted expected future cash flows includes numerous uncertainties which require our significant judgment when making assumptions of expected revenues, operating costs, marketing, selling and administrative expenses, interest rates, ship additions and retirements as well as assumptions regarding the cruise vacation industry's competitive environment and general economic and business conditions, among other factors. The principal assumptions used in the discounted cash flow model for our 2021 impairment assessments were:

- Forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate; and

- Weighted average cost of capital (i.e., discount rate).

The discounted cash flow model uses the most current projected operating results for the upcoming fiscal year as a base. We discount the projected cash flows using rates specific to the reporting unit based on its weighted-average cost of capital.

If the fair value of the reporting unit exceeds its carrying value, no write-down of goodwill is required. As amended by ASU No. 2017-04, *Intangibles - Goodwill and Other (Topic 350) – Simplifying the Test for Goodwill Impairment*, if the fair value of the reporting unit is less than the carrying value of its net assets, an impairment is recognized based on the amount by which the carrying value of a reporting unit exceeds its fair value, not to exceed the total amount of goodwill allocated to such reporting unit.

The impairment review for indefinite-life intangible assets can be performed using a qualitative or quantitative impairment assessment. The quantitative assessment consists of a comparison of the fair value of the asset with its carrying value. We estimate the fair value of these assets using a discounted cash flow model and various valuation methods depending on the nature of the intangible asset, such as the relief-from-royalty method, for trademarks and trade names. The principal assumptions used in the discounted cash flow model for our 2021 impairment assessments were:

- Forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries and terminal growth rate;

- Royalty rate; and

- Weighted average cost of capital (i.e., discount rate).

If the fair value exceeds its carrying value, an impairment loss is recognized in an amount equal to that excess. If the fair value exceeds its carrying value, the indefinite-life intangible asset is not considered impaired. Other intangible assets assigned finite useful lives are amortized on a straight-line basis over their estimated useful lives. Refer to Note 5. *Intangible Assets* to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information on indefinite-life intangible assets.

We review our ships and other long-lived assets for impairment whenever events or changes in circumstances indicate, based on recent and projected cash flow performance and remaining useful lives, that the carrying value of these assets may not be fully recoverable. We evaluate asset impairment at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. The lowest level for which we maintain identifiable cash flows that are independent of the cash flows of other assets and liabilities is at the ship level for our ships. If estimated undiscounted future cash flows are less than the carrying value of an asset, an impairment charge is recognized to the extent its carrying value exceeds fair value. Refer to Note 6. *Property and Equipment* to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information on determination of fair value for long-lived assets.

We estimate fair value based on quoted market prices in active markets, if available. If active markets are not available, we base fair value on independent appraisals, sales price negotiations and projected future cash flows discounted at a rate estimated by management to be commensurate with the business risk. Quoted market prices are often not available for individual reporting units and for indefinite-life intangible assets. Accordingly, we estimate the fair value of a reporting unit and an indefinite-life intangible asset using an expected present value technique.

As a result of our voluntary suspension of global cruise operations effective March 2020 in response to the COVID-19 outbreak and our gradual resumption of cruise operations during 2021, we performed interim impairment evaluations, in addition to our annual impairment reviews, of certain of our goodwill, indefinite-lived intangible assets and long-lived assets in connection with the preparation of our 2021 and 2020 quarterly and annual financial statements, as further discussed below.

*Royal Caribbean International Reporting Unit*

We performed interim impairment evaluations of Royal Caribbean International's goodwill in connection with the preparation of our quarterly financial statements for the periods ended March 31, 2020 and June 30, 2020 due to the significant impact that COVID-19 had on our projected cash flows and triggering events identified in those quarters.The fair value of the Royal Caribbean International reporting unit as of March 31, 2020 was determined using a probability-weighted discounted cash flow model and for June 30, 2020 we used a probability-weighted discounted cash flow model in combination with a market-based valuation approach. As a result of the tests, we determined that the fair value of the Royal Caribbean International reporting unit exceeded its carrying value by approximately 30% and 8% as of March 31, 2020 and June 30, 2020, respectively, resulting in no impairment to the Royal Caribbean International goodwill in those periods. We did not perform an interim impairment evaluation of Royal Caribbean International's goodwill subsequent to the quarter ended June 30, 2020 during 2020 or 2021, as no triggering events were identified.

During the fourth quarters of 2021 and 2020, we performed our annual impairment review of goodwill for Royal Caribbean International's reporting unit. We did not perform qualitative assessments but instead proceeded directly to the goodwill impairment tests. As of November 30, 2021, the fair value of the Royal Caribbean International reporting unit was determined using a discounted cash flow model in combination with a market-based valuation approach. As of November 30, 2020, we used a probability-weighted discounted cash flow model in combination with a market-based valuation approach. As a result of the tests, we determined the fair value of the Royal Caribbean International reporting unit exceeded its carrying value by approximately 38% and 14% as of November 30, 2021 and 2020, respectively, resulting in no impairment to Royal Caribbean International's goodwill. The carrying value of goodwill attributable to our Royal Caribbean reporting unit was $296.5 million and $296.6 million as of December 31, 2021 and 2020, respectively.

*Silversea Cruises Reporting Unit*

We performed interim impairment evaluations of Silversea Cruises' goodwill and trade name in connection with the preparation of our financial statements for the quarter ended March 31, 2020. As a result of these analyses, we determined that the carrying value of the Silversea Cruises reporting unit exceeded its fair value. Similarly, we determined that the carrying value of Silversea Cruises' trade name exceeded its fair value. Accordingly, upon the completion of the impairment tests, we recognized impairment charges of $576.2 million and $30.8 million for goodwill and the trade name, respectively, during the quarter ended March 31, 2020. We estimated the fair value of the Silversea Cruises reporting unit using a probability-weighted discounted cash flow model in combination with a market-based valuation approach. We did not perform an interim impairment evaluation of Silversea Cruises's goodwill or trade names subsequent to the quarter ended March 31, 2020 during 2020 or 2021, as no triggering events were identified.

During the fourth quarters of 2021 and 2020, we performed our annual impairment review of Silversea Cruises goodwill. We did not perform qualitative assessments but instead proceeded directly to the goodwill impairment tests. As of November 30, 2021, the fair value of the Silversea Cruises reporting unit was determined using a discounted cash flow model in combination with a market-based valuation approach. As of November 30, 2020, we used a probability-weighted discounted cash flow model in combination with a market-based valuation approach. As a result of the tests, we determined the fair value

of the Silversea Cruises reporting unit exceeded its carrying value by approximately 35% and 12% as of November 30, 2021 and 2020, respectively, resulting in no impairment to Silversea Cruises' goodwill. The carrying value of goodwill attributable to our Silversea Cruises reporting unit was $508.6 million as of December 31, 2021 and December 31, 2020.

During the fourth quarters of 2021 and 2020, we performed our annual impairment reviews of Silversea Cruises trade name. As a result of the quantitative tests, we determined that the fair value of the Silversea Cruises' trade name exceeded its carrying value by approximately 19% and 3%, as of November 30, 2021 and November 30, 2020, respectively, resulting in no impairment to Silversea Cruises' trade name.

As of December 31, 2021 and 2020, the carrying value of indefinite-life intangible assets was $321.5 million, which primarily relates to the Silversea Cruises trade name.

*Long-lived Assets*

Events surrounding the COVID-19 pandemic negatively impacted the expected undiscounted cash flows of certain of our long-lived assets. We evaluated these assets during the years ended 2021 and 2020 pursuant to our long-lived asset impairment test which resulted in no impairment charges for the year ended December 31, 2021 and $464.2 million of impairment charges during the year ended December 31, 2020 to write down certain ships operated by our Global Brands to their estimated fair values. The amount also includes impairment charges for ships that our Global Brands disposed of during 2020 as well as the three Azamara ships.

We also recorded impairment charges of $171.3 million during the year ended December 31, 2020 for the three ships that we chartered to Pullmantur Holdings prior to the filing of the Pullmantur reorganization. During the quarter ended September 30, 2020, we sold the ships to third parties for amounts approximating their carrying values and no further impairment was recorded. Refer to Note 6. *Property and Equipment* and Note 7. *Other Assets* to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information regarding impairment of the ships and Pullmantur's reorganization.

During the years ended December 31, 2021 and 2020, we also determined that certain construction in progress projects would be reduced in scope or would no longer be completed due to the impact COVID-19 has had on our operations. This led to impairment charges of construction in progress assets of $51.6 million and $91.5 million during 2021 and 2020, respectively, as reported in *Property and equipment, net*.

In addition, during the year ended December 31, 2020, we identified that the undiscounted cash flows for certain right-of-use assets were less than their carrying values due to the negative impact of COVID-19. We evaluated these assets pursuant to our long-lived asset impairment test, resulting in an impairment charge of $65.9 million to write down these assets to their estimated fair values during the year ended December 31, 2020. For the year ended December 31, 2021, there was no impairment to right-of-use assets.

The combined impairment charge of $55.2 million for the year ended December 31, 2021, related to construction in progress and other long-lived assets, and $1.5 billion for the year ended December 31, 2020, primarily related to our goodwill, trademarks and trade names, vessels, construction in progress, and right-of-use assets, are reported within *Impairment and credit losses* within our consolidated statements of comprehensive (loss) income. These impairment assessments and the resulting charges were determined based on management's current estimates and projections using information through the time of the issuance of these financial statements. The adverse impact that COVID-19 will continue to have on our business, operating results, cash flows and overall financial condition is uncertain and may result in changes to the assumptions used in the impairment tests discussed above, which may result in additional impairments of our goodwill, indefinite-lived intangible assets and long-lived assets in the future. Refer to *Risk Factors* in Part 1, Item 1A. for further discussion on risks related to the COVID-19 pandemic.

*Derivative Instruments*

We enter into various forward, swap and option contracts to manage our interest rate exposure and to limit our exposure to fluctuations in foreign currency exchange rates and fuel prices. These instruments are recorded on the balance sheet at their fair value and the vast majority are designated as hedges. We also use non-derivative financial instruments designated as hedges of our net investment in our foreign operations and investments. Although some of our derivative financial instruments do not qualify for hedge accounting or are not accounted for under hedge accounting, we do not hold or issue derivative financial instruments for trading or other speculative purposes. We account for derivative financial instruments in accordance with authoritative guidance. Refer to Note 2. *Summary of Significant Accounting Policies* and Note 16. *Fair Value Measurements and Derivative Instruments* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary*

Table of Contents

*Data* for more information on related authoritative guidance, the Company's hedging programs and derivative financial instruments.

On a regular basis, we enter into foreign currency forward contracts, interest rate swaps, fuel swaps and options with third-party institutions in over-the-counter markets. We estimate the fair value of our foreign currency forward contracts and interest rate swaps using expected future cash flows based on the instruments' contract terms and published forward prices for foreign currency exchange and interest rates. We value floors which are embedded within our interest rate swaps using standard option pricing models with inputs based on the options' contract terms, such as exercise price and maturity, and readily available market data, such as forward interest rates and interest rate volatility. We apply present value techniques to convert the expected future cash flows to the current fair value of the instruments.

We estimate the fair value of our fuel swaps using expected future cash flows based on the swaps' contract terms and forward prices. We derive forward prices from published forward fuel curves which in turn are based on actual market transactions and published price quotes for similar assets. We apply present value techniques to convert the expected future cash flows to the current fair value of the instruments. We also corroborate our fair value estimates using valuations provided by our counterparties.

We adjust the valuation of our derivative financial instruments to incorporate credit risk.

We believe it is unlikely that materially different estimates for the fair value of our foreign currency forward contracts, interest rate swaps, fuel swaps and options would be derived from other appropriate valuation models using similar assumptions, inputs or conditions suggested by actual historical experience.

The prior suspension of our cruise operations due to the COVID-19 pandemic and our gradual resumption of cruise operations has resulted in reductions to our forecasted fuel purchases. During the year ended December 31, 2021, we discontinued cash flow hedge accounting on 0.2 million metric tons of our fuel swap agreements maturing in 2021 and 2022, which resulted in the reclassification of a net $0.7 million loss from *Accumulated other comprehensive loss* to *Other income (expense)*. During the year ended December 31, 2020, we discontinued cash flow hedge accounting on 0.6 million metric tons of our fuel swap agreements maturing in 2020 and 2021, which resulted in the reclassification of a net $104.4 million loss from *Accumulated other comprehensive loss* to *Other income (expense)*. Changes in the fair value of fuel swaps for which cash flow hedge accounting was discontinued are currently recognized in *Other income (expense)* each reporting period through the maturity dates of the fuel swaps.

Future suspension of our operations or modifications to our itineraries may affect our expected forecasted fuel purchases which could result in further discontinuance of fuel swap cash flow hedge accounting and the reclassification of deferred gains or losses from *Accumulated other comprehensive loss* into earnings. Refer to *Risk Factors* in Part 1, Item 1A. for further discussion on risks related to the COVID-19 pandemic.

*Contingencies—Litigation*

On an ongoing basis, we assess the potential liabilities related to any lawsuits or claims brought against us. While it is typically difficult to determine the timing and ultimate outcome of such actions, we use our best judgment to determine if it is probable that we will incur an expense related to the settlement or final adjudication of such matters and whether a reasonable estimation of such probable loss, if any, can be made. In assessing probable losses, we take into consideration estimates of the amount of insurance recoveries, if any, which are recorded as assets when recoverability is probable. We accrue a liability when we believe a loss is probable and the amount of loss can be reasonably estimated. Due to the inherent uncertainties related to the eventual outcome of litigation and potential insurance recoveries, it is possible that certain matters may be resolved for amounts materially different from any provisions or disclosures that we have previously made.

**Seasonality**

Our revenues are seasonal based on demand for cruises. Demand is strongest for cruises during the Northern Hemisphere's summer months and holidays. In order to mitigate the impact of the winter weather in the Northern Hemisphere and to capitalize on the summer season in the Southern Hemisphere, our brands have focused on deployment to the Caribbean, Asia and Australia during that period.

34

**Financial Presentation**

*Description of Certain Line Items*

*Revenues*

Our revenues are comprised of the following:

- *Passenger ticket revenues*, which consist of revenue recognized from the sale of passenger tickets and the sale of air transportation to and from our ships; and

- *Onboard and other revenues*, which consist primarily of revenues from the sale of goods and/or services onboard our ships not included in passenger ticket prices, cancellation fees, sales of vacation protection insurance, pre- and post-cruise tours and fees for operating certain port facilities. *Onboard and other revenues* also include revenues we receive from independent third party concessionaires that pay us a percentage of their revenues in exchange for the right to provide selected goods and/or services onboard our ships, as well as revenues received for our bareboat charter, procurement and management related services we perform on behalf of our unconsolidated affiliates.

*Cruise Operating Expenses*

Our cruise operating expenses are comprised of the following:

- *Commissions, transportation and other expenses*, which consist of those costs directly associated with passenger ticket revenues, including travel advisor commissions, air and other transportation expenses, port costs that vary with passenger head counts and related credit card fees;

- *Onboard and other expenses*, which consist of the direct costs associated with onboard and other revenues, including the costs of products sold onboard our ships, vacation protection insurance premiums, costs associated with pre- and post-cruise tours and related credit card fees as well as the minimal costs associated with concession revenues, as the costs are mostly incurred by third-party concessionaires and costs incurred for the procurement and management related services we perform on behalf of our unconsolidated affiliates;

- *Payroll and related expenses*, which consist of costs for shipboard personnel (costs associated with our shoreside personnel are included in *Marketing, selling and administrative expenses*);

- *Food expenses*, which include food costs for both guests and crew;

- *Fuel expenses*, which include fuel and related delivery, storage and emission consumable costs and the financial impact of fuel swap agreements; and

- *Other operating expenses*, which consist primarily of operating costs such as repairs and maintenance, port costs that do not vary with passenger head counts, vessel related insurance, entertainment and gains and/or losses related to the sale of our ships, if any.

We do not allocate payroll and related expenses, food expenses, fuel expenses or other operating expenses to the expense categories attributable to passenger ticket revenues or onboard and other revenues since they are incurred to provide the total cruise vacation experience.

*Selected Operational and Financial Metrics*

We utilize a variety of operational and financial metrics which are defined below to evaluate our performance and financial condition. As discussed in more detail herein, certain of these metrics are non-GAAP financial measures. These non-GAAP financial measures are provided along with the related GAAP financial measures as we believe they provide useful information to investors as a supplement to our consolidated financial statements, which are prepared and presented in accordance with GAAP. The presentation of non-GAAP financial information is not intended to be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP.

*Adjusted (Loss) Earnings per Share ("Adjusted EPS")* represents Adjusted Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. (as defined below) divided by weighted average shares outstanding or by diluted weighted average shares outstanding, as applicable. We believe that this non-GAAP measure is meaningful when assessing our performance on a comparative basis.

*Adjusted Net (Loss) Income attributable to Royal Caribbean Cruises Ltd.* represents net (loss) income less net income attributable to noncontrolling interest excluding certain items that we believe adjusting for is meaningful when assessing our

performance on a comparative basis. For the periods presented, these items included (i) loss on the extinguishment of debt; (ii) the amortization of non-cash debt discount on our convertible notes; (iii) the estimated cash refund expected to be paid to Pullmantur guests and other expenses incurred as part of the Pullmantur S.A. reorganization; (iv) impairment and credit losses recognized as a result of the impact of COVID-19; (v) equity investment asset impairments; (vi) net insurance recoveries related to the collapse of the drydock structure at the Grand Bahama Shipyard involving Oasis of the Seas, or for 2019, incidental costs, net of insurance recoveries, related to drydock structure incidents Grand Bahama Shipyard; (vii) restructuring charges incurred in relation to the reduction in our U.S. workforce and other initiative expenses, and the reorganization of our international sales and marketing structure in 2019; (viii) the change in the fair value in the Silversea Cruises contingent consideration, the amortization of the Silversea Cruises intangible assets resulting from our acquisition of a 66.7% interest in Silversea Cruises in 2018, and transaction and integration costs related to the 2018 Silversea Cruises acquisition; (ix) the noncontrolling interest adjustment to exclude the impact of the contractual accretion requirements associated with the put option held by Heritage Cruise Holding Ltd. (previously known as Silversea Cruises Group Ltd.) noncontrolling interest in Silversea Cruises, which noncontrolling interest we acquired on July 9, 2020; (x) the net gain recognized in the first quarter of 2021 in relation to the sale of the Azamara brand; (xi) currency translation losses recognized during the second quarter of 2020, in connection with the ships classified as assets held-for-sale that were previously chartered to Pullmantur; and, (xii) the net loss recognized in the fourth quarter of 2021 related to the elimination of the three-month reporting lag for Silversea Cruises.

*Available Passenger Cruise Days* ("*APCD*") is our measurement of capacity and represents double occupancy per cabin multiplied by the number of cruise days for the period, which excludes canceled cruise days and cabins not available for sale. We use this measure to perform capacity and rate analysis to identify our main non-capacity drivers that cause our cruise revenue and expenses to vary.

*Occupancy ("Load factor")*, in accordance with cruise vacation industry practice, occupancy is calculated by dividing Passenger Cruise Days (as defined below) by APCD. A percentage in excess of 100% indicates that three or more passengers occupied some cabins.

*Passenger Cruise Days* represent the number of passengers carried for the period multiplied by the number of days of their respective cruises.

Although discussed in prior periods, we do not disclose or reconcile in this report our Gross Yields, Net Yields, Gross Cruise Costs, Net Cruise Costs and Net Cruise Costs Excluding Fuel, as defined in our Annual Report on Form 10-K for the year ended December 31, 2019. Historically, we have utilized these financial metrics to measure relevant rate comparisons to other periods. However, our 2020 and 2021 reduction in capacity and revenues and the shift in the nature of our running costs, due to the impact of the COVID-19 pandemic on our operations, do not allow for a meaningful analysis and comparison of these metrics and as such these metrics have been excluded from this report.

**Recent Developments: COVID-19**

*Return to Healthy Sailing*

We have restarted our global cruise operations in a phased manner, following our voluntary suspension of global cruise operations that commenced in March of 2020 in response to the COVID-19 outbreak. Our return to service efforts incorporate our enhanced health and safety protocols, and the requirements of regulatory agencies, which has resulted in reduced guest occupancy, modified itineraries and vaccination protocols.

By the end of December 2021, we operated 50 of our Global and Partner Brand ships, representing over 85% of worldwide capacity, and carried approximately 1.3 million guests since we resumed operations.

Uncertainties remain as to the specifics, timing and costs of administering and implementing our health and safety measures, some of which may be significant. Based on our assessment of these requirements and recommendations, the status of COVID-19 infection, and its variants, and/or vaccination rates in the U.S. or globally or for other reasons, we may determine it necessary to cancel or modify certain of our Global Brands' cruise sailings. We believe the impact to our global bookings resulting from COVID-19 will continue to have a material negative impact on our results of operations and liquidity, which may be prolonged beyond containment of the disease and its variants. See Part I. Item 1. *Business - Regulation* for an update on the U.S. Centers for Disease Control and Prevention's ("CDC") Framework for Conditional Sailing Order.

*Continued fleet ramp-up*

We experienced service disruptions and cancelled several sailings in the first quarter of 2022 due to the impact from the Omicron variant ("Omicron"). Service disruptions have abated as COVID-19 cases have declined. Despite these service disruptions and cancellations, the overall trajectory of our return to service remains unchanged. We expect that by the end of the first quarter of 2022, 53 out of 62 of our Global and Partner Brand ships, including *Wonder of the Seas*, which was delivered in

January 2022, will have been brought back to service. Additionally, we expect that the rest of the fleet will return to operations before the summer season.

We expect load factors in the first quarter of 2022 to be lower than initially anticipated due to the Omicron impact on bookings and cancellations, particularly on January sailings. As such, we anticipate load factors on core itineraries of approximately 60% during the first quarter of 2022, with sequential monthly improvement, and approximately 7.7 million APCDs for the first quarter of 2022. Core itineraries exclude sailings during the early ramp-up period of up to four weeks and exclude new itineraries implemented during the COVID period. Additionally, we expect total cash flow from ships in operation in the first quarter to be positive.

*Update on Bookings*

We experienced a softening in booking volumes and an increase in near-term cancellations as a result of the significant short-term disruptions experienced by the travel industry due to Omicron. The disruptions intensified during the holiday season and in early January with the spread of the variant.

Load factors for sailings in the first half of 2022 are expected to remain below historical levels, consistent with our return to service schedule, which includes the Omicron impact. Load factors for sailings in the second half of 2022 continue to be booked within historical ranges, at higher prices with and without FCCs. We have observed cancellations subside and bookings improve to pre-Omicron levels, and we have adjusted our sales and marketing efforts in anticipation of a delayed and extended WAVE period.

As of December 31, 2021, we had approximately $3.2 billion in customer deposits. Approximately 32% of the customer deposit balance as of December 31, 2021 is related to FCCs compared to 35% of the customer deposit balance as of September 30, 2021, a positive trend indicating new demand.

*Update on Recent Liquidity Actions and Ongoing Uses of Cash*

As of December 31, 2021, we had liquidity of approximately $3.5 billion in the form of cash and cash equivalents of $2.7 billion, $0.1 billion of undrawn revolving credit facility capacity, and a $0.7 billion commitment for a 364-day term loan facility available to draw on at any time prior to August 12, 2022. Our revolving credit facilities were mostly utilized through a combination of amounts drawn and letters of credit issued under the facilities as of December 31, 2021. We temporarily applied the net proceeds of the $1.0 billion January 2022 Unsecured Notes to repay borrowings under our revolving credit facilities, bringing our undrawn revolving credit facility capacity to $1.1 billion as of the date of the issuance of this report, from $0.1 billion as of December 31, 2021. We continue to prioritize and bolster liquidity while taking steps to improve our balance sheet and reduce our interest costs to be well positioned for recovery.

*Reduced Operating Expenses*

We took significant actions in early 2020 to reduce operating expenses during the suspension of our global cruise operations. In particular, we:

- significantly reduced ship operating expenses, including crew payroll, food, fuel, insurance and port charges;

- further reduced operating expenses as the Company's ships were transitioned into various levels of layup with several ships in the fleet transitioning into cold layup;

- significantly reduced marketing and selling expenses;

- reduced and furloughed our workforce, with approximately 23% of our US shoreside employee base being impacted in 2020; and

- suspended travel for shoreside employees and instituted a hiring freeze across the organization.

During our ramp up of operations, we have incurred and will continue to incur incremental spend related to bringing ships back to operating status, returning crew members to ships and implementing enhanced health and safety protocols. We also collected and will continue to collect deposits related to those sailings and for future cruises. We take into account a number of variables in determining when to bring ships back into service, including deployment opportunities, commercial potential, cost of operations and cash flow.

*Capital Expenditures*

COVID-19 has impacted shipyard operations, which have delayed and may continue to result in delays of our previously contracted ship deliveries. As of December 31, 2021, we anticipate that overall full year capital expenditures, based on our

existing ships on order, will be approximately $3.1 billion for 2022. This amount does not include any ships on order by our Partner Brands. We took delivery of *Wonder of the Seas* during the first quarter of 2022 and expect delivery of *Celebrity Beyond* during the second quarter of 2022. For 2023, we have three ship deliveries scheduled: *Icon of the Seas*, *Celebrity Ascent* and *Silver Nova*.

*Debt Maturities, New Financings and Other Liquidity Actions*

During the year ended December 31, 2021, we continued to take actions to further improve our liquidity position and manage cash flow. In particular, we:

- extended the maturity date or termination date, as applicable, of certain of the advances and commitments held by consenting lenders under our $1.0 billion unsecured term loan due April 2022 and our $1.55 billion unsecured revolving credit facility due October 2022, each by 18 months to October 2023 and April 2024, respectively;

- extended the period during which we may draw upon our binding commitment for a $700.0 million 364-day term loan facility by one year, which is now available for draw at any time prior to August 12, 2022;

- issued $1.50 billion of 5.5% senior unsecured notes due in 2028 for net proceeds of approximately $1.48 billion, which were used to repay principal payments on debt maturing or required to be paid in 2021 and 2022, with the remaining for general corporate purposes;

- issued $650.0 million of 4.25% senior unsecured notes due in 2026 for net proceeds of approximately $640.6 million, which were used to fully repay the Silversea Notes, in the amount of $619.8 million, and to pay the related call premiums, accrued interest and fees;

- issued $1.0 billion of 5.50% senior notes due in 2026 for net proceeds of approximately $986.0 million, which were used to replenish our capital as a result of the redemption of a portion of the 11.50% senior secured notes due 2025 in the amount of $928.0 million, and to pay the related premiums and accrued interest;

- amended the credit agreements for the unsecured financings of our first and second Evolution-class ships, increasing their maximum loan amounts by €175.6 million in the aggregate (or approximately $199.7 million based on the exchange rate at December 31, 2021), to finance ship design modifications that incorporate innovative sustainability features and additional premium cabins;

- issued 16.9 million shares of common stock for approximately $1.5 billion;

- amended $4.9 billion of our non-export-credit facilities and certain of our credit card processing agreements to extend the waiver of the financial covenants through and including the third quarter of 2022 and to implement modified covenants for the period starting fourth quarter of 2022 and extending through and including the fourth quarter of 2023;

- amended $6.3 billion of our export-credit facilities to extend the waiver of the financial covenants through and including the fourth quarter of 2022 and defer $1.15 billion of principal payments due between April 2021 and April 2022; and

- amended $7.3 billion of outstanding export-credit financing plus committed export-credit facilities to modify financial covenant levels for 2023 and 2024, following the waiver period through and including the fourth quarter of 2022.

Refer to Note 8. *Debt*, Note 10. *Shareholders' Equity*, and Note 17. *Commitments and Contingencies*, to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information on these financing transactions and our debt covenants.

Expected debt maturities for 2022 are $2.2 billion. We continue to identify and evaluate further actions to enhance our liquidity and support our recovery. These include and are not limited to further reductions in capital expenditures, operating expenses and administrative costs and additional financings and refinancings.

**Executive Overview**

While 2021 proved to be another challenging year for our company and industry, it also marked our successful return to service. Starting in June, we began our return to cruising with 50 ships back in service by year end, representing more than 85% of our capacity. We delivered safe and memorable experiences to approximately 1.3 million guests at record guest satisfaction scores.

The out-of-service period in the first half of the year, the costs of returning our ships and crew to operations, the revamping of sales and marketing and the costs to execute on health protocols all had a significant impact on our financial results. Although we generated a fraction of normal revenue levels in 2021, total revenue per passenger cruise day in the fourth quarter was up 10% compared to record 2019 levels. The increase was driven by strong onboard revenue performance seen across every revenue stream.

Since resuming operations, our focus has been on the safety and well-being of our guests and crew. As Delta and Omicron variants started to spread, they created short-term operational challenges as well as an increase in cancellations. However, our health and safety protocols, including our crew and guest vaccination requirements, proved to be successful as only 0.19% of our guests tested positive for COVID-19. As infection rates decline and localities lift COVID-19 protocols, we will continue to work closely with health authorities to maintain protocols that promote the health and safety of our guests, crew, and communities we visit. As part of this commitment, we have opted-in to the CDC's new voluntary program in the "Highly Vaccinated Ship" category for health and safety protocols.

During 2021, we remained focused on managing costs, improving our balance sheet and preserving liquidity. We ended the year with approximately $3.5 billion in liquidity, which includes cash and cash equivalents, undrawn revolving credit facility capacity, and a $0.7 billion commitment for a loan facility. We re-established access to unsecured debt markets and successfully refinanced $2.3 billion of secured or guaranteed high coupon debt, in some instances reducing the coupon by up to 600 basis points. Given the current environment and anticipated inflationary pressures, we continue to take numerous actions to reshape our cost structure, with a goal of further improving upon our leading pre-COVID margins.

New hardware is a key pillar to supporting our recovery and a driver of quality demand and financial performance. This past year we successfully took delivery of *Celebrity Apex*, *Odyssey of the Seas* and *Silver Dawn*, all poised to significantly contribute to our yield growth, profitability, and cash generation. Additionally, we look forward to welcoming two new ships in 2022, *Wonder of the Seas* and *Celebrity Beyond*. We expect to return the full fleet before the summer season of 2022 and load factors to reach pre-COVID levels in the third quarter. Although Omicron has caused service disruptions, several cancelled sailings and a likely delay in our return to profitability by a few months, we currently expect to be generating net income in the second half of 2022.

As we focus on setting the foundation for a strong recovery and long-term profitable growth, we remain driven to innovate our product and maintain a strong competitive advantage. We finished the year stronger than we started and continue to manage the challenges related to Omicron, as well as search for further operational opportunities on our journey back to financial health.

**Results of Operations**

In addition to the items discussed above under "Executive Overview," significant items for 2021 include:

- Our Net Loss attributable to Royal Caribbean Cruises Ltd. and Adjusted Net Loss attributable to Royal Caribbean Cruises Ltd. for the year ended December 31, 2021 was $(5.3) billion and $(4.8) billion, or $(20.89) and $(19.19) per share on a diluted basis, respectively, as compared to Net Loss attributable to Royal Caribbean Cruises Ltd. and Adjusted Net Loss attributable to Royal Caribbean Cruises Ltd. of $(5.8) billion and $(3.9) billion, or $(27.05) and $(18.31) per share on a diluted basis, respectively, for the year ended December 31, 2020.

- Total revenues, excluding the effect of changes in foreign currency rates, decreased by $686.1 million for the year ended December 31, 2021 compared to the same period in 2020 resulting from a 52.6% decrease in occupancy in 2021 while we gradually returned to service compared to 2020 when the majority of our fleet was operational up through our global suspension in March of 2020.

- The effect of changes in foreign currency exchange rates related to our passenger ticket and onboard and other revenue transactions, denominated in currencies other than the United States dollar, resulted in an increase in total revenues of $9.5 million for the year ended December 31, 2021 compared to the same period in 2020.

- Total cruise operating expenses, excluding the effect of changes in foreign currency rate, decreased by $114.9 million for the year ended December 31, 2021 compared to the same period in 2020, which reflects the decrease in occupancy mentioned above.

- The effect of changes in foreign currency exchange rates related to our cruise operating expenses, denominated in currencies other than the United States dollar, resulted in an increase in total operating expenses of $7.3 million for the year ended December 31, 2021 compared to the same period in 2020.

- During the year ended December 31, 2021 and 2020, as a result of ongoing impact of the COVID-19 pandemic on our operations and cash flows, we recorded total impairment and credit losses of $82.0 million and $1.6 billion, respectively, related to long-lived assets and credit losses related to our notes receivable, net of recoveries, in 2021, and to goodwill, trademarks and trade names, long-lived assets, including right-of-use assets, and credit losses related to our notes receivable in 2020.

- Effective October 1, 2021, we eliminated the Silversea Cruises three-month reporting lag to be consistent with the fiscal calendar of the Company. The effect of this change was an increase to net loss of $62.6 million, or a $0.25 per share loss on a basic and diluted basis, and this amount is reported within *Other (expense) income* in our consolidated statements of comprehensive income (loss) for the year ended December 31, 2021. Refer to Note 1. *General* to our consolidated financial statements under Item 8. Financial Statements and Supplementary Data for further information on the elimination of the Silversea Cruises reporting lag.

- During the year ended December 31, 2021, we executed and amended various financing arrangements. Refer to Note 8. *Debt* and Note 10. *Shareholders' Equity*, to our consolidated financial statements under Item 8. *Financial Statements and Supplemental Data* for further information on our 2021 financing activity.

We reported Net (Loss) Income attributable to Royal Caribbean Cruises Ltd., Adjusted Net (Loss) Income attributable to Royal Caribbean Cruises Ltd., (Loss) Earnings per Share and Adjusted (Loss) Earnings per Share as shown in the following table (in thousands, except per share data):

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. | $ | (5,260,499) | $ | (5,797,462) | $ | 1,878,887 |
| Adjusted Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. | | (4,832,889) | | (3,924,579) | | 2,002,847 |
| Net Adjustments to Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. | $ | 427,610 | $ | 1,872,883 | $ | 123,960 |
| Adjustments to Net (Loss) Income attributable to Royal Caribbean Cruises Ltd.: | | | | | | |
| Loss on extinguishment of debt (1) | $ | 138,759 | $ | 41,109 | $ | 6,326 |
| Convertible debt amortization of debt discount (2) | | 104,291 | | 46,546 | | — |
| Pullmantur reorganization settlement (3) | | 10,242 | | 21,637 | | — |
| Impairment and credit losses (4) | | 82,001 | | 1,566,380 | | — |
| Equity investment impairment (5) | | 31,344 | | 39,735 | | — |
| *Oasis of the Seas* incident, Grand Bahama's drydock write-off and other incidental expenses (6) | | (6,584) | | (1,938) | | 35,239 |
| Restructuring charges and other initiatives expense (7) | | 1,831 | | 51,853 | | 13,707 |
| Change in the fair value of contingent consideration and amortization of Silversea Cruises intangible assets related to Silversea Cruises acquisition (8) | | 6,493 | | (33,814) | | 30,675 |
| Noncontrolling interest adjustment (9) | | — | | 72,331 | | 35,965 |
| Net gain related to the sale of Azamara brand (10) | | (3,371) | | — | | — |
| Currency translation adjustment losses (11) | | — | | 69,044 | | — |
| Net Loss related to the elimination of the Silversea reporting lag (12) | | 62,604 | | — | | — |
| Transaction and integration costs related to the Silversea Cruises acquisition (8) | | — | | — | | 2,048 |
| Net Adjustments to Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. | $ | 427,610 | $ | 1,872,883 | $ | 123,960 |
| | | | | | | |
| Basic: | | | | | | |
| (Loss) Earnings per Share | $ | (20.89) | $ | (27.05) | $ | 8.97 |
| Adjusted (Loss) Earnings per Share | $ | (19.19) | $ | (18.31) | $ | 9.56 |
| | | | | | | |
| Diluted: | | | | | | |
| (Loss) Earnings per Share | $ | (20.89) | $ | (27.05) | $ | 8.95 |
| Adjusted (Loss) Earnings per Share | $ | (19.19) | $ | (18.31) | $ | 9.54 |
| | | | | | | |
| Weighted-Average Shares Outstanding: | | | | | | |
| Basic | | 251,812 | | 214,335 | | 209,405 |
| Diluted | | 251,812 | | 214,335 | | 209,930 |

(1)   In 2021, represents the net loss on the partial repayment of the 11.50% senior secured notes due 2025, the net gain on the full repayment of the Silversea Notes and the loss on the partial repayment of the $1.55 billion unsecured revolving credit facility. In 2020, represents the loss on the extinguishment of the $2.2 billion Senior Secured Term Loan. In 2019, represents the loss on the extinguishment of the $700 million 364-day loan related to the 2018 Silversea Cruises acquisition and the remaining balance of the unsecured term loan originally incurred in 2010 to purchase *Allure of the Seas*.

(2)   Represents the amortization of non-cash debt discount on our convertible notes.

Table of Contents

(3)   Represents estimated cash refunds expected to be paid to Pullmantur guests and other expenses incurred as part of the Pullmantur S.A. reorganization.

(4)   In 2021 and 2020, represents asset impairment and credit losses as a result of the impact of COVID-19. In 2021, amounts are net of the recovery of credit losses recognized in 2020.

(5)   Represents equity investment asset impairment, primarily for our investments in TUI Cruises GmbH, in 2021 and Grand Bahama Shipyard in 2020, as a result of the impact of COVID-19.

(6)   In 2021 and 2020, amounts include net insurance recoveries related to the collapse of the drydock structure at the Grand Bahama Shipyard involving *Oasis of the Seas*. In 2019, amount includes incidental costs, net of insurance recoveries, of $14.5 million related to the collapse of the drydock structure at the Grand Bahama Shipyard involving *Oasis of the Seas*, which were reported primarily within *Other operating* expenses in our consolidated statements of comprehensive (loss) income for the year ended December 31, 2019; and $20.7 million regarding the Grand Bahama incident involving one of its drydocks, included in *Equity investment income (loss)* within our consolidated statements of comprehensive (loss) income for the year ended December 31, 2019.

(7)   Represents primarily restructuring charges incurred in relation to the reduction in our U.S. workforce and other initiatives expenses in 2020 and 2021. Refer to Note 18. *Restructuring Charges* to our consolidated financial statements under item 8. *Financial Statements and Supplementary Data* for further information on the restructuring activities. In 2019, represents primarily the reorganization of our international sales and marketing structure.

(8)   Related to the 2018 Silversea Cruises acquisition. Refer to Note 1. *General* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data* for information on the Silversea Cruises acquisition.

(9)   Adjustment made to exclude the impact of the contractual accretion requirements associated with the put option held by Heritage Cruise Holding Ltd.'s (previously known as Silversea Cruises Group Ltd.) noncontrolling interest, which noncontrolling interest we acquired on July 9, 2020.

(10)   Represents the net gain recognized in the first quarter of 2021 in relation to the sale of the Azamara brand.

(11)   Represents currency translation losses recognized in connection with the ships sold in 2020 that were previously chartered to Pullmantur. Refer to Note 7. *Other Assets* to our consolidated financial statements under Item 1. *Financial Statements and Supplementary Data* for further information.

(12) Represents the net loss related to the elimination of the Silversea Cruises reporting lag.

The following table presents operating results as a percentage of total revenues for the last three years:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | 2019 | |
| Passenger ticket revenues | 61.4 | % | 68.1 | % | 71.7 | |
| Onboard and other revenues | 38.6 | % | 31.9 | % | 28.3 | |
| Total revenues | 100.0 | % | 100.0 | % | 100.0 | |
| Cruise operating expenses: | | | | | | |
| Commissions, transportation and other | 13.5 | % | 15.6 | % | 15.1 | |
| Onboard and other | 7.6 | % | 7.1 | % | 5.8 | |
| Payroll and related | 54.7 | % | 35.7 | % | 9.9 | |
| Food | 10.7 | % | 7.3 | % | 5.3 | |
| Fuel | 25.1 | % | 16.8 | % | 6.4 | |
| Other operating | 61.7 | % | 42.7 | % | 12.8 | |
| Total cruise operating expenses | 173.5 | % | 125.2 | % | 55.4 | |
| Marketing, selling and administrative expenses | 89.4 | % | 54.3 | % | 14.2 | |
| Depreciation and amortization expenses | 84.4 | % | 57.9 | % | 11.4 | |
| Impairment and credit losses | 5.4 | % | 70.9 | % | — | |
| **Operating (Loss) Income** | (252.6) | % | (208.3) | % | 19.0 | |
| Other income (expense): | | | | | | |
| Interest income | 1.1 | % | 1.0 | % | 0.2 | |
| Interest expense, net of interest capitalized | (84.3) | % | (38.2) | % | (3.7) | |
| Equity investment (loss) income | (8.8) | % | (9.7) | % | 2.1 | |
| Other income (expense) | 1.3 | % | (6.2) | % | (0.2) | |
| | (90.7) | % | (53.1) | % | (1.6) | |
| **Net (Loss) Income** | (343.3) | % | (261.5) | % | 17.4 | |
| **Less: Net Income attributable to noncontrolling interest** | — | % | 1.0 | % | 0.3 | |
| **Net (Loss) Income attributable to Royal Caribbean Cruises Ltd.** | (343.3) | % | (262.5) | % | 17.2 | |

Selected statistical information is shown in the following table:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2021(1)(3) | 2020(2) | 2019 (2) |
| Passengers Carried | 1,030,403 | 1,295,144 | 6,553,865 |
| Passenger Cruise Days | 5,802,582 | 8,697,893 | 44,803,953 |
| APCD | 11,767,441 | 8,539,903 | 41,432,451 |
| Occupancy | 49.3 % | 101.9 % | 108.1 % |

_____

(1)   Due to the elimination of the Silversea Cruises three-month reporting lag in October of 2021, we include Silversea Cruises' metrics from October 1, 2020 through June 30, 2021 and October 1 through December 31, 2021 in the year ended December 31, 2021. The year ended December 31, 2021 does not include July, August, and September 2021 statistics as Silversea Cruises' results of operations for those months are included within *Other (expense) income* in our consolidated statements of comprehensive loss for the year ended December 31, 2021. Refer to Note 1. General to our consolidated financial statements under Item 8. Financial Statements and Supplementary Data for more information on the three-month reporting lag.

(2)   Due to the three-month reporting lag effective through September 30, 2021, we include Silversea Cruises' metrics from October 1, 2019 through September 30, 2020 in the year ended December 31, 2020 and from October 1, 2018 through September 30, 2019 in the year ended December 31, 2019.

Table of Contents

(3)   For the year ended December, 31, 2021, we include Azamara Cruises' metrics through March 19, 2021, the effective sale date of the brand. Refer to Note 1. General to our consolidated financial statements under Item 8. Financial Statements and Supplementary Data for more information on the sale of the Azamara Cruises brand.

**Outlook**

The Company's operations are still impacted by COVID-19 and its related variants. The adverse impact of the COVID-19 pandemic on our revenues, consolidated results of operations, cash flows and financial condition has been and will continue to be material in 2022. We expect to incur a net loss on both a U.S. GAAP and adjusted basis for the first quarter and the first half of 2022 and a return to profitability in the second half of 2022. See *Recent Developments: COVID-19 – Continued Fleet Ramp-Up* and *Update on Bookings* for further indications on our resumption of operations and the booking environment.

**Year Ended December 31, 2021 Compared to Year Ended December 31, 2020**

*In this section, references to 2021 refer to the year ended December 31, 2021 and references to 2020 refer to the year ended December 31, 2020.*

*Revenues*

*Total revenues* for 2021 decreased $0.7 billion, or 30.6%, to $1.5 billion from $2.2 billion in 2020.

*Passenger ticket revenues* comprised 61.4% of our 2021 total revenues. *Passenger ticket revenues* decreased by $0.6 billion, or 37.4% from 2020. The decrease in Passenger ticket reflects a 52.6% decrease in occupancy for the period in 2021 during which we gradually returned to service compared to occupancy during 2020 when we operated the majority of our fleet, up through our global suspension in March of 2020.

The decrease to *Passenger ticket revenues* was slightly offset by the $5.0 million favorable effect of changes in foreign currency exchange rates related to our revenues in currencies other than the United States dollar.

The remaining 38.6% of 2021 total revenues was comprised of *Onboard and other revenues*, which decreased $0.1 billion, or 16.1%. This decrease was primarily due to the 52.6% decrease in occupancy noted above and a decrease in cancellation fees in 2021. These decreases more than offset a strong onboard revenue per passenger cruise day performance during our gradual resumption of operations in 2021 as well as the favorable effect of changes in foreign currency exchange rates related to our *Onboard and other revenues* denominated in currencies other than the United States dollar of $4.5 million.

*Onboard and other revenues* included concession revenues of $72.0 million in 2021 and $76.0 million in 2020.

*Cruise Operating Expenses*

Total *Cruise operating expenses* for 2021 decreased $0.1 billion, or 3.9%, to $2.7 billion in 2021 from $2.8 billion in 2020. The decrease was primarily due to a $137.1 million decrease in *Commissions, transportation and other* expenses and a $40.3 million decrease in *Onboard and other* expenses due to the decrease in revenues and occupancy noted above.

The decrease in *Cruise operating expenses* was partially offset by an increase in *Payroll and related* expenses of $49.8 million due to our return to service during 2021, and the unfavorable effect of changes in foreign currency exchange rates related to our expense transactions denominated in currencies other than the United States dollar of $7.3 million.

*Marketing, Selling and Administrative Expenses*

*Marketing, selling and administrative expenses* for 2021 increased $170.5 million, or 14.2% to $1.4 billion from $1.2 billion in 2020. The increase is due to the ramp up of our global sales and marketing efforts in the second half of 2021 as we commenced our resumption of operations.

*Depreciation and Amortization Expenses*

*Depreciation and amortization expenses* for 2021 increased $13.6 million, or 1.1%, to $1.3 billion. The increase was primarily due to the addition of *Odyssey of the Seas* to our fleet in the first quarter of 2021, a full year of depreciation in 2021 for *Celebrity Apex, Silver Moon and Silver Origin* which were added to our fleet during 2020, and to a lesser extent, the addition of *Silver Dawn* to our fleet in the fourth quarter of 2021. The increases in 2021 were partially offset by lower depreciation resulting from vessel disposals and asset impairments during 2020 and 2021.

*Impairment and Credit Losses*

For the year ended December 31, 2021 and 2020, as a result of the ongoing impact of the COVID-19 pandemic on our operations and cash flows, we recorded total impairment and credit losses of $82.0 million and $1.6 billion, respectively,

primarily related to construction in progress, other long-lived assets and credit loss allowances related to our notes receivable in 2021, and to our goodwill, trademarks and trade names, vessels, construction in progress, right-of-use assets and credit loss allowances related to our notes receivable in 2020.

*Other Income (Expense)*

 *Interest expense, net of interest capitalized*, increased $447.5 million, or 53.0%, to $1.3 billion in 2021 from $844.2 million in 2020. The increase was primarily due to new debt issuances in 2021 and 2020, a higher average balance on our revolver debt and a loss on extinguishment of debt of $138.8 million.

 *Equity investment (loss)* improved by $77.8 million, or 36.5%, to a loss of $135.5 million in 2021 from a loss of $213.3 million in 2020 mainly due to decreased losses reported by our equity investments as a result of their return to operations during 2021 and receipt of local government grants by one of our equity investments.

 *Other income* was $20.3 million in 2021 compared to *Other expense* of $137.1 million in 2020. The improvement of $157.4 million includes an increase in income of $110.6 million related to the change in the fair value of fuel swap derivative instruments that are not designated under hedge accounting, a one-time $14.4 million tax benefit recognized in 2021, and a $13.8 million decrease in foreign exchange losses from the remeasurement of monetary assets and liabilities denominated in foreign currency compared to 2020. Additionally in 2020, we recognized a deferred currency translation adjustment loss of $69.0 million related to the Pullmantur brand as we no longer have significant involvement in Pullmantur's operations, which did not recur in 2021, and a $20.0 million expense representing the cash refund expected to be paid to Pullmantur guests as part of the brand's reorganization, compared to a $5.0 million expense in 2021. The 2021 increases in income were partially offset by a $62.6 million loss recognized in 2021 resulting from the elimination of the Silversea Cruises three-month reporting lag effective October 1, 2021.

*Other Comprehensive Income (Loss)*

 *Other comprehensive income* in 2021 was $28.5 million compared to $58.4 million in 2020. The decrease of $29.9 million in 2021 was primarily due to a decrease in *Gain on cash flow derivative hedges* in 2021 of $34.0 million. *Gain on cash flow derivative hedges* decreased in 2021 primarily due to the reclassification of fuel swap gains from *Accumulated Other Comprehensive Loss* into the Consolidated Statement of Comprehensive (Loss) Income in 2021, compared to the reclassification of fuel swap losses during 2020. This decrease was partially offset by a net increase in the fair value of our cash flow derivative hedges, mostly driven by increases in the fair value of our fuel and interest rate swaps in 2021.

**Year Ended December 31, 2020 Compared to Year Ended December 31, 2019**

A discussion of our results of operations for the year ended December 31, 2020 compared to the year ended December 31, 2019 is included in Part II. Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2020, filed with the SEC on February 26, 2021, and is incorporated by reference into this Form 10-K.

Table of Contents

***Future Application of Accounting Standards***

Refer to Note. 2 *Summary of Significant Accounting Policies* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data* for further information on *Recent Accounting Pronouncements*.

**Liquidity and Capital Resources**

***Sources and Uses of Cash***

*Net cash (used in) operating activities* decreased by $1.9 billion to cash used of $1.9 billion for the year ended December 31, 2021, compared to cash used of $3.7 billion for the same period in 2020. Our gradual resumption of operations in 2021 generated increased guest ticket collections, resulting in an increase of customer deposits of $1.4 billion for the twelve months ended December 31, 2021, compared to a decrease of customer deposits of $1.6 billion during the same period in 2020, during our suspension of global operations. The increase in customer deposits was offset by increased expenses for our vessels that resumed cruise operations in 2021, including start up costs.

*Net cash (used in) operating activities* was $3.7 billion in 2020 compared to *Net cash provided* of $3.7 billion in 2019 reflecting a change of $7.4 billion in 2020. The 2020 disruptions to our business led to a decrease in collections from our guests as well as an increase of refunds to guests for cancelled sailings during the year ended December 31, 2020 compared to the same period in 2019.

*Net cash used in investing activities* decreased $33.8 million to cash used of $2.1 billion for the year ended December 31, 2021, compared to cash used of $2.2 billion for the same period in 2020. The decrease in cash used in investing activities was primarily attributable to an increase in proceeds from the sale of property and equipment and other assets of $148.2 million in 2021 compared to 2020, and a decrease in cash paid on settlement of derivative financial instruments of $87.1 million, partially offset by an increase in capital expenditures of $264.6 million mostly due to our purchase of Terminal A at PortMiami in 2021.

*Net cash used in investing activities* decreased $0.9 billion to cash used $2.2 billion in 2020 compared to cash used $3.1 billion in 2019. The decrease in investing activities was primarily attributable to a decrease in capital expenditures of $1.1 billion.

*Net cash provided by financing activities* was $3.0 billion in 2021 compared to cash provided of $9.3 billion in 2020. The decrease of $6.3 billion was primarily attributable to higher debt proceeds and issuance of commercial paper notes of $15.8 billion during the twelve months ended December 31, 2020, compared to the same period in 2021, offset by higher debt and commercial paper repayments of $9.0 billion during the twelve months ended December 31, 2020, compared to the same period in 2021. Additionally, dividends paid of $326.4 million during the twelve months ended December 31, 2020, compared to none during the same period in 2021.

*Net cash provided by financing activities* was $9.3 billion in 2020 compared to *Net cash used* of $0.7 billion in 2019. The change was primarily attributable to an increase in debt proceeds of $10.0 billion in 2020 compared to the same period in 2019, and $1.4 billion in proceeds from common stock issuances in 2020. These proceeds were partially offset by net repayments of commercial paper of $1.1 billion during the twelve months ended December 31, 2020 compared to net borrowings of commercial paper of $0.6 billion during the same period in 2019.

***Future Capital Commitments***

***Capital Expenditures***

Our future capital commitments consist primarily of new ship orders. As of December 31, 2021, we have two Oasis-class ships, and three ships of a new generation, known as our Icon-class, on order for our Royal Caribbean International brand with an aggregate capacity of approximately 28,200 berths. As of December 31, 2021, we have two Edge-class ships on order for our Celebrity Cruises brand, with an aggregate capacity of approximately 6,500 berths. Additionally, as of December 31, 2021, we have two ships on order for our Silversea Cruises brand with an aggregate capacity of approximately 1,460 berths. Refer to Item 1. *Business-Operations* for further information on our ships on order. We have committed financing arrangements in place covering 80% of the cost of the ship for the nine ships on order for our Global Brands, almost all of which include sovereign financing guarantees. Additionally, we have an agreement in place with Chantiers de l'Atlantique to build an additional Edge-class ship for delivery in 2025, which is contingent upon completion of conditions precedent and financing.

As of December 31, 2021, the aggregate cost of our ships on order, not including any ships on order by our Partner Brands, was approximately $12.4 billion, of which we had deposited $800.2 million as of such date. Approximately 59.0% of the aggregate cost was exposed to fluctuations in the Euro exchange rate at December 31, 2021. Refer to Note 16. *Fair Value*

*Measurements and Derivative Instruments* and Note 17. *Commitments and Contingencies* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data.*

Decreased demand for cruising as a result of concerns regarding the COVID-19 pandemic had, and is expected to continue to have, a material impact on our cash flows, liquidity and financial position. In order to preserve liquidity throughout the COVID-19 pandemic, we deferred a significant portion of our planned 2020, 2021 and 2022 capital expenditures. As of December 31, 2021, we anticipate overall full year capital expenditures, based on our existing ships on order, will be approximately $3.1 billion for 2022. These amounts do not include any ships on order by our Partner Brands.

***Material Cash Requirements***

As of December 31, 2021, our material cash requirements were as follows (in thousands):

| | Total | | Less than 1 year | | 1-3 years | | 3-5 years | | More than 5 years |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Payments due by period** | | | | |
| Operating Activities: | | | | | | | | | |
| Operating lease obligations[1] | $ | 1,272,527 | $ | 101,445 | $ | 190,048 | $ | 154,809 | $ 826,225 |
| Interest on long-term debt[2] | | 3,554,212 | | 938,258 | | 1,286,576 | | 688,131 | 641,247 |
| Other[3] | | 534,484 | | 154,552 | | 162,401 | | 63,498 | 154,033 |
| Investing Activities: | | | | | | | | | |
| Ship purchase obligations[4] | | 9,955,868 | | 2,306,087 | | 4,920,554 | | 2,729,227 | — |
| Financing Activities: | | | | | | | | | |
| Debt obligations[5] | | 20,618,065 | | 2,191,620 | | 9,345,412 | | 4,781,668 | 4,299,365 |
| Finance lease obligations[6] | | 472,275 | | 51,511 | | 57,497 | | 44,896 | 318,371 |
| Other[7] | | 17,374 | | 8,414 | | 8,960 | | — | — |
| Total | $ | 36,424,805 | $ | 5,751,887 | $ | 15,971,448 | $ | 8,462,229 | $ 6,239,241 |

(1)  We are obligated under noncancelable operating leases primarily for preferred berthing arrangements, real estate and shipboard equipment. Amounts represent contractual obligations with initial terms in excess of one year.

(2)  Long-term debt obligations mature at various dates through fiscal year 2033 and bear interest at fixed and variable rates. Interest on variable-rate debt is calculated based on forecasted debt balances, including the impact of interest rate swap agreements, using the applicable rate at December 31, 2021. Debt denominated in other currencies is calculated based on the applicable exchange rate at December 31, 2021.

(3)  Amounts primarily represent future commitments with remaining terms in excess of one year to pay for our usage of certain port facilities, marine consumables, services and maintenance contracts.

(4)  Amounts are based on contractual installment and delivery dates for our ships on order. Included in these figures are $7.9 billion in final contractual installments, which have committed financing. COVID-19 has impacted shipyard operations which have and may result in delays for our previously contracted ship deliveries. Amounts do not include potential obligations which remain subject to cancellation at our sole discretion or any agreements entered for ships on order that remain contingent upon completion of conditions precedent.

(5) Debt denominated in other currencies is calculated based on the applicable exchange rate at December 31, 2021. In addition, debt obligations presented above are net of debt issuance costs of $363.5 million as of December 31, 2021.

(6)   Amounts represent finance lease obligations with initial terms in excess of one year.

(7)  Amounts represent fees payable to sovereign guarantors in connection with certain of our export credit debt facilities and facility fees on our revolving credit facilities.

Please refer to *Funding Needs and Sources* below for discussion on the planned funding of the above material contractual obligations.

As a normal part of our business, depending on market conditions, pricing and our overall growth strategy, we continuously consider opportunities to enter into contracts for the building of additional ships. We may also consider the sale of ships or the purchase of existing ships. We continuously consider potential acquisitions and strategic alliances. If any of these

were to occur, they would be financed through the incurrence of additional indebtedness, the issuance of additional shares of equity securities or through cash flows from operations.

*Off-Balance Sheet Arrangements*

TUI Cruises has entered into various ship construction and credit agreements that include certain restrictions on each of our and TUI AG's ability to reduce our current ownership interest in TUI Cruises below 37.55% through May 2033.

Some of the contracts that we enter into include indemnification provisions that obligate us to make payments to the counterparty if certain events occur. These contingencies generally relate to changes in taxes, increased lender capital costs and other similar costs. The indemnification clauses are often standard contractual terms and are entered into in the normal course of business. There are no stated or notional amounts included in the indemnification clauses and we are not able to estimate the maximum potential amount of future payments, if any, under these indemnification clauses. We have not been required to make any payments under such indemnification clauses in the past and, under current circumstances, we do not believe an indemnification obligation is probable.

In June of 2021, we exercised our option under our operating lease with SMBC Leasing and Finance, Inc (the "Lessor") to purchase Terminal A at PortMiami in July 2021 for the pre-agreed purchase price of $220.0 million. Upon purchase of the terminal lease in July 2021, the underlying asset was recorded as a leasehold improvement within *Property and equipment, net*. Our July 2021 purchase of the Port of Miami terminal eliminated the residual value guarantee and a requirement under the lease to post $181.1 million of cash collateral on or before July 18, 2021.

Certain of our surety agreements with third party providers for the benefit of certain agencies and associations that provide travel related bonds, allow the sureties to request collateral. We also have agreements with our credit card processors relating to customer deposits received by us for future voyages. These agreements allow the credit card processors to require us, under certain circumstances, including breach of the financial covenants, the existence of other material adverse changes, excessive chargebacks, and other triggering events, to maintain a reserve that can be satisfied by posting collateral. As of December 31, 2021, we have posted letters of credit as collateral with our sureties and credit card processors under our revolving credit facilities in the amount of $193.3 million.

Executed amendments are in place for the majority of our credit card processors, waiving reserve requirements tied to breach of our financial covenants through at least September 30, 2022, with modified covenants thereafter, and as such, we do not anticipate any incremental collateral requirements for the processors covered by these waivers in the next 12 months. We have a reserve with a processor where the agreement was amended in the first quarter of 2021, such that proceeds are held in reserve until the sailing takes place or the funds are refunded to the customer. The maximum projected exposure with the processor, including amounts currently withheld and reported in *Trade and other receivables*, is approximately $285.0 million. The amount and timing are dependent on future factors that are uncertain, such as the pace of resumption of our cruise operations, the volume of future deposits and whether we transfer our business to other processors. If we require additional waivers on the credit card processing agreements and are not able to obtain them, this could lead to the termination of these agreements or the trigger of reserve requirements.

As of December 31, 2021, other than the items described above, we are not party to any other off-balance sheet arrangements, including guarantee contracts, retained or contingent interest, certain derivative instruments and variable interest entities, that either have, or are reasonably likely to have, a current or future material effect on our financial position.

*Funding Needs and Sources*

Historically, we relied on a combination of cash flows provided by operations, draw-downs under our available credit facilities, the incurrence of additional debt and/or the refinancing of our existing debt and the issuance of additional shares of equity securities to fund our obligations. The impact of COVID-19 resulted in our voluntary suspension of global cruise operations from March 2020 up to our gradual resumption of operations primarily in 2021. The suspension of operations strained our sources of cash flow and liquidity, causing us to take actions resulting in reductions in our operating expenses, reductions in our capital expenses and new financings and other liquidity actions.

The Company continues to identify and evaluate further actions to improve its liquidity. These include, and are not limited to further reductions in capital expenditures, operating expenses and administrative costs and additional financings. See further discussion on these liquidity actions at *Recent Developments - COVID-19.*

We have significant contractual obligations of which our debt service obligations and the capital expenditures associated with our ship purchases represent our largest funding needs. As of December 31, 2021, we had approximately $10.0 billion of committed financing for our ships on order.

As of December 31, 2021, we had $5.8 billion in contractual obligations due through December 31, 2022, of which approximately $2.2 billion relates to debt maturities, $0.9 billion relates to interest on debt and $2.3 billion relates to progress payments on our ship orders and the final installments payable due upon the delivery of *Wonder of the Seas* and *Celebrity Beyond*.

As of December 31, 2021, we had liquidity of $3.5 billion, including $0.1 billion of undrawn revolving credit facility capacity, $2.7 billion in cash and cash equivalents, and a $0.7 billion commitment for a 364-day term loan facility available to draw at any time prior to August 12, 2022. As of December 31, 2021, our revolving credit facilities were mostly utilized through a combination of amounts drawn and letters of credit issued under the facilities. We temporarily applied the net proceeds of the $1.0 billion January 2022 Unsecured Notes to repay borrowings under our revolving credit facilities, bringing our undrawn revolving credit facility capacity to $1.1 billion as of the date of issuance of this report, from $0.1 billion as of December 31, 2021.

We have agreed with certain of our lenders not to pay dividends or engage in stock repurchases. Thereafter, in the event we declare a dividend or engage in stock repurchases we will need to repay the amounts deferred under our export credit facilities. Refer to Note 10. *Shareholders' Equity* to our consolidated financial statements for further information.

If any person acquires ownership of more than 50% of our common stock or, subject to certain exceptions, during any 24-month period, a majority of our board of directors is no longer comprised of individuals who were members of our board of directors on the first day of such period, we may be obligated to prepay indebtedness outstanding under our credit facilities, which may be unable to replace on similar terms. Our public debt securities also contain change of control provisions that would be triggered by a third-party acquisition of greater than 50% of our common stock coupled with a ratings downgrade. If this were to occur, it would have an adverse impact on our liquidity and operations.

Based on our assumptions and estimates and our financial condition, we believe that the liquidity resulting from the actions mentioned above will be sufficient to fund our liquidity requirements over at least the next twelve months. However, there is no assurance that our assumptions and estimates are accurate due to possible unknown variables related to this unprecedented suspension of our operations and, as such, there is inherent uncertainty in our ability to predict future liquidity requirements. Refer to Note 1. *General, Management's Plan and Liquidity*, to our consolidated financial statements under Item 1. *Financial Statements* for further information.

Beyond the next 12 months, in June of 2023, approximately $3.2 billion of long-term debt will need to be refinanced in order to maintain the Company's liquidity position.

In February 2022, we entered into certain agreements with Morgan Stanley & Co., LLC ("MS") where MS agrees to provide backstop committed financing to refinance, repurchase and/or repay in whole or in part our existing and outstanding 10.875% Senior Secured Notes due 2023, 9.125% Priority Guaranteed Notes due 2023, and 4.25% Convertible Notes due 2023. Pursuant to the agreements, we may, at our sole option, issue and sell to MS (subject to the satisfaction of certain conditions) five-year senior unsecured notes with gross proceeds of up to $3.15 billion at any time between April 1, 2023 and June 29, 2023, to refinance the aforementioned notes.

*Debt Covenants*

Both our export credit facilities and our non-export credit facilities contain covenants that require us, among other things, to maintain a fixed charge coverage ratio of at least 1.25x and limit our net debt-to-capital ratio to no more than 62.5%, and under certain facilities, to maintain a minimum level of shareholders' equity. The fixed charge coverage ratio is calculated by dividing net cash from operations for the past four quarters by the sum of dividend payments plus scheduled principal debt payments in excess of any new financings for the past four quarters. Our minimum net worth and maximum net debt-to-capital calculations exclude the impact of *Accumulated other comprehensive loss* on *Total shareholders' equity*.

During 2020, we amended all of our export credit facilities, all of our non-export credit facilities and certain of our credit card processing agreements which contain financial covenants to extend the financial covenant waiver through and including the fourth quarter of 2021. During the first quarter of 2021, we amended $4.9 billion of our non-export credit facilities and $6.3 billion of our export credit facilities, and certain credit card processing agreements, to extend the waiver of our financial covenants through and including at least the third quarter of 2022, and subsequently in the third quarter of 2021, we entered into a letter agreement to extend the waiver period for our export credit facilities to the end of the fourth quarter of 2022. During the fourth quarter of 2021, we amended $7.3 billion of outstanding export-credit facilites plus committed export-credit facilities to

modify financial covenant levels for 2023 and 2024, following the waiver period through and including the fourth quarter of 2022.

The amendments impose a monthly-tested minimum liquidity covenant of $350.0 million, which in the case of the non-export credit facilities terminates at the end of the waiver period and in the case of the export credit facilities terminates either in July 2025, or when we pay off all deferred amounts, whichever is earlier. In addition, the amendments to the non-export credit facilities place restrictions on paying cash dividends and effectuating share repurchases through the end of the third quarter of 2022, while the export credit facility amendments require us to prepay any deferred amounts if we elect to issue dividends or complete share repurchases. As of December 31, 2021, we were in compliance with the applicable minimum liquidity covenant and we estimate that we will be in compliance for at least the next twelve months.

Any further covenant waivers may lead to increased costs, increased interest rates, additional restrictive covenants and other available lender protections as may be agreed with our lenders. There can be no assurance that we would be able to obtain additional waivers in a timely manner, or on acceptable terms. If we require additional waivers and are not able to obtain them or repay the debt facilities, this would lead to an event of default and potential acceleration of amounts due under all of our outstanding debt and derivative contracts.

*Dividends*

During the first quarter of 2020 we declared a cash dividend on our common stock of $0.78 per share which was paid in the second quarter of 2020.

During the second quarter of 2020, we agreed with certain of our lenders not to pay dividends or engage in common stock repurchases for so long as our debt covenant waivers are in effect. In addition, in the event we declare a dividend or engage in share repurchases, we will need to repay the amounts deferred under our export credit facilities. Accordingly, we did not declare a dividend during the seventh consecutive quarters ending December 31, 2021. Pursuant to amendments made to these agreements during the first quarter of 2021, the restrictions on paying cash dividends and effectuating share repurchases were extended through and including the third quarter of 2022.

**Item 7A.    Quantitative and Qualitative Disclosures About Market Risk**

**Financial Instruments and Other**

*General*

We are exposed to market risk attributable to changes in interest rates, foreign currency exchange rates and fuel prices. We try to mitigate these risks through a combination of our normal operating and financing activities and through the use of derivative financial instruments pursuant to our hedging practices and policies. The financial impact of these hedging instruments is primarily offset by corresponding changes in the underlying exposures being hedged. We achieve this by closely matching the amount, term and conditions of the derivative instrument with the underlying risk being hedged. Although certain of our derivative financial instruments do not qualify or are not accounted for under hedge accounting, our objective is not to hold or issue derivative financial instruments for trading or other speculative purposes. Refer to Note 16. *Fair Value Measurements and Derivative Instruments* to our consolidated financial statements under Item 8. *Financial Statements and Supplementary Data.*

*Interest Rate Risk*

Our exposure to market risk for changes in interest rates relates to our long-term debt obligations including future interest payments. At December 31, 2021, approximately 65.7% of our long-term debt was effectively fixed as compared to 64.5% as of December 31, 2020. We use interest rate swap agreements to modify our exposure to interest rate movements and to manage our interest expense.

Market risk associated with our long-term fixed rate debt is the potential increase in fair value resulting from a decrease in interest rates. We use interest rate swap agreements that effectively convert a portion of our fixed-rate debt to a floating-rate basis to manage this risk. At December 31, 2021, we maintained interest rate swap agreements on the following fixed-rate debt instruments:

| Debt Instrument | Swap Notional as of December 31, 2021 (In thousands) | Maturity | Debt Fixed Rate | Swap Floating Rate: LIBOR plus | All-in Swap Floating Rate as of December 31, 2021 |
|---|---|---|---|---|---|
| Unsecured senior notes | 650,000 | November 2022 | 5.25% | 3.63% | 3.79% |
| | $ 650,000 | | | | |

These interest rate swap agreements are accounted for as fair value hedges.

The estimated fair value of our long-term fixed-rate debt at December 31, 2021 was $13.7 billion, using quoted market prices, where available, or using the present value of expected future cash flows which incorporates risk profile. The fair value of our fixed to floating interest rate swap agreements was estimated to be an asset of $7.7 million as of December 31, 2021, based on the present value of expected future cash flows. A hypothetical one percentage point decrease in interest rates at December 31, 2021 would increase the fair value of our hedged and unhedged long-term fixed-rate debt by approximately $105.3 million and would increase the fair value of our fixed to floating interest rate swap agreements by approximately $5.0 million.

Market risk associated with our long-term floating-rate debt is the potential increase in interest expense from an increase in interest rates. We use interest rate swap agreements that effectively convert a portion of our floating-rate debt to a fixed-rate basis to manage this risk. A hypothetical one percentage point increase in interest rates would increase our forecasted 2022 interest expense by approximately $48.7 million, assuming no change in foreign currency exchange rates.

51

At December 31, 2021, we maintained interest rate swap agreements on the following floating-rate debt instruments:

| Debt Instrument | | Swap Notional as of December 31, 2021 (In thousands) | Maturity | Debt Floating Rate | | All-in Swap Fixed Rate |
|---|---|---|---|---|---|---|
| *Celebrity Reflection* term loan | $ | 163,625 | October 2024 | LIBOR plus | 0.40% | 2.85% |
| *Quantum of the Seas* term loan | | 306,250 | October 2026 | LIBOR plus | 1.30% | 3.74% |
| *Anthem of the Seas* term loan | | 332,292 | April 2027 | LIBOR plus | 1.30% | 3.86% |
| *Ovation of the Seas* term loan | | 449,583 | April 2028 | LIBOR plus | 1.00% | 3.16% |
| *Harmony of the Seas* term loan [1] | | 427,142 | May 2028 | EURIBOR plus | 1.15% | 2.26% |
| *Odyssey of the Seas* term loan [2] | | 421,667 | October 2032 | LIBOR plus | 0.96% | 3.21% |
| *Odyssey of the Seas* term loan [2] | | 191,667 | October 2032 | LIBOR plus | 0.96% | 2.84% |
| | $ | 2,292,226 | | | | |

_____

(1) Interest rate swap agreements hedging the Euro-denominated term loan for *Harmony of the Seas* include EURIBOR zero-floors matching the hedged debt EURIBOR zero-floor. Amount presented is based on the exchange rate as of December 31, 2021.

(2) Interest rate swap agreements hedging the term loan of *Odyssey of the Seas* include LIBOR zero-floors matching the debt LIBOR zero-floor. The effective dates of the $421.7 million and $191.7 million interest rate swap agreements are October 2020 and October 2022, respectively. The unsecured term loan for the financing of *Odyssey of the Seas* was drawn on March 2021.

These interest rate swap agreements are accounted for as cash flow hedges.

The fair value of our floating to fixed interest rate swap agreements was estimated to be a liability of $70.7 million as of December 31, 2021 based on the present value of expected future cash flows. These interest rate swap agreements are accounted for as cash flow hedges.

*Foreign Currency Exchange Rate Risk*

Our primary exposure to foreign currency exchange rate risk relates to our ship construction contracts denominated in Euros, our foreign currency denominated debt and our international business operations. On a regular basis, we enter into foreign currency forward contracts and, from time to time, we utilize cross-currency swap agreements and collar options to manage portions of the exposure to movements in foreign currency exchange rates.

The estimated fair value, as of December 31, 2021, of our Euro-denominated forward contracts associated with our ship construction contracts was a liability of $122.5 million, based on the present value of expected future cash flows. As of December 31, 2021, the aggregate cost of our ships on order, not including ships on order by our Partner Brands, was approximately $12.4 billion, of which we had deposited $800.2 million as of such date. Approximately 59.0% of the aggregate cost of the ships under construction was exposed to fluctuations in the Euro exchange rate at December 31, 2021 and 2020, respectively. A hypothetical 10% strengthening of the Euro as of December 31, 2021, assuming no changes in comparative interest rates, would result in a $730.4 million increase in the United States dollar cost of the foreign currency denominated ship construction contracts exposed to fluctuations in the Euro exchange rate. Our foreign currency forward contract agreements are accounted for as cash flow hedges.

Our international business operations subject us to foreign currency exchange risk. We transact business in many different foreign currencies and maintain investments in foreign operations which may expose us to financial market risk resulting from fluctuations in foreign currency exchange rates. Movements in foreign currency exchange rates may affect the value of our earnings in foreign currencies and cash flows. We manage most of this exposure on a consolidated basis, which allows us to take advantage of any natural offsets. Therefore, weakness in one particular currency might be offset by strengths in other currencies over time. The extent to which one currency is effective as a natural offset of another currency fluctuates over time. In addition, some foreign currency exposures have little to no mitigating natural offsets available.

We consider our investments in our foreign operations to be denominated in relatively stable currencies and of a long-term nature. As of December 31, 2021, we maintained a foreign currency forward contract and designated it as a hedge of a portion of our net investment in TUI Cruises of €245.0 million, or approximately $278.6 million based on the exchange rate at December 31, 2021. This forward currency contract matures in April 2022.

We also address the exposure of our investments in foreign operations by denominating a portion of our debt in our subsidiaries' and investments' functional currencies and designating it as a hedge of these subsidiaries and investments. We had designated debt as a hedge of our net investments primarily in TUI Cruises of approximately €97.0 million, or approximately $110.3 million, through December 31, 2021. As of December 31, 2020, we had designated debt as a hedge of our net investments primarily in TUI Cruises of approximately €215.0 million, or approximately $263.0 million.

We have included net gains of approximately $47.7 million and $22.1 million of foreign-currency transaction remeasurement and changes in the fair value of derivatives in the foreign currency translation adjustment component of *Accumulated other comprehensive loss* at December 31, 2021 and 2020, respectively.

On a regular basis, we enter into foreign currency forward contracts and, from time to time, we utilize cross-currency swap agreements and collar options to minimize the volatility resulting from the remeasurement of net monetary assets and liabilities denominated in a currency other than our functional currency or the functional currencies of our foreign subsidiaries. During 2021, we maintained an average of approximately $483.2 million of these foreign currency forward contracts. These instruments are not designated as hedging instruments. For the years ended December 31, 2021, 2020 and 2019 changes in the fair value of the foreign currency forward contracts resulted in gains (losses) of approximately $(30.9) million, $(19.0) million and $1.4 million, respectively, which offset gains (losses) arising from the remeasurement of monetary assets and liabilities denominated in foreign currencies in those same years of $24.3 million, $(1.5) million and $0.4 million, respectively. These changes were recognized in earnings within *Other income (expense)* in our consolidated statements of comprehensive income (loss).

*Fuel Price Risk*

Our exposure to market risk for changes in fuel prices relates primarily to the consumption of fuel on our ships. Fuel cost, net of the financial impact of fuel swap agreements, as a percentage of our total revenues, was approximately 25.1% in 2021, 16.8% in 2020 and 6.4% in 2019. We use fuel swap agreements to mitigate the financial impact of fluctuations in fuel prices.

As of December 31, 2021, we had fuel swap agreements to pay fixed prices for fuel with an aggregate notional amount of approximately $527.3 million, maturing through 2023. These fuel swap agreements are generally accounted for as cash flow hedges. The fuel swap agreements designated as hedges of projected fuel purchases represented 54% of our projected 2022 fuel requirements and 15% of our projected 2023 fuel requirements. The prior suspension of our cruise operations due to the COVID-19 pandemic and our gradual resumption of cruise operations has resulted in reductions to our forecasted fuel purchases. As of December 31, 2021, the Company had outstanding fuel swaps of 231,900 metric tons, maturing in 2022, that do not hedge forecasted fuel consumption. Of these swaps, 115,950 metric tons relate to fuel swap agreements with discontinued hedge accounting, in which we effectively pay fixed prices for our fuel purchases and receive floating prices from the counterparty. The remaining 115,950 tons relate to fuel swap agreements that were not designated as hedges since inception, in which we effectively pay floating prices for our fuel purchases and receive fixed prices from the counterparty. The estimated fair value of our fuel swap agreements at December 31, 2021 was estimated to be an asset of $40.3 million. We estimate that a hypothetical 10% increase in our weighted-average fuel price from that experienced during the year ended December 31, 2021 would increase our forecasted 2022 fuel cost by approximately $50.0 million, net of the impact of fuel swap agreements.

**Item 8.   Financial Statements and Supplementary Data**

Our Consolidated Financial Statements are included beginning on page F-1 of this report.

**Item 9.   Changes In and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

Table of Contents

**Item 9A.   Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our President and Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures, as such term is defined in Exchange Act Rule 13a-15(e), as of the end of the period covered by this report. Based upon such evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that those controls and procedures are effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's (the "SEC") rules and forms.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our management, with the participation of our President and Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting based on the *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2021.

The effectiveness of our internal control over financial reporting as of December 31, 2021 has been audited by PricewaterhouseCoopers LLP, the independent registered public accounting firm that audited our consolidated financial statements included in this Annual Report on Form 10-K, as stated in its report, which is included herein on page F-2.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Exchange Act Rule 13a-15(d) during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system will be met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there is only reasonable assurance that our controls will succeed in achieving their goals under all potential future conditions.

**Item 9B.   Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

Table of Contents

**PART III**

**Items 10, 11, 12, 13 and 14. Directors, Executive Officers and Corporate Governance; Executive Compensation; Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters; Certain Relationships and Related Transactions; and Director Independence and Principal Accountant Fees and Services.**

Except for information concerning executive officers (called for by Item 401(b) of Regulation S-K), which is included in Part I of this Annual Report on Form 10-K, the information required by Items 10, 11, 12, 13 and 14 is incorporated herein by reference to certain sections of the Royal Caribbean Cruises Ltd. Definitive Proxy Statement relating to our 2022 Annual Meeting of Shareholders (the "Proxy Statement") to be filed with the Securities and Exchange Commission no later than 120 days after the close of the fiscal year. Please refer to the following sections in the Proxy Statement for more information: *"Corporate Governance"*; *"Proposal 1—Election of Directors"*; *"Certain Relationships and Related Person Transactions"*; *"Delinquent Section 16(a) Reports"*; *"Executive Compensation"*; *"Security Ownership of Certain Beneficial Owners and Management"*; and *"Proposal 3—Ratification of Principal Independent Registered Public Accounting Firm."* Copies of the Proxy Statement will become available when filed through our Investor Relations website at www.rclcorporate.com (please see "Financial Reports" under "Financial Information"); by contacting our Investor Relations department at 1050 Caribbean Way, Miami, Florida 33132—telephone (305) 982-2625; or by visiting the SEC's website at www.sec.gov.

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees, including our executive officers, and our directors. A copy of the Code of Business Conduct and Ethics is posted in the corporate governance section of our website at www.rclcorporate.com and is available in print, without charge, to shareholders upon written request to our Corporate Secretary at Royal Caribbean Cruises, Ltd., 1050 Caribbean Way, Miami, Florida 33132. Any amendments to the code or any waivers from any provisions of the code granted to executive officers or directors will be promptly disclosed to investors by posting on our website at www.rclcorporate.com. None of the websites referenced in this Annual Report on Form 10-K or the information contained therein is incorporated herein by reference.

PART IV

**Item 15.   Exhibits and Financial Statement Schedules**

(a)(1)  Financial Statements

Our Consolidated Financial Statements have been prepared in accordance with Item 8. *Financial Statements and Supplementary Data* and are included beginning on page F-1 of this report.

(1)  Financial Statement Schedules

None.

(1)  Exhibits

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 3.1 | Restated Articles of Incorporation of the Company, as amended (composite) | S-3 | 3.1 | 3/23/2009 |
| 3.2 | Amended and Restated By-Laws of the Company, as amended | 8-K | 3.1 | 2/11/2022 |
| 4.1 | Indenture dated as of July 15, 1994, by and between the Company, as issuer, and The Bank of New York Trust Company, N.A., successor to NationsBank of Georgia, National Association, as Trustee | 20-F | 2.4 | 12/31/1994 |
| 4.2 | Sixth Supplemental Indenture dated as of October 14, 1997, to the Indenture, dated as of July 15, 1994, by and between the Company, as issuer, and The Bank of New York Trust Company, N.A., as Trustee | 20-F | 2.11 | 12/31/1997 |
| 4.3 | Eighth Supplemental Indenture dated as of March 16, 1998, to the Indenture, dated as of July 15, 1994, by and between the Company, as issuer, and The Bank of New York Trust Company, N.A., as Trustee | 20-F | 2.13 | 12/31/1997 |
| 4.4 | Form of Indenture, dated as of July 31, 2006, by and between the Company, as issuer, and The Bank of New York Trust Company, N.A., as Trustee | S-3 | 4.1 | 7/31/2006 |
| 4.5 | Second Supplemental Indenture dated as of November 7, 2012 between the Company, as issuer, and The Bank of New York Mellon Trust Company, N.A., as Trustee | 8-K | 4.1 | 11/7/2012 |
| 4.6 | Third Supplemental Indenture, dated as of November 28, 2017 between the Company, as issuer, and The Bank of New York Mellon Trust Company, N.A., as Trustee | 8-K | 4.1 | 11/28/2017 |
| 4.7 | Description of the Company's Securities | 10-K | 4.10 | 12/31/2020 |
| 4.8 | Indenture, dated May 19, 2020, among the Company, the guarantors named therein, and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent, registrar and security agent. | 8-K | 4.1 | 5/19/2020 |
| 4.9 | Indenture, dated June 9, 2020, among the Company, RCI Holdings LLC, a limited liability company formed and existing under the laws of Liberia and a direct wholly-owned subsidiary of the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent, registrar and security agent. | 8-K | 4.1 | 6/9/2020 |
| 4.10 | Indenture, dated June 9, 2020, among the Company, and The Bank of New York Mellon Trust Company, N.A., as trustee, paying agent, registrar, custodian and conversion agent. | 8-K | 4.2 | 6/9/2020 |
| 4.11 | Indenture, dated October 16, 2020, between the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, paying agent, registrar, custodian and conversion agent. | 8-K | 4.1 | 10/16/2020 |
| 4.12 | Indenture, dated March 29, 2021, among the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent, registrar and security agent | 8-K | 4.1 | 3/30/2021 |

| Exhibit Number | | Incorporated By Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date/ Period End Date |
| 4.13 | Indenture, dated June 24, 2021, among the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent and registrar | 8-K | 4.1 | 6/24/2021 |
| 4.14 | Indenture, dated August 19, 2021, among the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent and registrar | 8-K | 4.1 | 8/19/2021 |
| 4.15 | Indenture, dated January 7, 2022, among the Company and The Bank of New York Mellon Trust Company, N.A., as trustee, principal paying agent, transfer agent and registrar | 8-K | 4.1 | 1/7/2022 |
| 10.1 | Amended and Restated Registration Rights Agreement dated as of July 30, 1997, by and among the Company, A. Wilhelmsen AS., Cruise Associates, Monument Capital Corporation, Archinav Holdings, Ltd. and Overseas Cruiseship, Inc. | 20-F | 2.20 | 12/31/1997 |
| 10.2 | Amendment to the Credit Agreement, dated as of December 4, 2017, by and among the Company, the various financial institutions as are or shall become parties thereto and The Bank of Nova Scotia, as administrative agent for the lender parties | 8-K | 10.1 | 12/7/2017 |
| 10.3 | Amendment to the Credit Agreement, dated as of April 5, 2019, among Royal Caribbean Cruises Ltd., the various financial institutions as are or shall become parties thereto and The Bank of Nova Scotia, as administrative agent for the lender parties | 8-K | 10.1 | 4/10/2019 |
| 10.4 | Amendment No. 4 to Hull No. S-697 Credit Agreement, dated as of February 2, 2016, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-K | 10.7 | 12/31/2015 |
| 10.5 | Amendment No. 5 to Hull No. S-697 Credit Agreement, dated as of July 3, 2018, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-Q | 10.4 | 6/30/2018 |
| 10.6 | Amendment No. 4 to Hull No. S-698 Credit Agreement, dated as of February 3, 2016, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-K | 10.8 | 12/31/2015 |
| 10.7 | Amendment No. 5 to Hull No. S-698 Credit Agreement, dated as of July 3, 2018, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-Q | 10.5 | 6/30/2018 |
| 10.8 | Amendment No. 1 to Hull No. S-699 Credit Agreement, dated as of March 31, 2016, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-Q | 10.1 | 3/31/2016 |
| 10.9 | Amendment No. 2 to Hull No. S-699 Credit Agreement, dated as of July 3, 2018, by and between the Company, the Lenders from time to time party thereto, the Mandated Lead Arrangers and KfW IPEX-Bank GmbH, as Hermes Agent and Facility Agent | 10-Q | 10.6 | 6/30/2018 |
| 10.10 | Amendment and Restatement Agreement, dated as of January 15, 2016, in respect of a Facility Agreement dated, as of July 9, 2013, by and between the Company, the Lenders from time to time party thereto, Société Générale, as Facility Agent and Mandated Lead Arranger, BNP Paribas, as Documentation Bank and Mandated Lead Arranger, and HSBC France, as Mandated Lead Arranger | 10-K | 10.10 | 12/31/2015 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.11 | Amendment and Restatement Agreement, dated as of August 15, 2019, in respect of a Facility Agreement dated, as of July 9, 2013, by and between the Company, the Lenders from time to time party thereto, Société Générale, as Facility Agent and Mandated Lead Arranger, BNP Paribas, as Documentation Bank and Mandated Lead Arranger, and HSBC France, as Mandated Lead Arranger | 10-Q | 10.1 | 10/30/2019 |
| 10.12 | Hull No. B34 Credit Agreement, dated as of January 30, 2015, as novated, amended and restated on the Actual Delivery Date pursuant to a novation agreement dated January 30, 2015 (as amended) between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch, Citibank Europe plc, UK Branch, and the banks and financial institutions as lender parties thereto | 10-Q | 10.1 | 3/31/2018 |
| 10.13 | Hull No. S-700 Credit Agreement, dated as of November 13, 2015, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 8-K | 10.1 | 11/19/2015 |
| 10.14 | Amendment No. 1 to Hull No. S-700 Credit Agreement, dated as of November 13, 2015, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 10-Q | 10.7 | 6/30/2018 |
| 10.15 | Amendment No. 2 to Hull No. S-700 Credit Agreement, dated as of July 3, 2018, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 10-Q | 10.8 | 6/30/2018 |
| 10.16 | Hull No. S-713 Credit Agreement, dated as of November 13, 2015, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 8-K | 10.2 | 11/19/2015 |
| 10.17 | Amendment No. 1 to Hull No. S-713 Credit Agreement, dated as of September 7, 2016, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 10-Q | 10.9 | 6/30/2018 |
| 10.18 | Amendment No. 2 to Hull No. S-713 Credit Agreement, dated as of July 3, 2018, by and among the Company, the Lenders from time to time party thereto and KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent and Initial Mandated Lead Arranger | 10-Q | 10.10 | 6/30/2018 |
| 10.19 | Hull No. J34 Credit Agreement, dated as of June 22, 2016, as novated, amended and restated on the Actual Delivery Date pursuant to a novation agreement dated June 22, 2016 (as amended), between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch, Citibank Europe plc, UK Branch, and the banks and financial institutions as lender parties thereto | 10-K | 10.18 | 12/31/2018 |
| 10.20 | Novation Agreement, dated as of June 22, 2016, by and between Azaïremia Finance Ltd., Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch and the banks and financial institutions as lender parties thereto | 8-K | 10.2 | 6/28/2016 |
| 10.21 | First Supplemental Agreement, dated as of October 5, 2018, relating to Hull No. K34 and the Novation Agreement, dated as of June 22, 2016, by and between Azaïremia Finance Ltd., Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch, and the banks and financial institutions as lender parties thereto | 10-K | 10.20 | 12/31/2018 |
| 10.22 | Novation Agreement, dated as of July 24, 2017, between Hibisyeu Finance Ltd., Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch and the banks and financial institutions as lender parties thereto | 8-K | 10.1 | 7/28/2017 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.23 | Novation Agreement, dated as of July 24, 2017, between Hoediscus Finance Ltd., Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch and the banks and financial institutions as lender parties thereto | 8-K | 10.2 | 7/28/2017 |
| 10.24 | Novation Agreement, dated as of July 24, 2017, between Houatorris Finance Ltd., Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch and the banks and financial institutions as lender parties thereto | 8-K | 10.3 | 7/28/2017 |
| 10.25 | Novation Agreement, dated as of December 13, 2019, between Palmeraie Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch HSBC France, Banco Santander S.A., Banco Bilbao Vizcaya Argentaria S.A., Paris Branch, BNP Paribas SA, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch, Société Générale, Unicredit Bank AG and the banks and financial institutions as lender parties thereto | 8-K | 10.1 | 12/18/2019 |
| 10.26 | Icon 1 Hull No. S-1400 Credit Agreement, dated as of October 11, 2017, between Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent, Documentation Agent and Initial Mandated Lead Arranger and BNP Paribas Fortis SA/NV as Finnvera Agent | 8-K | 10.1 | 10/17/2017 |
| 10.27 | Amendment No. 1 to Icon 1 Hull No. S-1400 Credit Agreement, dated as of July 3, 2018, between Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent, Documentation Agent and Initial Mandated Lead Arranger and BNP Paribas Fortis SA/NV as Finnvera Agent | 10-Q | 10.11 | 6/30/2018 |
| 10.28 | Icon 2 Hull No. S-1401 Credit Agreement, dated as of October 11, 2017, between Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent, Documentation Agent and Initial Mandated Lead Arranger and BNP Paribas Fortis SA/NV as Finnvera Agent | 8-K | 10.2 | 10/17/2017 |
| 10.29 | Amendment No. 1 to Icon 2 Hull No. S-1401 Credit Agreement, dated as of July 3, 2018, between Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, KfW IPEX-Bank GmbH, as Hermes Agent, Facility Agent, Documentation Agent and Initial Mandated Lead Arranger and BNP Paribas Fortis SA/NV as Finnvera Agent | 10-Q | 10.12 | 6/30/2018 |
| 10.30 | Icon 3 Hull No. 1402 Credit Agreement, dated as of December 18, 2019, between Royal Caribbean Cruises Ltd., as the Borrower, KfW IPEX-Bank GmbH, as Facility Agent CIRR Agent, Documentation Agent, Hermes Agent, Initial Mandated Lead Arranger and Sole Bookrunner, and the Lenders and Residual Risk Guarantors from time to time party thereto | 8-K | 10.1 | 12/20/2019 |
| 10.31 | Loan Agreement, dated as of June 29, 2018, among Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, and JP Morgan Chase Bank, N.A. as Administrative Agent and Bank of America, N.A., Citigroup Global Markets Limited, Goldman Sachs Bank USA and Morgan Stanley Senior Funding Inc. as Co-Syndication Agents | 8-K | 10.1 | 7/5/2018 |
| 10.32 | Loan Agreement, dated as of April 5, 2019, among Royal Caribbean Cruises Ltd., as the Borrower, the Lenders from time to time party thereto, Bank of America, N.A., as Administrative Agent and Banco Bilbao Vizcaya Argentaria, S.A. New York Branch, Sumitomo Mitsui Banking Corporation, The Bank of Nova Scotia, Wells Fargo Bank, National Association and DNB Markets Inc. as Co-Syndication Agents | 8-K | 10.2 | 4/10/2019 |
| 10.33 | Commercial Paper Dealer Agreement, dated June 14, 2018, between Royal Caribbean Cruises Ltd., as issuer, and the dealer party thereto | 8-K | 10.1 | 6/18/2018 |

| Exhibit Number | | Form | Exhibit | Filing Date/ Period End Date |
|---|---|---|---|---|
| | | | **Incorporated By Reference** | |
| 10.34 | Term Loan Agreement, dated as of March 23, 2020, among Royal Caribbean Cruises Ltd., the various financial institutions as are or shall be party thereto and Morgan Stanley Senior Funding, Inc., as administrative agent for the lender parties and as collateral agent for the secured parties | 8-K | 10.1 | 3/23/2020 |
| 10.35 | Sixth Amendment to a Credit Agreement, dated as of June 8, 2011 (as amended and restated from time to time) "Anthem of the Seas" – ex Hull No. S-698, dated April 8, 2020, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arrangers and the mandated lead arrangers | 8-K | 10.1 | 4/10/2020 |
| 10.36 | Third Amendment Agreement to a Credit Agreement, dated as of 13 November 2015 (as amended and restated from time to time) "Spectrum of the Seas" – ex Hull No. S-700, dated April 8, 2020, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arrangers and the mandated lead arrangers | 8-K | 10.2 | 4/10/2020 |
| 10.37 | Sixth Amendment to a Credit Agreement, dated as of June 8, 2011 (as amended from time to time) "Quantum of the Seas"—ex Hull No. S-697, dated April 21, 2020 between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arrangers and the mandated lead arrangers | 8-K | 10.1 | 4/24/2020 |
| 10.38 | Second Supplemental Agreement to a Credit Agreement in respect of the financing of acquisition of m.v. Celebrity Edge (ex hull no. J34), dated as of April 28, 2020, between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch as global coordinator, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch as ECA agent, Citibank Europe PLC, UK branch as facility agent, the mandated lead arrangers and the other lenders party thereto | 8-K | 10.1 | 5/4/2020 |
| 10.39 | Second Supplemental Agreement to a Credit Agreement in respect of the financing of acquisition of m.v. Celebrity Apex (ex hull no. K34), dated as of April 29, 2020, between Royal Caribbean Cruises Ltd., Citibank N.A., London Bank, as global coordinator, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch as ECA agent, Citibank Europe PLC, UK Branch as facility agent, the mandated lead arrangers and the other lenders party thereto | 8-K | 10.2 | 5/4/2020 |
| 10.40 | Fourth Supplemental Agreement to a Credit Agreement in respect of the financing of acquisition of m.v. Symphony of the Seas (ex hull no. B34), dated as of April 29, 2020, between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch as ECA agent, Citibank Europe PLC, UK Branch as facility agent, the mandated lead arrangers and the other lenders party thereto | 8-K | 10.3 | 5/4/2020 |
| 10.41 | Amendment to the Amended and Restated Credit Agreement, dated as of May 7, 2020, among Royal Caribbean Cruises Ltd., the various financial institutions party thereto and The Bank of Nova Scotia as administrative agent | 8-K | 10.2 | 5/11/2020 |
| 10.42 | Third Amendment Agreement to a Credit Agreement dated as of 27 November 2013 (as amended and restated from time to time) "Ovation of the Seas" – ex hull no S-699, dated May 6, 2020, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arrangers and the mandated lead arrangers | 8-K | 10.4 | 5/11/2020 |
| 10.43 | Fourth Amendment and Restatement Agreement, relating to a credit agreement in respect of the financing of the acquisition of m.v. Harmony of the Seas (ex hull no. A34), dated May 6, 2020, between Royal Caribbean Cruises Ltd., Société Générale as facility agent, BNP Baribas, HSBC France and Société Générale as Mandated Lead Arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.5 | 5/11/2020 |

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.44 | First Supplemental Agreement relating to Hull No. L34 at Chantiers de l'Atlantique (previously known as STX France S.A.), dated as of March 12, 2020, by and among Houatorris Finance Limited, Chantiers de L'Atlantique, the Company, Citibank Europe PLC, UK Branch as facility agent, Citicorp Trustee Company Limited as security trustee, Citibank N.A., London branch, HSBC France, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch and the banks and financial institutions party thereto | 10-Q | 10.4 | 5/21/2020 |
| 10.45 | First Supplemental Agreement relating to Hull No. M34 at Chantiers de l'Atlantique (previously known as STX France S.A.), dated as of March 12, 2020, by and among Hoediscus Finance Limited, Chantiers de L'Atlantique as seller, the Company as buyer, Citibank Europe PLC, UK Branch as facility agent, Citicorp Trustee Company Limited as security trustee, Citibank N.A., London branch as global coordinator, HSBC France as French coordinating bank, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch as ECA agent and the banks and financial institutions listed thereto | 10-Q | 10.5 | 5/21/2020 |
| 10.46 | First Supplemental Agreement relating to Hull No. C34 at Chantiers de l'Atlantique (previously known as STX France S.A.), dated as of March 12, 2020, by and among Hibisyeu Finance Limited as borrower, Chantiers de L'Atlantique as seller, the Company as buyer, Citibank Europe PLC, UK Branch as facility agent, Citicorp Trustee Company Limited as security trustee, Citibank N.A., London branch as global coordinator, HSBC France as French coordinating bank, Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch as ECA agent and the banks and financial institutions listed thereto | 10-Q | 10.6 | 5/21/2020 |
| 10.47 | Amendment to the Amended and Restated Credit Agreement, dated as of July 28, 2020, among Royal Caribbean Cruises Ltd., the various financial institutions party thereto and The Bank of Nova Scotia as administrative agent | 8-K | 10.2 | 8/3/2020 |
| 10.48 | Financial Covenant Waiver Extension Consent Letter relating to the Cruise Debt Holiday Principles, dated July 28, 2020, among Royal Caribbean Cruises Ltd., Silversea Cruise Holdings Ltd. and KfW IPEX-Bank GmbH | 8-K | 10.4 | 8/3/2020 |
| 10.49 | Supplemental Agreement in relation to the extension of the waiver period for financial covenants in respect of the financing of the acquisition of Celebrity Edge (ex hull no. J34), dated July 28, 2020, among Royal Caribbean Cruises Ltd. and Citibank Europe plc, UK Branch | 8-K | 10.5 | 8/3/2020 |
| 10.50 | Supplemental Agreement in relation to the extension of the waiver period for financial covenants in respect of the financing of the acquisition of Celebrity Apex (ex hull no. K34), dated July 28, 2020, among Royal Caribbean Cruises Ltd. and Citibank Europe plc, UK Branch | 8-K | 10.6 | 8/3/2020 |
| 10.51 | Supplemental Agreement in relation to the extension of the waiver period for financial covenants in respect of the financing of the acquisition of Symphony of the Seas (ex hull no. B34), dated July 28, 2020, among Royal Caribbean Cruises Ltd. and Citibank Europe plc, UK Branch | 8-K | 10.7 | 8/3/2020 |
| 10.52 | Financial Covenant Waiver Extension Consent Letter relating to the Cruise Debt Holiday Principles, dated July 31, 2020, between Royal Caribbean Cruises Ltd. and KfW IPEX-Bank GmbH | 8-K | 10.8 | 8/3/2020 |
| 10.53 | Third Amendment Agreement to a Credit Agreement dated as of 13 November 2015 (as amended and restated from time to time) in respect of "Odyssey of the Seas" – Hull S-713, dated 30 April 2020, between the Company, the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arranger and the mandated lead arrangers. | 10-Q | 10.15 | 8/10/2020 |
| 10.54 | Amendment Letter, dated May 11, 2020 in respect of the Icon 3 Hull No. 1402 credit agreement, dated 18 December 2019 between the Company, the lenders and residual risk guarantors party thereto, and KfW IPEX-Bank GmbH as facility agent, CIRR agent, documentation agent, Hermes agent, initial mandated lead arranger and sole bookrunner. | 10-Q | 10.16 | 8/10/2020 |

| Exhibit Number | | Form | Exhibit | Filing Date/ Period End Date |
|---|---|---|---|---|
| | | **Incorporated By Reference** | | |
| 10.55 | Supplemental Agreement in relation to the extension of the waiver period for financial covenants in the EUR Facility Agreement in respect of m.v Harmony of the Seas, dated August 4, 2020, among the Company and Société Generale. | 10-Q | 10.17 | 8/10/2020 |
| 10.56 | Supplemental Agreement in relation to the extension of the waiver period for financial covenants in the EUR Facility Agreement in respect of m.v Harmony of the Seas, dated August 4, 2020, among the Company and Societe Generale. | 10-Q | 10.9 | 11/4/2020 |
| 10.57 | Supplemental Agreement in relation to certain amendments in connection with the Silversea negative covenants and the exercise of the Buyer's Stretch Option in respect of Edge 3 (ex. hull no. L34), dated August 29, 2020, among the Company, Hoediscus Finance Limited, Citibank Europe Plc, UK Branch, Citibank N.A., London Branch, Citicorp Trustee Company Limited, HSBC France and Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch | 10-Q | 10.10 | 11/4/2020 |
| 10.58 | Supplemental Agreement in relation to certain amendments in connection with the Silversea negative covenants and the exercise of the Buyer's Stretch Option in respect of Edge 4 (ex. hull no. M34), dated August 29, 2020, by and among the Company, Hoediscus Finance Limited, Citibank Europe Plc, UK Branch, Citibank N.A., London Branch, Citicorp Trustee Company Limited, HSBC France and Sumitomo Mitsui Banking Corporation Europe Limited, Paris Branch | 10-Q | 10.11 | 11/4/2020 |
| 10.59 | Supplemental Agreement in relation to certain amendments in connection with Silversea Cruise Holding Ltd. in respect of Oasis 5 (ex. hull no. C34), dated August 29, 2020, among the Company, Hibiseu Finance Limited, Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch and HSBC France | 10-Q | 10.12 | 11/4/2020 |
| 10.60 | Supplemental Agreement in relation to certain amendments in connection with Silversea Cruise Holding Ltd. in respect of Oasis 6 (ex. hull no. A35), dated August 29, 2020, among the Company, Palmeraie Finance Limited, Citibank Europe Plc, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch and HSBC France | 10-Q | 10.13 | 11/4/2020 |
| 10.61 | Equity Distribution Agreement, dated as of December 3, 2020, among the Company and the financial institutions named therein | 8-K | 1.1 | 12/4/2020 |
| 10.62 | Fourth Supplemental Agreement relating to a credit agreement in respect of the financing of the acquisition of m.v. Celebrity Edge (ex hull no. I34), dated as of October 30, 2020, between Royal Caribbean Cruises Limited, Citibank N.A., London Branch, SMBC Bank International PLC, Citibank Europe PLC, UK Branch, the mandated lead arrangers and the banks and financial institutions party thereto as lenders | 10-K | 10.68 | 12/31/2020 |
| 10.63 | Fourth Supplemental Agreement relating to a credit agreement in respect of the financing of the acquisition of m.v. Celebrity Apex (ex hull no. K34), dated as of October 30, 2020, between Royal Caribbean Cruises Limited, Citibank N.A., London Branch, SMBC Bank International PLC, Citibank Europe PLC, UK Branch, the mandated lead arrangers and the banks and financial institutions party thereto as lenders | 10-K | 10.69 | 12/31/2020 |
| 10.64 | Fifth Amendment and Restatement Agreement relating to a credit agreement in respect of the financing of the acquisition of m.v. Harmony of the Seas (ex hull no. A34)(EUR Facility), dated October 30, 2020, between Royal Caribbean Cruises Ltd., Société Générale, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.70 | 12/31/2020 |
| 10.65 | Fourth Amendment and Restatement Agreement relating to a credit agreement in respect of the financing of m.v. Harmony of the Seas (ex hull no. A34)(USD Facility), dated October 30, 2020, between Royal Caribbean Cruises Ltd., Société General, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.71 | 12/31/2020 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.66 | Sixth Supplemental Agreement relating to a credit agreement in respect of the financing of the acquisition of m.v. Symphony of the Seas (ex hull no. B34), dated as of October 30, 2020, between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch, Citibank Europe PLC, UK Branch, the mandated lead arrangers listed therein and the banks and financial institutions party thereto as lenders | 10-K | 10.72 | 12/31/2020 |
| 10.67 | Supplemental Agreement relating to a secured credit facility agreement for Hull No. L34 at Chantiers l'Atlantique S.A., dated November 13, 2020, between Hoediscus Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.73 | 12/31/2020 |
| 10.68 | Supplemental Agreement relating to a secured credit facility for hull no. M34, dated November 13, 2020, between Houatorris Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.74 | 12/31/2020 |
| 10.69 | Supplemental Agreement relating to Hull No. C34 at Chantiers de l'Atlantique, dated November 13, 2020, between Hibiscus Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, SMBC Bank International PLC, the banks and financial institutions party thereto and the mandated lead arrangers | 10-K | 10.75 | 12/31/2020 |
| 10.70 | Supplemental Agreement relating to Hull No. A35 at Chantiers de l'Atlantique, dated November 13, 2020, between Palmeraie Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC France, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.76 | 12/31/2020 |
| 10.71 | Amendment No. 4 in connection with the Credit Agreement in respect of "Celebrity Reflection" – Hull S-691, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.77 | 12/31/2020 |
| 10.72 | Amendment No. 4 in connection with the Credit Agreement in respect of "Celebrity Silhouette" – Hull S-679, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.78 | 12/31/2020 |
| 10.73 | Amendment No. 4 in connection with the Credit Agreement in respect of "Celebrity Solstice" – Hull S-675, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH, the mandated co-lead arrangers and the banks and financial institutions party thereto | 10-K | 10.79 | 12/31/2020 |
| 10.74 | Amendment No. 4 in connection with the Credit Agreement in respect of "Odyssey of the Seas" – Hull S-713, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.80 | 12/31/2020 |
| 10.75 | Amendment No. 4 in connection with the Credit Agreement in respect of "Ovation of the Seas" – Hull S-699, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.81 | 12/31/2020 |
| 10.76 | Amendment No. 7 in connection with the Credit Agreement in respect of "Quantum of the Seas" – Hull S-697, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.82 | 12/31/2020 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.77 | Amendment No. 4 in connection with the Credit Agreement in respect of "Spectrum of the Seas" – Hull S-700, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH, the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.83 | 12/31/2020 |
| 10.78 | Amendment No. 7 in connection with the Credit Agreement in respect of "Anthem of the Seas" – Hull S-698, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the mandated lead arrangers and the banks and financial institutions party thereto | 10-K | 10.84 | 12/31/2020 |
| 10.79 | Amendment No. 4 in connection with the Credit Agreement in respect of "Celebrity Eclipse" – Hull S-677, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.85 | 12/31/2020 |
| 10.80 | Amendment No. 4 in connection with the Credit Agreement in respect of "Celebrity Equinox" – Hull S-676, dated December 21, 2020, between Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.86 | 12/31/2020 |
| 10.81 | Amendment No. 1 in connection with the Credit Agreement in respect of Hull S-719, dated as of December 21, 2020, between Silversea Cruise Holding Ltd., Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.87 | 12/31/2020 |
| 10.82 | Amendment No. 1 in connection with the Credit Agreement in respect of Hull S-720, dated as of December 21, 2020, between Silversea Cruise Holding Ltd., Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-K | 10.88 | 12/31/2020 |
| 10.83 | Amendment to the Amended and Restated Credit Agreement, dated as of February 12, 2021, among the Company, the various financial institutions party thereto and The Bank of Nova Scotia as administrative agent | 8-K | 10.2 | 2/18/2021 |
| 10.84 | Amendment to Term Loan Agreement, dated as of February 12, 2021, among the Company, the various financial institutions party thereto and Bank of America, N.A. as administrative agent | 8-K | 10.3 | 2/18/2021 |
| 10.85 | Amendment No. 2 in connection with the Credit Agreement in respect of Icon 1—Hull 1400, dated as of February 15, 2021, between the Company, the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent and facility agent, BNP Paribas Fortis SA/NV as Finnvera agent, the banks and financial institutions listed therein as initial mandated lead arranger, other mandated lead arrangers or lead arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.4 | 2/18/2021 |
| 10.86 | Amendment No. 2 in connection with the Credit Agreement in respect of Icon 2—Hull 1401, dated as of February 15, 2021, between the Company, the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent and facility agent, BNP Paribas Fortis SA/NV as Finnvera agent, the banks and financial institutions listed therein as initial mandated lead arranger, other mandated lead arrangers or lead arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.5 | 2/18/2021 |
| 10.87 | Amendment No. 1 in connection with the Credit Agreement in respect of Icon 3—Hull 1402, dated as of February 15, 2021, between the Company, the lenders party thereto, KfW IPEX-Bank GmbH, as Hermes agent, facility agent, initial mandated lead arranger and sole book runner and the banks and financial institutions listed therein as lenders and residual risk guarantors | 8-K | 10.6 | 2/18/2021 |
| 10.88 | Amendment No. 5 in connection with the Credit Agreement in respect of "CELEBRITY ECLIPSE" – Hull S-677, dated as of February 17, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.1 | 2/23/2021 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.89 | Amendment No. 5 in connection with the Credit Agreement in respect of "CELEBRITY EQUINOX" – Hull S-676, dated as of February 17, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.2 | 2/23/2021 |
| 10.90 | Amendment No. 5 in connection with the Credit Agreement in respect of "CELEBRITY REFLECTION" – Hull S-691, dated as of February 17, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.3 | 2/23/2021 |
| 10.91 | Amendment No. 5 in connection with the Credit Agreement in respect of "CELEBRITY SILHOUETTE" – Hull S-679, dated as of February 17, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.4 | 2/23/2021 |
| 10.92 | Amendment No. 5 in connection with the Credit Agreement in respect of "ODYSSEY OF THE SEAS" – Hull S-713, dated as of February 18, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.5 | 2/23/2021 |
| 10.93 | Amendment No. 5 in connection with the Credit Agreement in respect of "CELEBRITY SOLSTICE" – Hull S-675, dated as of February 18, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.6 | 2/23/2021 |
| 10.94 | Amendment No. 5 in connection with the Credit Agreement in respect of "SPECTRUM OF THE SEAS" – Hull S-700, dated as of February 17, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.7 | 2/23/2021 |
| 10.95 | Amendment No. 8 in connection with the Credit Agreement in respect of "ANTHEM OF THE SEAS" – Hull S-698, dated as of February 18, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.8 | 2/23/2021 |
| 10.96 | Amendment No. 8 in connection with the Credit Agreement in respect of "QUANTUM OF THE SEAS" – Hull S-697, dated as of February 18, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.9 | 2/23/2021 |
| 10.97 | Amendment No. 5 in connection with the Credit Agreement in respect of "OVATION OF THE SEAS" – Hull S-699, dated as of February 18, 2021, between Royal Caribbean Cruises Ltd., KfW IPEX-GmbH as administrative agent and Hermes agent and the banks and financial institutions party thereto as lenders | 8-K | 10.10 | 2/23/2021 |
| 10.98 | Amendment Agreement in connection with the Credit Agreement in respect of "CELEBRITY EDGE" (ex. Hull J34), dated as of February 18, 2021 between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch as global coordinator, SMBC Bank International plc as ECA agent, Citibank Europe plc, UK Branch, as facility agent, the banks and financial institutions listed therein as the mandated lead arrangers and the banks and financial institutions listed as lenders party thereto | 8-K | 10.11 | 2/23/2021 |
| 10.99 | Amendment Agreement in connection with the Credit Agreement in respect of "CELEBRITY APEX" (ex. Hull K34), dated as of February 18, 2021 between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch as global coordinator, SMBC Bank International plc as ECA agent, Citibank Europe plc, UK Branch, as facility agent, the banks and financial institutions listed therein as the mandated lead arrangers and the banks and financial institutions listed as lenders party thereto | 8-K | 10.12 | 2/23/2021 |

| Exhibit Number | | Incorporated By Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.100 | Sixth Amendment and Restatement Agreement in connection with the Credit Agreement in respect of "HARMONY OF THE SEAS" (ex Hull A34) (EUR-denominated facility), dated as of February 19, 2021, between Royal Caribbean Cruises Ltd., Société Générale as facility agent, the banks and financial institutions listed therein as mandated lead arrangers and the banks and financial institutions listed as lenders party thereto | 8-K | 10.13 | 2/23/2021 |
| 10.101 | Fifth Amendment and Restatement Agreement in connection with the Credit Agreement in respect of "HARMONY OF THE SEAS" (ex Hull A34) (USD-denominated facility), dated as of February 19, 2021, between Royal Caribbean Cruises Ltd., Société Générale as facility agent, the banks and financial institutions listed therein as mandated lead arrangers and the banks and financial institutions listed as lenders party thereto | 8-K | 10.14 | 2/23/2021 |
| 10.102 | Amendment Agreement in connection with the Credit Agreement in respect of "SYMPHONY OF THE SEAS" (ex. Hull B34) dated as of February 17, 2021 between Royal Caribbean Cruises Ltd., Citibank N.A., London Branch as global coordinator, SMBC Bank International plc as ECA agent, Citibank Europe plc, UK Branch, as facility agent, the banks and financial institutions listed therein as the mandated lead arrangers and the banks and financial institutions listed as lenders party thereto | 8-K | 10.15 | 2/23/2021 |
| 10.103 | Amendment No. 6 in connection with the Credit Agreement in respect of "Odyssey of the Seas" – Hull S-713, dated as of March 10, 2021, between the Company, Kfw IPEX-Bank GmbH as facility agent and Hermes agent, the banks and financial institutions party thereto as mandated lead arrangers and the banks and financial institutions listed therein as lenders. | 8-K | 10.1 | 3/16/2021 |
| 10.104 | Amendment No. 3 in connection with the Credit Agreement in respect of "ICON 1" - Hull 1400, dated as of March 16, 2021, between the Company, KfW IPEX-Bank GmbH as facility agent and Hermes agent, BNP Paribas Fortis SA/NV as Finnvera agent, the banks and financial institutions party thereto as mandated lead arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.1 | 3/19/2021 |
| 10.105 | Amendment No. 3 in connection with the Credit Agreement in respect of "ICON 2" - Hull 1401, dated as of March 16, 2021, between the Company, KfW IPEX-Bank GmbH as facility agent and Hermes agent, BNP Paribas Fortis SA/NV as Finnvera agent, the banks and financial institutions party thereto as mandated lead arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.2 | 3/19/2021 |
| 10.106 | Amendment No. 2 in connection with the Credit Agreement in respect of "ICON 3" - Hull 1402, dated as of March 18, 2021, between the Company, KfW IPEX-Bank GmbH as facility agent and Hermes agent, KfW IPEX-Bank GmbH as the mandated lead arranger, the banks and financial institutions party thereto as mandated lead arrangers and the banks and financial institutions listed therein as lenders | 8-K | 10.3 | 3/19/2021 |
| 10.107 | Amendment No. 2 in connection with the Credit Agreement in respect of Hull S-719, dated March 26, 2021, by and among Silversea Cruise Holding Ltd., the Company, KfW IPEX-Bank GmbH as facility agent and Hermes agent and the banks and financial institutions listed in Schedule 1 thereto | 8-K | 10.1 | 4/1/2021 |
| 10.108 | Amendment No. 2 in connection with the Credit Agreement in respect of Hull S-720, dated March 26, 2021, by and among Silversea Cruise Holding Ltd., the Company, KfW IPEX-Bank GmbH as facility agent and Hermes agent and the banks and financial institutions listed in Schedule 1 thereto | 8-K | 10.2 | 4/1/2021 |
| 10.109 | Amended and Restated Credit Agreement, dated March 30, 2021, by and among the Company, the various financial institutions as are or shall be parties thereto and Nordea Bank AB (PUBL) New York branch, as administrative agent for the lender parties | 8-K | 10.3 | 4/1/2021 |
| 10.110 | Amended and Restated Term Loan Agreement, dated as of March 30, 2021, by and among the Company, the various financial institutions party thereto and Bank of America NA, as administrative agent | 8-K | 10.4 | 4/1/2021 |

| Exhibit Number | | Incorporated By Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.111 | Third Supplemental Agreement relating to a secured credit facility agreement for Hull No. A35 at Chantiers l'Atlantique S.A., dated July 6, 2021, between Palmeraie Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC Continental Europe, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto. | 10-Q | 10.1 | 9/30/2021 |
| 10.112 | Fourth Supplemental Agreement relating to a secured credit facility agreement for Hull No. L34 at Chantiers l'Atlantique S.A., dated July 12, 2021, between Hoediscus Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC Continental Europe, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto | 10-Q | 10.2 | 9/30/2021 |
| 10.113 | Fourth Supplemental Agreement relating to a secured credit facility for Hull No. M34 at Chantiers l'Atlantique S.A., dated July 12, 2021, between Houatorris Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC Continental Europe, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto | 10-Q | 10.3 | 9/30/2021 |
| 10.114 | Fourth Supplemental Agreement relating to Hull No. C34 at Chantiers de l'Atlantique, dated July 12, 2021, between Hibisyeu Finance Limited, Royal Caribbean Cruises Ltd., Citibank Europe PLC, UK Branch, Citicorp Trustee Company Limited, Citibank N.A., London Branch, HSBC Continental Europe, SMBC Bank International PLC, the mandated lead arrangers and the banks and financial institutions party thereto | 10-Q | 10.4 | 9/30/2021 |
| 10.115 | Amendment No. 3 in connection with the Credit Agreement in respect of Hull S-719, dated as of September 27, 2021, between Silversea Cruise Holding Ltd., Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-Q | 10.5 | 9/30/2021 |
| 10.116 | Amendment No. 3 in connection with the Credit Agreement in respect of Hull S-720, dated as of September 27, 2021, between Silversea Cruise Holding Ltd., Royal Caribbean Cruises Ltd., KfW IPEX-Bank GmbH and the banks and financial institutions party thereto | 10-Q | 10.6 | 9/30/2021 |
| 10.117 | Amendment No. 7 in connection with the Credit Agreement in respect of Odyssey of the Seas – Hull S-713, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.1 | 12/28/2021 |
| 10.118 | Amendment No. 9 in connection with the Credit Agreement in respect of Quantum of the Seas – Hull S-697, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.2 | 12/28/2021 |
| 10.119 | Amendment No. 9 in connection with the Credit Agreement in respect of Anthem of the Seas – Hull S-698, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.3 | 12/28/2021 |
| 10.120 | Amendment No. 6 in connection with the Credit Agreement in respect of Ovation of the Seas – Hull S-699, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.4 | 12/28/2021 |

| Exhibit Number | | Incorporated By Reference | | |
| --- | --- | --- | --- | --- |
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.121 | Amendment No. 6 in connection with the Credit Agreement in respect of Spectrum of the Seas – Hull S-700, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.5 | 12/28/2021 |
| 10.122 | Amendment No. 4 in connection with the Credit Agreement in respect of Hull S-719, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.6 | 12/28/2021 |
| 10.123 | Amendment No. 4 in connection with the Credit Agreement in respect of Hull S-720, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.7 | 12/28/2021 |
| 10.124 | Amendment No. 6 in connection with the Credit Agreement in respect of Celebrity Reflection - Hull S-691, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.8 | 12/28/2021 |
| 10.125 | Amendment No. 6 in connection with the Credit Agreement in respect of Celebrity Eclipse - Hull S-676, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.9 | 12/28/2021 |
| 10.126 | Amendment No. 6 in connection with the Credit Agreement in respect of Celebrity Eclipse - Hull S-677, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.10 | 12/28/2021 |
| 10.127 | Amendment No. 6 in connection with the Credit Agreement in respect of Celebrity Silhouette - Hull S-679, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and KfW IPEX-Bank GmbH | 8-K | 10.11 | 12/28/2021 |
| 10.128 | Amendment No. 6 in connection with the Credit Agreement in respect of Celebrity Solstice - Hull S-675, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, and the banks and financial institutions listed therein as mandated co-lead arrangers | 8-K | 10.12 | 12/28/2021 |
| 10.129 | Amendment No. 4 in connection with the Credit Agreement in respect of Icon 1 - Hull 1400, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, BNP Paribas Fortis SA/NV, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.13 | 12/28/2021 |
| 10.130 | Amendment No. 4 in connection with the Credit Agreement in respect of Icon 2 - Hull 1401, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, KfW IPEX-Bank GmbH, BNP Paribas Fortis SA/NV, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.14 | 12/28/2021 |
| 10.131 | Amendment No. 3 in connection with the Credit Agreement in respect of Icon 3 - Hull 1402, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and BNP Paribas Fortis SA/NV | 8-K | 10.15 | 12/28/2021 |
| 10.132 | Amendment No. 7 in connection with the Credit Agreement in respect of Oasis of the Seas - Hull 1363, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, and BNP Paribas Fortis SA/NV | 8-K | 10.16 | 12/28/2021 |
| 10.133 | Amendment Agreement in connection with the Credit Agreement in respect of Symphony of the Seas - Hull B34, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, Citibank N.A. London Branch, Citibank Europe PLC, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.17 | 12/28/2021 |

| Exhibit Number | | Form | Exhibit | Filing Date/ Period End Date |
|---|---|---|---|---|
| | | | Incorporated By Reference | |
| 10.134 | Amendment Agreement in connection with the Credit Agreement in respect of Celebrity Edge - Hull J34, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, Citibank N.A. London Branch, SMBC Bank International PLC, Citibank Europe PLC UK Branch, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.18 | 12/28/2021 |
| 10.135 | Amendment Agreement in connection with the Credit Agreement in respect of Celebrity Apex - Hull K34, dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., the lenders party thereto, Citibank N.A. London Branch, SMBC Bank International PLC, Citibank Europe PLC UK Branch, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.19 | 12/28/2021 |
| 10.136 | Amendment Agreement in connection with the Credit Agreement in respect of Hull A35 at Chantiers de L'Atlantique S.A., dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Palmeraie Finance Limited, the lenders party thereto, Citibank Europe PLC UK Branch, Citicorp Trustee Company Limited, Citibank N.A. London Branch, HSBC Continental Europe, and the mandated lead arrangers party thereto | 8-K | 10.20 | 12/28/2021 |
| 10.137 | Amendment Agreement in connection with the Credit Agreement in respect of Hull C34 at Chantiers de L'Atlantique S.A., dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Hibiscus Finance Limited, the lenders party thereto, Citibank Europe PLC UK Branch, Citicorp Trustee Company Limited, Citibank N.A. London Branch, HSBC Continental Europe, SMBC Bank International PLC, and the other banks and financial institutions listed therein | 8-K | 10.21 | 12/28/2021 |
| 10.138 | Amendment Agreement in connection with the Credit Agreement in respect of Hull L34 at Chantiers de L'Atlantique S.A., dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Hoediscus Finance Limited, the lenders party thereto, Citibank Europe PLC UK Branch, Citicorp Trustee Company Limited, Citibank N.A. London Branch, HSBC Continental Europe, SMBC Bank International PLC, and the other banks and financial institutions listed therein | 8-K | 10.22 | 12/28/2021 |
| 10.139 | Amendment Agreement in connection with the Credit Agreement in respect of Hull M34 at Chantiers de L'Atlantique S.A., dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Houatorris Finance Limited, the lenders party thereto, Citibank Europe PLC UK Branch, Citicorp Trustee Company Limited, Citibank N.A. London Branch, HSBC Continental Europe, SMBC Bank International PLC, and the other banks and financial institutions listed therein | 8-K | 10.23 | 12/28/2021 |
| 10.140 | Amendment Agreement in connection with the Credit Agreement in respect of Harmony of the Seas – Hull A34 (EUR Facility), dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Société Générale, the lenders party thereto, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.24 | 12/28/2021 |
| 10.141 | Amendment Agreement in connection with the Credit Agreement in respect of Harmony of the Seas – Hull A34 (USD Facility), dated as of December 22, 2021, between Royal Caribbean Cruises Ltd., Société Générale, the lenders party thereto, and the banks and financial institutions listed therein as mandated lead arrangers | 8-K | 10.25 | 12/28/2021 |
| 10.142 | Hull C34 Credit Agreement, dated as of July 24, 2017, as novated, amended and restated on the Actual Delivery Date pursuant to a Novation Agreement, dated as of July 24, 2017, by and between Royal Caribbean Cruises Ltd., Citibank N.A., Sumitomo Mitsui Banking Corporation Limited (Paris Branch), Citibank Europe plc (UK Branch), and the banks and financial institutions as lender parties thereto* | | | |
| 10.143 | Royal Caribbean Cruises Ltd. 2008 Equity Incentive Plan (as amended) † | 10-K | 10.17 | 12/31/2016 |
| 10.144 | Form of 2008 Equity Incentive Plan Stock Option Award Agreement—Incentive Options † | 10-Q | 10.3 | 9/30/2008 |

Table of Contents

| Exhibit Number | | Incorporated By Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date/ Period End Date |
| 10.145 | Form of 2008 Equity Incentive Plan Stock Option Award Agreement—Nonqualified Options † | 10-Q | 10.4 | 9/30/2008 |
| 10.146 | Form of 2008 Equity Incentive Plan Restricted Stock Unit Agreement— Executive Officer Grants † | 10-K | 10.23 | 12/31/2013 |
| 10.147 | Form of 2008 Equity Incentive Plan Restricted Stock Unit Agreement— Executive Officer Grants (Non-Vesting Into Retirement) † | 10-Q | 10.7 | 9/30/2017 |
| 10.148 | Form of 2008 Equity Incentive Plan Restricted Stock Unit Agreement—Director Grants † | 10-K | 10.31 | 12/31/2010 |
| 10.149 | Form of 2008 Equity Incentive Plan Performance Shares Agreement † | 10-K | 10.27 | 12/31/2014 |
| 10.150 | Form of 2008 Equity Incentive Plan Performance-Based Restricted Shares Agreement † | 10-K | 10.27 | 12/31/2015 |
| 10.151 | Employment Agreement, dated as of December 31, 2012, by and between the Company and Richard D. Fain † | 10-K | 10.22 | 12/31/2012 |
| 10.152 | Employment Agreement, dated as of May 20, 2013, by and between the Company and Jason T. Liberty † | 10-Q | 10.2 | 6/30/2013 |
| 10.153 | Employment Agreement, dated as of July 16, 2015, by and between the Company and Michael W. Bayley † | 10-Q | 10.3 | 6/30/2015 |
| 10.154 | Form of First Amendment to Employment Agreement, dated as of February 6, 2015 (entered into between the Company and each of Messrs. Fain and Liberty) † | 10-K | 10.33 | 12/31/2014 |
| 10.155 | Employment Agreement dated as of August 3, 2015, by and between Celebrity Cruises Inc. and Lisa Lutoff-Perlo † | 10-K | 10.31 | 12/31/2016 |
| 10.156 | Employment Agreement, dated as of December 31, 2012, by and between the Company and Harri U. Kulovaara † | 10-K | 10.26 | 2/25/2013 |
| 10.157 | Form of First Amendment to Employment Agreement, dated as of February 6, 2015 (entered into between the Company and each of Messrs. Fain, Kulovaara and Liberty) † | 10-K | 10.33 | 12/31/2014 |
| 10.158 | Royal Caribbean Cruises Ltd. Executive Short-Term Bonus Plan † | 10-Q | 10.4 | 6/30/2015 |
| 10.159 | Royal Caribbean Cruises Ltd. Supplemental Executive Retirement Plan † | 8-K | 10.3 | 12/8/2005 |
| 10.160 | Amendment to Royal Caribbean Cruises Ltd. Supplemental Executive Retirement Plan † | 10-K | 10.31 | 12/31/2006 |
| 10.161 | Amendment to Royal Caribbean Cruises Ltd. Supplemental Executive Retirement Plan † | 10-K | 10.31 | 12/31/2007 |
| 10.162 | Amendment to Royal Caribbean Cruises Ltd. Supplemental Executive Retirement Plan † | 10-Q | 10.1 | 9/30/2008 |
| 10.163 | Amendment to Royal Caribbean Cruises Ltd. Supplemental Executive Retirement Plan † | 10-K | 10.38 | 12/31/2008 |
| 10.164 | Cruise Policy for Members of the Board of Directors of the Company | 10-K | 10.35 | 12/31/2013 |
| 18.1 | Preferability Letter Regarding Change in Accounting Principle* | | | |
| 21.1 | List of Subsidiaries* | | | |
| 23.1 | Consent of PricewaterhouseCoopers LLP, an independent registered public accounting firm* | | | |
| 23.2 | Consent of Drinker Biddle & Reath LLP* | | | |
| 24.1 | Power of Attorney* | | | |
| 31.1 | Certification of Jason T. Liberty required by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934* | | | |
| 31.2 | Certification of Naftali Holtz by Rule 13a-14(a) or Rule 15d-14(a) of the Securities Exchange Act of 1934* | | | |
| 32.1 | Certification of Jason T. Liberty and Naftali Holtz pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code** | | | |

\*    Filed herewith

\*\*   Furnished herewith

†  Management contract or compensatory plan or arrangement.

Interactive Data File

| 101 | The following financial statements from Royal Caribbean Cruises Ltd.'s Annual Report on Form 10-K for the year ended December 31, 2021 formatted in iXBRL (Inline eXtensible Business Reporting Language) are as follows: |
| --- | --- |
| | (i) the Consolidated Statements of Comprehensive Income (Loss) for the years ended December 31, 2021, 2020 and 2019; |
| | (ii) the Consolidated Balance Sheets at December 31, 2021 and 2020; |
| | (iii) the Consolidated Statements of Cash Flows for the years ended December 31, 2021, 2020 and 2019; |
| | (iv) the Consolidated Statements of Shareholders' Equity for the years ended December 31, 2021, 2020 and 2019; and |
| | (v) the Notes to the Consolidated Financial Statements, tagged in summary and detail. |
| 104 | Cover Page Interactive Data File, formatted in iXBRL and contained in Exhibit 101 |

**Item 16.   Form 10-K Summary**

None.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ROYAL CARIBBEAN CRUISES LTD.
(Registrant)

By:      /s/ NAFTALI HOLTZ
          Naftali Holtz
          *Chief Financial Officer*
          *(Principal Financial Officer and duly authorized signatory)*

March 1, 2022

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 1, 2022.

/s/ JASON T. LIBERTY
Jason T. Liberty
 *Director and Chief Executive Officer*
 *(Principal Executive Officer)*

/s/ NAFTALI HOLTZ
Naftali Holtz
 *Chief Financial Officer*
 *(Principal Financial Officer)*

/s/ HENRY L. PUJOL
Henry L. Pujol
*Senior Vice President, Chief Accounting Officer (Principal Accounting Officer)*

/s/ RICHARD D. FAIN
Richard D. Fain
 *Chairman of the Board*

*
John F. Brock
 *Director*

*
Stephen R. Howe Jr.
 *Director*

*
William L. Kimsey
 *Director*

*
Maritza G. Montiel
 *Director*

*
Ann S. Moore
 *Director*

*
Eyal M. Ofer
 *Director*

*
William K. Reilly
 *Director*

*
Vagn O. Sørensen
 *Director*

*
Donald Thompson
 *Director*

*
Arne Alexander Wilhelmsen
*Director*

*
Amy C. McPherson
 *Director*

*
Michael O. Leavitt
 *Director*

*

**\*By:**      **/s/ NAFTALI HOLTZ**
          Naftali Holtz, *as Attorney-in-Fact*

Table of Contents

**ROYAL CARIBBEAN CRUISES LTD.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 238) | F-2 |
| Consolidated Statements of Comprehensive (Loss) Income | F-6 |
| Consolidated Balance Sheets | F-7 |
| Consolidated Statements of Cash Flows | F-8 |
| Consolidated Statements of Shareholders' Equity | F-10 |
| Notes to the Consolidated Financial Statements | F-11 |

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of Royal Caribbean Cruises Ltd.

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the accompanying consolidated balance sheets of Royal Caribbean Cruises Ltd. and its subsidiaries (the "Company") as of December 31, 2021 and 2020, and the related consolidated statements of comprehensive (loss) income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2021, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Change in Accounting Principle*

As discussed in Note 1 to the consolidated financial statements, effective October 1, 2021, the Company changed the manner in which it accounts for the consolidation of Silversea Cruises.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Emphasis of Matter*

As discussed in Note 1 to the consolidated financial statements, the ongoing effects of the COVID-19 pandemic have had, and will continue to have, a material negative impact on the Company's results of operations and liquidity. Management's evaluation of the events and conditions and management's plans to mitigate these matters are also described in Note 1.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Liquidity - Impact of COVID-19*

As described in Note 1 to the consolidated financial statements, the Company restarted its global cruise operations in a phased manner, following a voluntary suspension of global cruise operations that commenced in March 2020 in response to the COVID-19 outbreak. Management believes the impact to their global bookings resulting from COVID-19 will continue to have a material negative impact on the Company's results of operations and liquidity. Management has implemented a number of measures to mitigate the financial and operational impacts of COVID-19, including reduction of capital expenditures and operating expenses, the issuance of debt and shares of their common stock, the amendment of credit agreements to defer payments, the waiver and/or modification of covenant requirements and the suspension of dividend payments, with the addition of pursuing refinancing opportunities to reduce interest expense and extend maturities. The principal assumptions used in management's estimate of future liquidity requirements consisted of (i) the expected continued gradual resumption of cruise operations; (ii) the expected sustained increase in revenue per available passenger cruise day during the continued resumption of cruise operations; (iii) the expected lower than comparable historical occupancy levels during the continued resumption of cruise operations, increasing over time until the Company reaches historical occupancy levels; and (iv) the expected spend during the Company's resumption of cruise operations, including returning crew members to their vessels and maintaining enhanced health and safety protocols. Based on these assumptions regarding the impact of COVID-19 and the Company's resumption of operations, as well as the Company's present financial condition, management believes they have sufficient financial resources to fund their obligations for at least the next twelve months from the issuance of the financial statements.

The principal considerations for our determination that performing procedures relating to the impact of COVID-19 on the Company's liquidity is a critical audit matter are the significant judgment by management when developing the estimate of future liquidity requirements; this in turn led to a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's estimate of future liquidity requirements and assumptions related to (i) the expected continued gradual resumption of cruise operations; (ii) the expected sustained increase in revenue per available passenger cruise day during the continued resumption of cruise operations; (iii) the expected lower than comparable historical occupancy levels during the continued resumption of cruise operations, increasing over time until the Company reaches historical occupancy levels; and (iv) the expected spend during the Company's resumption of cruise operations, including returning crew members to their vessels and maintaining enhanced health and safety protocols.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of

controls relating to management's estimate of future liquidity requirements. These procedures also included, among others, (i) testing management's process for estimating future liquidity requirements for the twelve months after the date the financial statements are issued; (ii) testing the completeness and accuracy of underlying data used in the estimate; (iii) evaluating the reasonableness of the significant assumptions used by management related to the expected continued gradual resumption of cruise operations, the expected sustained increase in revenue per available passenger cruise day during the continued resumption of cruise operations, the expected lower than comparable historical occupancy levels during the continued resumption of cruise operations, increasing over time until the Company reaches historical occupancy levels, and the expected spend during the Company's resumption of cruise operations, including returning crew members to their vessels and maintaining enhanced health and safety protocols; and (iv) evaluating management's estimate of future liquidity requirements and their disclosure in the consolidated financial statements regarding having sufficient liquidity to satisfy the Company's obligations for at least the next twelve months from the issuance of the financial statements. Evaluating management's assumptions related to the expected continued gradual resumption of cruise operations, the expected sustained increase in revenue per available passenger cruise day during the continued resumption of cruise operations, the expected lower than comparable historical occupancy levels during the continued resumption of cruise operations, increasing over time until the Company reaches historical occupancy levels, and the expected spend during the Company's resumption of cruise operations, including returning crew members to their vessels and maintaining enhanced health and safety protocols, involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the Company; (ii) the consistency with external market and industry data; and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit.

*Impairment Assessments – Silversea Cruises Reporting Unit Goodwill and Trade Name*

As described in Notes 2, 4 and 5 to the consolidated financial statements, as of December 31, 2021 the Company's consolidated goodwill balance was $809 million and the indefinite-life intangible assets balance was $321 million, and the goodwill and trade name associated with the Silversea Cruises reporting unit and trade name was $509 million and $319 million, respectively. Management reviews goodwill and indefinite-life intangible assets for impairment at the reporting unit level and asset level, respectively, annually or, when events or circumstances dictate, more frequently. The impairment analysis consists of a comparison of the fair value of the reporting unit or asset with its carrying value. Fair value is estimated by management using a discounted cash flow model in combination with a market-based valuation approach and a relief-from-royalty method for trade names. Management's principal assumptions for the Silversea Cruises reporting unit and trade name were the forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, terminal growth rate, royalty rate, and weighted average cost of capital (i.e., discount rate).

The principal considerations for our determination that performing procedures relating to the impairment assessments of the Silversea Cruises reporting unit goodwill and trade name is a critical audit matter are (i) the significant judgment by management when developing the fair value estimates; (ii) a high degree of auditor judgment, subjectivity and effort in performing procedures and evaluating management's significant assumptions related to the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, terminal growth rates, and discount rates for the goodwill and trade name impairment assessments, and the royalty rate for the trade name impairment assessment; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill and trade name impairment assessments, including controls over the valuation of the Silversea Cruises reporting unit and trade name. These procedures also included, among others, (i) testing management's process for developing the fair value estimates; (ii) evaluating the appropriateness of the discounted future cash flow model, market-based valuation approach, and relief-from-royalty method; (iii) testing the completeness and accuracy of underlying data used in the fair value estimates; and (iv) evaluating the reasonableness of the significant assumptions used by management related to the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, terminal growth rates, and discount rates for the goodwill and trade name impairment assessments, and the royalty rate for the trade name impairment assessment. Evaluating management's assumptions related to the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rates involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the reporting unit and the Silversea Cruises brand; (ii) the consistency with external market and industry data; and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of (i) the Company's discounted cash flow

model, market-based valuation approach and relief-from-royalty method, and (ii) the discount rate and royalty rate assumptions.

/s/ PricewaterhouseCoopers LLP
Hallandale Beach, Florida
March 1, 2022

We have served as the Company's auditor since at least 1989, which includes periods before the Company became subject to SEC reporting requirements. We have not been able to determine the specific year we began serving as auditor of the Company.

**ROYAL CARIBBEAN CRUISES LTD.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME**
**(in thousands, except per share data)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Passenger ticket revenues | $ 941,175 | $ 1,504,569 | $ 7,857,057 |
| Onboard and other revenues | 590,958 | 704,236 | 3,093,604 |
| Total revenues | 1,532,133 | 2,208,805 | 10,950,661 |
| Cruise operating expenses: | | | |
| Commissions, transportation and other | 207,562 | 344,625 | 1,656,297 |
| Onboard and other | 116,946 | 157,213 | 639,782 |
| Payroll and related | 838,088 | 788,273 | 1,079,121 |
| Food | 164,389 | 161,750 | 583,905 |
| Fuel | 385,322 | 371,015 | 697,962 |
| Other operating | 945,205 | 942,232 | 1,405,698 |
| Total cruise operating expenses | 2,657,512 | 2,765,108 | 6,062,765 |
| Marketing, selling and administrative expenses | 1,370,076 | 1,199,620 | 1,559,253 |
| Depreciation and amortization expenses | 1,292,878 | 1,279,254 | 1,245,942 |
| Impairment and credit losses | 82,001 | 1,566,380 | — |
| **Operating (Loss) Income** | **(3,870,334)** | **(4,601,557)** | **2,082,701** |
| Other income (expense) | | | |
| Interest income | 16,773 | 21,036 | 26,945 |
| Interest expense, net of interest capitalized | (1,291,753) | (844,238) | (408,513) |
| Equity investment (loss) income | (135,469) | (213,286) | 230,980 |
| Other income (expense) [1] | 20,284 | (137,085) | (24,513) |
| | (1,390,165) | (1,173,573) | (175,101) |
| **Net (Loss) Income** | **(5,260,499)** | **(5,775,130)** | **1,907,600** |
| Less: Net Income attributable to noncontrolling interest | — | 22,332 | 28,713 |
| **Net (Loss) Income attributable to Royal Caribbean Cruises Ltd.** | $ (5,260,499) | $ (5,797,462) | $ 1,878,887 |
| **(Loss) Earnings per Share:** | | | |
| Basic | $ (20.89) | $ (27.05) | $ 8.97 |
| Diluted | $ (20.89) | $ (27.05) | $ 8.95 |
| **Comprehensive (Loss) Income** | | | |
| **Net (Loss) Income** | $ (5,260,499) | $ (5,775,130) | $ 1,907,600 |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustments | 15,703 | 40,346 | 869 |
| Change in defined benefit plans | 8,707 | (19,984) | (19,535) |
| Gain (loss) on cash flow derivative hedges | 4,046 | 38,010 | (151,313) |
| Total other comprehensive income (loss) | 28,456 | 58,372 | (169,979) |
| **Comprehensive (Loss) Income** | $ (5,232,043) | $ (5,716,758) | $ 1,737,621 |
| Less: Comprehensive Income attributable to noncontrolling interest | — | 22,332 | 28,713 |
| **Comprehensive (Loss) Income attributable to Royal Caribbean Cruises Ltd.** | $ (5,232,043) | $ (5,739,090) | $ 1,708,908 |

Including a $62.6 million net loss related to the 2021 elimination of the Silversea Cruises reporting lag.

**ROYAL CARIBBEAN CRUISES LTD.**
**CONSOLIDATED BALANCE SHEETS**

| | As of December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| | (in thousands, except share data) | |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 2,701,770 | $ 3,684,474 |
| Trade and other receivables, net of allowances of $13,411 and $3,867 at December 31, 2021 and December 31, 2020, respectively | 408,067 | 284,149 |
| Inventories | 150,224 | 118,703 |
| Prepaid expenses and other assets | 286,026 | 154,339 |
| Derivative financial instruments | 54,184 | 70,082 |
| Total current assets | 3,600,271 | 4,311,747 |
| Property and equipment, net | 25,907,949 | 25,246,595 |
| Operating lease right-of-use assets | 542,128 | 599,985 |
| Goodwill | 809,383 | 809,480 |
| Other assets, net of allowances of $86,781 and $81,580 at December 31, 2021 and December 31, 2020, respectively | 1,398,624 | 1,497,380 |
| **Total assets** | $ 32,258,355 | $ 32,465,187 |
| **Liabilities and shareholders' equity** | | |
| Current liabilities | | |
| Current portion of long-term debt | $ 2,243,131 | $ 961,768 |
| Commercial paper | — | 409,319 |
| Current portion of operating lease liabilities | 68,922 | 102,677 |
| Accounts payable | 545,978 | 353,422 |
| Accrued interest | 251,974 | 252,668 |
| Accrued expenses and other liabilities | 887,575 | 615,750 |
| Derivative financial instruments | 127,236 | 56,685 |
| Customer deposits | 3,160,867 | 1,784,832 |
| Total current liabilities | 7,285,683 | 4,537,121 |
| Long-term debt | 18,847,209 | 17,957,956 |
| Long-term operating lease liabilities | 534,726 | 563,876 |
| Other long-term liabilities | 505,181 | 645,565 |
| **Total liabilities** | 27,172,799 | 23,704,518 |
| Commitments and Contingencies (Note 17) | | |
| Shareholders' equity | | |
| Preferred stock ($0.01 par value; 20,000,000 shares authorized; none outstanding) | — | — |
| Common stock ($0.01 par value; 500,000,000 shares authorized; 282,703,246 and 265,198,371 shares issued, December 31, 2021 and December 31, 2020, respectively) | 2,827 | 2,652 |
| Paid-in capital | 7,557,297 | 5,998,574 |
| Retained earnings | 302,276 | 5,562,775 |
| Accumulated other comprehensive loss | (710,885) | (739,341) |
| Treasury stock (27,882,987 and 27,799,775 common shares at cost, December 31, 2021 and December 31, 2020, respectively) | (2,065,959) | (2,063,991) |
| **Total shareholders' equity** | 5,085,556 | 8,760,669 |
| **Total liabilities and shareholders' equity** | $ 32,258,355 | $ 32,465,187 |

The accompanying notes are an integral part of these consolidated financial statements.

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| | (in thousands) | | |
| **Operating Activities** | | | |
| Net (Loss) Income | $ (5,260,499) | $ (5,775,130) | $ 1,907,600 |
| Adjustments: | | | |
| Depreciation and amortization | 1,292,878 | 1,279,254 | 1,245,942 |
| Impairment and credit losses | 82,001 | 1,566,380 | — |
| Net deferred income tax (benefit) expense | (42,979) | (8,791) | 7,745 |
| (Gain) loss on derivative instruments not designated as hedges | (1,492) | 49,316 | (1,431) |
| Share-based compensation expense | 63,638 | 39,779 | 75,930 |
| Equity investment loss (income) | 135,469 | 213,286 | (230,980) |
| Amortization of debt issuance costs | 125,116 | 89,442 | 31,991 |
| Amortization of debt discounts and premiums | 123,439 | 66,776 | 31,616 |
| Loss on extinguishment of debt | 138,759 | 41,109 | 6,326 |
| Currency translation adjustment losses | — | 69,044 | — |
| Change in fair value of contingent consideration | — | (45,126) | 18,400 |
| Changes in operating assets and liabilities: | | | |
| (Increase) decrease in trade and other receivables, net | (181,707) | 121,055 | (9,898) |
| (Increase) decrease in inventories | (34,527) | 27,077 | (8,533) |
| (Increase) decrease in prepaid expenses and other assets | (152,071) | 295,876 | 15,669 |
| Increase (decrease) in accounts payable | 188,518 | (133,815) | 75,281 |
| Increase (decrease) in accrued expenses and other liabilities | 235,446 | (180,479) | 96,490 |
| Increase (decrease) in customer deposits | 1,426,647 | (1,643,560) | 280,139 |
| Dividends received from unconsolidated affiliates | — | 2,215 | 150,177 |
| Other, net | (15,757) | 12,061 | 28,362 |
| Net cash (used in) provided by operating activities | (1,877,815) | (3,731,653) | 3,716,366 |
| **Investing Activities** | | | |
| Purchases of property and equipment | (2,229,704) | (1,965,131) | (3,024,663) |
| Cash received on settlement of derivative financial instruments | 44,492 | 15,874 | 7,621 |
| Cash paid on settlement of derivative financial instruments | (74,249) | (161,335) | (68,836) |
| Investments in and loans to unconsolidated affiliates | (70,228) | (100,609) | (25,569) |
| Cash received on loans to unconsolidated affiliates | 31,334 | 21,086 | 32,870 |
| Proceeds from the sale of property and equipment and other assets | 176,039 | 27,796 | — |
| Other, net | (22,423) | (16,247) | (12,829) |
| Net cash used in investing activities | (2,144,739) | (2,178,566) | (3,091,406) |

The accompanying notes are an integral part of these consolidated financial statements.

F-8

**ROYAL CARIBBEAN CRUISES LTD.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| | | (in thousands) | |
| **Financing Activities** | | | |
| Debt proceeds | 4,467,789 | 13,547,189 | 3,525,564 |
| Debt issuance costs | (201,698) | (374,715) | (50,348) |
| Repayments of debt | (2,296,990) | (3,845,133) | (4,060,244) |
| Premium on repayment of debt | (135,372) | — | — |
| Proceeds from issuance of commercial paper notes | — | 6,765,816 | 26,240,540 |
| Repayments of commercial paper notes | (414,570) | (7,837,635) | (25,613,111) |
| Purchase of treasury stock | — | — | (99,582) |
| Dividends paid | — | (326,421) | (602,674) |
| Proceeds from common stock issuances | 1,621,860 | 1,431,375 | — |
| Other, net | (442) | (10,688) | (10,516) |
| Net cash provided by (used in) financing activities | 3,040,577 | 9,349,788 | (670,371) |
| Effect of exchange rate changes on cash | (727) | 1,167 | 1,297 |
| Net (decrease) increase in cash and cash equivalents | (982,704) | 3,440,736 | (44,114) |
| Cash and cash equivalents at beginning of year | 3,684,474 | 243,738 | 287,852 |
| Cash and cash equivalents at end of year | $ 2,701,770 | $ 3,684,474 | $ 243,738 |
| **Supplemental Disclosures** | | | |
| Cash paid during the year for: | | | |
| Interest, net of amount capitalized | $ 834,245 | $ 418,164 | $ 246,312 |
| **Non-Cash Investing Activities** | | | |
| Notes receivable issued upon sale of property and equipment and other assets | $ 16,000 | $ 53,419 | $ — |
| Purchases of property and equipment included in accounts payable and accrued expenses and other liabilities | $ 14,097 | $ 16,189 | $ 86,155 |
| **Non-Cash Financing Activities** | | | |
| Purchase of Silversea Cruises non-controlling interest | $ — | $ 592,313 | $ — |
| Termination of Silversea Cruises contingent consideration obligation | $ — | $ 16,564 | $ — |
| Common stock issuances pending cash settlement and included in trade receivables | $ — | $ 121,352 | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

F-9

ROYAL CARIBBEAN CRUISES LTD.
CONSOLIDATED STATEMENTS OF CASH FLOWS - CONTINUED

**ROYAL CARIBBEAN CRUISES LTD.**

**CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY**

| | Common Stock | Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Treasury Stock | Total Shareholders' Equity |
|---|---|---|---|---|---|---|
| | (in thousands, except per share data) | | | | | |
| **Balances at January 1, 2019** | $ 2,358 | $ 3,420,900 | $ 10,263,282 | $ (627,734) | $ (1,953,345) | $ 11,105,461 |
| Activity related to employee stock plans | 7 | 73,059 | — | — | (5,164) | 67,902 |
| Common stock dividends, $2.96 per share | — | — | (618,843) | — | — | (618,843) |
| Changes related to cash flow derivative hedges | — | — | — | (151,313) | — | (151,313) |
| Change in defined benefit plans | — | — | — | (19,535) | — | (19,535) |
| Foreign currency translation adjustments | — | — | — | 869 | — | 869 |
| Purchases of treasury stock | — | — | — | — | (99,582) | (99,582) |
| Net Income attributable to Royal Caribbean Cruises Ltd. | — | — | 1,878,887 | — | — | 1,878,887 |
| **Balances at December 31, 2019** | 2,365 | 3,493,959 | 11,523,326 | (797,713) | (2,058,091) | 12,163,846 |
| Activity related to employee stock plans | 9 | 29,750 | — | — | — | 29,759 |
| Common stock issuance | 226 | 1,552,500 | | | | 1,552,726 |
| Equity component of convertible notes, net of issuance costs | — | 307,640 | | | | 307,640 |
| Acquisition of Silversea non-controlling interest | 52 | 608,825 | — | — | — | 608,877 |
| Common stock dividends, $0.78 per share | — | — | (163,089) | — | — | (163,089) |
| Changes related to cash flow derivative hedges | — | — | — | 38,010 | — | 38,010 |
| Change in defined benefit plans | — | — | — | (19,984) | — | (19,984) |
| Foreign currency translation adjustments | — | 5,900 | — | 40,346 | — | 40,346 |
| Purchases of treasury stock | — | — | — | — | (5,900) | — |
| Net Income attributable to Royal Caribbean Cruises Ltd. | — | — | (5,797,462) | — | — | (5,797,462) |
| **Balances at December 31, 2020** | 2,652 | 5,998,574 | 5,562,775 | (739,341) | (2,063,991) | 8,760,669 |
| Activity related to employee stock plans | 5 | 62,991 | — | — | — | 62,996 |
| Common stock issuance | 170 | 1,495,732 | — | — | — | 1,495,902 |
| Changes related to cash flow derivative hedges | — | — | — | 4,046 | — | 4,046 |
| Change in defined benefit plans | — | — | — | 8,707 | — | 8,707 |
| Foreign currency translation adjustments | — | — | — | 15,703 | — | 15,703 |
| Purchases of treasury stock | — | — | — | — | (1,968) | (1,968) |
| Net Loss attributable to Royal Caribbean Cruises Ltd. | — | — | (5,260,499) | — | — | (5,260,499) |
| **Balances at December 31, 2021** | $ 2,827 | $ 7,557,297 | $ 302,276 | $ (710,885) | $ (2,065,959) | $ 5,085,556 |

The accompanying notes are an integral part of these consolidated financial statements.

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1.** *General*

*Description of Business*

We are a global cruise company. We own and operate three global cruise brands: Royal Caribbean International, Celebrity Cruises and Silversea Cruises (collectively, our "Global Brands"). We also own a 50% joint venture interest in TUI Cruises GmbH ("TUIC"), which operates the German brands TUI Cruises and Hapag-Lloyd Cruises (collectively, our "Partner Brands"). We account for our investments in our Partner Brands under the equity method of accounting. Together, our Global Brands and our Partner Brands operated a combined 61 ships as of December 31, 2021. Our ships offer a selection of worldwide itineraries that call on more than 1,000 destinations on all seven continents.

*Management's Plan and Liquidity*

We have restarted our global cruise operations in a phased manner, following our voluntary suspension of global cruise operations that commenced in March of 2020 in response to the COVID-19 pandemic. Our return to service efforts incorporate our enhanced health and safety protocols, and the requirements of regulatory agencies, which has resulted in reduced guest occupancy, modified itineraries and vaccination protocols.

By the end of December 2021, we operated 50 of our Global and Partner Brand ships, representing over 85% of our fleet's capacity, and carried approximately 1.3 million guests since we resumed operations. We expect to operate approximately 95% of our planned capacity in the first quarter of 2022. Additionally, we expect that the rest of the fleet will return to operations before the summer season.

Uncertainties remain as to the specifics, timing and costs of administering and implementing our health and safety measures, some of which may be significant. Based on our assessment of these requirements and recommendations, the status of COVID-19 infection, and its related variants, and/or vaccination rates in the U.S. or globally or for other reasons, we may determine it necessary to cancel or modify certain of our Global Brands' cruise sailings. We believe the impact to our global bookings resulting from COVID-19 will continue to have a material negative impact on our results of operations and liquidity, which may be prolonged beyond containment of the disease and its variants.

Significant events affecting travel, including COVID-19 and our gradual resumption of cruise operations, typically have an impact on the booking pattern for cruise vacations, with the full extent of the impact generally determined by the length of time the event influences travel decisions. The estimation of our future liquidity requirements include numerous assumptions that are subject to various risks and uncertainties. The principal assumptions used to estimate our future liquidity requirements consist of:

- Expected continued gradual resumption of cruise operations;

- Expected sustained increase in revenue per available passenger cruise day during our continued resumption of cruise operations;

- Expected lower than comparable historical occupancy levels during our continued resumption of cruise operations, increasing over time until we reach historical occupancy levels; and

- Expected spend during our continued resumption of cruise operations, including returning our crew members to our vessels and maintaining enhanced health and safety protocols.

There can be no assurance that our assumptions and estimates are accurate due to possible variables, including, but not limited to, the uncertainties associated with regulatory requirements and recommendations, subsequent changes to and/or enforceability of those requirements and recommendations, our ability to meet the requirements and recommendations, and whether efforts by countries to contain the disease and its variants will further restrict our ability to resume operations. We have implemented a number of proactive measures to mitigate the financial and operational impacts of COVID-19, including reduction of capital expenditures and operating expenses, the issuance of debt and shares of our common stock, the amendment of credit agreements to defer payments, the waiver and/or modification of covenant requirements and the suspension of

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

dividend payments. Additionally, we expect to continue to pursue refinancing opportunities to reduce interest expense and extend maturities.

As of December 31, 2021, we had liquidity of $3.5 billion, including $0.1 billion of undrawn revolving credit facility capacity, $2.7 billion in cash and cash equivalents and a $0.7 billion commitment for a 364-day term loan facility. Our revolving credit facilities were mostly utilized through a combination of amounts drawn and letters of credit issued under the facilities as of December 31, 2021. We temporarily applied the net proceeds of the $1.0 billion January 2022 Unsecured Notes to repay borrowings under our revolving credit facilities, bringing our undrawn revolving credit facility capacity to $1.1 billion as of the date of the issuance of this report, from $0.1 billion as of December 31, 2021.

During the fourth quarter of 2021, we amended $7.3 billion of outstanding export-credit financing plus committed export-credit facilities to modify financial covenant levels for 2023 and 2024, following the waiver period through and including the fourth quarter of 2022. Refer to Note 8. *Debt* for further discussion on the $1.0 billion senior notes issued in January of 2022, our 2021 financing activities, and for further information regarding the amendments made to our debt facilities and credit card processing agreements, including related covenants. As of December 31, 2021, we were in compliance with our financial covenants.

Based on our assumptions regarding the impact of COVID-19 and our resumption of operations, as well as our present financial condition, we believe that we have sufficient financial resources to fund our obligations for at least the next twelve months from the issuance of these financial statements.

Beyond the next 12 months, in June of 2023, approximately $3.2 billion of long- term debt will need to be refinanced in order to maintain the Company's liquidity position.

In February 2022, we entered into certain agreements with Morgan Stanley & Co., LLC ("MS") where MS agrees to provide backstop committed financing to refinance, repurchase and/or repay in whole or in part our existing and outstanding 10.875% Senior Secured Notes due 2023, 9.125% Priority Guaranteed Notes due 2023, and 4.25% Convertible Notes due 2023. Pursuant to the agreements, we may, at our sole option, issue and sell to MS (subject to the satisfaction of certain conditions) five-year senior unsecured notes with gross proceeds of up to $3.15 billion at any time between April 1, 2023 and June 29, 2023, to refinance the aforementioned notes.

If the Company is unable to maintain the required minimum level of liquidity or negotiate its minimum liquidity requirements, it could have a significant adverse effect on the Company's business, financial condition and operating results.

*Basis for Preparation of Consolidated Financial Statements*

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). Estimates are required for the preparation of financial statements in accordance with these principles. Actual results could differ from these estimates. Refer to Note 2. *Summary of Significant Accounting Policies* for a discussion of our significant accounting policies.

All significant intercompany accounts and transactions are eliminated in consolidation. We consolidate entities over which we have control, usually evidenced by a direct ownership interest of greater than 50%, and variable interest entities where we are determined to be the primary beneficiary. Refer to Note 7. *Other Assets* for further information regarding our variable interest entities. For affiliates we do not control but over which we have significant influence on financial and operating policies, usually evidenced by a direct ownership interest from 20% to 50%, the investment is accounted for using the equity method.

Effective March 19, 2021, we sold our wholly-owned brand, Azamara Cruises ("Azamara"), including its three-ship fleet and associated intellectual property, to Sycamore Partners for $201 million, before closing adjustments. The sale of Azamara does not represent a strategic shift that will have a major effect on our operations and financial results, as we continue to provide similar itineraries to and source passengers from the markets served by the Azamara business. Therefore, the sale of Azamara did not meet the criteria for discontinued operations reporting. Effective March 19, 2021, we no longer consolidate Azamara's balance sheet nor recognize its results of operations in our consolidated financial statements. We recognized an immaterial gain on the sale during the quarter ended March 31, 2021 and have agreed to provide certain transition services to Azamara for a period of time for a fee.

On July 9, 2020, we acquired the remaining 33.3% interest in Silversea Cruises that we did not already own from Heritage Cruise Holding Ltd. As a result of the acquisition of the noncontrolling interest, Silversea Cruises is now a wholly owned cruise brand. As consideration for the noncontrolling interest, we issued to Heritage 5.2 million shares of common stock, par value

The accompanying notes are an integral part of these consolidated financial statements.

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

$0.01 per share, of Royal Caribbean Cruises Ltd. Pursuant to the agreement governing the acquisition, among other things, the parties terminated any existing obligation to issue Heritage any contingent consideration, at fair value, in connection with our acquisition of a 66.7% interest in Silversea Cruises on July 31, 2018. The share purchase did not result in a change of control. The purchase was accounted for as an equity transaction and no gain or loss was recognized in earnings.

Prior to October 1, 2021, we consolidated the operating results of Silversea Cruises on a three-month reporting lag to allow for more timely preparation of our consolidated financial statements. Effective October 1, 2021, we eliminated the three-month reporting lag to reflect Silversea Cruises' financial position, results of operations and cash flows concurrently and consistently with the fiscal calendar of the Company ("elimination of the Silversea reporting lag"). The elimination of the Silversea reporting lag represents a change in accounting principle which we believe to be preferable because it provides more current information to the users of our financial statements. A change in accounting principle requires retrospective application, if material. The impact of the elimination of the reporting lag was immaterial to prior periods and is immaterial for our fiscal year ended December 31, 2021. As a result, we have accounted for this change in accounting principle in our consolidated results for the year ended December 31, 2021. Accordingly, the results of Silversea Cruises from October 1, 2020 to December 31, 2021 are included in our consolidated statement of comprehensive loss for the year ended December 31, 2021. To effect the change, we have reflected the third quarter 2021 operating results for Silversea Cruises, which were a net loss of $62.6 million within Other income (expense) in our consolidated statement of comprehensive loss for the year ended December 31, 2021.

**Note 2. *Summary of Significant Accounting Policies***

*Revenues and Expenses*

Deposits received on sales of passenger cruises are initially recorded as customer deposit liabilities on our balance sheet. Customer deposits are subsequently recognized as passenger ticket revenues, together with revenues from onboard and other goods and services and all associated cruise operating expenses of a voyage. For further information on revenue recognition, refer to Note 3. *Revenue.*

*Cash and Cash Equivalents*

Cash and cash equivalents include cash and marketable securities with original maturities of less than 90 days.

*Inventories*

Inventories consist of provisions, supplies and fuel carried at the lower of cost (weighted-average) or net realizable value.

*Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation and amortization. We capitalize interest as part of the cost of acquiring certain assets. Improvement costs that we believe add value to our ships are capitalized as additions to the ship, the useful lives of the improvements are estimated and depreciated over the shorter of the improvements' estimated useful lives or that of the associated ship, and the replaced assets are disposed of on a net cost basis. The estimated cost and accumulated depreciation of replaced or refurbished ship components are written off and any resulting losses are recognized in *Cruise operating expenses.* Liquidated damages received from shipyards as a result of the late delivery of a new ship are recorded as reductions to the cost basis of the ship.

Depreciation of property and equipment is computed using the straight-line method over the estimated useful life of the asset. The useful lives of our ships are generally 30-35 years, net of a 10%-15% projected residual value. The 30-35-year useful life and 10%-15% residual value are based on the weighted-average of all major components of a ship. Our useful life and residual value estimates take into consideration the impact of anticipated technological changes, long-term cruise and vacation market conditions and historical useful lives of similarly-built ships. In addition, we take into consideration our estimates of the weighted-average useful lives of the ships' major component systems, such as hull, superstructure, main electric, engines and cabins. We employ a cost allocation methodology at the component level, in order to support the estimated weighted-average useful lives and residual values, as well as to determine the net cost basis of assets being replaced. Given the very large and complex nature of our ships, our accounting estimates related to ships and determinations of ship improvement costs to be capitalized require considerable judgment and are inherently uncertain. Depreciation for assets under finance leases is computed using the shorter of the lease term or related asset life, unless the asset is a finance lease due to title transferring or a purchase option that is reasonably certain of being exercised, in which case the asset is depreciated over the related asset life.

Depreciation of property and equipment is computed utilizing the following useful lives:

F-13

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

|  | Years |
|---|---|
| Ships | generally, 30-35 |
| Ship improvements | 3-25 |
| Buildings and improvements | 10-40 |
| Computer hardware and software | 3-10 |
| Transportation equipment and other | 3-30 |
| Leasehold improvements | Shorter of remaining lease term or useful life 3-30 |

We periodically review estimated useful lives and residual values for ongoing reasonableness, considering long term views on our intended use of each class of ships and the planned level of improvements to maintain and enhance vessels within those classes. In the event a factor is identified that may trigger a change in the estimated useful lives and residual values of our ships, a review of the estimate is completed.

We review long-lived assets for impairment whenever events or changes in circumstances indicate, based on estimated undiscounted future cash flows, that the carrying value of these assets may not be fully recoverable. For purposes of recognition and measurement of an impairment loss, long-lived assets are grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. The lowest level for which we maintain identifiable cash flows that are independent of the cash flows of other assets and liabilities is at the ship level for our ships. If estimated future cash flows are less than the carrying value of an asset, an impairment charge is recognized to the extent its carrying value exceeds fair value. Refer to Note 6. *Property and Equipment* for further information on determination of fair value for long-lived assets.

We use the deferral method to account for drydocking costs. Under the deferral method, drydocking costs incurred are deferred and charged to expense on a straight-line basis over the period to the next scheduled drydock, which we estimate to be a period of thirty to sixty months based on the vessel's age as required by Class. Deferred drydock costs consist of the costs to drydock the vessel and other costs incurred in connection with the drydock which are necessary to maintain the vessel's Class certification. Class certification is necessary in order for our cruise ships to be flagged in a specific country, obtain liability insurance and legally operate as passenger cruise ships. The activities associated with those drydocking costs cannot be performed while the vessel is in service and, as such, are done during a drydock as a planned major maintenance activity. The significant deferred drydock costs consist of hauling and wharfage services provided by the drydock facility, hull inspection and related activities (e.g., scraping, pressure cleaning, bottom painting), maintenance to steering propulsion, thruster equipment and ballast tanks, port services such as tugs, pilotage and line handling, and freight associated with these items. We perform a detailed analysis of the various activities performed for each drydock and only defer those costs that are directly related to planned major maintenance activities necessary to maintain Class. The costs deferred are related to activities not otherwise routinely periodically performed to maintain a vessel's designed and intended operating capability. Repairs and maintenance activities are charged to expense as incurred.

*Goodwill*

Goodwill represents the excess of cost over the fair value of net tangible and identifiable intangible assets acquired. We review goodwill for impairment at the reporting unit level annually or, when events or circumstances dictate, more frequently. The impairment review for goodwill consists of a qualitative assessment of whether it is more-likely-than-not that a reporting unit's fair value is less than its carrying value, and if necessary, a goodwill impairment test. Factors to consider when performing the qualitative assessment include general economic conditions, limitations on accessing capital, changes in forecasted operating results, changes in fuel prices and fluctuations in foreign exchange rates. If the qualitative assessment demonstrates that it is more-likely-than-not that the estimated fair value of the reporting unit exceeds its carrying value, it is not necessary to perform the goodwill impairment test. We may elect to bypass the qualitative assessment and proceed directly to step one, for any reporting unit, in any period. On a periodic basis, we elect to bypass the qualitative assessment and proceed to step one to corroborate the results of recent years' qualitative assessments. We can resume the qualitative assessment for any reporting unit in any subsequent period.

The goodwill impairment analysis consists of a comparison of the fair value of the reporting unit with its carrying value. We typically estimate the fair value of our reporting units using a discounted cash flow model, which may also include a combination of a market-based valuation approach. The estimation of fair value utilizing discounted expected future cash flows includes numerous uncertainties which require our significant judgment when making assumptions of expected revenues, operating costs, marketing, selling and administrative expenses, interest rates, ship additions and retirements as well as

F-14

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

assumptions regarding the cruise vacation industry's competitive environment and general economic and business conditions, among other factors. The principal assumptions used in the discounted cash flow model for our 2021 impairment assessments were: (i) forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate; and (ii) weighted average cost of capital (i.e., discount rate). The discounted cash flow model uses the most current projected operating results for the upcoming fiscal year as a base. We discount the projected cash flows using rates specific to the reporting unit based on its weighted-average cost of capital. If the fair value of the reporting unit exceeds its carrying value, no write-down of goodwill is required. If the fair value of the reporting unit is less than the carrying value of its net assets, an impairment is recognized based on the amount by which the carrying value of a reporting unit exceeds its fair value, not to exceed the total amount of goodwill allocated to such reporting unit.

*Intangible Assets*

In connection with our acquisitions, we have acquired certain intangible assets to which value has been assigned based on our estimates. Intangible assets that are deemed to have an indefinite life are not amortized, but are subject to an annual impairment test, or when events or circumstances dictate, more frequently. The impairment review for indefinite-life intangible assets can be performed using a qualitative or quantitative impairment assessment. The quantitative assessment consists of a comparison of the fair value of the asset with its carrying value. We estimate the fair value of these assets using a discounted cash flow model and various valuation methods depending on the nature of the intangible asset, such as the relief-from-royalty method for trademarks and trade names. The principal assumptions used in the discounted cash flows model for our 2021 impairment assessments were: (i) forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate; (ii) royalty rate; and (iii) weighted average cost of capital (i.e., discount rate). If the carrying value exceeds its fair value, an impairment loss is recognized in an amount equal to that excess. If the fair value exceeds its carrying value, the indefinite-life intangible asset is not considered impaired.

Other intangible assets assigned finite useful lives are amortized on a straight-line basis over their estimated useful lives.

*Contingencies — Litigation*

On an ongoing basis, we assess the potential liabilities related to any lawsuits or claims brought against us. While it is typically difficult to determine the timing and ultimate outcome of such actions, we use our best judgment to determine if it is probable that we will incur an expense related to the settlement or final adjudication of such matters and whether a reasonable estimation of such probable loss, if any, can be made. In assessing probable losses, we take into consideration estimates of the amount of insurance recoveries, if any, which are recorded as assets when recoverability is probable. We accrue a liability when we believe a loss is probable and the amount of loss can be reasonably estimated. Due to the inherent uncertainties related to the eventual outcome of litigation and potential insurance recoveries, it is possible that certain matters may be resolved for amounts materially different from any provisions or disclosures that we have previously made.

*Advertising Costs*

Advertising costs are expensed as incurred except those costs which result in tangible assets, such as brochures, which are treated as prepaid expenses and charged to expense as consumed. Advertising costs consist of media and online advertising as well as brochure, production and direct mail costs.

Media advertising was $303.2 million, $138.1 million and $309.4 million, and brochure, production and direct mail costs were $88.9 million, $69.1 million and $156.0 million for the years ended December 31, 2021, 2020 and 2019, respectively.

*Derivative Instruments*

We enter into various forward, swap and option contracts to manage our interest rate exposure and to limit our exposure to fluctuations in foreign currency exchange rates and fuel prices. These instruments are recorded on the balance sheet at their fair value and the vast majority are designated as hedges. We also use non-derivative financial instruments designated as hedges of our net investment in our foreign operations and investments. Although certain of our derivative financial instruments do not qualify or are not accounted for under hedge accounting, our objective is not to hold or issue derivative financial instruments for trading or other speculative purposes.

At inception of the hedge relationship, a derivative instrument that hedges the exposure to changes in the fair value of a firm commitment or a recognized asset or liability is designated as a fair value hedge. A derivative instrument that hedges a forecasted transaction or the variability of cash flows related to a recognized asset or liability is designated as a cash flow hedge.

**ROYAL CARIBBEAN CRUISES LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Changes in the fair value of derivatives that are designated as fair value hedges are offset against changes in the fair value of the underlying hedged assets, liabilities or firm commitments. Gains and losses on derivatives that are designated as cash flow hedges are recorded as a component of *Accumulated other comprehensive loss* until the underlying hedged transactions are recognized in earnings. The foreign currency transaction gain or loss of our non-derivative financial instruments and the changes in the fair value of derivatives designated as hedges of our net investment in foreign operations and investments are recognized as a component of *Accumulated other comprehensive loss* along with the associated foreign currency translation adjustment of the foreign operation or investment. In certain hedges of our net investment in foreign operations and investments, we exclude forward points from the assessment of hedge effectiveness and we amortize the related amounts directly into earnings.

On an ongoing basis, we assess whether derivatives used in hedging transactions are "highly effective" in offsetting changes in the fair value or cash flow of hedged items. For our net investment hedges, we use the dollar offset method to measure effectiveness. For all other hedging programs, we use the long-haul method to assess hedge effectiveness using regression analysis for each hedge relationship. The methodology for assessing hedge effectiveness is applied on a consistent basis for each one of our hedging programs (i.e., interest rate, foreign currency ship construction, foreign currency net investment and fuel). For our regression analysis, we use an observation period of up to three years, utilizing market data relevant to the hedge horizon of each hedge relationship. High effectiveness is achieved when a statistically valid relationship reflects a high degree of offset and correlation between the changes in the fair values of the derivative instrument and the hedged item. If it is determined that a derivative is not highly effective as a hedge or hedge accounting is discontinued, any change in fair value of the derivative since the last date at which it was determined to be effective is recognized in earnings.

Cash flows from derivative instruments that are designated as fair value or cash flow hedges are classified in the same category as the cash flows from the underlying hedged items. In the event that hedge accounting is discontinued, cash flows subsequent to the date of discontinuance are classified within investing activities. Cash flows from derivative instruments not designated as hedging instruments are classified as investing activities.

We consider the classification of the underlying hedged item's cash flows in determining the classification for the designated derivative instrument's cash flows. We classify derivative instrument cash flows from hedges of benchmark interest rate or hedges of fuel expense as operating activities due to the nature of the hedged item. Likewise, we classify derivative instrument cash flows from hedges of foreign currency risk on our newbuild ship payments as investing activities.

*Foreign Currency Translations and Transactions*

We translate assets and liabilities of our foreign subsidiaries whose functional currency is the local currency, at exchange rates in effect at the balance sheet date. We translate revenues and expenses at weighted-average exchange rates for the period. Equity is translated at historical rates and the resulting foreign currency translation adjustments are included as a component of *Accumulated other comprehensive loss*, which is reflected as a separate component of *Shareholders' equity*. Exchange gains or losses arising from the remeasurement of monetary assets and liabilities denominated in a currency other than the functional currency of the entity involved are immediately included in our earnings, except for certain liabilities that have been designated to act as a hedge of a net investment in foreign operation or investment. Exchange gains (losses) were $24.3 million, $(1.5) million and $0.4 million for the years ended December 31, 2021, 2020 and 2019, respectively, and were recorded within *Other income (expense)*. The majority of our transactions are settled in United States dollars. Gains or losses resulting from transactions denominated in other currencies are recognized in income at each balance sheet date.

*Concentrations of Credit Risk*

We monitor our credit risk associated with financial and other institutions with which we conduct significant business and, to minimize these risks, we select counterparties with credit risks acceptable to us and we seek to limit our exposure to an individual counterparty. Credit risk, including but not limited to counterparty nonperformance under derivative instruments, our credit facilities and new ship progress payment guarantees, is not considered significant, as we primarily conduct business with large, well-established financial institutions, insurance companies and export credit agencies many of which we have long-term relationships with and which have credit risks acceptable to us or where the credit risk is spread out among a large number of counterparties. As of December 31, 2021 and December 31, 2020, we had counterparty credit risk exposure under our derivative instruments of $1.9 million and $26.9 million respectively, which was limited to the cost of replacing the contracts in the event of non-performance by the counterparties to the contracts, the majority of which are currently our lending banks. We do not anticipate nonperformance by any of our significant counterparties. In addition, we have established guidelines we follow regarding credit ratings and instrument maturities to maintain safety and liquidity. We do not normally require collateral or other security to support credit relationships; however, in certain circumstances this option is available to us.

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*(Loss) Earnings Per Share*

Basic (loss) earnings per share is computed by dividing *Net (Loss) Income attributable to Royal Caribbean Cruises Ltd.* by the weighted-average number of shares of common stock outstanding during each period. Diluted (loss) earnings per share incorporates the incremental shares issuable upon the assumed exercise of stock options and conversion of potentially dilutive securities.

*Stock-Based Employee Compensation*

We measure and recognize compensation expense at the estimated fair value of employee stock awards. Compensation expense for awards and the related tax effects are recognized as they vest. We use the estimated amount of expected forfeitures to calculate compensation costs for all outstanding awards.

*Segment Reporting*

As of December 31, 2021, we controlled and operated three global cruise brands: Royal Caribbean International, Celebrity Cruises and Silversea Cruises. We also own a 50% joint venture interest in TUIC, that operates the German brands TUI Cruises and Hapag-Lloyd Cruises. We believe our brands possess the versatility to enter multiple cruise market segments within the cruise vacation industry. Although each of these brands has its own marketing style as well as ships and crews of various sizes, the nature of the products sold and services delivered by these brands share a common base (i.e., the sale and provision of cruise vacations). Our brands also have similar itineraries as well as similar cost and revenue components. In addition, our brands source passengers from similar markets around the world and operate in similar economic environments with a significant degree of commercial overlap. As a result, our brands have been aggregated as a single reportable segment based on the similarity of their economic characteristics, types of consumers, regulatory environment, maintenance requirements, supporting systems and processes as well as products and services provided. Our Chief Executive Officer has been identified as the chief operating decision-maker and all significant operating decisions including the allocation of resources are based upon the analyses of the Company as one segment. Refer to Note 3. *Revenue* for passenger ticket revenue information by geographic area.

*Recent Accounting Pronouncements*

In March 2020, the FASB issued ASU No. 2020-04, Reference Rate Reform (Topic 848), which provides optional expedients and exceptions to the current guidance on contract modifications and hedging relationships to ease the financial reporting burdens of the expected market transition from LIBOR and other interbank offered rates to alternative reference rates. Subsequently, in January 2021, the FASB issued ASU No. 2021-01, Reference Rate Reform (Topic 848), which presents amendments to clarify that certain optional expedients and exceptions in Topic 848 for contract modifications and hedge accounting apply to derivatives that are affected by the discounting transition. The guidance in both ASUs was effective upon issuance and may be applied prospectively to contract modifications made and hedging relationships entered into or evaluated on or before December 31, 2022. We are currently evaluating the impact of the new guidance on our consolidated financial statements. The impact, if any, will be dependent on the terms of any future contract modifications related to a change in reference rate.

In August 2020, the FASB issued ASU No. 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40), which simplifies the accounting for convertible instruments. The guidance removes certain accounting models which separate the embedded conversion features from the host contract for convertible instruments, requiring bifurcation only if the convertible debt feature qualifies as a derivative under ASC 815 or for convertible debt issued at a substantial premium. The ASU removes certain settlement conditions required for equity contracts to qualify for the derivative scope exception, permitting more contracts to qualify for it. In addition, the guidance eliminates the treasury stock method to calculate diluted earnings per share for convertible instruments and requires the use of the if-converted method. The ASU is effective for annual reporting periods beginning after December 15, 2021, including interim reporting periods within those annual periods, with early adoption permitted no earlier than the fiscal year beginning after December 15, 2020. We plan to adopt the new guidance on January 1, 2022 using the modified retrospective approach and expect to record a cumulative effect of adoption of approximately $146 million to retained earnings. The adoption will also result in a reduction to additional paid in capital of $308 million, and an increase to debt by $162 million primarily as a result of the reversal of the remaining non-cash convertible debt discount. The guidance will also result in a decrease in interest expense and will require us to use the more dilutive "if-converted" method when calculating the dilutive impact of our convertible debt instruments on earnings per share.

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Note 3.** *Revenue*

**Revenue Recognition**

Revenues are measured based on consideration specified in our contracts with customers and are recognized as the related performance obligations are satisfied.

The majority of our revenues are derived from passenger cruise contracts which are reported within *Passenger ticket revenues* in our consolidated statements of comprehensive income (loss). Our performance obligation under these contracts is to provide a cruise vacation in exchange for the ticket price. We satisfy this performance obligation and recognize revenue over the duration of each cruise, which generally range from one to 25 nights.

*Passenger ticket revenues* include charges to our guests for port costs that vary with passenger head counts. These types of port costs, along with port costs that do not vary by passenger head counts, are included in our operating expenses. The amounts of port costs charged to our guests and included within *Passenger ticket revenues* on a gross basis were $104.8 million,$125.0 million and $666.8 million for the years ended December 31, 2021, 2020 and 2019, respectively.

Our total revenues also include *Onboard and other revenues*, which consist primarily of revenues from the sale of goods and services onboard our ships that are not included in passenger ticket prices. We receive payment before or concurrently with the transfer of these goods and services to passengers during a cruise and recognize revenue at the time of transfer over the duration of the related cruise.

As a practical expedient, we have omitted disclosures on our remaining performance obligations as the duration of our contracts with customers is less than a year.

**Disaggregated Revenues**

The following table disaggregates our total revenues by geographic regions where we provide cruise itineraries (in thousands):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| **Revenues by itinerary** | | | | | | |
| North America(1) | $ | 1,039,783 | $ | 1,342,429 | $ | 6,392,354 |
| Asia/Pacific(2) | | 128,348 | | 411,865 | | 1,529,898 |
| Europe(3) | | 180,256 | | 18,604 | | 1,942,057 |
| Other regions | | 77,985 | | 241,590 | | 567,904 |
| **Total revenues by itinerary** | | 1,426,372 | | 2,014,488 | | 10,432,213 |
| **Other revenues(4)** | | 105,761 | | 194,317 | | 518,448 |
| **Total revenues** | $ | 1,532,133 | $ | 2,208,805 | $ | 10,950,661 |

(1)Includes the United States, Canada, Mexico and the Caribbean.

(2)Includes Southeast Asia (e.g., Singapore, Thailand and the Philippines), East Asia (e.g., China and Japan), South Asia (e.g., India and Pakistan) and Oceania (e.g., Australia and Fiji Islands) regions.

(3)Includes European countries (e.g., the Nordics, Germany, France, Italy, Spain and the United Kingdom).

(4)Includes revenues primarily related to cancellation fees, vacation protection insurance and pre- and post-cruise tours and fees for operating certain port facilities. Amounts also include revenues related to our bareboat charter, procurement and management related services we perform on behalf of our unconsolidated affiliates. Refer to Note 7. *Other Assets* for more information on our unconsolidated affiliates.

Passenger ticket revenues are attributed to geographic areas based on where the reservation originates. For the years ended December 31, 2021, 2020 and 2019, our guests were sourced from the following areas:

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2021 | 2020 | 2019 |
| **Passenger ticket revenues:** | | | |
| United States | 76 % | 67 % | 65 % |
| All other countries (1) | 24 % | 33 % | 35 % |

(1) No other individual country's revenue exceeded 10% for the years ended December 31, 2021, 2020 and 2019.

**Customer Deposits and Contract Liabilities**

Our payment terms generally require an upfront deposit to confirm a reservation, with the balance due prior to the cruise. Deposits received on sales of passenger cruises are initially recorded as *Customer deposits* in our consolidated balance sheets and subsequently recognized as passenger ticket revenues during the duration of the cruise. Additionally, refunds payable to guests who have elected cash refunds for cancelled sailings are recorded in *Accounts Payable*. ASC 606, *Revenues from Contracts with Customers*, defines a "contract liability" as an entity's obligation to transfer goods or services to a customer for which the entity has received consideration from the customer. We do not consider customer deposits to be a contract liability until the customer no longer retains the unilateral right, resulting from the passage of time, to cancel such customer's reservation and receive a full refund.

The reduction in demand for cruising due to the COVID-19 pandemic resulted in lower than historical levels of advance bookings and the associated customer deposits received. At the same time, we experienced significant cancellations as a result of the COVID-19 pandemic, which led to issuance of refunds to customers, while the remainder has been rebooked on future cruises or received credits in lieu of cash refunds.

As of December 31, 2021, refunds due to customers mostly as a result of cancelling their sailings were $38.8 million compared to $95.8 million as of December 31, 2020 and are included within *Accounts payable* in our consolidated balance sheets. Customer deposits also include deposits related to cancelled cruises prior to the election of a cash refund by guests. Due to the uncertainty related to the timing and pace of our return for cruising, we are unable to estimate the amount of the December 31, 2021 customer deposits that will be recognized in earnings compared to amounts that will be refunded to customers or issued as a credit for future travel through the end of 2022. *Customer deposits* presented in our consolidated balance sheets include contract liabilities of $814.3 million and $124.8 million as of December 31, 2021 and December 31, 2020, respectively.

We have provided flexibility to guests with bookings on sailings cancelled due to COVID-19 by allowing guests to receive future cruise credits ("FCC") or elect to receive refunds in cash. As of December 31, 2021, our customer deposit balance includes approximately $600.0 million of unredeemed FCCs. As of December 31, 2021, the expiration date of the FCCs was extended until April 2022 for sailings departing on or before December 2022. Given the uncertainty of travel demand caused by COVID-19 and lack of comparable historical experience of FCC redemptions, we are unable to estimate the number of FCCs that may expire unused in future periods and get recognized as breakage. We will update our breakage analysis as future information is received.

**Contract Receivables and Contract Assets**

Although we generally require full payment from our customers prior to their cruise, we grant credit terms to a relatively small portion of our revenue sourced in select markets outside of the United States. As a result, we have outstanding receivables from passenger cruise contracts in those markets. We also have receivables from credit card merchants for cruise ticket purchases and goods and services sold to guests during cruises that are collected before, during or shortly after the cruise voyage. In addition, we have receivables due from concessionaires onboard our vessels. These receivables are included within *Trade and other receivables, net* in our consolidated balance sheets.

We have contract assets that are conditional rights to consideration for satisfying the construction services performance obligations under a service concession arrangement. As of December 31, 2021 and 2020, our contract assets were $52.9 million and $53.7 million, respectively, and were included within *Other assets* in our consolidated balance sheets. Given the short duration of our cruises and our collection terms, we do not have any other significant contract assets.

**Assets Recognized from the Costs to Obtain a Contract with a Customer**

Prepaid travel advisor commissions are an incremental cost of obtaining contracts with customers that we recognize as an asset and include within *Prepaid expenses and other assets* in our consolidated balance sheets. Prepaid travel advisor

commissions were $75.4 million and $1.1 million as of December 31, 2021 and 2020, respectively. Our prepaid travel advisor commissions at December 31, 2020 were expensed and reported primarily within *Other operating* in our consolidated statements of comprehensive income (loss) during the year ended December 31, 2021.

**Note 4.** *Goodwill*

The impact of COVID-19 on our operating plans and projected cash flows resulted in the completion of interim impairment assessments in respect of certain reporting units as of March 31, 2020 and June 30, 2020, in addition to our annual goodwill impairment assessments performed as of November 30, 2020, and November 30, 2021. Refer to Note 1. *General* for further information regarding COVID-19 and its impact to the Company.

In respect to the Royal Caribbean International reporting unit, we determined that the fair value of the Royal Caribbean International reporting unit exceeded its carrying value as of March 31, 2020 and June 30, 2020 by approximately 30% and 8%, respectively, resulting in no impairment to the Royal Caribbean International goodwill in those periods. We did not perform an interim impairment evaluation of Royal Caribbean International's goodwill during the quarter ended September 30, 2020 as no triggering events were identified. As of November 30, 2020, we performed our annual goodwill impairment review and determined the fair value of the Royal Caribbean International reporting unit exceeded its carrying value by approximately 14%. We did not perform interim impairment evaluations during the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021 as no triggering events were identified.

In respect to the Silversea Cruises reporting unit, we determined the carrying value of the reporting unit exceeded its fair value as of March 31, 2020. Accordingly, we recognized a goodwill impairment charge of $576.2 million for the quarter ended March 31, 2020. We did not perform interim impairment evaluations of Silversea Cruises' reporting unit during the quarters ended June 30, 2020 and September 30, 2020 as no triggering events were identified. As of November 30, 2020, we performed our annual goodwill impairment review and determined the fair value of the Silversea Cruises reporting unit exceeded its carrying value by approximately 12%. We did not perform interim impairment evaluations during the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021 as no triggering events were identified.

As of November 30, 2021, we performed our annual goodwill impairment reviews and determined no incremental impairment losses existed at the date of this annual assessment. We determined the fair value of the Royal Caribbean International and Silversea Cruises reporting units exceeded their carrying values by approximately 38% and 35%, respectively, at the date of this annual assessment.

The gradual resumption of cruise operations, as further discussed in Note 1. *General*, and possibility of further delays or suspensions create uncertainty in forecasting operating cash flows. The fair value of the Royal Caribbean International reporting unit as of March 31, 2020 was determined using a probability-weighted discounted cash flow model. For the June 30, 2020 and November 30, 2020 assessments, we used a probability-weighted discounted cash flow model in combination with a market-based valuation approach. For the Silversea reporting unit, a probability-weighted discounted cash flow model in combination with a market-based valuation approach was used for all periods assessed in 2020. As of November 30, 2021, a discounted cash flow model was used in combination with a market-based valuation approach for both reporting units. This requires the use of assumptions that are subject to risk and uncertainties. The principal assumptions used in the discounted cash flow analyses that support our Royal Caribbean International and Silversea Cruises reporting unit impairment assessments consisted of:

- Forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate; and

- Weighted average cost of capital (i.e., discount rate).

The adverse impact COVID-19 will continue to have on our business, operating results, cash flows and overall financial condition is uncertain and may result in changes to the assumptions used in the impairment tests discussed above, which may result in impairments to these assets in the future.

The carrying value of goodwill attributable to our Royal Caribbean International, Celebrity Cruises and Silversea Cruises reporting units and the changes in such balances during the years ended December 31, 2021 and 2020 were as follows (in thousands):

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Royal Caribbean International | Celebrity Cruises | Silversea Cruises (1) | Total |
|---|---|---|---|---|
| Balance at December 31, 2019 | $ 299,226 | $ 1,632 | $ 1,084,786 | $ 1,385,644 |
| Impairment charge | — | — | (576,208) | (576,208) |
| Transfer of goodwill attributable to the 2019 purchase of photo operations onboard our ships (2) | (2,694) | 2,694 | — | — |
| Foreign currency translation adjustment | 44 | — | — | 44 |
| Balance at December 31, 2020 | 296,576 | 4,326 | 508,578 | 809,480 |
| Foreign currency translation adjustment | (97) | — | — | (97) |
| Balance at December 31, 2021 | $ 296,479 | $ 4,326 | $ 508,578 | $ 809,383 |

---

(1)   In 2018, we acquired a 66.7% equity stake in Silversea Cruises. Our controlling interest purchase price allocation was final during 2019. In 2020, we acquired the remaining 33.3% minority interest, making Silversea Cruises a wholly owned brand. Refer to Note 1. *General* for further information.

(2)   In 2019, we purchased the photo operations onboard our ships from our former concessionaire. The acquisition was accounted for as a business purchase combination using the purchase method of accounting which requires the use of fair value measurements. The business combination, including purchase transaction and assets acquired, was immaterial to our consolidated financial statements.

**Note 5.** *Intangible Assets*

Intangible assets consist of finite and indefinite life assets and are reported within *Other assets* in our consolidated balance sheets.

The impact of COVID-19 on our operating plans and projected cash flows resulted in the completion of an interim impairment assessment for the Silversea Cruises trade name as of March 31, 2020, in addition to our annual indefinite-lived intangible asset impairment assessments performed as of November 30, 2020 and November 30, 2021. Refer to Note 1. *General* for further information regarding COVID-19 and its impact to the Company.

As a result of our evaluation, we determined the carrying value of the Silversea Cruises trade name exceeded its fair value as of March 31, 2020. Accordingly, we recognized an impairment charge of $30.8 million for the quarter ended March 31, 2020. We did not perform interim impairment evaluations of Silversea Cruises' trade name during the quarters ended June 30, 2020 and September 30, 2020, as no triggering events were identified. As of November 30, 2020, we performed our annual trade name impairment review and determined the fair value of the Silversea Cruise trade name exceeded its carrying value by approximately 3%. We did not perform interim impairment evaluations of Silversea Cruises' trade name during the quarters ended March 31, 2021, June 30, 2021, and September 30, 2021 as no triggering events were identified.

As of November 30, 2021, we performed our annual trade name impairment review and determined no incremental impairment losses existed at the date of this annual assessment. We determined the fair value of the Silversea Cruises trade name exceeded its carrying value by approximately 19% at the date of this annual assessment. The adverse impact COVID-19 will continue to have on our business, operating results, cash flows and overall financial condition is uncertain and may result in changes to the assumptions used in the impairment tests discussed above. In addition, delays in achieving occupancy levels at historical levels or changes to our planned ship deliveries could adversely impact our expected occupancy rates and may result in additional impairment charges of Silversea Cruises trade name in the future.

The gradual resumption of cruise operations, as further discussed in Note 1. *General*, and possibility of further delays or suspensions create uncertainty in forecasting operating cash flows. The determination of our trade name fair values using a discounted cash flow model and various valuation methods depending on the nature of the intangible asset, such as the relief-from-royalty method, require the use of assumptions that are subject to risk and uncertainties. The principal assumptions used in the discounted cash flow analyses that support the Silversea Cruises trade name impairment assessments consisted of:

- Forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate;

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

- Royalty rate; and

- Weighted average cost of capital (i.e., discount rate).

The following is a summary of our intangible assets as of December 31, 2021 (in thousands, except weighted average amortization period), with Silversea Cruises' trade name representing approximately $318.7 million of the indefinite-lived intangible asset balance:

|  | Remaining Weighted Average Amortization Period (Years) | Gross Carrying Value | Accumulated Amortization | Accumulated Impairment Losses | Net Carrying Value |
|---|---|---|---|---|---|
| **As of December 31, 2021** | | | | | |
| Finite-life intangible assets: | | | | | |
| Customer relationships | 11.6 | $ 97,400 | $ 22,186 | $ — | $ 75,214 |
| Galapagos operating license | 22.6 | 47,669 | 9,802 | — | 37,867 |
| Other finite-life intangible assets | 0 | 11,560 | 11,560 | — | — |
| Total finite-life intangible assets | | 156,629 | 43,548 | — | 113,081 |
| Indefinite-life intangible assets [1] | | 352,275 | — | 30,800 | 321,475 |
| Total intangible assets, net | | $ 508,904 | $ 43,548 | $ 30,800 | $ 434,556 |

[1] Primarily relates to the Silversea Cruises trade name.

The following is a summary of our intangible assets as of December 31, 2020 (in thousands, except weighted average amortization period):

|  | Remaining Weighted Average Amortization Period (Years) | Gross Carrying Value | Accumulated Amortization | Accumulated Impairment Losses | Net Carrying Value |
|---|---|---|---|---|---|
| **As of December 31, 2020** | | | | | |
| Finite-life intangible assets: | | | | | |
| Customer relationships | 12.8 | $ 97,400 | $ 14,069 | $ — | $ 83,331 |
| Galapagos operating license | 23.8 | 47,669 | 7,621 | — | 40,048 |
| Other finite-life intangible assets | 0 | 11,560 | 11,560 | — | — |
| Total finite-life intangible assets | | 156,629 | 33,250 | — | 123,379 |
| Indefinite-life intangible assets [1] | | 352,275 | — | 30,800 | 321,475 |
| Total intangible assets, net | | $ 508,904 | $ 33,250 | $ 30,800 | $ 444,854 |

[1] Primarily relates to the Silversea Cruises trade name.

The estimated future amortization for finite-life intangible assets for each of the next five years is as follows (in thousands):

| Year | |
|---|---|
| 2022 | $ 8,179 |
| 2023 | 8,179 |
| 2024 | 8,179 |
| 2025 | 8,179 |
| 2026 | 8,179 |

Table of Contents

Table of Contents

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Note 6.** *Property and Equipment*

Property and equipment consists of the following (in thousands):

|  | As of December 31, | |
|  | 2021 | 2020 |
|---|---|---|
| Ships | $ 31,357,703 | $ 29,872,655 |
| Ship improvements | 2,152,457 | 2,108,922 |
| Ships under construction | 1,180,486 | 1,078,243 |
| Land, buildings and improvements, including leasehold improvements and port facilities | 746,785 | 524,849 |
| Computer hardware and software, transportation equipment and other | 1,650,249 | 1,678,903 |
| Total property and equipment | 37,087,680 | 35,263,572 |
| Less—accumulated depreciation and amortization[1] | (11,179,731) | (10,016,977) |
|  | $ 25,907,949 | $ 25,246,595 |

(1) Amount includes accumulated depreciation and amortization for assets in service.

Ships under construction include progress payments for the construction of new ships as well as planning, design, capitalized interest and other associated costs. We capitalized interest costs of $58.8 million, $59.1 million, and $56.5 million for the years ended December 31, 2021, 2020 and 2019, respectively.

During 2021, we took delivery of *Odyssey of the Seas*, *Silver Dawn* and, with our joint venture partner TUIC, we took delivery of *Hanseatic Spirit*. The November 2021 delivery and related financing for the *Silver Dawn* was reported in our consolidated financial statements as of and for the year ended December 31, 2021, as a result of the elimination of the Silversea Cruises three month reporting lag. In January of 2022, we took delivery of *Wonder of the Seas*. Refer to Note 8. *Debt* for further information on the financings for *Odyssey of the Seas* and *Wonder of the Seas* and to Note 9. *Leases* on the financing for *Silver Dawn*.

During the first quarter 2020, we determined that the lease for *Silver Explorer*, operated by Silversea Cruises and previously classified as a finance lease, was an operating lease based on modification of the terms of the lease. Accordingly, *Silver Explorer* is included within *Operating lease right-of-use assets*, *Current portion of operating lease liabilities*, and *Long term lease liabilities* in our consolidated balance sheets. Refer to Note 9. *Leases* for further information.

*Long-lived Assets impairments*

We review our long-lived assets for impairment whenever events or circumstances indicate potential impairment losses exist. The impact of COVID-19 on our expected future operating cash flows, as well as decisions to dispose of certain vessels, resulted in the identification of impairment triggers for certain vessels in 2020. Refer to Note 1. *General* for further information regarding COVID-19 and its impact to the Company.

We estimated the recoverability of certain vessels using undiscounted cash flow analyses at interim dates throughout 2020 and at December 31, 2020. A number of vessels were found to have net carrying values in excess of their estimated undiscounted future cash flows and, as such, were subject to fair value assessments. Fair value was determined based on our intended use of the identified vessels and, as such, we used a combination of discounted cash flows, replacement cost, scrap and residual value techniques to estimate fair value. Differences between the estimated fair values and the net carrying values were recorded as an impairment charge within the period the loss was identified. Consequently, we recorded $635.5 million of impairment losses during the year ended 2020. Included in this 2020 amount are $171.3 million impairment losses recorded for the three ships that we chartered to Pullmantur Holdings, prior to its filing for reorganization. Refer to Note 7. *Other Assets* for further information regarding Pullmantur's reorganization. During the quarter ended September 30, 2020, we sold the ships previously chartered to Pullmantur Holdings to third parties for amounts approximating their carrying values and no further impairment was recorded. Also included in the $635.5 million impairment loss for the year ended December 31, 2020, is a $166.8 million impairment charge for the three Azamara ships included in the sale of the Azamara brand, effective March 19, 2021. There were no vessel impairment charges for the year ended December 31, 2021.

The suspension of operations, as discussed in Note 1. *General*, and the possibility of further suspensions create uncertainty in forecasting undiscounted cash flows, which are used to determine if a vessel is at risk of impairment and in estimating the fair value of our ships. Our principal assumptions used in our undiscounted cash flows consisted of:

F-23

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

- The timing of our return to service, changes in market conditions and port or other restrictions;

- Forecasted net revenues, primarily the timing of returning to normalized operations, and occupancy rates; and

- Intended use of the vessel for the remaining useful life.

The adverse impact COVID-19 will continue to have on our business, operating results, cash flows and overall financial condition is uncertain and may result in changes to the assumptions used in the impairment tests discussed above, which may result in additional impairments to these assets in the future.

During the years ended December 31, 2021 and 2020, we also determined that certain construction in progress projects would be reduced in scope or would no longer be completed as a result of our capital cost containment measures in response to the COVID-19 impact on our liquidity. We recorded property and equipment impairment charges of $55.2 million and $91.5 million, during the years ended December 31, 2021 and December 31, 2020, respectively, which primarily related to construction in progress assets.

These impairment charges were reported within *Impairment and Credit Losses* in our consolidated statements of comprehensive (loss) income.

**Note 7. *Other Assets***

A Variable Interest Entity ("VIE") is an entity in which the equity investors have not provided enough equity to finance the entity's activities or the equity investors (1) cannot directly or indirectly make decisions about the entity's activities through their voting rights or similar rights; (2) do not have the obligation to absorb the expected losses of the entity; (3) do not have the right to receive the expected residual returns of the entity; or (4) have voting rights that are not proportionate to their economic interests and the entity's activities involve or are conducted on behalf of an investor with a disproportionately small voting interest.

We have determined that TUI Cruises GmbH ("TUIC"), our 50%-owned joint venture, which operates the brands TUI Cruises and Hapag-Lloyd Cruises, is a VIE. We have determined that we are not the primary beneficiary of TUIC. We believe that the power to direct the activities that most significantly impact TUIC's economic performance are shared between ourselves and TUI AG, our joint venture partner. All the significant operating and financial decisions of TUIC require the consent of both parties, which we believe creates shared power over TUIC. Accordingly, we do not consolidate this entity and account for this investment under the equity method of accounting.

On June 30, 2020, TUIC acquired Hapag-Lloyd Cruises, a luxury and expedition brand for German-speaking guests, from TUI AG for approximately €1.2 billion, or approximately $1.3 billion as of the purchase date. Hapag-Lloyd Cruises operates two luxury liners and two smaller expedition ships. We and TUI AG each made an equity contribution of €75.0 million, or approximately $84.2 million to TUIC to fund a portion of the purchase price, the remainder of which was financed by third-party financing.

As of December 31, 2021, the net book value of our investment in TUIC was $444.4 million, primarily consisting of $322.4 million in equity and a loan of €103.0 million, or approximately $117.2 million, based on the exchange rate at December 31, 2021. As of December 31, 2020, the net book value of our investment in TUIC was $538.4 million, primarily consisting of $387.5 million in equity and a loan of €118.9 million, or approximately $145.5 million, based on the exchange rate at December 31, 2020. The loan, which was made in connection with the sale of *Splendour of the Seas* in April 2016, accrues interest at a rate of 6.25% per annum and is payable over 10 years. This loan is 50% guaranteed by TUI AG and is secured by a first priority mortgage on the ship. The majority of these amounts were included within *Other assets* in our consolidated balance sheets. During the quarter ended March 31, 2021, we and TUI AG each contributed €59.5 million, or approximately $69.9 million based on the exchange rate at March 31, 2021, of additional equity through a combination of cash contributions and conversion of existing receivables. In June 2021, Hapag-Lloyd Cruises received delivery of the *Hanseatic Spirit*, a 230 berth luxury expedition cruise vessel.

TUIC has various ship construction and financing agreements which include certain restrictions on each of our and TUI AG's ability to reduce our current ownership interest in TUIC below 37.55% through May 2033. Our investment amount and outstanding term loan are substantially our maximum exposure to loss in connection with our investment in TUIC.

We have determined that Pullmantur Holdings, in which we have a 49% noncontrolling interest and Springwater Capital LLC has a 51% interest, is a VIE for which we are not the primary beneficiary as we do not have the power to direct the activities that most significantly impact the entity's economic performance. In 2020, Pullmantur Holdings and certain of its

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

subsidiaries filed for reorganization under the terms of the Spanish insolvency laws due to the negative impact of the COVID-19 pandemic on the companies, and on July 15, 2021, Pullmantur Holdings and certain of its subsidiaries filed for liquidation. We suspended the equity method of accounting for Pullmantur Holdings during the second quarter of 2020 as we do not intend to fund the entity's future losses and lost our ability to exert significant influence over the entity's activities as a result of the reorganization and liquidation process.

In connection with the reorganization, we terminated the agreements chartering three of our ships to Pullmantur Holdings and sold the ships to third parties during the quarter ended September 30, 2020 for amounts approximating their carrying values. Refer to Note 6. *Property and Equipment* for further discussion on the impact of the ships' sale on our consolidated financial statements. In addition, we recognized a loss of $69.0 million within *Other expense* in our consolidated statements of comprehensive (loss) income, during the quarter ended June 30, 2020 representing deferred currency translation adjustment losses, net of hedging, as we no longer had significant involvement in the Pullmantur operation.

During the quarter ended June 30, 2020, we entered into an agreement with Springwater Capital LLC to settle the guests previously issued by them and for costs that we incurred as a result of Pullmantur S.A.'s reorganization. As part of this settlement, we agreed to provide Pullmantur guests the option to apply their paid deposits toward a Royal Caribbean International or Celebrity Cruises sailing, or request a cash refund. The estimated total cash refunds expected to be paid to Pullmantur guests and other expenses incurred as part of the liquidation were approximately $10.2 million and $21.6 million for the years ended December 31, 2021 and 2020, respectively. These amounts were recorded in *Other operating* and in *Other expense* in our consolidated statements of comprehensive (loss) income for the years ended December 31, 2021 and 2020.

We have determined that Grand Bahama Shipyard Ltd. ("Grand Bahama"), a ship repair and maintenance facility in which we have a 40% noncontrolling interest, is a VIE. This facility serves cruise and cargo ships, oil and gas tankers and offshore units. We utilize this facility, among other ship repair facilities, for our regularly scheduled drydocks and certain emergency repairs as may be required. During the years ended December 31, 2021 and 2020, we made payments of $9.3 million and $0.2 million, respectively, to Grand Bahama for ship repair and maintenance services. We have determined that we are not the primary beneficiary of this facility, as we do not have the power to direct the activities that most significantly impact the facility's economic performance. Accordingly, we do not consolidate this entity.

Given the impact of the COVID-19 pandemic to our business, we evaluated whether our equity method investments were other than temporarily impaired. During the quarter ended March 31, 2020, we performed an impairment evaluation on our investment in Grand Bahama. As a result of the evaluation, we did not deem our investment balance to be recoverable and recorded an impairment charge of $30.1 million. The impairment assessment and the resulting charge on our equity method investment in Grand Bahama were determined based on management's estimates and projections. We are currently recognizing our share of net accumulated equity method losses against the carrying value of our loans receivable from Grand Bahama, for which there were no impairments during 2021.

For further information on the measurements used to estimate the fair value of our equity investments, refer to Note 16. *Fair Value Measurements and Derivative Instruments.*

As of December 31, 2021, we had exposure to credit loss in Grand Bahama consisting of a $11.1 million loan. Our loan to Grand Bahama matures March of 2026 and bears interest at LIBOR plus 3.5% to 3.75%, capped at 5.75%. Interest payable on the loan is due on a semi-annual basis. During the year ended December 31, 2021, we received principal and interest payments of $8.9 million related to a term loan that had fully matured. We did not receive any principal and interest payments during the year ended December 31, 2020. The remaining loan balance is included within *Other assets* on our consolidated balance sheets.

We monitor credit risk associated with the loan through our participation on Grand Bahama's board of directors along with our review of Grand Bahama's financial statements and projected cash flows. Effective April 1, 2020, we placed the loan in non-accrual status based on our review of Grand Bahama's projected cash flows which have been adversely affected by impacts to their operations caused by the 2019 crane accident related to *Oasis of the Seas*, Hurricane Dorian and most recently, COVID-19. During the year ended December 31, 2021, no credit losses were recorded related to the fully matured loan, nor the outstanding loan.

The following tables set forth information regarding our investments accounted for under the equity method of accounting, including the entities discussed above, (in thousands):

Table of Contents

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | Year ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Share of equity (loss) income from investments | $ (135,469) | $ (213,286) | $ 230,980 |
| Dividends received [1] | $ — | $ 2,215 | $ 150,177 |

(1) For the year ended December 31, 2019, TUI Cruises paid us dividends totaling €170.0 million, or approximately $190.3 million, based on the exchange rates at the time of the transactions. There were no dividends received from TUI Cruises for the years ended December 31, 2021 and 2020, respectively. The amounts included in the table above are net of tax withholdings.

| | As of December 31, | |
|---|---|---|
| | **2021** | **2020** |
| Total notes receivable due from equity investments | $ 130,587 | $ 164,596 |
| Less-current portion [1] | 21,508 | 29,501 |
| Long-term portion [2] | $ 109,079 | $ 135,095 |

_____

(1)   Included within *Trade and other receivables, net* in our consolidated balance sheets.

(2)   Included within *Other assets* in our consolidated balance sheets.

We also provide ship management services to TUI Cruises GmbH and provided management services to Pullmantur Holdings (which filed for reorganization, and liquidation in Spain in 2020). Additionally, we bareboat chartered to Pullmantur Holdings the vessels previously operated by its brands, which were retained by us following the sale of our 51% interest in Pullmantur Holdings. These bareboat charters were terminated when Pullmantur Holdings filed for reorganization in Spain. We recorded the following as it relates to these services in our operating results within our consolidated statements of comprehensive income (loss) (in thousands):

| | Year ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Revenues | $ 24,568 | $ 21,372 | $ 47,242 |
| Expenses | $ 6,275 | $ 4,986 | $ 4,304 |

Summarized financial information for our affiliates accounted for under the equity method of accounting was as follows (in thousands):

| | As of December 31, | |
|---|---|---|
| | **2021** | **2020** |
| Current assets | $ 736,263 | $ 488,329 |
| Non-current assets | 5,241,302 | 5,456,061 |
| **Total assets** | $ 5,977,565 | $ 5,944,390 |
| | | |
| Current liabilities | $ 1,225,032 | $ 1,106,700 |
| Non- current liabilities | 3,860,646 | 3,771,992 |
| **Total liabilities** | $ 5,085,678 | $ 4,878,692 |

| | Year ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| Total revenues | $ 679,137 | $ 619,795 | $ 2,354,744 |
| Total expenses | (897,308) | (939,481) | (1,875,952) |
| Net (loss) income | $ (218,171) | $ (319,686) | $ 478,792 |

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Credit Losses*

We reviewed our notes receivable for credit losses in connection with the preparation of our financial statements. In evaluating the credit loss allowance, management considered factors such as historical loss experience, the types of loans and the amount of loans in the loan portfolio, adverse situations that may affect the borrower's ability to repay, the estimated value of any underlying collateral, peer group information and prevailing economic conditions. Based on these credit loss estimation factors, during the year ended December 31, 2021, we recorded a loss provision of $43.8 million. The 2021 loss provision was primarily related to a note receivable of approximately $24.3 million due from an investment previously reported under the equity-method of accounting, which we subsequently determined was no longer recoverable and wrote the amount off from our credit loss allowance. The 2021 credit loss provision also includes $12.6 million of other receivable balances primarily related to loans due from travel advisors. Our credit loss allowance beginning balance as of January 1, 2021 primarily relates to credit losses recognized during 2020 on notes receivable for the previous sale of our property and equipment of $81.6 million.

The following table summarizes our credit loss allowance related to receivables for the year ended December 31, 2021 (in thousands):

| | Credit Loss Allowance |
|---|---|
| Balance at January 1, 2021 | $ 85,4 |
| Loss provision for receivables | 43,8 |
| Write-offs | $ (29,07 |
| Balance at December 31, 2021 | $ 100,19 |

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Note 8.** *Debt*

Debt consists of the following (in thousands):

| | Interest Rate[1] | Maturities Through | As of December 31, | |
| --- | --- | --- | --- | --- |
| | | | 2021 | 2020 |
| **Fixed rate debt:** | | | | |
| Unsecured senior notes | 3.70% - 9.13% | 2022 - 2028 | $ 5,604,498 | $ 2,464,994 |
| Secured senior notes | 10.88% - 11.50% | 2023 - 2025 | 2,354,037 | 3,895,166 |
| Unsecured term loans | 2.53% - 5.41% | 2028 - 2032 | 2,860,567 | 3,210,161 |
| Convertible notes | 2.88% - 4.25% | 2023 | 1,558,780 | 1,454,488 |
| **Total fixed rate debt** | | | 12,377,882 | 11,024,809 |
| **Variable rate debt:** | | | | |
| Unsecured revolving credit facilities[2] | 1.51% -1.91% | 2022 - 2024 | 2,899,342 | 3,289,000 |
| Unsecured UK Commercial paper | | 2021 | — | 409,319 |
| USD unsecured term loan | 0.71% - 3.17% | 2022 - 2033 | 5,018,740 | 4,002,249 |
| Euro unsecured term loan | 1.74% -2.25% | 2022 - 2028 | 685,633 | 705,064 |
| **Total variable rate debt** | | | 8,603,715 | 8,405,632 |
| **Finance lease liabilities** | | | 472,275 | 213,365 |
| **Total debt [3]** | | | 21,453,872 | 19,643,806 |
| Less: unamortized debt issuance costs | | | (363,532) | (314,763) |
| Total debt, net of unamortized debt issuance costs | | | 21,090,340 | 19,329,043 |
| Less—current portion including commercial paper | | | (2,243,131) | (1,371,087) |
| Long-term portion | | | $ 18,847,209 | $ 17,957,956 |

(1)     Interest rates based on outstanding loan balance as of December 31, 2021 and, for variable rate debt, includes either LIBOR or EURIBOR plus the applicable margin.

(2)     Includes $1.9 billion facility and $1.3 billion facility, the vast majority of which is due in 2024. Our $1.9 billion facility accrues interest at LIBOR plus a maximum interest rate margin of 1.30%, which interest rate was 1.51%, as of December 31, 2021 and is subject to a facility fee of 0.20%. Our $1.3 billion facility accrues interest at LIBOR plus a maximum interest rate margin of 1.70%, which interest was 1.91% as of December 31, 2021 and is subject to a facility fee of a maximum of 0.30%.

(3)     At December 31, 2021 and 2020, the weighted average interest rate for total debt was 5.47% and 6.02%, respectively.

In March 2021, we amended our $1.55 billion unsecured revolving credit facility due October 2022 and our $1.0 billion unsecured term loan due April 2022. These amendments, among other things, extend the maturity date and termination date of certain of the advances and commitments, as applicable, under the facilities held by consenting lenders by 18 months and increase the interest rate margin and/or the facility fee, as applicable, with respect to advances and commitments held by such lenders. Consenting lenders also received a prepayment and commitment reduction equal to 20% of their respective outstanding advances and commitments. Following these amendments, the aggregate revolving capacity of the revolving credit facility is approximately $1.3 billion, with approximately $0.2 billion terminating in October 2022 and approximately $1.1 billion terminating in April 2024 and the aggregate principal balance of the term loan is approximately $0.9 billion, with approximately $0.3 billion maturing in April 2022 and approximately $0.6 billion maturing in October 2023.

As of December 31, 2021, our aggregate revolving borrowing capacity was $3.2 billion and was mostly utilized through a combination of amounts drawn and letters of credit issued under the facilities. Certain of our surety agreements with third party providers for the benefit of certain agencies and associations that provide travel related bonds, allow the sureties to request collateral. We also have agreements with our credit card processors relating to customer deposits received by us for future voyages. These agreements allow the credit card processors to require us, under certain circumstances, to maintain a reserve that can be

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

satisfied by posting collateral. As of December 31, 2021, we have posted letters of credit as collateral with our sureties and credit card processors under our revolving credit facilities in the amount of $193.3 million.

Executed amendments are in place for the majority of our credit card processors, waiving reserve requirements tied to breach of our financial covenants through at least September 30, 2022, with modified covenants thereafter, and as such, we do not anticipate any incremental collateral requirements for the processors covered by these waivers in the next 12 months. We have a reserve with a processor where the agreement was amended in the first quarter of 2021, such that proceeds are held in reserve until the sailing takes place or the funds are refunded to the customer. The maximum projected cash exposure with the processor, including amounts currently held and reported in Trade and other receivables, is approximately $285.0 million. The amount and timing are dependent on future factors that are uncertain, such as the pace of resumption of cruise operations, volume of future deposits and whether we transfer our business to other processors. If we require additional waivers on the credit card processing agreements and are not able to obtain them, this could lead to the termination of these agreements or the trigger of reserve requirements.

In March 2021, we took delivery of *Odyssey of the Seas*. To finance the purchase, we borrowed $994.1 million under a previously committed unsecured term loan which is 95% guaranteed by Euler Hermes Aktiengesellschaft ("Hermes"), the official export credit agency of Germany. The loan amortizes semi-annually over 12 years and bears interest at a floating rate equal to LIBOR plus a margin of 0.96%. Prior to delivery during the first quarter of 2021, we amended the credit agreement to (i) increase the maximum loan amount under the facility to make available to us a maximum amount equal to the US dollar equivalent of 80% of the vessel purchase price plus 100% of the premium payable to Hermes and (ii) defer the payment of all principal payments due between April 2021 and April 2022, which amounts will be repayable semi-annually over a five year period starting in April 2022.

In March 2021, we issued $1.50 billion of senior unsecured notes that mature in 2028, for net proceeds of $1.48 billion. Interest on the senior notes accrues at 5.5% per annum and is payable semi-annually. We used the proceeds from the notes to repay principal payments on debt maturing in 2021 and 2022, and the remaining for general corporate purposes.

In March 2021, we extended our binding commitment from Morgan Stanley Senior Funding Inc. for a $700.0 million term loan facility by one year. The commitment was initially obtained in August 2020, and as amended, we may draw on the facility at any time prior to August 12, 2022. Once drawn, the loan will bear interest at LIBOR plus 3.75% and will mature 364 days from funding. In addition, the facility, once drawn, will be guaranteed by RCI Holdings, LLC, our wholly owned subsidiary that owns the equity interests in subsidiaries that own seven of our vessels. We have the ability to increase the capacity of the facility by an additional $300.0 million from time to time subject to the receipt of additional or increased commitments and the issuance of guarantees from additional subsidiaries.

In June 2021, we issued $650.0 million of senior unsecured notes due in 2026 (the "June Unsecured Notes") for net proceeds of approximately $640.6 million. Interest accrues on the June Unsecured Notes at a fixed rate of 4.25% per annum and is payable semi-annually in arrears. We fully repaid the Silversea Cruises 7.25% senior secured notes due in 2025 (the "Silversea Notes"), in the amount of $619.8 million, with a portion of the proceeds from the June Unsecured Notes. We also funded call premiums, fees and expenses in connection with the redemption of the Silversea Notes with proceeds from the June Unsecured Notes.

Additionally, during the second quarter of 2021, we repaid in full a $130 million term loan.

In August 2021, we issued $1.0 billion of senior notes due in 2026 (the "August Unsecured Notes") for net proceeds of approximately $986.0 million. Interest accrues on the August Unsecured Notes at a fixed rate of 5.50% per annum and is payable semi-annually in arrears. We used the proceeds of the August Unsecured Notes to replenish our capital as a result of the redemption of a portion of the 11.50% senior secured notes due 2025, in the amount of $928.0 million plus accrued interest and premiums. The repayment of the 11.50% senior secured notes due 2025 resulted in a total loss on the extinguishment of debt of $141.9 million, which was recognized within Interest expense, net of interest capitalized within our consolidated statements of comprehensive loss for the year ended December 31, 2021.

In January 2022, we took delivery of *Wonder of the Seas*. To finance the delivery, we borrowed a total of $1.3 billion under a credit agreement novated to us in July of 2017, resulting in an unsecured term loan which is 100% guaranteed by Bpifrance Assurance Export ("BpiFAE"), the official export credit agency of France. The unsecured loan amortizes semi-annually over 12 years and bears interest at a fixed rate of 3.18%.

In January 2022, we issued $1.0 billion of senior notes (the "January 2022 Unsecured Notes") due in 2027 for net proceeds of approximately $990.0 million. Interest accrues on the January 2022 Unsecured Notes at a fixed rate of 5.375% per annum and is payable semi-annually in arrears. The proceeds from the January 2022 Unsecured Notes will be used to repay principal payments on debt maturing in 2022. Pending such debt maturities, we have temporarily applied the proceeds to repay borrowings under our

revolving credit facilities, bringing our undrawn revolving credit facility capacity to $1.1 billion as of the date of the issuance of this report from $0.1 billion as of December 31, 2021.

In February 2022, we entered into certain agreements with Morgan Stanley & Co., LLC ("MS") where MS agrees to provide backstop committed financing to refinance, repurchase and/or repay in whole or in part our existing and outstanding 10.875% Senior Secured Notes due 2023, 9.125% Priority Guaranteed Notes due 2023, and 4.25% Convertible Notes due 2023. Pursuant to the agreements, we may, at our sole option, issue and sell to MS (subject to the satisfaction of certain conditions) five-year senior unsecured notes with gross proceeds of up to $3.15 billion at any time between April 1, 2023 and June 29, 2023, to refinance the aforementioned notes.

During 2020, we amended all of our export credit facilities, all of our non-export credit facilities and certain of our credit card processing agreements which contain financial covenants to extend the financial covenant waiver through and including the fourth quarter of 2021. During the first quarter of 2021, we amended $4.9 billion of our non-export credit facilities and certain of our credit card processing agreements to extend the waiver of the financial covenants through and including the third quarter of 2022 or, if earlier, that date falling after January 1, 2022 on which we elect to comply with the modified covenants. Pursuant to the amendments, we have modified the manner in which such covenants are calculated (temporarily in certain cases and permanently in others) as well as the terms at which our net debt to capitalization covenant will be tested during the period commencing immediately following the end of the waiver period and continuing through the end of 2023. As of December 31, 2021, the monthly-tested minimum liquidity covenant was $350 million for the duration of the waiver period. As of the date of these financial statements, we were in compliance with the applicable minimum liquidity covenant. Pursuant to these amendments, the restrictions on paying cash dividends and effectuating share repurchases were extended through and including the third quarter of 2022.

During the first quarter of 2021, we also amended $6.3 billion of our export credit facilities to extend the waiver of the financial covenants through and including at least the end of the third quarter of 2022, and during the third quarter of 2021, we entered into a letter agreement to extend the waiver period to the end of the fourth quarter of 2022. During the fourth quarter of 2021, we amended $7.3 billion of outstanding export-credit financing plus committed export-credit facilities to modify financial covenant levels for 2023 and 2024, following the waiver period through and including the fourth quarter of 2022. These amendments deferred $1.15 billion of principal payments due between April 2021 and April 2022. The deferred amounts will be repayable semi-annually over a five-year period starting in April 2022. Pursuant to these amendments, we have agreed to implement the same liquidity covenant that applies in our non-export credit facilities. The amendments also provide for mandatory prepayment of the deferred amounts upon the taking of certain actions. Subject to a number of carve outs, these include, but are not limited to, issuance of dividends, completion of share repurchases, issuances of debt other than for crisis and recovery purposes, the making of loans and the sale of assets other than at arm's length.

In the fourth quarter of 2020 and the first quarter of 2021, we entered into amendments to our outstanding and committed export-credit facilities to provide for the issuance of guarantees in satisfaction of existing obligations under these facilities. Following issuance (which, in the case of the undrawn facilities, will occur once the debt is drawn), the guarantees will be released under certain circumstances as other debt is repaid or refinanced on an unsecured and unguaranteed basis. In connection with and following the issuance of the guarantees, the guarantor subsidiaries are restricted from issuing additional guarantees in favor of lenders (other than those lenders who are party to the ECA facilities), and certain of the guarantor subsidiaries are restricted from incurring additional debt. In addition, the ECA facilities will benefit from guarantees to be issued by intermediary parent companies of subsidiaries that take delivery of any new vessels subject to export-credit backed financing.

Except for the term loans we incurred to acquire *Celebrity Flora* and *Silver Moon*, all of our unsecured ship financing term loans are guaranteed by the export credit agency in the respective country in which the ship is constructed. For the majority of the loans as of December 31, 2021, we pay to the applicable export credit agency, depending on the financing agreement, an upfront fee of 2.35% to 5.48% of the maximum loan amount in consideration for these guarantees. We amortize the fees that are paid upfront over the life of the loan. We classify these fees within *Amortization of debt issuance costs* in our consolidated statements of cash flows. Prior to the loan being drawn, we present these fees within Other assets in our consolidated balance sheets. Once the loan is drawn, such fees are classified as a discount to the related loan, or contra-liability account, within *Current portion of long-term debt* or *long-term debt*.

In March 2020, we increased the capacity of our $1.7 billion and $1.2 billion unsecured revolving credit facilities due in 2024 and 2022, by $200 million and $400 million, respectively, utilizing their respective accordion features. As of December 31, 2020, our aggregate revolving borrowing capacity was $3.5 billion and was fully utilized through a combination of amounts drawn and letters of credit issued under the facilities. Certain of our surety agreements with third party providers for the benefit of certain

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

agencies and associations that provide travel related bonds allow the surety to request collateral in the form of cash or letters of credit. As of December 31, 2020, we posted collateral in the amount of approximately $91 million.

In March 2020, we took delivery of *Celebrity Apex*. To finance the purchase, we borrowed $722.2 million under a previously committed unsecured term loan which is 100% guaranteed by BpiFrance Assurance Export, the official export credit agency of France. The loan amortizes semi-annually over 12 years and bears interest at a fixed rate of 3.23% per annum. In the second quarter of 2020 and the first quarter of 2021, we amended the agreement to defer the payment of all principal payments due between April 2020 and March 2022. The deferred amounts will be repayable starting in 2022 over a five year period.

In March 2020, we borrowed $2.2 billion pursuant to a 364-day senior secured term loan agreement. In May 2020, this secured term loan was increased by an additional $150 million through the exercise of the accordion feature. The increased secured term loan balance was repaid with proceeds from the $3.32 billion Secured Notes (as described below) issued in May 2020. This secured term loan would have matured 364 days after funding and could have been extended at our option for an additional 364 days subject to customary conditions, including the payment of a 1.00% extension fee. Interest accrued at LIBOR plus a margin of 2.25% which would have increased to 2.50% and 2.75% at 180 days and 365 days, respectively, after funding. We would have also been required to pay a duration fee in an amount equal to 0.25% of the aggregate loan principal amount every 60 days. Additionally, two of our board members each purchased a participation interest equal to $100 million. The repayment of this secured term loan in May 2020 resulted in a total loss on the extinguishment of debt of $41.1 million, which was recognized within *Interest expense, net of interest capitalized* within our consolidated statements of comprehensive income (loss).

In May 2020, we issued $3.32 billion of senior secured notes (the "Secured Notes") for net proceeds of approximately $3.2 billion. We repaid the $2.35 billion, 364-day senior secured term loan in its entirety with a portion of the proceeds of the Secured Notes. $1.0 billion of the notes accrue interest at 10.875% and mature in June of 2023 (the "2023 Secured Notes"). The remaining $2.32 billion of the Secured Notes accrue interest at 11.5% and mature in June of 2025 (the "2025 Secured Notes"). The Secured Notes are fully and unconditionally guaranteed by Celebrity Cruises Holdings Inc., Celebrity Cruises Inc., and certain of our wholly-owned vessel-owning subsidiaries. $1.66 billion of the obligations under the Secured Notes and the related guarantees are secured by first priority security interests in the collateral (which generally includes certain of our material intellectual property, a pledge of 100% of the equity interests of certain of our vessel-owning subsidiaries, the collateral account established pursuant to the indenture governing the Secured Notes (the "Secured Notes Indenture"), mortgages on the 28 vessels owned by such subsidiaries, and an assignment of insurance and earnings in respect of such vessels, subject to permitted liens and certain exclusions and release provisions), subject to certain adjustments after the date of issuance based on our debt rating as of the date of issuance and our lien basket amount in certain of our credit facilities. Prior to March 1, 2023, we may, at our option, redeem some or all of the 2023 Secured Notes at 100% of the principal amount thereof plus accrued and unpaid interest plus the applicable "make-whole premium" described in the Secured Notes Indenture. On or after March 1, 2023, we may, at our option, redeem some or all of the 2023 Secured Notes at a redemption price equal to 100% of the principal amount of the 2023 Secured Notes to be redeemed plus accrued and unpaid interest, if any, to, but excluding, the redemption date. Prior to June 1, 2022, we may, at our option, redeem some or all of the 2025 Secured Notes at 100% of the principal amount plus accrued and unpaid interest plus the applicable "make-whole premium" described in the Secured Notes Indenture. On or after June 1, 2022, we may, at our option, redeem some or all of the 2025 Secured Notes at the applicable redemption prices set forth in the Secured Notes Indenture. In addition, on or prior to June 1, 2022, we may, at our option, redeem up to 40% of the 2025 Secured Notes with the proceeds from certain equity offerings at the redemption price listed in the Secured Notes Indenture. In addition, we may redeem all, but not part, of the Secured Notes upon the occurrence of specified tax events set forth in the Secured Notes Indenture.

In June 2020, we issued $1.0 billion of senior unsecured notes which accrue interest at 9.125% and mature in June of 2023. The notes are fully and unconditionally guaranteed by RCI Holdings LLC, which owns 100% of the equity interests in certain of our wholly-owned vessel-owning subsidiaries.

In June 2020, RCL Cruises Ltd., our subsidiary that operates and manages our business in the United Kingdom, established a commercial paper facility for the purpose of issuing short-term, unsecured Sterling-denominated notes that are eligible for purchase under the Joint HM Treasury and Bank of England's COVID Corporate Financing Facility commercial paper program in an aggregate principal amount up to £300.0 million. The maturities of the commercial paper notes can vary by note, but cannot exceed 364 days from the date of issuance. As of December 31, 2020, we had £300.0 million, or approximately $409.9 million, based on the exchange rate at December 31, 2020, of commercial paper notes outstanding under this program. During the first quarter of 2021, we repaid in full the £300.0 million notes issued under the Joint HM Treasury and Bank of England's COVID Corporate Financing Facility.

In June 2020, we issued $1.15 billion of convertible notes which accrue interest at 4.25% and mature in June of 2023. If note holders elect to convert, the notes will be converted into our shares of common stock, cash, or a combination of common stock and

F-31

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

cash, at our discretion. The initial conversion rate per $1,000 principal amount of the convertible is 13.8672 shares of our common stock, which is equivalent to an initial conversion price of approximately $72.11 per share, subject to adjustment in certain circumstances. Prior to March 15, 2023, the convertible notes will be convertible at the option of holders during certain periods, and only under the following conditions:

- during any calendar quarter after September 30, 2020, if the last reported sale price per share of our common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- the trading price per $1,000 principal amount of notes is less than 98% of the product of the last reported sale price per share of our common stock and the conversation rate for ten consecutive trading days (in which case the notes are convertible at any time during the five business day period following the 10 consecutive trading day period);

- if we call the notes for a tax redemption; or

- upon the occurrence of specified corporate events.

On or after March 15, 2023, the convertible notes will be convertible at any time until the close of business on the second scheduled trading day immediately preceding their maturity date.

Holders of the convertible notes may require us, upon the occurrence of certain events that constitute a fundamental change under the indenture, to offer to repurchase the convertible notes at a repurchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest.

We allocated $907.9 million of the convertible notes' proceeds, net of debt issue costs, to *Long-term debt* and $209.0 million to *Paid-in-capital* on our Consolidated Balance Sheet. We recognized the equity component by ascribing the difference between the proceeds and the fair value of the convertible notes' debt component to Paid-in-capital and the corresponding debt discount will be amortized to interest expense over the term of the convertible notes using the straight-line method, which approximates the effective interest method. The fair value of the convertible notes' debt component was determined utilizing a present value calculation. Debt issuance costs on the convertible notes were allocated to the debt and equity components in proportion to the allocation of proceeds to those components. We incurred total debt issue costs of $33.1 million on the issuance of the debt and allocated $6.2 million to *Paid-in-capital*. Debt issuance costs attributable to debt will be amortized to interest expense over the term of the convertible notes.

In October 2020, we issued $575 million of senior convertible notes which accrue interest at 2.875% and mature in November of 2023. If note holders elect to convert, the notes will be converted into our shares of common stock, cash, or a combination of common stock and cash, at our discretion. The initial conversion rate per $1,000 principal amount of the convertible notes is 12.1212 shares of our common stock, which is equivalent to an initial conversion price of approximately $82.50 per share, subject to adjustment in certain circumstances. Prior to August 15, 2023, the convertible notes will be convertible at the option of holders during certain periods, and only under the following conditions:

- during any calendar quarter after December 31, 2020, if the last reported sale price per share of our common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price on each applicable trading day;

- the trading price per $1,000 principal amount of notes is less than 98% of the product of the last reported sale price per share of our common stock and the conversation rate for ten consecutive trading days (in which case the notes are convertible at any time during the five business day period following the ten consecutive trading day period);

- if we call the notes for a tax redemption; or

- upon the occurrence of specified corporate events.

On or after August 15, 2023, the convertible notes will be convertible at any time until the close of business on the second scheduled trading day immediately preceding their maturity date.

Holders of the convertible notes may require us, upon the occurrence of certain events that constitute a fundamental change under the indenture, to offer to repurchase the convertible notes at a repurchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest.

F-32

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

We allocated $463.0 million of the convertible notes' proceeds, net of debt issue costs, to *Long-term debt* and $101.9 million to *Paid-in-capital* on our Consolidated Balance Sheet. We recognized the equity component by ascribing the difference between the proceeds and the fair value of the convertible notes' debt component to Paid-in-capital and the corresponding debt discount will be amortized to interest expense over the term of the convertible notes using the straight-line method, which approximates the effective interest method. The fair value of the convertible notes' debt component was determined utilizing a present value calculation. Debt issuance costs on the convertible notes were allocated to the debt and equity components in proportion to the allocation of proceeds to those components. We incurred total debt issue costs of $10.1 million on the issuance of the debt and allocated $1.8 million to *Paid-in-capital*. Debt issuance costs attributable to debt will be amortized to interest expense over the term of the convertible notes.

The net carrying value of the liability component of the convertible notes was as follows:

| *(in thousands)* | | As of December 31, 2021 | As of December 31,2020 |
|---|---|---|---|
| Principal | $ | 1,725,000 | 1,725,000 |
| Less: Unamortized debt discount and transaction costs | | 188,764 | 312,117 |
| | $ | 1,536,236 | $ 1,412,883 |

The interest expense recognized related to the convertible notes was as follows:

| *(in thousands)* | | As of December 31, 2021 | As of December 31, 2020 |
|---|---|---|---|
| Contractual interest expense | $ | 65,406 | 30,832 |
| Amortization of debt discount and transaction costs | | 118,566 | 52,518 |
| | $ | 183,972 | $ 83,350 |

In October 2020, we took delivery of *Silver Moon.* To finance the purchase, Silversea Cruise Holding Ltd., our wholly owned subsidiary, borrowed $300 million under a previously committed unsecured term loan facility, guaranteed by us, to pay a portion of the ship's contract price. The loan is due and payable at maturity in June 2028, provided however, that each lender may elect to cause us to repay the outstanding amount of any advances held by such lender on June 2026 upon 90 days advance notice. The loan amortizes semi-annually starting six months after funding, with 1/24th of the outstanding principal payable every six months and the balance payable upon maturity. Interest on the loan currently accrues at LIBOR plus 2.00%.

During 2020, we amended certain export-credit backed ship debt facilities to benefit from a 12-month debt amortization deferral (the "Debt Deferral"). Under the Debt Deferral, deferred debt amortization of approximately $0.9 billion will be paid over a period of 4 years after the 12-month deferral period. The Debt Deferral was offered by certain export credit agencies as a result of the current impact to cruise-line borrowers as a result of COVID-19. During the first quarter of 2021, we further amended our export-credit backed ship debt facilities and deferred an additional $0.8 billion of principal payments due under these export facilities between April 2021 and March 2022. The new amounts being deferred are scheduled to be repaid over a five year period starting in April 2022.

Under certain of our agreements, the contractual interest rate, facility fee and/or export credit agency fee vary with our debt rating. On February 25, 2021, S&P Global downgraded our senior unsecured rating from B+ to B, which had no financial impact, and downgraded our 10.875% senior secured notes due 2023 and our 11.50% senior secured notes due 2025 (collectively, "the Secured Notes") and our Silversea Notes which were fully repaid in June 2021 with proceeds from the $650 million June Unsecured Notes, from BB to BB-. This downgrade had no impact on the terms of the notes.

Following is a schedule of annual maturities on our total debt net of debt issuance costs and including finance leases, as of December 31, 2021 for each of the next five years (in thousands):

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| Year | | |
|---|---|---|
| 2022 | $ | 2,243,131 |
| 2023 | | 5,376,305 |
| 2024 | | 4,026,746 |
| 2025 | | 2,293,638 |
| 2026 | | 2,533,027 |
| Thereafter | | 4,617,493 |
| | $ | 21,090,340 |

**Note 9. *Leases***

*Operating leases*

Our operating leases primarily relate to preferred berthing arrangements, real estate and shipboard equipment and are included within Operating lease right-of-use assets, and Long-term operating lease liabilities with the current portion of the liability included within *Current portion of operating lease liabilities* in our consolidated balance sheet as of December 31, 2021. Leases with an initial term of 12 months or less are not recorded on the consolidated balance sheet. We recognize lease expense for these leases on a straight-line basis over the lease term. Our operating leases include Silver Explorer, operated by Silversea Cruises. The operating lease for *Silver Explorer* will expire in 2023.

For some of our real estate leases and berthing agreements, we do have the option to extend our current lease term. For those lease agreements with renewal options, the renewal periods for real estate leases range from one to 10 years and the renewal periods for berthing agreements range from one year to 20 years. Generally, we do not include renewal options as a component of our present value calculation for berthing agreements. However, for certain real estate leases, we include them.

In June of 2021, we exercised our option under our operating lease with SMBC Leasing and Finance, Inc (the "Lessor") to purchase Terminal A at PortMiami in July 2021 for the pre-agreed purchase price of $220.0 million. Upon purchase of the terminal lease in July 2021, the underlying asset was recorded as a leasehold improvement within *Property and equipment, net*. Our July 2021 purchase of the Port of Miami terminal eliminated the residual value guarantee and a requirement under the lease to post $181.1 million of cash collateral.

Additionally, we remeasured the ground lease related to the Terminal A lease based on a reassessed lease term resulting from our purchase option exercise. We determined that the ground lease should remain as an operating lease with adjustments to the operating lease liability and the related right-of-use asset in our Consolidated Balance Sheet.

As most of our leases do not provide an implicit rate, we use our incremental borrowing rate in determining the present value of lease payments. We estimate our incremental borrowing rates based on LIBOR and U.S. Treasury note rates corresponding to lease terms increased by the Company's credit risk spread and reduced by the estimated impact of collateral. In addition, we have lease agreements with lease and non-lease components, which are generally accounted for separately. However, for berthing agreements, we account for the lease and non-lease components as a single lease component.

Commencing in 2016 when we sold our 51% interest in the Pullmantur brand to Pullmantur Holdings, and continuing through the quarter ended June 30, 2020, we bareboat chartered to Pullmantur Holdings the vessels operated by the Pullmantur brand. On June 22, 2020, Pullmantur S.A., a subsidiary of Pullmantur Holdings, filed for reorganization in Spain, at which time we terminated these bareboat charters. See Note 7. *Other Assets* for further discussion of Pullmantur Holdings. We accounted for the bareboat charters of these vessels as operating leases for which we were the lessor.

*Finance Leases*

Silversea Cruises operates the *Silver Dawn* under a finance lease. We received delivery of the *Silver Dawn* in November of 2021 under a sale-leaseback agreement with a bargain purchase option at the end of the 15 year lease term. Due to the bargain purchase option at the end of the lease term, whereby Silversea Cruises is reasonably certain of obtaining ownership of the ship, *Silver Dawn* is accounted for as a finance lease. The lease includes other purchase options beginning in year three, none of which are reasonably certain of being exercised at this time.

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The carrying amount of the ship is reported within *Property and Equipment, net* in our Consolidated Balance Sheet as of December 31, 2021. The ship has a useful life and residual value of 30 years and 15%, respectively. The total aggregate amount of finance lease liabilities recorded for this ship are $283.7 million and are reflected in *Current portion of long-term debt* and *Long-term debt* in our Consolidated Balance Sheet as of December 31, 2021.

Silversea Cruises operates *Silver Whisper* under a finance lease. In May 2021, the finance lease for the *Silver Whisper* expiring in 2022 was amended to extend its expiration by 12 months and will now expire in 2023, subject to an option to purchase the ship. Additionally, certain scheduled payments have been deferred and are reflected in *Long-term debt* in our Consolidated Balance Sheet as of December 31, 2021. The total aggregate amount of finance lease liabilities recorded for this ship was $24.1 million and $31.5 million at December 31, 2021 and December 31, 2020, respectively. The lease payments on the *Silver Whisper* are subject to adjustments based on the LIBOR rate.

Supplemental balance sheet information for leases was as follows (in thousands):

| | As of December 31, 2021 | As of December 31, 2020 |
|---|---|---|
| Lease assets: | | |
| Finance lease right-of-use assets, net: | | |
| Property and equipment, gross | $ 737,444 | $ 364,910 |
| Accumulated depreciation | (94,729) | (71,288) |
| Property and equipment, net | 642,715 | 293,622 |
| Operating lease right-of-use assets | 542,128 | 599,985 |
| Total lease assets | $ 1,184,843 | $ 893,607 |
| Lease liabilities: | | |
| Finance lease liabilities: | | |
| Current portion of debt | $ 51,470 | $ 51,856 |
| Long-term debt | 420,805 | 161,509 |
| Total finance lease liabilities | 472,275 | 213,365 |
| Operating lease liabilities: | | |
| Current portion of operating lease liabilities | 68,922 | 102,677 |
| Long-term operating lease liabilities | 534,726 | 563,876 |
| Total operating lease liabilities | 603,648 | 666,553 |
| Total lease liabilities | $ 1,075,923 | $ 879,918 |

The components of lease expense were as follows (in thousands):

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Consolidated Statement of Comprehensive Income (Loss) Classification | Year ended December 31, 2021 | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---|---|---|
| Lease costs: | | | | |
| Operating lease costs | Commission, transportation and other | $ 18,860 | $ 38,349 | $ 76,226 |
| Operating lease costs | Other operating expenses | 23,261 | 30,955 | 27,868 |
| Operating lease costs | Marketing, selling and administrative expenses | 18,027 | 21,971 | 18,837 |
| Finance lease costs: | | | | |
| Amortization of right-of-use-assets | Depreciation and amortization expenses | 16,814 | 6,901 | 22,044 |
| Interest on lease liabilities | Interest expense, net of interest capitalized | 2,593 | 4,429 | 8,355 |
| Total lease costs | | $ 79,555 | $ 102,605 | $ 153,330 |

In addition, certain of our berth agreements include variable lease costs based on the number of passengers berthed. During the twelve months ended December 31, 2021, we had no variable lease costs recorded within *Commission, transportation and other* in our consolidated statement of comprehensive income (loss).

Weighted average of the remaining lease terms and weighted average discount rates are as follows:

| | As of December 31, 2021 | As of December 31, 2020 |
|---|---|---|
| Weighted average of the remaining lease term | | |
| Operating leases | 18.18 | 7.8 |
| Finance leases | 23.96 | 41.2 |
| Weighted average discount rate | | |
| Operating leases | 6.52 % | 4.59 % |
| Finance leases | 5.54 % | 6.89 % |

Supplemental cash flow information related to leases is as follows (in thousands):

| | Year ended December 31, 2021 | Year ended December 31, 2020 | Year ended December 31, 2019 |
|---|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ 42,759 | $ 89,179 | $ 125,307 |
| Operating cash flows from finance leases | $ 2,593 | $ 4,429 | $ 8,355 |
| Financing cash flows from finance leases | $ 23,522 | $ 19,778 | $ 32,090 |

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

As of December 31, 2021, maturities related to lease liabilities were as follows (in thousands):

| Years | | Operating Leases | | Finance Leases |
|---|---|---|---|---|
| 2022 | $ | 101,445 | $ | 72,076 |
| 2023 | | 104,585 | | 52,340 |
| 2024 | | 85,463 | | 43,497 |
| 2025 | | 80,182 | | 43,089 |
| 2026 | | 74,626 | | 37,900 |
| Thereafter | | 826,226 | | 632,709 |
| Total lease payments | | 1,272,527 | | 881,611 |
| Less: Interest | | (668,879) | | (409,336) |
| Present value of lease liabilities | $ | 603,648 | $ | 472,275 |

Operating lease payments do not include any costs related to options to extend lease terms as none are reasonably certain of being exercised.

*Right-of-use assets impairments*

During the year ended December 31, 2020, we identified that the undiscounted cash flows for certain right-of-use assets were less than their carrying values due to the negative impact of COVID-19. We evaluated these assets pursuant to our long-lived asset impairment test, resulting in an impairment charge of $65.9 million to write down these assets to their estimated fair values during the year ended December 31, 2020. For the year ended December 31, 2021, there were no impairments to right-of-use assets.

**Note 10. *Shareholders' Equity***

*Common Stock Issued*

During March 2021, we issued 16.9 million shares of common stock, par value $0.01 per share, at a price of $91.00 per share. We received net proceeds of $1.5 billion from the sale of our common stock, after deducting the estimated offering expenses payable by us.

During October 2020, we issued 9.6 million shares of common stock, par value $0.01 per share, at a price of $60.00 per share. We received net proceeds of $557.4 million from the sale of our common stock, after deducting the underwriters' discount and the estimated offering expenses payable by us.

During December 2020, we issued 13.0 million shares of common stock, par value $0.01 per share, at an average price of $76.65 per share. We received net proceeds of $994.6 million after deducting the underwriters' discount and the estimated offering expenses payable by us. Of the total proceeds, $868.6 million was received as of December 31, 2020 and the remainder was received in January of 2021.

*Dividends Declared*

During the first quarter of 2020 we declared a cash dividend on our common stock of $0.78 per share which was paid in the second quarter of 2020. During the first quarter of 2020, we also paid a cash dividend on our common stock of $0.78 per share, which was declared during the fourth quarter of 2019.

During the second quarter of 2020, we agreed with certain of our lenders not to pay dividends or engage in common stock repurchases for so long as our debt covenant waivers are in effect. In addition, in the event we declare a dividend or engage in share repurchases, we will need to repay the amounts deferred under our export credit facilities. Accordingly, we did not declare a dividend from the second quarter of 2020. Pursuant to amendments made to these agreements during the first quarter of 2021, the restrictions on paying cash dividends and effectuating share repurchases were extended through and including the third quarter of 2022.

*Common Stock Repurchase Program*

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

During the quarter ended on June 30, 2020, the 24-month common stock repurchase program authorized by our board of directors on May 9, 2018 had expired. In connection with our debt covenant waivers, we agreed with our lenders not to engage in stock repurchases for so long as our debt covenant waivers are in effect. Effective in the first quarter of 2021, the agreement with our lenders to suspend stock repurchases is extended through the third quarter of 2022.

### Note 11. *Stock-Based Employee Compensation*

We currently have awards outstanding under one stock-based compensation plan, our 2008 Equity Plan, which provides for awards to our officers, directors and key employees. The 2008 Equity Plan, as amended, provides for the issuance of up to 14,000,000 shares of our common stock pursuant to grants of (i) incentive and non-qualified stock options, (ii) stock appreciation rights, (iii) stock awards (including time-based and/or performance-based stock awards) and (iv) restricted stock units (including time-based and performance-based restricted stock units). During any calendar year, no one individual (other than non-employee members of our board of directors) may be granted awards of more than 500,000 shares and no non-employee member of our board of directors may be granted awards with a value in excess of $500,000 at the grant date. Options and restricted stock units outstanding as of December 31, 2021, generally vest in equal installments over four years from the date of grant. In addition, performance shares and performance share units generally vest in three years. With certain limited exceptions, awards are forfeited if the recipient ceases to be an employee before the shares vest.

Prior to 2012, our officers received a combination of stock options and restricted stock units. Beginning in 2012, our officers instead receive their long-term incentive awards through a combination of performance share units and restricted stock units. Each performance share unit award is expressed as a target number of performance share units based upon the fair market value of our common stock on the date the award is issued. The actual number of shares underlying each award (not to exceed 200% of the target number of performance share units) will be determined based upon the Company's achievement of a specified performance target range. In 2021, we issued a target number of 296,798 performance share units, which will vest approximately three years following the award issue date. The performance payout of these grants will be based on return on the Company's invested capital ("ROIC"), earnings per share ("EPS") and leverage for the year ended December 31, 2023, as may be adjusted by the Talent and Compensation Committee of our board of directors in early 2024 for events that are outside of management's control.

Beginning in 2016, our senior officers meeting certain minimum age and service criteria receive their long-term incentive awards through a combination of restricted stock awards and restricted stock units. The restricted stock awards are subject to both performance and time-based vesting criteria while the restricted stock units are subject only to time-based vesting criteria. Each restricted stock award is issued in an amount equal to 200% of the target number of shares underlying the award based upon the fair market value of our common stock on the date the award is issued. Declared dividends accrue (but do not get paid) on the restricted stock awards during the vesting period, with the accrued amounts to be paid out following vesting only on the number of shares underlying the award which actually vest based on satisfaction of the performance criteria. The actual number of shares that vest (not to exceed 200% of the shares) will be determined based upon the Company's achievement of a specified performance target range. In 2021, we issued 350,996 restricted stock awards, representing 200% of the target number of shares underlying the award, all of which are considered issued and outstanding from the date of issuance, however; grantees will only retain those shares earned as the result of the Company achieving the performance goals during the measurement period. The performance payout of the 2021 awards will be based on the Company's ROIC, EPS and leverage for the year ended December 31, 2023, as may be adjusted by the Talent and Compensation Committee of our board of directors in early 2024 for events that are outside of management's control.

On January 24, 2018, the Company issued a one-time bonus award for all non-officer employees. These awards vested, in equal installments, over the 3 years following the award issue date. For shoreside eligible employees, awards were issued as equity-settled restricted stock units. As of December 31, 2021, these awards have fully vested.

We also provide an Employee Stock Purchase Plan ("ESPP") to facilitate the purchase by employees of up to 2,800,000 shares of common stock in the aggregate. Offerings to employees are made on a quarterly basis. Subject to certain limitations, the purchase price for each share of common stock is equal to 85% of the average of the market prices of the common stock as reported on the New York Stock Exchange on the first business day of the purchase period and the last business day of each month of the purchase period. During the years ended December 31, 2021, 2020 and 2019, 136,480, 184,936 and 91,586 shares of our common stock were purchased under the ESPP at a weighted-average price of $70.95, $48.08 and $98.20, respectively.

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Total compensation expense recognized for employee stock-based compensation for the years ended December 31, 2021, 2020 and 2019 was as follows (in thousands):

| Classification of expense | Employee Stock-Based Compensation | | |
| | 2021 | 2020 | 2019 |
|---|---|---|---|
| Marketing, selling and administrative expenses | $ 63,638 | $ 39,780 | $ 75,930 |
| Total compensation expense | $ 63,638 | $ 39,780 | $ 75,930 |

The fair value of each stock option grant is estimated on the date of grant using the Black-Scholes option pricing model. The estimated fair value of stock options, less estimated forfeitures, is amortized over the vesting period using the graded-vesting method. We did not issue any stock options during the years ended December 31, 2021, 2020 and 2019.

Stock option activity and information about stock options outstanding are summarized in the following table:

| Stock Option Activity | Number of Options | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value[1] |
| | | | (years) | (in thousands) |
|---|---|---|---|---|
| Outstanding at January 1, 2021 | 49,647 | $ 46.18 | 0.11 | $ 1,355 |
| Granted | — | — | — | — |
| Exercised | (49,647) | $ 46.18 | — | — |
| Canceled | — | $ — | — | — |
| Outstanding at December 31, 2021 | — | $ — | — | $ — |
| Vested at December 31, 2021 | — | $ — | — | $ — |
| Options Exercisable at December 31, 2021 | — | $ — | — | $ — |

(1)    The intrinsic value represents the amount by which the fair value of stock exceeds the option exercise price.

The total intrinsic value of stock options exercised during the years ended December 31, 2021, 2020 and 2019 was $1.3 million, $1.5 million and $8.1 million, respectively. As of December 31, 2021, there was no unrecognized compensation cost, net of estimated forfeitures, related to stock options granted under our stock incentive plan. Additionally, there were no stock options outstanding as of December 31, 2021.

Restricted stock units are converted into shares of common stock upon vesting or, if applicable, are settled on a one-for-one basis. The cost of these awards is determined using the fair value of our common stock on the date of the grant, and compensation expense is recognized over the vesting period. Restricted stock activity is summarized in the following table:

| Restricted Stock Units Activity | Number of Awards | Weighted-Average Grant Date Fair Value |
|---|---|---|
| Non-vested share units as of January 1, 2021 | 972,592 | $ 91.26 |
| Granted | 568,107 | $ 85.08 |
| Vested | (448,469) | $ 90.90 |
| Canceled | (97,192) | $ 89.73 |
| Non-vested share units as of December 31, 2021 | 995,038 | $ 88.19 |

The weighted-average estimated fair value of restricted stock units granted during the years ended December 31, 2021, 2020 and 2019 was $78.51 and $112.113, respectively. The total fair value of shares released on the vesting of restricted stock units during the years ended December 31, 2021, 2020 and 2019 was $36.1 million, $31.2 million, and $30.8 million, respectively. As of December 31, 2021, we had $42.3 million of total unrecognized compensation expense, net of estimated forfeitures, related to restricted stock unit grants, which will be recognized over the weighted-average period of 1.16 years.

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Performance share units are converted into shares of common stock upon vesting on a one-for-one basis. We estimate the fair value of each performance share when the grant is authorized and the related service period has commenced. We remeasure the fair value of our performance shares in each subsequent reporting period until the grant date has occurred, which is the date when the performance conditions are satisfied. We recognize compensation cost over the vesting period based on the probability of the service and performance conditions being achieved adjusted for each subsequent fair value measurement until the grant date. If the specified service and performance conditions are not met, compensation expense will not be recognized and any previously recognized compensation expense will be reversed. Performance share units activity is summarized in the following table:

| Performance Share Units Activity | Number of Awards | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Non-vested share units as of January 1, 2021 | 267,722 | $ | 109.34 |
| Granted | 296,798 | $ | 84.83 |
| Vested | (66,377) | $ | 123.49 |
| Canceled | (31,791) | $ | 98.78 |
| Non-vested share units as of December 31, 2021 | 466,352 | $ | 92.45 |

The weighted-average estimated fair value of performance share units granted during the years ended December 31, 2020 and 2019 was $95.81 and $87.39 respectively. The total fair value of shares released on the vesting of performance share units during the years ended December 31, 2021, 2020 and 2019 was $5.6 million, $24.6 million and $23.0 million, respectively. As of December 31, 2021, we had $14.8 million of total unrecognized compensation expense, net of estimated forfeitures, related to performance share unit grants, which will be recognized over the weighted-average period of 1.51 year.

The shares underlying our restricted stock awards to age and service eligible senior officers are issued as of the grant date in an amount equal to 200% of the target number of shares. Following the vesting date, the restrictions will lift with respect to the number of shares for which the performance criteria was met and any excess shares will be canceled. Dividends will accrue on the issued restricted shares during the vesting period, but will not be paid to the recipient until the awards vest and the final number of shares underlying the award is determined, at which point, the dividends will be paid in cash only on the earned shares. We estimate the fair value of each restricted stock award when the grant is authorized and the related service period has commenced. We remeasure the fair value of these restricted stock awards in each subsequent reporting period until the grant date has occurred, which is the date when the performance conditions are satisfied. We recognize compensation cost over the vesting period based on the probability of the service and performance conditions being achieved adjusted for each subsequent fair value measurement until the grant date. If the specified service and performance conditions are not met, compensation expense will not be recognized, any previously recognized compensation expense will be reversed, and any unearned shares will be returned to the Company. Restricted stock awards activity is summarized in the following table:

| Restricted Stock Awards Activity | Number of Awards | | Weighted-Average Grant Date Fair Value |
|---|---|---|---|
| Non-vested share units as of January 1, 2021 | 575,432 | $ | 116.83 |
| Granted | 350,996 | $ | 84.63 |
| Vested | (60,011) | $ | 129.23 |
| Canceled | (69,205) | $ | 123.33 |
| Non-vested share units as of December 31, 2021 | 797,212 | $ | 101.25 |

The weighted-average estimated fair value of restricted stock awards granted during the years ended December 31, 2020 and 2019 was $110.21 and $118.08, respectively. As of December 31, 2021, we had $3.3 million of total unrecognized compensation expense, net of estimated forfeitures, related to restricted stock award grants, which will be recognized over the weighted-average period of 1.36 years.

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Note 12.** *(Loss) Earnings Per Share*

A reconciliation between basic and diluted earnings per share is as follows (in thousands, except per share data):

| | 2021 | 2020 | 2019 |
|---|---|---|---|
| | Year Ended December 31, | | |
| Net (Loss) Income attributable to Royal Caribbean Cruises Ltd. for basic and diluted (loss) earnings per share | $ (5,260,499) | $ (5,797,462) | $ 1,878,887 |
| Weighted-average common shares outstanding | 251,812 | 214,335 | 209,405 |
| Dilutive effect of stock-based awards | — | — | 525 |
| Diluted weighted-average shares outstanding | 251,812 | 214,335 | 209,930 |
| Basic (loss) earnings per share | $ (20.89) | $ (27.05) | $ 8.97 |
| Diluted (loss) earnings per share | $ (20.89) | $ (27.05) | $ 8.95 |

There were approximately 504,250 and 282,118 antidilutive shares for the years ended December 31, 2021 and 2020, respectively. There were no antidilutive shares for the year ended December 31, 2019.

While the criteria for conversion of our convertible notes has not been met, the shares that would be issued upon conversion of the notes would be antidilutive for the year ended December 31, 2021.

**Note 13.** *Retirement Plan*

We maintain a defined contribution plan covering shoreside employees. Effective January 1, 2016, we commenced annual, non-elective contributions to the plan on behalf of all eligible participants equal to 3% of participants' eligible earnings. Additional annual contributions to the plan are discretionary and are based on fixed percentages of participants' salaries and years of service, not to exceed certain maximums. Contribution expenses were $17.9 million, $18.4 million and $21.2 million for the years ended December 31, 2021, 2020 and 2019, respectively.

**Note 14.** *Income Taxes*

We are subject to corporate income taxes in countries where we have operations or subsidiaries. We and the majority of our ship-operating and vessel-owning subsidiaries are currently exempt from U.S. corporate income tax on U.S. source income from the international operation of ships pursuant to Section 883 of the Internal Revenue Code. Regulations under Section 883 have limited the activities that are considered the international operation of a ship or incidental thereto. Accordingly, our provision for U.S. federal and state income taxes includes taxes on certain activities not considered incidental to the international operation of our ships.

Additionally, one of our ship-operating subsidiaries is subject to tax under the tonnage tax regime of the United Kingdom. Under this regime, income from qualifying activities is subject to corporate income tax, but the tax is computed by reference to the tonnage of the ship or ships registered under the relevant provisions of the tax regimes (the "relevant shipping profits"), which replaces the regular taxable income base. Income from activities not considered qualifying activities, which we do not consider significant, remains subject to United-Kingdom corporate income tax.

For the year ended December 31, 2021, we had an income tax benefit of approximately $45.2 million primarily driven by items not qualifying under Section 883. For the year ended December 31, 2020 we had an income tax benefit of approximately $15.0 million and for year ended December 31, 2019 income tax expense was $32.6 million, for items not qualifying under Section 883, tonnage tax and income taxes for the remainder of our subsidiaries. Income taxes are recorded within *Other income (expense)*. In addition, all interest expense and penalties related to income tax liabilities are classified as income tax expense within *Other income (expense)*.

For a majority of our subsidiaries, we do not expect to incur income taxes on future distributions of undistributed earnings. Accordingly, no deferred income taxes have been provided for the distribution of these earnings. Where we do expect to incur income taxes on future distributions of undistributed earnings, we have provided for deferred taxes, which we do not consider significant to our operations.

As of December 31, 2021, the Company had deferred tax assets for U.S. and foreign net operating losses ("NOLs") of approximately $56.4 million. We have provided a valuation allowance for approximately $20.8 million of these NOLs. $11.6 million of the NOLs are subject to expire between 2022 and 2033.

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Our deferred tax assets and deferred tax liabilities and corresponding valuation allowances related to our operations were not material as of December 31, 2021 and 2020.

We regularly review deferred tax assets for recoverability based on our history of earnings, expectations of future earnings, and tax planning strategies. Realization of deferred tax assets ultimately depends on the existence of sufficient taxable income to support the amount of deferred taxes. A valuation allowance is recorded in those circumstances in which we conclude it is not more-likely-than-not we will recover the deferred tax assets prior to their expiration.

**Note 15. *Changes in Accumulated Other Comprehensive Income (Loss)***

The following table presents the changes in accumulated other comprehensive loss by component for the years ended December 31, 2021, 2020 and 2019 (in thousands):

| | Changes related to cash flow derivative hedges | Changes in defined benefit plans | Foreign currency translation adjustments | Accumulated other comprehensive (loss) income |
|---|---|---|---|---|
| **Accumulated comprehensive loss at January 1, 2019** | $ (537,216) | $ (26,023) | $ (64,495) | $ (627,734) |
| Other comprehensive income (loss) before reclassifications | (146,108) | (20,314) | 869 | (165,553) |
| Amounts reclassified from accumulated other comprehensive loss | (5,205) | 779 | — | (4,426) |
| Net current-period other comprehensive income (loss) | (151,313) | (19,535) | 869 | (169,979) |
| | | | | |
| **Accumulated comprehensive loss at January 1, 2020** | (688,529) | (45,558) | (63,626) | (797,713) |
| Other comprehensive income (loss) before reclassifications | (41,109) | (22,051) | (28,698) | (91,858) |
| Amounts reclassified from accumulated other comprehensive loss | 79,119 | 2,067 | 69,044 | 150,230 |
| Net current-period other comprehensive (loss) income | 38,010 | (19,984) | 40,346 | 58,372 |
| | | | | |
| **Accumulated comprehensive loss at January 1, 2021** | (650,519) | (65,542) | (23,280) | (739,341) |
| Other comprehensive (loss) income before reclassifications | (16,667) | 4,790 | 15,703 | 3,826 |
| Amounts reclassified from accumulated other comprehensive loss | 20,713 | 3,917 | — | 24,630 |
| Net current-period other comprehensive (loss) income | 4,046 | 8,707 | 15,703 | 28,456 |
| | | | | |
| **Accumulated comprehensive loss at December 31, 2021** | $ (646,473) | $ (56,835) | $ (7,577) | $ (710,885) |

The following table presents reclassifications out of accumulated other comprehensive loss for the years ended December 31, 2021, 2020 and 2019 (in thousands):

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| Details about Accumulated Other Comprehensive Loss Components | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Loss into (Loss) Income | | | Affected Line Item in Statements of Comprehensive Income (Loss) |
|---|---|---|---|---|
| | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 | |
| Gain (loss) on cash flow derivative hedges: | | | | |
| Interest rate swaps | (43,185) | (25,267) | (4,289) | Interest expense, net of interest capitalized |
| Foreign currency forward contracts | (15,359) | (14,679) | (14,063) | Depreciation and amortization expenses |
| Foreign currency forward contracts | (2,797) | (7,315) | (5,080) | Other income (expense) |
| Fuel swaps | (409) | 3,549 | (1,292) | Other income (expense) |
| Fuel swaps | 41,037 | (35,407) | 29,929 | Fuel |
| | (20,713) | (79,119) | 5,205 | |
| Amortization of defined benefit plans: | | | | |
| Actuarial loss | (3,917) | (2,067) | (779) | Payroll and related |
| | (3,917) | (2,067) | (779) | |
| Release of foreign cumulative translation due to sale or liquidation of businesses: | | | | |
| Foreign cumulative translation | — | (69,044) | — | Other operating |
| Total reclassifications for the period | $ (24,630) | $ (150,230) | $ 4,426 | |

During the year ended December 31, 2020, a $69.0 million net loss was recorded within *Other expense* in our consolidated statements of comprehensive (loss) income, consisting of a $92.6 million loss resulting from the recognition of a currency translation adjustment, partially offset by the recognition of a deferred $23.6 million foreign exchange gain related to the Pullmantur net investment hedge. In connection with the Pullmantur reorganization in 2020, we no longer have significant involvement in the Pullmantur operations and these amounts previously deferred in *Accumulated other comprehensive loss* were recognized in earnings.

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Note 16.** *Fair Value Measurements and Derivative Instruments*

**Fair Value Measurements**

The estimated fair value of our financial instruments that are not measured at fair value, categorized based upon the fair value hierarchy, are as follows (in thousands):

| | Fair Value Measurements at December 31, 2021 | | | | | Fair Value Measurements at December 31, 2020 | | | |
| Description | Total Carrying Amount | Total Fair Value | Level 1[1] | Level 2[2] | Level 3[3] | Total Carrying Amount | Total Fair Value | Level 1[1] | Level 2[2] |
|---|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | | |
| Cash and cash equivalents(4) | $ 2,701,770 | $ 2,701,770 | $ 2,701,770 | | | $ 3,684,474 | $ 3,684,474 | $ 3,684,474 | $ — |
| **Total Assets** | $ 2,701,770 | $ 2,701,770 | $ 2,701,770 | $ — | $ — | $ 3,684,474 | $ 3,684,474 | $ 3,684,474 | $ — |
| **Liabilities:** | | | | | | | | | |
| Long-term debt (including current portion of long-term debt)(5) | $ 20,618,065 | $ 22,376,480 | $ — | $ 22,376,480 | $ — | $ 18,706,359 | $ 20,981,040 | $ — | $ 20,981,040 |
| **Total Liabilities** | $ 20,618,065 | $ 22,376,480 | $ — | $ 22,376,480 | $ — | $ 18,706,359 | $ 20,981,040 | $ — | $ 20,981,040 |

(1) Inputs based on quoted prices (unadjusted) in active markets for identical assets or liabilities that we have the ability to access. Valuation of these items does not entail a significant amount of judgment.

(2) Inputs other than quoted prices included within Level 1 that are observable for the liability, either directly or indirectly. For unsecured revolving credit facilities and unsecured term loans, fair value is determined utilizing the income valuation approach. This valuation model takes into account the contract terms of our debt such as the debt maturity and the interest rate on the debt. The valuation model also takes into account the creditworthiness of the Company.

(3) Inputs that are unobservable. The Company did not use any Level 3 inputs as of December 31, 2021 and 2020.

(4) Consists of cash and marketable securities with original maturities of less than 90 days.

(5) Consists of unsecured revolving credit facilities, senior notes, term loans and convertible notes. These amounts do not include our finance lease obligations or commercial paper.

*Other Financial Instruments*

The carrying amounts of accounts receivable, accounts payable, accrued interest, accrued expenses and commercial paper approximate fair value as of December 31, 2021 and 2020.

Assets and liabilities that are recorded at fair value have been categorized based upon the fair value hierarchy. The following table presents information about the Company's financial instruments recorded at fair value on a recurring basis (in thousands):

| | Fair Value Measurements at December 31, 2021 | | | | Fair Value Measurements at December 31, 2020 | | | |
| Description | Total Fair Value | Level 1[1] | Level 2[2] | Level 3[3] | Total Fair Value | Level 1[1] | Level 2[2] | Level 3[3] |
|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | |
| Derivative financial instruments[4] | $ 69,808 | $ — | $ 69,808 | $ — | $ 108,539 | $ — | $ 108,539 | $ — |
| **Total Assets** | $ 69,808 | $ — | $ 69,808 | $ — | $ 108,539 | $ — | $ 108,539 | $ — |
| **Liabilities:** | | | | | | | | |
| Derivative financial instruments[5] | $ 200,541 | $ — | $ 200,541 | $ — | $ 259,705 | $ — | $ 259,705 | $ — |
| **Total Liabilities** | $ 200,541 | $ — | $ 200,541 | $ — | $ 259,705 | $ — | $ 259,705 | $ — |

(1)   Inputs based on quoted prices (unadjusted) in active markets for identical assets or liabilities that we have the ability to access. Valuation of these items does not entail a significant amount of judgment.

(2)   Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. For foreign currency forward contracts, interest rate swaps and fuel swaps, fair value is derived using valuation models that utilize the income valuation approach. These valuation models take into account the contract terms, such as maturity as well as other inputs, such as foreign exchange rates and curves, fuel types, fuel curves and interest rate yield curves. Derivative instrument fair values take into account the creditworthiness of the counterparty and the Company.

(3)   Inputs that are unobservable. No Level 3 inputs were used in fair value measurements of Other financial instruments as of December 31, 2021 and December 31, 2020

(4)   Consists of foreign currency forward contracts, interest rate swaps and fuel swaps. Refer to the "Fair Value of Derivative Instruments" table for breakdown by instrument type.

(5)   Consists of foreign currency forward contracts, interest rate swaps and fuel swaps. Refer to the "Fair Value of Derivative Instruments" table for breakdown by instrument type.

The reported fair values are based on a variety of factors and assumptions. Accordingly, the fair values may not represent actual values of the financial instruments that could have been realized as of December 31, 2021 or 2020, or that will be realized in the future, and do not include expenses that could be incurred in an actual sale or settlement.

*Nonfinancial Instruments Recorded at Fair Value on a Nonrecurring Basis*

The following tables presents information about the Company's nonfinancial instruments recorded at fair value on a nonrecurring basis (in thousands):

| | Fair Value Measurements at December 31, 2021 | | | |
| --- | --- | --- | --- | --- |
| **Description** | **Total Carrying Amount** | **Total Fair Value** | **Level 3** | **Total Impairment for the year ended December 31, 2021 (1)** |
| Long-lived assets | — | — | — | 55,213 |
| **Total** | — | — | — | 55,213 |

[1] Amount is primarily composed of construction in progress assets that were impaired during the year ended 2021 due to a reduction in scope or the decision to not complete the projects. The impairments were calculated based on orderly liquidation values. The fair value of these assets was estimated as of the date the assets were last impaired.

| | Fair Value Measurement at December 31, 2020 | | | |
| --- | --- | --- | --- | --- |
| **Description** | **Total Carrying Amount** | **Total Fair Value** | **Level 3** | **Total Impairment for the year ended December 31, 2020** |
| Silversea Goodwill(1) | 508,578 | 508,578 | 508,578 | 576,208 |
| Indefinite-life intangible asset(2) | 318,700 | 318,700 | 318,700 | 30,800 |
| Long-lived assets(3) | 577,193 | 577,193 | 577,193 | 727,063 |
| Right-of-use assets(4) | 67,265 | 67,265 | 67,265 | 65,909 |
| Equity-method investments(5) | — | — | — | 39,735 |
| **Total** | 1,471,736 | 1,471,736 | 1,471,736 | 1,439,715 |

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

[1] We estimated the fair value of the Silversea Cruises reporting unit using a probability-weighted discounted cash flow model in combination with a market-based valuation approach. The principal assumptions used in the discounted cash flow model were (i) forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, and terminal growth rate; and (ii) weighted average cost of capital (i.e., discount rate). The probability-weighted discounted cash flow model used our most current projected operating results for the upcoming fiscal year as a base. To that base we added future years' cash flows through 2030 assuming multiple revenue and expense scenarios that reflect the impact of different global economic environments for this period on the Silversea Cruises' reporting unit. We assigned a probability to each revenue and expense scenario. We discounted the projected cash flows using rates specific to the Silversea Cruises' reporting unit based on its weighted-average cost of capital, which was determined to be 12.75%. The fair value of Silversea Cruises' goodwill was estimated as of March 31, 2020, the date the asset was last impaired.

[2] Amount represents the Silversea Cruises trade name which makes up the majority of our indefinite-life intangible assets, totaling $321.5 million. We estimated the fair value of the Silversea Cruises trade name using a discounted cash flow model and the relief-from-royalty method and used a discount rate of 13.25%. Significant inputs in performing the fair value assessment for the trade name were (i) forecasted net revenues, primarily the timing of returning to normalized operations, occupancy rates from existing and expected ship deliveries, including options, and terminal growth rate; (ii) the royalty rate of 3.0%; and (iii) weighted average cost of capital (i.e., discount rate). The fair value of the Silversea Cruises trade name was estimated as of March 31, 2020, the date the asset was last impaired.

[3] Impairments primarily relate to certain vessels during 2020. In addition, certain construction in progress projects generated impairments during 2020. For the vessels impaired during the quarter ended March 31, 2020, we estimated the fair value of two of our vessels using a blended indication from the income and cost approaches and the fair value of the remaining vessels was estimated primarily based on their orderly liquidation values. For the vessels impaired during the quarter ended June 30, 2020, we estimated the fair value of the vessels using a modified market approach based on the carrying values and orderly liquidation values of the vessels. For the vessels impaired during the quarter ended December 31, 2020, we estimated the fair value of the three Azamara vessels using a market approach. A significant input in performing the fair value assessments for these vessels was management's expected use of the vessels, which takes into consideration forecasted operating results. During the quarter ended September 30, 2020 and quarter ended December 31, 2020, construction in progress assets were impaired due to a reduction in scope or the decision to not complete the projects. The impairment was calculated based on orderly liquidation values. The fair value of these assets was estimated as of the date the asset was last impaired.

[4] Impairments to our right-of-use assets relate to certain of our berthing arrangements and a ship operating lease. We estimated the fair value of the berthing arrangements using estimated projected discounted cash flows and the fair value of the ship operating lease was estimated using a market approach. The fair value of the berthing arrangements was estimated as of March 31, 2020, the date these assets were last impaired. A significant input in performing the fair value assessments for these assets was our expected passenger headcount. The fair value of the ship operating lease was estimated as of December 31, 2020, the date this asset was last impaired, and significant inputs in performing the fair value assessment using the market approach for this asset were the expected rate of return and remaining lease payments.

[5] We estimated the fair value of our other than temporarily impaired equity-method investments using a discounted cash flow model. A significant input in performing the fair value assessments for these assets was forecasted operating results for these investments. The fair value of these equity-method investments was estimated as of March 31, 2020, the date these assets were last impaired. For further information on our equity method investments, refer to Note 7. *Other Assets.*

*Master Netting Agreements*

We have master International Swaps and Derivatives Association ("ISDA") agreements in place with our derivative instrument counterparties. These ISDA agreements generally provide for final close out netting with our counterparties for all positions in the case of default or termination of the ISDA agreement. We have determined that our ISDA agreements provide us with rights of setoff on the fair value of derivative instruments in a gain position and those in a loss position with the same counterparty. We have elected not to offset such derivative instrument fair values in our consolidated balance sheets.

See *Credit Related Contingent Features* for further discussion on contingent collateral requirements for our derivative instruments.

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table presents information about the Company's offsetting of financial assets under master netting agreements with derivative counterparties (in thousands):

| | Gross Amounts not Offset in the Consolidated Balance Sheet that are Subject to Master Netting Agreements | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | As of December 31, 2021 | | | | As of December 31, 2020 | | | |
| | Gross Amount of Derivative Assets Presented in the Consolidated Balance Sheet | Gross Amount of Eligible Offsetting Recognized Derivative Liabilities | Cash Collateral Received | Net Amount of Derivative Assets | Gross Amount of Derivative Assets Presented in the Consolidated Balance Sheet | Gross Amount of Eligible Offsetting Recognized Derivative Liabilities | Cash Collateral Received | Net Amount of Derivative Assets |
| Derivatives subject to master netting agreements | $ 69,808 | $ (67,995) | $ — | $ 1,813 | $ 108,539 | $ (80,743) | $ — | $ 27,796 |
| **Total** | $ 69,808 | $ (67,995) | $ — | $ 1,813 | $ 108,539 | $ (80,743) | $ — | $ 27,796 |

The following table presents information about the Company's offsetting of financial liabilities under master netting agreements with derivative counterparties (in thousands):

| | Gross Amounts not Offset in the Consolidated Balance Sheet that are Subject to Master Netting Agreements | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | As of December 31, 2021 | | | | As of December 31, 2020 | | | |
| | Gross Amount of Derivative Liabilities Presented in the Consolidated Balance Sheet | Gross Amount of Eligible Offsetting Recognized Derivative Assets | Cash Collateral Pledged | Net Amount of Derivative Liabilities | Gross Amount of Derivative Liabilities Presented in the Consolidated Balance Sheet | Gross Amount of Eligible Offsetting Recognized Derivative Assets | Cash Collateral Pledged | Net Amount of Derivative Liabilities |
| Derivatives subject to master netting agreements | $ (200,541) | $ 67,995 | $ 44,411 | $ (88,135) | $ (259,705) | $ 80,743 | $ 57,273 | $ (121,689) |
| **Total** | $ (200,541) | $ 67,995 | $ 44,411 | $ (88,135) | $ (259,705) | $ 80,743 | $ 57,273 | $ (121,689) |

*Concentrations of Credit Risk*

We monitor our credit risk associated with financial and other institutions with which we conduct significant business and, to minimize these risks, we select counterparties with credit risks acceptable to us and we seek to limit our exposure to an individual counterparty. Credit risk, including but not limited to counterparty nonperformance under derivative instruments, our credit facilities and new ship progress payment guarantees, is not considered significant, as we primarily conduct business with large, well-established financial institutions, insurance companies and export credit agencies many of which we have long-term relationships with and which have credit risks acceptable to us or where the credit risk is spread out among a large number of counterparties. As of December 31, 2021, we had counterparty credit risk exposure under our derivative instruments of $1.9 million, which was limited to the cost of replacing the contracts in the event of non-performance by the counterparties to the contracts, the majority of which are currently our lending banks. We do not anticipate nonperformance by any of our significant counterparties. In addition, we have established guidelines we follow regarding credit ratings and instrument maturities to maintain safety and liquidity. We do not normally require collateral or other security to support credit relationships; however, in certain circumstances this option is available to us.

**Derivative Instruments**

We are exposed to market risk attributable to changes in interest rates, foreign currency exchange rates and fuel prices. We try to mitigate these risks through a combination of our normal operating and financing activities and through the use of derivative financial instruments pursuant to our hedging practices and policies. The financial impact of these hedging instruments is primarily offset by corresponding changes in the underlying exposures being hedged. We achieve this by closely matching the notional amount, term and conditions of the derivative instrument with the underlying risk being hedged. Although certain of our derivative

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

financial instruments do not qualify or are not accounted for under hedge accounting, our objective is not to hold or issue derivative financial instruments for trading or other speculative purposes.

We enter into various forward, swap and option contracts to manage our interest rate exposure and to limit our exposure to fluctuations in foreign currency exchange rates and fuel prices. These instruments are recorded on the balance sheet at their fair value and the vast majority are designated as hedges. We also use non-derivative financial instruments designated as hedges of our net investment in our foreign operations and investments.

At inception of the hedge relationship, a derivative instrument that hedges the exposure to changes in the fair value of a firm commitment or a recognized asset or liability is designated as a fair value hedge. A derivative instrument that hedges a forecasted transaction or the variability of cash flows related to a recognized asset or liability is designated as a cash flow hedge.

Changes in the fair value of derivatives that are designated as fair value hedges are offset against changes in the fair value of the underlying hedged assets, liabilities or firm commitments. Gains and losses on derivatives that are designated as cash flow hedges are recorded as a component of *Accumulated other comprehensive loss* until the underlying hedged transactions are recognized in earnings. The foreign currency transaction gain or loss of our non-derivative financial instruments and the changes in the fair value of derivatives designated as hedges of our net investment in foreign operations and investments are recognized as a component of *Accumulated other comprehensive loss* along with the associated foreign currency translation adjustment of the foreign operation or investment. In certain hedges of our net investment in foreign operations and investments, we exclude forward points from the assessment of hedge effectiveness and we amortize the related amounts directly into earnings.

On an ongoing basis, we assess whether derivatives used in hedging transactions are "highly effective" in offsetting changes in the fair value or cash flow of hedged items. For our net investment hedges, we use the dollar offset method to measure effectiveness. For all other hedging programs, we use the long-haul method to assess hedge effectiveness using regression analysis for each hedge relationship. The methodology for assessing hedge effectiveness is applied on a consistent basis for each one of our hedging programs (i.e., interest rate, foreign currency ship construction, foreign currency net investment and fuel). For our regression analyses, we use an observation period of up to three years, utilizing market data relevant to the hedge horizon of each hedge relationship. High effectiveness is achieved when a statistically valid relationship reflects a high degree of offset and correlation between the changes in the fair values of the derivative instrument and the hedged item. If it is determined that a derivative is not highly effective as a hedge or hedge accounting is discontinued, any change in fair value of the derivative since the last date at which it was determined to be effective is recognized in earnings.

Cash flows from derivative instruments that are designated as fair value or cash flow hedges are classified in the same category as the cash flows from the underlying hedged items. In the event that hedge accounting is discontinued, cash flows subsequent to the date of discontinuance are classified within investing activities. Cash flows from derivative instruments not designated as hedging instruments are classified as investing activities.

We consider the classification of the underlying hedged item's cash flows in determining the classification for the designated derivative instrument's cash flows. We classify derivative instrument cash flows from hedges of benchmark interest rate or hedges of fuel expense as operating activities due to the nature of the hedged item. Likewise, we classify derivative instrument cash flows from hedges of foreign currency risk on our newbuild ship payments as investing activities.

*Interest Rate Risk*

Our exposure to market risk for changes in interest rates primarily relates to our debt obligations including future interest payments. At December 31, 2021 and 2020, approximately 65.7% and 64.5%, respectively, of our debt was effectively fixed. We use interest rate swap agreements to modify our exposure to interest rate movements and to manage our interest expense.

Market risk associated with our fixed rate debt is the potential increase in fair value resulting from a decrease in interest rates. We use interest rate swap agreements that effectively convert a portion of our fixed-rate debt to a floating-rate basis to manage this risk. At December 31, 2021, we maintained interest rate swap agreements on the following fixed-rate debt instruments:

| Debt Instrument | Swap Notional as of December 31, 2021 (In thousands) | Maturity | Debt Fixed Rate | Swap Floating Rate: LIBOR plus | All-in Swap Floating Rate as of December 31, 2021 |
|---|---|---|---|---|---|
| Unsecured senior notes | 650,000 | November 2022 | 5.25% | 3.63% | 3.79% |
| | $ 650,000 | | | | |

F-48

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

These interest rate swap agreements are accounted for as fair value hedges.

Market risk associated with our long-term floating rate debt is the potential increase in interest expense from an increase in interest rates. We use interest rate swap agreements that effectively convert a portion of our floating-rate debt to a fixed-rate basis to manage this risk. At December 31, 2021, we maintained interest rate swap agreements on the following floating-rate debt instruments:

| Debt Instrument | Swap Notional as of December 31, 2021 (In thousands) | Maturity | Debt Floating Rate | | All-in Swap Fixed Rate |
|---|---|---|---|---|---|
| Celebrity Reflection term loan | $ 163,625 | October 2024 | LIBOR plus | 0.40% | 2.85% |
| Quantum of the Seas term loan | 306,250 | October 2026 | LIBOR plus | 1.30% | 3.74% |
| Anthem of the Seas term loan | 332,292 | April 2027 | LIBOR plus | 1.30% | 3.86% |
| Ovation of the Seas term loan | 449,583 | April 2028 | LIBOR plus | 1.00% | 3.16% |
| Harmony of the Seas term loan [1] | 427,142 | May 2028 | EURIBOR plus | 1.15% | 2.26% |
| Odyssey of the Seas term loan [2] | 421,667 | October 2032 | LIBOR plus | 0.96% | 3.21% |
| Odyssey of the Seas term loan [2] | 191,667 | October 2032 | LIBOR plus | 0.96% | 2.84% |
| | $ 2,292,226 | | | | |

[1]  Interest rate swap agreements hedging the Euro-denominated term loan for *Harmony of the Seas* include EURIBOR zero-floors matching the hedged debt EURIBOR zero-floor. Amount presented is based on the exchange rate as of December 31, 2021.

[2]  Interest rate swap agreements hedging the term loan of *Odyssey of the Seas* include LIBOR zero-floors matching the debt LIBOR zero-floor. The effective dates of the $421.7 million and $191.7 million interest rate swap agreements are October 2020 and October 2022, respectively. The unsecured term loan for the financing of *Odyssey of the Seas* was drawn on March 2021.

These interest rate swap agreements are accounted for as cash flow hedges.

The notional amount of interest rate swap agreements related to outstanding debt and our current unfunded financing arrangements as of December 31, 2021 and 2020 was $2.9 billion and $3.4 billion, respectively.

*Foreign Currency Exchange Rate Risk*

*Derivative Instruments*

Our primary exposure to foreign currency exchange rate risk relates to our ship construction contracts denominated in Euros, our foreign currency denominated debt and our international business operations. We enter into foreign currency forward contracts to manage portions of the exposure to movements in foreign currency exchange rates. As of December 31, 2021, the aggregate cost of our ships on order, was $12.4 billion, of which we had deposited $800.2 million as of such date. These amounts do not include any ships placed on order that are contingent upon completion of conditions precedent and/or financing, any ships on order by our Partner Brands. Refer to Note 17. *Commitments and Contingencies*, for further information on our ships on order. At December 31, 2021 and 2020, approximately 59.0% and 66.3%, respectively, of the aggregate cost of the ships under construction was exposed to fluctuations in the Euro exchange rate. Our foreign currency forward contract agreements are accounted for as cash flow or net investment hedges depending on the designation of the related hedge.

On a regular basis, we enter into foreign currency forward contracts and, from time to time, we utilize cross-currency swap agreements and collar options to minimize the volatility resulting from the remeasurement of net monetary assets and liabilities denominated in a currency other than our functional currency or the functional currencies of our foreign subsidiaries. During the year ended December 31, 2021, we maintained an average of approximately $483.2 million of these foreign currency forward contracts. These instruments are not designated as hedging instruments. For the years ended December 31, 2021, 2020 and 2019, changes in the fair value of the foreign currency forward contracts resulted in gains (losses) of $(30.9) million, $(19.0) million and $1.4 million, respectively, which offset gains (losses) arising from the remeasurement of monetary assets and liabilities denominated in foreign currencies in those same years of $24.3 million, $(1.5) million and $0.4 million, respectively. These amounts were recognized in earnings within *Other income (expense)* in our consolidated statements of comprehensive income (loss).

We consider our investments in our foreign operations to be denominated in relatively stable currencies and of a long-term nature. As of December 31, 2021, we maintained a foreign currency forward contract and designated it as a hedge of a portion of our

F-49

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

net investments in TUI Cruises of €245.0 million, or approximately $278.6 million based on the exchange rate at December 31, 2021. This forward currency contract matures in April 2022.

The notional amount of outstanding foreign exchange contracts, excluding the forward contracts entered into to minimize remeasurement volatility, as of December 31, 2021 and 2020 was $3.4 billion and $3.1 billion, respectively.

*Non-Derivative Instruments*

We also address the exposure of our investments in foreign operations by denominating a portion of our debt in our subsidiaries' and investments' functional currencies and designating it as a hedge of these subsidiaries and investments. We had designated debt as a hedge of our net investments primarily in TUI Cruises of €97.0 million, or approximately $110.3 million, as of December 31, 2021. As of December 31, 2020, we had designated debt as a hedge of our net investments primarily in TUI Cruises of €215.0 million, or approximately $263.0 million.

*Fuel Price Risk*

Our exposure to market risk for changes in fuel prices relates primarily to the consumption of fuel on our ships. We use fuel swap agreements to mitigate the financial impact of fluctuations in fuel prices.

Our fuel swap agreements are generally accounted for as cash flow hedges. In the case that our hedged forecasted fuel consumption is not probable of occurring, hedge accounting will be discontinued and the related accumulated other comprehensive gain or loss will be reclassified to *Other income (expense)* immediately. For hedged forecasted fuel consumption that remains possible of occurring, hedge accounting will be discontinued and the related accumulated other comprehensive gain or loss will remain in accumulated other comprehensive gain or loss until the underlying hedged transactions are recognized in earnings or the related hedged forecasted fuel consumption is deemed probable of not occurring.

The prior suspension of our cruise operations due to the COVID-19 pandemic and our gradual resumption of cruise operations has resulted in reductions to our forecasted fuel purchases. During the year ended December 31, 2021, we discontinued cash flow hedge accounting on 0.2 million metric tons of our fuel swap agreements maturing in 2021 and 2022, which resulted in the reclassification of a net $0.7 million loss from *Accumulated other comprehensive loss* to *Other income (expense)*. During the year ended December 31, 2020, we discontinued cash flow hedge accounting on 0.6 million metric tons of our fuel swap agreements maturing in 2020 and 2021, which resulted in the reclassification of a net $104.4 million loss from *Accumulated other comprehensive loss* to *Other income (expense)*. Changes in the fair value of fuel swaps for which cash flow hedge accounting was discontinued are currently recognized in *Other income (expense)* each reporting period through the maturity dates of the fuel swaps.

Future suspension of our operations or modifications to our itineraries may affect our expected forecasted fuel purchases which could result in further discontinuance of fuel swap cash flow hedge accounting and the reclassification of deferred gains or losses from *Accumulated other comprehensive loss* into earnings. Refer to *Risk Factors* in Part 1, Item 1A. for further discussion on risks related to the COVID-19 pandemic.

At December 31, 2021, we have hedged the variability in future cash flows for certain forecasted fuel transactions occurring through 2023. As of December 31, 2021 and December 31, 2020, we had the following outstanding fuel swap agreements

| | Fuel Swap Agreements | |
| | As of December 31, 2021 | As of December 31, 2020 |
| | (metric tons) | |
| **Designated as hedges:** | | |
| 2022 | 821,850 | 389,650 |
| 2023 | 249,050 | 82,400 |

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Fuel Swap Agreements | |
|---|---|---|
| | As of December 31, 2021 | As of December 31, 2020 |
| | (% hedged) | |
| **Designated hedges as a % of projected fuel purchases:** | | |
| 2022 | 54 % | 23 % |
| 2023 | 15 % | 5 % |

| | Fuel Swap Agreements | |
|---|---|---|
| | As of December 31, 2021 | As of December 31, 2020 |
| | (metric tons) | |
| **Not designated as hedges:** | | |
| 2022[1] | 231,900 | 14,650 |

(1)   As of December 31, 2021, 115,950 metric tons relate to fuel swap agreements with discontinued hedge accounting, in which we effectively pay fixed prices for our fuel purchases and receive floating prices from the counterparty. The remaining 115,950 tons relate to fuel swap agreements that were not designated as hedges since inception, in which we effectively pay floating prices for our fuel purchases and receive fixed prices from the counterparty.

At December 31, 2021 there was $23.8 million of estimated unrealized net gain associated with our cash flow hedges pertaining to fuel swap agreements to be reclassified to earnings from *Accumulated other comprehensive loss* within the next twelve months when compared to $13.1 million of estimated unrealized net loss at December 31, 2020. Reclassification is expected to occur as the result of fuel consumption associated with our hedged forecasted fuel purchases.

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The fair value and line item caption of derivative instruments recorded within our consolidated balance sheets were as follows (in thousands):

| | | **Fair Value of Derivative Instruments** | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Asset Derivatives** | | | **Liability Derivatives** | | |
| | **Balance Sheet Location** | As of December 31, 2021 | As of December 31, 2020 | **Balance Sheet Location** | As of December 31, 2021 | As of December 31, 2020 | |
| | | **Fair Value** | **Fair Value** | | **Fair Value** | **Fair Value** | |
| **Derivatives designated as hedging instruments under ASC 815-20**[(1)] | | | | | | | |
| Interest rate swaps | Other assets | $ — | $ 17,271 | Other long-term liabilities | $ 62,080 | $ 144,653 | |
| Interest rate swaps | Derivative financial instruments | 6,478 | 261 | Derivative Financial Instruments | — | — | |
| Foreign currency forward contracts | Derivative financial instruments | 7,357 | 63,894 | Derivative financial instruments | 116,027 | 13,294 | |
| Foreign currency forward contracts | Other assets | 2,070 | 20,836 | Other long-term liabilities | 8,813 | 7,306 | |
| Fuel swaps | Derivative financial instruments | 31,919 | 5,093 | Derivative financial instruments | 7,944 | 25,203 | |
| Fuel swaps | Other assets | 13,452 | 350 | Other long-term liabilities | 1,202 | 50,117 | |
| Total derivatives designated as hedging instruments under ASC 815-20 | | 61,276 | 107,705 | | 196,066 | 240,573 | |
| **Derivatives not designated as hedging instruments under ASC 815-20** | | | | | | | |
| Foreign currency forward contracts | Derivative financial Instruments | — | — | Derivative financial instruments | — | 160 | |
| Foreign currency forward contracts | Other assets | — | — | Other long-term liabilities | — | — | |
| Fuel swaps | Derivative financial instruments | 8,430 | 834 | Derivative financial instruments | 3,264 | 18,028 | |
| Fuel swaps | Other assets | 102 | — | Other long-term liabilities | 1,211 | 944 | |
| Total derivatives not designated as hedging instruments under ASC 815-20 | | 8,532 | 834 | | 4,475 | 19,132 | |
| Total derivatives | | $ 69,808 | $ 108,539 | | $ 200,541 | $ 259,705 | |

_____

(1)     Accounting Standard Codification 815-20 "*Derivatives and Hedging.*"

**ROYAL CARIBBEAN CRUISES LTD.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The location and amount of gain or (loss) recognized in income on fair value and cash flow hedging relationships were as follows (in thousands)

| | Year Ended December 31, 2021 | | | | Year Ended December 31, 2020 | | | |
|---|---|---|---|---|---|---|---|---|
| | Fuel Expense | Depreciation and Amortization Expenses | Interest Income (Expense) | Other Income (Expense) | Fuel Expense | Depreciation and Amortization Expenses | Interest Income (Expense) | Other Income (Expense) |
| **Total amounts of income and expense line items presented in the statement of financial performance in which the effects of fair value or cash flow hedges are recorded** | $385,322 | $1,292,878 | $(1,274,980) | $20,284 | $371,015 | $1,279,254 | $(823,202) | $(137,085) |
| **The effects of fair value and cash flow hedging:** | | | | | | | | |
| **Gain or (loss) on fair value hedging relationships in Subtopic 815-20** | | | | | | | | |
| Interest contracts | | | | | | | | |
| Hedged items | n/a | n/a | $11,083 | — | n/a | n/a | $(18,813) | $— |
| Derivatives designated as hedging instruments | n/a | n/a | $(1,349) | — | n/a | n/a | $23,819 | $— |
| **Gain or (loss) on cash flow hedging relationships in Subtopic 815-20** | | | | | | | | |
| Interest contracts | | | | | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | n/a | n/a | $(43,185) | n/a | n/a | n/a | $(25,267) | n/a |
| Commodity contracts | | | | | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | $41,037 | n/a | n/a | $(409) | $(35,407) | n/a | n/a | $3,549 |
| Foreign exchange contracts | | | | | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | n/a | $(15,359) | n/a | $(2,797) | n/a | $(14,679) | n/a | $(7,315) |

| | Year Ended December 31, 2019 | | | |
|---|---|---|---|---|
| | Fuel Expense | Depreciation and Amortization Expenses | Interest Income (Expense) | Other Income (Expense) |
| **Total amounts of income and expense line items presented in the statement of financial performance in which the effects of fair value or cash flow hedges are recorded** | $697,962 | $1,245,942 | $(381,568) | $(24,513) |
| **The effects of fair value and cash flow hedging:** | | | | |
| **Gain or (loss) on fair value hedging relationships in Subtopic 815-20** | | | | |
| Interest contracts | | | | |
| Hedged items | n/a | n/a | $(23,464) | $— |
| Derivatives designated as hedging instruments | n/a | n/a | $16,607 | $— |
| **Gain or (loss) on cash flow hedging relationships in Subtopic 815-20** | | | | |
| Interest contracts | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | n/a | n/a | $(4,289) | n/a |
| Commodity contracts | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | $29,929 | n/a | n/a | $(1,292) |
| Foreign exchange contracts | | | | |
| Amount of gain or (loss) reclassified from accumulated other comprehensive loss into income | n/a | $(14,063) | n/a | $(5,080) |

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The carrying value and line item caption of non-derivative instruments designated as hedging instruments recorded within our consolidated balance sheets were as follows (in thousands):

| Non-derivative instrument designated as hedging instrument under ASC 815-20 | Balance Sheet Location | Carrying Value | |
|---|---|---|---|
| | | As of December 31, 2021 | As of December 31, 2020 |
| Foreign currency debt | Current portion of long-term debt | $ 75,518 | $ 43,696 |
| Foreign currency debt | Long-term debt | 34,795 | 219,335 |
| | | $ 110,313 | $ 263,031 |

The effect of derivative instruments qualifying and designated as hedging instruments and the related hedged items in fair value hedges on the consolidated statements of comprehensive income (loss) was as follows (in thousands):

| Derivatives and related Hedged Items under ASC 815-20 Fair Value Hedging Relationships | Location of Gain (Loss) Recognized in Income on Derivative and Hedged Item | Amount of Gain (Loss) Recognized in Income on Derivative | | | Amount of Gain (Loss) Recognized in Income on Hedged Item | | |
|---|---|---|---|---|---|---|---|
| | | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
| Interest rate swaps | Interest expense (income), net of interest capitalized | $ (1,349) | $ 23,819 | $ 16,607 | $ 11,083 | $ (18,813) | $ (23,464) |
| | | $ (1,349) | $ 23,819 | $ 16,607 | $ 11,083 | $ (18,813) | $ (23,464) |

The fair value and line item caption of derivative instruments recorded within our consolidated balance sheets for the cumulative basis adjustment for fair value hedges were as follows (in thousands):

| Line Item in the Statement of Financial Position Where the Hedged Item is Included | Carrying Amount of the Hedged Liabilities | | Cumulative amount of Fair Value Hedging Adjustment Included in the Carrying Amount of the Hedged Liabilities | |
|---|---|---|---|---|
| | As of December 31, 2021 | As of December 31, 2020 | As of December 31, 2021 | As of December 31, 2020 |
| Current portion of long-term debt and Long-term debt | $ 655,502 | $ 700,331 | $ 6,428 | $ 17,512 |
| | $ 655,502 | $ 700,331 | $ 6,428 | $ 17,512 |

The effect of derivative instruments qualifying and designated as cash flow hedging instruments on the consolidated financial statements was as follows (in thousands):

| Derivatives under ASC 815-20 Cash Flow Hedging Relationships | Amount of Gain (Loss) Recognized in Accumulated Other Comprehensive Income (Loss) on Derivative | | | Location of Gain (Loss) Reclassified from Accumulated Other Comprehensive Loss into Income | Amount of Gain (Loss) Reclassified from Accumulated Other Comprehensive Income into Income | | |
|---|---|---|---|---|---|---|---|
| | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 | | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
| Interest rate swaps | $ 45,572 | $ (112,960) | $ (72,732) | Interest expense | $ (43,185) | $ (25,267) | $ (4,289) |
| Foreign currency forward contracts | (203,129) | 130,426 | (148,881) | Depreciation and amortization expenses | (15,359) | (14,679) | (14,063) |
| Foreign currency forward contracts | — | — | — | Other income (expense) | (2,797) | (7,315) | (5,080) |
| Fuel swaps | — | — | — | Other income (expense) | (409) | 3,549 | (1,292) |
| Fuel swaps | 140,890 | (58,575) | 75,505 | Fuel | 41,037 | (35,407) | 29,929 |
| | $ (16,667) | $ (41,109) | $ (146,108) | | $ (20,713) | $ (79,119) | $ 5,205 |

F-54

**ROYAL CARIBBEAN CRUISES LTD.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The table below represents amounts excluded from the assessment of effectiveness for our net investment hedging instruments for which the difference between changes in fair value and periodic amortization is recorded in accumulated other comprehensive income (loss) (in thousands):

| Gain (Loss) Recognized in Income (Net Investment Excluded Components) | Year Ended December 31, 2021 |
|---|---|
| Net inception fair value at January 1, 2021 | $ (1,916) |
| Amount of gain recognized in income on derivatives for the year ended December 31, 2021 | 5,810 |
| Amount of loss remaining to be amortized in accumulated other comprehensive loss as of December 31, 2021 | (4,448) |
| Fair value at December 31, 2021 | $ (554) |

The effect of non-derivative instruments qualifying and designated as net investment hedging instruments on the consolidated financial statements was as follows (in thousands):

| Non-derivative instruments under ASC 815-20 Net Investment Hedging Relationships | Amount of Gain (Loss) Recognized in Other Comprehensive Income (Loss) | | |
|---|---|---|---|
| | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
| Foreign Currency Debt | $ 7,837 | $ (28,062) | $ 6,111 |
| | $ 7,837 | $ (28,062) | $ 6,111 |

The effect of derivatives not designated as hedging instruments on the consolidated financial statements was as follows (in thousands):

| Derivatives Not Designated as Hedging Instruments under ASC 815-20 | Location of Gain (Loss) Recognized in Income on Derivative | Amount of Gain (Loss) Recognized in Income on Derivative | | |
|---|---|---|---|---|
| | | Year Ended December 31, 2021 | Year Ended December 31, 2020 | Year Ended December 31, 2019 |
| Foreign currency forward contracts | Other income (expense) | $ (30,903) | $ (18,961) | $ 1,356 |
| Fuel swaps | Fuel | — | — | (37) |
| Fuel swaps | Other income (expense) | 33,720 | (102,740) | 112 |
| | | $ 2,817 | $ (121,701) | $ 1,431 |

*Credit Related Contingent Features*

Our current interest rate derivative instruments require us to post collateral if our Standard & Poor's and Moody's credit ratings fall below specified levels. Specifically, under most of our agreements, if on the fifth anniversary of executing a derivative instrument, or on any succeeding fifth-year anniversary, our credit ratings for our senior unsecured debt is rated below BBB- by Standard & Poor's and Baa3 by Moody's, then the counterparty will periodically have the right to demand that we post collateral in an amount equal to the difference between (i) the net market value of all derivative transactions with such counterparty that have reached their fifth year anniversary, to the extent negative, and (ii) the applicable minimum call amount.

The amount of collateral required to be posted will change as, and to the extent, our net liability position increases or decreases by more than the applicable minimum call amount. If our credit rating for our senior unsecured debt is subsequently equal to or above BBB- by Standard & Poor's or Baa3 by Moody's, then collateral posted at such time will be released to us and we will no longer be required to post collateral unless we meet the collateral trigger requirement, generally, at the next fifth-year anniversary.

As of December 31, 2021, our senior unsecured debt credit rating was B by Standard & Poor's and B2 by Moody's. As of December 31, 2021, six of our interest rate derivative hedges had a term of at least five years requiring us to post collateral of $44.4 million to satisfy our obligations under our interest rate derivative agreements, taking into account collateral waivers issued by certain banks. We expect that we will not need to provide additional collateral under these agreements in the next twelve months.

**Note 17.** *Commitments and Contingencies*

*Ship Purchase Obligations*

Our future capital commitments consist primarily of new ship orders. As of December 31, 2021, we had two Oasis-class ships and three ships of a new generation, known as our Icon-class, on order for our Royal Caribbean International brand with an aggregate capacity of approximately 28,200 berths. As of December 31, 2021, we had two Edge-class ships on order for our Celebrity brand with an aggregate capacity of approximately 6,500 berths. Additionally as of December 31, 2021, we had two ships on order with an aggregate capacity of approximately 1,460 berths for our Silversea Cruises brand. The following provides further information on recent developments with respect to our ship orders.

In September 2019, Silversea Cruises entered into two credit agreements, guaranteed by us, for the unsecured financing of the first and second Evolution-class ships for an amount of up to 80% of each ship's contract price. The maximum loan amount under each facility is not to exceed the United States dollar equivalent of €351.6 million in the case of the first Evolution-class ship and €359.0 million in the case of the second Evolution-class ship, or approximately $399.9 million and $408.3 million, respectively, based on the exchange rate at December 31, 2021. Each loan, once funded, will amortize semi-annually and will mature 12 years following the delivery of each ship. At our election, interest on each loan will accrue either (1) at a fixed rate of 4.14% and 4.18%, respectively (inclusive of the applicable margin) or (2) at a floating rate equal to LIBOR plus 0.79% and 0.83%, respectively. The first and second Evolution-class ships will each have a capacity of approximately 730 berths.

In December 2019, we entered into a credit agreement for the unsecured financing of the sixth Oasis-class ship for up to 80% of the ship's contract price through a facility to be guaranteed 100% by BpiFrance Assurance Export, the official export credit agency of France. Under the financing arrangement, we have the right, but not the obligation, to satisfy the obligations to be incurred upon delivery and acceptance of the ship under the shipbuilding contract by assuming, at delivery and acceptance, the debt incurred by the shipbuilder during the construction of the ship. The maximum loan amount under the facility is not to exceed the United States dollar equivalent of €1.3 billion, or approximately $1.5 billion based on the exchange rate at December 31, 2021. The loan will amortize semi-annually and will mature 12 years following delivery of the ship. Interest on the loan will accrue at a fixed rate of 3.00% (inclusive of margin). The sixth Oasis-class ship will have a capacity of approximately 5,700 berths.

In December 2019, we entered into a credit agreement for the unsecured financing of the third Icon-class ship for up to 80% of the ship's contract price. Finnvera plc, the official export credit agency of Finland, has agreed to guarantee 95% of the substantial majority of the financing, with a smaller portion of the financing to be 95% guaranteed by Euler Hermes, the official German export credit agency. The maximum loan amount under the facility is not to exceed the United States dollar equivalent of €1.4 billion, or approximately $1.6 billion based on the exchange rate at December 31, 2021. The loan, once funded, will amortize semi-annually and will mature 12 years following the delivery of the ship. Approximately 60% of the loan will accrue interest at a fixed rate of 3.29%. The balance of the loan will accrue interest at a floating rate of LIBOR plus 0.85%. The third Icon-class ship will have a capacity of approximately 5,600 berths

During 2017, we entered into credit agreements for the unsecured financing of the two Icon-class ships for up to 80% of each ship's contract price. For each ship, the official Finnish export credit agency, Finnvera plc, has agreed to guarantee 100% of a substantial majority of the financing to the lenders, with a smaller portion of the financing to be 95% guaranteed by Euler Hermes, the official German export credit agency. The maximum loan amount under each facility is not to exceed €1.4 billion, or approximately $1.6 billion, based on the exchange rate at December 31, 2021. Interest on approximately 75% of each loan will accrue at a fixed rate of 3.56% and 3.76% for the first and second Icon-class ships, respectively, and the balance will accrue interest at a floating rate ranging from LIBOR plus 1.10% to 1.15% and LIBOR plus 1.15% to 1.20% for the first and second Icon-class ships. Each loan will amortize semi-annually and will mature 12 years following delivery of each ship. The first and second Icon-class ships will each have a capacity of approximately 5,600 berths.

During 2017, we entered into credit agreements for the unsecured financing of the third and fourth Edge-class ships and the fifth Oasis-class ship for up to 80% of each ship's contract price through facilities to be guaranteed 100% by Bpifrance Assurance Export, the official export credit agency of France. Under these financing arrangements, we have the right, but not the obligation, to satisfy the obligations to be incurred upon delivery and acceptance of each ship under the shipbuilding contract by assuming, at delivery and acceptance, the debt indirectly incurred by the shipbuilder during the construction of each ship. The maximum loan amount under each facility is not to exceed €684.2 million in the case of the third Edge-class ship and the United States dollar equivalent of €714.6 million and €1.1 billion in the case of the fourth Edge-class ship and fifth Oasis-class ship, or approximately $812.7 million and $1.3 billion, respectively, based on the exchange rate at December 31, 2021. The loans will amortize semi-annually and will mature 12 years following delivery of each ship. Interest on the loans will

Table of Contents

ROYAL CARIBBEAN CRUISES LTD.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

accrue at a fixed rate of 1.28% for the third Edge-class ship and at a fixed rate of 3.18% for both, the fourth Edge-class ship and the fifth Oasis-class ship. The third and fourth Edge-class ships, each of which will have a capacity of approximately 3,250 berths. The fifth Oasis-class ship will have a capacity of approximately 5,700 berths.

Our future capital commitments consist primarily of new ship orders. COVID-19 has impacted shipyard operations which have and may continue to result in delays of our previously contracted ship deliveries. As of December 31, 2021, the dates that ships on order by our Global and Partner Brands are expected to be delivered, subject to change in the event of construction delays, and their approximate berths are as follows:

| Ship | Shipyard | Expected to be delivered | Approximate Berths |
|---|---|---|---|
| Royal Caribbean International — | | | |
| Oasis-class: | | | |
| *Wonder of the Seas* | Chantiers de l'Atlantique | 1st Quarter 2022 | 5,700 |
| *Unnamed* | Chantiers de l'Atlantique | 2nd Quarter 2024 | 5,700 |
| Icon-class: | | | |
| *Icon of the Seas* | Meyer Turku Oy | 3rd Quarter 2023 | 5,600 |
| *Unnamed* | Meyer Turku Oy | 2nd Quarter 2025 | 5,600 |
| *Unnamed* | Meyer Turku Oy | 2nd Quarter 2026 | 5,600 |
| Celebrity Cruises — | | | |
| Edge-class: | | | |
| *Celebrity Beyond* | Chantiers de l'Atlantique | 2nd Quarter 2022 | 3,250 |
| *Celebrity Ascent* | Chantiers de l'Atlantique | 4th Quarter 2023 | 3,250 |
| Silversea Cruises — | | | |
| Evolution-class: | | | |
| *Silver Nova* | Meyer Werft | 2nd Quarter 2023 | 730 |
| *Unnamed* | Meyer Werft | 2nd Quarter 2024 | 730 |
| TUI Cruises (50% joint venture) — | | | |
| *Mein Schiff 7* | Meyer Turku Oy | 2nd Quarter 2024 | 2,900 |
| *Unnamed* | Fincantieri | 4th Quarter 2024 | 4,100 |
| *Unnamed* | Fincantieri | 2nd Quarter 2026 | 4,100 |
| *Total Berths* | | | 47,260 |

We took delivery of *Wonder of the Seas* in January of 2022. In addition, as of December 31, 2021, we have an agreement in place with Chantiers de l'Atlantique to build an additional Edge-class ship for delivery in 2025, which is contingent upon completion of conditions precedent and financing.

In September 2021, we amended the credit agreements for the first and second Evolution-class ships to increase their maximum loan amounts by €175.6 million on an aggregate basis, or approximately $199.7 million based on the exchange rate at December 31, 2021. The increase in the loan amounts will finance ship design modifications that incorporate innovative sustainability features and additional premium cabins, increasing the capacity for each ship to 730 berths. At our election, interest on incremental portion of each loan will accrue either (1) at a fixed rate of 4.34% and 4.38%, respectively (inclusive of the applicable margin) or (2) at a floating rate equal to LIBOR plus 0.99% and 1.03%, respectively.

As of December 31, 2021, the aggregate cost of our ships on order, presented in the above table, not including any ships on order by our Partner Brands, was approximately $12.4 billion, of which we had deposited $800.2 million as of such date. Approximately 59.0% of the aggregate cost was exposed to fluctuations in the Euro exchange rate at December 31, 2021. Refer to Note 16. *Fair Value Measurements and Derivative Instruments* for further information.

ROYAL CARIBBEAN CRUISES LTD.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Litigation*

As previously reported, two lawsuits were filed against us in August 2019 in the U.S. District Court for the Southern District of Florida (the "Court") under Title III of the Cuban Liberty and Democratic Solidarity Act, also known as the Helms-Burton Act. The complaint filed by Havana Docks Corporation ("Havana Docks Action") alleges it holds an interest in the Havana Cruise Port Terminal, and the complaint filed by Javier Garcia-Bengochea (the "Port of Santiago Action") alleges that he holds an interest in the Port of Santiago, Cuba, both of which were expropriated by the Cuban government. The complaints further allege that we trafficked in those properties by embarking and disembarking passengers at these facilities. The plaintiffs seek all available statutory remedies, including the value of the expropriated property, plus interest, treble damages, attorneys' fees and costs. In the Havana Docks Action, we and the plaintiff have filed motions for summary judgment, which were heard by the Court in January 2022. The Havana Docks Action is scheduled for trial on May 23, 2022. The Court dismissed the Port of Santiago Action with prejudice on the basis that the plaintiff lacked standing, and the plaintiff's appeal of the dismissal is awaiting a decision by the appellate court. We believe we have meritorious defenses to the claims alleged in both the Havana Docks Action and the Port of Santiago Action, and we intend to vigorously defend ourselves against them. The outcome of litigation is inherently unpredictable and subject to significant uncertainties, and there can be no assurances that the final outcome of either case will not be material.

We are routinely involved in claims, typical within the travel and tourism industry. The majority of these claims are covered by insurance. We believe the outcome of such claims, net of expected insurance recoveries, will not have a material adverse impact on our financial condition or results of operations and cash flows.

*Other*

Some of the contracts that we enter into include indemnification provisions that obligate us to make payments to the counterparty if certain events occur. These contingencies generally relate to changes in taxes, increased lender capital costs and other similar costs. The indemnification clauses are often standard contractual terms and are entered into in the normal course of business. There are no stated or notional amounts included in the indemnification clauses and we are not able to estimate the maximum potential amount of future payments, if any, under these indemnification clauses. We have not been required to make any payments under such indemnification clauses in the past and, under current circumstances, we do not believe an indemnification in any material amount is probable.

If any person acquires ownership of more than 50% of our common stock or, subject to certain exceptions, during any 24-month period, a majority of our board of directors is no longer comprised of individuals who were members of our board of directors on the first day of such period, we may be obligated to prepay indebtedness outstanding under our credit facilities, which we may be unable to replace on similar terms. Our public debt securities also contain change of control provisions that would be triggered by a third-party acquisition of greater than 50% of our common stock coupled with a ratings downgrade. If this were to occur, it would have an adverse impact on our liquidity and operations.

At December 31, 2021, we have future commitments to pay for our usage of certain port facilities, marine consumables, services and maintenance contracts as follows (in thousands):

| Year | | |
|------|---|---|
| 2022 | $ | 154,552 |
| 2023 | | 86,532 |
| 2024 | | 75,868 |
| 2025 | | 33,981 |
| 2026 | | 29,518 |
| Thereafter | | 154,033 |
| | $ | 534,484 |

F-58

Table of Contents

**ROYAL CARIBBEAN CRUISES LTD.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**Note 18.** *Restructuring Charges*

In April 2020, we reduced our US shoreside workforce by approximately 23% through permanent layoffs. We incurred severance costs of $28.0 million during the year ended December 31, 2020.

The following table summarizes our restructuring costs during the twelve months ended December 31, 2021 as it relates to the April 2020 reduction in our workforce (in thousands):

| | Beginning Balance January 1, 2021 | Accruals | Payments | Ending Balance December 31, 2021 | Cumulative Charges Incurred |
|---|---|---|---|---|---|
| Termination benefits | $ 4,257 | $ 682 | $ 4,626 | $ 313 | $ 28,635 |
| **Total** | $ 4,257 | $ 682 | $ 4,626 | $ 313 | 28,635 |

**HULL NO. C34 CREDIT AGREEMENT**

**dated 24 July 2017 as novated, amended and restated on the Actual Delivery Date pursuant to a novation agreement dated 24 July 2017 (as amended and restated by a first novation agreement supplement dated 12 March 2020, as amended by a second novation agreement supplement dated 29 August 2020, as further amended and restated by a third novation agreement supplement dated 13 November 2020 and as further amended and restated by a fourth novation agreement supplement dated      July 2021)**

**BETWEEN**

**Royal Caribbean Cruises Ltd. as the Borrower,**

**the Lenders from time to time party hereto,**

**Citibank N.A., London Branch as Global Coordinator**

**SMBC Bank International plc as ECA Agent and**

**Citibank Europe plc, UK Branch as Facility Agent and**

**Citibank N.A., London Branch, Banco Santander, S.A., Paris Branch, BNP Paribas, HSBC Continental Europe, Société Générale and SMBC Bank International plc as Mandated Lead Arrangers**

BD-#3810523 8-v3

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Article I | |
| DEFINITIONS AND ACCOUNTING TERMS | |
| Section 1.1.    Defined Terms | 2 |
| Section 1.2.    Use of Defined Terms | 29 |
| Section 1.3.    Cross-References | 29 |
| Section 1.4.    Accounting and Financial Determinations | 29 |
| Article II | |
| COMMITMENTS AND BORROWING PROCEDURES | |
| Section 2.1.    Commitment | 30 |
| Section 2.2.    Commitment of the Lenders; Termination and Reduction of Commitments | 30 |
| Section 2.3.    Borrowing Procedure | 30 |
| Section 2.4.    Funding | 33 |
| Article III | |
| REPAYMENTS, PREPAYMENTS, INTEREST AND FEES | |
| Section 3.1.    Repayments | 33 |
| Section 3.2.    Prepayment | 33 |
| Section 3.3.    Interest Provisions | 34 |
| Section 3.3.1.    Rates | 34 |
| Section 3.3.2.    [Intentionally omitted] | 35 |
| Section 3.3.3.    Interest stabilisation | 35 |
| Section 3.3.4.    Post-Maturity Rates | 35 |
| Section 3.3.5.    Payment Dates | 35 |
| Section 3.3.6.    Interest Rate Determination; Replacement Reference Banks | 35 |
| Section 3.3.7.    Unavailability of the LIBO Rate | 36 |
| Section 3.4.    Commitment Fees | 37 |
| Section 3.4.1.    Payment | 37 |
| Section 3.5.    Other Fees | 38 |
| Article IV | |
| CERTAIN LIBO RATE AND OTHER PROVISIONS | |

Section 4.1.    LIBO Rate Lending Unlawful                                          38
Section 4.2.    Deposits Unavailable                                               38
Section 4.3.    Increased LIBO Rate Loan Costs, etc.                               39
Section 4.4.    Funding Losses                                                     41
Section 4.4.1.   Indemnity                                                         41
Section 4.4.2.   Exclusion                                                         42
Section 4.5.    Increased Capital Costs                                            42
Section 4.6.    Taxes                                                              43
Section 4.7.    Reserve Costs                                                      45
Section 4.8.    Payments, Computations, etc.                                       46
Section 4.9.    Replacement Lenders, etc.                                          46
Section 4.10.    Sharing of Payments                                              47
Section 4.10.1.   Payments to Lenders                                             47
Section 4.10.2.   Redistribution of payments                                      47
Section 4.10.3.   Recovering Lender's rights                                      48
Section 4.10.4.   Reversal of redistribution                                      48
Section 4.10.5.   Exceptions.                                                      48
Section 4.11.    Set-off                                                           48
Section 4.12.    Use of Proceeds                                                   49
Section 4.13.    FATCA Information                                                 49
Section 4.14.    Resignation of the Facility Agent                                 50

                                                                    Article V

                                                                    CONDITIONS TO BORROWING

Section 5.1.    Advance of the Loan                                                50
Section 5.1.1.    Resolutions, etc                                                 50
Section 5.1.2.    Opinions of Counsel                                              51
Section 5.1.3.    BpiFAE Insurance Policy                                          51
Section 5.1.4.    Closing Fees, Expenses, etc                                      51
Section 5.1.5.    Compliance with Warranties, No Default, etc                      52
Section 5.1.6.    Loan Request                                                     52
Section 5.1.7.    Foreign Exchange Counterparty Confirmations                      52
Section 5.1.8.    Protocol of delivery                                             52
Section 5.1.9.    Title to Purchased Vessel                                        52
Section 5.1.10.    Interest Stabilisation                                          53
Section 5.1.11.    Escrow Account Security                                         54

Article VI

REPRESENTATIONS AND WARRANTIES

Section 6.1.    Organization, etc.                                              54
Section 6.2.    Due Authorization, Non-Contravention, etc.                      54
Section 6.3.    Government Approval, Regulation, etc.                           55
Section 6.4.    Compliance with Environmental Laws                             55
Section 6.5.    Validity, etc.                                                  55
Section 6.6.    No Default, Event of Default or Prepayment Event               55
Section 6.7.    Litigation                                                      55
Section 6.8.    The Purchased Vessel                                            55
Section 6.9.    Obligations rank pari passu; Liens                             56
Section 6.10.    Withholding, etc.                                             56
Section 6.11.    No Filing, etc. Required                                      56
Section 6.12.    No Immunity                                                    56
Section 6.13.    Investment Company Act                                        56
Section 6.14.    Regulation U                                                   56
Section 6.15.    Accuracy of Information                                        57
Section 6.16.    Compliance with Laws                                          57

Article VII

COVENANTS

Section 7.1.    Affirmative Covenants                                          57
Section 7.1.1.    Financial Information, Reports, Notices, etc                 57
Section 7.1.2.    Approvals and Other Consents                                 60
Section 7.1.3.    Compliance with Laws, etc                                     60
Section 7.1.4.    The Purchased Vessel                                          61
Section 7.1.5.    Insurance                                                     62
Section 7.1.6.    Books and Records                                            62
Section 7.1.7.    BpiFAE Insurance Policy/French Authority Requirements        62
Section 7.1.8.    Further Assurances in respect of the Framework.             62
Section 7.1.9.    Equal Treatment with Pari Passu Creditors.                   62
Section 7.1.10.    Performance of shipbuilding contract obligations           63

| | |
|---|---|
| Section 7.2.    Negative Covenants | 64 |
| Section 7.2.1.    Business Activities | 64 |
| Section 7.2.2.    Indebtedness | 64 |
| Section 7.2.3.    Liens | 64 |
| Section 7.2.4.    Financial Condition | 67 |
| Section 7.2.5.    Additional Undertakings | 68 |
| Section 7.2.6.    Consolidation, Merger, etc | 76 |
| Section 7.2.7.    Asset Dispositions, etc | 76 |
| Section 7.2.8.    Borrower's Procurement Undertaking | 77 |
| Section 7.2.9.    Framework Lien and Guarantee Restriction | 77 |
| Section 7.3.    Covenant Replacement. | 78 |
| Section 7.4.    Lender incorporated in the Federal Republic of Germany | 79 |
| Article VIII | |
| EVENTS OF DEFAULT | |
| Section 8.1.    Listing of Events of Default | 79 |
| Section 8.1.1.    Non-Payment of Obligations | 79 |
| Section 8.1.2.    Breach of Warranty | 79 |
| Section 8.1.3.    Non-Performance of Certain Covenants and Obligations | 79 |
| Section 8.1.4.    Default on Other Indebtedness | 79 |
| Section 8.1.5.    Bankruptcy, Insolvency, etc | 80 |
| Section 8.2.    Action if Bankruptcy | 81 |
| Section 8.3.    Action if Other Event of Default | 81 |
| Article IX | |
| PREPAYMENT EVENTS | |
| Section 9.1.    Listing of Prepayment Events | 81 |
| Section 9.1.1.    Change of Control | 81 |
| Section 9.1.2.    Unenforceability | 81 |
| Section 9.1.3.    Approvals | 82 |
| Section 9.1.4.    Non-Performance of Certain Covenants and Obligations | 82 |
| Section 9.1.5.    Judgments | 82 |
| Section 9.1.6.    Condemnation, etc | 82 |
| Section 9.1.7.    Arrest | 82 |

Section 9.1.8.   Sale/Disposal of the Purchased Vessel                        83
Section 9.1.9.   BpiFAE Insurance Policy                                      83
Section 9.1.10.   Illegality                                                  83
Section 9.1.11.   Framework Prohibited Events                                 83
Section 9.2.   Mandatory Prepayment                                          84
Section 9.3.   Mitigation                                                    84

Article X

THE FACILITY AGENT AND THE ECA AGENT

Section 10.1.   Actions                                                      84
Section 10.2.   Indemnity                                                    85
Section 10.3.   Funding Reliance, etc                                        85
Section 10.4.   Exculpation                                                  87
Section 10.5.   Successor                                                    88
Section 10.6.   Loans by the Facility Agent                                  88
Section 10.7.   Credit Decisions                                            89
Section 10.8.   Copies, etc                                                  89
Section 10.9.   The Agents' Rights                                           89
Section 10.10.   The Facility Agent's Duties                                 89
Section 10.11.   Employment of Agents                                        90
Section 10.12.   Distribution of Payments                                    90
Section 10.13.   Reimbursement                                               90
Section 10.14.   Instructions                                               90
Section 10.15.   Payments                                                    91
Section 10.16.   "Know your customer" Checks                                 91
Section 10.17.   No Fiduciary Relationship                                   91
Section 10.18.   Illegality                                                  91

Article XI

MISCELLANEOUS PROVISIONS

Section 11.1.   Waivers, Amendments, etc.                                    91
Section 11.2.   Notices                                                      93
Section 11.3.   Payment of Costs and Expenses                                94
Section 11.4.   Indemnification                                             94
Section 11.5.   Survival                                                    96
Section 11.6.   Severability                                                96
Section 11.7.   Headings                                                    96

BD-#3810523B-v3

Section 11.8.    Execution in Counterparts, Effectiveness, etc.                                    96
Section 11.9.    Third Party Rights                                                                96
Section 11.10.    Successors and Assigns                                                           96
Section 11.11.    Sale and Transfer of the Loan; Participations in the Loan                        96
Section 11.11.1.    Assignments                                                                    97
Section 11.11.2.    Participations                                                                 99
Section 11.11.3.    Register                                                                       100
Section 11.11.4.    Rights of BpiFAE to payments                                                   100
Section 11.12.    Other Transactions                                                               100
Section 11.13.    BpiFAE Insurance Policy                                                          101
Section 11.13.1.    Terms of BpiFAE Insurance Policy                                               101
Section 11.13.2.    Obligations of the Borrower                                                    101
Section 11.13.3.    Obligations of the ECA Agent and the Lenders.                                  101
Section 11.14.    Law and Jurisdiction                                                             102
Section 11.14.1.    Governing Law                                                                  102
Section 11.14.2.    Jurisdiction                                                                   102
Section 11.14.3.    Alternative Jurisdiction                                                       102
Section 11.14.4.    Service of Process                                                             103
Section 11.15.    Confidentiality                                                                  103
Section 11.16.    French Authority Requirements                                                    104
Section 11.17.    Waiver of immunity                                                               104
Section 11.18.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions            104

**EXHIBITS**

Exhibit A - Form of Loan Request
Exhibit B-1 - Form of Opinion of Liberian Counsel to Borrower
Exhibit B-2 - Form of Opinion of English Counsel to the Facility Agent and the Lenders
Exhibit B-3 - Form of Opinion of French Counsel to the Facility Agent and the Lenders
Exhibit B-4 - Form of Opinion of US Tax Counsel to the Lenders
Exhibit C - Form of Lender Assignment Agreement
Exhibit D - Form of Certificate of French Content
Exhibit E-1 - Form of Delivery Non-Yard Costs Certificate
Exhibit E-2 - Form of Final Non-Yard Costs Certificate
Exhibit F - Silversea Indebtedness and Liens

Exhibit G - Form of First Priority Guarantee
Exhibit H - Form of Second Priority Guarantee
Exhibit I - Form of Third Priority Guarantee
Exhibit J - Form of Senior Parties Subordination Agreement
Exhibit K - Form of Other Senior Parties Subordination Agreement
Exhibit L - Framework
Exhibit M - Debt Deferral Extension Regular Monitoring Requirements
Exhibit N - Replacement covenants with effect from the Guarantee Release Date

## CREDIT AGREEMENT

HULL NO. **C34** CREDIT AGREEMENT, dated 24 July 2017 as novated, amended and restated on the Actual Delivery Date (as defined below), and as amended and restated by a first novation agreement supplement dated 12 March 2020, and as further amended by a second novation agreement supplement dated 29 August 2020, and as further amended and restated by a third novation agreement supplement dated 13 November 2020, and as further novated and restated by a fourth novation agreement supplement dated         July 2021 is among Royal Caribbean Cruises Ltd., a Liberian corporation (the "<u>Borrower</u>"), SMBC Bank International plc in its capacity as agent for the Lenders referred to below in respect of BpiFAE-related matters (in such capacity, the "<u>ECA Agent</u>"), Citibank Europe plc, UK Branch in its capacity as facility agent (in such capacity, the "<u>Facility Agent</u>") and the financial institutions listed in Schedule 1 to the Novation Agreement or <u>Section 11.11.1</u> hereof (as defined below) as lenders (in such capacity, together with each of the other Persons that shall become a "Lender" in accordance with clause 12 of the Novation Agreement or <u>Section 11.11.1</u> hereof, each of them individually a "<u>Lender</u>" and, collectively, the "<u>Lenders</u>").

### W I T N E S S E T H :

WHEREAS,

1.   The Borrower and Chantiers de l'Atlantique (previously known as STX France S.A.) (the "<u>Builder</u>") have entered on 30 September 2016 into a Contract for the Construction and Sale of Hull No. **C34** (as amended from time to time, the "<u>Construction Contract</u>") pursuant to which the Builder has agreed to design , construct, equip, complete, sell and deliver the passenger cruise vessel bearing Builder's hull number **C34** which shall be owned by the Nominated Owner (the "<u>Purchased Vessel</u>");

2.   The Lenders have agreed to make available to the Borrower, upon the terms and conditions contained herein, a US dollar loan facility calculated on the amount (the "<u>Maximum Loan Amount</u>") equal to the EUR sum of:

   a.   eighty per cent (80%) of the Contract Price (as defined below) of the Purchased Vessel, and including Non-Yard Costs of up to EUR 150,000,000 (the "<u>Maximum Non-Yard Costs Amount</u>"), and the Other Basic Contract Price Increases (as defined below) for the Purchased Vessel of up to EUR 68,000,000, (but which, when aggregated with the Non-Yard Costs, shall not exceed an amount equal to EUR 175,000,000), and all of which amounts shall not exceed in aggregate EUR 1,272,411,000;

   b.   eighty per cent (80%) of the change orders of up to EUR 117,541,100 effected in accordance with the Construction Contract; and

   c.   100% of the BpiFAE Premium (as defined below),

      being an amount no greater than EUR1,145,320,530 and being made available in the US Dollar Equivalent of that Maximum Loan Amount (as such Dollar amount may be adjusted pursuant to clause 5.3 of the Novation Agreement);

3.   Of the amounts referred to in recital (B)(i) and (ii) above, the Lenders have made certain amounts available to the Original Borrower during the period prior to the Actual Delivery Date pursuant to this Agreement (the liability for which amount has been assumed by the Borrower following the novation of this Agreement pursuant to the Novation Agreement) and, in relation to the amount referred to in recital (B)(i), the balance has been or shall be

BD-#38105238-v3   1        1

made available to the Borrower as an Additional Advance pursuant to the Novation Agreement and this Agreement.

4.    The Parties have previously amended this Agreement pursuant to the Third Novation Agreement Supplement (as defined below) in connection with the provision of the Guarantees (as defined below).

NOW, THEREFORE, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.1.    <u>DEFINED TERMS</u>.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, when capitalized, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"<u>Accumulated Other Comprehensive Income (Loss)</u>" means at any date the Borrower's accumulated other comprehensive income (loss) on such date, determined in accordance with GAAP.

"<u>Actual Delivery Date</u>" means the date on which the Purchased Vessel is delivered by the Builder to, and accepted by, the Borrower under the Construction Contract, being also the date on which the final balance of the Loan is advanced by way of the Additional Advances.

"<u>Additional Advances</u>" is defined in the Novation Agreement.

"<u>Additional Guarantee</u>" means a guarantee of the Obligations provided by a New Guarantor in a form and substance substantially the same as the other Guarantees (reflecting any necessary logical and factual changes), with such changes, or otherwise in a form and substance, reasonably acceptable to the Facility Agent and acceptable to BpiFAE.

"<u>Additional Subordination Agreement</u>" means any subordination agreement with respect to the Second Priority Guarantee or the Third Priority Guarantee, as applicable, in a form and substance substantially the same as the other Subordination Agreements (reflecting any necessary logical and factual changes), with such changes, or otherwise in a form and substance, reasonably acceptable to the Facility Agent and the beneficiaries of any Indebtedness incurred by the relevant Guarantor, as applicable, and acceptable to BpiFAE.

"<u>Adjustable Amount</u>" means, as of any time of determination, $500,000,000; <u>provided</u> if the aggregate amount of New Capital is equal to or greater than $500,000,000, then the Adjustable Amount shall be $350,000,000.

"<u>Adjusted Cash Balance</u>" means, as of any date (the "<u>Measurement Date</u>"), the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and its Subsidiaries as determined in accordance with GAAP plus (a) any amounts available to be drawn by the Borrower and/or any of its Subsidiaries under committed but undrawn term loan or revolving credit facility agreements (excluding any amounts available under agreements where the proceeds are only intended to be used to fund the purchase of new Vessels) and less (b) the sum of (i) any scheduled payments of principal or interest (but for the purposes of anticipating any interest liabilities, the interest rate of any floating rate debt shall be determined based on reference rates then in effect at the Measurement Date) in respect of debt during the period commencing on the Measurement Date and ending on the date that is six months thereafter, (ii)

any customer deposits held by the Borrower or its Subsidiaries for cruises that are scheduled to commence within three months of the Measurement Date and (iii) any planned Non-Financed Capex during the period commencing on the Measurement Date and ending on the date that is six months thereafter.

"Adjusted EBITDA After Principal and Interest" means, for any Last Reported Fiscal Quarter, the Borrower's EBITDA After Principal and Interest for such period, excluding those items, if any, that the Borrower has excluded in determining "Adjusted Net Income" for such period as disclosed in the Borrower's annual report on 10-K or quarterly report on 10-Q, as applicable, for such Last Reported Fiscal Quarter, as evidenced pursuant to the relevant certificate to be submitted by the Borrower pursuant to Section 7.1.1(l).

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person. A Person shall be deemed to be "controlled by" any other Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent" means either the ECA Agent or the Facility Agent and "Agents" means both of them.

"Agreement" means, on any date, this credit agreement as originally in effect on the Signing Date and as novated, amended and restated by the Novation Agreement and as thereafter from time to time amended, supplemented, amended and restated, or otherwise modified and in effect on such date.

"Annex VI" means Annex VI of the Protocol of 1997 (as subsequently amended from time to time) to amend the International Convention for the Prevention of Pollution from Ships 1973 (Marpol), as modified by the Protocol of 1978 relating thereto.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"Anticipated Delivery Date" means the Expected Delivery Date (as defined in the Receivable Purchase Agreement) as at the Signing Date, namely 20 May 2021.

"Applicable Commitment Rate" means (x) from the Signing Date up to and including the date falling two years prior to the Anticipated Delivery Date, 0.15% per annum, (y) from the day following the date falling two years prior to the Anticipated Delivery Date up to and including the date falling one year prior to the Anticipated Delivery Date, 0.28% per annum, and (z) from the day following the date falling one year prior to the Anticipated Delivery Date until the Commitment Fee Termination Date, 0.33% per annum.

"Applicable Jurisdiction" means the jurisdiction or jurisdictions under which the Borrower is organized, domiciled or resident or from which any of its business activities are conducted or in which any of its properties are located and which has jurisdiction over the subject matter being addressed.

"Approved Appraiser" means any of the following: Barry Rogliano Salles, Paris, H Clarkson & Co. Ltd., London, R.S. Platou Shipbrokers, Norway, or Fearnley AS, Norway.

"Assignee Lender" is defined in Section 11.11.1.

"<u>Authorized Officer</u>" means those officers of the Borrower authorized to act with respect to the Loan Documents and whose signatures and incumbency shall have been certified to the Facility Agent by the Secretary or an Assistant Secretary of the Borrower.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means: (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule; and (b) in relation to any state other than such an EEA Member Country or (to the extent that the United Kingdom is not such an EEA Member Country) the United Kingdom, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

"<u>Bank Indebtedness</u>" means the Borrower's Indebtedness up to a maximum aggregate principal amount of $5,300,000,000 under the following agreements (as amended, restated, supplemented, extended, refinanced, replaced or otherwise modified from time to time): (a) the USD1,550,000,000 revolving credit facility maturing in 2022 with Nordea Bank AB (publ), New York Branch as agent, (b) the USD1,925,000,000 revolving credit facility maturing in 2024 with The Bank of Nova Scotia as agent, (c) the USD1,000,000,000 term loan maturing on 5 April 2022 with Bank of America, N.A. as agent, (d) the USD300,000,000 term loan maturing on 7 June 2028 with Nordea Bank ABP, New York Branch as agent, (e) the USD55,827,065 term loan maturing on 5 December 2022 with Sumitomo Mitsui Banking Corporation as agent, (f) the €80,000,000 term loan maturing in November 2024 with Skandinaviska Enskilda Banken AB (publ) as agent, (g) the USD130,000,000 term loan maturing on 2 February 2023 with Industrial and Commercial Bank of China Limited, New York Branch as agent, (h) that certain guarantee dated 18 July 2016 with SMBC Leasing and Finance, Inc. as agent in connection with liabilities relating to the "Lease", the "Construction Agency Agreement", the "Participation Agreement" and any other "Operative Document" (as each term is defined in such guarantee) and (i) any other agreement (other than in connection with Credit Card Obligations) as to which the Second Priority Guarantors provide a first priority guarantee package.

"<u>Bank of Nova Scotia Agreement</u>" means the U.S. $1,925,000,000 amended and restated credit agreement dated as of 4 December 2017 among the Borrower, as borrower, the various financial institutions as are or shall become parties thereto, as lenders, and The Bank of Nova Scotia, as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Basic Contract Price</u>" is as defined in the Construction Contract. "<u>Borrower</u>" is defined in the <u>preamble</u>.

"<u>BpiFAE</u>" means BpiFrance Assurance Export, the French export credit agency, a French *société par action simplifiée à associé unique* with its registered office at 27-31, avenue du Général Leclerc, 94710 Maisons-Alfort Cedex, France, registered at the trade and companies registry of Créteil under number 815 276 308 and includes its successors in title or any other person succeeding to BpiFrance Assurance Export in the role as export credit agency of the Republic of France to manage and provide under its control, on its behalf and in its name the public export guarantees as provided by article L 432-1 of the French insurance code.

"<u>BpiFAE Enhanced Guarantee</u>" means the enhanced guarantee (*garantie rehaussée*) issued or to be issued by BpiFAE to the benefit of CAFFIL in accordance with article 84 of the French Amending Finance Law 2012 (as amended) in relation to the refinancing of SFIL's

participation and Commitments under the Loan, and any other documents (including any security) entered into or to be entered into by SFIL with CAFFIL and/or BpiFAE in relation thereto.

"BpiFAE Insurance Policy" means the export credit insurance policy in respect of the Loan issued by BpiFAE for the benefit of the Lenders.

"BpiFAE Premium" means the premium payable to BpiFAE under and in respect of the BpiFAE Insurance Policy.

"Builder" is defined in the preamble.

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in New York City, London, Madrid or Paris, and if the applicable Business Day relates to an advance of all or part of the Loan, an Interest Period, prepayment or conversion, in each case with respect to the Loan bearing interest by reference to the LIBO Rate, a day on which dealings in deposits in Dollars are carried on in the London interbank market.

"B34 Facility Amendment Date" means 20 March 2018, the effective date of the third supplemental agreement dated 16 March 2018 to (among other things) a credit facility supported by BpiFAE (pertaining to Hull No. B34) reflecting the alignment of certain provisions and covenants with the Borrower's revolving credit facility refinanced on 12 October 2017.

"CAFFIL" means *Caisse Française de Financement Local*, a French société anonyme, with its registered office at 1-3 rue du Passeur de Boulogne, 92130 Issy-les- Moulineaux, France, registered at the trade and companies registry of Nanterre under number 421 318 064.

"Capital Lease Obligations" means obligations of the Borrower or any Subsidiary of the Borrower under any leasing or similar arrangement which, in accordance with GAAP, would be classified as capitalized leases.

"Capitalization" means, at any date, the sum of (a) Net Debt on such date, plus (b) Stockholders' Equity on such date.

"Capitalized Lease Liabilities" means the principal portion of all monetary obligations of the Borrower or any of its Subsidiaries under any leasing or similar arrangement which, in accordance with GAAP, would be classified as capitalized leases, and, for purposes of this Agreement and each other Loan Document, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Cash Equivalents" means all amounts other than cash that are included in the "cash and cash equivalents" shown on the Borrower's balance sheet prepared in accordance with GAAP.

"Change of Control" means an event or series of events by which (a) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 50% or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-

diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); or (b) during any period of 24 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"CIRR" means 2.56% per annum being the Commercial Interest Reference Rate determined in accordance with the OECD Arrangement for Officially Supported Export Credits to be applicable to the Loan hereunder.

"Code" means the Internal Revenue Code of 1986, as amended, reformed or otherwise modified from time to time.

"Commitment" is defined in Section 2.2 and means, relative to any Lender, such Lender's obligation to make the Loan pursuant to Section 2.1.

"Commitment Fees" is defined in Section 3.4.

"Commitment Fee Termination Date" is defined in Section 3.4.

"Commitment Termination Date" means the Back Stop Date (as defined in the Receivable Purchase Agreement) (or such later date as the Lenders and BpiFAE may agree).

"Construction Contract" is defined in the preamble.

"Contract Price" is as defined in the Construction Contract and which includes a lump sum amount in respect of the Non-Yard Costs.

"Contractual Delivery Date" means, at any time, the date which at such time is the date specified for delivery of the Purchased Vessel under the Construction Contract, as such date may be modified from time to time pursuant to the terms of the Construction Contract.

"Covenant Modification Date" means the later to occur of (a) the expiry of the Financial Covenant Waiver Period and (b) the date upon which the financial covenants set out in Section 7.2.4 have been modified in this Agreement in a form and substance satisfactory to BpiFAE, the Borrower and the Lenders.

"Covered Taxes" is defined in Section 4.6.

"Credit Card Obligations" means any obligations of the Borrower under credit card processing arrangements or other similar payment processing arrangements entered into in the ordinary course of business of the Borrower.

"DDTL Indebtedness" means the Borrower's Indebtedness (or, if such Indebtedness has not yet been incurred, the commitments by lenders to provide Indebtedness to the Borrower as of the effectiveness of the Third Novation Agreement Supplement) in connection with that certain Commitment Letter, dated as of August 12, 2020, between the Borrower and MORGAN

STANLEY SENIOR FUNDING INC. (as amended, restated, extended, supplemented, refinanced, replaced or otherwise modified from time to time).

"Debt Deferral Extension Regular Monitoring Requirements" means the general test scheme/reporting package in the form set out in Exhibit M to this Agreement submitted or to be submitted (as the case may be) by the Borrower in accordance with Section 7.1.1(i).

"Debt Incurrence" means any incurrence of Indebtedness for borrowed money by any Group Member, whether incurred pursuant to a public offering or a Rule 144A or other private placement of debt securities (including any secured debt securities (but excluding any unsecured debt securities) convertible into equity securities) or an incurrence of loans under any loan or credit facility, or any issuance of bonds, other than:

(a)    any Indebtedness (but having regard, in respect of any secured and/or guaranteed Indebtedness, to the restrictions set out in Section 7.2.9(b)) incurred by a Group Member between 1 April 2020 and the earlier of (i) the end of the Early Warning Monitoring Period and (ii) 31 December 2023 (or such later date as may, with the prior consent of BpiFAE, be agreed between the Borrower and the Lenders) (the "Debt Incurrence Trigger Date");

(b)    Indebtedness incurred by a Group Member pursuant to an intra-Group loan from another Group Member, provided that no Group Member shall be permitted to incur any such Indebtedness at any time where an Event of Default or a Prepayment Event has occurred and is continuing;

(c)    Indebtedness incurred to refinance (and for this purpose having regard to the applicable provisions of Section 7.2.9) a maturity payment under any existing loan or credit facility (including any crisis and/or recovery-related Indebtedness incurred by a Group Member prior to the Debt Incurrence Trigger Date) or issued bonds of a Group Member, provided that;

(i)    in the case of any such refinancing, the amount of such Indebtedness being used in connection with that refinancing does not increase the aggregate principal amount of such Indebtedness or the commitments outstanding at the time of that refinancing and is otherwise incurred on a basis permitted pursuant to this Agreement (including, without limitation, in relation to the provision of any Liens or guarantees that may be provided to support the relevant refinancing arrangement); and

(ii)    in the case of the refinancing of crisis and/or recovery-related Indebtedness of the type referred to above, that refinancing shall either (A) reduce the interest burden of the Borrower (and for such purposes the interest rate of any floating rate debt shall be determined based on reference rates then in effect at the time of the new debt incurrence) or (B) replace the existing secured and/or guaranteed Indebtedness with unsecured and unguaranteed debt;

(d)    Indebtedness provided by banks or other financial institutions under the Borrower's senior unsecured revolving credit facilities in an aggregate amount not greater than the commitments thereunder as in effect on 19 February 2021 plus the amount of any existing uncommitted incremental facilities (i.e. any unused accordion) on such facilities;

(e)   Indebtedness provided by banks or other financial institutions which, as at 19 February 2021, is committed but yet to be incurred in respect of the DDTL Indebtedness (but, in respect of that DDTL Indebtedness, up to a maximum amount of $700,000,000);

(f)   any of the following types of indebtedness in each case incurred in the ordinary course of business of any Group Member and with the prior written consent of BpiFAE:

    (i)   the issuances of commercial paper;

    (ii)   Capitalized Lease Liabilities;

    (iii)   purchase money indebtedness;

    (iv)   indebtedness under overdraft facilities; and

    (v)   financial obligations in connection with repurchase agreements and/or securities lending arrangements; and

(g)   vessel financings (including the financing of pre-delivery contract installments, change orders, owner furnished equipment costs or other such similar arrangements) in respect of vessels for which shipbuilding contracts have been executed on or prior to 28 April 2020 (provided, however, that a refinancing of a vessel financing shall not be included in this carve-out (g)).

"<u>Default</u>" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Delivery Non-Yard Costs Certificate</u>" means the certificate to be provided to the Facility Agent in the form of Exhibit E-1 on or prior to the Actual Delivery Date certifying the amount in EUR of the Paid Non-Yard Costs and the Unpaid Non-Yard Costs as at the Actual Delivery Date, duly signed by the Borrower and endorsed by the Builder.

"<u>Dispose</u>" means to sell, transfer, license, lease, distribute or otherwise transfer, and "Disposition" shall have a correlative meaning.

"<u>Disruption Event</u>" means either or both of:

(a)   a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Loan (or otherwise in order for the transactions contemplated by the Loan Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the parties; or

(b)   the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party preventing that, or any other, party:

    (i)   from performing its payment obligations under the Loan Documents; or

    (ii)   from communicating with other parties or in accordance with the terms of the Loan Documents,

and which (in either such case) is not caused by, and is beyond the control of, the party whose operations are disrupted.

"<u>Dollar</u>" and the sign "$" mean lawful money of the United States.

"<u>Early Warning Monitoring Period</u>" means the period beginning on the Novation Effective Time and ending on the last day of two consecutive Fiscal Quarters in which the Borrower has achieved a higher Adjusted EBITDA After Principal and Interest for such Fiscal Quarters when compared with the same calculation for the corresponding Fiscal Quarters of the 2019 Fiscal Year, as evidenced pursuant to the certificate to be submitted by the Borrower pursuant to Section 7.1.1(l) (and such date shall be notified to the Borrower by the Facility Agent).

"<u>EBITDA After Principal and Interest</u>" means, for any Last Reported Fiscal Quarter, the Borrower's consolidated operating income for such period plus any depreciation and amortization expenses that were deducted in calculating consolidated operating income for such period and minus (a) any scheduled amortization or maturity payments made during such period and (b) consolidated interest expense of the Borrower for such period (net of any capitalized interest and interest income), in each relevant case as determined in accordance with GAAP.

"<u>ECA Agent</u>" is defined in the preamble.

"<u>ECA Financed Vessel</u>" means any Vessel subject to any ECA Financing.

"<u>ECA Financing</u>" means any financing arrangement pursuant to which one or more ECA Guarantor provides guarantees or other credit support (including but not limited to a sale and leaseback transaction or bareboat charter or lease or an arrangement whereby a Vessel under construction is pledged as collateral to secure the indebtedness of a shipbuilder, and, for the avoidance of doubt, committed but undrawn export credit agency facilities), entered into by the Borrower or a Subsidiary for the purpose of financing or refinancing all or any part of the purchase price, cost of design or construction of a Vessel or Vessels or the acquisition of Equity Interests of entities owning, or to own, Vessels.

"<u>ECA Guarantor</u>" means BpiFrance Assurance Export, Finnvera plc or Euler Hermes Aktiengesellschaft (or, in each case, any successor thereof).

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of a Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>Effective Date</u>" means the date this Agreement becomes effective pursuant to <u>Section 11.8</u>.

"<u>Effective Time</u>" means the Novation Effective Time as defined in the Novation Agreement.

"<u>Environmental Laws</u>" means all applicable federal, state, local or foreign statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to the protection of the environment.

"<u>Equity Interests</u>" means, with respect to any Person, all of the shares, interests, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the

purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities) but excluding any debt securities convertible into such Equity Interests.

"Escrow Account" means the Dollar escrow account of the Borrower opened or to be opened with the Escrow Account Bank for the purpose of receiving the relevant amount of the Additional Advances in respect of Unpaid Non-Yard Costs in accordance with Section 2.3f).

"Escrow Account Bank" means Citibank N.A., London Branch of Citigroup Centre, Canada Square, Canary Wharf, London E14 5LB.

"Escrow Account Security" means the account security in respect of the Escrow Account executed or, as the context may require, to be executed by the Borrower in favour of the Security Trustee in the form agreed by the Lenders and the Borrower on or about the Restatement Date.

"Escrow Agency and Trust Deed" means the agency and trust deed executed or, as the context may require, to be executed by, amongst others, the Borrower, the parties to this Agreement and the Security Trustee.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"EUR", "Euro" and the sign "€" mean the currency of participating member states of the European Monetary Union pursuant to Council Regulation (EC) 974/98 of 3 May 1998, as amended from time to time.

"Event of Default" is defined in Section 8.1.

"Existing Principal Subsidiaries" means each Subsidiary of the Borrower that is a Principal Subsidiary on the Signing Date.

"Facility Agent" is defined in the preamble and includes each other Person as shall have subsequently been appointed as the successor Facility Agent, and as shall have accepted such appointment, pursuant to Section 10.5.

"FATCA" means (a) Sections 1471 through 1474 of the Code, as in effect at the date hereof, and any current or future regulations promulgated thereunder or official interpretations thereof, (b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a)above; or (c) any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

"FATCA Deduction" means a deduction or withholding from a payment under a Loan Document required by FATCA.

"FATCA Exempt Party" means a party to this Agreement that is entitled to receive payments free from any FATCA Deduction.

"Fee Letter" means any letter entered into by reference to this Agreement between any or all of the Facility Agent, the Mandated Lead Arrangers, the Arrangers, the Lenders and/or the Borrower setting out the amount of certain fees referred to in, or payable in connection with, this Agreement.

"<u>Final Maturity</u>" means twelve (12) years after the Actual Delivery Date.

"<u>Final Non-Yard Costs Certificate</u>" means the certificate to be provided to the Facility Agent in the form of Exhibit E-2 on or prior to the NYC Cut Off Date certifying the amount in Euro of the Paid Non-Yard Costs as at the date of that certificate, duly signed by the Borrower.

"<u>Financial Covenant Waiver Period</u>" means the period from and including the Novation Effective Time to and including 30 September 2022.

"<u>First Novation Agreement Supplement</u>" means the supplemental agreement dated 12 March 2020 and made between, amongst others, the Original Borrower and the parties hereto, pursuant to which the Novation Agreement was amended and restated.

"<u>First Priority Assets</u>" means the Vessels known on the date the Third Novation Agreement Supplement becomes effective as or that sailed under the name (i) Celebrity Constellation, (ii) Celebrity Equinox, (iii) Celebrity Millennium, (iv) Celebrity Silhouette, (v) Celebrity Summit, (vi) Celebrity Eclipse, (vii) Celebrity Infinity, (viii) Celebrity Reflection and (ix) Celebrity Solstice (it being understood that such Vessels shall remain "First Priority Assets" regardless of any change in name or ownership after such date).

"<u>First Priority Guarantee</u>" means the first priority guarantee granted by the First Priority Guarantor prior to the Effective Time (and any other first priority guarantee granted by a First Priority Holdco Subsidiary in connection with becoming a First Priority Guarantor) in favor of the Facility Agent for the benefit of the Agents and the Lenders, in each case substantially in the form attached hereto as Exhibit G.

"<u>First Priority Guarantor</u>" means Celebrity Cruise Lines Inc. (and any of its successors) and any other First Priority Holdco Subsidiary that has granted or, prior to that entity becoming a First Priority Holdco Subsidiary pursuant to a Disposal of a First Priority Asset in accordance with Section 7.2.5(a)(v)(A), will grant a First Priority Guarantee.

"<u>First Priority Holdco Subsidiaries</u>" means one or more Subsidiaries of the Borrower that directly own any of the Equity Interests issued by any other Subsidiary of the Borrower that owns any First Priority Assets.

"<u>First Priority Release Event</u>" means the occurrence of any event or other circumstance that results in either (x) 80% of the aggregate principal amount of Bank Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being $5,300,000,000 (and 80% of which is $4,240,000,000)) or (y) 100% of the aggregate principal amount of Secured Note Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being $3,320,000,000):

a)   no longer remaining outstanding (whether as a result of repayment, redemption or otherwise (but excluding in connection with any enforcement action taken by the relevant creditors in respect of that Indebtedness)); and

b)   not having been refinanced (whether initially or through subsequent refinancings) with Indebtedness that is (i) secured by a Lien or (ii) incurred or guaranteed by any one or more Subsidiaries of the Borrower.

Notwithstanding the foregoing, a First Priority Release Event shall in no case occur if the Borrower has failed to pay any Indebtedness that is outstanding under any ECA Financing (including this Agreement) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise). For the avoidance of doubt,

if a First Priority Release Event would have occurred but for the continuance of the payment default described above, then a First Priority Release Event will occur immediately upon that payment default being remedied.

"<u>Fiscal Quarter</u>" means any quarter of a Fiscal Year.

"<u>Fiscal Year</u>" means any annual fiscal reporting period of the Borrower.

"<u>Fixed Charge Coverage Ratio</u>" means, as of the end of any Fiscal Quarter, the ratio computed for the period of four consecutive Fiscal Quarters ending on the close of such Fiscal Quarter of:

        i)    net cash from operating activities (determined in accordance with GAAP) for such period, as shown in the Borrower's consolidated statement of cash flow for such period, to

        ii)   the sum of:

            1.   dividends actually paid by the Borrower during such period (including, without limitation, dividends in respect of preferred stock of the Borrower); <u>plus</u>

            2.   scheduled payments of principal of all debt less New Financings (determined in accordance with GAAP, but in any event including Capitalized Lease Liabilities) of the Borrower and its Subsidiaries for such period.

"<u>Fixed Rate</u>" means a rate per annum equal to the sum of the CIRR plus the Fixed Rate Margin.

"<u>Fixed Rate Margin</u>" means 0.62% per annum.

"<u>Floating Rate</u>" means a rate per annum equal to the sum of the LIBO Rate plus the Floating Rate Margin.

"<u>Floating Rate Margin</u>" means, for each Interest Period 1.05% per annum.

"<u>Fourth Novation Agreement Supplement</u>" means the supplemental agreement dated         July 2021 and made between, amongst others, the Original Borrower, the Security Trustee and the parties hereto, pursuant to which the Novation Agreement was amended in connection with the Framework.

"<u>Fourth Supplement Effective Date</u>" has the meaning ascribed to the term "Amendment Effective Date" in the Fourth Novation Agreement Supplement.

"Framework" means the document titled "Debt Deferral Extension Framework" in the form set out in Exhibit L to this Agreement, and which sets out certain key principles and parameters and being applicable to BpiFAE-covered loan agreements such as this Agreement.

"<u>F.R.S. Board</u>" means the Board of Governors of the Federal Reserve System or any successor thereto.

"<u>French Authorities</u>" means the *Direction Générale du Trésor* of the French Ministry of Economy and Finance, any successors thereto, or any other governmental authority in or of

France involved in the provision, management or regulation of the terms, conditions and issuance of export credits including, among others, such entities to whom authority in respect of the extension or administration of export financing matters have been delegated, such as BpiFAE and Natixis DAI.

"<u>Funding Losses Event</u>" is defined in Section 4.4.1.

"<u>GAAP</u>" is defined in Section 1.4.

"<u>Government-related Obligations</u>" means obligations of the Borrower or any Subsidiary of the Borrower under, or Indebtedness incurred by the Borrower or any Subsidiary of the Borrower to satisfy obligations under, any governmental requirement imposed by any Applicable Jurisdiction that must be complied with to enable the Borrower and its Subsidiaries to continue their business in such Applicable Jurisdiction, <u>excluding</u>, in any event, any taxes imposed on the Borrower or any Subsidiary of the Borrower.

"<u>Group</u>" means the Borrower and its Subsidiaries from time to time.

"<u>Group Member</u>" means any entity that is a member of the Group.

"<u>Group Member Guarantee</u>" means any guarantee or other similar or analogous credit support arrangement granted by a Group Member (other than the Borrower) in support of the Indebtedness of another Group Member or any other Person.

"<u>Guarantee</u>" means the First Priority Guarantee, the Second Priority Guarantee, the Third Priority Guarantee and (if applicable) any Additional Guarantee and "Guarantees" means any or all of them.

"<u>Guarantee Release Date</u>" means the date upon which the First Priority Release Event, the Second Priority Release Event and the Third Priority Release Event have all occurred and accordingly, subject to Section 7.2.5(g) (and in particular proviso (2) to such Section 7.2.5(g)) each of the Guarantees has been released by the Facility Agent, and also being the date upon which, in accordance with Section 7.3, certain provisions of this Agreement shall be replaced by the provisions set out in Exhibit N, and if such date falls prior to the Novation Effective Time, the Guarantee Release Date shall be deemed to occur at the Novation Effective Time.

"<u>Guarantor</u>" means the provider of any Guarantee from time to time and "Guarantors" means any or all of them.

"<u>Hedging Instruments</u>" means options, caps, floors, collars, swaps, forwards, futures and any other agreements, options or instruments substantially similar thereto or any series or combination thereof used to hedge interest, foreign currency and commodity exposures.

"<u>herein</u>", "<u>hereof</u>", "<u>hereto</u>", "<u>hereunder</u>" and similar terms contained in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular Section, paragraph or provision of this Agreement or such other Loan Document.

"<u>Historic Screen Rate</u>" means, in relation to the Loan, the most applicable recent rate which appeared on Thomson Reuters LIBOR 01 Page (or any replacement page) for the currency of the Loan and for a period equal to the applicable Interest Period for the Loan and which is no more than 7 days before the commencement of the applicable Interest Period for which such rate may be applicable.

"<u>Illegality Notice</u>" is defined in Section 3.2(b).

"<u>Indebtedness</u>" means, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of property or services, other than (i) trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business so long as such trade accounts payable are payable within 180 days of the date the respective goods are delivered or the respective services are rendered and (ii) any purchase price adjustment, earnout or deferred payment of a similar nature incurred in connection with an acquisition (but only to the extent that no payment has at the time accrued pursuant to such purchase price adjustment, earnout or deferred payment obligation); (c) Indebtedness of others secured by a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) guarantees by such Person of Indebtedness of others, up to the amount of Indebtedness so guaranteed; (g) obligations of such Person in respect of surety bonds and similar obligations; and (h) liabilities arising under Hedging Instruments.

"<u>Indemnified Liabilities</u>" is defined in Section 11.4.

"<u>Indemnified Parties</u>" is defined in Section 11.4.

"<u>Interest Payment Date</u>" means each Repayment Date.

"<u>Interest Period</u>" means the period between the Actual Delivery Date and the first Repayment Date, and subsequently each succeeding period between two consecutive Repayment Dates.

"<u>Interest Stabilisation Agreement</u>" means an agreement on interest stabilisation entered into between Natixis and each Lender (other than BpiFAE or CAFFIL as assignee of all or any of SFIL's rights as Lender following the enforcement of any security granted pursuant to paragraph (iv) of <u>Section 11.11.1</u> in connection with the BpiFAE Enhanced Guarantee, subject as provided in <u>Section 11.11.1</u>) in connection with the Loan.

"<u>Investment Grade</u>" means, with respect to Moody's, a Senior Debt Rating of Baa3 or better and, with respect to S&P, a Senior Debt Rating of BBB- or better.

"<u>Last Reported Fiscal Quarter(s)</u>" means the most recently completed Fiscal Quarter(s) for which the Borrower has filed financial statements with the SEC as part of an annual report on Form 10-Q or a quarterly report on Form 10-Q.

"<u>Lender Assignment Agreement</u>" means any Lender Assignment Agreement substantially in the form of <u>Exhibit C</u>.

"<u>Lender</u>" and "<u>Lenders</u>" are defined in the <u>preamble</u>.

"<u>Lending Office</u>" means, relative to any Lender, the office of such Lender designated as such below its signature hereto or designated in a Lender Assignment Agreement or such other office of a Lender as designated from time to time by notice from such Lender to the Borrower and the Facility Agent, whether or not outside the United States but subject in all cases to the

agreement of Natixis DAI in relation to the CIRR, which shall be making or maintaining the Loan of such Lender hereunder.

"LIBO Rate" means the rate per annum of the offered quotation for deposits in Dollars for six months (or for such other period as shall be agreed by the Borrower and the Facility Agent) which appears on Thomson Reuters LIBOR01 Page (or any successor page) at or about 11:00 a.m. (London time) two (2) Business Days before the commencement of the relevant Interest Period; provided that:

i)   subject to Section 3.3.6, if no such offered quotation appears on Thomson Reuters LIBOR01 Page (or any successor page) at the relevant time the LIBO Rate shall be the Historic Screen Rate or, if it is not possible to calculate an Historic Screen Rate, it shall be the rate per annum certified by the Facility Agent to be the average of the rates quoted by the Reference Banks as the rate at which each of the Reference Banks was (or would have been) offered deposits of Dollars by prime banks in the London interbank market in an amount approximately equal to the amount of the Loan and for a period of six months;

ii)   for the purposes of determining the post-maturity rate of interest under Section 3.3.4, the LIBO Rate shall be determined by reference to deposits on an overnight or call basis or for such other period or periods as the Facility Agent may determine after consultation with the Lenders, which period shall be no longer than one month unless the Borrower otherwise agrees; and

iii)   if that rate is less than zero, the LIBO Rate shall be deemed to be zero. "Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property to secure payment of a debt or performance of an obligation or other priority or preferential arrangement of any kind or nature whatsoever.

"Lien Basket Amount" is defined in Section 7.2.3(b).

"Loan" means the advances made by the Lenders under this Agreement from time to time or, as the case may be, the aggregate outstanding amount of such advances from time to time.

"Loan Documents" means this Agreement, the Novation Agreement, the First Novation Agreement Supplement, the Second Novation Agreement Supplement, the Third Novation Agreement Supplement, the Fourth Novation Agreement Supplement, the Escrow Agency and Trust Deed, the First Priority Guarantee, the Second Priority Guarantee, the Third Priority Guarantee, any Additional Guarantee, the Subordination Agreement, any Additional Subordination Agreement, any New Guarantor Subordination Agreement, the Fee Letters, the Escrow Account Security and any other document designated as a Loan Document by the Borrower and the Facility Agent.

"Loan Request" means the loan request and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit A hereto.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations or financial condition of the Borrower and its Subsidiaries taken as a whole, (b) the rights and remedies of the Facility Agent or any Lender under the Loan Documents or (c) the ability of the Borrower to perform its payment Obligations under the Loan Documents to which it is a party.

BD-#38105238-v3   15

"<u>Material Guarantor</u>" means (i) each of Celebrity Cruise Lines Inc., RCI Holdings LLC, RCL Cruise Holdings LLC and RCL Cruises Ltd (and each of their respective successors) and (ii) any other entity that becomes a First Priority Guarantor, a Second Priority Guarantor or a Third Priority Guarantor after the effectiveness of the Third Novation Agreement Supplement.

"<u>Material Litigation</u>" is defined in Section 6.7.

"<u>Maximum Loan Amount</u>" is defined in the preamble.

"<u>Maximum Non-Yard Costs Amount</u>" is defined in the <u>preamble</u>.

"<u>Monthly Outflow</u>" means, in respect of each monthly period, the quotient obtained by dividing:

    a)   the sum of (i) Total Cruise Operating Expenses (as determined in accordance with GAAP) for the Last Reported Fiscal Quarter, (ii) Marketing, Selling and Administrative Expenses (as determined in accordance with GAAP) for the Last Reported Fiscal Quarter and (iii) Interest Expense, net of Interest Capitalized (as determined in accordance with GAAP) for the Last Reported Fiscal Quarter *minus* (x) Interest Income (as determined in accordance with GAAP) for the Last Reported Fiscal Quarter, (y) any non-cash charges or impairments included in the calculation of Total Cruise Operating Expenses or Marketing, Selling and Administrative Expenses pursuant to sub-clause (i) or (ii) of this definition and (z) any loss on extinguishment of debt included in Interest Expenses, net of Interest Capitalized (as each such capitalized expression is defined in or referenced in the financial statements of the Borrower); by

    b)   three,

as evidenced pursuant to the relevant certificate to be submitted by the Borrower pursuant to Section 7.1.1(l).

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Natixis</u>" means Natixis, a French *société anonyme* with its registered office at 30, avenue Pierre Mendès France, 75013 Paris, France, registered under the Paris Commercial and Companies Registry under number 542 044 524 RCS Paris.

"<u>Natixis DAI</u>" means Natixis DAI Direction des Activités Institutionnelles.

"<u>Net Debt</u>" means, at any time, the aggregate outstanding principal amount of all debt (including, without limitation, the principal portion of all capitalized leases) of the Borrower and its Subsidiaries (determined on a consolidated basis in accordance with GAAP) less the sum of (without duplication):

    a)   all cash on hand of the Borrower and its Subsidiaries; plus

    b)   all Cash Equivalents.

"<u>Net Debt to Capitalization Ratio</u>" means, as at any date, the ratio of (a) Net Debt on such date to (b) Capitalization on such date.

"<u>New Capital</u>" means the aggregate gross amount of proceeds from any capital (whether in the form of debt, equity or otherwise) raised by the Borrower or any of its Subsidiaries in one or a series of financings after January 1, 2021 (including (a) amounts borrowed (that were

previously undrawn) under committed term loan facilities existing as of such date and (b) Indebtedness borrowed in lieu of the committed term loan facilities described in the foregoing clause (a) if the incurrence of such Indebtedness results in a reduction or termination of such commitments); <u>provided</u> that proceeds of any capital raise which are used substantially concurrently for (i) the purchase price of a new Vessel or (ii) repayment of existing Indebtedness (other than Indebtedness (A) maturing no later than the end of the first full calendar year following the date of such repayment or (B) under any revolving credit agreement the repayment of which is not accompanied by a corresponding permanent reduction in the related revolving credit commitments), in each case, shall not constitute New Capital.

"<u>New Financings</u>" means proceeds from:

    a)   borrowed money (whether by loan or issuance and sale of debt securities), including drawings under this Agreement and any revolving credit facilities of the Borrower, and

    b)   the issuance and sale of equity securities.

"<u>New Guarantor</u>" means, with respect to any Vessel delivered after the effectiveness of the Third Novation Agreement Supplement, the Subsidiary of the Borrower that (a) directly owns the Equity Interests of the Principal Subsidiary that acquired such Vessel and (b) delivers an Additional Guarantee.

"<u>New Guarantor Subordination Agreement</u>" means a subordination agreement pursuant to which the Lenders' rights under the applicable Additional Guarantee will be fully subordinated in right of payment to the rights of the beneficiaries of the applicable Senior Guarantee, which subordination agreement shall be in a form and substance substantially the same as the other Subordination Agreements (reflecting any necessary logical and factual changes), with such changes, or otherwise in a form and substance, reasonably acceptable to the Facility Agent and the agent, trustee or other representative for such Senior Guarantee.

"<u>Nominated Owner</u>" means a Subsidiary of the Borrower to be nominated by the Borrower prior to the Actual Delivery Date to take delivery of the Vessel under the Construction Contract.

"<u>Non-Financed Capex</u>" means, with respect to any period, (a) the aggregate amount of purchases of property (including Vessels) and equipment by the Borrower and its Subsidiaries during such period as determined in good faith by the Borrower *minus* (b) the aggregate amount of committed financing available to be drawn during such period to fund any such purchases of property and equipment.

"<u>Non-Yard Costs</u>" has the meaning assigned to "<u>NYC Allowance</u>" in paragraph 1.5 of Article II of the Construction Contract and, when such expression is prefaced by the word "incurred", shall mean such amount of the Non-Yard Costs not exceeding EUR 150,000,000 and, when aggregated with the Other Basic Contract Price Increases, in an amount not exceeding EUR 175,000,000, as shall at the relevant time have been paid, or become payable, to the Builder by the Borrower under the Construction Contract as part of the Contract Price.

"<u>Nordea Agreement</u>" means the U.S. $1,150,000,000 amended and restated credit agreement dated as of October 12, 2017, among the Borrower, as the borrower, the various financial institutions as are or shall become parties thereto and Nordea Bank AB (publ), New York Branch as administrative agent, as amended, restated, supplemented or otherwise modified from time to time.

"Novated Loan Balance" is as defined in the Novation Agreement.

"Novation Agreement" means the novation agreement dated 24 July 2017 (as amended and/or restated from time to time, including by way of the Third Novation Agreement Supplement) and made between the Original Borrower and the parties hereto pursuant to which (amongst other things) this Agreement was novated, amended and restated.

"Novation Effective Time" is as defined in the Novation Agreement.

"NYC Cut Off Date" means the date falling 60 days after the Actual Delivery Date or such later date as the Lenders (with the approval of BpiFAE) may agree.

"Obligations" means all obligations (payment or otherwise) of the Borrower arising under or in connection with this Agreement.

"Obligors" means the Borrower and the Guarantors.

"Option Period" is defined in Section 3.2(c).

"Organic Document" means, relative to the Borrower, its articles of incorporation (inclusive of any articles of amendment to its articles of incorporation) and its by-laws.

"Original Borrower" means Hibisyeu Finance Limited of Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.

"Other Basic Contract Price Increases" is defined in the Novation Agreement.

"Other ECA Parties" means the facility agents acting on behalf of the creditors under any ECA Financing, whether existing on or after the effectiveness of the Third Novation Agreement Supplement (excluding the Facility Agent acting in any representative capacity in connection with this Agreement).

"Other Guarantees" means the guarantees issued, or to be issued, by any of the First Priority Guarantor, the Second Priority Guarantors, the Third Priority Guarantor or any New Guarantor in favor of any Other ECA Party; provided that any Other Guarantee issued by (a) the First Priority Guarantor shall be pari passu in right of payment with the First Priority Guarantee, (b) any Second Priority Guarantor shall be pari passu (or junior) in right of payment with the Second Priority Guarantee, (c) the Third Priority Guarantor shall be pari passu (or junior) in right of payment with the Third Priority Guarantee and (d) any New Guarantor shall be pari passu in right of payment with each Additional Guarantee issued by such New Guarantor.

"Other Senior Parties" means each agent, trustee or other representative in respect of Bank Indebtedness or Credit Card Obligations.

"Paid Non-Yard Costs" means as at any relevant date, the amount in Euro of the Non- Yard Costs which have been paid for by the Borrower and, where applicable, supplied, installed and completed on the Purchased Vessel and as determined in accordance with the relevant amounts certified in the Delivery Non-Yard Costs Certificate or, as the case may be, the Final Non-Yard Costs Certificate as at such time.

"Pari Passu Creditor" means with respect to any Group Member, any creditor under or in respect of any Indebtedness incurred by such Group Member (including in respect of any ECA Financing) which is not, as at December 31, 2020, secured by a Lien over a Vessel or which, at

any time (whether pursuant to the operation of Section 7.1.9(d) or otherwise), shares in the same security and/or guarantee package as the Lenders.

"Participant" is defined in Section 11.11.2.

"Participant Register" is defined in Section 11.11.2.

"Percentage" means, relative to any Lender, the percentage set forth opposite its signature hereto or as set out in the applicable Lender Assignment Agreement, as such percentage may be adjusted from time to time pursuant to Section 4.9 or pursuant to Lender Assignment Agreement(s) executed by such Lender and its Assignee Lender(s) and delivered pursuant to Section 11.11.1.

"Permitted Refinancing" means, in respect of any Indebtedness or commitments, any amendment, restatement, extension, renewal, refinancing or replacement that does not increase the aggregate principal amount of such Indebtedness or commitments outstanding at the time of such Permitted Refinancing other than by the amount of unpaid accrued interest and premium thereon and underwriting discounts, fees, commissions and expenses associated with such amendment, restatement, supplement, refinancing or other modification.

"Person" means any natural person, corporation, limited liability company, partnership, firm, association, trust, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

"Poseidon Principles" means the financial industry framework for assessing and disclosing the climate alignment of ship finance portfolios published in June 2019 as the same may be amended or replaced to reflect changes in applicable law or regulation or the introduction of or changes to mandatory requirements of the International Maritime Organisation from time to time.

"Prepayment Event" is defined in Section 9.1.

"Principal Subsidiary" means any Subsidiary of the Borrower that owns a Vessel.

"Purchased Vessel" is defined in the preamble.

"Purchase Price" means, with respect to any Vessel, the book value of such Vessel at the time initially acquired by a Principal Subsidiary.

"Receivable Purchase Agreement" is as defined in the Novation Agreement.

"Reference Banks" means Société Générale and SMBC Bank International plc and such other Lender as shall be so named by the Borrower and agrees to serve in such role and each additional Reference Bank and/or each replacement Reference Bank appointed by the Facility Agent pursuant to Section 3.3.6.

"Register" is defined in Section 11.11.3.

"Repayment Date" means, subject to Section 4.8(c), each of the dates for payment of the repayment installments of the Loan pursuant to Section 3.1.

"Required Lenders" means (a) at any time when SFIL is a Lender, SFIL and at least one other Lender that in the aggregate with SFIL hold more than 50% of the aggregate unpaid principal amount of the Loan or (b) or at any other time, Lenders that in the aggregate hold more

than 50% of the aggregate unpaid principal amount of the Loan, and in each case, if no such principal amount is then outstanding, Lenders that in the aggregate have more than 50% of the Commitments.

"Resolution Authority" means any body which has authority to exercise any Write- down and Conversion Powers.

"Restatement Date" means 12 March 2020, being the date on which the form of this Agreement was amended and restated pursuant to the First Novation Agreement Supplement.

"Restricted Credit Enhancement" means any Group Member Guarantee, Lien or other security or other similar or analogous credit support arrangement granted by a Group Member in respect of any Indebtedness of a Group Member.

"Restricted Loan Arrangement" means any loan or credit (including any seller's credit granted in connection with the sale of a Vessel or other assets (and provided that any such sale complies with the provisions of Section 9.1.11(c))) made available by a Group Member to any Person but excluding any such loan or credit that is provided:

(a)   to another Group Member;

(b)   to a Person in respect of which the Borrower or any Subsidiary holds Equity Interests;

(c)   in circumstances where the relevant credit is a seller's credit granted by that Group Member in the ordinary course of industry business and consistent with past practice; or

(d)   in circumstances where the relevant credit is otherwise in the ordinary course of business and/or consistent with past practice (it being agreed that any loans provided by the Group to its travel agents, vendors or customers to assist the Group during the crisis and/or recovery will be considered in the ordinary course of business) and where the aggregate amount of such credit referred to in this paragraph (d) does not exceed $100,000,000 (or its equivalent in any other currency) at any relevant time,

provided that no Group Member shall be permitted to make or grant any new loan or other credit (or make any further advances in respect of any existing loan or other credit) of any kind to any Person at any time where an Event of Default or a Prepayment Event has occurred and is continuing. It is agreed that for the purpose of this definition "credit" shall not include any short term trade and/or operational receivables owing to a Group Member by a Person who is not a Group Member and which are created or arise in the ordinary course of business.

"Restricted Payments" means any dividend or other distribution (whether in cash, securities or other property (other than Equity Interests)), with respect to any Equity Interests in the Borrower, or any share buy-back program or other payment (whether in cash, securities or other property (other than Equity Interests)), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower.

"Restricted Voluntary Prepayment" means, in respect of any Indebtedness for borrowed money of any Group Member (other than any such Indebtedness incurred pursuant to an ECA Financing), the relevant Group Member elects to prepay, repay or redeem that Indebtedness prior to its scheduled maturity date other than:

(a)   any Indebtedness which is scheduled to mature on or prior to the end of the following calendar year (and whether pursuant to an amendment and extension of the agreements evidencing such Indebtedness and/or using proceeds raised by any Group Member in connection with any issuance of capital (whether in the form of Indebtedness for borrowed money, equity or otherwise but, in the case of any Indebtedness, subject to that Indebtedness being incurred in compliance with the carve-out provision set out in paragraph (c) of the definition of Debt Incurrence) or pursuant to the exercise of the equity claw feature in the Secured Note Indenture), provided, however, that the Borrower may, with the prior written consent of BpiFAE, prepay, repay or redeem any notes issued under indentures which are callable in accordance with their terms, including any call date through the use of the equity claw feature;

(b)   pursuant to a voluntary repayment under a revolving credit facility that does not result in the permanent reduction of the relevant revolving credit commitments under that revolving credit facility; and/or

(c)   where such prepayment, repayment or redemption is made solely for the purpose of avoiding an event of default or acceleration under the terms of the facility agreement in respect of the relevant Indebtedness.

"S&P" means Standard & Poor's Financial Services LLC, a wholly-owned subsidiary of The McGraw-Hill Financial Inc.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions- related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any European Union member state, or any person owned or controlled by any such Person or Persons, or (b) any Person operating, organized or resident in a Sanctioned Country.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Second Novation Agreement Supplement" means the supplemental agreement dated 29 August 2020 and made between, amongst others, the Original Borrower and the parties hereto, pursuant to which the Novation Agreement was supplemented.

"Second Priority Assets" means the Vessels known on the date the Third Novation Agreement Supplement becomes effective as or that sailed under the name (i) Azamara Quest, (ii) Azamara Pursuit, (iii) Azamara Journey, (iv) Celebrity Edge, (v) Celebrity Apex, (vi) Celebrity Flora, (vii) Celebrity Xpedition, (viii) Celebrity Xperience, (ix) Celebrity Xploration, (x) Monarch, (xi) Horizon and (xii) Sovereign (it being understood that such Vessels shall remain "Second Priority Assets" regardless of any change in name or ownership after such date).

"Second Priority Guarantee" means the second priority guarantee granted by the Second Priority Guarantors prior to the Effective Time (and any other second priority guarantee granted by a Second Priority Holdco Subsidiary in connection with becoming a Second Priority Guarantor) in favor of the Facility Agent for the benefit of the Agents and the Lenders, in each case substantially in the form attached hereto as Exhibit H.

"Second Priority Guarantors" means RCL Cruise Holdings LLC, Torcatt Enterprises S.A., RCL Holdings Cooperatief UA, RCL Cruises Ltd and RCL Investments Ltd (and any of their respective successors) and any other Second Priority Holdco Subsidiary that has granted or, prior to that entity becoming a Second Priority Holdco Subsidiary pursuant to a Disposal of a Second Priority Asset in accordance with Section 7.2.5(b)(iii)(A), will grant a Second Priority Guarantee.

"Second Priority Holdco Subsidiaries" means (a) RCL Cruises Ltd. or any other Subsidiaries of the Borrower that directly own all of the equity interests in (i) RCL TUI Cruises German Verwaltungs GmbH and (ii) RCL TUI Cruises German Holding GmbH & Co. KG and (b) one or more Subsidiaries of the Borrower that directly own any of the Equity Interests in any other Subsidiary of the Borrower that owns any Second Priority Asset. For the avoidance of doubt, Second Priority Holdco Subsidiaries shall not include any Principal Subsidiary.

"Second Priority Release Event" means the occurrence of any event or other circumstance that results in either (x) 80% of the aggregate principal amount of Bank Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being $5,300,000,000 (and 80% of which is $4,240,000,000)) or (y) 100% of the aggregate principal amount of Secured Note Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being $3,320,000,000):

a)   no longer remaining outstanding (whether as a result of repayment, redemption or otherwise (but excluding in connection with any enforcement action taken by the relevant creditors in respect of that Indebtedness)); and

b)   not having been refinanced (whether initially or through subsequent refinancings) with Indebtedness that is (i) secured by a Lien or (ii) incurred or guaranteed by any one or more Subsidiaries of the Borrower,

and which, in the case of (y) above, has resulted in the release of (or will result in the substantially simultaneous release of) each guarantee granted by the Second Priority Guarantors in respect of the Bank Indebtedness.

Notwithstanding the foregoing, a Second Priority Release Event shall in no case occur if the Borrower has failed to pay any Indebtedness that is outstanding under any ECA Financing (including this Agreement) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise). For the avoidance of doubt, if a Second Priority Release Event would have occurred but for the continuance of the payment default described above, then a Second Priority Release Event will occur immediately upon that payment default being remedied.

"Secured Note Indebtedness" means the Borrower's Indebtedness under the Secured Note Indenture.

"Secured Note Indenture" means that certain Indenture, dated as of May 19, 2020 (as amended, supplemented, extended, refinanced, replaced and/or otherwise modified from time to time) in respect of the $1,000,000,000 10.875% senior secured notes due 2023 and $2,320,000,000 11.50% senior secured notes due 2025, by and among the Borrower, as issuer,

the guarantors party thereto from time to time, and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as trustee and as security agent.

"Security Trustee" means Citicorp Trustee Company Limited of Citigroup Centre, Canada Square, London E14 5LB in its capacity as security trustee for the purpose of the Escrow Account Security.

"Senior Debt Rating" means, as of any date, (a) the implied senior debt rating of the Borrower for debt pari passu in right of payment and in right of collateral security with the Obligations as given by Moody's and S&P or (b) in the event the Borrower receives an actual unsecured senior debt rating (apart from an implied rating) from Moody's and/or S&P, such actual rating or ratings, as the case may be (and in such case the Senior Debt Rating shall not be determined by reference to any implied senior debt rating from either agency).

"Senior Guarantee" means any guarantee by a New Guarantor of Indebtedness incurred by the Borrower or any of its Subsidiaries after the effectiveness of the Third Novation Agreement Supplement; provided that the aggregate principal amount of Indebtedness guaranteed under any Senior Guarantee shall in no case exceed 10.0% of the Purchase Price of the relevant Vessel owned by the Principal Subsidiary of such New Guarantor that acquired such Vessel.

"Senior Parties" means each agent, trustee or other representative in respect of Unsecured Note Indebtedness or DDTL Indebtedness.

"SFIL" means SFIL, a French société anonyme with is registered office at 1-3 rue du Passeur de Boulogne, 92130 Issy-les-Moulineaux, France, registered at the trade and companies registry of Nanterre under number 428 782 585.

"Signing Date" means the date of the Novation Agreement.

"Statement of Compliance" means a Statement of Compliance related to fuel oil consumption pursuant to regulations 6.6 and 6.7 of Annex VI.

"Spot Rate of Exchange" is as defined in the Novation Agreement.

"Stockholders' Equity" means, as at any date, the Borrower's stockholders' equity on such date, excluding Accumulated Other Comprehensive Income (Loss), determined in accordance with GAAP, provided that any non-cash charge to Stockholders' Equity resulting (directly or indirectly) from a change after the Signing Date in GAAP or in the interpretation thereof shall be disregarded in the computation of Stockholders' Equity such that the amount of any reduction thereof resulting from such change shall be added back to Stockholders' Equity.

"Subordination Agreement" means any subordination agreement with respect to the Second Priority Guarantee or the Third Priority Guarantee executed by the Facility Agent and any of the Senior Parties or Other Senior Parties.

"Subsidiary" means, with respect to any Person, any corporation of which more than 50% of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class or classes of such corporation shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.

"<u>Third Novation Agreement Supplement</u>" means the supplemental agreement dated 13 November 2020 and made between, amongst others, the Original Borrower and the parties hereto, pursuant to which the Novation Agreement was supplemented.

"<u>Third Priority Assets</u>" means the Vessels known on the date the Third Novation Agreement Supplement becomes effective as (i) Symphony of the Seas, (ii) Oasis of the Seas, (iii) Harmony of the Seas, (iv) Spectrum of the Seas, (v) Quantum of the Seas, (vi) Ovation of the Seas and (vii) Anthem of the Seas (it being understood that such Vessels shall remain "Third Priority Assets" regardless of any change in name or ownership after the such date).

"<u>Third Priority Guarantee</u>" means the third priority guarantee granted by RCI Holdings LLC prior to the Effective Time (and any other third priority guarantee granted by a Third Priority Holdco Subsidiary in connection with becoming a Third Priority Guarantor) in favor of the Facility Agent for the benefit of the Agents and the Lenders, in each case substantially in the form attached hereto as Exhibit I.

"<u>Third Priority Guarantor</u>" means RCI Holdings LLC (and any of its successors) and any other Third Priority Holdco Subsidiary that has granted or, prior to that entity becoming a Third Priority Holdco Subsidiary pursuant to a Disposal of a Third Priority Asset in accordance with Section 7.2.5(c)(iii)(A), will grant a Third Priority Guarantee.

"<u>Third Priority Holdco Subsidiaries</u>" means one or more Subsidiaries of the Borrower that directly own any of the Equity Interests issued by any other Subsidiary of the Borrower that owns any Third Priority Asset.

"<u>Third Priority Release Event</u>" means the occurrence of any event or other circumstance that results in either (x) 80% of the aggregate principal amount of Bank Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being $5,300,000,000 (and 80% of which is $4,240,000,000)) or (y) 100% of the aggregate principal amount of Unsecured Note Indebtedness and the DDTL Indebtedness outstanding as of the effectiveness of the Third Novation Agreement Supplement (being, in aggregate, $1,700,000,000):

a)   no longer remaining outstanding (whether as a result of repayment, redemption or otherwise (but excluding in connection with any enforcement action taken by the relevant creditors in respect of that Indebtedness)); and

b)   not having been refinanced (whether initially or through subsequent refinancings) with Indebtedness that is (i) secured by a Lien or (ii) incurred or guaranteed by any one or more Subsidiaries of the Borrower,

and which, in the case of (y) above, has resulted in the release of (or will result in the substantially simultaneous release of) each guarantee granted by the Third Priority Guarantor in respect of the Unsecured Note Indebtedness, the DDTL Indebtedness and the Bank Indebtedness.

Notwithstanding the foregoing, a Third Priority Release Event shall in no case occur if the Borrower has failed to pay any Indebtedness that is outstanding under any ECA Financing (including this Agreement) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise). For the avoidance of doubt, if a Third Priority Release Event would have occurred but for the continuance of the payment default described above, then a Third Priority Release Event will occur immediately upon that payment default being remedied.

"<u>UK Bail-In Legislation</u>" means (to the extent that the United Kingdom is not an EEA Member Country which has implemented, or implements, Article 55 of Directive 2014/59/EU)

Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings).

"<u>Unpaid Non-Yard Costs</u>" means, as at the Actual Delivery Date, the amount in Euro of the Non-Yard Costs which have not been paid for by the Borrower and/or where applicable, supplied, installed and completed on the Purchased Vessel at the Actual Delivery Date and as determined in accordance with the relevant amounts certified in the Delivery Non-Yard Costs Certificate.

"<u>US Dollar Equivalent</u>" means (i) for all EUR amounts payable in respect of the Additional Advances for the amount of the Non-Yard Costs or the Other Basic Contract Price Increases referred to in clause 5.2(a) of the Novation Agreement (and disregarding for the purposes of this definition that the Additional Advance in respect of such amounts shall be drawn in Dollars), such EUR amounts converted to a corresponding Dollar amount at the Weighted Average Rate of Exchange and (ii) for the EUR amount payable in respect of the Additional Advance for the BpiFAE Premium referred to in clause 5.2(b) of the Novation Agreement and for the calculation and payment of the Novated Loan Balance (as defined in the Novation Agreement), the amount thereof in EUR converted to a corresponding Dollar amount as determined by the Facility Agent on the basis of the Spot Rate of Exchange. Such rate of exchange under (i) above shall be evidenced by foreign exchange counterparty confirmations to the extent applicable. The US Dollar Equivalent of the Maximum Loan Amount shall be calculated by the Borrower in consultation with the Facility Agent no less than two (2) Business Days prior to the proposed Actual Delivery Date.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America, its fifty States and the District of Columbia.

"<u>Unsecured Note Indebtedness</u>" means the Borrower's Indebtedness under the Unsecured Note Indenture.

"<u>Unsecured Note Indenture</u>" means that certain Indenture, dated as of June 9, 2020 (as amended, supplemented, extended, refinanced, replaced and/or otherwise modified from time to time) in respect of the $1,000,000,000 9.125% senior notes due 2023, by and among the Borrower, as issuer, the guarantor party thereto, and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as trustee.

"<u>Vessel</u>" means a passenger cruise vessel owned by a Group Member.

"<u>Weighted Average Rate of Exchange</u>" means the weighted average rate of exchange that the Borrower has agreed, either in the spot or forward currency markets, to pay its counterparties for the purchase of the relevant amounts of euro with Dollars for the payment of the euro amount of the Contract Price (including the portion thereof comprising the change orders, any Other Basic Contract Price Increases and the Non-Yard Costs) and including in such weighted average calculation (a) the NYC Applicable Rate (as defined in the Novation Agreement) in relation to the portion of the Contract Price comprising the Non-Yard Costs and (b) the spot rates for any other euro amounts that have not been hedged by the Borrower.

"<u>Write-Down and Conversion Powers</u>" means: (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; and (b) in relation to any UK Bail-In Legislation: (i) any powers under that UK Bail-In Legislation to

cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers; and (ii) any similar or analogous powers under that UK Bail-In Legislation.

Section 1.2.   USE OF DEFINED TERMS.   Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall, when capitalized, have such meanings when used in the Loan Request and each notice and other communication delivered from time to time in connection with this Agreement or any other Loan Document.

Section 1.3.   CROSS-REFERENCES.   Unless otherwise specified, references in this Agreement and in each other Loan Document to any Article or Section are references to such Article or Section of this Agreement or such other Loan Document, as the case may be, and, unless otherwise specified, references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

Section 1.4.   ACCOUNTING AND FINANCIAL DETERMINATIONS.   Unless otherwise specified, all accounting terms used herein or in any other Loan Document shall be interpreted, all accounting determinations and computations hereunder or thereunder (including under Section 7.2.4) shall be made, and all financial statements required to be delivered hereunder or thereunder shall be prepared, in accordance with United States generally accepted accounting principles ("GAAP") consistently applied (or, if not consistently applied, accompanied by details of the inconsistencies); provided that if the Borrower elects to apply or is required to apply International Financial Reporting Standards ("IFRS") accounting principles in lieu of GAAP, upon any such election and notice to the Facility Agent, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); provided further that if, as a result of (i) any change in GAAP or IFRS or in the interpretation thereof or (ii) the application by the Borrower of IFRS in lieu of GAAP, in each case, after the date of the financial statements referred to in Section 6.15, there is a change in the manner of determining any of the items referred to herein or thereunder that are to be determined by reference to GAAP, and the effect of such change would (in the reasonable opinion of the Borrower or the Facility Agent) be such as to affect the basis or efficacy of the financial covenants contained in Section 7.2.4 in ascertaining the consolidated financial condition of the Borrower and its Subsidiaries and the Borrower notifies the Facility Agent that the Borrower requests an amendment to any provision hereof to eliminate such change occurring after the date hereof in GAAP or the application thereof on the operation of such provision (or if the Facility Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), then such item shall for the purposes of Section 7.2.4 continue to be determined in accordance with GAAP relating thereto as if GAAP were applied immediately prior to such change in GAAP or in the interpretation thereof until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding the foregoing, all obligations of any person that are or would be characterized as operating lease obligations in accordance with GAAP on the B34 Facility Amendment Date (whether or not such operating lease obligations were in effect on such date) shall continue to be accounted for as operating lease obligations for the purposes of this Agreement regardless of any change in GAAP following the B34 Facility Amendment Date that would otherwise require such obligations to be recharacterized (on a prospective or retroactive basis or otherwise) as capital leases, provided that, for clarification purposes, operating leases recorded as liabilities on the balance sheet due to

a change in accounting treatment, or otherwise, shall for all purposes not be treated as Indebtedness, Capital Lease Obligations or Capitalized Lease Liabilities.

## ARTICLE II

## COMMITMENTS AND BORROWING PROCEDURES

Section 2.1.   <u>COMMITMENT</u>.  On the terms and subject to the conditions of this Agreement (including Article V), each Lender severally agrees to make its portion of the Loan pursuant to its Commitment described in Section 2.2. No Lender's obligation to make its portion of the Loan shall be affected by any other Lender's failure to make its portion of the Loan.

Section 2.2.   <u>COMMITMENT OF THE LENDERS; TERMINATION AND REDUCTION OF COMMITMENTS</u>.

a)   Each Lender will make its portion of the Loan available to the Borrower in accordance with <u>Section 2.3</u> on the Actual Delivery Date. The commitment of each Lender described in this <u>Section 2.2</u> (herein referred to as its "<u>Commitment</u>") shall be the commitment of such Lender to make available to the Borrower its portion of the Loan hereunder expressed as the initial amount set forth opposite such Lender's name on its signature page attached hereto or, in the case of any Lender that becomes a Lender pursuant to an assignment pursuant to <u>Section 11.11.1</u>, the amount set forth as such Lender's Commitment in the related Lender Assignment Agreement, in each case as such amount may be reduced from time to time pursuant clause 10.2 of the Novation Agreement or reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to <u>Section 11.11.1</u>. Notwithstanding the foregoing, each Lender's Commitment shall terminate on the earlier of (i) the Commitment Termination Date if the Purchased Vessel is not delivered prior to such date and (ii) the Actual Delivery Date.

b)   If any Lender shall default in its obligations under <u>Section 2.1</u>, the Facility Agent shall, at the request of the Borrower, use reasonable efforts to assist the Borrower in finding a bank or financial institution acceptable to the Borrower to replace such Lender.

Section 2.3.   <u>BORROWING PROCEDURE</u>.

a)   Part of the Loan in an amount equal to the Novated Loan Balance shall be assumed by the Borrower and be deemed to be advanced to, and borrowed by the Borrower, pursuant to the provisions of clause 3 of the Novation Agreement and thereafter converted into Dollars pursuant to clause 5.1 of the Novation Agreement.

b)   In relation to the amount of the Loan comprised by the Additional Advances, the Borrower shall deliver a Loan Request and the documents required to be delivered pursuant to <u>Section 5.1.1(a)</u> to the Facility Agent on or before 3:00 p.m., London time, not less than two (2) Business Days prior to the anticipated Actual Delivery Date. The Additional Advances shall be drawn in Dollars.

c)   The Facility Agent shall promptly notify each Lender of the Loan Request in respect of the Additional Advances by forwarding a copy thereof to each Lender, together with its attachments. On the terms and subject to the conditions of this Agreement, the portion of the Loan in respect of the Additional Advances shall be made on the Actual Delivery Date. On or before 11:00 a.m., London time, on the Actual Delivery Date, the Lenders shall, without any set-off or counterclaim, deposit with the Facility Agent same day funds in an amount equal to such Lender's Percentage of the

requested portion of the Additional Advances in Dollars. Such deposits will be made to such account which the Facility Agent shall specify from time to time by notice to the Lenders. To the extent funds are so received from the Lenders (and having regard, where applicable, to Sections 2.3d), e) and f) below), the Facility Agent shall, without any set-off or counterclaim, make such funds available to the Borrower on the Actual Delivery Date by wire transfer of same day funds to the accounts the Borrower shall have specified in its Loan Request.

d)   If the Borrower elects to finance that part of the BpiFAE Premium payable by the Borrower with an Additional Advance under clause 5.2(b)(i) of the Novation Agreement, the Borrower shall indicate such election in the Loan Request. The amount of the advance in Dollars (the "US Dollar BpiFAE Advance Amount") that will fund the BpiFAE Premium shall be equal to the Dollar amount that corresponds to the EUR amount of the BpiFAE Premium to be financed with such advance, which amount shall be determined by the Facility Agent based on the Spot Rate of Exchange. The Facility Agent shall notify the Borrower and the Lenders of the US Dollar BpiFAE Advance Amount on the date such Loan Request is delivered, and the Lenders shall deposit such US Dollar BpiFAE Advance Amount with the Facility Agent in accordance with Section 2.3.c). The Facility Agent shall furnish a certificate to the Borrower on the date such Loan Request is delivered setting forth such Spot Rate of Exchange, its derivation and the calculation of the US Dollar BpiFAE Advance Amount. If the Borrower elects to so finance the BpiFAE Premium, the Borrower will be deemed to have directed the Facility Agent to pay over directly to BpiFAE on behalf of the Borrower that portion of the EUR amount of the BpiFAE Premium to be financed with the proceeds of the advance on the Actual Delivery Date and to retain for its own account deposits made by the Lenders in Dollars in an amount equal to the portion of the US Dollar BpiFAE Advance Amount attributable to the BpiFAE Premium paid by the Facility Agent to BpiFAE on behalf of the Borrower.

e)   If the Borrower elects to finance that part of the BpiFAE Premium payable by the Borrower with an Additional Advance under clause 5.2(b)(ii) of the Novation Agreement, the Borrower shall indicate such election in the Loan Request (and whether it wishes to receive such amount in EUR or in Dollars). The amount of the advance in Dollars (the "US Dollar BpiFAE Balance Amount") that will fund the BpiFAE Premium shall be equal to the Dollar amount that corresponds to the EUR amount of the BpiFAE Premium to be financed with such advance, which amount shall be determined by the Facility Agent based on the Spot Rate of Exchange. The Facility Agent shall notify the Borrower and the Lenders of the US Dollar BpiFAE Balance Amount on the date such Loan Request is delivered, and the Lenders shall deposit such US Dollar BpiFAE Balance Amount with the Facility Agent in accordance with Section 2.3.c). The Facility Agent shall furnish a certificate to the Borrower on the date such Loan Request is delivered setting forth such Spot Rate of Exchange, its derivation and the calculation of the US Dollar BpiFAE Balance Amount. If the Borrower elects to so finance the BpiFAE Premium and receive the proceeds in EUR, the Borrower will be deemed to have directed the Facility Agent to pay over to the Borrower that portion of the EUR amount of the BpiFAE Premium to be financed with the proceeds of the advance on the Actual Delivery Date and to retain for its own account deposits made by the Lenders in Dollars in an amount equal to the US Dollar BpiFAE Balance Amount.

f)   In relation to any Additional Advance that is to be advanced to the Borrower in respect of the Non-Yard Costs it is agreed that:

i)   an amount equal to the US Dollar Equivalent of eighty per cent (80%) of the Paid Non-Yard Costs shall be advanced to the Borrower on the Actual

Delivery Date in accordance with the provisions of <u>Section 2.3 c)</u>, which amount shall be determined by the Facility Agent based on the amounts contained in the Delivery Non-Yard Costs Certificate; and

ii)   an amount equal to the US Dollar Equivalent of eighty per cent (80%) of the Unpaid Non-Yard Costs, which amount shall be determined by the Facility Agent based on the amounts contained in the Delivery Non-Yard Costs Certificate (the "<u>Escrow Amount</u>"), shall be remitted by the Facility Agent (and the Borrower hereby instructs the Facility Agent to make such remittance) to the Escrow Account and such amount shall be regulated in accordance with the following provisions of this <u>Section 2.3 f)</u> and the Escrow Account Security, subject to the aggregate of the amounts referred to in i) and ii) above not exceeding the Maximum Non-Yard Costs Amount.

Where an Escrow Amount payment is made to the Escrow Account pursuant to ii) above, the Borrower shall be entitled at any time prior to the NYC Cut Off Date to provide the Facility Agent with the Final Non-Yard Cost Certificate setting out the final amount of the Paid Non-Yard Costs. Where the Final Non-Yard Costs Certificate is so received by the Facility Agent, the Facility Agent shall determine promptly the US Dollar Equivalent of the EUR amount of the Paid Non-Yard Costs and within one Business Day thereafter shall authorize the release of the Escrow Amount (or, if less, an amount equal to the US Dollar Equivalent of eighty per cent of the final amount of the Paid Non-Yard Costs (as determined above) less the amount previously advanced to the Borrower under i) above) to the Borrower. Any interest accruing on the Escrow Account shall be released to the Borrower at the same time as the release of the Escrow Amount (or, if applicable, part thereof) to the Borrower pursuant to this provision.

If any amount of the Escrow Amount remains on the Escrow Account on the day falling immediately after the NYC Cut Off Date (having regard to any applicable permitted release of moneys from the Escrow Account to the Borrower referred to above) then on the Business Day thereafter the Facility Agent shall be entitled to request the withdrawal of that amount from the Escrow Account and shall apply the amount so received, on behalf of the Borrower, in or towards prepayment of the Loan.

The basis on which the Escrow Account Security is held by the Security Trustee for the benefit of the Lenders is regulated under the Escrow Agency and Trust Deed.

Section 2.4.   <u>FUNDING</u>. Each Lender may, if it so elects, fulfill its obligation to make or continue its portion of the Loan hereunder by causing a branch or Affiliate (or an international banking facility created by such Lender) other than that indicated next to its signature to this Agreement or, as the case may be, in the relevant Lender Assignment Agreement, to make or maintain such portion of the Loan; provided that such portion of the Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrower to repay such portion of the Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility; provided, further, that the Borrower shall not be required to pay any amount under Sections 4.2(c), 4.3, 4.4, 4.5, 4.6 and 4.7 that is greater than the amount which it would have been required to pay had the Lender not caused such branch or Affiliate (or international banking facility) to make or maintain such portion of the Loan.

ARTICLE III

REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

Section 3.1.   <u>REPAYMENTS</u>.

a)   The Borrower shall repay the Loan in 24 equal semi-annual installments, with the first installment to fall due on the date falling six (6) months after the Actual Delivery Date and the final installment to fall due on the date of Final Maturity.

b)   No such amounts repaid by the Borrower pursuant to this <u>Section 3.1</u> may be re- borrowed under the terms of this Agreement.

Section 3.2.   <u>PREPAYMENT</u>.

a)   The Borrower

i)   may, from time to time on any Business Day, make a voluntary prepayment, in whole or in part, of the outstanding principal amount of the Loan; <u>provided</u> that:

(A)   all such voluntary prepayments shall require at least five (5) Business Days' prior written notice to the Facility Agent; and

(B)   all such voluntary partial prepayments shall be in an aggregate minimum amount of $10,000,000 and a multiple of $1,000,000 (or in the remaining amount of the Loan) and shall be applied in inverse order of maturity or ratably among all remaining installments, as the Borrower shall designate to the Facility Agent, in satisfaction of the remaining repayment installments of the Loan; and

ii)   shall, immediately upon any acceleration of the repayment of the installments of the Loan pursuant to <u>Section 8.2</u> or <u>8.3</u> or the mandatory prepayment of the Loan pursuant to <u>Section 9.2</u>, repay the Loan.

b)   If it becomes unlawful in any jurisdiction for any Lender to perform any of its obligations under the Loan Documents or to maintain or fund its portion of the Loan, the affected Lender may give written notice (the "<u>Illegality Notice</u>") to the Borrower and the Facility Agent of such event, including reasonable details of the relevant circumstances.

c)   If an affected Lender delivers an Illegality Notice, the Borrower, the Facility Agent and the affected Lender shall discuss in good faith (but without obligation) what steps may be open to the relevant Lender to mitigate or remove such circumstances but, if they are unable to agree such steps within 20 Business Days or if the Borrower so elects, the Borrower shall have the right, but not the obligation, exercisable at any time within 50 days after receipt of such Illegality Notice or, if earlier, the date upon which the unlawful event referred to in (b) above will apply (but not being a date falling earlier than the end of the 20 Business Day period referred to above) (the "<u>Option Period</u>"), either (1) to prepay the portion of the Loan held by such Lender in full on or before the expiry of the Option Period, together with all unpaid interest and fees thereon accrued to but excluding the date of such prepayment, or (2) to replace such Lender on or before the expiry of the Option Period with one or more financial institutions (I)

BD-#38105238-v3   30

acceptable to the Facility Agent (such consent not to be unreasonably withheld or delayed) and (II) where relevant, eligible to benefit from an Interest Stabilisation Agreement, pursuant to assignment(s) notified to and consented in writing by BpiFAE and, where relevant Natixis DAI, provided that (x) in the case of a single assignment, any such assignment shall be either an assignment of all of the rights and obligations of the assigning Lender under this Agreement or, in the case of more than one assignment, an assignment of a portion of such rights and obligations made concurrently with another such assignment or other such assignments that collectively cover all of the rights and obligations of the assigning Lender under this Agreement and (y) no Lender shall be obliged to make any such assignment as a result of an election by the Borrower pursuant to this Section 3.2(c) unless and until such Lender shall have received one or more payments from one or more Assignee Lenders and/or the Borrower in an aggregate amount at least equal to the portion of the Loan held by such Lender, together with all unpaid interest and fees thereon accrued to but excluding the date of such assignment (and all other amounts then owing to such Lender under this Agreement).

Each prepayment of the Loan made pursuant to this Section shall be without premium or penalty, except as may be required by <u>Section 4.4</u>. No amounts prepaid by the Borrower may be re-borrowed under the terms of this Agreement.

Section 3.3.   <u>INTEREST PROVISIONS</u>. Interest on the outstanding principal amount of the Loan shall accrue and be payable in accordance with this Section 3.3.

Section 3.3.1.   <u>Rates</u>.   The Loan shall accrue interest from the Actual Delivery Date to the date of repayment or prepayment of the Loan in full to the Lenders at either the Fixed Rate or, where the proviso to Section 5.1.10 applies, the Floating Rate. Interest calculated at the Fixed Rate or the Floating Rate shall (having regard in the case of a Defaulting Lender to Section 10.3(b)) be payable in arrears on each Repayment Date. The Loan shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to the Loan. All interest shall be calculated on the basis of the actual number of days elapsed over a year comprised of 360 days.

Section 3.3.2.   [Intentionally omitted]

Section 3.3.3.   <u>Interest stabilisation</u>.   Each Lender who is a party hereto on the Restatement Date represents and warrants to the Borrower that it has entered into an Interest Stabilisation Agreement and any Lender not a party hereto on the Restatement Date (other than BpiFAE or CAFFIL as assignee of all or any of SFIL's rights as Lender following the enforcement of the security granted pursuant to paragraph (iv) of Section 11.11.1 in connection with the BpiFAE Enhanced Guarantee, subject as provided in Section 11.11.1(iv)) represents and warrants to the Borrower on the date that such Lender becomes a party hereto that it has entered into an Interest Stabilisation Agreement on or prior to becoming a party hereto.

Section 3.3.4.   <u>Post-Maturity Rates</u>.   After the date any principal amount of the Loan is due and payable (whether on any Repayment Date, upon acceleration or otherwise), or after any other monetary Obligation of the Borrower shall have become due and payable, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on such amounts for each day during the period of such default at a rate per annum certified by the Facility Agent to the Borrower (which certification shall be conclusive in the absence of manifest error) to be equal to the sum of the Floating Rate plus 1.5% per annum.

Section 3.3.5.   <u>Payment Dates</u>.   Interest accrued on the Loan shall be payable, without duplication, on the earliest of:

a) each Interest Payment Date;

b) each Repayment Date;

c) the date of any prepayment, in whole or in part, of principal outstanding on the Loan (but only on the principal so prepaid); and

d) on that portion of the Loan the repayment of which is accelerated pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration.

Section 3.3.6.   Interest Rate Determination; Replacement Reference Banks. Where Section 3.3.4 or the Floating Rate applies, the Facility Agent shall obtain from each Reference Bank timely information for the purpose of determining the LIBO Rate in the event that no offered quotation appears on Thomson Reuters LIBOR01 Page (or any successor page) and the LIBO Rate is to be determined by reference to quotations supplied by the Reference Banks and not by reference to the Historic Screen Rate. If any one or more of the Reference Banks shall fail to furnish in a timely manner such information to the Facility Agent for any such interest rate, the Facility Agent shall determine such interest rate on the basis of the information furnished by the remaining Reference Banks. If the Borrower elects to add an additional Reference Bank hereunder or a Reference Bank ceases for any reason to be able and willing to act as such, the Facility Agent shall, at the direction of the Required Lenders and after consultation with the Borrower and the Lenders, appoint a replacement for such Reference Bank reasonably acceptable to the Borrower, and such replaced Reference Bank shall cease to be a Reference Bank hereunder. The Facility Agent shall furnish to the Borrower and to the Lenders each determination of the LIBO Rate made by reference to quotations of interest rates furnished by Reference Banks (it being understood that the Facility Agent shall not be required to disclose to any party hereto (other than the Borrower) any information regarding any Reference Bank or any rate quoted by a Reference Bank, including, without limitation, whether a Reference Bank has provided a rate or the rate provided by any individual Reference Bank).

Interest accrued on the Loan or other monetary Obligations arising under this Agreement or any other Loan Document after the date such amount is due and payable (whether upon acceleration or otherwise) shall be payable upon demand.

Section 3.3.7.   Unavailability of the LIBO Rate.

Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Facility Agent determines (which determination shall, in the absence of manifest error, be conclusive) or the Borrower or the Required Lenders notify the Facility Agent (with, in the case of the Required Lenders, a copy to Borrower) that the Borrower or the Required Lenders (as applicable) have determined that:

a) adequate and reasonable means would not exist for ascertaining (should the Floating Rate apply) the LIBO Rate for the relevant Interest Period including, without limitation, because the LIBO Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

b) the administrator of the LIBO Rate or a governmental authority having jurisdiction over the Facility Agent has made a public statement identifying a specific date after which the LIBO Rate shall no longer be made available or used for determining the interest rate of loans (such specific date, the "Scheduled Unavailability Date"); or

c)   syndicated loans currently being executed, or existing syndicated loans that include language similar to that contained in this section 3.3.7, are being executed and/or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, then, reasonably promptly after such determination by the Facility Agent or receipt by the Facility Agent of such notice, as applicable, or if the Borrower otherwise requests, the Facility Agent and the Borrower may amend this Agreement to replace the LIBO Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "LIBO Successor Rate"), and also together with any proposed LIBO Successor Rate Conforming Changes (as defined below) and any such amendment shall become effective at 5:00 P.M. (London time) on the fifth (5) Business Day after the Facility Agent shall have posted such proposed amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Facility Agent written notice that such Required Lenders do not accept such amendment. Such LIBO Successor Rate shall be applied in a manner consistent with market practice; provided that to the extent such market practice is not administratively feasible for the Facility Agent, such LIBO Successor Rate shall be applied in a manner as otherwise reasonably determined by the Facility Agent.

If no LIBO Successor Rate has been determined and the circumstances under paragraph a) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Facility Agent will promptly notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to fund or maintain the relevant portion of the Loan at the LIBO Rate (to the extent of the affected part of the Loan or Interest Periods) shall be suspended. Upon receipt of such notice, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of any part of the Loan (to the extent of the affected part of the Loan or Interest Periods).

Notwithstanding anything else herein, any definition of LIBO Successor Rate shall provide that in no event shall such LIBO Successor Rate be less than zero for purposes of this Agreement.

The Facility Agent (acting on the instructions of the Required Lenders) and the Borrower shall, during the period between 1 April 2021 and 30 June 2022 (or such later date as may be agreed between the Required Lenders and the Borrower), enter into negotiations in good faith with a view to agreeing a basis upon which a LIBO Successor Rate can be used in replacement of the LIBO Rate, together with any associated LIBO Successor Rate Conforming Changes, and a timetable for the implementation of these changes so that the appropriate changes can be made prior to the Scheduled Unavailability Date.

For the purposes of this Agreement, "LIBO Successor Rate Conforming Changes" means, with respect to any proposed LIBO Successor Rate, any conforming changes to the definition of Floating Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Facility Agent in consultation with the Borrower, to reflect the adoption of such LIBO Successor Rate and to permit the administration thereof by the Facility Agent in a manner substantially consistent with market practice (or, if the Facility Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBO Successor Rate exists, in such other manner of administration as the Facility Agent determines is reasonably necessary in connection with the administration of this Agreement).

Section 3.4.   <u>COMMITMENT FEES</u>.  Subject to clause 10.1 of the Novation Agreement, the Borrower agrees to pay to the Facility Agent for the account of each Lender a commitment fee (the "<u>Commitment Fee</u>") on its daily unused portion of Maximum Loan Amount (as such amount may be adjusted from time to time), for the period commencing on the Signing Date and continuing through the earliest to occur (the "<u>Commitment Fee Termination Date</u>") of (i) the Actual Delivery Date, (ii) the date upon which the Facility Agent has provided the Borrower with written notice that the Lenders will not advance the Loan because the Commitments have been terminated pursuant to Section 8.2 or 8.3, (iii) the Commitment Termination Date and (iv) the date the Commitments shall have been terminated in full pursuant to clause 10.2 of the Novation Agreement.

Section 3.4.1.   <u>Payment.</u>  The Commitment Fee shall be payable by the Borrower to the Facility Agent for the account of each Lender six-monthly in arrears, with the first such payment (the "<u>First Commitment Fee Payment</u>") to be made on the day falling six months following the Signing Date and the final such payment to be made on the Commitment Fee Termination Date (each date on which a Commitment Fee payment is required to be made in accordance with this Section 3.4.1 referred to herein as a "<u>Commitment Fee Payment Date</u>").  The Commitment Fee shall be in the amount in EUR equal to the product of the Applicable Commitment Rate, multiplied by, for each day elapsed since the preceding Commitment Fee Payment Date (or, in the case of the First Commitment Fee Payment, the Signing Date), 75% of the daily unused portion of Maximum Loan Amount (as such amount may be adjusted from time to time), divided by 360 days.

Section 3.5.   <u>OTHER FEES</u>.  The Borrower agrees to pay to the Facility Agent the agreed-upon fees set forth in the Fee Letters on the dates and in the amounts set forth therein.

ARTICLE IV

CERTAIN LIBO RATE AND OTHER PROVISIONS

Section 4.1.   <u>LIBO RATE LENDING UNLAWFUL</u>.  If after the Signing Date the introduction of or any change in or in the interpretation of any law makes it unlawful, or any central bank or other governmental authority having jurisdiction over such Lender asserts that it is unlawful for such Lender to make, continue or maintain its portion of the Loan where the relevant Lender has funded itself in the interbank market at a rate based on the LIBO Rate, the obligation of such Lender to make, continue or maintain its portion of the Loan shall, upon notice thereof to the Borrower, the Facility Agent and each other Lender, forthwith be suspended until the circumstances causing such suspension no longer exist, provided that such Lender's obligation to make, continue and maintain its portion of the Loan hereunder shall be automatically converted into an obligation to make, continue and maintain its portion of the Loan bearing interest at a rate to be negotiated between such Lender and the Borrower that is the equivalent of the sum of the LIBO Rate for the relevant Interest Period plus the Floating Rate Margin.

Section 4.2.   <u>DEPOSITS UNAVAILABLE</u>.  If any Lender has funded itself in the interbank market and the Facility Agent shall have determined that:

a)   Dollar deposits in the relevant amount and for the relevant Interest Period are not available to each Reference Bank in its relevant market, or

b)   by reason of circumstances affecting the Reference Banks' relevant markets, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate loans for the relevant Interest Period, or

c)   the cost to Lenders that in the aggregate hold more than 50% of the aggregate outstanding principal amount of the Loan then held by Lenders of obtaining matching deposits in the relevant interbank market for the relevant Interest Period would be in excess of the LIBO Rate, (provided, that no Lender may exercise its rights under this Section 4.2.c) for amounts up to the difference between such Lender's cost of obtaining matching deposits on the date such Lender becomes a Lender hereunder less the LIBO Rate on such date), then the Facility Agent shall give notice of such determination (hereinafter called a "Determination Notice") to the Borrower and each of the Lenders. The Borrower, the Lenders and the Facility Agent shall then negotiate in good faith in order to agree upon a mutually satisfactory interest rate and interest period (or interest periods) to be substituted for those which would otherwise have applied under this Agreement. If the Borrower, the Lenders and the Facility Agent are unable to agree upon an interest rate (or rates) and interest period (or interest periods) prior to the date occurring fifteen (15) Business Days after the giving of such Determination Notice, the Facility Agent shall (after consultation with the Lenders) set an interest rate and an interest period (or interest periods), in each case to take effect at the end of the Interest Period current at the date of the Determination Notice, which rate (or rates) shall be equal to the sum of the Floating Rate Margin and the weighted average of the corresponding interest rates at or about 11:00 a.m. (London time) two (2) Business Days before the commencement of the relevant Interest Period on Thomson Reuters' pages KLIEMMM, GARBIC01 and FINA01 (or such other pages as may replace Thomson Reuters' pages KLIEMMM, GARBIC01 or FINA01 on Thomson Reuters' service) (or, in the case of clause (c) above, the lesser of (x) the respective cost to the Lenders of funding the respective portions of the Loan held by the Lenders and (y) such weighted average). The Facility Agent shall furnish a certificate to the Borrower as soon as reasonably practicable after the Facility Agent has given such Determination Notice setting forth such rate(s). In the event that the circumstances described in this Section 4.2 shall extend beyond the end of an interest period agreed or set pursuant hereto, the foregoing procedure shall be repeated as often as may be necessary.

Section 4.3.   INCREASED LIBO RATE LOAN COSTS, ETC. If after the Signing Date a change in any applicable treaty, law, regulation or regulatory requirement or in the interpretation thereof or in its application to the Borrower, or if compliance by any Lender with any applicable direction, request, requirement or guideline (whether or not having the force of law) of any governmental or other authority including, without limitation, any agency of the European Union or similar monetary or multinational authority insofar as it may be changed or imposed after the date hereof, shall:

a)   subject any Lender to any taxes, levies, duties, charges, fees, deductions or withholdings of any nature with respect to its portion of the Loan or any part thereof imposed, levied, collected, withheld or assessed by any jurisdiction or any political subdivision or taxing authority thereof (other than taxation on overall net income and, to the extent such taxes are described in Section 4.6, withholding taxes); or

b)   change the basis of taxation to any Lender (other than a change in taxation on the overall net income of any Lender) of payments of principal or interest or any other payment due or to become due pursuant to this Agreement; or

c)   impose, modify or deem applicable any reserve or capital adequacy requirements (other than the increased capital costs described in Section 4.5 and the reserve costs described in Section 4.7) or other banking or monetary controls or requirements which affect the manner in which a Lender shall allocate its capital resources to its obligations hereunder or require the making of any special deposits against or in respect of any assets or liabilities of, deposits with or for the account of, or

loans by, any Lender (<u>provided</u> that such Lender shall, unless prohibited by law, allocate its capital resources to its obligations hereunder in a manner which is consistent with its present treatment of the allocation of its capital resources); or

    d)   impose on any Lender any other condition affecting its portion of the Loan or any part thereof, and the result of any of the foregoing is either (i) to increase the cost to such Lender of making its portion of the Loan or maintaining its portion of the Loan or any part thereof, (ii) to reduce the amount of any payment received by such Lender or its effective return hereunder or on its capital or (iii) to cause such Lender to make any payment or to forego any return based on any amount received or receivable by such Lender hereunder, then and in any such case if such increase or reduction in the opinion of such Lender materially affects the interests of such Lender, (A) such Lender shall (through the Facility Agent) notify the Borrower of the occurrence of such event and use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and the terms of the BpiFAE Insurance Policy and (if the Fixed Rate applies) the arrangements with Natixis DAI relating to the CIRR) to designate a different Lending Office if the making of such a designation would avoid the effects of such law, regulation or regulatory requirement or any change therein or in the interpretation thereof and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender and (B) the Borrower shall forthwith upon such demand pay to the Facility Agent for the account of such Lender such amount as is necessary to compensate such Lender for such additional cost or such reduction and ancillary expenses, including taxes, incurred as a result of such adjustment. Such notice shall (i) describe in reasonable detail the event leading to such additional cost, together with the approximate date of the effectiveness thereof, (ii) set forth the amount of such additional cost, (iii) describe the manner in which such amount has been calculated, (iv) certify that the method used to calculate such amount is such Lender's standard method of calculating such amount, (v) certify that such request is consistent with its treatment of other borrowers that are subject to similar provisions, and (vi) certify that, to the best of its knowledge, such change in circumstance is of general application to the commercial banking industry in such Lender's jurisdiction of organization or in the relevant jurisdiction in which such Lender does business. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that in relation to increased costs or reductions arising after the Effective Date the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than three months prior to the date that such Lender notifies the Borrower of the circumstance giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; <u>provided further</u> that, if the circumstance giving rise to such increased costs or reductions is retroactive, then the three-month period referred to above shall be extended to include the period of retroactive effect thereof, but not more than six months prior to the date that such Lender notifies the Borrower of the circumstance giving rise to such cost or reductions and of such Lender's intention to claim compensation therefor.

    It is acknowledged that the Borrower shall have no liability to compensate any Lender under this Section for amounts of increased costs that accrue before the Effective Time on the Actual Delivery Date (with any such amounts arising before the Effective Time being the responsibility of the Original Borrower).

    Section 4.4.    <u>FUNDING LOSSES</u>.

    Section 4.4.1.    <u>Indemnity.</u>  In the event any Lender shall incur any loss or expense (for the avoidance of doubt excluding loss of profit) by reason of the liquidation or re-employment (at not less than the market rate) of deposits or other funds acquired by such Lender,

to make, continue or maintain any portion of the principal amount of its portion of the Loan as a result of:

> i)   any repayment or prepayment or acceleration of the principal amount of such Lender's portion of the Loan, other than any repayment made on the date scheduled for such repayment or (if the Floating Rate applies) any repayment or prepayment or acceleration on a date other than the scheduled last day of an Interest Period or otherwise scheduled date for repayment or payment; or

> ii)   the relevant portion of the Loan not being made in accordance with the Loan Request therefor due to the fault of the Borrower or as a result of any of the conditions precedent set forth in clause 6.1(c) of the Novation Agreement and Article V not being satisfied,

(a "<u>Funding Losses Event</u>") then, upon the written notice of such Lender to the Borrower (with a copy to the Facility Agent), the Borrower shall, within three (3) days of its receipt thereof:

> a)   if at that time interest is calculated at the Floating Rate on such Lender's portion of the Loan, pay directly to the Facility Agent for the account of such Lender an amount equal to the amount by which:

> i)   interest calculated at the Floating Rate (excluding the Floating Rate Margin) which such Lender would have received on its share of the amount of the Loan subject to such Funding Losses Event for the period from the date of receipt of any part of its share in the Loan to the last day of the applicable Interest Period,

exceeds:

> ii)   the amount which such Lender would be able to obtain by placing an amount equal to the amount received by it on deposit with a leading bank in the appropriate interbank market for a period starting on the Business Day following receipt and ending on the last day of the applicable Interest Period; or

> b)   if at that time interest is calculated at the Fixed Rate on such Lender's portion of the Loan, pay to the Facility Agent the amount notified to it following the calculation referred to in the next paragraph.

Since the Lenders commit themselves irrevocably to the French Authorities in charge of monitoring the CIRR mechanism, any prepayment (whether voluntary, involuntary or mandatory, including following the acceleration of the Loan) will be subject to the mandatory payment by the Borrower of the amount calculated in liaison with the French Authorities two (2) Business Days prior to the prepayment date by taking into account the differential (the "<u>Rate Differential</u>") between the CIRR and the prevailing market yield (currently ISDAFIX) for each installment to be prepaid and applying such Rate Differential to the remaining residual period of such installment and discounting to the net present value as described below. Each of these Rate Differentials will be applied to the corresponding installment to be prepaid during the period starting on the date on which such prepayment is required to be made and ending on the original Repayment Date (as adjusted following any previous prepayments) for such installment and:

> (A)   the net present value of each corresponding amount resulting from the above calculation will be determined at the corresponding market yield; and

(B)   if the cumulated amount of such present values is negative, no amount shall be due to the Borrower or from the Borrower.

Such written notice shall include calculations in reasonable detail setting forth the loss or expense to such Lender.

Section 4.4.2.   <u>Exclusion.</u> In the event that a Lender's wilful misconduct or gross negligence has caused the loss or cancellation of the BpiFAE Insurance Policy, the Borrower shall not be liable to indemnify that Lender under <u>Section 4.4.1</u> for its loss or expense arising due to the occurrence of the Prepayment Event referred to in <u>Section 9.1.9</u>.

Section 4.5.   <u>INCREASED CAPITAL COSTS</u>. If after the Signing Date any change in, or the introduction, effectiveness, interpretation, reinterpretation or phase-in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any court, central bank, regulator or other governmental authority increases the amount of capital required to be maintained by any Lender or any Person controlling such Lender, and the rate of return on its or such controlling Person's capital as a consequence of its Commitment or its portion of the Loan made by such Lender is reduced to a level below that which such Lender or such controlling Person would have achieved but for the occurrence of any such change in circumstance, then, in any such case upon notice from time to time by such Lender to the Borrower, the Borrower shall immediately pay directly to such Lender additional amounts sufficient to compensate such Lender or such controlling Person for such reduction in rate of return. Any such notice shall (i) describe in reasonable detail the capital adequacy requirements which have been imposed, together with the approximate date of the effectiveness thereof, (ii) set forth the amount of such lowered return, (iii) describe the manner in which such amount has been calculated, (iv) certify that the method used to calculate such amount is such Lender's standard method of calculating such amount, (v) certify that such request for such additional amounts is consistent with its treatment of other borrowers that are subject to similar provisions and (vi) certify that, to the best of its knowledge, such change in circumstances is of general application to the commercial banking industry in the jurisdictions in which such Lender does business. In determining such amount, such Lender may use any method of averaging and attribution that it shall, subject to the foregoing sentence, deem applicable. Each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and the terms of the BpiFAE Insurance Policy and (if the Fixed Rate applies) the arrangements with Natixis DAI relating to the CIRR) to designate a different Lending Office if the making of such a designation would avoid such reduction in such rate of return and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that in relation to increased costs or reductions arising after the Effective Date the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than three months prior to the date that such Lender notifies the Borrower of the circumstance giving rise to such reductions and of such Lender's intention to claim compensation therefor; <u>provided</u> <u>further</u> that, if the circumstance giving rise to such reductions is retroactive, then the three-month period referred to above shall be extended to include the period of retroactive effect thereof, but not more than six months prior to the date that such Lender notifies the Borrower of the circumstance giving rise to such reductions and of such Lender's intention to claim compensation therefor.

It is acknowledged that the Borrower shall have no liability to compensate any Lender under this Section for reduced returns that accrue before the Effective Time on the Actual Delivery Date (with any compensation liability to the Lenders arising before the Effective Time being the responsibility of the Original Borrower).

Section 4.6.  <u>TAXES</u>.  All payments by any Obligor of principal of, and interest on, the Loan and all other amounts payable under any Loan Document shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, and excluding franchise taxes and taxes imposed on or measured by any Lender's net income or receipts of such Lender and franchise taxes imposed in lieu of net income taxes or taxes on receipts, by the jurisdiction under the laws of which such Lender is organized or any political subdivision thereof or the jurisdiction of such Lender's Lending Office or any political subdivision thereof or any other jurisdiction unless such net income taxes are imposed solely as a result of the applicable Obligor's activities in such other jurisdiction, and any taxes imposed under FATCA (such non-excluded items being called "<u>Covered Taxes</u>").  In the event that any withholding or deduction from any payment to be made by an Obligor under any Loan Document is required in respect of any Covered Taxes pursuant to any applicable law, rule or regulation, then the Borrower will:

    a)   pay directly to the relevant authority the full amount required to be so withheld or deducted;

    b)   promptly forward to the Facility Agent an official receipt or other documentation satisfactory to the Facility Agent evidencing such payment to such authority; and

    c)   pay to the Facility Agent for the account of the Lenders such additional amount or amounts as is necessary to ensure that the net amount actually received by each Lender will equal the full amount such Lender would have received had no such withholding or deduction been required.

Moreover, if any Covered Taxes are directly asserted against the Facility Agent or any Lender with respect to any payment received or paid by the Facility Agent or such Lender hereunder, the Facility Agent or such Lender may pay such Covered Taxes and the Borrower will promptly pay such additional amounts (including any penalties, interest or expenses) as is necessary in order that the net amount received by such person after the payment of such Covered Taxes (including any Covered Taxes on such additional amount) shall equal the amount such person would have received had no such Covered Taxes been asserted.

Any Lender claiming any additional amounts payable pursuant to this Section agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and the terms of the BpiFAE Insurance Policy and (if the Fixed Rate applies) the arrangements with Natixis DAI relating to the CIRR) to change the jurisdiction of its Lending Office if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

If the Borrower fails to pay any Covered Taxes when due to the appropriate taxing authority or fails to remit to the Facility Agent for the account of the respective Lenders the required receipts or other required documentary evidence, the Borrower shall indemnify the Lenders for any incremental withholding Covered Taxes, interest or penalties that may become payable by any Lender as a result of any such failure (so long as such amount did not become payable as a result of the failure of such Lender to provide timely notice to the Borrower of the assertion of a liability related to the payment of Covered Taxes).  For purposes of this <u>Section 4.6</u>, a distribution hereunder by the Facility Agent or any Lender to or for the account of any Lender shall be deemed a payment by the Borrower.

If any Lender is entitled to any refund, credit, deduction or other reduction in tax by reason of any payment made by the Borrower in respect of any Covered Tax under this <u>Section 4.6</u> or by reason of any payment made by the Borrower pursuant to <u>Section 4.3</u>, such Lender shall use reasonable efforts to obtain such refund, credit, deduction or other reduction and, promptly after receipt thereof, will pay to the Borrower such amount (plus any interest received by such Lender in connection with such refund, credit, deduction or reduction) as is equal to the net after-tax value to such Lender of such part of such refund, credit, deduction or reduction as such Lender reasonably determines is allocable to such Covered Tax or such payment (less out-of-pocket expenses incurred by such Lender), <u>provided</u> that no Lender shall be obligated to disclose to the Borrower any information regarding its tax affairs or tax computations.

Each Lender (and each Participant) agrees with the Borrower and the Facility Agent that it will (i) in the case of a Lender or a Participant organized under the laws of a jurisdiction other than the United States (a) provide to the Facility Agent and the Borrower an appropriately executed copy of Internal Revenue Service Form W-8ECI certifying that any payments made to or for the benefit of such Lender or such Participant are effectively connected with a trade or business in the United States (or alternatively, an Internal Revenue Service Form W-8BEN claiming the benefits of a tax treaty, but only if the applicable treaty described in such form provides for a complete exemption from U.S. federal income tax withholding), or any successor form, on or prior to the date hereof (or, in the case of any Assignee Lender or Participant, on or prior to the date of the relevant assignment or participation), in each case attached to an Internal Revenue Service Form W-8IMY, if appropriate, (b) notify the Facility Agent and the Borrower if the certifications made on any form provided pursuant to this paragraph are no longer accurate and true in all material respects and (c) without prejudice to its obligations under <u>Section 4.13</u>, provide such other tax forms or other documents as shall be prescribed by applicable law, if any, or as otherwise reasonably requested, to demonstrate, to the extent applicable, that payments to such Lender Party (or Participant) hereunder are exempt from withholding under FATCA, and (ii) in all cases, provide such forms, certificates or other documents, as and when reasonably requested by the Borrower, necessary to claim any applicable exemption from, or reduction of, Covered Taxes or any payments made to or for benefit of such Lender Party or such Participant, <u>provided</u> that the Lender Party or Participant is legally able to deliver such forms, certificates or other documents. For any period with respect to which a Lender (or Assignee Lender or Participant) has failed to provide the Borrower with the foregoing forms (other than if such failure is due to a change in law occurring after the date on which a form originally was required to be provided (which, in the case of an Assignee Lender, would be the date on which the original assignor was required to provide such form) or if such form otherwise is not required hereunder) such Lender (or Assignee Lender or Participant) shall not be entitled to the benefits of this <u>Section 4.6</u> with respect to Covered Taxes imposed by reason of such failure.

All fees and expenses payable pursuant to <u>Section 11.3</u> shall be paid together with value added tax or any similar tax (if any) properly chargeable thereon. Any value added tax chargeable in respect of any services supplied by a Lender or an Agent under this Agreement shall, on delivery of the value added invoice, be paid in addition to any sum agreed to be paid hereunder.

Section 4.7.   <u>RESERVE COSTS</u>.   Without in any way limiting the Borrower's obligations under Section 4.3, the Borrower shall, with effect from the Effective Time, pay to the Facility Agent for the account of each Lender on the last day of each Interest Period, so long as the relevant Lending Office of such Lender is required to maintain reserves against "<u>Eurocurrency liabilities</u>" under Regulation D of the F.R.S. Board, upon notice from such Lender, an additional amount equal to the product of the following for the Loan for each day during such Interest Period:

i)   the principal amount of the Loan outstanding on such day; and

ii)   the remainder of (x) a fraction the numerator of which is the rate (expressed as a decimal) at which interest accrues on the Loan for such Interest Period as provided in this Agreement (less, if applicable, the Floating Rate Margin) and the denominator of which is one <u>minus</u> any increase after the Signing Date in the effective rate (expressed as a decimal) at which such reserve requirements are imposed on such Lender <u>minus</u> (y) such numerator; and

iii)   <u>1/360</u>.

Such notice shall (i) describe in reasonable detail the reserve requirement that has been imposed, together with the approximate date of the effectiveness thereof, (ii) set forth the applicable reserve percentage, (iii) certify that such request is consistent with such Lender's treatment of other borrowers that are subject to similar provisions and (iv) certify that, to the best of its knowledge, such requirements are of general application in the commercial banking industry in the United States.

Each Lender agrees to use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and the terms of the BpiFAE Insurance Policy and (if the Fixed Rate applies) the arrangements with Natixis DAI relating to the CIRR) to avoid the requirement of maintaining such reserves (including by designating a different Lending Office) if such efforts would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

<u>Section 4.8.   PAYMENTS, COMPUTATIONS, ETC.</u>

a)   Unless otherwise expressly provided, all payments by an Obligor pursuant to any Loan Document shall be made by such Obligor to the Facility Agent for the pro rata account of the Lenders entitled to receive such payment. All such payments required to be made to the Facility Agent shall be made, without set-off, deduction or counterclaim, not later than 11:00 a.m., New York time, on the date due, in same day or immediately available funds through the New York Clearing House Interbank Payments System (or such other funds as may be customary for the settlement of international banking transactions in Dollars), to such account as the Facility Agent shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed to have been received by the Lenders on the next succeeding Business Day.

b)   Each Lender hereby instructs the Facility Agent, with respect to any portion of the Loan held by such Lender, to pay directly to such Lender interest thereon at the Fixed Rate or (if the proviso to <u>Section 5.1.10</u> applies) the Floating Rate, on the basis that (if the Fixed Rate applies) such Lender will, where amounts are payable to Natixis by such Lender under the Interest Stabilisation Agreement, account directly to Natixis for any such amounts payable by that Lender under the Interest Stabilisation Agreement to which such Lender is a party.

c)   The Facility Agent shall promptly (but in any event on the same Business Day that the same are received or, as contemplated in clause (a) of this Section, deemed received) remit in same day funds to each Lender its share, if any, of such payments received by the Facility Agent for the account of such Lender without any set-off, deduction or counterclaim. All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360

BD-#38105238-v3   41

days. Whenever any payment to be made shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees, if any, in connection with such payment.

Section 4.9.   REPLACEMENT LENDERS, ETC. If the Borrower shall be required to make any payment to any Lender pursuant to Section 4.2(c), 4.3, 4.4, 4.5, 4.6 or 4.7, the Borrower shall be entitled at any time (so long as no Default and no Prepayment Event shall have occurred and be continuing) within 180 days after receipt of notice from such Lender of such required payment to (a) terminate such Lender's Commitment (where upon the Percentage of each other Lender shall automatically be adjusted to an amount equal to such Lender's ratable share of the remaining Commitments), (b) prepay the affected portion of such Lender's Loan in full, together with accrued interest thereon through the date of such prepayment (provided that the Borrower shall not terminate any Lender's Commitment pursuant to clause (a) or prepay any such Lender pursuant to this clause (b) without replacing such Lender pursuant to the following clause (c) until a 30-day period shall have elapsed during which the Borrower and the Facility Agent shall have attempted in good faith to replace such Lender), and/or (c) replace such Lender with another financial institution reasonably acceptable to the Facility Agent and (if the Fixed Rate applies) Natixis DAI, provided that (i) each such transfer shall be either a transfer of all of the rights and obligations of the transferring Lender under this Agreement or a transfer of a portion of such rights and obligations made concurrently with another such transfer or other such transfers that together cover all of the rights and obligations of the transferring Lender under this Agreement and (ii) no Lender shall be obligated to make any such transfer as a result of a demand by the Borrower pursuant to this Section unless and until such Lender shall have received one or more payments from either the Borrower or one or more Assignee Lenders in an aggregate amount at least equal to the aggregate outstanding principal amount of the Loan owing to such Lender, together with accrued interest thereon to the date of payment of such principal amount and all other amounts payable to such Lender under this Agreement. Each Lender represents and warrants to the Borrower that, as of the Signing Date (or, with respect to any Lender not a party hereto on the Signing Date, on the date that such Lender becomes a party hereto), there is no existing treaty, law, regulation, regulatory requirement, interpretation, directive, guideline, decision or request pursuant to which such Lender would be entitled to request any payments under any of Sections 4.3, 4.4, 4.5, 4.6 and 4.7 to or for account of such Lender.

Section 4.10.   SHARING OF PAYMENTS.

Section 4.10.1.   Payments to Lenders. If a Lender (a "Recovering Lender") receives or recovers any amount from an Obligor other than in accordance with Section 4.8 (Payments, Computations, etc.) (a "Recovered Amount") and applies that amount to a payment due under the Loan Documents then:

a)   the Recovering Lender shall, within three (3) Business Days, notify details of the receipt or recovery to the Facility Agent;

b)   the Facility Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Lender would have been paid had the receipt or recovery been received or made by the Facility Agent and distributed in accordance with the said Section 4.8, without taking account of any taxes which would be imposed on the Facility Agent in relation to the receipt, recovery or distribution; and

c)   the Recovering Lender shall, within three (3) Business Days of demand by the Facility Agent, pay to the Facility Agent an amount (the "Sharing Payment") equal to such receipt or recovery less any amount which the Facility Agent

determines may be retained by the Recovering Lender as its share of any payment to be made, in accordance with any applicable provisions of this Agreement.

Section 4.10.2.   <u>Redistribution of payments</u>. The Facility Agent shall treat the Sharing Payment as if it had been paid by the Borrower and distribute it between the Lenders (other than the Recovering Lender) (the "<u>Sharing Lenders</u>") in accordance with the provisions of this Agreement towards the obligations of the Borrower to the Sharing Lenders.

Section 4.10.3.   <u>Recovering Lender's rights</u>. On a distribution by the Facility Agent under <u>Section 4.10.2</u> of a payment received by a Recovering Lender from the relevant Obligor, as between that Obligor and the Recovering Lender, an amount of the Recovered Amount equal to the Sharing Payment will be treated as not having been paid by the relevant Obligor.

Section 4.10.4.   <u>Reversal of redistribution</u>. If any part of the Sharing Payment received or recovered by a Recovering Lender becomes repayable and is repaid by that Recovering Lender, then:

a)   each Sharing Lender shall, upon request of the Facility Agent, pay to the Facility Agent for the account of that Recovering Lender an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Lender for its proportion of any interest on the Sharing Payment which that Recovering Lender is required to pay) (the "<u>Redistributed Amount</u>"); and

b)   as between the relevant Obligor and each relevant Sharing Lender, an amount equal to the relevant Redistributed Amount will be treated as not having been paid by the relevant Obligor.

Section 4.10.5.   <u>Exceptions.</u>

a)   This Section 4.10 shall not apply to the extent that the Recovering Lender would not, after making any payment pursuant to this Section 4.10, have a valid and enforceable claim against the relevant Obligor.

b)   A Recovering Lender is not obliged to share with any other Lender any amount which the Recovering Lender has received or recovered as a result of taking legal or arbitration proceedings, if:

i)   it notified the other Lender of the legal or arbitration proceedings; and

ii)   the other Lender had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

Section 4.11.   <u>SET-OFF</u>. Upon the occurrence and during the continuance of an Event of Default or a Prepayment Event, each Lender shall have, to the extent permitted by applicable law, the right to appropriate and apply to the payment of the Obligations then due and owing to it any and all balances, credits, deposits, accounts or moneys of any Obligor then or thereafter maintained with such Lender; provided that any such appropriation and application shall be subject to the provisions of Section 4.10. Each Lender agrees promptly to notify the applicable Obligor and the Facility Agent after any such set-off and application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section are in addition to other rights and

remedies (including other rights of set-off under applicable law or otherwise) which such Lender may have.

Section 4.12.    <u>USE OF PROCEEDS</u>. The Borrower shall apply the proceeds of the Loan made available to the Borrower in respect of the Additional Advances for the purpose of making payments of, or reimbursing the Borrower for payments already made for, the amounts referred to in clauses 5.2, 5.3 and/or 5.4 of the Novation Agreement and, without limiting the foregoing, no proceeds of the Loan will be used to acquire any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934 or any "margin stock", as defined in F.R.S. Board Regulation U.

Section 4.13.    <u>FATCA INFORMATION</u>.

 a) Subject to paragraph <u>c</u>) below, each party (other than the Borrower) shall, within ten Business Days of a reasonable request by another party (other than the Borrower):

  i) confirm to that other party whether it is:

   (A) a FATCA Exempt Party; or

   (B) not a FATCA Exempt Party;

  ii) supply to that other party such forms, documentation and other information relating to its status under FATCA as that other party reasonably requests for the purposes of that other party's compliance with FATCA;

  iii) supply to that other party such forms, documentation and other information relating to its status as that other party reasonably requests for the purposes of that other party's compliance with any other law, regulation, or exchange of information regime.

 b) If a party confirms to another party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that party shall notify that other party reasonably promptly.

 c) Paragraph <u>a</u>) above shall not oblige any Lender or the Facility Agent to do anything, and paragraph <u>a</u>)(<u>iii</u>) above shall not oblige any other party to do anything, which would or might in its reasonable opinion constitute a breach of:

  i) any law or regulation;

  ii) any fiduciary duty; or

  iii) any duty of confidentiality.

 d) If a party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such party shall be treated for the purposes of the Loan Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the party in question provides the requested confirmation, forms, documentation or other information.

e)   Each party may make a FATCA Deduction from a payment under this Agreement that it is required to be made by FATCA, and any payment required in connection with that FATCA Deduction, and no party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

Section 4.14.    RESIGNATION OF THE FACILITY AGENT. The Facility Agent shall resign (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Facility Agent) if, either:

a)   the Facility Agent fails to respond to a request under Section 4.13 and a Lender reasonably believes that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party;

b)   the information supplied by the Facility Agent pursuant to Section 4.13 indicates that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party; or

c)   the Facility Agent notifies the Lenders that the Facility Agent will not be (or will have ceased to be) a FATCA Exempt Party;

and (in each case) a Lender reasonably believes that a party to this Agreement will be required to make a FATCA Deduction that would not be required if the Facility Agent were a FATCA Exempt Party, and that Lender, by notice to the Facility Agent, requires it to resign.

ARTICLE V

CONDITIONS TO BORROWING

Section 5.1.    ADVANCE OF THE LOAN. The obligation of the Lenders to fund the relevant portion of the Loan to be made available on the Actual Delivery Date shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 5.1. The Facility Agent shall advise the Lenders of the satisfaction of the conditions precedent set forth in this Section 5.1 prior to funding on the Actual Delivery Date.

Section 5.1.1.    Resolutions, etc. The Facility Agent shall have received from the Borrower:

a)   a certificate of its Secretary or Assistant Secretary as to the incumbency and signatures of those of its officers authorized to act with respect to this Agreement and each other Loan Document and as to the truth and completeness of the attached:

(x)    resolutions of its Board of Directors then in full force and effect authorizing the execution, delivery and performance of this Agreement and each other Loan Document, and

(y)   Organic Documents of the Borrower,

and upon which certificate the Lenders may conclusively rely until the Facility Agent shall have received a further certificate of the Secretary or Assistant Secretary of the Borrower canceling or amending such prior certificate; and

b)   a Certificate of Good Standing issued by the relevant Liberian authorities in respect of the Borrower.

Section 5.1.2.   <u>Opinions of Counsel.</u> The Facility Agent shall have received opinions, addressed to the Facility Agent, the Security Trustee (in relation to a) and b) below) and each Lender from:

a)   Watson Farley & Williams LLP, counsel to the Borrower, as to Liberian Law, covering the matters set forth in <u>Exhibit B-1</u> hereto (and which shall be updated to include reference to the Escrow Account Security);

b)   Norton Rose Fulbright LLP, counsel to the Facility Agent and the Lenders, covering the matters set forth in <u>Exhibit B-2</u> hereto (and which shall be re-issued or replaced on or about the Actual Delivery Date, <u>Exhibit B-3</u> hereto; and

c)   Clifford Chance US LLP, United States tax counsel to the Facility Agent for the benefit of the Lenders, covering the matters set forth in <u>Exhibit B-4</u> hereto, each such opinion to be updated to take into account all relevant and applicable Loan Documents at the time of issue thereof.

Section 5.1.3.   <u>BpiFAE Insurance Policy.</u> The Facility Agent or the ECA Agent shall have received the BpiFAE Insurance Policy duly issued and BpiFAE shall not have, prior to the advance of the Loan, delivered to the Facility Agent or the ECA Agent any notice seeking the cancellation, suspension or termination of the BpiFAE Insurance Policy or the suspension of the drawing of the Additional Advances under this Agreement.

Section 5.1.4.   <u>Closing Fees, Expenses, etc.</u> The Facility Agent shall have received for its own account, or for the account of each Lender or BpiFAE, as the case may be, all fees that the Borrower shall have agreed in writing to pay to the Facility Agent (whether for its own account or for the account of any of the Lenders) that are due and owing as of the date of such funding and all invoiced expenses of the Facility Agent (including the agreed fees and expenses of counsel to the Facility Agent and the BpiFAE Premium) required to be paid by the Borrower pursuant to <u>Section 11.3</u> or that the Borrower has otherwise agreed in writing to pay to the Facility Agent, in each case on or prior to the date of such funding.

Section 5.1.5.   <u>Compliance with Warranties, No Default, etc</u>. Both before and after giving effect to the funding of the Loan the following statements shall be true and correct:

a)   the representations and warranties set forth in <u>Article VI</u> (excluding, however, those set forth in Section 6.10) shall be true and correct in all material respects except for those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct, with the same effect as if then made; and

b)   no Default and no Prepayment Event and no event which (with notice or lapse of time or both) would become a Prepayment Event shall have then occurred and be continuing.

Section 5.1.6.   <u>Loan Request</u>. The Facility Agent shall have received a Loan Request duly executed by the Borrower together with:

a)   where an Additional Advance is requested in respect of the Non-Yard Costs, the Delivery Non-Yard Costs Certificate;

b)   certified as true (by the Builder) copies of the invoice and supporting documents received by the Builder from the Borrower pursuant to Appendix C of the Construction Contract in relation to the Paid Non-Yard Costs to be financed as at the time of issue and a declaration from the Borrower in substantially the form set forth in Exhibit D hereto that the requirements for a minimum 15% French content in respect of Non-Yard Costs have been fulfilled;

c)   a copy of the final commercial invoice from the Builder showing the amount of the Contract Price (including the Non-Yard Costs and the Other Basic Contract Price Increases) and the portion thereof payable to the Builder on the Actual Delivery Date under the Construction Contract; and

d)   copies of the wire transfers for all payments by the Borrower to the Builder under the Construction Contract in respect of the Basic Contract Price to the extent not already provided as part of the drawdown conditions for drawdowns made by the Original Borrower.

Section 5.1.7.    <u>Foreign Exchange Counterparty Confirmations</u>. The Facility Agent shall have received the documentation and other information referred to in clause 5.6 of the Novation Agreement.

Section 5.1.8.    <u>Protocol of delivery</u>. The Facility Agent shall have received a copy of the protocol of delivery and acceptance under the Construction Contract duly signed by the Builder and the Borrower or the Nominated Owner to be notified to the Facility Agent.

Section 5.1.9.    <u>Title to Purchased Vessel</u>. The Facility Agent shall have received evidence that the Purchased Vessel is legally and beneficially owned by the Borrower or the Nominated Owner (as the case may be), free of all recorded Liens, other than Liens permitted by <u>Section 7.2.3</u> and, to the extent not yet discharged, the Mortgage (as defined in the Novation Agreement).

Section 5.1.10.    <u>Interest Stabilisation</u>. The ECA Agent shall have received a duly executed fixed rate approval from Natixis DAI issued to the Lenders in respect of the CIRR applicable to the Loan and shall have been informed by the French Authorities of the conditions of the interest make-up mechanisms (*stabilisation du taux d'intérêt*) applicable to the Loan under the applicable Interest Stabilisation Agreement in respect of the Lenders, such conditions to specify, among other things, that the CIRR has been retained under the interest make-up mechanisms applicable to the Loan.

In relation to Section 5.1.10, if a Lender (an "<u>Ineligible Lender</u>") becomes ineligible or otherwise ceases to be a party to an Interest Stabilisation Agreement, it shall promptly upon becoming aware thereof (and by no later than 15 Business Days before the anticipated Actual Delivery Date) notify the Borrower, the ECA Agent and the Facility Agent.

Following receipt of such a notice, the ECA Agent (through the Facility Agent) shall give to the Borrower at least 10 Business Days' prior notice stating if the condition precedent in Section 5.1.10 will not be satisfied due to the Ineligible Lender but would be satisfied by the replacement of the Ineligible Lender as set out below, with such replacement to take effect for the purpose of this Section on the Actual Delivery Date.

On its receipt of such notice from the ECA Agent, the Borrower shall be entitled, at any time thereafter and without prejudice to any rights and remedies it may have against such Ineligible Lender pursuant to Section 3.3.3, to replace such Ineligible Lender with another bank or financial institution reasonably acceptable to the Facility Agent, BpiFAE and Natixis DAI

with effect from the Actual Delivery Date, provided that (i) each such transfer shall be either a transfer of all of the rights and obligations of the Ineligible Lender under this Agreement or a transfer of a portion of such rights and obligations made concurrently with another such transfer or other such transfers that together cover all of the rights and obligations of the Ineligible Lender under this Agreement and (ii) no Lender shall be obligated to make effective any such transfer as a result of a demand by the Borrower pursuant to this Section unless and until such Lender shall have received one or more payments from one or more Assignee Lenders in an aggregate amount equal to the aggregate outstanding principal amount of the portion of the Novated Loan Balance which, immediately following the Effective Time, would have been owing to such Lender pursuant to Section 2.3(a) had that Lender not been replaced prior to the Effective Time. The ECA Agent and the Facility Agent shall, at the request of the Borrower, use reasonable efforts to assist the Borrower in finding a bank or financial institution acceptable to the Borrower to replace such Ineligible Lender, and taking such other steps that may be reasonably required and which are within the control of the ECA Agent and the Facility Agent to assist with the satisfaction of the condition precedent in Section 5.1.10 prior to funding on the Actual Delivery Date.

Provided however the Borrower shall be entitled, without prejudice to its rights and remedies pursuant to Section 3.3.3, to elect that if at the Actual Delivery Date the condition precedent in Section 5.1.10 is not satisfied the Floating Rate should apply to the Loan, such election to be made by notice in writing to the Facility Agent not less than five (5) Business Days prior to the anticipated Actual Delivery Date in which event, subject to the approval of BpiFAE, the Loan shall bear interest at the Floating Rate and the condition set out in Section 5.1.10 shall be deemed waived by the Lenders.

The ECA Agent (through the Facility Agent) shall, promptly after the Borrower's request, advise the Borrower whether it is aware (based solely on information obtained from Natixis DAI and other French Authorities and/or received from the Lenders at the time of any such request and without any liability on the ECA Agent for the accuracy of that information) that the condition precedent in Section 5.1.10 will not or may not be satisfied as required by Section 5.1.10.

Section 5.1.11.   <u>Escrow Account Security</u>.  The Facility Agent shall have received the Escrow Account Security duly executed by the Borrower together with a duly executed notice of charge and acknowledgement thereto executed by the Borrower and the Escrow Account Bank respectively.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

To induce the Lenders and the Facility Agent to enter into this Agreement and to make the Loan hereunder, the Borrower represents and warrants to the Facility Agent and each Lender as set forth in this <u>Article VI</u> as of the Actual Delivery Date and on the Guarantee Release Date (in each case except as otherwise stated).

Section 6.1.   <u>ORGANIZATION, ETC.</u>  The Borrower is a corporation validly organized and existing and in good standing under the laws of its jurisdiction of incorporation; the Borrower is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the nature of its business requires such qualification, except where the failure to be so qualified would not have a Material Adverse Effect; and the Borrower has full power and authority, has taken all corporate action and holds all governmental and creditors' licenses, permits, consents and other approvals necessary to enter into each Loan Document to which it is a party and to perform the Obligations.

Section 6.2.   <u>DUE AUTHORIZATION, NON-CONTRAVENTION, ETC.</u> The execution, delivery and performance by the Borrower of this Agreement and each other Loan Document, are within the Borrower's corporate powers, have been duly authorized by all necessary corporate action, and do not:

a)   contravene the Borrower's Organic Documents;

b)   contravene any law or governmental regulation of any Applicable Jurisdiction except as would not reasonably be expected to result in a Material Adverse Effect;

c)   contravene any court decree or order binding on the Borrower or any of its property except as would not reasonably be expected to result in a Material Adverse Effect;

d)   contravene any contractual restriction binding on the Borrower or any of its property except as would not reasonably be expected to result in a Material Adverse Effect; or

e)   result in, or require the creation or imposition of, any Lien on any of the Borrower's properties except as would not reasonably be expected to result in a Material Adverse Effect.

Section 6.3.   <u>GOVERNMENT APPROVAL, REGULATION, ETC.</u> No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or other Person is required for the due execution, delivery or performance by the Borrower of this Agreement or any other Loan Document (except for authorizations or approvals not required to be obtained on or prior to the Actual Delivery Date or that have been obtained or actions not required to be taken on or prior to the Actual Delivery Date or that have been taken). The Borrower holds all governmental licenses, permits and other approvals required to conduct its business as conducted by it on the Actual Delivery Date, except to the extent the failure to hold any such licenses, permits or other approvals would not have a Material Adverse Effect.

Section 6.4.   <u>COMPLIANCE WITH ENVIRONMENTAL LAWS.</u> The Borrower is in compliance with all applicable Environmental Laws, except to the extent that the failure to so comply would not have a Material Adverse Effect.

Section 6.5.   <u>VALIDITY, ETC.</u> This Agreement constitutes the legal, valid and binding obligation of the Borrower enforceable in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

Section 6.6.   <u>NO DEFAULT, EVENT OF DEFAULT OR PREPAYMENT EVENT</u>

No Default, Event of Default or Prepayment Event has occurred and is continuing.

Section 6.7.   <u>LITIGATION.</u> There is no action, suit, litigation, investigation or proceeding pending or, to the knowledge of the Borrower, threatened against the Borrower, that (i) except as set forth in filings made by the Borrower with the SEC in the Borrower's reasonable opinion might reasonably be expected to materially adversely affect the business, operations or financial condition of the Borrower and its Subsidiaries (taken as a whole) (collectively, "<u>Material Litigation</u>") or (ii) purports to affect the legality, validity or enforceability of the Loan Documents or the consummation of the transactions contemplated hereby.

BD-#38105238-v3   49

Section 6.8.    THE PURCHASED VESSEL.   Immediately following the delivery of the Purchased Vessel to the Borrower under the Construction Contract, the Purchased Vessel will be:

a)    legally and beneficially owned by the Borrower or one of the Borrower's wholly owned Subsidiaries,

b)    registered in the name of the Borrower or one of the Borrower's wholly owned Subsidiaries under the Bahamian or Maltese flag or such other flag as the parties may mutually agree,

c)    classed as required by Section 7.1.4(b),

d)    free of all recorded Liens, other than Liens permitted by Section 7.2.3,

e)    insured against loss or damage in compliance with Section 7.1.5, and

f)    exclusively operated by or chartered to the Borrower or one of the Borrower's wholly owned Subsidiaries.

Section 6.9.    OBLIGATIONS RANK PARI PASSU; LIENS.

a)    The Obligations rank at least pari passu in right of payment and in all other respects with all other unsecured unsubordinated Indebtedness of the Borrower other than Indebtedness preferred as a matter of law.

b)    As at the date of this Agreement, the provisions of this Agreement which permit or restrict the granting of Liens are no less favorable than the provisions permitting or restricting the granting of Liens in any other agreement entered into by the Borrower with any other person providing financing or credit to the Borrower.

Section 6.10.    WITHHOLDING, ETC.  . As of the Signing Date, no payment to be made by the Borrower under any Loan Document is subject to any withholding or like tax imposed by any Applicable Jurisdiction.

Section 6.11.    NO FILING, ETC. REQUIRED.  No filing, recording or registration and no payment of any stamp, registration or similar tax is necessary under the laws of any Applicable Jurisdiction to ensure the legality, validity, enforceability, priority or admissibility in evidence of this Agreement or the other Loan Documents (except for filings, recordings, registrations or payments not required to be made on or prior to the Actual Delivery Date or that have been made).

Section 6.12.    NO IMMUNITY.  The Borrower is subject to civil and commercial law with respect to the Obligations. Neither the Borrower nor any of its properties or revenues is entitled to any right of immunity in any Applicable Jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), set-off or execution of a judgment or from any other legal process or remedy relating to the Obligations (to the extent such suit, court jurisdiction, judgment, attachment, set-off, execution, legal process or remedy would otherwise be permitted or exist).

Section 6.13.    INVESTMENT COMPANY ACT.  The Borrower is not required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 6.14.    <u>REGULATION U</u>.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loan will be used for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U.  Terms for which meanings are provided in F.R.S. Board Regulation U or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

Section 6.15.    <u>ACCURACY OF INFORMATION</u>.  The financial and other information (other than financial projections or other forward looking information) furnished to the Facility Agent and the Lenders in writing by or on behalf of the Borrower by its chief financial officer, treasurer or corporate controller in connection with the negotiation of this Agreement is, when taken as a whole, to the best knowledge and belief of the Borrower, true and correct and contains no misstatement of a fact of a material nature.  All financial projections, if any, that have been furnished to the Facility Agent and the Lenders in writing by or on behalf of the Borrower by its chief financial officer, treasurer or corporate controller in connection with this Agreement have been or will be prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made (it being understood that such projections are subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the projections will be realized).  All financial and other information furnished to the Facility Agent and the Lenders in writing by or on behalf of the Borrower by its chief financial officer, treasurer or corporate controller after the date of this Agreement shall have been prepared by the Borrower in good faith.

Section 6.16.    <u>COMPLIANCE WITH LAWS</u>.  The Borrower is in compliance with all applicable laws, rules, regulations and orders, except to the extent that the failure to so comply does not and could not reasonably be expected to have a Material Adverse Effect, and the Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.  The Borrower and its Subsidiaries and, to the knowledge of the Borrower, their respective officers, employees, directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions, in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in Borrower being designated as a Sanctioned Person.  None of (a) the Borrower, any Subsidiary or to the knowledge of the Borrower or such Subsidiary any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

ARTICLE VII

COVENANTS

Section 7.1.    <u>AFFIRMATIVE COVENANTS</u>.  The Borrower agrees with the Facility Agent and each Lender that, from the Effective Date (or, where applicable, from such time as may be stated in any applicable provision below) until all Commitments have terminated and all Obligations have been paid in full, the Borrower will perform the obligations set forth in this Section 7.1.

Section 7.1.1.    <u>Financial Information, Reports, Notices, etc</u>.  The Borrower will furnish, or will cause to be furnished, to the Facility Agent (with sufficient copies for distribution to each Lender) the following financial statements, reports, notices and information:

a)    as soon as available and in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year of the Borrower, a copy of

the Borrower's report on Form 10-Q (or any successor form) as filed by the Borrower with the SEC for such Fiscal Quarter, containing unaudited consolidated financial statements of the Borrower for such Fiscal Quarter (including a balance sheet and profit and loss statement) prepared in accordance with GAAP, subject to normal year-end audit adjustments;

     b)   as soon as available and in any event within 120 days after the end of each Fiscal Year of the Borrower, a copy of the Borrower's annual report on Form 10-K (or any successor form) as filed by the Borrower with the SEC for such Fiscal Year, containing audited consolidated financial statements of the Borrower for such Fiscal Year prepared in accordance with GAAP (including a balance sheet and profit and loss statement) and audited by PricewaterhouseCoopers LLP or another firm of independent public accountants of similar standing;

     c)   together with each of the statements delivered pursuant to the foregoing clause (a) or (b), a certificate, executed by the chief financial officer, the treasurer or the corporate controller of the Borrower, showing, as of the last day of the relevant Fiscal Quarter or Fiscal Year compliance with the covenants set forth in <u>Section 7.2.4</u> (in reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Facility Agent);

     d)   as soon as possible after the occurrence of a Default or Prepayment Event, a statement of the chief financial officer of the Borrower setting forth details of such Default or Prepayment Event (as the case may be) and the action which the Borrower has taken and proposes to take with respect thereto;

     e)   as soon as the Borrower becomes aware thereof, notice of any Material Litigation except to the extent that such Material Litigation is disclosed by the Borrower in filings with the SEC;

     f)   as soon as the Borrower becomes aware thereof, notice of any event which, in its reasonable opinion, would be expected to materially adversely affect the business, operations or financial condition of the Borrower and its Subsidiaries taken as a whole;

     g)   promptly after the sending or filing thereof, copies of all reports which the Borrower sends to all holders of each security issued by the Borrower, and all registration statements which the Borrower or any of its Subsidiaries files with the SEC or any national securities exchange;

     h)   such other information respecting the condition or operations, financial or otherwise, of the Borrower or any of its Subsidiaries as any Lender through the Facility Agent may from time to time reasonably request (including an update to any information and projections previously provided to the Lenders where these have been prepared and are available);

     i)   during the Financial Covenant Waiver Period, as soon as available and in any event within respectively five (5) Business Days, ten (10) and forty (40) days (or such other period as BpiFAE may require from time to time) after the end of each monthly, bi-monthly and quarterly period (save that the period in respect of the final quarter of each Fiscal Year shall be sixty (60) days) from the Fourth Supplement Effective Date, the information required by the Debt Deferral Extension Regular Monitoring Requirements (as such information requirements may be amended on the basis set out in the Debt Deferral Extension Regular Monitoring Requirements) (in

reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Facility Agent);

    j)   during the Financial Covenant Waiver Period, upon the request of the Facility Agent (acting on the instructions of BpiFAE), the Borrower and the Lenders shall provide information in form and substance satisfactory to BpiFAE regarding arrangements in respect of Indebtedness for borrowed money of the Group then existing or any such Indebtedness to be incurred by or made available to (as the case may be) the Group pursuant to binding commitments (such information to be provided to BpiFAE in accordance with terms of the Facility Agent's request);

    k)   during the period from the Novation Effective Time until the Covenant Modification Date, within five Business Days after the end of each month falling during such period, a certificate, executed by the chief financial officer, the treasurer or the corporate controller of the Borrower, showing, as of the last day of the immediately preceding month, compliance with the covenant set forth in Section 7.2.4(C); provided that if, during such period, the Borrower is not in compliance with the covenant set forth in Section 7.2.4(C) as of the last day of such month, the Borrower shall show compliance with such covenant as of the date such certificate is delivered;

    l)   within 15 Business Days of the end of each month throughout the Early Warning Monitoring Period, a certificate, executed by the chief financial officer, the treasurer or the corporate controller of the Borrower, showing, as of the last day of the relevant month (i) the ratio of Adjusted Cash Balance as of the last day of the most recently completed month to the Monthly Outflow for the month most recently ended (and showing whether the Adjusted Cash Balance covers the Monthly Outflow for at least the subsequent five-month period), (ii) the Borrower's Adjusted EBITDA After Principal and Interest for the two consecutive Last Reported Fiscal Quarters and (iii) in the case of the next certificate to be submitted immediately following the Borrower's publishing of results for each Last Reported Fiscal Quarter, a comparison of Adjusted EBITDA After Principal and Interest with the figure from the corresponding Fiscal Quarter in the 2019 Fiscal Year (in each case in reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Facility Agent);

    m)   on one occasion during each calendar year from the start of the Financial Covenant Waiver Period, the environmental plan of the Borrower (and including the Group's carbon emissions for the past two years (calculated according to methodologies defined by the IMO or any other public methodology specified by the Borrower) as required to be published pursuant to each letter of the Borrower issued pursuant to the Fourth Novation Agreement Supplement;

    n)   if the Borrower intends to make a Restricted Voluntary Prepayment, not less than ten Business Days prior to the anticipated making of a Restricted Voluntary Prepayment, the Borrower shall provide written notice to the Facility Agent of that Restricted Voluntary Prepayment (which notice shall set out in reasonable detail the terms of that Restricted Voluntary Prepayment); and

    o)   during the Financial Covenant Waiver Period, as soon as the Borrower becomes aware thereof, notice (with a copy to the ECA Agent and BpiFAE) of any matter that has, or may, result in a breach of section 7.1.10,

provided that information required to be furnished to the Facility Agent under subsections (a), (b), (g) and (m) of this Section 7.1.1 shall be deemed furnished to the Facility Agent when

available free of charge on the Borrower's website at http://www.rclinvestor.com or the SEC's website at http://www.sec.gov.

Section 7.1.2.    Approvals and Other Consents. The Borrower will obtain (or cause to be obtained) all such governmental licenses, authorizations, consents, permits and approvals as may be required for (a) each Obligor to perform its obligations under the Loan Documents to which it is a party and (b) the operation of the Purchased Vessel in compliance with all applicable laws, except, in each case, to the extent that failure to obtain (or cause to be obtained) such governmental licenses, authorizations, consents, permits and approvals would not be expected to have a Material Adverse Effect.

Section 7.1.3.    Compliance with Laws, etc. The Borrower will, and will cause each of its Subsidiaries to, comply in all material respects with all applicable laws, rules, regulations and orders, except (other than as described in clauses (a) and (f) below) to the extent that the failure to so comply would not have a Material Adverse Effect, which compliance shall in any case include (but not be limited to):

a)    in the case of the Borrower, the maintenance and preservation of its corporate existence (subject to the provisions of Section 7.2.6);

b)    in the case of the Borrower, maintenance of its qualification as a foreign corporation in the State of Florida;

c)    the payment, before the same become delinquent, of all taxes, assessments and governmental charges imposed upon it or upon its property, except to the extent being diligently contested in good faith by appropriate proceedings;

d)    compliance with all applicable Environmental Laws;

e)    compliance with all anti-money laundering and anti-corrupt practices laws applicable to the Borrower, including by not making or causing to be made any offer, gift or payment, consideration or benefit of any kind to anyone, either directly or indirectly, as an inducement or reward for the performance of any of the transactions contemplated by this agreement to the extent the same would be in contravention of such applicable laws; and

f)    the Borrower will maintain in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers and employees with Anti-Corruption Laws and applicable Sanctions.

Section 7.1.4.    The Purchased Vessel. The Borrower will:

a)    cause the Purchased Vessel to be exclusively operated by or chartered to the Borrower or one of the Borrower's wholly owned Subsidiaries, provided that the Borrower or such Subsidiary may charter out the Purchased Vessel (i) to entities other than the Borrower and the Borrower's wholly owned Subsidiaries and (ii) on a time charter with a stated duration not in excess of one year;

b)    cause the Purchased Vessel to be kept in such condition as will entitle her to classification by a classification society of recognized standing;

c)    provide the following to the Facility Agent with respect to the Purchased Vessel:

  i) evidence as to the ownership of the Purchased Vessel by the Borrower or one of the Borrower's wholly owned Subsidiaries; and

  ii) evidence of no recorded Liens on the Purchased Vessel, other than Liens permitted pursuant to <u>Section 7.2.3</u>;

 d) within seven days after the Actual Delivery Date, provide the following to the Facility Agent with respect to the Purchased Vessel:

  i) evidence of the class of the Purchased Vessel; and

  ii) evidence as to all required insurance being in effect with respect to the Purchased Vessel; and

 e) on or before the later of (i) 31 July and (ii) 30 days after its own receipt of a Statement of Compliance in each calendar year, supply, or procure the supply, to the Facility Agent (for distribution to BpifAE and the Lenders) (in each case at the cost of the Borrower) of all information necessary in order for any Lender to comply with its obligations under the Poseidon Principles in respect of the preceding year, including, without limitation, all ship fuel oil consumption data required to be collected and reported in accordance with Regulation 22A of Annex VI (as collated and reported to the Purchased Vessel's flag state using the verification report submitted to that flag state) and any Statement of Compliance, in each case relating to the Purchased Vessel for the preceding calendar year, provided always that such information shall be confidential information for the purposes of Section 11.15 and, accordingly, no Lender shall publicly disclose such information with the identity of the Purchased Vessel or the Borrower (or, if applicable, the Borrower's wholly owned Subsidiary that then owns the Purchased Vessel) without the prior written consent of the Borrower (it being expressly agreed however that, in accordance with the Poseidon Principles, such information will form part of the information published regarding the relevant Lender's portfolio climate alignment).

  Section 7.1.5. <u>Insurance</u>. The Borrower will maintain or cause to be maintained with responsible insurance companies insurance with respect to the Purchased Vessel against such casualties, third-party liabilities and contingencies and in such amounts, in each case, as is customary for other businesses of similar size in the passenger cruise line industry (provided that in no event will the Borrower or any Subsidiary be required to obtain any business interruption, loss of hire or delay in delivery insurance) and will, upon request of the Facility Agent, furnish to the Facility Agent (with sufficient copies for distribution to each Lender) at reasonable intervals a certificate of a senior officer of the Borrower setting forth the nature and extent of all insurance maintained by the Borrower and certifying as to compliance with this Section.

  Section 7.1.6. <u>Books and Records</u>. The Borrower will keep books and records that accurately reflect all of its business affairs and transactions and permit the Facility Agent and each Lender or any of their respective representatives, at reasonable times and intervals and upon reasonable prior notice, to visit each of its offices, to discuss its financial matters with its officers and to examine any of its books or other corporate records.

  Section 7.1.7. <u>BpifAE Insurance Policy/French Authority Requirements</u>. The Borrower shall, on the reasonable request of the ECA Agent or the Facility Agent, provide such other information as required under the BpifAE Insurance Policy and/or the Interest Stabilisation Agreement as necessary to enable the ECA Agent or the Facility Agent to obtain the full support of the relevant French Authority pursuant to the BpifAE Insurance Policy and/or the Interest Stabilisation Agreement (as the case may be). The Borrower must pay to the ECA Agent or the Facility Agent the amount of all reasonable costs and expenses reasonably incurred by the ECA

Agent or the Facility Agent in connection with complying with a request by any French Authority for any additional information necessary or desirable in connection with the BpiFAE Insurance Policy or the Interest Stabilisation Agreement (as the case may be); provided that the Borrower is consulted before the ECA Agent or Natixis incurs any such cost or expense.

Section 7.1.8.   <u>Further Assurances in respect of the Framework.</u> The Borrower will from time to time throughout the Financial Covenant Waiver Period, and at the request of the Facility Agent, promptly enter into good faith negotiations in respect of (a) amending this Agreement to remove the carve-out of Section 7.2.4 set out in Section 9.1.4 and/or (b) amending the financial covenants set forth in this Agreement, resetting the testing of such financial covenants and/or supplementing those financial covenants with additional financial covenants. A failure to reach an agreement under this paragraph following such good faith negotiations shall not constitute an Event of Default or a Prepayment Event.

Section 7.1.9.   <u>Equal Treatment with Pari Passu Creditors.</u> The Borrower undertakes with the Facility Agent that it shall ensure (and shall procure that each other Group Member shall ensure) that the Lenders are treated equally in all respects with all other Pari Passu Creditors, and accordingly:

a)   the Borrower shall, to the extent not already entered into as at the Fourth Supplement Effective Date, enter into similar covenant amendment and replacement and mandatory prepayment arrangements to those contemplated by the Fourth Novation Agreement Supplement in respect of each ECA Financing (and for this purpose excluding any ECA Financings where the lenders under that ECA Financing do not provide their consent to such arrangements in circumstances where the arrangements contemplated in respect of that ECA Financing are on substantially the same basis as set out in this Agreement (as amended by the Fourth Novation Agreement Supplement) but including any financing which will, upon novation of the relevant facility agreement to the Borrower, become an ECA Financing) as soon as reasonably practicable after the Fourth Supplement Effective Date (with such amendments being on terms which shall not prejudice the rights of BpiFAE under this Agreement);

b)   the Borrower shall promptly upon written request, supply the Facility Agent and the ECA Agent with information (in a form and substance satisfactory to the Facility Agent and ECA Agent) regarding the status of the amendments to be entered into in accordance with paragraph (a) above;

c)   to enable the Borrower to comply with the requirements under paragraph (d) below, prior to any Group Member entering into any Restricted Credit Enhancement with a Pari Passu Creditor (other than a Restricted Credit Enhancement granted in accordance with Section 7.2.9(a)(ii)), the Borrower shall promptly notify the Facility Agent (and such notification shall include details of the new Lien or Group Member Guarantee and shall otherwise be in form and substance reasonably satisfactory to the Facility Agent); and

d)   at the same time as any relevant Restricted Credit Enhancement is provided to the relevant Pari Passu Creditor (other than a Restricted Credit Enhancement granted in accordance with Section 7.2.9(a)(ii), the Borrower, any relevant Group Member and the Lenders shall enter into such documentation as may be necessary in the reasonable opinion of the Facility Agent to ensure that the Lenders benefit from that Restricted

Credit Enhancement on the same terms as the relevant Pari Passu Creditor(s) and, where that Restricted Credit Enhancement is a Lien or a Group Member Guarantee, to share in that Lien or Group Member Guarantee on a pari passu basis (and the Lenders agree to enter into such intercreditor documentation to reflect such pari passu ranking (in a form and substance satisfactory to the Lenders (acting reasonably)) as may be required in connection with such arrangements).

Section 7.1.10.    <u>Performance of shipbuilding contract obligations</u>. During the Financial Covenant Waiver Period, the Borrower shall (and shall procure that each of its Subsidiaries shall) comply with its contractual commitments under and in respect of (i) each shipbuilding contract in existence as at the Fourth Supplement Effective Date (or which comes into existence at any time during the Financial Covenant Waiver Period) entered into with the Builder and (ii) any option agreements or similar binding contractual commitments (whether in respect of a firm order of a vessel or otherwise) in existence at the Fourth Supplement Effective Date (or which comes into existence at any time during the Financial Covenant Waiver Period) entered into by the Borrower (or any of its Subsidiaries) and the Builder in connection with the potential entry into of a shipbuilding contract at a future point in time (it being agreed that such obligation shall not require the Borrower or the relevant Subsidiary (as applicable) to exercise any option or other contractual right thereunder), save that this Section 7.1.10 shall be subject to any amendment to any such shipbuilding contract, option agreement, contract or other related document if such amendment has, in consultation with the ECA Agent (acting on the instructions of BpiFAE), been agreed between the Borrower or, as the case may be, relevant Subsidiary and the Builder.

Section 7.2.    <u>NEGATIVE COVENANTS</u>. The Borrower agrees with the Facility Agent and each Lender that, from the Effective Date until all Commitments have terminated and all Obligations have been paid and performed in full, the Borrower will perform the obligations set forth in this Section 7.2.

Section 7.2.1.    <u>Business Activities</u>. The Borrower will not, and will not permit any of its Subsidiaries to, engage in any principal business activity other than those engaged in by the Borrower and its Subsidiaries on the date hereof and other business activities reasonably related, ancillary or complimentary thereto or that are reasonable extensions thereof.

Section 7.2.2.    <u>Indebtedness</u>. Until the occurrence of the Guarantee Release Date (whereupon Section 7.2.2 of Exhibit N shall apply in accordance with Section 7.3), the Borrower will not permit any of the Existing Principal Subsidiaries to create, incur, assume or suffer to exist or otherwise become or be liable in respect of any Indebtedness, other than, without duplication, the following:

a)    Indebtedness secured by Liens of the type described in <u>Section 7.2.3</u>;

b)    Indebtedness owing to the Borrower or a direct or indirect Subsidiary of the Borrower;

c)    Indebtedness incurred to finance, refinance or refund the cost (including the cost of construction) of assets acquired after the Effective Date;

d)    Indebtedness in an aggregate principal amount, together with (but without duplication of) Indebtedness permitted to be secured under <u>Section 7.2.3(b)</u>, at any one time outstanding not exceeding (determined at the time of creation of such Lien or the incurrence by any Existing Principal Subsidiary of such Indebtedness, as

BD-#38105238-v3    57

applicable) 10% of the total assets of the Borrower and its Subsidiaries taken as a whole as determined in accordance with GAAP as at the last day of the most recent ended Fiscal Quarter;

e)   obligations in respect of Hedging Instruments entered into for the purpose of managing interest rate, foreign currency exchange or commodity exposure risk and not for speculative purposes; and

f)   Indebtedness of Silversea Cruise Holding Ltd. and its Subsidiaries ("Silversea") identified in Section 1 of Exhibit F hereto.

Section 7.2.3.   Liens. Until the occurrence of the Guarantee Release Date (whereupon Section 7.2.2 of Exhibit N shall apply in accordance with Section 7.3), the Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any of its property, revenues or assets, whether now owned or hereafter acquired, except:

a)   Liens on assets (including, without limitation, shares of capital stock of corporations and assets owned by any corporation that becomes a Subsidiary of the Borrower after the Effective Date) acquired after the Effective Date (whether by purchase, construction or otherwise) by the Borrower or any of its Subsidiaries (other than (x) an Existing Principal Subsidiary or (y) any other Principal Subsidiary which, at any time, after three months after the acquisition of a Vessel, owns a Vessel free of any mortgage Lien), which Liens were created solely for the purpose of securing Indebtedness representing, or incurred to finance, refinance or refund, the cost (including the cost of construction) of such assets, so long as (i) the acquisition of such assets is not otherwise prohibited by the terms of this Agreement and (ii) each such Lien is created within three months after the acquisition of the relevant assets;

b)   in addition to other Liens permitted under this Section 7.2.3, Liens securing Indebtedness in an aggregate principal amount, together with (but without duplication of) Indebtedness permitted under Section 7.2.2(d), at any one time outstanding not exceeding (determined at the time of creation of such Lien or the incurrence by any Existing Principal Subsidiary of such Indebtedness, as applicable) 10% of the total assets of the Borrower and its Subsidiaries (the "Lien Basket Amount") taken as a whole as determined in accordance with GAAP as at the last day of the most recent ended Fiscal Quarter; provided, however that, if, at any time, the Senior Debt Rating of the Borrower is less than Investment Grade as given by both Moody's and S&P, the Lien Basket Amount shall be the greater of (x) 5.0% of the total assets of the Borrower and its Subsidiaries taken as a whole as determined in accordance with GAAP as at the last day of the most recent ended Fiscal Quarter and (y) $735,000,000;

c)   Liens on assets acquired after the Effective Date by the Borrower or any of its Subsidiaries (other than by (x) any Subsidiary that is an Existing Principal Subsidiary or (y) any other Principal Subsidiary which, at any time, owns a Vessel free of any mortgage Lien) so long as (i) the acquisition of such assets is not otherwise prohibited by the terms of this Agreement and (ii) each such Liens existed on such assets before the time of its acquisition and was not created by the Borrower or any of its Subsidiaries in anticipation thereof;

d)   Liens on any asset of any corporation that becomes a Subsidiary of the Borrower (other than a corporation that also becomes a Subsidiary of an Existing Principal Subsidiary) after the Effective Date so long as (i) the acquisition or creation of such corporation by the Borrower is not otherwise prohibited by the terms of this

Agreement and (ii) such Liens are in existence at the time such corporation becomes a Subsidiary of the Borrower and were not created by the Borrower or any of its Subsidiaries in anticipation thereof;

 e) Liens securing Government-related Obligations;

 f) Liens for taxes, assessments or other governmental charges or levies not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings;

 g) Liens of carriers, warehousemen, mechanics, material-men and landlords incurred in the ordinary course of business for sums not overdue by more than 60 days or being diligently contested in good faith by appropriate proceedings;

 h) Liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance or other forms of governmental insurance or benefits;

 i) Liens for current crew's wages and salvage;

 j) Liens arising by operation of law as the result of the furnishing of necessaries for any Vessel so long as the same are discharged in the ordinary course of business or are being diligently contested in good faith by appropriate proceedings;

 k) Liens on Vessels that:

  i) secure obligations covered (or reasonably expected to be covered) by insurance;

  ii) were incurred in the course of or incidental to trading such Vessel in connection with repairs or other work to such Vessel; or

  iii) were incurred in connection with work to such Vessel that is required to be performed pursuant to applicable law, rule, regulation or order;

provided that, in each case described in this clause (k), such Liens are either (x) discharged in the ordinary course of business or (y) being diligently contested in good faith by appropriate proceedings.

 l) normal and customary rights of set-off upon deposits of cash or other Liens originating solely by virtue of any statutory or common law provision relating to bankers' liens, rights of set-off or similar rights in favor of banks or other depository institutions;

 m) Liens in respect of rights of set-off, recoupment and holdback in favor of credit card processors securing obligations in connection with credit card processing services incurred in the ordinary course of business;

 n) Liens on cash or Cash Equivalents or marketable securities securing obligations in respect of Hedging Instruments not incurred for speculative purposes or securing letters of credit that support such obligations;

 o) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations

of a like nature, in each case in the ordinary course of business and deposits securing liabilities to insurance carriers under insurance or self-insurance arrangements;

p)   easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

q)   licenses, sublicenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of the Borrower or any of its Subsidiaries; and

r)   Liens on any property of Silversea identified in Section 2 of Exhibit F hereto,

provided, however that from the Fourth Supplement Effective Date until the Guarantee Release Date, no Group Member shall be entitled to grant any Lien of the type referred to in paragraphs (a) to (d) above over any ECA Financed Vessel.

Section 7.2.4.   <u>Financial Condition</u>. The Borrower will not permit

a)   Net Debt to Capitalization Ratio, as at the end of any Fiscal Quarter, to be greater than 0.625 to 1.

b)   Fixed Charge Coverage Ratio to be less than 1.25 to 1 as at the last day of any Fiscal Quarter.

In addition, if, at any time, the Senior Debt Rating of the Borrower is less than Investment Grade as given by both Moody's and S&P, the Borrower will not permit Stockholders' Equity to be less than, as at the last day of any Fiscal Quarter, the sum of (i) $4,150,000,000 <u>plus</u> (ii) 50% of the consolidated net income of the Borrower and its Subsidiaries for the period commencing on January 1, 2007 and ending on the last day of the Fiscal Quarter most recently ended (treated for these purposes as a single accounting period, but in any event excluding any Fiscal Quarters for which the Borrower and its Subsidiaries have a consolidated net loss).

SECTION 7.2.4(A).   <u>Most favored lender with respect to Financial Covenants.</u> During the Financial Covenant Waiver Period, if any Group Member agrees, in respect of any of its Indebtedness for borrowed money, to any new, modified or substitute financial covenants of the type, or similar to, the financial covenants set out in Section 7.2.4 above then (i) the Borrower shall notify the Facility Agent in writing within 5 Business Days of such new, modified or substitute financial covenants being agreed with the relevant creditor(s) and (ii) if required by the Lenders, the Borrower and the Lenders shall, as soon as practicable thereafter, enter into an amendment to this Agreement to incorporate the new, modified or substitute financial covenants.

SECTION 7.2.4(B).   <u>Notification of change to financial covenants.</u>   (i)   If at any time during the Financial Covenant Waiver Period, other than as notified in writing by the Borrower to the Facility Agent prior to the date of the Fourth Novation Agreement Supplement, the last day of a financial covenant waiver period under any of the agreements in respect of any of the Borrower's other Indebtedness shall be amended such that it falls prior to September 30, 2022, the Borrower shall notify the Facility Agent and that revised date, save as provided below, shall be the last date of the Financial Covenant Waiver Period for the purposes of this Agreement.

(ii)   If, other than as notified in writing by the Borrower to the Facility Agent prior to the date of the Fourth Novation Agreement Supplement, following receipt of the notice referred to in sub-paragraph (i) above, the relevant date referred to above is then extended, the Borrower shall be entitled to notify the Facility Agent of the same and, upon receipt of that notice, such revised date or, if earlier, September 30, 2022, shall then become the final date of the Financial Covenant Waiver Period for the purposes of this Agreement.

SECTION 7.2.4(C).   Minimum liquidity.   The Borrower will not allow the aggregate amount of unrestricted cash and Cash Equivalents of the Borrower and its Subsidiaries as determined in accordance with GAAP to be less than the Adjustable Amount as of (i) the last day of any calendar month from the Fourth Supplement Effective Date until the Covenant Modification Date, or (ii) if the Borrower is not in compliance with the requirements of this Section 7.2.4(C) as of the last day of any calendar month during the Financial Covenant Waiver Period (or, if earlier, prior to the Covenant Modification Date), the date the certificate required by Section 7.1.1(k) with respect to such month is delivered to the Facility Agent (it being understood that the Borrower shall not be required to comply with this Section 7.2.4(C) at any time on or after the Covenant Modification Date).

Section 7.2.5.   Additional Undertakings.   From the effectiveness of the Third Novation Agreement Supplement, and notwithstanding anything to the contrary set out in this Agreement or any other Loan Document:

a)   First Priority Guarantee Matters. Until the occurrence of a First Priority Release Event:

(i)   the Borrower will not form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of the First Priority Guarantor (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests);

(ii)   the First Priority Guarantor will not form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of any Principal Subsidiary (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests);

(iii)   the First Priority Guarantor will not incur any additional Indebtedness for borrowed money (including any guarantees in respect of Indebtedness), except in connection with any Other Guarantees;

(iv)   neither Celebrity Cruises Holdings Inc. nor Celebrity Cruises Inc will incur any additional Indebtedness for borrowed money (including any guarantees in respect of Indebtedness), except in connection with the Secured Note Indebtedness or any Permitted Refinancing thereof; and

(v)   the Borrower shall not, and shall procure that each other Subsidiary will not, Dispose of any First Priority Assets or any Equity Interests in a Subsidiary that owns, directly or indirectly, any First Priority Assets, other than

(A)   to any other entity that is a First Priority Guarantor;

(B)   if the fair market value thereof, together with the fair market value of all other Dispositions of First Priority Assets made after the effectiveness of the

Third Novation Agreement Supplement (but for this purpose excluding any Disposition of the type referred to in the foregoing clause (A) and any Disposition, the net proceeds of which are applied in accordance with the following clause (C)) is less than the sum of:

(2)   $250,000,000 *plus*

(3)   the fair market value of any asset (other than (1) current assets, intercompany debt or equity instruments and (2) First Priority Assets or other assets owned by another First Priority Guarantor immediately prior to acquisition) acquired by any First Priority Guarantor after the effectiveness of the Third Novation Agreement Supplement; or

(C)   if the net proceeds therefrom are applied in accordance with Section 4.09(b)(i) or 4.09(b)(iii) of the Secured Note Indenture, to the extent applicable at such time; provided, however, that if, within 450 days of such Disposition, any net proceeds of such Disposition have not been utilized in accordance with such provisions and are retained by the Borrower or any Subsidiary after such application (such retained net proceeds, "Excess Proceeds"), then:

(1)   if not already held by a First Priority Guarantor, such Excess Proceeds shall be promptly transferred to a First Priority Guarantor to be (x) retained in an account and on the balance sheet of that First Priority Guarantor and (y) used solely (i) for capital expenditures for the benefit of the remaining First Priority Assets or for the purposes of any asset purchase by that First Priority Guarantor or (ii) to make an offer to each ECA Guarantor in accordance with the following sub-clause (2); or

(2)   where the Borrower has elected to utilize the Excess Proceeds in the manner referred to in (ii) above, the Borrower shall make a written offer contemporaneously to each ECA Guarantor to apply such Excess Proceeds as a pro rata prepayment of the Loan and the Indebtedness under each other ECA Financing that is pari passu in right of payment to the Obligations. If any ECA Guarantor provides written notice to the Borrower within 90 days of such offer accepting such offer, the Borrower shall

prepay the relevant Indebtedness notified to it within 10 Business Days (or such longer period as may be agreed with the lenders under each relevant ECA Financing being prepaid) of the date of receipt of such notice. If any ECA Guarantor fails to accept such offer within the said 90 days referred to above, then the pro rata portion of such Excess Proceeds that would have been applied to prepay the ECA Financings with respect to such ECA Guarantor if such offer was accepted shall be retained and applied in accordance with the foregoing sub-clause (1)(i).

b)   <u>Second Priority Guarantee Matters</u>. Until the occurrence of a Second Priority Release Event:

(i)    the Borrower will not, and will not permit any of its Subsidiaries to, form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of any Second Priority Guarantor (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests);

(ii)    no Second Priority Guarantor will form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of any Principal Subsidiary (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests); and

(iii)    the Borrower shall not, and shall procure that each other Subsidiary will not, Dispose of any Second Priority Assets or any Equity Interests in a Subsidiary that owns, directly or indirectly, any Second Priority Assets, other than:

(A)   to any other entity that is a Second Priority Guarantor; or

(B)   if the fair market value thereof, together with the fair market value of all other Dispositions of Second Priority Assets made after the effectiveness of the Third Novation Agreement Supplement (but for this purpose excluding any Disposition of the type referred to in the foregoing clause (A)) is less than the sum of:

(1)   $250,000,000 *plus*

(2)   the fair market value of any asset (other than (1) current assets, intercompany debt or equity instruments and (2) Second Priority Assets or other assets owned by another Second Priority Guarantor immediately prior to acquisition) acquired by any Second

Priority Guarantor after the effectiveness of the Third Novation Agreement Supplement.

c)   <u>Third Priority Guarantee Matters</u>. Until the occurrence of a Third Priority Release Event:

(i)    the Borrower will not form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of the Third Priority Guarantor (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests);

(ii)    the Third Priority Guarantor will not form, create, acquire or otherwise establish any new Subsidiaries that own, directly or indirectly, the Equity Interests of any Principal Subsidiary (and will not permit any such new Subsidiary to own, directly or indirectly, any such Equity Interests); and

(iii)   the Borrower shall not, and shall procure that each other Subsidiary will not, Dispose of any Third Priority Assets or any Equity Interests in a Subsidiary that owns, directly or indirectly, any Third Priority Assets, other than:

(A)   to any other entity that is a Third Priority Guarantor;

(B)   if the fair market value thereof, together with the fair market value of all other Dispositions of Third Priority Assets made after the effectiveness of the Third Novation Agreement Supplement (but for this purpose excluding any Disposition of the type referred to in the foregoing clause (A) and any Disposition, the net proceeds of which are applied in accordance with the following clause (C)) is less than the sum of:

(1)   $250,000,000 *plus*

(2)   the fair market value of any asset (other than (1) current assets, intercompany debt or equity instruments and (2) Third Priority Assets or other assets owned by another Third Priority Guarantor immediately prior to acquisition) acquired by any Third Priority Guarantor after the effectiveness of the Third Novation Agreement Supplement; or

(C)   if the net proceeds therefrom are applied in accordance with those provisions of the Unsecured Note Indenture and/or the definitive documentation governing the DDTL Indebtedness to the extent applicable at the time which allow the Borrower to make an offer to prepay and/or repay the debt evidenced by the Unsecured Note Indenture and/or DDTL Indebtedness, as applicable; provided that, if

BD-#38105238-v3   64

any such net proceeds are retained by the Borrower or any Subsidiary after such application, the Borrower shall promptly repay or redeem all or any portion of any Indebtedness that is pari passu or senior in right of payment to the Obligations and for which a Third Priority Guarantor is a guarantor, in each case, subject to the terms of the documentation governing such Indebtedness (including the DDTL Indebtedness, the Unsecured Note Indebtedness, any Bank Indebtedness, any Credit Card Obligations, the Loan and any other Indebtedness under an ECA Financing); provided, further, that any repayment of Indebtedness under any revolving credit agreement pursuant to this paragraph shall be accompanied by a corresponding permanent reduction in the related revolving credit commitments.

d) <u>New Guarantor Matters</u>. In the event the Borrower or any of its Subsidiaries acquires an ECA Financed Vessel:

    (i)    the Borrower will cause the applicable New Guarantor to provide:

        (A)    on or before the later of (1) 15 Business Days of the purchase of the relevant ECA Financed Vessel and (2) the Effective Time, (A) an Additional Guarantee, together with each equivalent Other Guarantee required to be provided under the terms of the other ECA Financings (as amended from time to time) and (B) all documents and information required by the Lenders in order to satisfy any applicable "know your customer" checks and any other reasonable condition precedent requirements of the Lenders (excluding, for the avoidance of doubt, legal opinions); provided that, in each case, if such New Guarantor is party to a Senior Guarantee at such time, the Facility Agent shall have contemporaneously entered into a New Guarantor Subordination Agreement; and

    (ii)    until the occurrence of a Second Priority Release Event and a Third Priority Release Event:

        (A)    the Borrower will not permit the applicable New Guarantor to incur any Indebtedness for borrowed money (including any guarantees in respect of Indebtedness) other than the applicable Additional Guarantee, any Other Guarantee and any Senior Guarantee;

        (B)    the Borrower will not permit the Principal Subsidiary that acquires the relevant ECA Financed Vessel to incur any Indebtedness for borrowed

money (including any guarantees in respect of Indebtedness);

(C)  notwithstanding any other provision of this Agreement, the Borrower will not, and shall procure that no other Subsidiary shall Dispose (whether to a Group Member or otherwise) of the relevant ECA Financed Vessel (or any equity interests in a Subsidiary that owns, directly or indirectly, such ECA Financed Vessel); provided that (1) such ECA Financed Vessel may be exclusively operated by or chartered to the Borrower or one of the Borrower's wholly owned Subsidiaries and (2) the Borrower or such Subsidiary may charter out such ECA Financed Vessel (x) to entities other than the Borrower and the Borrower's wholly owned Subsidiaries and (y) on a time charter with a stated duration not in excess of one year; and

(D)  notwithstanding the provisions of Sections 7.2.2 and 7.2.3, the Borrower will not, and will not permit any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon the relevant ECA Financed Vessel, other than Liens permitted under Section 7.2.3 that do not secure Indebtedness for borrowed money.

e)   _Further Assurances_. At the Borrower's reasonable request, the Facility Agent shall execute (i) any Additional Subordination Agreement or any Subordination Agreement, in substantially the form attached hereto as Exhibit J or Exhibit K with such changes, or otherwise in form and substance, reasonably satisfactory to the Facility Agent (acting upon the instructions of the Required Lenders and BpiFAE), to ensure the required priority of the Second Priority Guarantee and the Third Priority Guarantee and (ii) any New Guarantor Subordination Agreement contemporaneously with the execution of any Senior Guarantee by a New Guarantor if such New Guarantor has granted an Additional Guarantee at such time.

f)   _Amount of Indebtedness_. The Borrower shall ensure that:

(i)   the maximum aggregate principal amount of Bank Indebtedness (or any Permitted Refinancing thereof) guaranteed by the Second Priority Guarantors shall not exceed, in the aggregate, $5,300,000,000 (or its equivalent in any other currency) until the occurrence of a First Priority Release Event, a Second Priority Release Event, and a Third Priority Release Event;

(ii)   the maximum aggregate principal amount of Unsecured Note Indebtedness and DDTL Indebtedness (or any Permitted Refinancing of either of them), in each case, guaranteed by the Third Priority Guarantor shall not exceed, in the aggregate, $1,700,000,000 (or its equivalent in any other currency) until the occurrence of a Third Priority Release Event;

(iii)    until the occurrence of a Second Priority Release Event, none of the Second Priority Guarantors will grant any guarantee that is pari passu with or senior to its obligations under the Second Priority Guarantee, except in

connection with (A) any Bank Indebtedness or any Permitted Refinancing thereof, (B) any Credit Card Obligations or (C) any Other Guarantees, provided that each Other Guarantee shall be on terms no more favourable in any material respect (including for this purpose the priority of that guarantee) than that currently provided by that Second Priority Guarantor in connection with the relevant Indebtedness; and

  (iv) until the occurrence of a Third Priority Release Event, the Third Priority Guarantor will not grant any guarantee that is pari passu with or senior to its obligations under the Third Priority Guarantee, except in connection with (A) any Bank Indebtedness, Unsecured Note Indebtedness, DDTL Indebtedness or any Permitted Refinancing of any thereof, (B) any Credit Card Obligations or (C) any Other Guarantees, provided that each Other Guarantee shall be on terms no more favourable in any material respect (including for this purpose the priority of that guarantee) than that currently provided by the Third Priority Guarantor in connection with the relevant Indebtedness.

g) <u>Release of Guarantees</u>. The Borrower agrees to give the Facility Agent written notice of the occurrence of any First Priority Release Event, Second Priority Release Event or Third Priority Release Event. The Facility Agent agrees, subject to the proviso (2) below, that:

  (i) the First Priority Guarantee shall be automatically released upon the occurrence of a First Priority Release Event;

  (ii) the Second Priority Guarantee shall be automatically released upon the occurrence of a Second Priority Release Event;

  (iii) the Third Priority Guarantee shall be automatically released upon the occurrence of a Third Priority Release Event; and

  (iv) each Additional Guarantee shall be automatically released upon the occurrence of both a Second Priority Release Event and a Third Priority Release Event,

provided (1) in each case, and subject to the proviso (2) below, that upon the Borrower's request, the Facility Agent shall promptly confirm in writing the release of the applicable Guarantee following the occurrence of the relevant release event and (2) where the Borrower is of the opinion that it would, if the Guarantee Release Date was to occur, be in breach of the provisions of Section 7.2.2 as set out in Exhibit N (and which would otherwise come into effect on that Guarantee Release Date) on the Guarantee Release Date, the Borrower shall be entitled, by serving written notice on the Facility Agent, to request that the Guarantee Release Date be postponed until such time as the Borrower is satisfied that it will be able to comply with the provisions of the said Section 7.2.2. Where the Borrower issues a notice pursuant to this proviso (2) it agrees that it shall use all reasonable endeavors and take all appropriate action as may be practicable at such time to enable it to comply with the said Section 7.2.2 as soon as practicable following the date that the Guarantee Release Date would have occurred but for this proviso (2) so that the Guarantee Release Date can then occur and, as soon as it is satisfied that it will be able to comply with the said Section 7.2.2 it will promptly serve a further written notice on the Facility Agent. Upon receipt of this further notice, the provisions of this paragraph (g) shall once again apply and the Facility Agent shall then take the action required of it to enable the Guarantee Release Date to occur.

Section 7.2.6.    <u>Consolidation, Merger, etc.</u> The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge into or with, any other corporation, except:

a)    any such Subsidiary may (i) liquidate or dissolve voluntarily into, and may merge with and into, the Borrower or any other Subsidiary, and the assets or stock of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary or (ii) merge with and into another Person in connection with a sale or other disposition permitted by <u>Section 7.2.7</u>; and

b)    so long as no Event of Default has occurred and is continuing or would occur after giving effect thereto, the Borrower or any of its Subsidiaries may merge into any other Person, or any other Person may merge into the Borrower or any such Subsidiary, or the Borrower or any of its Subsidiaries may purchase or otherwise acquire all or substantially all of the assets of any Person, in each case so long as:

i)    after giving effect thereto, the Stockholders' Equity of the Borrower and its Subsidiaries is at least equal to 90% of such Stockholders' Equity immediately prior thereto; and

ii)    in the case of a merger involving the Borrower where the Borrower is not the surviving corporation, (and without prejudice to the provisions of Sections 3.2b) and c) and 9.1.10, which shall not restrict the proposed merger but which can still apply to the extent that the proposed merger would give rise to any of the events or circumstances contemplated by such Sections):

(A)    the surviving corporation shall have assumed in writing, delivered to the Facility Agent, all of the Borrower's obligations hereunder and under the other Loan Documents; and

(B)    the surviving corporation shall, promptly upon the request of the Facility Agent or any Lender, supply such documentation and other evidence as is reasonably requested by the Facility Agent or any Lender in order for the Facility Agent or such Lender to carry out and be satisfied it has complied with the results of all necessary "know your customer" or other similar checks under all applicable laws and regulations.

Section 7.2.7.    <u>Asset Dispositions, etc.</u> Subject to Section 7.2.5, the Borrower will not, and will not permit any of its Subsidiaries to, sell, transfer, contribute or otherwise convey, or grant options, warrants or other rights with respect to, all or substantially all of the assets of (a) the Borrower or (b) the Subsidiaries of the Borrower, taken as a whole, except sales of assets between or among the Borrower and Subsidiaries of the Borrower.

Section 7.2.8.    <u>Borrower's Procurement Undertaking</u>. Where any of the covenants set out in this Agreement require performance by any Subsidiary of the Borrower, the Borrower shall procure the performance of that obligation by such Subsidiary.

Section 7.2.9.    <u>Framework Lien and Guarantee Restriction</u>. From the Fourth Supplement Effective Date until the Guarantee Release Date, and without prejudice to Section 7.2.3, the Borrower shall not (and shall procure that each other Group Member shall not, save in respect of a Restricted Credit Enhancement of the type referred to in Section 7.1.9(d) (and in respect of which the Lenders therefore receive the benefit)):

a)   grant any Restricted Credit Enhancement in respect of any Indebtedness for borrowed money, provided that:

i)   subject to the limitations set out in paragraph (b) below, this paragraph (a) shall not prohibit any Group Member from providing any Lien or Group Member Guarantee in connection with Indebtedness incurred after the Fourth Supplement Effective Date (provided that such Lien and/or Group Member Guarantee is issued at the same time, and in connection with, the initial incurrence of that Indebtedness (and is therefore not by way of additional credit support));

ii)   in connection with a Permitted Refinancing of any Indebtedness, the relevant Group Member shall be entitled to provide the creditors under that Permitted Refinancing with Liens and/or Group Member Guarantees (as applicable) which:

(A)   in the case where the existing Indebtedness being refinanced was previously supported by Liens, the Liens and/or the Group Member Guarantees securing or supporting the Permitted Refinancing (as applicable) are over some or all of the same assets and

(1)   with respect to any Liens, are with the same or lower priority as the Liens in respect of such assets that secured the Indebtedness being refinanced; and

(2)   with respect to any Group Member Guarantees, are Group Member Guarantees provided by a Group Member that owns (directly or indirectly) only those Vessels (or some of those Vessels but not any other Vessel) that were previously secured pursuant to the Liens referred to in the first sentence of this paragraph (A); and

(B)   in the case where the existing Indebtedness being refinanced was previously supported by any Group Member Guarantee, the Group Member Guarantee(s) supporting such Permitted Refinancing are:

(1)   guarantees of obligations in an amount no greater than the guarantees granted in connection with the original Indebtedness being refinanced;

(2)   in the case where the entity providing the relevant Group Member Guarantee(s) supporting such Permitted Refinancing is the same entity providing the Group Member Guarantees that are being replaced, provided by entities owning (directly or indirectly) only those Vessels (or some of those Vessels but not any other Vessel) that it owned when the previous Group Member Guarantee was provided;

(3)   in the case where the entity providing the relevant Group Member Guarantee(s) supporting such Permitted Refinancing differs from the entity providing the Group Member Guarantees being replaced, provided by entities that directly or indirectly own Vessels with an aggregate book value no greater than the Vessels that were owned

(directly or indirectly) by the previous provider of the relevant Group Member Guarantee(s) that supported the existing Indebtedness; and

(4)    the same or lower priority as the original Group Member Guarantee(s) and are issued by either the same entities or from shareholders of those entities,

provided that this paragraph (a) shall not prohibit any Group Member from providing or maintaining any Lien in accordance with the provisions of Section 7.2.3(d) through to (q) inclusive, provided, however, that the proviso at the end of Section 7.2.3(d) shall apply with respect to Liens granted pursuant to that provision; and

b)    incur any new Indebtedness (including Indebtedness of the type referred to in paragraph (a)(i) above but excluding any Permitted Refinancing Indebtedness in connection with paragraph (a)(ii) above) which is secured by a Lien or is supported by a Group Member Guarantee and which, when taken with all other Indebtedness incurred by the Group since the Fourth Supplement Effective Date and which is also secured by a Lien or supported by a Group Member Guarantee, is greater than $1,300,000,000 (but deducting from this amount for this purpose, (i) the amount of any additional Indebtedness incurred by the Borrower in connection with the drawing of the DDTL Indebtedness (whether pursuant to the accordion option or otherwise) or (ii) any Indebtedness borrowed in lieu of the drawing of the DDTL Indebtedness in the foregoing clause) or its equivalent in any other currency, and provided that no Group Member shall, as contemplated by the proviso to Section 7.2.3, from the Fourth Supplement Effective Date until the Guarantee Release Date (whereupon the relevant provisions of Exhibit N shall apply) be permitted to grant any Lien over an ECA Financed Vessel as security for any Indebtedness permitted to be incurred under this Agreement after the Fourth Supplement Effective Date.

Section 7.3.    COVENANT REPLACEMENT.

With effect on and from the Guarantee Release Date, it is agreed that Sections 7.2.2 and 7.2.3 shall be deleted in their entirety and replaced with the covenants and other provisions set out in Exhibit N, which shall become part of this Agreement and effective and binding on all Parties.

Section 7.4.    LENDER INCORPORATED IN THE FEDERAL REPUBLIC OF GERMANY. The representations and warranties and covenants given in Sections 6.16 and 7.1.3(f) respectively shall only be given, and be applicable to, a Lender incorporated in the Federal Republic of Germany insofar as the giving of and compliance with such representations and warranties do not result in a violation of or conflict with section 7 of the German Foreign Trade Regulation (Außenwirtschaftsverordnung) (in conjunction with section 4 paragraph 1 a no.3 foreign trade law (AWG) (Außenwirtschaftsgesetz), any provision of Council Regulation (EC) 2271/1996 or any similar applicable anti-boycott law or regulation.

ARTICLE VIII

EVENTS OF DEFAULT

Section 8.1.    LISTING OF EVENTS OF DEFAULT. Each of the following events or occurrences described in this Section 8.1 shall constitute an "Event of Default".

Section 8.1.1.   <u>Non-Payment of Obligations</u>. The Borrower shall default in the payment when due of any amount payable by it under the Loan Documents in the manner required under the Loan Documents unless such failure is solely as a result of either (a) administrative or technical error or (b) a Disruption Event, and, in either case, payment is made within 3 Business Days of its due date.

Section 8.1.2.   <u>Breach of Warranty</u>. Any representation or warranty of the Borrower made or deemed to be made hereunder (including any certificates delivered pursuant to Article V) or under any other Loan Document is or shall be incorrect in any material respect when made.

Section 8.1.3.   <u>Non-Performance of Certain Covenants and Obligations</u>. The Borrower shall default in the due performance and observance of any other agreement contained herein (including, from the Guarantee Release Date, Exhibit N) or in any other Loan Document (other than the covenants set forth in <u>Section 7.1.1(i), Section 7.1.1(l), Section 7.1.1(m), Section 7.1.1(n), Section 7.1.1(o), Section 7.1.4(e), Section 7.1.8, Section 7.1.10 and Section 7.2.4</u> (but excluding Sections 7.2.4(A) and 7.2.4(B) (which shall be regulated in accordance with Section 9.1.11(d)) and also excluding Section 7.2.4(C), a breach of which shall, subject to the cure periods set out in this Section 8.1.3, result in an Event of Default) and the obligations referred to in <u>Section 8.1.1</u>) and such default shall continue unremedied for a period of five days after notice thereof shall have been given to the Borrower by the Facility Agent or any Lender (or, if (a) such default is capable of being remedied within 30 days (commencing on the first day following such five-day period) and (b) the Borrower is actively seeking to remedy the same during such period, such default shall continue unremedied for at least 35 days after such notice to the Borrower).

Section 8.1.4.   <u>Default on Other Indebtedness</u>. (a) The Borrower or any of the Principal Subsidiaries shall fail to pay any Indebtedness that is outstanding in a principal amount of at least $100,000,000 (or the equivalent in other currencies) in the aggregate (but excluding Indebtedness hereunder or with respect to Hedging Instruments) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness; (b) the occurrence under any Hedging Instrument of an Early Termination Date (as defined in such Hedging Instrument) resulting from (A) any event of default under such Hedging Instrument as to which the Borrower is the Defaulting Party (as defined in such Hedging Instrument) or (B) any Termination Event (as so defined) as to which the Borrower is an Affected Party (as so defined) and, in either event, the termination value with respect to any such Hedging Instrument owed by the Borrower as a result thereof is greater than $100,000,000 and the Borrower fails to pay such termination value when due after applicable grace periods; or (c) any other event shall occur or condition shall exist under any agreement or instrument evidencing, securing or relating to any such Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to cause or permit the holder or holders of such Indebtedness to cause such Indebtedness to become due and payable prior to its scheduled maturity; or (d) any such Indebtedness shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption or by voluntary agreement), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness is required to be made, in each case prior to the scheduled maturity thereof (other than as a result of any sale or other disposition of any property or assets under the terms of such Indebtedness); provided that any required prepayment or right to require prepayment triggered by terms that are certified by the Borrower to be unique to, but customary in, ship financings shall not constitute an Event of Default under this Section 8.1.4 so long as any required prepayment is made when due. For purposes of determining Indebtedness for any Hedging Instrument, the principal amount of the obligations under any such instrument at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the

Borrower or any Principal Subsidiary would be required to pay if such instrument were terminated at such time.

Section 8.1.5.    <u>Bankruptcy, Insolvency, etc</u>. The Borrower, any of the Material Guarantors or any of the Principal Subsidiaries (or any of its other Subsidiaries to the extent that the relevant event described below would have a Material Adverse Effect) shall:

a)    generally fail to pay, or admit in writing its inability to pay, its debts as they become due;

b)    apply for, consent to, or acquiesce in, the appointment of a trustee, receiver, sequestrator or other custodian for it or any of its property, or make a general assignment for the benefit of creditors;

c)    in the absence of such application, consent or acquiescence, permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for it or for a substantial part of its property, and such trustee, receiver, sequestrator or other custodian shall not be discharged within 60 days, <u>provided</u> that in the case of such an event in respect of the Borrower or any Material Guarantor, such Person hereby expressly authorizes the Facility Agent and each Lender to appear in any court conducting any relevant proceeding during such 60-day period to preserve, protect and defend their respective rights under the Loan Documents;

d)    permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law, or any dissolution, winding up or liquidation proceeding, in respect of the Borrower, any Material Guarantor or any of such Subsidiaries, and, if any such case or proceeding is not commenced by the Borrower, such Material Guarantor or such Subsidiary, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Material Guarantor or such Subsidiary or shall result in the entry of an order for relief or shall remain for 60 days undismissed, <u>provided</u> that the Borrower and each Material Guarantor hereby expressly authorizes the Facility Agent and each Lender to appear in any court conducting any such case or proceeding during such 60-day period to preserve, protect and defend their respective rights under the Loan Documents; or

e)    take any corporate action authorizing, or in furtherance of, any of the foregoing.

Section 8.2.    <u>ACTION IF BANKRUPTCY</u>. If any Event of Default described in clauses (b) through (d) of Section 8.1.5 shall occur with respect to any Group Member, the Commitments (if not theretofore terminated) shall automatically terminate and the outstanding principal amount of the Loan and all other Obligations shall automatically be and become immediately due and payable, without notice or demand.

Section 8.3.    <u>ACTION IF OTHER EVENT OF DEFAULT</u>. If any Event of Default (other than any Event of Default described in clauses (b) through (d) of Section 8.1.5 with respect to a Group Member) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Facility Agent, upon the direction of the Required Lenders (after consultation with BpiFAE who shall have the right to instruct the Lenders to waive such Event of Default), shall by notice to the Borrower declare all of the outstanding principal amount of the Loan and other Obligations to be due and payable and/or the Commitments (if not theretofore terminated) to be terminated, whereupon the full unpaid amount of the Loan and other Obligations shall be and become immediately due and payable, without further notice, demand or presentment, and/or, as the case may be, the Commitments shall terminate.

ARTICLE IX

PREPAYMENT EVENTS

Section 9.1.   LISTING OF PREPAYMENT EVENTS. Each of the following events or occurrences described in this Section 9.1 shall constitute a "Prepayment Event".

Section 9.1.1.   Change of Control. There occurs any Change of Control.

Section 9.1.2.   Unenforceability. Any Loan Document shall cease to be the legally valid, binding and enforceable obligation of the Borrower or, to the extent applicable, any Material Guarantor (in each case, other than with respect to provisions of any Loan Document (i) identified as unenforceable in the form of the opinion of the Borrower's counsel set forth as Exhibit B-1 or in any opinion delivered to the Facility Agent after the Signing Date in connection with this Agreement or (ii) that a court of competent jurisdiction has determined are not material) and such event shall continue unremedied for 15 days after notice thereof has been given to the Borrower by the Facility Agent.

Section 9.1.3.   Approvals. Any material license, consent, authorization, registration or approval at any time necessary to enable the Borrower, any Material Guarantor or any Principal Subsidiary to conduct its business shall be revoked, withdrawn or otherwise cease to be in full force and effect, unless the same would not have a Material Adverse Effect.

Section 9.1.4.   Non-Performance of Certain Covenants and Obligations. The Borrower shall default in the due performance and observance of any of the covenants set forth in Sections 4.12, 7.1.1(m), 7.1.4(e) or 7.2.4 (but excluding Section 7.2.4(C)) and, in the case of Sections 7.1.1(m) and 7.1.4(e), such default shall continue unremedied for a period of five days after notice thereof shall have been given to the Borrower by the Facility Agent or any Lender (or, if (a) such default is capable of being remedied within 30 days (commencing on the first day following such five-day period) and (b) the Borrower is actively seeking to remedy the same during such period, such default shall continue unremedied for at least 35 days after such notice to the Borrower), provided that any such default in respect of Section 7.2.4 (but again excluding Section 7.2.4(C)), that occurs during the Financial Covenant Waiver Period (but without prejudice to the rights of the Lenders in respect of any further breach that may occur following the expiry of the Financial Covenant Waiver Period) shall not (as long as no Event of Default under Section 8.1.5 has occurred and is continuing, and no Prepayment Event under Section 9.1.11 or 9.1.12 has occurred, in each case during the Financial Covenant Waiver Period) constitute a Prepayment Event.

Section 9.1.5.   Judgments. Any judgment or order for the payment of money in excess of $100,000,000 shall be rendered against the Borrower or any of the Principal Subsidiaries by a court of competent jurisdiction and the Borrower or such Principal Subsidiary shall have failed to satisfy such judgment and either:

a)   enforcement proceedings in respect of any material assets of the Borrower or such Principal Subsidiary shall have been commenced by any creditor upon such judgment or order and shall not have been stayed or enjoined within five (5) Business Days after the commencement of such enforcement proceedings; or

b)   there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

Section 9.1.6.     Condemnation, etc. The Purchased Vessel shall be condemned or otherwise taken under color of law or requisitioned and the same shall continue unremedied for at least 20 days, unless such condemnation or other taking would not have a Material Adverse Effect.

Section 9.1.7.     Arrest. The Purchased Vessel shall be arrested and the same shall continue unremedied for at least 20 days, unless such arrest would not have a Material Adverse Effect.

Section 9.1.8.     Sale/Disposal of the Purchased Vessel. The Purchased Vessel is sold to a company which is not the Borrower or any other Subsidiary of the Borrower (other than for the purpose of a lease back to the Borrower or any other Subsidiary of the Borrower).

Section 9.1.9.     BpiFAE Insurance Policy. The BpiFAE Insurance Policy is cancelled for any reason or ceases to be in full force and effect.

Section 9.1.10.     Illegality. No later than the close of business on the last day of the Option Period related to the giving of any Illegality Notice by an affected Lender pursuant to Section 3.2(b), either: (x) the Borrower has not elected to take an action specified in clause (1) or (2) of Section 3.2(c) or (y) if any such election shall have been made, the Borrower has failed to take the action required in respect of such election. In such circumstances the Facility Agent (at the direction of the affected Lender) shall by notice to the Borrower require the Borrower to prepay in full all principal and interest and all other Obligations owing to such Lender either (i) forthwith or, as the case may be, (ii) on a future specified date not being earlier than the latest date permitted by the relevant law.

Section 9.1.11.     Framework Prohibited Events

    a)     The Borrower declares, pays or makes or agrees to pay or make, directly or indirectly, any Restricted Payment, except for (i) dividends or other distributions with respect to its Equity Interests payable solely in additional shares of its Equity Interests or options to purchase Equity Interests, (ii) Restricted Payments pursuant to and in accordance with stock option plans or other benefit plans (including with respect to performance shares issued in the ordinary course of business) for present or former officers, directors, consultants or employees of the Borrower in the ordinary course of business consistent with past practice and (iii) the payment of cash in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exercisable for Equity Interests of the Borrower;

    b)     a Group Member makes any payment of any kind under any shareholder loan;

    c)     a Group Member sells, transfers, leases or otherwise disposes of any its assets, whether by one or a series of related transactions and that disposal or action was not conducted on arms' length terms between a willing seller and a willing buyer and for fair market value;

    d)     any Group Member breaches any of the requirements of Section 7.1.1(i), Section 7.1.1(l), Section 7.1.1(n), Section 7.1.1(o), Section 7.1.8, Section 7.1.10, Section 7.2.4(A) or Section 7.2.4(B);

    e)     a Group Member completes a Debt Incurrence;

f)   a Group Member enters into a Restricted Loan Arrangement; and/or

g)   a Group Member makes a Restricted Voluntary Prepayment and the Facility Agent (acting upon the instructions of BpiFAE) notifies the Borrower that BpiFAE has confirmed that the Financial Covenant Waiver Period shall come to an end.

SECTION 9.1.12   <u>Breach of Principles and Framework</u>. The Borrower shall default in the due performance and observance of the Principles and/or the Framework (it being agreed that if there is inconsistency between the terms of the Principles and the Framework, the Framework shall prevail) and, if capable of remedy, such default shall continue unremedied for a period of ten (10) days after notice thereof shall have been given to the Borrower by the Facility Agent, provided that, if the default does not otherwise constitute a Default or a Prepayment Event under another section of this Agreement as amended to date, the Borrower, the Facility Agent, the ECA Agent and BpiFAE shall negotiate a resolution in good faith for a maximum period of fifteen (15) days after notice thereof shall have been given to the Borrower by the Facility Agent.

Section 9.2.   <u>MANDATORY PREPAYMENT</u>. If any Prepayment Event (other than a Prepayment Event under Section 9.1.10) shall occur and be continuing, the Facility Agent, upon the direction of the Required Lenders, shall by notice to the Borrower require the Borrower to prepay in full on the date of such notice all principal of and interest on the Loan and all other Obligations (and, in such event, the Borrower agrees to so pay the full unpaid amount of the Loan and all accrued and unpaid interest thereon and all other Obligations), provided that in the case of a Prepayment Event arising under Sections 9.1.11 or 9.1.12, such Prepayment Event shall not give rise to an entitlement on the part of the Lenders to terminate the Commitments or, where the Loan has been advanced, to require that the Loan is prepaid but instead, where a notice is given by the Facility Agent pursuant to this Section 9.2 following the occurrence of a Prepayment Event under either Section 9.1.11 or 9.1.12, the waiver of Section 7.2.4 contained in Section 9.1.4 shall immediately cease such that any breach of Section 7.2.4 in existence as at the date of the notice from the Facility Agent referred to in the first sentence of this Section 9.2 or any breach occurring at any time after such notice shall constitute a Prepayment Event with all attendant consequences.

Section 9.3.   <u>MITIGATION</u>. If the ECA Agent, the Facility Agent or any of the Lenders become aware that an event or circumstance has arisen which will cause the BpiFAE Insurance Policy to be cancelled for any reason or no longer remain in full force and effect they shall notify the Borrower and the Lenders, the Borrower, the ECA Agent and the Facility Agent shall negotiate in good faith for a period of up to 30 days or, if less, the date by which the BpiFAE Insurance Policy shall be terminated or cease to be in full force and effect to determine whether the facility can be restructured and/or the Loan refinanced in a manner acceptable to each of the Lenders in their absolute discretion. The Lenders will use reasonable efforts to involve BpiFAE in such negotiations.

ARTICLE X

THE FACILITY AGENT AND THE ECA AGENT

Section 10.1.   <u>ACTIONS</u>. Each Lender hereby appoints Citibank Europe plc, UK Branch, as Facility Agent and SMBC Bank International plc as ECA Agent, as its agent under and for purposes of this Agreement and each other Loan Document (for purposes of this Article X, the Facility Agent and the ECA Agent are referred to collectively as the "<u>Agents</u>"). Each Lender authorizes the Agents to act on behalf of such Lender under this Agreement and each other Loan Document and, in the absence of other written instructions from the Required

Lenders received from time to time by the Agents (with respect to which each Agent agrees that it will comply, except as otherwise provided in this Section 10.1 or as otherwise advised by counsel or as otherwise instructed by any French Authority, it being understood and agreed that any instructions provided by a French Authority shall prevail), to exercise such powers hereunder and thereunder as are specifically delegated to or required of the Agents by the terms hereof and thereof, together with such powers as may be reasonably incidental thereto. Neither Agent shall be obliged to act on the instructions of any Lender or the Required Lenders if to do so would, in the opinion of such Agent, be contrary to any provision of this Agreement or any other Loan Document or the BpiFAE Insurance Policy or to any law or the conflicting instructions of any French Authority, or would expose such Agent to any actual or potential liability to any third party. As between the Lenders and the Agents, it is acknowledged that each Agent's duties under this Agreement and the other Loan Documents are solely mechanical and administrative in nature.

Section 10.2.    <u>INDEMNITY</u>.  Each Lender hereby indemnifies (which indemnity shall survive any termination of this Agreement) each Agent, pro rata according to such Lender's Percentage, from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel) that be incurred by or asserted or awarded against, such Agent in any way relating to or arising out of this Agreement and any other Loan Document or any action taken or omitted by such Agent under this Agreement or any other Loan Document; provided that no Lender shall be liable for the payment of any portion of such claims, damages, losses, liabilities and expenses which have resulted from such Agent's gross negligence or willful misconduct. Without limitation of the foregoing, each Lender agrees to reimburse each Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, to the extent that such Agent is not reimbursed for such expenses by the Borrower. In the case of any investigation, litigation or proceeding giving rise to any such indemnified costs, this Section applies whether any such investigation, litigation or proceeding is brought by any Agent, any Lender or a third party. Neither Agent shall be required to take any action hereunder or under any other Loan Document, or to prosecute or defend any suit in respect of this Agreement or any other Loan Document, unless it is expressly required to do so under this Agreement or is indemnified hereunder to its satisfaction. If any indemnity in favor of an Agent shall be or become, in such Agent's determination, inadequate, such Agent may call for additional indemnification from the Lenders and cease to do the acts indemnified against hereunder until such additional indemnity is given.

Section 10.3.    <u>FUNDING RELIANCE, ETC</u>.

a)    Each Lender shall notify the Facility Agent by 4:00 p.m., London time, one day prior to the advance of the Loan if it is not able to fund the following day. Unless the Facility Agent shall have been notified by telephone, confirmed in writing, by any Lender by 4:00 p.m., London time, on the day prior to the advance of the Loan that such Lender will not make available the amount which would constitute its Percentage of the Loan on the date specified therefor, the Facility Agent may assume that such Lender has made such amount available to the Facility Agent and, in reliance upon such assumption, may, but shall not be obliged to, make available to the Borrower a corresponding amount. If and to the extent that such Lender shall not have made such amount available to the Facility Agent, such Lender and the Borrower severally agree to repay the Facility Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date the Facility Agent made such amount available to the Borrower to the date such amount is repaid to the Facility Agent, at the interest rate applicable at the time to the Loan without premium or penalty.

b)

(i)    Where a sum is to be paid to an Agent under the Finance Documents for another party to this Agreement, that Agent is not obliged to pay that sum to that other party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum

(ii)    Unless paragraph (iii) below applies, if an Agent or its Affiliate or representative on its behalf or at its direction in performing the role of Agent (that Agent and its applicable Affiliate or representative being an "**Agent Entity**") pays an amount to another party to this Agreement (unless sub-paragraph (iii) below applies) or, at the direction of such party, that party's Affiliate, related fund or representative (such other party and its applicable Affiliate, related fund or representative being an "**Other Party Entity**") and it proves to be the case (and for this purpose a statement of the relevant Agent given in good faith shall be prima facie evidence of this) that (A) neither that Agent nor the applicable Agent Entity actually received that amount or (B) such amount was otherwise paid in error (whether such error was known or ought to have been known to such other party or applicable Other Party Entity), then the party to whom that amount (or the proceeds of any related exchange contract) was paid (or on whose direction its applicable Other Party Entity was paid) by the applicable Agent Entity shall hold such amount on trust or, to the extent not possible as a matter of law, for the account (or will procure that its applicable Other Party Entity holds on trust or for the account) of the Agent Entity and on demand (or will procure that its applicable Other Party Entity shall on demand) refund the same to the Agent Entity together with interest on that amount from the date of payment to the date of receipt by the Agent Entity, calculated by the Agent to reflect its cost of funds.

(iii)    If an Agent, upon the Borrower's written request, is willing to make available amounts for the account of the Borrower before receiving funds from the Lenders then, if and to the extent that such Agent does so but it proves to be the case (and for this purpose a statement of the relevant Agent given in good faith shall be prima facie evidence of this) that it does not then receive funds from a Lender (such Lender being a "**Defaulting Lender**") in respect of such sum which it paid to the Borrower (or as it may direct) then: (A) the Agent shall notify (and the Lenders expressly acknowledge that the Agent shall be entitled to so notify) the Borrower of the identity of the Defaulting Lender; (B) without prejudice to any rights of the Borrower against the Defaulting Lender under this Agreement (including, without limitation, in relation to any amounts required to be paid by the Borrower under sub-paragraph (C) below) the Borrower shall (or shall procure that its applicable Other Party Entity to whom such amount was paid shall) hold such amount on trust or, to the extent not possible as a matter of law, for the account, of the relevant Agent and on demand refund it to that Agent; and (C) the Defaulting Lender by whom those funds should have been made available or, if that Defaulting Lender fails to do so (and having regard to paragraph (iv) below), the Borrower shall on demand pay to the relevant Agent the amount (as certified by that Agent) which will indemnify the Agent against any funding cost incurred by it as a result of paying out that sum before receiving those funds from the Defaulting Lender

(iv)    It is expressly acknowledged and agreed that, without prejudice to the requirement of the Borrower to make the payments referred to in paragraphs (ii) and (iii) above:

(A) the Borrower shall not be obliged to pay interest for the account of the Defaulting Lender on the part of the Loan that was not made available by that Defaulting Lender but which was pre-funded by the relevant Agent pursuant to this Section 10.3(b); and

(B) the Defaulting Lender shall indemnify the Borrower for any costs, losses or liabilities incurred by the Borrower arising from the Defaulting Lender's failure to make any payment under sub-Section (iii) above.

Section 10.4.    EXCULPATION. Neither of the Agents nor any of their respective directors, officers, employees or agents shall be liable to any Lender for any action taken or omitted to be taken by it under this Agreement or any other Loan Document, or in connection herewith or therewith, except for its own willful misconduct or gross negligence. Without limitation of the generality of the foregoing, each Agent (i) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it and in accordance with the advice of such counsel, accountants or experts, (ii) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement, (iii) shall not have any duty to ascertain or to inquire as to the performance, observance or satisfaction of any of the terms, covenants or conditions of this Agreement on the part of the Obligors or the existence at any time of any Default or Prepayment Event or to inspect the property (including the books and records) of the Obligors, (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other instrument or document furnished pursuant hereto, (v) shall incur no liability under or in respect of this Agreement by action upon any notice, consent, certificate or other instrument or writing (which may be by telecopier) believed by it to be genuine and signed or sent by the proper party or parties, and (vi) shall have no responsibility to the Borrower or any Lender on account of (A) the failure of a Lender or the Obligors to perform any of its obligations under this Agreement or any Loan Document; (B) the financial condition of the Obligors; (C) the completeness or accuracy of any statements, representations or warranties made in or pursuant to this Agreement or any Loan Document, or in or pursuant to any document delivered pursuant to or in connection with this Agreement or any Loan Document; or (D) the negotiation, execution, effectiveness, genuineness, validity, enforceability, admissibility in evidence or sufficiency of this Agreement or any Loan Document or of any document executed or delivered pursuant to or in connection with this Agreement or any Loan Document.

Section 10.5.    SUCCESSOR. The Facility Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders and shall resign where required to do so in accordance with Section 4.14, provided that any such resignation shall not become effective until a successor Facility Agent has been appointed as provided in this Section 10.5 and such successor Facility Agent has accepted such appointment. If the Facility Agent at any time shall resign, the Required Lenders shall, subject to the immediately preceding proviso and subject to the consent of the Borrower (such consent not to be unreasonably withheld), appoint another Lender as a successor to the Facility Agent which shall thereupon become such Facility Agent's successor hereunder (provided that the Required Lenders shall, subject to the consent of the Borrower unless an Event of Default or a Prepayment Event shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed) offer to each of the other Lenders in turn, in the order of their respective Percentages of the Loan, the right to become successor Facility Agent). If no successor Facility Agent shall have been so appointed by the

Required Lenders, and shall have accepted such appointment, within 30 days after the Facility Agent's giving notice of resignation, then the Facility Agent may, on behalf of the Lenders, appoint a successor Facility Agent, which shall be one of the Lenders or a commercial banking institution having a combined capital and surplus at least $1,000,000,000 (or the equivalent in other currencies), subject, in each case, to the consent of the Borrower (such consent not to be unreasonably withheld). Upon the acceptance of any appointment as Facility Agent hereunder by a successor Facility Agent, such successor Facility Agent shall be entitled to receive from the resigning Facility Agent such documents of transfer and assignment as such successor Facility Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the resigning Facility Agent, and the resigning Facility Agent shall be discharged from its duties and obligations under this Agreement. After any resigning Facility Agent's resignation hereunder as the Facility Agent, the provisions of:

    a)   this Article X shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Facility Agent under this Agreement; and

    b)   Section 11.3 and Section 11.4 shall continue to inure to its benefit.

If a Lender acting as the Facility Agent assigns its Loan to one of its Affiliates, such Facility Agent may, subject to the consent of the Borrower (such consent not to be unreasonably withheld or delayed) assign its rights and obligations as Facility Agent to such Affiliate.

    Section 10.6.   LOANS BY THE FACILITY AGENT. The Facility Agent shall have the same rights and powers with respect to the Loan made by it or any of its Affiliates. The Facility Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Affiliate of the Borrower as if the Facility Agent were not the Facility Agent hereunder and without any duty to account therefor to the Lenders. The Facility Agent shall have no duty to disclose information obtained or received by it or any of its Affiliates relating to the Borrower or its Subsidiaries to the extent such information was obtained or received in any capacity other than as the Facility Agent.

    Section 10.7.   CREDIT DECISIONS. Each Lender acknowledges that it has, independently of each Agent and each other Lender, and based on such Lender's review of the financial information of the Obligors, this Agreement, the other Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend its Commitment. Each Lender also acknowledges that it will, independently of each Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under this Agreement or any other Loan Document.

    Section 10.8.   COPIES, ETC. Each Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to such Agent by the Borrower pursuant to the terms of this Agreement (unless concurrently delivered to the Lenders by the Borrower). Each Agent will distribute to each Lender each document or instrument received for its account and copies of all other communications received by such Agent from the Borrower for distribution to the Lenders by such Agent in accordance with the terms of this Agreement.

    Section 10.9.   THE AGENTS' RIGHTS. Each Agent may (i) assume that all representations or warranties made or deemed repeated by the Obligors in or pursuant to this Agreement or any Loan Document are true and complete, unless, in its capacity as the Facility Agent, it has acquired actual knowledge to the contrary, (ii) assume that no Default has occurred unless, in its capacity as an Agent, it has acquired actual knowledge to the contrary, (iii) rely on

any document or notice believed by it to be genuine, (iv) rely as to legal or other professional matters on opinions and statements of any legal or other professional advisers selected or approved by it, (v) rely as to any factual matters which might reasonably be expected to be within the knowledge of the Borrower on a certificate signed by or on behalf of the Borrower and (vi) refrain from exercising any right, power, discretion or remedy unless and until instructed to exercise that right, power, discretion or remedy and as to the manner of its exercise by the Lenders (or, where applicable, by the Required Lenders) and unless and until such Agent has received from the Lenders any payment which such Agent may require on account of, or any security which such Agent may require for, any costs, claims, expenses (including legal and other professional fees) and liabilities which it considers it may incur or sustain in complying with those instructions.

Section 10.10.    <u>THE FACILITY AGENT'S DUTIES</u>.  The Facility Agent shall (i) if requested in writing to do so by a Lender, make enquiry and advise the Lenders as to the performance or observance of any of the provisions of this Agreement or any Loan Document by the Borrower or as to the existence of an Event of Default and (ii) inform the Lenders promptly of any Event of Default of which the Facility Agent has actual knowledge.

The Facility Agent shall not be deemed to have actual knowledge of the falsehood or incompleteness of any representation or warranty made or deemed repeated by the Obligors or actual knowledge of the occurrence of any Default unless a Lender or the Borrower shall have given written notice thereof to the Facility Agent in its capacity as the Facility Agent. Any information acquired by the Facility Agent other than specifically in its capacity as the Facility Agent shall not be deemed to be information acquired by the Facility Agent in its capacity as the Facility Agent.

The Facility Agent may, without any liability to account to the Lenders, generally engage in any kind of banking or trust business with the Borrower or with the Borrower's Subsidiaries or associated companies or with a Lender as if it were not the Facility Agent.

Section 10.11.    <u>EMPLOYMENT OF AGENTS</u>.  In performing its duties and exercising its rights, powers, discretions and remedies under or pursuant to this Agreement or the Loan Documents, each Agent shall be entitled to employ and pay agents to do anything which such Agent is empowered to do under or pursuant to this Agreement or the Loan Documents (including the receipt of money and documents and the payment of money); provided that, unless otherwise provided herein, including without limitation Section 11.3, the employment of such agents shall be for such Agent's account, and to act or refrain from taking action in reliance on the opinion of, or advice or information obtained from, any lawyer, banker, broker, accountant, valuer or any other person believed by such Agent in good faith to be competent to give such opinion, advice or information.

Section 10.12.    <u>DISTRIBUTION OF PAYMENTS</u>.  The Facility Agent shall pay promptly to the order of each Lender that Lender's Percentage share of every sum of money received by the Facility Agent pursuant to this Agreement or the Loan Documents (including, without limitation, any amounts payable pursuant to Section 4.4.1 but not including any amounts payable pursuant to the Fee Letter and any amounts which, by the terms of this Agreement or the Loan Documents, are paid to the Facility Agent for the account of the Facility Agent alone or specifically for the account of one or more Lenders) and until so paid such amount shall be held by the Facility Agent on trust absolutely for that Lender.

Section 10.13.    <u>REIMBURSEMENT</u>.  The Facility Agent shall have no liability to pay any sum to a Lender until it has itself received payment of that sum. If, however, the Facility Agent does pay any sum to a Lender on account of any amount prospectively due to that Lender pursuant to <u>Section 10.12</u> before it has itself received payment of that amount, and the Facility

Agent does not in fact receive payment within two (2) Business Days after the date on which that payment was required to be made by the terms of this Agreement or the Loan Documents, that Lender will, on demand by the Facility Agent, refund to the Facility Agent an amount equal to the amount received by it, together with an amount sufficient to reimburse the Facility Agent for any amount which the Facility Agent may certify that it has been required to pay by way of interest on money borrowed to fund the amount in question during the period beginning on the date on which that amount was required to be paid by the terms of this Agreement or the Loan Documents and ending on the date on which the Facility Agent receives reimbursement.

Section 10.14.   <u>INSTRUCTIONS</u>.  Where an Agent is authorized or directed to act or refrain from acting in accordance with the instructions of the Lenders or of the Required Lenders each of the Lenders shall provide such Agent with instructions within three (3) Business Days of such Agent's request (which request may be made orally or in writing). If a Lender does not provide such Agent with instructions within that period, that Lender shall be bound by the decision of such Agent. Nothing in this Section 10.14 shall limit the right of such Agent to take, or refrain from taking, any action without obtaining the instructions of the Lenders or the Required Lenders if such Agent in its discretion considers it necessary or appropriate to take, or refrain from taking, such action in order to preserve the rights of the Lenders under or in connection with this Agreement or the Loan Documents. In that event, such Agent will notify the Lenders of the action taken by it as soon as reasonably practicable, and the Lenders agree to ratify any action taken by the Facility Agent pursuant to this Section 10.14.

Section 10.15.   <u>PAYMENTS</u>.  All amounts payable to a Lender under this Section 10 shall be paid to such account at such bank as that Lender may from time to time direct in writing to the Facility Agent.

Section 10.16.   <u>"KNOW YOUR CUSTOMER" CHECKS</u>.  Each Lender shall promptly upon the request of the Facility Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Facility Agent (for itself) in order for the Facility Agent to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in this Agreement or the Loan Documents.

Section 10.17.   <u>NO FIDUCIARY RELATIONSHIP</u>.  Except as provided in Section 10.12, no Agent shall have any fiduciary relationship with or be deemed to be a trustee of or for any other person and nothing contained in this Agreement or any Loan Document shall constitute a partnership between any two or more Lenders or between either Agent and any other person.

Section 10.18.   <u>ILLEGALITY</u>.  The Agent shall refrain from doing anything which it reasonably believes would be contrary to any law of any jurisdiction (including but not limited to England and Wales, the United States of America or any jurisdiction forming part of it) or any regulation or directive of any agency of such state or jurisdiction or which would or might render it liable to any person and may without liability do anything which is, in its opinion, necessary to comply with any such law, directive or regulation.

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.1.   <u>WAIVERS, AMENDMENTS, ETC.</u>  The provisions of this Agreement and of each other Loan Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; <u>provided</u> that no such amendment, modification or waiver which would:

a)    contravene or be in breach of the terms of the BpiFAE Insurance Policy or the arrangements with Natixis DAI relating to the CIRR (if the Fixed Rate applies) shall be effective unless consented to by, as applicable, BpiFAE and/or Natixis DAI;

b)    modify any requirement hereunder that any particular action be taken by all the Lenders or by the Required Lenders shall be effective unless consented to by each Lender;

c)    modify this Section 11.1 or change the definition of "Required Lenders" shall be made without the consent of each Lender;

d)    increase the Commitment of any Lender shall be made without the consent of such Lender;

e)    reduce any fees described in Article III payable to any Lender shall be made without the consent of such Lender;

f)    extend the Commitment Termination Date of any Lender shall be made without the consent of such Lender;

g)    extend the due date for, or reduce the amount of, any scheduled repayment or prepayment of principal of or interest on the Loan (or reduce the principal amount of or rate of interest on the Loan) owed to any Lender shall be made without the consent of such Lender; or

h)    affect adversely the interests, rights or obligations of the Facility Agent in its capacity as such shall be made without consent of the Facility Agent.

No failure or delay on the part of the Facility Agent or any Lender in exercising any power or right under this Agreement or any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances. No waiver or approval by any the Facility Agent or any Lender under this Agreement or any other Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder. The Lenders hereby agree, at any time and from time to time that the Nordea Agreement or the Bank of Nova Scotia Agreement is amended or refinanced, to negotiate in good faith to amend this Agreement to conform any representations, warranties, covenants or events of default in this Agreement to the amendments made to any substantively comparable provisions in the Nordea Agreement or the Bank of Nova Scotia Agreement or any refinancing thereof.

Neither the Borrower's rights nor its obligations under the Loan Documents shall be changed, directly or indirectly, as a result of any amendment, supplement, modification, variance or novation of the BpiFAE Insurance Policy, except any amendments, supplements, modifications, variances or novations, as the case may be, which occur (i) with the Borrower's consent, (ii) at the Borrower's request or (iii) in order to conform to amendments, supplements, modifications, variances or novations effected in respect of the Loan Documents in accordance with their terms.

BD-#38105238-v3    82

Section 11.2.   <u>NOTICES</u>.

a)   All notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing, by facsimile or by electronic mail and addressed, delivered or transmitted to such party at its address, facsimile number or electronic mail address set forth below its signature hereto or set forth in the Lender Assignment Agreement or at such other address, or facsimile number as may be designated by such party in a notice to the other parties. Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when transmitted provided it is received in legible form; any notice, if transmitted by electronic mail, shall be deemed given upon acknowledgment of receipt by the recipient.

b)   So long as Citibank Europe plc, UK Branch is the Facility Agent, the Borrower may provide to the Facility Agent all information, documents and other materials that it furnishes to the Facility Agent hereunder or any other Loan Document (and any guaranties, security agreements and other agreements relating thereto), including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing advance or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due hereunder or any other Loan Document prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of the Agreement and/or advance or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "<u>Communications</u>"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Facility Agent to such email address notified by the Facility Agent to the Borrower; <u>provided</u> that any Communication requested pursuant to <u>Section 7.1.1(b</u>) shall be in a format acceptable to the Borrower and the Facility Agent.

c)   The Borrower agrees that the Facility Agent may make such items included in the Communications as the Borrower may specifically agree available to the Lenders by posting such notices, at the option of the Borrower, on Intralinks or any similar such platform (the "<u>Platform</u>") acceptable to the Borrower. Although the primary web portal is secured with a dual firewall and a User ID/Password Authorization System and the Platform is secured through a single user per deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, the Borrower acknowledges that (i) the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution, (ii) the Platform is provided "as is" and "as available" and (iii) neither the Facility Agent nor any of its Affiliates warrants the accuracy, adequacy or completeness of the Communications or the Platform and each expressly disclaims liability for errors or omissions in the Communications or the Platform. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by the Facility Agent or any of its Affiliates in connection with the Platform.

d)   The Facility Agent agrees that the receipt of Communications by the Facility Agent at its e-mail address set forth above shall constitute effective delivery of such Communications to the Facility Agent for purposes hereunder and any other Loan

Document (and any guaranties, security agreements and other agreements relating thereto).

Section 11.3.   <u>PAYMENT OF COSTS AND EXPENSES</u>. The Borrower agrees to pay on demand all reasonable expenses of the Facility Agent (including the reasonable fees and out-of-pocket expenses of counsel to the Facility Agent and of local counsel, if any, who may be retained by counsel to the Facility Agent) in connection with any amendments, waivers, consents, supplements or other modifications to, this Agreement or any other Loan Document as may from time to time hereafter be required, whether or not the transactions contemplated hereby are consummated. The Borrower further agrees to pay, and to save the Facility Agent and the Lenders harmless from all liability for, any stamp, recording, documentary or other similar taxes arising from the execution, delivery or enforcement of this Agreement or the borrowing hereunder or any other Loan Documents. The Borrower also agrees to reimburse the Facility Agent and each Lender upon demand for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and legal expenses) incurred by the Facility Agent or such Lender in connection with (x) the negotiation of any restructuring or "work-out", whether or not consummated, of any Obligations and (y) the enforcement of any Obligations.

Section 11.4.   <u>INDEMNIFICATION</u>. In consideration of the execution and delivery of this Agreement by each Lender and the extension of the Commitments, the Borrower hereby indemnifies and holds harmless the Facility Agent, each Lender and each of their respective Affiliates and their respective officers, advisors, directors and employees (collectively, the "<u>Indemnified Parties</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby or any actual or proposed use of the proceeds of the Loans (collectively, the "<u>Indemnified Liabilities</u>"), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct or the material breach by such Indemnified Party of its obligations under this Agreement, any other Loan Document, the BpiFAE Insurance Policy or Interest Stabilisation Agreement and which breach is not attributable to the Borrower's own breach of the terms of this Agreement or any other Loan Document or is a claim, damage, loss, liability or expense which would have been compensated under other provisions of the Loan Documents but for any exclusions applicable thereunder.

In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, any of its directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto. Each Indemnified Party shall (a) furnish the Borrower with prompt notice of any action, suit or other claim covered by this <u>Section 11.4</u>, (b) not agree to any settlement or compromise of any such action, suit or claim without the Borrower's prior consent, (c) shall cooperate fully in the Borrower's defense of any such action, suit or other claim (<u>provided</u> that the Borrower shall reimburse such indemnified party for its reasonable out-of-pocket expenses incurred pursuant hereto) and (d) at the Borrower's request, permit the Borrower to assume control of the defense of any such claim, other than regulatory, supervisory or similar investigations, <u>provided</u> that (i) the Borrower acknowledges in writing its obligations to indemnify the Indemnified Party in accordance with the terms herein in connection with such claims, (ii) the Borrower shall keep the Indemnified Party fully informed with respect to the conduct of the defense of such claim, (iii) the Borrower shall consult in good faith with the Indemnified Party (from time to time and

before taking any material decision) about the conduct of the defense of such claim, (iv) the Borrower shall conduct the defense of such claim properly and diligently taking into account its own interests and those of the Indemnified Party, (v) the Borrower shall employ counsel reasonably acceptable to the Indemnified Party and at the Borrower's expense, and (vi) the Borrower shall not enter into a settlement with respect to such claim unless either (A) such settlement involves only the payment of a monetary sum, does not include any performance by or an admission of liability or responsibility on the part of the Indemnified Party, and contains a provision unconditionally releasing the Indemnified Party and each other indemnified party from, and holding all such persons harmless, against, all liability in respect of claims by any releasing party or (B) the Indemnified Party provides written consent to such settlement (such consent not to be unreasonably withheld or delayed). Notwithstanding the Borrower's election to assume the defense of such action, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such action and the Borrower shall bear the fees, costs and expenses of such separate counsel if (i) the use of counsel chosen by the Borrower to represent the Indemnified Party would present such counsel with an actual or potential conflict of interest, (ii) the actual or potential defendants in, or targets of, any such action include both the Borrower and the Indemnified Party and the Indemnified Party shall have concluded that there may be legal defenses available to it which are different from or additional to those available to the Borrower and determined that it is necessary to employ separate counsel in order to pursue such defenses (in which case the Borrower shall not have the right to assume the defense of such action on the Indemnified Party's behalf), (iii) the Borrower shall not have employed counsel reasonably acceptable to the Indemnified Party to represent the Indemnified Party within a reasonable time after notice of the institution of such action, or (iv) the Borrower authorizes the Indemnified Party to employ separate counsel at the Borrower's expense. The Borrower acknowledges that none of the Indemnified Parties shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Borrower or any of its security holders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings). If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

Section 11.5.    <u>SURVIVAL</u>. The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 4.7, 11.3 and 11.4 and the obligations of the Lenders under Section 10.1, shall in each case survive any termination of this Agreement and the payment in full of all Obligations. The representations and warranties made by the Borrower in this Agreement and in each other Loan Document shall survive the execution and delivery of this Agreement and each such other Loan Document.

Section 11.6.    <u>SEVERABILITY</u>. Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 11.7.    <u>HEADINGS</u>. The various headings of this Agreement and of each other Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or such other Loan Document or any provisions hereof or thereof.

Section 11.8.   EXECUTION IN COUNTERPARTS, EFFECTIVENESS, ETC. This Agreement may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement. This Agreement, as a novated and amended Agreement, shall become effective upon the occurrence of the Effective Time under, and as defined in, the Novation Agreement.

Section 11.9.   THIRD PARTY RIGHTS. Notwithstanding the provisions of the Contracts (Rights of Third Parties) Act 1999, no term of this Agreement is enforceable by a person who is not a party to it with the exception of BpiFAE and Natixis.

Section 11.10.   SUCCESSORS AND ASSIGNS. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that:

a)   except to the extent permitted under Section 7.2.6, the Borrower may not assign or transfer its rights or obligations hereunder without the prior written consent of the Facility Agent, each Lender and BpiFAE; and

b)   the rights of sale, assignment and transfer of the Lenders are subject to Section 11.11.

Section 11.11.   SALE AND TRANSFER OF THE LOAN; PARTICIPATIONS IN THE LOAN. Each Lender may assign its Percentage or portion of the Loan to one or more other Persons (a "New Lender"), or sell participations in its Percentage or portion of the Loan to one or more other Persons; provided that, in the case of assignments where the Fixed Rate applies, such New Lender (other than BpiFAE or CAFFIL as assignee of all or any of SFIL's rights as Lender following the enforcement of the security granted pursuant to paragraph (iv) of Section 11.11.1 in connection with the BpiFAE Enhanced Guarantee, and subject as provided in Section 11.11.1(iv)) enters into an Interest Stabilisation Agreement.

Section 11.11.1.   Assignments

i)   Any Lender with the prior written consents of the Borrower and the Facility Agent (which consents shall not be unreasonably delayed or withheld and which consent, in the case of the Borrower, shall be deemed to have been given in the absence of a written notice delivered by the Borrower to the Facility Agent, on or before the fifth Business Day after receipt by the Borrower of such Lender's request for consent, stating, in reasonable detail, the reasons why the Borrower proposes to withhold such consent) may at any time (and from time to time) assign or transfer to one or more commercial banks or other financial institutions all or any fraction of such Lender's portion of the Loan.

ii)   Any Lender, with notice to the Borrower and the Facility Agent, and, notwithstanding the foregoing clause (i), without the consent of the Borrower, or the Facility Agent may assign or transfer (A) to any of its Affiliates, (B) to SFIL or (C) following the occurrence and during the continuance of an Event of Default under Sections 8.1.1, 8.1.4(a) or 8.1.5, to any other Person, in each case, all or any fraction of such Lender's portion of the Loan.

iii)   Any Lender may (notwithstanding the foregoing clauses, and without notice to, or consent from, the Borrower or the Facility Agent) assign or charge all or any fraction of its portion of the Loan to any federal reserve or central bank as collateral security in connection with the extension of credit or support by such federal reserve or central bank to such Lender.

iv)   SFIL may (notwithstanding the foregoing clauses, and without notice to, or consent from, the Borrower or the Facility Agent) assign, charge or otherwise grant security over all or any fraction of its portion of the Loan and of its rights as Lender to CAFFIL as collateral security in connection with the extension of credit or support by CAFFIL to SFIL in respect of this Agreement and the BpiFAE Enhanced Guarantee, provided that at the time of the assignment, charge or grant of security CAFFIL is an Affiliate of SFIL and that such assignment, charge or other security is on terms that (i) CAFFIL shall not have any rights to assign, charge or grant any security over such rights to any other person (other than to BpiFAE pursuant to and in accordance with the BpiFAE Enhanced Guarantee) without the prior written consent of the Borrower, (ii) CAFFIL shall only be entitled to enforce its rights under such assignment, charge or other security without the prior written consent of the Borrower if at that time it remains an Affiliate of SFIL, (iii) prior to any enforcement such assignment, charge or other security, the Borrower and the Facility Agent shall continue to deal solely and directly with SFIL in connection with its rights and obligations as Lender under this Agreement and other Loan Documents (subject to any payment instructions given by SFIL), (iv) for the avoidance of doubt, the Borrower's rights and obligations under this Agreement shall not be increased or affected (including, without limitation, the right to pay Fixed Rate under Section 3.3.1) as a result of such assignment, charge or security or any enforcement thereof, (v) the Borrower shall not be liable to pay any amount under Sections 4.2(c), 4.3, 4.4, 4.5, 4.6 and 4.7 that is greater than the amount which it would have been required to pay to SFIL had no such assignment, charge or other security been granted and (vi) without prejudice to SFIL's obligations under that Section, CAFFIL shall be bound by the confidentiality provisions set forth in Section 11.15. in relation to any information to which it applies to the same extent as required of the Lenders. For the avoidance of doubt:

(A)   if CAFFIL becomes a Lender under this Agreement in respect of any portion of the Loan following enforcement of any assignment, charge or other security granted to it by SFIL pursuant to this Section 11.11.1(iv), it shall have the same rights to assign or transfer all or any fraction of such portion of the Loan and subject to the same terms and conditions as are set forth in this Agreement for assignments and transfers by other Lenders and

(B)   CAFFIL may not enforce its rights under any such assignment, charge or other security by assigning or transferring all or any fraction of SFIL's portion of the Loan or any of its rights or obligations under this Agreement or other Loan Documents except pursuant to an assignment or transfer to a commercial bank or other financial institution on and subject to the same terms and conditions as are set forth in this Agreement for assignments and transfers by Lenders.

v)   No Lender may (notwithstanding the foregoing clauses) assign or transfer any of its rights under this Agreement unless it has given prior written notification of the transfer to BpiFAE and (if the Loan is accruing interest at the Fixed Rate) Natixis DAI and has obtained a prior written consent from BpiFAE and Natixis DAI and any Assignee Lender (other than BpiFAE and CAFFIL as assignee of all or any of SFIL's rights as Lender following the enforcement of the security granted pursuant to paragraph (iv) of Section 11.11.1 in connection with the BpiFAE Enhanced Guarantee, subject as provided in Section 11.11.1(iv)) is, if the Fixed Rate applies, eligible to benefit from the CIRR stabilisation. Any assignment or transfer shall comply with the terms of the BpiFAE Insurance Policy.

vi)    Nothing in this Section 11.11.1 shall prejudice the right of the Lender to assign its rights under this Agreement to BpiFAE, if such assignment is required to be made by that Lender to BpiFAE in accordance with the BpiFAE Insurance Policy or the BpiFAE Enhanced Guarantee or, if the Lender is SFIL, to CAFFIL (but only if CAFFIL is, at that time, an Affiliate of SFIL) upon the enforcement of any security granted pursuant, and subject to the provisions of paragraph (iv) of Section 11.11.1, in connection with the BpiFAE Enhanced Guarantee.

Each Person described in the foregoing clauses as being the Person to whom such assignment or transfer is to be made, is hereinafter referred to as an "Assignee Lender". Assignments in a minimum aggregate amount of $25,000,000 (or, if less, all of such Lender's portion of the Loan and Commitment) (which assignment or transfer shall be of a constant, and not a varying, percentage of such Lender's portion of the Loan) are permitted; provided that the Borrower and the Facility Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned or transferred to an Assignee Lender until:

a)    written notice of such assignment or transfer, together with payment instructions, addresses and related information with respect to such Assignee Lender, shall have been given to the Borrower and the Facility Agent by such Lender and such Assignee Lender;

b)    such Assignee Lender shall have executed and delivered to the Borrower and the Facility Agent a Lender Assignment Agreement, accepted by the Facility Agent and any other agreements required by the Facility Agent or, if the Fixed Rate applies, Natixis in connection therewith; and

c)    the processing fees described below shall have been paid.

From and after the date that the Facility Agent accepts such Lender Assignment Agreement, (x) the Assignee Lender thereunder shall be deemed automatically to have become a party hereto and to the extent that rights and obligations hereunder have been assigned or transferred to such Assignee Lender in connection with such Lender Assignment Agreement, shall have the rights and obligations of a Lender hereunder and under the other Loan Documents, and (y) the assignor Lender, to the extent that rights and obligations hereunder have been assigned or transferred by it, shall be released from its obligations hereunder and under the other Loan Documents, other than any obligations arising prior to the effective date of such assignment. Except to the extent resulting from a subsequent change in law, in no event shall the Borrower be required to pay to any Assignee Lender any amount under Sections 4.2(c), 4.3, 4.4, 4.5, 4.6 and 4.7 that is greater than the amount which it would have been required to pay had no such assignment been made. Such assignor Lender or such Assignee Lender must also pay a processing fee to the Facility Agent upon delivery of any Lender Assignment Agreement in the amount of $5,000 (and shall also reimburse the Facility Agent and Natixis for any reasonable out-of-pocket costs, including reasonable attorneys' fees and expenses, incurred in connection with the assignment).

Section 11.11.2.    Participations.  Any Lender may at any time sell to one or more commercial banks or other financial institutions (each of such commercial banks and other financial institutions being herein called a "Participant") participating interests in its Loan; provided that:

a)    no participation contemplated in this Section 11.11.2 shall relieve such Lender from its obligations hereunder;

b)   such Lender shall remain solely responsible for the performance of its obligations hereunder;

c)   the Borrower and the Facility Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and each of the other Loan Documents;

d)   no Participant, unless such Participant is an Affiliate of such Lender, shall be entitled to require such Lender to take or refrain from taking any action hereunder or under any other Loan Document, except that such Lender may agree with any Participant that such Lender will not, without such Participant's consent, take any actions of the type described in clauses (b) through (f) of Section 11.1;

e)   the Borrower shall not be required to pay any amount under Sections 4.2(c), 4.3, 4.4, 4.5, 4.6 and 4.7 that is greater than the amount which it would have been required to pay had no participating interest been sold; and

f)   each Lender that sells a participation under this Section 11.2 shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts of (and stated interest on) each of the Participant's interest in that Lender's portion of the Loan, Commitments or other interests hereunder (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender may treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes hereunder.

The Borrower acknowledges and agrees that each Participant, for purposes of Sections 4.2(c), 4.3, 4.4, 4.5, 4.6 and clause (e) of 7.1.1, shall be considered a Lender.

Section 11.11.3.   Register. The Facility Agent shall maintain at its address referred to in Section 11.2 a copy of each Lender Assignment Agreement delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders and the Commitment(s) of, and principal amount of the Loan owing to, each Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Facility Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

Section 11.11.4.   Rights of BpiFAE to payments. The Borrower acknowledges that, immediately upon any payment by BpiFAE (i) of any amounts to a Lender under the BpiFAE Insurance Policy, BpiFAE will be automatically subrogated to the extent of such payment to the rights of that Lender under the Loan Documents or (ii) of any amount under the BpiFAE Enhanced Guarantee and the enforcement of any related security granted by SFIL to any of its Affiliates, which may benefit BpiFAE after payment by BpiFAE under the BpiFAE Enhanced Guarantee, BpiFAE will be automatically entitled to receive the payments normally due to SFIL under the Loan Documents( but, for the avoidance of doubt, such payments shall continue to be made by the Borrower to the Facility Agent in accordance with the provisions of Section 4.8 or any other relevant provisions of this Agreement, as applicable).

Section 11.12.   OTHER TRANSACTIONS. Nothing contained herein shall preclude the Facility Agent or any Lender from engaging in any transaction, in addition to those contemplated by this Agreement or any other Loan Document, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

Section 11.13.    BPIFAE INSURANCE POLICY.

Section 11.13.1.    Terms of BpiFAE Insurance Policy

a)    The BpiFAE Insurance Policy will cover 100% of the Loan.

b)    The BpiFAE Premium will equal 3% of the aggregate principal amount of the Loan as at the Actual Delivery Date.

c)    If, after the Actual Delivery Date, the Borrower prepays all or part of the Loan in accordance with this Agreement, BpiFAE shall reimburse to the ECA Agent for the account of the Borrower an amount equal to 80% of all or a corresponding proportion of the unexpired portion of the BpiFAE Premium, having regard to the amount of the prepayment and the remaining term of the Loan, such amount to be calculated in accordance with the following formula:

$$R = P \times (1 - (1 / (1+3\%)) \times (N / (12 * 365)) \times 80\%$$

where:

"R" means the amount of the refund;

"P" means the amount of the prepayment;

"N" means the number of days between the effective prepayment date and Final Maturity; and

$P \times (1 - (1 / (1+3\%))$ corresponds to the share of the financed BpiFAE Premium corresponding to P.

Section 11.13.2.    Obligations of the Borrower. Provided that the BpiFAE Insurance Policy complies with Section 11.13.1 and remains in full force and effect, the Borrower shall pay the balance of the BpiFAE Premium calculated in accordance with Section 11.13.1(b) and still owing to BpiFAE on the Actual Delivery Date to BpiFAE on the Actual Delivery Date by directing the Agent in the Loan Request to pay the Additional Advance in respect of the BpiFAE Premium directly to BpiFAE.

Section 11.13.3.    Obligations of the ECA Agent and the Lenders.

a)    Promptly upon receipt of the BpiFAE Insurance Policy from BpiFAE, the ECA Agent shall (subject to any confidentiality undertakings given to BpiFAE by the ECA Agent pursuant to the terms of the BpiFAE Insurance Policy) send a copy thereof to the Borrower.

b)    The ECA Agent shall perform such acts or provide such information, which are, acting reasonably, within its power so to perform or so to provide, as required by BpiFAE under the BpiFAE Insurance Policy as necessary to ensure that the Lenders obtain the support of BpiFAE pursuant to the BpiFAE Insurance Policy.

c)    Each Lender will co-operate with the ECA Agent, the Facility Agent and each other Lender, and take such action and/or refrain from taking such action as may be reasonably necessary, to ensure that the BpiFAE Insurance Policy and each Interest Stabilisation Agreement continues in full force and effect and shall indemnify

and hold harmless each other Lender in the event that the BpiFAE Insurance Policy or such Interest Stabilisation Agreement (as the case may be) does not continue in full force and effect due to its gross negligence or willful default or due to a voluntary change in status which results in it no longer being eligible for CIRR interest stabilisation.

    d)   The ECA Agent shall, in conjunction with the Facility Agent:

        i)   make written requests to BpiFAE seeking a reimbursement of the BpiFAE Premium in the circumstances described in <u>Section 11.13.1(c</u>) promptly after the relevant cancellation or prepayment and (subject to any confidentiality undertakings given to BpiFAE by the ECA Agent pursuant to the terms of the BpiFAE Insurance Policy) provide a copy of the request to the Borrower;

        ii)   use its reasonable endeavours to seek any reimbursement of the BpiFAE Premium to which the ECA Agent is entitled;

        iii)   pay to the Borrower (in the same currency as the refund received from BpiFAE) the full amount of any reimbursement of the BpiFAE Premium that the ECA Agent receives from BpiFAE within two (2) Business Days of receipt with same day value; and

        iv)   relay the good faith concerns of the Borrower to BpiFAE regarding the amount of any reimbursement to which the ECA Agent is entitled, it being agreed that the ECA Agent's obligation shall be no greater than simply to pass on to BpiFAE the Borrower's concerns.

Section 11.14.   <u>LAW AND JURISDICTION</u>

    Section 11.14.1.   <u>Governing Law</u>. This Agreement and any non- contractual obligations arising out of or in respect of this Agreement shall in all respects be governed by and interpreted in accordance with English Law.

    Section 11.14.2.   <u>Jurisdiction</u>. For the exclusive benefit of the Facility Agent and the Lenders, the parties to this Agreement irrevocably agree that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that any proceedings may be brought in those courts. The Borrower irrevocably waives any objection which it may now or in the future have to the laying of the venue of any proceedings in any court referred to in this Section, and any claim that those proceedings have been brought in an inconvenient or inappropriate forum.

    Section 11.14.3.   <u>Alternative Jurisdiction</u>. Nothing contained in this Section shall limit the right of the Facility Agent or the Lenders to commence any proceedings against the Borrower in any other court of competent jurisdiction nor shall the commencement of any proceedings against the Borrower in one or more jurisdictions preclude the commencement of any proceedings in any other jurisdiction, whether concurrently or not.

    Section 11.14.4.   <u>Service of Process</u>. Without prejudice to the right of the Facility Agent or the Lenders to use any other method of service permitted by law, the Borrower irrevocably agrees that any writ, notice, judgment or other legal process shall be sufficiently served on it if addressed to it and left at or sent by post to RCL Cruises Ltd., presently at Building 3, The Heights - Brooklands, Weybridge, Surrey, KT13 0NY, Attention: General Counsel, and in that event shall be conclusively deemed to have been served at the time of leaving or, if posted, at 9:00 am on the third Business Day after posting by prepaid first class registered post.

Section 11.15.   <u>CONFIDENTIALITY.</u> Each of the Facility Agent and the Lenders agrees to maintain and to cause its Affiliates to maintain the confidentiality of all information provided to it by the Borrower or any Subsidiary of the Borrower, or by the Facility Agent on the Borrower's or such Subsidiary's behalf, under this Agreement, and neither it nor any of its Affiliates shall use any such information other than in connection with or in enforcement of this Agreement or in connection with other business now or hereafter existing or contemplated with the Borrower or any Subsidiary, except to the extent such information (i) was or becomes generally available to the public other than as a result of disclosure by it or its Affiliates or their respective directors, officers, employees and agents, or (ii) was or becomes available on a non-confidential basis from a source other than the Borrower or any of its Subsidiaries so long as such source is not, to its knowledge, prohibited from disclosing such information by a legal, contractual or fiduciary obligation to the Borrower or any of its Affiliates; provided, however, that it may disclose such information (A) at the request or pursuant to any requirement of any self-regulatory body, governmental body, agency or official to which the Facility Agent, any Lender or any of their respective Affiliates is subject or in connection with an examination of the Facility Agent, such Lender or any of their respective Affiliates by any such authority or body, including without limitation the Republic of France and any French Authority; (B) pursuant to subpoena or other court process; (C) when required to do so in accordance with the provisions of any applicable requirement of law; (D) to the extent reasonably required in connection with any litigation or proceeding to which the Facility Agent, any Lender or their respective Affiliates may be party; (E) to the extent reasonably required in connection with the exercise of any remedy hereunder; (F) to the Facility Agent or such Lender's independent auditors, counsel, and any other professional advisors of the Facility Agent or such Lender who are advised of the confidentiality of such information; (G) to any participant or assignee, provided that such Person agrees to keep such information confidential to the same extent required of the Facility Agent and the Lenders hereunder; (H) as to the Facility Agent, any Lender or their respective Affiliates, as expressly permitted under the terms of any other document or agreement regarding confidentiality to which the Borrower or any Subsidiary is party with the Facility Agent, such Lender or such Affiliate; (I) to its Affiliates and its Affiliates' directors, officers, employees, professional advisors and agents, <u>provided</u> that each such Affiliate, director, officer, employee, professional advisor or agent shall keep such information confidential to the same extent required of the Facility Agent and the Lenders hereunder; (J) to any other party to the Agreement and (K) to the French Authorities and any Person to whom information is required to be disclosed by the French Authorities. Each of the Facility Agent and the Lenders shall be responsible for any breach of this <u>Section 11.15</u> by any of its Affiliates or any of its or its Affiliates' directors, officers, employees, professional advisors and agents.

Section 11.16.   <u>FRENCH AUTHORITY REQUIREMENTS.</u> The Borrower acknowledges that:

    a)   the Republic of France and any French Authority or any authorised representatives specified by these bodies shall be authorised at any time to inspect and make or demand copies of the records, accounts, documents and other deeds of any or all of the Lenders relating to this Agreement;

    b)   in the course of its activity as the Facility Agent, the Facility Agent may:

        i)   provide the Republic of France and any French Authority with information concerning the transactions to be handled by it under this Agreement; and

        ii)   disclose information concerning the subsidized transaction contemplated by this Agreement in the context of internationally agreed consultation/

notification proceedings and statutory specifications, including information received from the Lenders relating to this Agreement.

Section 11.17.    WAIVER OF IMMUNITY.  To the extent that the Borrower has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its assets, the Borrower hereby irrevocably waives such immunity in respect of its obligations under this Agreement and the other Loan Documents.

Section 11.18.    ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of a Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

    a)   the application of any Write-Down and Conversion Powers by a Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

    b)   the effects of any Bail-in Action on any such liability, including, if applicable:

        i)   a reduction in full or in part or cancellation of any such liability;

        ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

        iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Resolution Authority.

IN WITNESS WHEREOF, the parties hereto have caused this Hull No. **C34** Credit Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

ROYAL CARIBBEAN CRUISES LTD.

By _____
Name:
Title:

Address:

1050 Caribbean Way
Miami, Florida 33132
Facsimile No.: (305) 539-0562 Email: agibson@rccl.com
bstein@rccl.com
Attention: Vice President, Treasurer
With a copy to: General Counsel

Commitment
5.3479946973% of the
Maximum Loan Amount

Citibank N.A., London Branch as Global Coordinator and a Lender

By _____
Name:
Title:

Citigroup Centre Canada Square London E14
5LB United Kingdom

Attention:
Wei-Fong Chan
Kara Catt
Romina Coates
Antoine Paycha

Fax No: +44 20 7986 4881
Tel No: +44 20 7986 3036 /
+44 20 7508 0344
+44 20 7986 4824
+44 20 7500 0907 /

E-mail:
weifong.chan@citi.com
kara.catt@citi.com
romina.coates@citi.com
antoine.paycha@citi.com

Commitment
5.0254557412% of the
Maximum Loan Amount

Banco Santander, S.A., Paris Branch as Lender

By ____
Name:
Title:

| | |
|---|---|
| Lending Office: | 374 rue Saint Honoré 75001 Paris France |
| Operational address: | Ciudad Financiera Avenida de Cantabria s/n Edificio Encinar 2a planta 28600 Boadilla del Monte Spain |
| Attention: | Elise Regnault Julián Arroyo Angela Rabanal Ecaterina Mucuta Vanessa Berrio Ana Sanz Gómez |

Fax No: +34 91 257 1682
Tel No: +34 912893722 /
+1 212-297-2919
+1 212-297-2942
+33 1 53 53 70 46
+34 91 289 10 28
+34 91 289 17 90

| | |
|---|---|
| E-mail: | elise.regnault@gruposantander.com  Julian.Arroyo@santander.us  arabanal@santander.us Ecaterina.mucuta@gruposantander.com    vaberrio@gruposantander.com    anasanz@gruposantander.com MiddleOfficeParis@gruposantander.com |

Commitment
  3.9306454510% of the
  Maximum Loan Amount

BNP PARIBAS as Lender

By ____
  Name:
  Title:

Front Office to keep copied to all matters.

BNPP SA
37 RUE DU MARCHE SAINT HONORE
75001 PARIS
ACI :
CHC03B1
Alexandre de VATHAIRE /
Mauricio GONZALEZ alexandre.devathaire@bnpparibas.com mauricio.gonzalez@us.bnpparibas.com
Tel : 00 331 42 98 00 29/00 1212 841 38 88

Middle Office: For Operational / Servicing matters

KHALID BOUITIDA /
THIERRY ANEZO /
ESTELLE FARNEY
MILLENAIRE 4
35, RUE DE LA GARE
75019 PARIS
ACI :
CVA05A1
khalid.k.bouitida@bnpparibas.com thierry.anezo@bnpparibas.com
estelle.farny@bnpparibas.com
Tel : 00 331 42 98 58 69 / 00 331 43 16 81 57 / 01 40 14 59 84

Back Office : For Standard Settlement Instruction authentication/call-back

STEVE LOUISOR /
VALERIE DUMOULIN
MILLENAIRE 4
35, RUE DE LA GARE
75019 PARIS
ACI :
CVA03A1
paris.cib.boci.ca.3@bnpparibas.com valerie.dumoulin@bnpparibas.com steve.louisor@bnpparibas.com
ls1.loanservicinglisbon@bnpparibas.com
Tel : 00 331 55 77 91 86 / 00 331 40 14 46 59

Commitment
4.2645646367% of the
Maximum Loan Amount

HSBC Continental Europe as Lender

By ____
  Name:
  Title:

HSBC Continental Europe - Global Banking Agency Operations (GBAO) Transaction Manager Unit
103 avenue des Champs Elysées
75008 Paris
France

Attention:
Florencia Thomas
Alexandra Penda
Fax No: +33 1 40 70 28 80
Tel No: +33 1 40 70 73 81 /
+33 1 41 02 67 50
Email: florencia.thomas@hsbc.fr alexandra.penda@hsbc.fr

Copy to:
HSBC Continental Europe
103 avenue des Champs Elysées
75008 Paris
France

Attention:
 Julie Bellais
Celine Karsenty
Fax No: +33 1 40 70 78 93
Tel No: +33 1 40 70 28 59 /
+ 33 1 40 70 22 97
Email: julie.bellais@hsbc.fr celine.karesenty@hsbc.fr

Commitment
 9.9328353079% of the
 Maximum Loan Amount

Société Générale as Lender

By ____
Name:
Title:

Société Générale Facility Office
29 Boulevard Haussmann
75009 Paris
France

For operational/servicing matters:
Bouchra BOUMEZOUED /
Tatiana BYCHKOVA
Société Générale 189, rue d'Aubervilliers 75886
PARIS CEDEX 18 OPER/FIN/CAF/DMT6
Phone: +33 1 57 29 13 12 / +33 1 58 98 43 05
Email: bouchra.boumezoued@sgcib.com tatiana.bychkova@sgcib.com
par-oper-caf-mt6@sgcib.com

For credit matters:
Francois ROLLAND /
Mohamed MEROUANE
Société Générale
189, rue d'Aubervilliers
75886
PARIS CEDEX 18 GBSU/FTB/SMO/EXT
Phone: +33 1 58 98 17 78 / +33 1 58 98 92 06

Email: list.par-gbsu-ftb-smo-ext-aom @sgcib.com

Commitment
2.7360453298% of the
Maximum Loan Amount

SMBC Bank International plc as ECA Agent and a Lender

BD-#38105238-v3   99

By    ____
Name:
Title:

1/3/5 rue Paul Cézanne,
75008 Paris,
France
Attention:
Cedric Le Duigou
Guillaume Branco
Herve Billi
Claire Lucien
Helene Ly
Fax No: +33 1 44 90 48 01
Tel No:
Cedric Le Duigou: +33 1 44 90 48 83
Guillaume Branco: +33 1 44 90 48 71
Herve Billi: +33 1 44 90 48 48
Claire Lucien: +33 1 44 90 48 49
Helene Ly: +33 1 44 90 48 76

E-mail :
cedric_leduigou@fr.smbcgroup.com guillaume_branco@fr.smbcgroup.com
herve_billi@fr.smbcgroup.com helene_ly@fr.smbcgroup.com claire_lucien@fr.smbcgroup.com

Commitment
68.7624588361% of the
Maximum Loan Amount

SFIL as Lender

By   ____
Name:
Title:

1-3, rue de Passeur de Boulogne - CS 80054
92861 Issy-les-Moulineaux Cedex 9
France

Contact Person
Loan Administration Department:
Direction du Crédit Export:
Pierre-Marie Debreuille / Anne Crépin
Direction des Opérations:
Dominique Brossard / Patrick Sick
Telephone:
Pierre-Marie Debreuille
+33 1 73 28 87 64
Anne Crépin +33 1 73 28 88 59
Dominique Brossard +33 1 73 28 91 93
Patrick Sick +33 1 73 28 87 66

Email:
pierre-marie.debreuille@sfil.fr
anne.crepin@sfil.fr
dominique.brossard@sfil.fr
patrick.sick@sfil.fr
refinancements-export@sfil.fr
creditexport_ops@sfil.fr
Fax: + 33 1 73 28 85 04

Citibank Europe plc, UK Branch as Facility Agent

By ____

  Name:

  Title:

5th Floor Citigroup
Centre Mail drop CGC2 05-65
25 Canada Square Canary Wharf
London E14 5LB
U.K.

Fax no.: +44 20 7492 3980

Attention: EMEA Loans Agency

March 1, 2022

Board of Directors
Royal Caribbean Cruises Ltd.
1050 Caribbean Way
Miami, FL 33132

Dear Directors:

We are providing this letter to you for inclusion as an exhibit to Royal Caribbean Cruises Ltd.'s (the "Company") Annual Report on Form 10-K for the year ended December 31, 2021 (the "Form 10-K") pursuant to Item 601 of Regulation S-K.

We have audited the consolidated financial statements included in the Form 10-K and issued our report thereon dated March 1, 2022.  Note 1 to the financial statements describes a change in accounting principle related to the removal of the three-month reporting lag for Silversea Cruises.  It should be understood that the preferability of one acceptable method of accounting over another for consolidation procedures has not been addressed in any authoritative accounting literature, and in expressing our concurrence below we have relied on management's determination that this change in accounting principle is preferable.  Based on our reading of management's stated reasons and justification for this change in accounting principle in the Form 10-K, and our discussions with management as to their judgment about the relevant business planning factors relating to the change, we concur with management that such change represents, in the Company's circumstances, a change to a preferable accounting principle in conformity with Accounting Standards Codification 250, *Accounting Changes and Error Corrections.*

Very truly yours,

/s/ PricewaterhouseCoopers LLP
Hallandale Beach, Florida

Exhibit 21.1

**LIST OF SUBSIDIARIES**

The following is a list of all our subsidiaries, their jurisdiction of incorporation and the names under which they do business. This list does not include those subsidiaries that, in the aggregate, would not have been a "significant subsidiary" as of December 31, 2021.

| NAME | INCORPORATION |
|---|---|
| Admiral Management Inc. | Liberia |
| Adventure of the Seas Inc. | Liberia |
| Allure of the Seas Inc. | Liberia |
| Anthem of the Seas Inc. | Liberia |
| Brilliance of the Seas Shipping Inc. | Liberia |
| Canodros CL | Ecuador |
| Celebrity Apex Inc. | Liberia |
| Celebrity Cruise Lines Inc. | Cayman Islands |
| Celebrity Cruises Holdings Inc. | Liberia |
| Celebrity Cruises Inc., doing business as Celebrity Cruises | Liberia |
| Celebrity Eclipse Inc. | Liberia |
| Celebrity Edge Inc. | Liberia |
| Celebrity Equinox Inc. | Liberia |
| Celebrity Reflection Inc. | Liberia |
| Celebrity Silhouette Inc. | Liberia |
| Celebrity Solstice Inc. | Liberia |
| Constellation Inc. | Liberia |
| Enchantment of the Seas Inc. | Liberia |
| Explorer of the Seas Inc. | Liberia |
| Freedom of the Seas Inc. | Liberia |
| GG Operations Inc. | Delaware |
| Global Fleet Management LLC | Liberia |
| Global Fleet Management Two LLC | Liberia |
| Grandeur of the Seas Inc. | Liberia |
| Greensboro S.L. | Spain |
| Harmony of the Seas Inc. | Liberia |
| Independence of the Seas Inc. | Liberia |
| Infinity Inc. | Liberia |
| Island for Science, Inc. | Indiana |
| Islas Galapagos Turismo y Vapores CA | Ecuador |
| Jewel of the Seas Inc. | Liberia |
| Labadee Investments Ltd. | Cayman Islands |
| Liberty of the Seas Inc. | Liberia |
| Mariner of the Seas Inc. | Liberia |
| Millennium Inc. | Liberia |
| Navigator of the Seas Inc. | Liberia |
| Oasis of the Seas Inc. | Liberia |
| Oceanadventures S.A. | Ecuador |
| Odyssey of the Seas Inc. | Liberia |
| Ovation of the Seas Inc. | Liberia |
| Quantum of the Seas Inc. | Liberia |
| Radiance of the Seas Inc. | Liberia |
| RCI Holdings LLC | Liberia |

| | |
|---|---|
| RCL Cruise Holdings LLC | Liberia |
| RCL Cruises Ltd. | England and Wales |
| RCL GEO LLC | Florida |
| RCL Holdings Cooperatief U.A. | Netherlands |
| RCL Horizon LLC | Liberia |
| RCL Investments Ltd. | England and Wales |
| RCL Monarch LLC | Liberia |
| RCL New Vessel Holding Company LLC | Liberia |
| RCL Sovereign LLC | Liberia |
| RCL TUI Cruises German Holding GmbH & Co. KG | Germany |
| RCL (UK) Ltd. | England and Wales |
| RCL Worldwide (Hong Kong) Limited | Hong Kong |
| RCL Worldwide Ltd. | Liberia |
| RCL Zenith LLC | Liberia |
| Rhapsody of the Seas Inc. | Liberia |
| Royal Caribbean Cruise Lines AS | Norway |
| Royal Caribbean Cruises (Asia) Pte. Ltd. | Singapore |
| Royal Caribbean Cruises Services (China) Company Limited | China |
| Serenade of the Seas Inc. | Liberia |
| SG Cruises GmbH | Switzerland |
| SG Expeditions Cyprus Limited | Cyprus |
| SG Expeditions SAGL | Switzerland |
| Silver Cloud Shipping Co. Ltd. | Bahamas |
| Silversea Cruise Finance Ltd. | Bahamas |
| Silversea Cruise Holding Ltd. | Bahamas |
| Silversea Cruises Australia Pty. Ltd. | Australia |
| Silversea Cruises Canada Ltd. | Canada |
| Silversea Cruises (Europe) Ltd. | England and Wales |
| Silversea Cruises Ltd. | Bahamas |
| Silversea Cruises South Africa Pty. Ltd. | South Africa |
| Silversea Cruises (UK) Ltd. | England and Wales |
| Silversea New Build Seven Ltd. | Bahamas |
| Silversea RCL Holdings LLC | Liberia |
| Silversea SAM | Monaco |
| Silver Muse Shipping Co. Ltd. | Bahamas |
| Silver Shadow Shipping Co. Ltd. | Bahamas |
| Silver Spirit Shipping Co. Ltd. | Bahamas |
| Silver Wind Shipping Ltd. | Bahamas |
| Societe Labadee Nord, S.A. | Haiti |
| Spectrum of the Seas Inc. | Liberia |
| Summit Inc. | Liberia |
| Symphony of the Seas Inc. | Liberia |
| Torcat Enterprises Limitada | Costa Rica |
| Vision of the Seas Inc. | Liberia |
| Voyager of the Seas Inc. | Liberia |
| Whisper SpA | Italy |
| White Sand Inc. | Liberia |
| XP Tours S.A. | Ecuador |

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (No. 333-253674) and Form S-8 (Nos. 333-257442, 333-228427, 333-202263, 333-170170, 333-157097, 333-84982, 333-84980, 333-42070 and 333-42072) of Royal Caribbean Cruises Ltd. of our report dated March 1, 2022 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Hallandale Beach, Florida
March 1, 2022

faegre
drinker

faegredrinker.com

**Faegre Drinker Biddle & Reath** LLP One Logan Square, Suite 2000 Philadelphia, Pennsylvania 19103
+1 215 988 2700 main
+1 215 988 2757 fax

January 13, 2022

Royal Caribbean Cruises Ltd. 1050 Caribbean Way
Miami, FL 33132

> Re:   <u>Form 10-K for Year Ended December 31, 2021</u>

Dear Sirs and Mesdames:

You have asked for our opinion on certain U.S. Federal tax matters relating to Royal Caribbean Cruises Ltd. (the "Company") and its direct and indirect subsidiaries. For purposes of rendering our opinion, we have, when relevant facts were not independently established, relied upon information provided by representatives of the Company.

<u>Certain Factual Assumptions</u>

In issuing our opinion, we have relied upon representations and/or publicly available information that:

(1)   the Company and its direct and indirect wholly-owned subsidiaries that own, charter or operate a ship or ships consist of:

(a) corporations formed under the laws of Liberia;

(b)   a United Kingdom company (the "UK Disregarded Entity") for which a valid and timely election was filed with the Internal Revenue Service (the "IRS") on Form 8832 to be classified as a pass-through entity for U.S. Federal income tax purposes, and the equity interests in which are owned entirely by the Company;

(c)   an Ecuadorean corporation (the "Ecuador Subsidiary") that owns and operates a ship used for Galapagos Islands cruises that are conducted entirely outside the United States; and

(d)   Silversea Cruise Holding Ltd., a Bahamian company, and wholly- owned direct and indirect subsidiaries of it (collectively, the "Silversea Entities");

(2)   valid and timely elections were filed with the IRS on Forms 8832 to cause each of the Silversea Entities to be classified as a disregarded entity for U.S. Federal income tax purposes, effective January 1, 2021;

ACTIVE.135177684.03

(3)    the common stock of the Company is the Company's only outstanding class of stock, and there are currently more than 200 million common shares outstanding;

(4)    all outstanding shares of common stock of the Company are listed for trading on the New York Stock Exchange (the "NYSE"), where those shares are regularly quoted by dealers making a market in the stock (by regularly and actively offering to make, and making, purchases and sales of such shares in the ordinary course of business to and from customers who are not related persons with respect to the dealers), and Company shares are not traded on any non-U.S. securities market;

(5)    trades of Company common stock are effected on the NYSE in other than *de minimis* quantities on at least 60 days during each year, and the aggregate number of such shares traded on the NYSE each year equals or exceeds 10% of the average number of shares of Company common stock outstanding during the year;

(6)    the NYSE is a national securities exchange that is registered under section 6 of the Securities Act of 1934;

(7)    more than 50% of the outstanding shares of Company common stock are (and will be for at least 183 days during the current year) owned by persons each of whom owns less than 5% of such outstanding shares (treating as one person for this purpose any two or more persons who are related within the meaning of section 267(b) of the Internal Revenue Code of 1986, as amended (the "Code")), ₁ and no such shares (or any shares of a subsidiary of the Company) are in bearer form;

(8)    the Company's certificate of incorporation precludes any person from acquiring more than 4.9% of the outstanding shares of Company's common stock (treating as one person for this purpose any two or more persons who are related within the meaning of Code section 267(b)), except that this restriction does not apply to existing 5% shareholders of the Company and may not apply, under Liberian law, to shares that were not voted in favor of the adoption of such restriction; and

(9)    the Company and each relevant subsidiary will comply with all applicable substantiation and reporting requirements set forth in Treasury Regulation §§1.883-1(c)(3), 1.883-2(e) and (f), and 1.883-4(d).

<u>Discussion</u>

Under Code section 883, certain foreign corporations are exempt from U.S. Federal income tax and branch profits tax on income derived from or incidental to the international

---

¹ Code §267(b) describes a number of relationships between two or more persons, including members of the same family, a grantor and a fiduciary of a trust, a fiduciary and a beneficiary of a trust, and various other relationships between individuals and entities and between entities. Additional attribution rules applicable under Code §267(b) are set forth in Code §267(c).

ACTIVE.135177684.03

operation of a ship or ships, including income from the leasing of such ships. [2] A foreign corporation will qualify for the benefits of section 883 if, in relevant part, (1) the foreign country in which the foreign corporation is organized grants an equivalent exemption to corporations organized in the United States, and (2) (a) more than 50% of the value of the corporation's capital stock is owned, directly or indirectly, by individuals who are residents of a foreign country or countries that grant such an equivalent exemption to corporations organized in the United States or (b) the stock of the corporation is "primarily and regularly traded on an established securities market" in the United States or another qualifying country. [3] If the stock of a parent corporation meets the test of clause (2)(b), then any stock of a direct or indirect subsidiary is treated for purposes of clause (2)(a) as if it were owned by individual residents of the country of incorporation of the parent corporation. [4]

The Company and each direct and indirect wholly-owned subsidiary that owns, charters or operates a ship or ships that generates U.S.-source international shipping income will meet the requirements of clause (1) above because Liberia is a country that grants an equivalent exemption for all relevant categories of international shipping income. [5] For this purpose, the Company will be treated as the owner or operator of all ships owned or operated by the UK Disregarded Entity and likewise for all ships owned or operated by the Silversea Entities. Lastly, the vessel owned and operated by the Ecuador Subsidiary does not visit U.S. ports, or otherwise operate in U.S. waters, so the Ecuador Subsidiary will have no U.S.-source shipping income. [6]

With respect to the requirements of clause (2)(b) above, regulations and other guidance under Code section 883 set forth the tests applicable to determine whether a corporation's shares of stock should be considered "primarily and regularly traded on an established securities market" in the United States or another qualifying country. One or more classes of stock of the corporation that, in the aggregate, represent more than 50% of the vote and value of the stock of the corporation must be listed on such a market and must meet the applicable tests for being "primarily and regularly traded" on such market. [7]

---

[2] Code §883(a) provides that, to the extent that it applies, the relevant items of shipping income "shall not be included in gross income" of the corporation and "shall be exempt from taxation under this subtitle," which is the subtitle regarding income taxes.

[3] Code §§883(a)(1), (c)(1), (c)(3)(A).

[4] Code §883(c)(3)(B).

[5] Rev. Rul. 2008-17, 2008-1 C.B. 626; *see* Exchange of Notes Between Liberia Ministry of Foreign Affairs, dated Oct. 7, 1987, and U.S. Embassy, Monrovia, Liberia, dated Oct. 23, 1987, *reprinted at* 1988-1 C.B. 463; Exchange of Notes Between Liberia Ministry of Foreign Affairs, dated Dec. 9, 2004, and U.S. Embassy, Monrovia, Liberia, dated June 4, 2005.

[6] Code §863(c). An Ecuador corporation may also qualify for the equivalent exemption. According to Rev. Rul. 2008-17, the internal tax law of Ecuador provides an equivalent exemption for international shipping income, based on the IRS's review of Ecuador tax law as of December 1989. Thus, unless that aspect of Ecuador tax law has changed in the interim, the Ecuador Subsidiary would be eligible for the benefits of §883 were it to have any U.S-source international shipping income.

[7] Treas. Reg. §1.883-2(d)(1)(i).

The Company's common shares are traded on an established securities market in the United States. The NYSE constitutes an established securities market for purposes of section 883 because it is a "national securities exchange that is registered under section 6 of the Securities Act of 1934." [8] The Company's common stock is its only class of outstanding equity as a legal and Federal tax matter.[9]

The Company's shares are considered "primarily" traded on the NYSE because the number of such shares traded on the NYSE during the year exceeds the number of such shares traded on any other established securities market during that year. [10]

Stock will generally be considered "regularly traded" on a securities market if trades in more than *de minimis* quantities occur on the market on at least sixty days of the year, and the annual trading volume on the market equals or exceeds 10% of the outstanding shares.[11] The Company's shares also meet this test with respect to the NYSE. The Company's shares also meet an alternative basis for such a conclusion with respect to the NYSE, inasmuch as the stock is regularly quoted by dealers making a market in the stock. [12]

If, for at least half the number of days in the year, 50% or more of a corporation's outstanding shares are owned by 5% or greater shareholders other than registered investment companies (a "closely-held group"), the regulations under Code section 883 provide that the shares generally will fail to be treated as "regularly traded" unless the corporation can identify sufficient qualified direct or indirect shareholders within the closely-held group as to reduce to 50% or less the aggregate shares owned by the closely-held group that are not owned, directly or indirectly, by qualified shareholders.[13] Less than 50% of the Company's outstanding shares are owned by such 5% or greater shareholders, so the Company is not disqualified by reason of the closely-held exception. The restriction in the Company's certificate of incorporation described in paragraph (8) above is designed to ensure that this will continue to be the case.

So long as the Company meets the requirements of clause (2)(b) above, then each subsidiary in which the Company owns, directly or indirectly, more than 50% of the value of the

---

[8] Treas. Reg. §1.883-2(b)(1)(ii).

[9] Although the Company issued convertible senior notes in June 2020 and October 2020, all of those notes have substantially more debt characteristics than equity characteristics, so there is no reason to believe they should upon issuance have been treated as a class of equity rather than debt for Federal income tax purposes. They provide creditor-type remedies, a 3-year term, and semi-annual cash interest payments at the relatively low interest rate of 4.25% per year in the case of the notes issued in June and 2.875% per year in the case of the notes issued in October, and are *pari passu* with trade creditors a nd with more than $5 billion of mostly longer-term unsecured loa ns of the Company; the Company is not thinly capitalized; the conversion price for the notes issued in June was approximately 25% higher than the last reported sale price of the Company's common stock on the pricing date and for the notes issued in October was approximately 36% higher than the last reported sale of the Company's common stock on the pricing date; and the convertible notes were not sold exclusively to the existing common stockholders of the Company.

[10] Treas. Reg. §1.883-2(c).

[11] Treas. Reg. §1.883-2(d)(1)(ii).

[12] Treas. Reg. §1.883-2(d)(2).

[13] Treas. Reg. §1.883-2(d)(3).

stock, and that meets the requirements of clause (1) above, will meet the requirements of clause (2)(a) above.

<u>Conclusion</u>

Based upon, and subject to the factual representations and assumptions described above, and the legal authorities and limitations set forth below, it is our opinion that the income derived from a U.S. trade or business and/or from sources within the United States by the Company, and by its subsidiaries that own or operate a ship or ships, is excluded from gross income for U.S. Federal income tax purposes pursuant to Code section 883 to the extent derived from or incidental to the international operation of a ship or ships.

*   *   *   *   *

This opinion represents our best legal judgment, but it has no binding effect or official status of any kind, and no assurance can be given that contrary positions may not be taken by the IRS or a court considering the issues. We express no opinion relating to any Federal income tax matter except on the basis of the facts described above, and any changes in such facts could require a reconsideration and modification of our opinion. We also express no opinion regarding tax consequences under foreign, state or local laws. In issuing our opinion, we have relied solely upon existing provisions of the Code, existing and proposed regulations under it, and current administrative positions and other authorities. Those laws, regulations, administrative positions and other authorities are subject to change at any time. Any such changes could affect the validity of the opinion set forth above. Also, future changes in Federal tax laws and the interpretation thereof can have retroactive effect.

Our firm includes lawyers admitted to practice in the Commonwealth of Pennsylvania, the States of California, Colorado, Connecticut, Delaware, Illinois, Indiana, Iowa, Minnesota, New Jersey, New York, Texas, the District of Columbia, the United Kingdom and China. We do not purport to be experts in the laws of any other jurisdiction, aside from U.S. Federal law.

Very truly yours,

FAEGRE DRINKER BIDDLE & REATH LLP

ACTIVE.135177684.03

**POWER OF ATTORNEY**

**DIRECTORS OF**
**ROYAL CARIBBEAN CRUISES LTD.**

The undersigned directors of Royal Caribbean Cruises Ltd., a Liberian corporation (the "Company"), hereby constitute and appoint Jason T. Liberty and Naftali Holtz and each of them (with full power to each of them to act alone), the true and lawful attorneys-in-fact and agents for the undersigned, and on behalf of the undersigned and in the name, place and stead of the undersigned, in any and all capacities, to sign the Annual Report on Form 10-K for the fiscal year ended December 31, 2021 to be filed by the Company with the Securities and Exchange Commission under the provisions of the Securities Exchange Act of 1934, and any and all amendments, applications, or other documents to be filed with the Securities and Exchange Commission pertaining to such Annual Report on Form 10-K, with full power and authority to do and perform any and all acts and things whatsoever required and necessary to be done in the premises, as fully to all intents and purposes as the undersigned could do if personally present. The undersigned hereby ratify and confirm all that said attorneys-in-fact and agents may lawfully do or cause to be done by virtue hereof.

EXECUTED as of the 1 day of March 2022.

/s/ John F. Brock
John F. Brock – Director

/s/ Richard D. Fain
Richard D. Fain – Chairman

/s/ Stephen R. Howe Jr.
Stephen R. Howe Jr. – Director

/s/ William L. Kimsey
William L. Kimsey – Director

/s/ Michael O. Leavitt
Michael O. Leavitt – Director

/s/ Amy C. McPherson
Amy C. McPherson – Director

/s/ Maritza G. Montiel
Maritza G. Montiel – Director

/s/ Ann S. Moore
Ann S. Moore – Director

/s/ Eyal M. Ofer
Eyal M. Ofer – Director

/s/ William K. Reilly
William K. Reilly – Director

/s/ Vagn O. Sørensen
Vagn O. Sørensen – Director

/s/ Donald Thompson
Donald Thompson – Director

/s/ Arne Alexander Wilhelmsen
Arne Alexander Wilhelmsen – Director

Exhibit 31.1

**CERTIFICATIONS**

I, Jason T. Liberty, certify that:

1. I have reviewed this annual report on Form 10-K of Royal Caribbean Cruises Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:       March 1, 2022

/s/ Jason T. Liberty
Jason T. Liberty
President and
Chief Executive Officer
(Principal Executive Officer)

**CERTIFICATIONS**

I, Naftali Holtz, certify that:

1. I have reviewed this annual report on Form 10-K of Royal Caribbean Cruises Ltd.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:      March 1, 2022

/s/ Naftali Holtz
Naftali Holtz
Chief Financial Officer
(Principal Financial Officer)

**Exhibit 32.1**

In connection with the annual report on Form 10-K for the year ended December 31, 2021 as filed by Royal Caribbean Cruises Ltd. with the Securities and Exchange Commission on the date hereof (the "Report"), Jason T. Liberty, President and Chief Executive Officer, and Naftali Holtz, Chief Financial Officer, each hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Royal Caribbean Cruises Ltd.

Date:     March 1, 2022

By:     /s/ Jason T. Liberty
        Jason T. Liberty
        President and
        Chief Executive Officer
        (Principal Executive Officer)

By:     /s/ Naftali Holtz
        Naftali Holtz
        Chief Financial Officer
        (Principal Financial Officer)